UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
CARL MARTIN                 * CRIMINAL FILE NO. 19-157

JURY TRIAL
Monday, June 6, 2022
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        Senior District Judge

APPEARANCES:

    WENDY L. FULLER, ESQ., and ANDREW C. GILMAN, ESQ.,
        Assistant United States Attorneys, Federal
        Building, Burlington, Vermont; Attorneys for the
        United States

    CHANDLER W. MATSON, ESQ., The Law Offices of
        Chandler W. Matson, 125 Mountain Road, Stowe,
        Vermont; Attorney for Defendant Carl Martin

ANNE NICHOLS PIERCE
United States District Court Reporter (ret'd.)
*fortherecordinvermont@gmail.com*

# I N D E X

### M I S C E L L A N E O U S

|                            | PAGE |
| -------------------------- | ---- |
| Jury drawn                 | 18   |
| Jury sworn                 | 25   |
| Initial charge to jury     | 25   |

**OPENING STATEMENTS**

| Mr. Gilman | 35 |
| Mr. Matson | 42 |

### E X A M I N A T I O N

| WITNESS NAME          | PAGE | LINE |
| --------------------- | ---- | ---- |
| **BRIAN WOOD**        |      |      |
| Direct by Ms. Fuller  | 49   | 5    |

### E X H I B I T S

| GOVERNMENT'S | DESCRIPTION                                     | IN EVIDENCE |
| ------------ | ---------------------------------------------- | ----------- |
| 1            | Map of Price Chopper/Cottage Grove/Heritage Aviation | 63    |
| 2            | Map of McDonald's/ Grey Birch Drive            | 63          |
| 3            | Text messages - 8/16/2019 - 8/26/2019          | 56          |
| 4            | Video from 8/22/2019 text message              | 63          |
| 6            | Video of 8/26/2019 controlled buy              | 63          |
| 7            | Transcript of 8/26/2019 buy                    | 63          |
| 10           | Photo of lunch container                       | 63          |
| 11           | Photo of cocaine                               | 63          |
| 13           | Photo of white substance on scale              | 63          |
| 14           | Text messages - 8/29/2019 - 9/5/2019           | 56          |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 16 | Video of 9/15/2019 controlled buy | 63 |
| 17 | Transcript of 9/5/2019 buy | 63 |
| 21 | Photo of box and cocaine | 63 |
| 22 | Photo of white substance on scale | 63 |
| 25 | Text messages - 9/13/2019 - 9/17/2019 | 56 |
| 26 | Text messages - 9/18/2019 - 9/20/2019 | 56 |
| 27 | Text messages - 9/20/2019 - 9/21/2019 | 56 |
| 29 | Video of 9/20/2019 controlled buy | 63 |
| 30 | Transcript of 9/20/2019 buy | 63 |
| 33 | Photo of white substance on scale | 63 |
| 34 | Text messages - 9/21/2019 - 10/23/2019 | 56 |
| 38 | Photo of prop gun | 63 |
| 45 | Photo of larger bag of white substance on scale | 63 |
| 47 | Photo of smaller bag of white substance on scale | 63 |
| 52 | Photos of items found in car | 63 |
| 66 | DEA Exhibit 8:  Cocaine | 63 |
| 70 | DEA Exhibit 9:  Cocaine | 63 |
| 75 | DEA Exhibit 10:  Cocaine | 63 |
| 94 | Photo of Bryan Correa Santiago | 63 |
| 117 | ATF reverse gun | 63 |
| 128 | Text messages - 8/4/2019 - 8/9/2019 | 56 |

# <u>I N D E X</u>

**E X H I B I T S**

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 129 | Text messages - 8/9/2019 - 8/16/2019 | 56 |

1    MONDAY, JUNE 6, 2022

2    (The following was held in chambers at 9:05 a.m.)

3            THE COURT:  Okay.  We are in chambers.  All

4    counsel are present.  Well, I guess all -- I think -- is

5    Owen Foster going to help try the case?

6            MS. FULLER:  No, he is not, your Honor.  Just

7    the two of us.

8            THE COURT:  Okay.

9        I just wanted to bring up a preliminary question.

10   When I talk to the jury in voir dire, ordinarily

11   identify the counts, two counts have been dismissed.

12   Technically I think you take Counts 5, 6, 7 and 8 and

13   reduce those numbers by two, so what the jury would

14   actually get would be Counts 1 through 6, I think.

15   Right?

16           MS. FULLER:  That's what I have it as.

17           THE COURT:  So it's a modification of the

18   indictment, but I think that's it logical; otherwise,

19   you have to try to explain why Counts 3 and 4 --

20           MS. FULLER:  I can't remember.  Does

21   your Honor want our office to go and revise the

22   indictment for you?

23           THE COURT:  Yes.

24           MS. FULLER:  Okay.

25           THE COURT:  I think so.

1        MS. FULLER:  Before jury draw or --

2        THE COURT:  No.

3        MS. FULLER:  Okay.

4        THE COURT:  I can adjust.  All right.

5     Then the next thing:  We are here just on the

6  entrapment defense.  I have taken -- at least I have

7  instructed Claire to write an instruction which combines

8  your submissions and the Sand instruction.  This is

9  almost identical to the Sand instruction except I have

10  added -- or suggested it be added, and it's been added,

11  the solicitation definition, which I think is a good

12  idea, and both of you had the same solicitation

13  instruction.

14     So my question is whether you have any objections

15  to the entrapment instruction?

16        MR. GILMAN:  Your Honor, for the government,

17  Andrew Gilman, just for the record.

18        THE COURT:  Yes.

19        MR. GILMAN:  We appreciate the Court's effort

20  to construct this instruction, and it does incorporate

21  elements, it seems, for both the prosecution and defense

22  instructions.

23     Since we filed our instructions, the defense theory

24  of the case has come more to light to the government,

25  and it seems that the defense intends to try to address

1    or admit evidence of controlled purchases by Vermont

2    state drug task force in to the defendant in October of

3    2018, which predates, really, the factual nexus in our

4    case by almost a year.  By about approximately nine

5    months or so.

6              THE COURT:  Okay.

7              MR. GILMAN:  And so with that theory, it

8    presents an issue with some of the wording in the

9    instruction.  Specifically the wording starting at the

10   end of the first paragraph, which says:  "If it was the

11   government who also persuaded him to commit the crime,

12   and if he was not ready and willing to commit the crime

13   before the government officials or agents first spoke

14   with him."

15        So if that evidence is coming in regard to the

16   2018, that's entirely before, you know, the confidential

17   informant was introduced to him in the summer of 2018,

18   and then we have the four undercover purchases that are

19   late summer and fall of 2019, and so this doesn't fairly

20   address the evidence, in the government's view, that if

21   he had to be ready and before the government had any

22   contact with him.

23        The charged conduct really -- the four counts are

24   August 26, September 5, September 20, October 23.  And

25   so that's really where the case is going to be focused.

1          We also have evidence he was dealing to other

2     people, so he is -- he is not just -- the evidence will

3     show he is not just a drug dealer with respect to the

4     government agent, but to other people, and that is very

5     probative evidence of his -- of course, the crime.

6               THE COURT:  The disposition.

7               MR. GILMAN:  The disposition.

8               THE COURT:  What's the problem?  Let me just

9     ask the defense:  Is your theory that back in 2018,

10    when -- there must have been other sales.

11              MR. MATSON:  Two sales in October 2018.

12              THE COURT:  Okay.  Are you suggesting that

13    that was the time when the government induced him to

14    start selling drugs?

15              MR. MATSON:  That was one of the times.  Two

16    of the times, I should say.  And then it recommenced in

17    the summer of 2019.  I think there is a -- and the case

18    will reflect it, to Mr. Gilman's point, there are cases

19    that address sort of this -- the timing that a -- a

20    defendant may be induced the first time and likes it,

21    right?  And down the line, a year later, there may be

22    inducement -- but at this point he is predisposed -- at

23    that point.

24              THE COURT:  So is this inducement through the

25    confidential informant?

1          MR. MATSON:  Yes.

2          THE COURT:  Or is this inducement through

3     agents who dealt with him in 2018?

4          MR. MATSON:  Agents dealing with the

5     confidential informant inducing Carl Martin directly.

6     In 2018.

7          THE COURT:  That's in 2018.

8          MR. MATSON:  Yes.  And then they do the same

9     thing in 2019, your Honor.

10          THE COURT:  Oh, okay.

11          MR. MATSON:  The first three controlled

12     purchases, two of which have been dismissed.  But the

13     last three -- the confidential informant, at least to

14     start -- the third controlled purchase introduced the

15     undercover, and then the final sales are all undercover.

16          THE COURT:  Okay.  So what is the problem in

17     the language of the entrapment instruction?

18          MR. GILMAN:  So it's really -- it's the phrase

19     around it, where it is italicized:  If he was not ready

20     and willing to commit the crime *before* the government

21     officials or agents first spoke with him.

22          If the defense is able to admit that first buy, you

23     know, in October of -- or, sorry, those buys in October

24     2018, the marker is going to be -- all evidence that

25     occurred prior to that is going to be predisposition.

1           But, I mean, that's really not a fair view of the

2     evidence in this case, which shows that the defendant

3     was intimately involved in selling drugs not just to the

4     government but to other people.  And I think, for

5     instance, it might be better if the jury were instructed

6     to consider entrapment as to each count.  I mean,

7     that --

8           THE COURT:  Is there a section in here which

9     says you have to deal with that count by count?

10          MR. GILMAN:  I don't see that --

11          THE COURT:  Yeah.

12          MR. GILMAN:  -- language, but I think that

13    would help address it.  I mean, essentially the defense

14    theory is that -- I mean, this instruction would allow

15    the defense to argue, which is just contrary to the

16    evidence, that the government turned Mr. Martin into a

17    drug dealer, and once the government did that, you know,

18    that's it.  That's the end.  Because he can't be found

19    guilty.  But the evidence is going to show that he was

20    engaged in drug dealing and lots of activities with

21    respect to firearms with all sorts of people.  And so

22    it's not -- doesn't accurately state, I think, the

23    criminal liability here.

24          MS. FULLER:  I think the biggest problem,

25    there's such a gap in time between what Mr. Matson is

1    talking about, the fall of 2018, to when ATF steps in in

2    June of 2019 and when our charges start.  So we are

3    concerned about the idea that even if they were to find,

4    you know, some -- some improper inducement in the fall,

5    they need to find it again come August of -- you know,

6    August 26th, 2019, when our first count is; and that's a

7    huge gap in time.  And I think we just want it clear

8    that because it happens to him once, it doesn't sort of

9    carry over.

10              THE COURT:  Yeah, my -- I don't see it

11    actually in this instrument -- this -- is there --

12    there's a section I remember in which each count is to

13    be addressed.  I am missing page two.  Do you have that?

14              LAW CLERK:  You are missing -- I don't know

15    why that is.  But, no, I don't think there's a line in

16    here right now that says it needs to be addressed.

17              THE COURT:  Oh, I must have seen that in one

18    of the instructions.  I think that's important.  So I

19    would add that they need to address each one of the

20    counts separately on the question of entrapment, and

21    maybe that would resolve your concern.  But that's the

22    law.  And you gotta take entrapment in regard to each

23    count, right?

24              MR. MATSON:  I do agree that's the law.  I

25    think it -- I'd like to see the final wording because I

1    don't think it reflects -- again, when you have a

2    continuing course of conduct, and Count 1 is a

3    conspiracy, there's a time when the person -- and I have

4    seen this argument in the same case all reflected --

5    when the person becomes ready, willing and able.  It

6    might not have been on day one, but day 10 they joined

7    it, right, and they were predisposed to it, and that's a

8    perfectly reasonable argument.

9         So as long as it reflects that line of case law, I

10   have no problem.

11             THE COURT:  I guess my question is:  Do I need

12   to resolve this language now?  You are not going to be

13   using this instruction in your opening statement.

14             MS. FULLER:  The government isn't, your Honor.

15             THE COURT:  Right?

16             MR. MATSON:  No, your Honor.

17             THE COURT:  Okay.  So -- all right.  I'll

18   take that under consideration --

19             MR. MATSON:  There's a typo on page two.

20   Sixth line down:  If you find beyond a reasonable doubt;

21   not if you find a reasonable doubt.  If you find beyond

22   a reasonable doubt.

23        Oh, no.  There's no typo.  I'm sorry.

24             LAW CLERK:  That's okay.

25             MR. MATSON:  I was just so enthusiastic about

1    finding typos.

2              THE COURT:  Right.

3              MR. MATSON:  So, Judge, I put in a portion

4    about how they should consider predisposition, and I

5    understand predisposition obviously comes in, but it

6    comes in for a purpose, to show predisposition.  It

7    doesn't come in to show bad guy.  And certain evidence

8    is going to come out, I am going to argue that's not

9    predisposition, right?  It's irrelevant to the

10   predisposition.  So I put in a limiting instruction in

11   mine.  I don't see it here.  I would ask for it.

12             THE COURT:  Okay.  Let me take a look at it.

13             MR. GILMAN:  I believe it is in this proposed

14   instruction, your Honor.  Looking at page two of the

15   final complete paragraph, this instruction:  You may

16   consider such evidence -- referring to predisposition

17   evidence -- however, solely in connection with your

18   determination of his predisposition or readiness to

19   commit the offense for which he is charged.  I think

20   that fairly addresses the limiting nature of that

21   instruction.

22             THE COURT:  Solely in connection with your

23   determination of his predisposition.  Right.

24             MR. MATSON:  Right.  Look at my -- I guess

25   it's the final paragraph of my instructions that I am

1    referring to.  It just gives an example.  Again, it's

2    not -- they have to decide that it's predisposition

3    evidence.  Right?

4                THE COURT:  Yes.

5                MR. MATSON:  And I just used it to come from

6    the case law I cited, United States V Williston, just

7    this idea that -- is that possession of drugs, for

8    instance, doesn't necessarily indicate distribution of

9    drugs.  It could be drug user.  And they have to

10   consider those issues, right?  So, hey, it's a firearm,

11   but possession of a firearm, possession of a firearm in

12   a drug case, these are two different things.  And they

13   need to process that.  So I just included that very

14   specifically in that final paragraph.

15               THE COURT:  Let me take a look at that.

16               MR. MATSON:  Thanks, Judge.

17               MR. GILMAN:  With respect to that, your Honor,

18   the government disagrees with the defense position on

19   that and specifically cites the Second Circuit Harvey

20   decision, which the defense is familiar with, has cited

21   in his papers.  And it's the Harvey case that says that

22   the predisposition evidence need not be precisely the

23   same as that for which the defendant is charged, I

24   believe.  Excuse me.  That's a paraphrase.

25          So that evidence is clear it does not have to be

```
1     the same type, and so I don't think it's an instruction
2     further limiting what they consider as predisposition
3     beyond which the Court has already said, I think.  I
4     don't think that would be appropriate.
5                    THE COURT:  Okay.  Let me take a look at that.
6                    MR. GILMAN:  Okay.
7                    THE COURT:  All right.  Let's talk about the
8     schedule.  The jury's being oriented at this point.
9     Then I go out and I have a conversation with them about
10    just basic law and give them an opportunity to persuade
11    me to be excused.  So you don't have to be there for
12    that.  And my guess is that we probably would start with
13    jury selection by about 11.  And my hope is that, well,
14    early afternoon, you will start your case.  Do you have
15    witnesses to --
16                    MS. FULLER:  We do, your Honor.
17                    THE COURT:  Well, opening statements and then
18    you have witnesses?
19                    MS. FULLER:  Yes.  There were other -- not
20    that they were our motions.  We are prepared to address
21    them.  There were two motions filed.
22                    THE COURT:  Over the weekend.  I haven't
23    looked at them.
24                    MR. MATSON:  Just not arguing the point; I
25    filed a motion, Judge, in regard to the exhibits that
```

1    were text messages, which you now have all the text

2    messages.  It's in there premarked.  I didn't want to

3    file those text messages -- I did not want to file the

4    texts on Pacer because they are confidential informant

5    texts, and some of them do involve the confidential

6    informant's family and ancillary matters we want up

7    there.  But I do want your Honor just to be familiar

8    with that so I can highlight which exact texts by

9    exhibit number now you have my binder.

10         What I didn't want to do is pull out my cross

11    examination and say, Here, this is what I want to admit.

12    I did attempt over the weekend to cull it down to 80

13    pages that fairly informs without crossing that line of

14    work product.  I will have that for everybody by this

15    afternoon.

16              THE COURT:  Great.  And I know that you are

17    seeking to get an instruction on the confidential

18    informant not being called.  Is the confidential

19    informant available in Vermont?  Is the person here?

20              MR. MATSON:  I found him.

21              THE COURT:  Oh, you found him?

22              MR. MATSON:  Yes.

23              MS. FULLER:  So is he going to testify?

24              MR. MATSON:  He is going to testify.

25              THE COURT:  Oh, all right.

1          MR. MATSON:  So that could put that issue to

2    bed.  Fingers crossed.

3          THE COURT:  Okay.  All right.  So we will see

4    you in a little while.

5          MS. FULLER:  So being in the courtroom at 11?

6          THE COURT:  Well, I am hoping by 11.  I will

7    know a little bit better --

8          MS. FULLER:  So should we wait?

9       You want to give us a shout?

10          COURTROOM DEPUTY:  I will give you a call.

11          MR. MATSON:  I have one more issue.

12       There are exhibits that are audio-video files that

13    I plan to introduce.  They were provided to me by the

14    prosecution on something called USAFacts, which is

15    great.  I cannot pull it off of there and then replay

16    it.  I just can't.  And I have a Wi-Fi connection off my

17    phone.

18          MS. FULLER:  If you tell me -- I will go

19    downstairs, but if you give me the exhibit numbers, I

20    will see if we can -- would a disk -- I can get you the

21    actual disk.  We can work this out.

22          MR. MATSON:  Okay.  Thank you.

23          THE COURT:  Okay.  Excellent.  Thanks.

24    (Chambers conference concluded at 9:26 a.m.)

25    (The following was held in open court at 11:00 a.m.)

1          (A jury was drawn.)

2      (Court was in recess.)

3      (The following was held in open court without the jury

4      present at 1:56 p.m.)

5              THE COURT:  Okay, the government want to

6      discuss something?

7              MS. FULLER:  Yes, your Honor.

8          I believe our first witness is going to be Brian

9      Wood from ATF.  I believe during cross examination of

10     Agent Wood there may be some reference to a presumptive

11     positive cocaine test using a device called TruNarc, and

12     I wanted to raise this with the Court because the

13     witness who administered the TruNarc is not available to

14     testify as far as -- will not testify.

15         So as your Honor knows, that presumptive test

16     wouldn't be relevant given we do have lab results as to

17     what the substance was or wasn't.  So I wanted to

18     preview that for the Court.

19         The government's inclined to object to that line of

20     cross examination.  I believe the argument will be this

21     particular TruNarc -- on two occasions the TruNarc

22     tested negative and that it was later sent to the lab

23     and found to be positive for cocaine at the lab, which I

24     don't want to speak for the defense, but I believe

25     that's the line of cross examination.

1   And, you know, I am inclined to object to the

2 TruNarc right -- even just with the test.  But beyond

3 that, I think it's potentially confusing under 403 if

4 you have this --

5     THE COURT:  Who is being given the test?  It's

6 not the agent.

7     MS. FULLER:  Correct.

8     THE COURT:  Who is getting -- who has --

9     MS. FULLER:  So there is another agent, who is

10 not being called to testify -- is administering this

11 presumptive positive test on the cocaine obtained from

12 Mr. Martin.

13     THE COURT:  Oh.

14     MS. FULLER:  And the government's objection is

15 the person who administered the test will not testify.

16  It's also potentially confusing under 403 given

17 that we do have a lab result for that cocaine that was

18 tested with TruNarc.  So there's a couple different

19 issues here that I wanted to front with the Court before

20 we got into cross examination.

21     THE COURT:  Okay.  All right.  So what do you

22 want to cross examine on that?

23     MR. MATSON:  Well, I appreciate that, Judge.

24 This was part of a larger conversation Attorney Fuller

25 and I had, and I actually am -- I am surprised that that

1    is the position.  I understand there's a drug cert that

2    came in.  There's conversation about the admissibility

3    of exhibits, in particular field-testing, which we

4    stipulated to, and I said I want to talk about the

5    TruNarc, which, okay, I am not saying that it overrides

6    the drug certs.  Certainly not.  But if Wood was present

7    for this --

8         This TruNarc, Judge, is at the station.  It's a

9    device and it comes up positive or it comes up negative.

10   It came up negative three times on substances which

11   subsequently tested for really poor drugs.  Like below

12   10 percent, okay.  And there is a -- it also helps

13   explain the chronology of events as well, that Wood was

14   present and these drugs tested through the TruNarc as

15   being negative.

16        Again, that doesn't affect the ultimate conclusion,

17   that the prosecution could say the drug certs came in,

18   that --

19              THE COURT:  Well, for one, are you contesting

20   the fact that the substance tested positive for cocaine?

21              MR. MATSON:  No.

22              THE COURT:  I mean, is that at issue?

23              MR. MATSON:  That the chemist -- the substance

24   the chemist tested --

25              THE COURT:  This is on a substantive offense;

1    is that right?

2              MS. FULLER:  I'm sorry.  I didn't hear the

3    last part.

4              THE COURT:  This is on a substantive offense?

5              MS. FULLER:  Yes.

6              THE COURT:  Either Counts --

7              MS. FULLER:  Yes.

8              THE COURT:  -- 3 through 6?

9              MS. FULLER:  Yes, your Honor.

10             THE COURT:  Okay.  And even though there may

11   be a -- I don't know what the device is, but a --

12             MR. MATSON:  TruNarc.

13             THE COURT:  -- a test at the stationhouse

14   that's negative, there's a positive test which the

15   government relies upon to prove that it's cocaine.

16             MS. FULLER:  Correct.

17             THE COURT:  Okay.  And my question of the

18   defense is, are you objecting to the fact that this

19   substance was cocaine?

20             MR. MATSON:  Yes.  The substance that was

21   initially taken from -- you know, taken into evidence,

22   yes, we are.  That is in dispute.  That the substance

23   eventually made its way to the chemist was tested and

24   tested positive, that we are not disputing.

25             THE COURT:  It's all in the same -- it's the

1    same drug, isn't it?

2            MR. MATSON:  It's not, Judge.  And, again, I

3    am a little put off right now because this is "Explain

4    your cross examination, Chandler" --

5            THE COURT:  Right.

6            MR. MATSON:  -- "to your case" when I thought

7    we had a limited agreement, and we did because there was

8    some other drugs certs that were -- not drug certs, but

9    drug testing that's coming in from the prosecution.

10           THE COURT:  All right.  So he's going to -- we

11   need to get going with the opening statements, so he is

12   going to be testifying today?

13           MR. MATSON:  Right.

14           MS. FULLER:  Correct.

15           THE COURT:  And cross examination -- well, how

16   long will he testify?

17           MS. FULLER:  An hour and a half, perhaps.

18           THE COURT:  Half an hour?

19           MS. FULLER:  An hour and a half.

20           THE COURT:  Oh, an hour and a half?

21           MS. FULLER:  Yes.

22           THE COURT:  So he is going to be testifying on

23   direct just about for the rest of the day.

24           MS. FULLER:  Most of it, yes.

25           THE COURT:  So before we get into his cross

1    examination, let's address this issue --

2                MS. FULLER:  Okay.

3                THE COURT:  -- because I -- you know, I am a

4    little confused.  I mean, the substance that apparently

5    forms the basis of Counts 3 through 6, one of them

6    tested negative at the stationhouse under this

7    individual test, and then the same substance tested

8    positive later on, and the government's relying upon

9    that.  And if the defense doesn't say that "We're

10   objecting.  This is not cocaine" -- if they're accepting

11   the fact that it was cocaine, then I don't know what the

12   relevance is of the initial negative test, because

13   there's no dispute.  Cocaine is cocaine.  Now --

14               MR. MATSON:  But, Judge, we haven't conceded

15   chain of custody now, okay.  That's not stipulated.

16               THE COURT:  You have not stipulated to --

17               MR. MATSON:  Correct.

18               THE COURT:  -- chain of custody?

19               MR. MATSON:  Correct, Judge.

20               THE COURT:  So you are not stipulating that,

21   in fact, the substance which forms the basis of

22   Counts -- whatever it is -- 3 through 6, whichever one,

23   was cocaine, because you are arguing that the chain of

24   custody must have been interrupted?

25               MR. MATSON:  Um hum.

```
 1                THE COURT:  Is that what you are saying?
 2                MR. MATSON:  That's correct.  That's right.
 3                THE COURT:  All right.  So let's address that
 4       before cross examination.  And I think we should get the
 5       jury in and get going.  Okay.
 6                MS. FULLER:  Just one additional question:  As
 7       to the face shield question, do you want the witness in
 8       the box wearing the face shield, your Honor?
 9                THE COURT:  Wearing a face shield, yes.
10                MS. FULLER:  Okay.
11                THE COURT:  Not a mask.  Right?
12                MS. FULLER:  Okay.
13                THE COURT:  So they can't be --
14                MS. FULLER:  Okay.
15                THE COURT:  Good.  We are ready to go.  You
16       can bring the jury in.
17       (The following was held in open court with the jury
18       present at 2:04 p.m.)
19                THE COURT:  Okay.  Please be seated.
20           Okay, I think everyone has pens.  I appreciate your
21       patience.  We had to deal with some legal issues, and
22       that's why we are starting just a little bit late, but
23       again, we will be done at four.
24           Before I give you some preliminary instructions,
25       I'd ask that you stand for the oath to be administered.
```

1           (The jury was sworn.)

2           THE COURT:  All right.  I am going to give you

3    some preliminary instructions.  Again, I'll talk about

4    law.  I am not going to talk about facts.  Your

5    determination on the facts is what is most significant.

6           First, I want to go over the indictment again with

7    you.  It's a six-count indictment brought by the grand

8    jury.

9           Count 1 charges a conspiracy to distribute cocaine

10   from in or about the fall of 2018 to October 20, 2019,

11   in the District of Vermont.  The allegation is that the

12   defendant knowingly and willfully conspired together and

13   with others -- and the others listed in the

14   indictment -- to distribute cocaine.

15          The second count is that on October 23rd, 2019, in

16   Vermont, the defendant knowingly possessed a firearm in

17   furtherance of a drug trafficking crime for which he may

18   be prosecuted in a court of the United States, that is

19   the distribution of cocaine charge that is in Count 6.

20          Third, the allegation -- there's four separate

21   substantive distribution cases.  The first is, in Count

22   3, that on August 26th, 2019, in Vermont, the defendant

23   knowingly and intentionally distributed cocaine, which

24   is a Schedule II controlled substance.

25          Count 4.  The same offense occurred on September 5,

1    2018.

2           The next offense allegedly occurred on or about

3    September 20, 2019, in the District of Vermont.

4           And in Count 6, the allegations are that on or

5    about October 23rd, 2019, in Vermont, Mr. Martin

6    knowingly and intentionally distributed cocaine, a

7    Schedule II controlled substance.

8           Mr. Martin has entered not guilty pleas to those

9    offenses.

10           And, again, I just want to remind you that a grand

11    jury indictment is not evidence and may not be

12    considered as evidence.  It is only a vehicle by which

13    charges are brought into federal court.

14           So let's talk about evidence and what is evidence,

15    and I have talked to you a little bit about this before.

16           Evidence consists of three things:  Number one, it

17    consists of the testimony of witnesses from the witness

18    stand.  Second, evidence consists of admission of

19    documents or physical evidence in evidence which has

20    been accepted by the Court in evidence.

21           And the third consists of stipulations of the

22    parties.  What that means is that all other things are

23    not evidence.  I mean, they're used as guidelines to

24    argue cases or positions, and you certainly should pay

25    attention to everything that occurs in a court, but your

1    ultimate charge is to decide whether, in fact, the

2    government has proven beyond a reasonable doubt all of

3    the elements of each of the counts beyond a reasonable

4    doubt based upon the evidence that you hear in court.

5    It's not arguments of counsel.  That in no way is

6    statements that I make during the course of the trial.

7         My function is to rule on issues of law, to

8    regulate the kinds of evidence that you will consider,

9    but I in no way mean to suggest to you any verdict or

10   any determination as to any factual question.  It is

11   your responsibility to decide the facts.  And that's the

12   evidence that you are to consider.

13        Now, there's three principles of -- constitutional

14   principles of law that I want to remind you about, and

15   those are required that you administer -- or follow in

16   the course of the trial.  And the first is the

17   presumption of innocence, that Mr. Martin is presumed

18   innocent.  It is a matter of constitutional law at this

19   point.  That presumption stays with him throughout the

20   trial, and it ends only if and when you determine that

21   the government has proven its case beyond a reasonable

22   doubt.  That's in regard to each of these six counts.

23   Right?  So the presumption of innocence stays with him

24   throughout the trial and is removed only if you find the

25   government has proven its case beyond a reasonable

1    doubt.

2        The second constitutional principle I want to talk

3    to you about again is beyond a reasonable doubt.  It's a

4    rigorous -- it's a rigorous standard.  It's the kind of

5    standard that distinguishes the American system from

6    other systems around the world.  The government is

7    required to prove beyond a reasonable doubt each element

8    of each offense, and I will describe to you at the end

9    of the trial what those elements are, but essentially

10    the government has the obligation to prove each and

11    every element of that offense.  And in a practical way,

12    what that means is the defendant need not say anything.

13    The defendant not even need -- not even cross examine

14    any witnesses.  The burden is always placed upon the

15    government to prove its case, and so, you know, there's

16    no obligation that the defendant come forward.

17        And that's the third constitutional principle, and

18    that is that a defendant cannot be compelled to testify.

19    A defendant does not have to testify.  Again, a

20    defendant can rely solely upon the burden of proof that

21    the government has to satisfy, and can remain quiet.

22    And you cannot use the fact, if the defendant chose not

23    to testify, against him in any kind of way.  That is not

24    evidence and should not be considered by you.

25        So let me now talk about the way the trial will

1    proceed.

2        We begin with opening statements.  So the
3    government first has an opportunity to provide you with
4    an opening statement, and let me define what an opening
5    statement is.

6        It is a statement of what the government intends to
7    introduce and reasonably expects will be introduced
8    during its case-in-chief, which is its portion of the
9    trial.  That is, if the government intends to introduce
10   this evidence and has reasonable expectation the
11   evidence will be introduced, it then describes that to
12   you.  It is not an argument.  One doesn't argue what
13   those facts mean and how they can -- how they impact
14   your ultimate judgment.  It is:  This is what we are
15   going to prove and we reasonably expect will be proven.
16   When they get off into any -- if they went off into any
17   issues about argument, that is improper.  It is just:
18   This is what we anticipate.

19       So once the government has finished its opening
20   statement, then the defendant has an opportunity, if the
21   defendant wishes, to make an opening statement as well.
22   Again, the opening statement is the same form as the
23   government.  It can -- the attorney can describe what
24   the attorney reasonably expects will be introduced
25   during cross examination, that may be evidence that's

introduced during cross or during its own case-in-chief.
Again, the defendant has no obligation to say anything,
and it's a choice that a defense counsel and the
defendant will make as to whether an opening statement
is used at this point or not.

The other alternatives for opening statements are
that the defendant can postpone the opening statement
until after the government's case has been presented and
then it begins the defendant's case, and the defendant
at that point could make an opening statement or, of
course, a defendant can waive an opening statement
because they have no obligation to offer any kind of
evidence during the trial.

Once the opening statements have been completed, it
becomes the government's case, and the government will
seek to introduce evidence by witnesses' testimony, by
presenting physical documentation or physical evidence
that's accepted by the Court into evidence, or by
stipulation.  And at that point the government will
introduce evidence that it describes in the opening
statement.

Once the government's case has been completed, that
is once they have introduced all the evidence they seek
to introduce, then the defendant has an opportunity to
introduce evidence if the defendant wishes.  Again,

1    there's no obligation for the defendant to introduce

2    anything, but the defendant is then afforded an

3    opportunity -- and by defendant, I mean Mr. Martin, is

4    afforded an opportunity to introduce evidence as well.

5         If the defendant chooses to introduce evidence,

6    then the government, because it has a burden to prove

7    guilt beyond a reasonable doubt, will then have an

8    opportunity to offer rebuttal evidence.  And, again,

9    rebuttal evidence is through witnesses' oral testimony,

10   through the introduction of documents or physical

11   evidence, or stipulations.  The government has the

12   opportunity to respond to issues which have been raised

13   during the course of the defendant's case.

14        Once the government has finished its rebuttal, then

15   we turn to what is called summations.  The government

16   first will offer a summation.  And a summation is not

17   only what evidence has been introduced but what

18   arguments can be made as to what that evidence proves

19   and why it proves it.  This is called closing argument.

20   In fact, this is an argument.  And, again, it's not

21   evidence.  When the lawyers stand up and argue, that's

22   not evidence, but it's really helpful to see the

23   analysis of evidence one way or another from either the

24   defendant or from the government.  And, again, this is

25   when the government has the opportunity to make a

1    closing argument.

2         Then the defendant has an opportunity to make a

3    closing argument as well.  And if the defendant makes a

4    closing argument, then the government would have an

5    opportunity to rebut the closing argument because it has

6    the burden.  Again, the defendant does not have to

7    introduce any closing argument.  The defendant has no

8    burden of proof, and as a result can sit silent or can

9    make a closing argument to you as well.

10        Once the closing arguments have finished, it's my

11   one opportunity to talk.  Well, I will bet I will be

12   talking other times, but this -- this is my opportunity

13   to give you a charge.  And the charge is divided into

14   two parts.

15        So the first part of the charge is to give you

16   guidelines about how you weigh evidence, and I want to

17   remind you that what I say about the evidence is

18   meaningless.  And what I would be saying in giving you

19   guidelines is not how I think you should interpret this

20   evidence, but these are guidelines in general about how

21   one assesses credibility, as an example, or how one, you

22   know, assesses factual matters in a broad -- in a very

23   broad sense.  This is not my analysis of the case.  That

24   is up to you.  This is just some standards that you use

25   in assessing evidence.

1          And then the next thing, perhaps the most

2     important, is the definition of the crimes and the legal

3     analysis of those crimes.  Elements of the crime.  So

4     each crime has a series of elements, one, two, three.

5     You can count them off.  And I will read to you in Count

6     1, which is the conspiracy count, these are the elements

7     that the government has to prove beyond a reasonable

8     doubt.  The government has to prove each and every

9     element beyond a reasonable doubt, and these are what

10     the elements are, and it's what they mean.

11          And then the second count is the gun in furtherance

12     of a drug conspiracy.  I will define that crime to you

13     and tell you these are the elements, one, two, three,

14     that the government must prove beyond a reasonable

15     doubt.

16          And then the substantive distribution counts,

17     there's four of those.  Allegations are by the grand

18     jury that the defendant distributed cocaine, and this is

19     what the government would have to prove to establish

20     cocaine.  And assuming that entrapment is before you,

21     then the Court will talk to you about entrapment.  And

22     these are the factors that you look to in assessing

23     whether entrapment is a viable defense or not.

24          So then once I have completed the charge -- and by

25     the way, you will have a copy of the charge as I read it

1    to you so that you read it along with me reading it in

2    court.  I have to read it in court.  It's a matter of

3    law.  But you can read it along with me, and then you

4    will take the charge along with you to the jury room for

5    your deliberations.  The Court will appoint a foreperson

6    who will be your spokesperson, and then you will go --

7    begin to deliberate.

8        Now, there are just a couple of things that I would

9    remind you to be leery about or cautious about.  Number

10   one, you are in a small courtroom, and you can't talk to

11   anyone about the case.  I should tell you that I rode up

12   on an elevator with a member of the jury today just

13   after you had been selected, and she immediately said,

14   "I guess we can't say anything."  Absolutely you can say

15   hello, but you cannot discuss anything.  And, in fact,

16   if anybody ever approaches you about this case or asks

17   you anything or says anything to you about the facts of

18   the case, I need to know that right away because any

19   verdict would be at risk if you are swayed in any way or

20   you are persuaded in any way by something outside of the

21   courtroom.

22       And the final thing is -- and this is a problem

23   that is nationwide at this point -- you have to decide

24   the case based upon the evidence, and that's it.  You

25   can't go out and do your own investigation.  You can't

1    go to a crime scene or use the computer in any way to

2    aid along in your receipt of facts here.

3         Every day I will ask you, Have you learned anything

4    about the case from outside of the courtroom?  And your

5    oath requires you to say yes or no.  Assuming that you

6    have not, the answer is uniformly no, and we can

7    proceed.  If the answer is yes, you mistakenly came

8    across a fact which might influence your judgment, or

9    you did something on the computer which impacted you, or

10   someone said something to you inadvertently -- I mean,

11   you are walking through the courthouse and you might

12   have heard somebody say to somebody else something, and

13   I just need to know about those things right away.

14        It doesn't necessarily mean that you would be

15   excused or it doesn't necessarily mean that the whole

16   trial would be put at risk, but any kind of -- any kind

17   of statements, including statements from spouses or kids

18   or whatever, which in any way is about this case, I need

19   to know about right away.

20        So, again, thank you for your patience and

21   listening to me, and I think we are ready to proceed.

22        Is the government ready to proceed on the motion --

23   or on the opening statement?

24             MR. GILMAN:  Yes, your Honor.

25             THE COURT:  Okay.  Mr. Gilman?

1          MR. GILMAN:  May it please the Court, ladies

2    and gentlemen of the jury:

3          Selling cocaine and trading a firearm for cocaine.

4    The defendant, Carl Martin, sold cocaine and traded

5    cocaine for a gun on October 23rd, 2019.  On that day

6    Mr. Martin met with a man who Mr. Martin had sold

7    cocaine to three times before.  October 23, 2019, would

8    be the fourth and final time that Mr. Martin met with

9    that man, because what Mr. Martin did not know was that

10   that man was an undercover special agent with the Bureau

11   of Alcohol, Tobacco, Firearms & Explosives.

12         After Mr. Martin handed the undercover the cocaine

13   and accepted the gun in exchange, law enforcement

14   stopped Mr. Martin and placed him under arrest.  That,

15   ladies and gentlemen, is why we are here today.

16         Now, over the course of this trial, we, the

17   government, expect the evidence to show the following:

18   In 2018 and 2019, Carl Martin was trying to make money

19   selling cocaine.  Mr. Martin was constantly looking for

20   that next cocaine customer, that next dollar.  He was

21   trying to build a business.  And when the firearm was

22   available, Mr. Martin wanted that too.

23         In the summer of 2019, law enforcement used a

24   confidential informant, that is a private citizen who is

25   cooperating with law enforcement, to buy cocaine from

1    Mr. Martin.  Mr. Martin arranged three sales of cocaine

2    to the confidential informant.  In two of those sales,

3    the cocaine was real; in one sale, the cocaine was not.

4        The confidential informant then introduced the

5    undercover to Mr. Martin, and between August and October

6    of 2019, Mr. Martin sold to the undercover on six

7    occasions.  Four times the drugs were real; twice they

8    were not.

9        The evidence you will hear will establish that Mr.

10    Martin arranged the drug deals with the undercover

11    through text messages.  You will see those messages.

12    You will also see that Mr. Martin negotiated the amount

13    of cocaine to sell.  Mr. Martin set the price of that

14    cocaine.  Mr. Martin also used his associate, Mirnes

15    Julardzija, to drive him to these deals.

16        At times, Mr. Martin used Mr. Julardzija to deliver

17    the cocaine to the undercover and to bring the money

18    from the undercover back to Mr. Martin.  At other times,

19    Mr. Martin and Mr. Julardzija met the undercover in

20    Mr. Julardzija's car.

21        Leading up to the final drug deal in this case, Mr.

22    Martin had conversation with the undercover about

23    firearms.  When the undercover asked Mr. Martin if he

24    was looking for something, Mr. Martin responded, "Yeah.

25    Like a .357.  Has to be clean."

1          Ladies and gentlemen, when Mr. Martin said .357,

2      the evidence will show that he was referring to a .357

3      caliber handgun.  You will see this conversation and you

4      will learn that it was Mr. Martin who first asked the

5      undercover for this specific firearm.

6          As I mentioned, this investigation ended when Mr.

7      Martin sold cocaine to the undercover in exchange for a

8      firearm.  That final drug deal resulted in Mr. Martin's

9      arrest.

10          Now, for his actions, the defendant, Mr. Martin, is

11     charged with six crimes.  First, he is charged with

12     conspiracy to distribute cocaine from the fall of 2018

13     through October 23rd, 2019, a charge that concerns Mr.

14     Martin's illegal agreement with others to help him sell

15     cocaine.

16          Second, he is charged with possession of a firearm

17     in furtherance of a drug trafficking crime,

18     specifically, the sale of cocaine on October 23rd, 2019,

19     and the trade of cocaine for a gun on that date.

20          Next he is charged with the four instances of

21     distributing cocaine to the undercover, specifically on

22     August 26th, September 5th, September 20th, and October

23     23rd, 2019.

24          Over the course of this trial we will prove that

25     the defendant, Carl Martin, committed these crimes

1    through a number of different types of evidence.  I want

2    to review five of those areas of evidence with you now.

3        First, the undercover agent will testify.  You will

4    see video and audio recordings the undercover took

5    during Mr. Martin's four distributions of cocaine to

6    him, including the final trade of cocaine for a gun.

7        You will hear Mr. Martin in his own words on some

8    of these recordings.  You will also see the messages

9    that Mr. Martin and the undercover exchanged.  In those

10   messages, you will see Mr. Martin using coded language

11   and continually reaching out to the undercover to sell

12   him cocaine.

13       For instance, on August 21st, 2019, Mr. Martin sent

14   a text message to let the undercover know, in coded

15   language, that Mr. Martin had more cocaine.  Mr. Martin

16   messaged, "That fish came in.  Let me know when you want

17   to have lunch."

18       The next day Mr. Martin even sent a video of the

19   cocaine to the undercover stating, "It's that fish."

20       As I mentioned before, in these messages you will

21   see Mr. Martin ask the undercover about a specific

22   firearm.  On the night of October 21st, 2019, the

23   undercover sent a message to Mr. Martin.  The message

24   was, "Yo, Red says you're looking for something.  LMK if

25   I can help."  Red was the confidential informant that

1    had introduced Mr. Martin to the undercover.

2         That's when Mr. Martin responded the next morning,

3    "Yeah, like a .357, has to be clean."

4         The messages show Mr. Martin agreeing to buy a

5    handgun, and shortly before Mr. Martin's arrest on

6    October 23rd, 2019, Mr. Martin traded cocaine for that

7    handgun.

8         Second, Mr. Martin's associate, Mirnes Julardzija,

9    will testify.  In his testimony, Mr. Julardzija will

10   give you inside view as to how Mr. Martin operated, how

11   the defendant sold cocaine.  The evidence will show that

12   Mr. Martin and Mr. Julardzija were part of a conspiracy,

13   that is an illegal agreement, to sell cocaine.

14        In exchange for cocaine for Mr. Martin, Mr.

15   Julardzija would drive Mr. Martin and help Mr. Martin

16   distribute cocaine.  Mr. Julardzija will tell you how he

17   met Mr. Martin months before the confidential informant

18   and the undercover agent had anything to do with Mr.

19   Martin.  Mr. Julardzija will walk you through how he

20   drove and helped Mr. Martin with each of the four sales

21   of cocaine to the undercover, including the last one

22   with the gun.

23        Now, Mr. Julardzija has pleaded guilty to

24   conspiracy to distribute cocaine.  He is cooperating

25   with the government, and he will be testifying in hopes

1    of receiving a lower sentence.  You should listen

2    carefully to his testimony, and as you do, note where

3    and how it is corroborated by the other evidence in this

4    case.

5        Third, a pilot, who was one of Martin's cocaine

6    customers, will testify.  The pilot has agreed to

7    testify provided his statements are not used against

8    him.  He will tell you about purchasing cocaine from Mr.

9    Julardzija and Mr. Martin in 2018 and in 2019 while Mr.

10   Martin was selling to the undercover.

11       Fourth, you will hear from other agents in law

12   enforcement who assisted in this undercover operation

13   and who helped perform surveillance on Mr. Martin.  You

14   will learn that it was ATF Special Agent Matthew Ekstrom

15   who was able to extract information, including messages

16   and other items, from Mr. Julardzija and Mr. Martin's

17   phones.  You will hear another ATF special agent, Sam

18   Brown, who will present some of that evidence to you.

19       Fifth, you will see more of the contents of Mr.

20   Martin's cell phone, including other messages Mr. Martin

21   sent furthering his efforts to sell cocaine.

22       Now, I mentioned the messages that Martin exchanged

23   with the undercover, the messages in which Mr. Martin

24   negotiated and coordinated those four deals.  You will

25   also see messages Mr. Martin exchanged with his

1    associate, Mr. Julardzija.  In these messages, Mr.

2    Martin and Mr. Julardzija also used code words to

3    discuss cocaine:  "basket" for a ball of cocaine and an

4    "onion" for an ounce.

5        You will see Mr. Martin and Mr. Julardzija worked

6    together to try to sell more cocaine.  These messages

7    will be an important window into the conspiracy, and

8    they will corroborate the other evidence in this case.

9        After you have heard all of the evidence, you will

10   hear from the government again when my colleague,

11   Assistant United States Attorney Wendy Fuller, will

12   address you.  In the meantime, we ask that you pay

13   careful attention, and we thank you for your time.

14             THE COURT:  Okay.  Mr. Matson, do you wish to

15   make an opening statement?

16             MR. MATSON:  Yes, your Honor.

17             THE COURT:  Okay.

18             MR. MATSON:  Good afternoon again, ladies

19   and gentlemen.

20       You just heard from AUSA Gilman about what the

21   evidence is going to show you from the government's

22   perspective, but let me remind you again, the evidence

23   and what it says is up to you, not Mr. Gilman.  And in

24   the presentation I just heard from Mr. Gilman, I heard

25   Mr. Gilman conflate Carl Martin with this gentleman,

1    Mirnes Julardzija, when he talks about distributing
2    drugs.  Yes, I have seen that.  You will see evidence of
3    it.  You will see audio-video of it.  You will see
4    Mirnes Julardzija deliver drugs, and you will see him
5    point the finger at Carl Martin.  And you'll see him
6    point the finger at Carl Martin during the course of
7    this trial.  He will come off the street.  He will be
8    sentenced sometime after -- sometime after this trial.
9    And you just heard from Mr. Gilman that he is doing that
10    in hopes that his sentence will be reduced.

11        You will hear from Daniel Lathrop too.  Daniel
12    Lathrop's a pilot, still is a pilot.  You will see
13    Daniel Lathrop was involved in buying drugs, but Daniel
14    Lathrop, he wasn't prosecuted.  He was given immunity.

15        You are not going to hear any witnesses come in
16    here who aren't motivated to point the finger at
17    somebody else.

18        Ladies and gentlemen, I want you to listen to the
19    evidence, I want you to watch the video evidence that
20    comes in very carefully, because it's one thing to point
21    the finger at Carl Martin.  It's another thing to look
22    at the totality of the circumstances and see why Carl
23    Martin was even present in each one of these, quote,
24    drug deals, especially because you are going to hear
25    evidence that a confidential informant, John Latimer --

1    I don't want you to get too confused.  This can be a
2    confusing case.
3         In 2018, you are going to hear evidence that the
4    confidential informant, John Latimer, was directed by
5    law enforcement to try and do drug deals with Carl
6    Martin.  And those two drug deals were completely
7    unsuccessful.  No drugs were procured.  Fake drugs were
8    procured:  aspirin, very expensive aspirin.  And you are
9    going to hear that other fake drugs were sold.  And in
10   those deals, Carl Martin is present.  Carl Martin
11   actually participates in it.  That evidence will be
12   clear.
13        Look, a lot of time was spent trying to get Carl
14   Martin into a real drug deal.  Carl Martin participated
15   in fake, scam deals with aspirin and like that.  And you
16   are going to hear that evidence, but what you are going
17   to see is that the government, law enforcement,
18   confidential informant, immunized witnesses, who were
19   all pointing the finger at Mr. Martin, were also
20   creating a tremendous amount of pressure around Mr.
21   Martin that eventually put him in a very bad position.
22   That's the last transaction, the one in October of 2019.
23   Look at that transaction very carefully.  You are going
24   to hear the audio.  Listen who is speaking very
25   carefully.

1        Let me back up a little bit, because I do want to
2   address one more time evidence you won't hear.  Now we
3   haven't decided whether Mr. Martin is going to take the
4   stand or not.  He might or he might not.  The judge
5   already talked about it, but it's worth reiterating.

6        Somebody is accused of a crime is in a very tough
7   position.  If they take the stand and they say, "Oh, I
8   didn't do it," our natural inclination is to think,
9   "Well, they're doing it to save their own skin."  If
10  they say nothing, our natural inclination is to say,
11  "Well, if they're innocent, they'd certainly tell us."
12  So because of that conundrum, that's the -- the
13  constitution takes that problem away.  Right?  That's
14  where it comes from.  It would be fundamentally unfair
15  to make someone prove their own innocence.

16       Some countries do it that way.  Spanish Inquisition
17  did it that way, and that's why it got rid of the
18  constitution.  We don't do it that way.  So draw no
19  conclusions whether or not you hear from Mr. Martin.

20       A lot of evidence in support of the defense is just
21  going to come in through cross examination, and you will
22  hear that, and Mr. Martin getting up or not, no bearing
23  on this case.  Okay?

24       This case fundamentally is about pressure.  Law
25  enforcement pressure.  You are going to hear evidence of

1  prolonged, concerted building pressure aimed squarely at

2  Mr. Martin.  The government may choose to sidestep the

3  back story of this case, and they may not.  But the

4  defense certainly will not.

5      You are going to hear evidence this whole thing

6  started with a confidential informant by the name of

7  John Latimer, the one I previously spoke about.  Mr.

8  Latimer knew Mr. Martin.  In fact, they were neighbors.

9  Mr. Latimer had been cooperating with law enforcement

10  for quite some time before law enforcement directed Mr.

11  Latimer to engage in drug dealing with Mr. Martin.

12  Close to a year, as a matter of fact.

13      And you are going to hear again the first two times

14  when Mr. Latimer went out and tried to engage Mr. Martin

15  in drug dealing, it didn't work.  And after those failed

16  occasions to get Mr. Martin selling drugs, you are going

17  to see that pressure ratcheted way, way up.

18      Now, it took some time.  Don't get me wrong.  But

19  when the CI was reengaged in 2019 to try and do drug

20  deals with Carl Martin, you are going to see the

21  pressure was way up, and you are going to see once again

22  that there were failures to implicate Mr. Martin in drug

23  crimes.

24      Ladies and gentlemen, I know there's a firearm

25  involved in this case, but at its foundational level,

1    this is a drug case.  The government may try to turn it
2    into something else, but it's not.  The judge will
3    instruct you as to the law and that drug conspiracy,
4    those drug charges, that is a predicate, that is a
5    foundation that must be found in this case.  The only
6    problem is the evidence could show that Carl Martin is
7    not a drug dealer.

8        Now, our position of police pressure is not, as I
9    have already alluded to a little bit -- it's not some
10   grand conspiracy.  Okay.  You are just going to hear
11   that law enforcement had a plan, and they pushed hard.
12   They used deception.  They used money.  They used
13   payments to a confidential informant.  They orchestrated
14   these events.  And they're allowed to do that.  Okay?
15   It's part of police practice.  You might not all like
16   it, but they're allowed to do that.

17       The only problem is, again, Carl Martin wasn't a
18   drug dealer, and he got pushed into this position.
19   That's when that goes wrong.  Pressure and time, that's
20   all it takes, really.  Pressure and time.  That's a
21   quote from a movie.  I'm borrowing it.  Maybe some of
22   you know it, but it's a good one.  And it's true.  With
23   time and pressure, anything is possible.

24       And in this case you are going to hear it took over
25   a year.  You are going to hear the money it took.  You

1    are going to hear about the DEA, ATF, drug task force,

2    countless agents and over a year to make it look like

3    Carl Martin was a drug dealer.

4         And ultimately, even if you find that you think --

5    or you find beyond a reasonable doubt that Mr. Martin

6    did something wrong, that same evidence is going to tell

7    you what that pressure was, and that behavior, induced

8    by the government, and that Mr. Martin was not

9    responsible for being there.  When you hear that

10   evidence, I will be back here at the end of this trial,

11   and I will be asking you to acquit Mr. Martin.

12        Thank you.

13             THE COURT:  All right.  Is the government

14   ready to proceed?

15             MS. FULLER:  Yes, we are, your Honor.  We call

16   Special Agent Brian Wood.

17             THE COURT:  We will go till three o'clock and

18   have our break and then come back at 3:15.

19                       BRIAN WOOD,

20        having been duly sworn by the courtroom deputy,

21        was examined and testified as follows:

22             THE COURT:  Good afternoon, Agent Wood.

23             THE WITNESS:  Good afternoon.

24             THE COURT:  I should tell the jury that we

25   have asked that the witnesses have masks on -- or have

1    the shield on so that the mask can be taken off, and you

2    can hear them better but also there be protection.

3    Okay.

4              THE WITNESS:  Thank you, your Honor.

5                   DIRECT EXAMINATION

6    BY MS. FULLER:

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Could you introduce yourself to the jury, please?

10   A    My name is Brian Wood.

11   Q    And how are you employed?

12   A    I am a special agent with the Bureau of Alcohol,

13   Tobacco, Firearms & Explosives.

14   Q    How long have you worked for them?

15   A    For about six years.

16   Q    Okay.  Did you have a law enforcement job before

17   that?

18   A    I did.

19   Q    And what was that?

20   A    I worked for the United States Border Patrol.

21   Q    How long were you employed by them?

22   A    Also for about six years.

23   Q    All right.  And in your work with ATF, do you have

24   any special duties?  Do you work in any special capacity

25   for them?

1    A    Yes.  At times I will work in an undercover

2    capacity for ATF.

3    Q    Tell us what you mean by that.

4    A    I will act as an undercover agent.  I will present

5    myself as someone who might be involved in illegal

6    activities that suspects in investigations might be

7    participating in.

8    Q    How long have you worked as a -- can we call it a

9    UC?

10   A    Yes.

11   Q    How long have you worked as a UC?

12   A    Between four and five years.  It was at the end of

13   2017 I started.

14   Q    And what kind of training, if any, do you go

15   through to do this kind of work?

16   A    So at the ATF National Academy, we go through

17   undercover operations training.  I received additional

18   training from the ATF undercover branch in June of 2017.

19   Q    Okay.  And so describe for us why -- why it's

20   helpful to ATF to use a UC in investigations.  What

21   benefit does ATF -- what benefit is there to do it that

22   way?

23   A    It allows for the direct collection of evidence or

24   statements or experiences.  And at other times we may

25   use a confidential informant to collect evidence,

1    but using an undercover, we can personally experience

2    and collect evidence ourselves so we're not reporting

3    evidence that we got from someone else.  It comes

4    directly from us.

5    Q    Okay.  So what you are explaining is if you use

6    something like a CI, it's essentially another person

7    involved in the investigation when you could do it

8    directly?

9    A    Yes.

10    Q    And when you are acting in an undercover

11    capacity -- and let's specifically talk about an

12    undercover transaction, undercover buy -- are there any

13    protocols that you use and that law -- ATF uses in those

14    controlled transactions?

15    A    Yes.  I will generally outfit myself, and possibly

16    a vehicle that I drive while acting in an undercover

17    capacity, with audio and/or video recording and

18    transmitting equipment, the recording to collect

19    evidence and transmitting for safety purposes for other

20    agents to be able to hear what's going on.

21         I will also -- if I am going to purchase something,

22    I will receive money.  I will photograph that money

23    prior, just to record the exact money that I am using

24    during that purchase.

25    Q    So the money that you use, that you don't provide

1    that?  ATF does?

2    A    Correct.

3    Q    Okay.  And that is, you record the money that you

4    are provided by ATF?

5    A    Yes.

6    Q    How about surveillance?  What happens with that?

7    A    So other agents will conduct surveillance of the

8    undercover agent, you know, to the meet location, from

9    the meet location, during the meet, and they will

10   also -- may conduct surveillance of suspects of the

11   investigation that they anticipate meeting with the

12   undercover, if locations are known.

13   Q    And describe for us generally what happens after a

14   controlled transaction when you purchased controlled

15   substances, for example.  What protocols do you follow

16   after those transactions?

17   A    I will meet with other agents from my office and

18   turn over the evidence to them, for them to be entered

19   into our evidence vault.

20   Q    Okay.  And those protocols that you just

21   described -- we're going to talk about a number of

22   controlled transactions that happened in this case.

23   Those protocols you just described, were each of those

24   protocols followed in the transactions we are going to

25   talk about?

1    A    Yes.

2    Q    Okay.  Now, in your work as a UC, are there -- when

3    you have communications with the subject of an

4    investigation, is there some mechanism to memorialize

5    those communications?

6    A    Yes.

7         I will generally -- I will take the screenshot

8    photos of my communications.  So if I am communicating

9    via text message, I will screenshot pictures of all of

10   the messages and memorialize them that way.

11   Q    Okay.  Are you familiar with Carl Martin?

12   A    I am.

13   Q    And how do you know him?

14   A    I first learned of Carl Martin in February of 2018

15   after his involvement in an incident outside of Nectar's

16   in Burlington in which a female was shot in the chest.

17        I later became familiar with Mr. Martin again in

18   June 2019 when I learned of reports of his suspected

19   drug distribution.

20   Q    Okay.  And did you know Mr. Martin by any other

21   name?  Did you come to know Mr. Martin by any other

22   name?

23   A    I did.  I came to know him as Dre.

24   Q    As Dre.

25        And were you working in a UC capacity at some point

1    in this case to communicate with Mr. Martin?

2    A    I was.

3    Q    And can you describe for us how you communicated

4    with him?

5    A    Mostly via text message.

6    Q    Okay.  Were there some incidences where you talked

7    to him on the phone?

8    A    There were instances when I talked to him on the

9    phone and also times when I talked to him in person as

10   well.

11   Q    Okay.  I am going to show you what's been marked as

12   Government Exhibits 3, 14, 25, 26, 27, 34, 128 and 129.

13        I am going to show you what's been marked, those

14   list of exhibits.  Can you identify that package of

15   exhibits for me?

16        So can you identify those for me?

17   A    These are pictures of my text message

18   communications while acting as an undercover with Carl

19   Martin.

20   Q    Okay.  Are those all of the communications that you

21   had with Mr. Martin?

22   A    Yes.

23        MS. FULLER:  Your Honor, I would move to admit

24   Exhibits 3, 14, 25, 26, 27, 34, 128 and 129.

25        THE COURT:  All right.  Any objection?

1      MR. MATSON:  Yes, your Honor.  I think we need

2   a little more foundation as to how he concludes that he

3   was communicating with Carl Martin.

4      THE COURT:  I'm sorry.  I couldn't --

5      MR. MATSON:  We need more of a foundation how

6   he concludes he was communicating with Carl Martin as

7   opposed to somebody else.

8      THE COURT:  Well, all right.  You want to

9   clarify how the agent knows he was speaking with Mr.

10  Martin.

11  BY MS. FULLER:

12  Q    So in each of these communications or in each of

13  those exhibits, you just testified you believed those

14  were your communications with Mr. Martin.  Can you

15  describe for us why you believe you were communicating

16  with Mr. Martin?

17  A    Because we would communicate about things like

18  where we would meet, when we would meet, just kind of

19  circumstances around the meeting, and then I would go to

20  those meets and Carl Martin would be there.  And

21  other -- and in person we would continue conversations

22  at times that had started via text messages.

23  Q    So the text message would describe a place to meet,

24  and then you would meet, and Mr. Martin would be there,

25  and there were also conversations in the text messages

1    that you would then continue when you saw Mr. Martin?

2    A    Yes.

3          MS. FULLER:  Your Honor, I would move to admit

4    those exhibits.

5          THE COURT:  All right.  Any objection?

6          MR. MATSON:  No objection, your Honor.

7          THE COURT:  All right.  So admitted.

8          (Government's Exhibits 3, 14, 25, 26, 27, 34,

9    128 and 129 are received in evidence.)

10         THE COURT:  All right.  It is three o'clock,

11   so let's take a recess at this point for 15 minutes.  I

12   am going to stay on the bench and speak with the

13   lawyers.  And we will see you in a few minutes.

14   (The jury left the courtroom after which the following

15   was held in open court at 3:00 p.m.)

16         THE COURT:  Okay.  Thank you, Agent Wood.

17         (Witness temporarily excused.)

18         THE COURT:  So my question is:  Have the

19   parties met and addressed the stipulation as to the

20   admission of all of these exhibits?  You don't have to

21   go through the authenticity and identification aspects?

22         MR. MATSON:  Well, Judge, I am -- I just

23   found -- said, as to whether or not these are the texts

24   that actually came off his phone, fine.  Still needs to

25   lay a foundation as to who is writing to the agent,

1    because there is -- well, I will leave it there.

2            THE COURT:  I am not suggesting that you waive

3    your right to address authentication issues, but -- if

4    you got a legitimate ground to do so.  So I guess my

5    question is -- I just want to make sure that you have

6    gone over these exhibits, that you can stipulate to

7    whatever exhibits you can stipulate to, and then the

8    rest you have cross examination.

9            MR. MATSON:  Right, Judge, but I need to cross

10   examine -- I mean, why he concludes that those are Carl

11   Martin, is important.  And so I --

12           THE COURT:  Okay.

13           MR. MATSON:  Yeah.  We just need that

14   foundation.

15           THE COURT:  But there -- I mean, my question

16   is whether there's various documents along the way which

17   could be introduced by way of stipulation in which you

18   do not have to -- which you do not have an objection on

19   authentication.

20           MR. MATSON:  Just use them, and they are in

21   evidence.  There are some of those documents.  Yes,

22   Judge.

23           THE COURT:  Okay.  And the other thing is, I

24   don't have a book of documents.  Ordinarily I have a

25   book of documents --

1           MS. FULLER:  That's our mistake, your Honor.
2  We have --
3           COURTROOM DEPUTY:  We have defendant's.
4           THE COURT:  Pardon me?
5           COURTROOM DEPUTY:  We have defendant's here.
6           MS. FULLER:  We have the government's as well.
7  I apologize.  I thought you had it at the bench.
8           THE COURT:  No.
9           MS. FULLER:  Your Honor, I am wondering -- I
10  understand the COVID concerns -- I'm wondering if it's
11  possible -- I am having a really hard time hearing the
12  witness.  I didn't -- is it possible to move one of
13  these next to the witness box?
14           THE COURT:  I think this can be moved.
15           COURTROOM DEPUTY:  Yes.
16           MS. FULLER:  So that perhaps he can take his
17  screen down.
18           THE COURT:  You know, this is important for
19  opening statements because you are talking to the jury,
20  but I don't see the importance of this particular screen
21  anymore, so I -- that can be moved.
22           MS. FULLER:  I was also just wondering for the
23  witnesses, is there a way to put the screen around the
24  box so he can take the mask down?  It's also hard to, I
25  think, judge his credibility.  You can't see his facial

1    expressions.

2            THE COURT:  Well, let me know if you -- if

3    there's a way to put the screen separating the witness

4    from the jury box, that's fine.

5            MS. FULLER:  Okay.

6            THE COURT:  You can take down the screen.

7            MS. FULLER:  All right.

8            THE COURT:  Or take off the screen.

9            MS. FULLER:  Here's the government's exhibits,

10    your Honor.

11            THE COURT:  See if you can do that and --

12            MS. FULLER:  Yes.

13            THE COURT:  Great.  All right.  So I am going

14    to take a little bit of recess and we will see you back

15    in just -- well, 12 minutes.

16    (Court was in recess at 3:03 p.m.)

17    (The following was held in open court without the jury

18    present at 3:18 p.m.)

19            THE COURT:  Okay.  There's a transcript issue?

20            MS. FULLER:  So the government has -- we

21    presented transcripts to the defense of the audio and

22    video that we intend to use, and in one of the upcoming

23    videos, pretty quickly there is the undercover's voice.

24    I also hear two different voices.  The undercover will

25    testify whose those voices belong to.

1          In the transcript, it's referred to as speaker one

2    and speaker two, and I believe the defense has an

3    objection to speaker one versus speaker two.  I believed

4    as the information was being uploaded that we had taken

5    out speaker one, speaker two, just -- you know, as the

6    defense had requested.  I'm now looking at the exhibit,

7    and speaker one and speaker two is still in there.  I

8    don't want to speak for the defense as to why he is

9    objecting to speaker one, speaker two, given that the

10   undercover will testify that there were two people

11   speaking and he will identify the people who were

12   speaking.

13        I think it's fine the way that it is, but I wanted

14   to raise it for the judge before we played it.

15              THE COURT:  Okay.  What's the objection?

16              MR. MATSON:  Judge, it's not at all clear

17   who's talking, whether it's speaker one, speaker two,

18   and whether it switches or changes.  There's really --

19   it will speak for itself.  It's fine.  We had stipulated

20   to its admission so long as it just says speaker.

21   That's all.

22              THE COURT:  It says speaker one and speaker

23   two.  He is going to identify who is speaker one, who is

24   speaker two, based upon his knowledge.

25              MR. MATSON:  Yes.

1          THE COURT:  You think it's just all the same?

2          MR. MATSON:  Yes, including some -- some that

3    are attributed to speaker, quote, two that I think is

4    speaker one.  That's very important.

5          THE COURT:  Well, all right.  Okay?

6          MS. FULLER:  Well, I mean, the transcript

7    doesn't go back to the jury anyway.  It's just for

8    demonstrative purposes.

9          THE COURT:  Right.  It's just for

10   demonstrative purposes, and you can argue that to the

11   jury.  They are going to make a determination as to what

12   is on the tape.

13         MR. MATSON:  Your Honor, again, this is

14   something I agreed to last night week.  It's fine.  I

15   agreed to it.  I want things to come in smoothly and

16   efficiently.  There might be a blip.

17         THE COURT:  Okay.  So let's bring in the jury.

18         MS. FULLER:  Okay.  Thank you.

19         THE COURT:  Are you suggesting that the screen

20   be right there?

21         LAW CLERK:  No, I'm going to --

22         MS. FULLER:  No, I was hoping it would be --

23         LAW CLERK:  Once the jury's in.

24         THE COURT:  They'll push it in.  Okay.  Great.

25   (The following was held in open court with the jury

```
1    present at 3:23 p.m.)

2              THE COURT:  So we will go till four o'clock.

3              MS. FULLER:  Thank you.

4              THE COURT:  All right.  We had a slight

5    modification of how we are going to proceed with the

6    screens.  The screen actually allows you to see the

7    witnesses, in general, a little bit better, and it also

8    provides the protection that we think is necessary.

9    So --

10        All right.  We ready?

11             MS. FULLER:  Yes, we are, your Honor.  Before

12   I proceed, we have a number of stipulations as to

13   evidence.

14             THE COURT:  Okay.

15             MS. FULLER:  We stipulate -- both parties

16   stipulate to the admission of Exhibit 30, Exhibit 52,

17   Exhibit 45, Exhibit 47, Exhibit 75, Exhibit 2,

18   Exhibit 29, Exhibit 33, Exhibit 70, Exhibit 1,

19   Exhibit 94, Exhibit 4, Exhibit 6, Exhibit 7, Exhibit 66,

20   Exhibit 10, Exhibit 11, Exhibit 13, Exhibit 16,

21   Exhibit 17, Exhibit 21, Exhibit 22, Exhibit 38, and

22   Exhibit 117.

23             THE COURT:  Okay.  Is that true, Mr. Matson?

24             MR. MATSON:  Yes, your Honor.

25             THE COURT:  All right.  So admitted.
```

1          (Government's Exhibits 1, 2, 4, 6, 7, 10, 11,

2     13, 16, 17, 21, 22, 29, 30, 33, 38, 45, 47, 52, 66, 70,

3     75, 94 and 117 were received in evidence.)

4          THE COURT:  Okay.  So that means those

5     exhibits have been admitted into evidence and they will

6     be talked about later on during the course of the

7     examination.

8          So go ahead.

9          MS. FULLER:  Thank you, your Honor.

10    BY MS. FULLER:

11    Q    So, Agent Wood, we were talking a moment ago about

12    the communications you had with who you believed was Mr.

13    Martin.  Were you communicating with him on September

14    18th, 2019?

15    A    Yes.

16          MS. FULLER:  Okay.  Could we bring up Exhibit

17    26, please.

18    BY MS. FULLER:

19    Q    Could you take a look at that for me and tell us

20    what that is.

21    A    That is one of the screenshots of text messages

22    between myself and Carl Martin.

23    Q    Okay.  And this is taken on September 18th, 2019;

24    is that right?

25    A    Yes.

1  Q    Okay.  And if you could read the text messages for
2  us, starting where it says, "Wednesday" --
3       Well, actually, before you do that, what's the
4  phone number that you were communicating with?
5  A    (802) 335-2236.
6  Q    Okay.  And does this phone number that you were
7  communicating with -- does that stay the same throughout
8  this case, throughout your communications in this case?
9  A    No.  The phone number changes later on in the case.
10 Q    Later on?
11      I'm wondering if you could pull the mic towards
12 you.  Thank you.
13      Okay.  If you could start halfway down the page at
14 Wednesday, 12:15 p.m.  Whose message are you about to
15 read?
16 A    Carl Martin's.
17 Q    Okay.  If you could read that for us.
18 A    "I have some good news.  One of my brothers on his
19 way from Philly right now with some raw fish that you
20 can cook yourself if needed.  Only thing is he wants
21 more for one."
22 Q    Okay.  Can I ask you a couple questions.  Way back
23 when he is -- when that message says, "On his way from
24 Philly right now," what do you understand that to mean?
25 A    Someone's coming back from Philadelphia right now.

```
1    Q    Okay.  Does that have any relevance to you having
2    been involved in this investigation?  Philadelphia?
3    A    Yes.  I know Carl Martin to come from the
4    Philadelphia area.
5    Q    All right.  And how about that other phrase, "some
6    raw fish."  Tell us what you understand that to mean in
7    connection with this message.
8    A    In this message, "raw fish" is referencing
9    high-quality cocaine.
10   Q    Okay.  And in your communications with Mr. Martin
11   throughout this case, tell us a little bit more about
12   what -- what terms would you use to refer to cocaine?
13   A    Sometimes I would say "lunch" or "meals," and I
14   would also say "fish" or "scales."
15   Q    Okay.  And that all referred to cocaine?
16   A    Yes.
17   Q    Okay.  So when he says "some raw fish," you
18   understood that to mean some high-quality cocaine?
19   A    Yes.
20   Q    All right.
21              THE COURT:  Can you just clarify what the date
22   of that --
23              THE WITNESS:  September 18th, 2019.
24   BY MS. FULLER:
25   Q    And when he proceeds to say, "You can cook yourself
```

1    if needed," in your training and experience, and in
2    connection with this case, what did you understand that
3    to mean?
4    A    That it was such a high quality that I could cut it
5    or step on it or also possibly cook it into cocaine
6    base, also known as crack cocaine.
7    Q    There's a couple words you used in there, "cut it"
8    and "step on it."  In connection with your work and
9    training and experience, can you explain to the jury
10   what you mean by those phrases.
11   A    To step on it, to add additives to make it -- to
12   add something to it so the ratio of cocaine to whatever
13   else is added is less.  So if there was a high
14   percentage of cocaine or a high quality of cocaine or a
15   more pure cocaine, you would be able to turn that into
16   more cocaine by adding something to it, creating more
17   weight, and distribute it.
18   Q    Why would someone do that?
19   A    To make more money.  It creates -- it creates more
20   cocaine just of lower quality, and selling more cocaine
21   you would make more money.
22   Q    Okay.  And the last thing in this particular
23   message, he says, "Only thing is he wants more for one."
24   What did you understand that to mean?
25   A    I understood that to mean that he was saying this

1  person was asking for more money per ounce or for one

2  ounce of cocaine.

3  Q    Okay.  So if you can just continue reading on down

4  and then turn the page.  Continue reading.

5  A    "Just let me know what you think when he gets here.

6  I could meet you and give you something to try.  I had

7  him bring enough for what you wanted."

8       "Yeah, I want to.  I just" --

9  Q    Just hold on a second.

10 A    Sorry.

11 Q    So "I could meet you and give you something to

12 try."  What did you understand that to mean?

13 A    I understood it to be him saying that he would

14 provide me with cocaine on consignment, or front cocaine

15 to me, for which I would receive it and then pay him

16 later.

17 Q    Why would he be giving you cocaine to try?

18 A    I had complained about the quality of substances I

19 had received prior to this date from Carl Martin.

20 Q    Okay.  So he would give it to you to try it for

21 what reason?

22 A    For me to -- to prove to me that it was of higher

23 quality and to encourage me to keep purchasing cocaine

24 from him.

25 Q    Okay.  And so the next message that you just

1    started to read when I interrupted you, who sent that

2    message?

3    A    I did.

4    Q    Okay.  Could you continue reading it, please.

5    A    "Yeah.  I want to.  I just legit ain't got the

6    bread until I get some paychecks.  Like that bread is

7    gone.  I'm gonna get it back working overtime and

8    traveling and shit 'cuz we get more for that.  I just

9    can't make any moves RN," or right now.  "Like it might

10   take like weeks."

11   Q    Okay.  What's the next message after that?  Keep

12   reading these.

13   A    "Understand.  I gotta.  Just keep me posted."

14   Q    Keep going.

15   A    "I like working with you because you are careful

16   and not stupid like most people and I want to make this

17   play.  I just gotta fix my shit this was bad."

18   Q    And what are we referring to when you say, "I gotta

19   fix this shit" -- excuse my language -- "I gotta fix --

20   this was bad"?

21   A    I was saying that I needed -- the previous cocaine

22   I had received was of poor quality, and I had said

23   that -- that my customers were not happy and that I had

24   lost money due to the poor quality of cocaine.  So I was

25   saying I needed to get more money to be able to do

1    anything.

2    Q    Okay.  And why are you engaging in this

3    conversation with him about the quality of the cocaine,

4    mentioning customers?  Why are you talking with him

5    about this?

6    A    Because prior to this, we had made previous

7    purchases of cocaine, and lab results had come back and

8    shown that some of those previous purchases had

9    contained cocaine and that some had not.

10   Q    Okay.  So this is all about some of that cocaine

11   being good and some of it not being good?

12   A    Yes.

13   Q    All right.  Continue reading, please.

14   A    "I apologize for all that.  I trust you enough to

15   give you these and you probably get rid of the all by

16   weekend.  What you think?"

17   Q    And then you respond?

18   A    And then I said, "Sorry bud.  I'm driving to New

19   York" -- or NY -- "for work, and I gotta pull over to

20   text 'cuz they're crazy about that here.  I'm staying

21   tonight and tomorrow and I'll be back in VT Friday.  You

22   sure it'll move though.  Like I ain't getting the bread

23   from these people.  I gotta do it on the arm too, so if

24   it ain't good, then your bread's F'd up too you know."

25   Q    What did you mean by that?

1  A    So I was saying that I was -- like he was saying

2  that he was going to front it to me.  I was saying I'm

3  going to have to do the same thing because my money was

4  that bad from the previous cocaine that was of poor

5  quality, and that if I front it and it's bad, I am not

6  going to get paid for it and then I won't be able to pay

7  him for it.

8  Q    And so just to be clear, you are working in an

9  undercover capacity at this point, right?

10  A    I am.

11  Q    So these communications that you are having with

12  him, are they true?

13  A    No.

14  Q    Okay.  And why engage in that kind of communication

15  with him?

16  A    Well, in order to -- to put myself out there as

17  someone that would be involved in these activities that

18  we are investigating, and to -- to better collect

19  evidence as an undercover agent.  So in order to do

20  that, I will say that I am -- in this instance, I said

21  that I was selling cocaine, even though I was not

22  actually selling cocaine.

23  Q    Okay.  So it's to build trust?

24  A    It is to build trust, yes.

25  Q    Okay.  So if we can skip down to -- we're on the

1    same document page 251 -- where you start -- where it

2    starts Wednesday, 7:50 p.m.  This is still on the 18th

3    of September; is that right?

4    A    Yes.

5    Q    If you could read the message from him.

6    A    "So he's taking 22 from me.  I can give you three

7    for either same 22 or 24.  And just pay me when it

8    moves."

9    Q    Can you explain to me what that means.

10   A    So when he says, "He is taking 22 from me," I

11   understood that to mean that he was saying the person

12   was charging $2,200 per ounce of cocaine.  He said, "I

13   can give you three for either same 22 or 24."  I

14   understood him to mean that he would give me three

15   ounces for either $2,200 per ounce or $2,400 per ounce.

16   And when he said, "Just pay me when it move," I

17   understood him to be saying that after I sell it and

18   make the money, that I could pay him back for what he

19   gives me.

20   Q    All right.  Is there a word that is used just in

21   the drug trade for -- for offering people drugs on

22   consignment essentially where you don't pay for them?

23   A    Fronting is the term that's used.

24   Q    All right.  And is that what was happening here?

25   A    Yes.

1    Q    He was offering to front you drugs, and if you sold

2    it, you would then pay him later?

3    A    Yes.

4    Q    Okay.  Now after these text messages, if we look on

5    document page 252, did you agree to meet him at some

6    point?

7    A    I did.

8    Q    Where was that?

9    A    I agreed to meet him at the McDonald's in

10   Colchester.  It's on Heineburg --

11              MS. FULLER:  If we can --

12   A    -- I believe.

13   Q    I'm sorry.

14   A    Sorry.

15        On Heineburg.

16              MS. FULLER:  Okay.  If we can bring up

17   Exhibit 2, please.

18   BY MS. FULLER:

19   Q    And so this is a map of that area; is that correct?

20   A    It is.

21   Q    Okay.  Could you touch on the screen and circle a

22   couple of the areas on that map that's of interest in

23   this case?

24        Is it working?

25   A    Not yet.

```
1    Q    I'll do it.  How about this one?

2    A    Thank you.  Maybe I can drag that over.

3    Q    That's okay.  I circled one.  Do you see it?

4    A    Yes, I do.

5    Q    What location is that?

6    A    192 Grey Birch Drive, Colchester, Vermont.

7    Q    And how does that figure in this case?

8    A    I knew that to be Carl Martin's residence.

9    Q    And, again, this is Colchester we are talking

10   about?

11   A    It is.

12   Q    All right.  And the McDonald's that you agreed to

13   meet at -- I have circled it -- is that the location?

14   A    Yes.

15   Q    Okay.  What's the relevance of both of those

16   locations to this case?

17   A    The 192 Grey Birch Drive, Colchester, Vermont, I

18   knew to be Carl Martin's residence; and McDonald's is a

19   location where I met Carl Martin while acting in an

20   undercover capacity multiple times.

21   Q    Okay.  So tell us what was supposed to happen

22   during the meet with Mr. Martin at this point.

23   A    I was supposed to meet Carl Martin at the

24   McDonald's in Colchester and receive a quantity of

25   cocaine fronted, or on consignment.
```

1    Q    Okay.  And what day were you scheduled to meet him?

2    A    On September 20th, 2019.

3              MS. FULLER:  Okay.  If we can pull up

4    Exhibit 27, please.

5    BY MS. FULLER:

6    Q    And talk us through what we are looking at here on

7    Exhibit 27.

8    A    They're text messages exchanged between Carl Martin

9    and me --

10   Q    Okay.

11   A    -- on September 20th, 2019.

12   Q    And is the phone number the same phone number you

13   had been using?

14   A    It is.

15   Q    All right.  Could you just read quickly through

16   those text messages.

17   A    Okay.

18        "Yo.  I'll be there around 12.  I'm on the bike."

19        "Just got up.  12:45 works?"  Question marks.

20        And then I said, "Yeah.  I'll be there at 12:45."

21        And then he said, "Just wait for me.  I'll be there

22   like 12:30, 12:40."

23        "Okay, okay."

24        And I said, "Just got here.  Gonna grab a burger

25   and wait outside."

1   Q    And did you end up meeting with Mr. Martin?

2   A    I did.

3   Q    And so were these text messages right before you

4   met with him?

5   A    They were.

6   Q    Can you describe for us what happens when you meet

7   with Mr. Martin.

8   A    While waiting at the McDonald's in Colchester I

9   observed a Chevy Equinox pull into the parking lot.  I

10  observed Carl Martin in the passenger seat and Mirnes

11  Julardzija driving the vehicle.  They instructed me to

12  get into the Equinox.  I got in the back seat.  Carl

13  Martin handed me approximately one ounce of cocaine.

14  Carl Martin told me that the cocaine should be better.

15  He told me it was to build back trust.  And he talked

16  about making a trip himself, and that it was just a

17  matter of time and money.

18  Q    What do you mean make a trip himself?

19  A    We had previously discussed a trip to Philadelphia

20  to go obtain high-quality cocaine, and this was an

21  extension of that conversation.

22  Q    You talked about, at the beginning, some protocol

23  that ATF follows and that you follow before and after

24  each controlled transaction that you engage in.  Was

25  that protocol followed?

1    A    Yes.

2    Q    Okay.  I am going to show you -- well, so the

3    protocol was followed.  Was there a video and audio of

4    this transaction?

5    A    There was.

6              MS. FULLER:  Okay.  So if we can pull up

7    Exhibit 29, please.

8              (A digital recording was played in open

9    court.)

10             MS. FULLER:  Stop it.

11   BY MS. FULLER:

12   Q    So there's a speaker that said, "What is that?  A

13   Harley?"

14        Who is that speaking?

15   A    Mirnes.

16   Q    All right.  And you responded, "Yeah."

17        And then that -- was it the same speaker or a

18   different speaker that said, "I want an Indian, but that

19   shit's cool"?

20   A    Same speaker.  Mirnes.

21             (A digital recording was further played in

22   open court.)

23             MS. FULLER:  Can we stop it, please.

24   BY MS. FULLER:

25   Q    So it's a little difficult to hear, but when the

1    speaker said -- indicated he was trying to gain trust

2    back, who was that speaking?

3    A    Carl Martin.

4            MS. FULLER:  Go ahead.  Please continue.

5            (A digital recording was further played in

6    open court.)

7            MS. FULLER:  Stop it please.

8    BY MS. FULLER:

9    Q    So who was speaking when they said, "I'm going to

10   make the trip myself"?

11   A    Carl Martin.

12           MS. FULLER:  Keep going.

13           (A digital recording was further played in

14   open court.)

15           MS. FULLER:  Stop it, please.

16   BY MS. FULLER:

17   Q    And, again, the speaker says, "Just time and money.

18   If I could do that myself, then I think" -- and then we

19   can't hear the rest of it, but the "time and money," who

20   makes that statement?

21   A    Carl Martin.

22           (A digital recording was further played in

23   open court.)

24   BY MS. FULLER:

25   Q    So we'll see this other places, but what's up with

1    the video, the difficulty in the video in these -- in

2    these recordings?

3    A    Limited by the resources we have.  We made our best

4    attempt to get video, but the situations are dynamic,

5    and it can be difficult, combination with whatever

6    equipment we have, whatever the situation is, whether we

7    are in a vehicle or outside.

8    Q    Okay.  So, again, when you are listening to Mr.

9    Martin talk about making a trip, what do you understand

10   that to refer to?

11   A    I understand it to be a continuation of the

12   conversation that he and I had been having about going

13   to Philadelphia to obtain cocaine, high-quality cocaine.

14   Q    Okay.  And about gaining trust back, what -- what

15   do you understand that to mean?

16   A    I understand that to be a reference to my

17   complaints about the poor quality of cocaine, about me

18   complaining that I was losing money, and him trying to

19   gain my trust back.

20   Q    Okay.  So you told us a few minutes ago that when

21   you got into the car, Carl Martin had handed you

22   cocaine?

23   A    Yes.

24   Q    I am going to show you Government's Exhibit 70 and

25   ask you if you can identify what that is?

1    A    Yep.  I recognize this to be the cocaine

2    purchased --

3    Q    All right.

4    A    -- or received, fronted from Carl Martin on

5    September 20th, 2019.

6         MS. FULLER:  So if we can also bring up

7    Exhibit 33, please.

8    BY MS. FULLER:

9    Q    And what is that a picture of?

10   A    That is a picture of the cocaine that I was fronted

11   by Carl Martin on September 20th, 2019, on a scale.

12   Q    Did the substance on that scale later end up in

13   that bag?

14   A    It did.

15   Q    Can you walk us through what happens -- what does

16   law enforcement do after they take possession of a

17   substance such as that?  Actually let me ask a better

18   question.

19        What did you specifically do after you took

20   possession of that substance from Mr. Martin?

21   A    I met with ATF Special Agent Eric Premo, and I

22   turned the substance over to Agent Premo.

23   Q    Okay.  And what happens at that point?

24   A    It then gets brought back to our office and is

25   processed by two agents, and then entered into the

1    evidence vault.

2    Q    Okay.  And the processing by two agents, walk me

3    through what that is.

4    A    Two agents will be present for the -- the

5    processing, which is the weighing, and then we put it

6    inside heat-sealed plastic and will seal four edges of

7    the plastic.  Both agents will initial and date along

8    the seams of the heat-sealed plastic.

9    Q    Okay.  So do you recall where you were when you

10    gave that substance to officer -- or Special Agent

11    Premo?

12    A    I believe I was at the Dollar General in

13    Colchester.

14    Q    Okay.  And tell us why you meet in random places

15    like that.

16    A    It's for safety concerns.  While acting in an

17    undercover capacity, we are trying not to reveal who I

18    am, so going to different locations to try to stay out

19    of sight while we do things like turn over evidence and

20    such.

21    Q    All right.  So just trying to walk through this

22    really carefully.  You take the substance from Mr.

23    Martin.  Then you get back into your own car.  Is that

24    what you do?

25    A    Yes.  My undercover vehicle.

1    Q    And you drove to Dollar General?

2    A    Yes.

3    Q    And you met with Special Agent Premo?

4    A    Yes.

5    Q    Was he in his own vehicle?

6    A    He was with -- I believe he was with resident

7    Agent-in-Charge Alex Schmidt.

8    Q    Is that your boss?

9    A    He is.

10    Q    Okay.

11    A    From ATF.

12         I don't recall whether they were in RAC Schmidt's

13    vehicle or Agent Premo's vehicle, but they were

14    together.

15    Q    But at that point did you turn over the drugs to

16    Agent Premo?

17    A    I did.

18    Q    And did you have any other interaction with those

19    drugs after that point?

20    A    I don't recall if I was present for the -- the --

21    the weighing and the processing, but as far as chain of

22    custody, I didn't take custody back of those drugs, no.

23    Q    I am having a hard time hearing you.

24    A    Sorry.

25         I don't recall if I was present for the processing

1    portion, but I did not take possession, retake

2    possession of those drugs, no.

3    Q    So possession didn't come back to you of those

4    drugs after you gave it to Agent Premo?

5    A    Correct.

6    Q    All right.  And just as a general matter -- well,

7    specifically in this case, what does ATF then do with

8    the drugs sort of once you get back to the station and

9    you go through the process of heat sealing it:  What

10   happens to them then?

11   A    They get entered into our evidence vault.

12   Q    Okay.  Do they stay there?

13   A    And then eventually they will get sent to a lab for

14   testing.

15   Q    Okay.  And those drugs that you have in front of

16   you there, are those the drugs that you just got back

17   from the lab?

18   A    Yes.

19   Q    Okay.  So you told us a little earlier -- I want to

20   talk a little bit about the background of the

21   information into Mr. Martin.

22        You told us a little earlier that you were aware of

23   an incident that had happened almost a year previous in

24   front of Nectar's?

25   A    Yes.

1   Q    Were you involved in that incident -- in that

2   incident that happened in front of Nectar's?

3   A    No, I was not involved.  No.

4   Q    Okay.  How did you become aware of it?

5   A    An investigation was in my office around the

6   events, surrounding that event.

7   Q    So another agent in your office had this

8   investigation?

9   A    Yes.

10  Q    Okay.  And I want to ask you about that, but I'll

11  fast-forward to June of 2019.  Is that when you became

12  involved in the case?

13  A    It is.

14  Q    Okay.  And tell us how you became involved in that

15  case.

16  A    I learned that a -- that Carl Martin was reported

17  to have been distributing controlled substances, and we

18  signed up an ATF confidential informant to make

19  controlled purchases of cocaine from Carl Martin and

20  eventually introduce an undercover agent to Carl Martin

21  to make purchases themselves.

22  Q    Okay.

23           MR. MATSON:  Your Honor, I would move to

24  strike so much of that as was hearsay, which was, "I had

25  heard Carl Martin was distributing drugs."

```
1              THE COURT:  All right.  Objection to -- is
2    hearsay.  What's the exception?
3              MS. FULLER:  I'm not offering it for the
4    truth --
5              THE COURT:  Right.
6              MS. FULLER:  Or I'm offering it to demonstrate
7    why he did -- why he -- how he became involved.
8              THE COURT:  It's not being offered for the
9    truth of the matter asserted.  It's being offered to
10   understand exactly what his conduct was.  As a result,
11   objection overruled.
12       You can answer that.  Well, you've already answered
13   the question, so go ahead.
14             MS. FULLER:  Thank you, your Honor.
15   BY MS. FULLER:
16   Q    What was the CI's name?
17   A    John Latimer.
18   Q    Okay.  What did he go by?  Did you --
19   A    Red.
20   Q    What was the nickname he had?
21   A    Red.
22   Q    Is there a process that involves signing up of a
23   confidential informant?
24   A    There is.
25   Q    Okay.  Were you involved in that process for Red?
```

1    A    I was involved.

2    Q    You were involved?

3    A    I was involved -- I was not the primary agent

4    signing him up, I guess.

5    Q    Okay.  But you were aware of it?

6    A    Yes.

7    Q    But the paperwork, was it done by somebody else?

8    A    The prime- -- yeah, I may have witnessed the

9    paperwork, but I was not the primary agent on it.

10    Q    Okay.  Fair enough.

11        Now, what was the investigative plan with regard to

12    Red?

13    A    To conduct controlled purchases of cocaine from

14    Carl Martin, and then introduce an undercover agent,

15    myself, to continue to purchase cocaine from Carl Martin

16    directly.

17    Q    I think you answered this a little bit when we

18    first started, but why does ATF proceed in this way?

19    What benefit is there -- why do you -- why do you

20    introduce a CI and then introduce yourself into the same

21    case?

22    A    Well, it kind of -- it bridges the gap in trust.

23    At the time I did not know Carl Martin.  Carl Martin did

24    not know me.  But the CI did know Carl Martin, so we use

25    the CI for the introduction, and then again we use an

1    undercover agent so I can gather evidence directly.

2    Q    And ATF is a gun organization, isn't it, largely?

3    A    Yes.

4    Q    So what's ATF's interest in controlled substances,

5    buying drugs?

6    A    So our mission -- a large part of our mission is

7    gun violence, and gun violence is often associated with

8    drug distribution or drug trafficking.  At times drug

9    distributors will possess firearms to protect their drug

10   trade.  At times drug distributors will use firearms to

11   rob people of drugs in order to use or sell them.  At

12   times drug distributors will take drugs in on trade from

13   users in exchange for drugs to those users.  And at

14   times drug distributors will traffic firearms they

15   receive out of state to their suppliers who are often

16   prohibited or possessing them for illegal purposes.

17       In this specific investigation, the incident

18   referred to from February, the circumstances surrounding

19   that, combined with drug distribution by -- potential

20   drug distribution by Carl Martin was concerning, and we

21   deemed it worth investigating.

22   Q    So the incident, if you could just maybe put a

23   label to it and tell us what you knew about the incident

24   at the time without getting into the granular level,

25   just so the grand jurors -- the jurors have a sense of

1    what we are talking about, this February incident.

2    A    There was an altercation between Carl Martin and

3    Rashad Nashid, and I watched the -- I wasn't involved in

4    investigating but I did watch the surveillance video and

5    I watched what transpired, and the altercation involved

6    Carl Martin approaching Nashid outside of Nectar's after

7    two a.m., February of 2018, with a firearm in his hand.

8         On the surveillance video I watched Carl Martin

9    strike Nashid with his other hand while holding the

10   firearm.  I observed Carl Martin raise the firearm and

11   point it at Nashid.  I then observed Nashid retrieve his

12   own firearm and -- and shoot the firearm.  I observed

13   the crowd disperse, and I observed a female subject

14   across the street, and I could hear her on the video as

15   saying, "I think I'm shot."

16   Q    Was she in fact shot?

17   A    She was.

18   Q    And so you indicated -- just to close this loop,

19   was ATF involved in that investigation into the Nectar's

20   shooting back in February of 2018?

21   A    We were.

22   Q    So I want to be clear for the grand jurors because

23   I think I have skipped around and I hope I didn't

24   confuse anybody.  The controlled buy that we were

25   talking about initially, that was in September -- on

1    September 20th, 20 -- 2019; is that right?

2    A    That's right.

3    Q    Okay.  And when did you -- when did ATF sign up Red

4    to be a CI?

5    A    In June --

6    Q    Okay.

7    A    -- of --

8    Q    So we're sort of going a little bit back in time to

9    talk about how the investigation started.

10    A    We were.

11    Q    Now, how many controlled buys did Red participate

12    in with ATF into Carl Martin?

13    A    Three.

14    Q    Are those on the 25th of June, the 28th of June,

15    and the 23rd of July?

16    A    Yes.

17    Q    Okay.  How many of those buys were you present for?

18    A    Three.  All three.

19    Q    All three?

20    A    Yes.

21    Q    And how many of those buys did you personally

22    participate in with the CI?

23    A    Two.  The second two.  On June 28th and on July

24    23rd.

25              MS. FULLER:  All right.  Can we bring up

1    Exhibit 2, please.

2    BY MS. FULLER:

3    Q    All right.  So we are back -- we are back to the

4    map that I initially marked up in the first place.  Can

5    you talk us through the first buy that happened on June

6    25th.

7    A    Yes.

8         On June 25th, we used the ATF CI to conduct a

9    controlled purchase of approximately 3.5 grams of

10   cocaine from -- the plan was to purchase from Carl

11   Martin, in exchange for $300.

12   Q    Okay.  Was the actual hand-to-hand transaction in

13   that controlled buy with Mr. Martin?

14   A    It was not.

15   Q    Okay.  Then what was Mr. Martin's involvement?

16   A    The -- his involvement was that's -- the

17   communications were between the CI and Mr. Martin.

18   Q    Setting up the deal, you mean?

19   A    Yes.

20   Q    Okay.  So the deal was set up through Mr. Martin,

21   and then there was somebody else involved for Mr.

22   Martin?

23   A    Yes.

24   Q    Okay.  Male or female?

25   A    A female subject.

1   Q    All right.  And you indicated a minute ago that

2   there was approximately 3.5 grams of crack cocaine

3   purchased in that transaction?

4   A    Yes.

5   Q    What happened to the drugs purchased in that

6   transaction?

7   A    They were turned over to Special Agent Sam Brown

8   with ATF, and they were later sent to the Vermont State

9   Lab.

10  Q    Okay.  And the Vermont State Lab, is that -- do you

11  regularly send drugs to that lab to have them tested?

12  A    More often the DEA lab, but at this time we -- they

13  were sent to the Vermont State Lab.

14  Q    And what's your experience with sending drugs to

15  chemists or labs?  Is that an immediate turnaround to

16  determine whether there's in fact drugs in the

17  substances that you send them?

18  A    No.  It really does vary.  It can be -- it can be

19  months -- up to months, and a lot of factors come into

20  play, such as workload.  If there's court dates coming

21  up, sometimes they can be expedited, but it really does

22  vary, and it can take up to months.

23  Q    Okay.  So in the transactions that we are going to

24  talk about today and tomorrow, do you -- sounds like you

25  don't have an immediate result from the lab about what

1     those substances contain?

2     A     Correct.

3     Q     All right.  And sometimes, you just said a minute

4     ago, it takes quite a while to get a lab determination

5     of what the substances actually contain?

6     A     Yes.

7     Q     And in this particular case, are you aware of what

8     the lab determination was for the buy on June 25th,

9     2019?

10    A     Yes.  The Vermont State Lab determined that the

11    substance was crack cocaine.

12    Q     Okay.  And we did have Exhibit 2 up there, but it

13    went away.  Is that -- are any of the locations on this

14    map involved in the buy on June 25th?

15    A     Yes.  The -- the 192 Grey Birch Drive and then Grey

16    Birch Drive itself, and River Road, I believe, which I

17    believe is the bottom part of the circle, it looks like.

18    Q     Now, was there another buy involving this CI --

19              THE COURT:  You going to the next buy?

20              MS. FULLER:  Yes.

21              THE COURT:  It's now four.  Why don't we take

22    a break at this point.

23              MS. FULLER:  Okay.

24              THE COURT:  I am going to stay on the bench

25    and just speak with the lawyers about tomorrow.  So

1    we'll have breakfast here at -- before nine o'clock, and

2    so we will start again at nine.

3        Now I just want to remind you not to talk to anyone

4    or conduct any investigation on your own.  Again, I will

5    be asking you whether you have been exposed to any

6    information before we begin tomorrow.  So have a good

7    evening and we will see you tomorrow.

8    (The jury was excused for the day after which the

9    following was held in open court at 4:01 p.m.)

10               THE COURT:  Okay.  Thank you, Agent Wood.

11               THE WITNESS:  Thank you, your Honor.

12               (Witness excused temporarily.)

13               THE COURT:  All right.  So let's talk about

14    tomorrow.  What issues are going to be coming up in the

15    course of Agent Wood's testimony?

16               MR. MATSON:  Cross.  You're looking at me?

17               THE COURT:  Right.  That's not an issue, but

18    is there anything in particular that we need to address

19    in advance?  I thought we were going to be coming back

20    early to address anything that --

21               MR. MATSON:  No, I believe that the

22    evidence -- we have now cleared all government evidence

23    that's going in through Wood.

24               MS. FULLER:  I think we were going to talk

25    about the TruNarc and the presumptive test.

1          THE COURT:  Right.

2          MR. MATSON:  That is an issue, Judge.

3          THE COURT:  Okay.  Now, how about meeting at

4     9:15 -- or, I'm sorry, at 8:45 and so we can address

5     that and we can start right at nine o'clock?

6          MS. FULLER:  Okay.

7          THE COURT:  Okay?

8          MR. MATSON:  So, Judge, also, just to orient

9     you, this would also, on cross, involve the memo I

10    submitted over the weekend about text messages between

11    Wood and Latimer which, again, very rarely I am

12    submitting for the truth of the matter asserted, because

13    many times that would be implicating my client in drugs.

14    It's not for the truth of the matter asserted; it's just

15    the opposite.  But those are now in your possession,

16    Judge.

17         THE COURT:  Okay.

18         MR. GILMAN:  Tim, what --

19         MR. MATSON:  I believe it's Z2.  That's

20    correct.  Z2, Judge.  So --

21         THE COURT:  V2.

22         MR. MATSON:  Z -- Z as in zebra.

23         THE COURT:  All right.  B.

24         MR. MATSON:  Z as in zebra.

25         THE COURT:  B2, all right.  And -- yeah?

1          MR. MATSON:  So, again, zebra 2, Judge.  All
2    the way at the end.

3          THE COURT:  I don't quite understand.  B2?

4          MR. MATSON:  Okay, Judge.

5          THE COURT:  I thought you said --

6          MR. MATSON:  Z as in zebra.

7          THE COURT:  Z.  Yeah?

8          MR. MATSON:  2.  It's the second-to-last
9    exhibit, Judge.

10          THE COURT:  Z2.

11          MR. MATSON:  Flip all the way to the end.

12          THE COURT:  Oh, okay.  Got it.

13          MR. MATSON:  Thank you.

14          THE COURT:  And these are the messages?

15          MR. MATSON:  Those are the messages, and I
16    will also highlight one thing.  I intend to put them all
17    in.  That's how they were produced to me apparently from
18    Wood, and I do have some questions about why Wood used
19    them in that manner, because they are completely
20    unreadable.  So.  They are also an area of inquiry I
21    want to ask him about.

22          THE COURT:  Okay.  I guess I am not quite
23    understanding why you are not allowed to ask those
24    questions.

25          MR. MATSON:  I should be allowed to ask those

1    questions.

2                MS. FULLER:  When we had a discussion about

3    text messages, it was actually about text messages

4    between Latimer and Jon Prack.

5                THE COURT:  Right.  Okay?

6                MS. FULLER:  And so when I first addressed

7    this with the Court, I was given 600 pages, so I didn't

8    know the theory of admissibility of all 600 pages was --

9                MR. MATSON:  Right.  I'm sorry.  I may have

10   misunderstood the objection as to those.  Well, if there

11   is none, we'll get 'em in and I'll go --

12               THE COURT:  Right.

13               MS. FULLER.  It's just all the repe- -- I

14   don't know, you know -- again, from the government's

15   perspective, there has to be a theory of admissibility

16   as to them.  I'm not really sure at this point.  You

17   know, if it's not for the truth, okay, well, that's a

18   theory of admissibility.  I didn't know before right now

19   what we were talking about.

20               THE COURT:  Okay.  So now you can look at

21   this.  We'll meet at quarter of nine, and I will hear

22   your response.  But essentially you want to be able to

23   admit these through this -- through Agent Wood, cross

24   examine Agent Wood in regard to these particular text

25   messages.  Right?

1           MR. MATSON:  Correct, your Honor.

2           THE COURT:  And the government's going to

3   review this and see if they object.

4           MR. MATSON:  That's the way I see things,

5   Judge.

6           THE COURT:  You might want to talk to each

7   other and maybe you'll get --

8           MR. MATSON:  We are, Judge.  I think there's

9   perhaps an appearance that we're not.

10           THE COURT:  Oh, no.

11           MR. MATSON:  We are both challenged in that

12   there's a zed 2, right?  So, anyway.

13           MS. FULLER:  Your Honor, if I could just ask

14   you -- I can't remember -- we do have a stipulation as

15   to the controlled substances in this case and the lab

16   reports.  Does your Honor prefer that the stipulation be

17   marked as an exhibit?

18           THE COURT:  Yes.

19           MS. FULLER:  Okay.

20           THE COURT:  Right.  Because that becomes a

21   piece of evidence.

22           MS. FULLER:  Okay.

23           THE COURT:  That actually is addressed to them

24   as evidence.

25           MS. FULLER:  So I plan to read this to the

```
1    jury --

2              THE COURT:  Yep.

3              MS. FULLER:  -- sometime tomorrow during Mr.

4    Wood's cross -- or Mr. Wood's direct examination.

5              THE COURT:  Okay.  And, actually, I am not

6    suggesting at all that you're not -- the two of you are

7    not working cooperatively; frankly, just the opposite.

8    I'm just not quite sure that my 75-year-old ears hear

9    the distinction between B and Z.

10             MR. MATSON:  Let the record show I said zebra

11   five times, Judge.

12             THE COURT:  Zebra.

13             MR. MATSON:  Zebra.  But that was probably

14   wrong.  It's got a B in it.  Z -- ah, strike that.

15             THE COURT:  Oh, my goodness.  Well, welcome to

16   the aging process.

17        Okay.  Thank you.

18             MS. FULLER:  Thank you, your Honor.

19             (Court was in recess at 4:07 p.m.)

20                      *** *** ***

21             C E R T I F I C A T I O N

22        I certify that the foregoing is a correct
     transcript from the record of proceedings in the
23   above-entitled matter.

24

25   July 7, 2023                _____
     Date                         Anne Nichols Pierce
```