UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
              V              *
                             *
CARL MARTIN                  * CRIMINAL FILE NO. 19-157




JURY TRIAL
Tuesday, June 7, 2022
Burlington, Vermont



BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        Senior District Judge

APPEARANCES:

    WENDY L. FULLER, ESQ., and ANDREW C. GILMAN, ESQ.,
        Assistant United States Attorneys, Federal
        Building, Burlington, Vermont; Attorneys for the
        United States

    CHANDLER W. MATSON, ESQ., The Law Offices of
        Chandler W. Matson, 125 Mountain Road, Stowe,
        Vermont; Attorney for Defendant Carl Martin



ANNE NICHOLS PIERCE
United States District Court Reporter (ret'd.)
fortherecordinvermont@gmail.com

# I N D E X

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **BRIAN WOOD** | | |
| Direct by Ms. Fuller | 9 | 14 |
| Cross by Mr. Matson | 118 | 4 |
| Redirect by Ms. Fuller | 156 | 23 |
| Recross by Mr. Matson | 169 | 3 |
| **MICHAEL BELIVEAU** | | |
| Direct by Ms. Fuller | 171 | 8 |
| Cross by Mr. Matson | 191 | 14 |
| **MATTHEW EKSTROM** | | |
| Direct by Ms. Fuller | 204 | 10 |
| Cross by Mr. Matson | 221 | 22 |
| **MIRNES JULARDZIGA** | | |
| Direct by Mr. Gilman | 223 | 11 |

### E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 24 | Video of surveillance | 174 |
| 34 | 9/21/2019 - 10/23/2019 text messages | 204 |
| 53 | Photos of Samsung phone found in car | 204 |
| 54 | Photos of Samsung phone found in car | 204 |
| 59 | Video of Nectar's shooting | 174 |
| 62 | DEA Exhibit 7:  Cocaine | 117 |
| 66 | DEA Exhibit 8:  Cocaine | 117 |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 69 | DEA data | 117 |
| 75 | DEA Exhibit 10:  Cocaine | 117 |
| 96 | Mirnes cell phone messages with Carl Martin | 204 |
| 97 | Martin cell extraction | 204 |
| 97A-D | Attachments:  resized screenshots | 204 |
| 101 | Nectar's gun | 174 |
| 110 | Texts from Martin's cell phone with Ashley Hojohn | 204 |
| 111 | Texts from Martin's cell phone with Bevin | 204 |
| 112 | Texts from Martin's cell phone with Byrd | 204 |
| 112A-B | Attachments:  resized jpegs | 204 |
| 113 | Texts from Martin's cell phone with Jake | 204 |
| 114 | Texts from Martin's cell phone with Larry | 204 |
| 115 | Texts from Martin's cell phone with Malik | 204 |
| 116A | Cellebrite extraction report | 204 |
| 116B | Photo of Martin holding gun | 204 |
| 116C | Photo of gun in gloved hand | 204 |
| 116D | Photo of 2 guns and magazine | 204 |
| 116E | Photo of gloved hands with 2 guns | 204 |
| 120 | Texts from Martin's cell phone with Correa Santiago | 204 |

# **I N D E X**

**E X H I B I T S**

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 120A-H | Attachments:  resized jpegs | 204 |
| 121 | Texts from Martin's cell phone with Boi nephew | 204 |
| 122 | Texts from Martin's cell phone with (561)306-6028 | 204 |
| 124 | Texts from Martin's cell phone with Daniel Lathrop | 204 |
| 125 | Martin cell phone contacts | 204 |
| 126 | Martin cell phone accounts | 204 |
| 127 | Texts from Martin's cell phone with UC (802)238-9734 | 204 |

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| C | Interview with Carl Martin dated 2/28/2018 | 202 |
| Z2 | Text messages between Wood and CI | 133 |

```
 1   TUESDAY, JUNE 7, 2022
 2   (The following was held in open court without the jury
 3   present at 8:45 a.m.)
 4             THE COURT:  Okay.  Good morning.
 5             MS. FULLER:  Good morning.
 6             MR. MATSON:  Good morning, your Honor.
 7             THE COURT:  I have heard you may have resolved
 8   the issue about all of these text messages?
 9             MS. FULLER:  I believe we have an agreement.
10   The government is not going to oppose the admission of
11   the defense exhibit Zed 2.
12             THE COURT:  Right.  Yeah, that's fine.  Yeah,
13   I heard it, "zed" now.  I do want to tell you I just
14   have difficulty -- for instance, I did not ever hear the
15   word "zebra."  So I try to turn these up, but -- anyway.
16   And you said "zebra" five times?
17             MR. MATSON:  Well, I was saying "zebra."  Tim
18   was trying to tell me he was saying Z2, and I think --
19   those mikes are super-sensitive.  So, Judge, I am giving
20   you an out here.
21             THE COURT:  I appreciate it.  You too will
22   suffer from the aging process at some point.
23             MS. FULLER:  I already am, your Honor.
24             MR. MATSON:  Hopefully, it's all blowing over
25   our heads.
```

1          THE COURT:  At least -- at least as you age,

2    when you are talking to the judge, all you have to

3    remember is "your Honor."  You can forget the name, but

4    you just say "your Honor."

5       All right.  So you want to put something on the

6    record as to how you have resolved this issue?

7          MS. FULLER:  I think we have an agreement as

8    to the TruNarc.  The government understands that the

9    defense has a -- has an argument about the fact that

10   there was a presumptive test that was negative that then

11   turned out to be positive, and I understand the defense

12   argument as to that.  I think therefore that presumptive

13   test in this particular case -- even though in another

14   case it wouldn't be relevant, I think in this particular

15   case it's relevant for that limited purpose of showing

16   there was a negative presumptive test that then turned

17   out to be positive when it got to the lab.

18       The government's concern, and I think we agree on

19   that, is there isn't going to be further extrapolation

20   of sort of what the TruNarc means and how reliable it is

21   because the person who administered that test is not

22   here to talk about the test or his training and

23   experience with it, and so that was my concern.  Just as

24   long as the questioning is sort of limited to the fact

25   of the test, we would be fine with that.

1          THE COURT:  All right.  Your client is here?

2          MR. MATSON:  No.  I have --

3          THE COURT:  You haven't seen him yet this

4  morning?

5          MR. MATSON:  But I have not seen him.

6      Judge, before we go into that, there is another

7  text issue.  We have the -- the limited Prack -- let me

8  just start over again.

9      Officer Trooper Prack will be testifying, called by

10  the defense.  There are text messages.  There's a

11  600-page exhibit that your Honor has.

12          THE COURT:  Yes.

13          MR. MATSON:  We have whittled that down to 80,

14  and we will be giving that to everyone today.  We will

15  mark it C3.

16          THE COURT:  Okay.

17          MR. MATSON:  As in "cat" 3.

18          THE COURT:  Right.

19          MS. FULLER:  We will try to come up with some

20  agreement as to what's admissible out of any of those,

21  if anything.

22          THE COURT:  All right.  So let's take a recess

23  and see if we get your client here, and then we will get

24  the jury in, and then I will come back.

25          MR. MATSON:  Thank you, Judge.

```
1              MS. FULLER:  Thank you, your Honor.
2              THE COURT:  Thank you.
3    (Court was in recess at 8:45 a.m.)
4    (The following was held in open court with the jury
5    present at 9:10 a.m.)
6              THE COURT:  Okay.  Good morning.  Welcome
7    back.
8              COURTROOM DEPUTY:  Your Honor, this is
9    criminal case, defendant number one, United States of
10   America versus Carl Martin.  The government is present
11   through Assistant United States Attorneys Wendy Fuller
12   and Andrew Gilman.  The defendant is present with his
13   attorney, Chandler Matson.
14       The matter before the Court is day two of jury
15   trial.
16             THE COURT:  All right.  Have you learned
17   anything about this case over the past 24 hours outside
18   of the courtroom?  Or have you discussed this case among
19   yourselves at all?
20             (The jury all indicate in the negative.)
21             THE COURT:  All right.  That's a uniform
22   shaking of the head, or nodding of the head.  So
23   appreciate that.  I think we are ready to proceed.
24       The government want to call its witness.
25             MS. FULLER:  Yes, your Honor.  We call Special
```

1  Agent Brian Wood.

2          THE COURT:  I should tell you that ordinarily

3  I ask the lawyers here to be here early.  They were here

4  early, we had dealt with some legal issues, and so we

5  try to proceed on time.

6      Good morning, Agent.

7          SPECIAL AGENT BRIAN WOOD:  Good morning,

8  your Honor.

9          THE COURT:  Now do you want to swear him

10  again.

11                    BRIAN WOOD,

12      having been duly sworn by the courtroom deputy,

13      was further examined and testified as follows:

14               CONTINUED DIRECT EXAMINATION

15  BY MS. FULLER:

16  Q    Good morning, Agent.

17  A    Good morning.

18  Q    When we left off yesterday, we were talking about a

19  controlled buy that the CI had participated in on June

20  25th, 2019.  Do you have that in mind?

21  A    Yes.

22  Q    Okay.  Was there another buy after that controlled

23  buy?

24  A    Yes.  There was another controlled buy by the CI on

25  June 28th, 2019.

1    Q    Can you describe for us what your role was in that
2    buy.
3    A    My role was to drive the CI to the buy while acting
4    in an undercover capacity, the thought being I was
5    posing as the purchaser of the drugs the CI was to buy
6    from the CI, the CI acting as a middleman.
7    Q    Okay.  And can you walk us through the protocols
8    that ATF follows before and after a controlled buy
9    involving a CI.  I know we talked about the protocols
10   for a UC, but I am wondering if there's any protocols
11   that you follow when you use a CI.
12   A    There are.  The CI is searched.  The CI's person is
13   searched, and if the CI has a vehicle, the vehicle is
14   searched, both prior to and after the buy.  The CI is
15   provided ATF funds for any purchases they may make.  The
16   CI is outfitted with audio and/or video transmitting and
17   recording equipment.  Sometimes their vehicle is also
18   outfitted with some of that equipment.
19        The surveillance is conducted as much as possible
20   of the CI from when we meet with him before, to the
21   deal, during the deal, and then after for the deal, to
22   the meet location.
23   Q    Okay.  And did each of those things happen in this
24   case for this buy on the 28th of June, 2018 -- 2019?
25   A    Yes.

1    Q    Okay.  And did you tell us -- I'm sorry that I
2    might have forgotten.  Did you tell us what your role
3    was in this buy?
4    A    I was the undercover agent that was driving the CI
5    to this buy.
6    Q    So you were driving him?
7    A    Yes.
8    Q    Okay.  And tell us where the buy was supposed to
9    happen, what was supposed to happen during it.
10    A    The CI was supposed to purchase about 3.5 grams of
11    cocaine from Carl Martin in the area of River Road in
12    Colchester, Vermont, River Road being near Grey Birch
13    Drive.
14    Q    Okay.  And so it was approximately 3.5 grams.  What
15    was the amount to be paid?
16    A    $300.
17    Q    Okay.  And in -- acting in your undercover
18    capacity, what was the amount that you were supposed to
19    pay for those drugs?
20    A    The CI was purchasing it for $300, and then I was
21    to purchase the cocaine from the CI in -- in an
22    undercover role for $350, the CI getting a $50 profit,
23    all of that being a ruse, the part of me purchasing it
24    from him.
25    Q    Okay.  So what happened during the buy?

1    A    I drove the CI first to the area of River Road and

2    then down Grey Birch Drive in Colchester.  I observed

3    the same female that I had seen from the June 25th

4    purchase.  I pulled the vehicle over.  The CI got out,

5    walked to the female, met with the female.  The CI then

6    came back and got in my vehicle.  We drove to a meet

7    location, met with Special Agent Sam Brown.  The CI

8    turned over 3. -- about 3.5 grams of supposed cocaine to

9    Special Agent Sam Brown.

10   Q    Did you notice anything or make any mental note

11   about what the substance looked like as it was being

12   turned over to Special Agent Brown?

13   A    Yes.  It was -- it was a bright white, fine powder.

14   It's inconsistent with what I saw from June 25th, and it

15   didn't -- wasn't consistent with the cocaine that had

16   been purchased previously.

17   Q    Okay.  And do you know whether that substance was

18   ultimately tested?

19   A    It was.

20   Q    And what did it test positive for?

21   A    The Vermont State Lab showed it tested positive for

22   aspirin.

23   Q    Okay.  So it was not controlled substances?

24   A    Correct.

25   Q    So could you describe how you conduct your

1    relationship with the CI.  Do you speak to him on the

2    phone?  Do you speak to him by text message?  How does

3    that work?

4    A    Both over the phone and through text message.

5    Q    Okay.  And is there any techniques that you use as

6    an undercover when you communicate with the CI?  Any

7    investigative techniques you use?

8    A    Yeah.  At times I will stage communications via

9    text message with a confidential informant, which

10   involves me acting in a role through messaging, and the

11   CI as instructed also responding to me.  The purpose of

12   these messages to be something that the CI could or is

13   instructed to show to a suspect of investigation, to

14   kind of validify [sic] who I am supposed to be, and it's

15   kind of corroboration or just something else they can

16   show to help introduce me as an undercover.

17   Q    Okay.  Did that happen here?

18   A    It did.

19   Q    Did that happen in and around the buy on June 28th,

20   2019?

21   A    It did.

22   Q    Can you describe for us a little bit more

23   specifically as to what kinds of communications you had

24   with the CI in and around this time?

25   A    Yes.

1          I communicated with the CI via text message
2     complaining about the June 28th purchase.
3     Q    Why would you do that?
4     A    Because of the -- the product purchased did not
5     appear to be cocaine or consistent with cocaine that we
6     had previously purchased.
7     Q    Okay.
8     A    And the other -- the other -- it was also an
9     opportunity for me to kind of engage with Carl Martin.
10    If I say it's, you know, poor quality and such, it gives
11    me a reason to communicate with him directly.
12    Q    How were you communicating with him directly?
13    A    Well, at first it was indirectly through these text
14    messages to encourage kind of an introduction or a --
15    you know, us to be able to meet in person or communicate
16    directly on the phone.
17    Q    Okay.  Just so the jurors understand, can you walk
18    us through a little bit more specifically what you mean
19    by staged conversations and what happens with those
20    conversations that you are having with the CI?
21    A    So I would talk to the CI prior to those
22    conversations, and we would talk about what they would
23    look like and what the purpose was.  It then would -- we
24    would communicate back and forth in one of those
25    conversations.  I would then have the CI screenshot

1    those communications.  We would look at them and look

2    at -- for sending the message that we are trying to

3    send, and at times I would instruct the CI to send those

4    messages to the suspect, in this instance Carl Martin.

5    Q    And I know you hit on this, but just sort of to

6    close that loop, can you describe for the jurors why you

7    would send -- why would you be directing the CI to do

8    this and send those messages to the suspect?

9    A    To -- you know, to encourage direct contact.  Also

10   it's -- you know, it encourages further conversation

11   from -- from Carl Martin, and it's a way for me to kind

12   of send -- it's a way for me to communicate with him,

13   send the exact message that I want to send to him when I

14   don't have access to him in person at the time or

15   through phone.

16   Q    So you are going through the CI to do it?

17   A    Yes.

18   Q    And the overall, the overarching plan was what?

19   A    To have -- to deal with Carl Martin myself as an

20   undercover.  To have an introduction of me to Carl

21   Martin.  So instead of selling cocaine to the CI, Carl

22   Martin would sell cocaine to me.

23   Q    So this is all part of introducing you to Mr.

24   Martin?

25   A    Yes.

1   Q    Okay.  So you told us a little bit earlier that the

2   substance purchased on June 28th was aspirin, according

3   to the lab?

4   A    Yes.

5   Q    So if you had concerns about the substance and the

6   substance was later negative, why continue on with the

7   investigation into Mr. Martin?

8   A    When we started this investigation, you know, the

9   focus was on potential violence around drug distribution

10  or cocaine distribution in this case.  And the fact that

11  Carl Martin appeared to sometimes be distributing

12  cocaine and sometimes distributing other substances

13  supposed to be cocaine, didn't lessen our concerns about

14  potential violence.  If anything, it increased them

15  because there's -- violence does occur in drug

16  distribution due to people selling things and saying

17  they're one thing and having them be another.

18  Q    Okay.  And remind us again, what did the substance

19  during the first buy, the buy on June 25th, 2019 -- what

20  did that test positive for?

21  A    Cocaine base, or crack cocaine.

22  Q    Okay.  And so was there -- was there a third buy

23  with the CI in July of 2019?

24  A    Yes.  On July 23rd, 2019.

25  Q    Okay.  And can you describe for us the plan for

1    that buy?

2    A    The plan was to have an introduction of me in

3    person to Carl Martin through the CI.  It was to take

4    place at the McDonald's in Colchester.  The plan was to

5    conduct a purchase of one ounce of cocaine in exchange

6    for $1,800.

7    Q    Okay.  What happened during the buy?

8    A    During the buy I -- the CI arrived to McDonald's

9    prior to me arriving.  When I arrived to McDonald's, I

10   went in and I observed Carl Martin, the CI, and Bryan

11   Correa Santiago at a table in McDonald's, kind of seated

12   together.  I approached the table; I greeted everyone

13   there; and then I told them I was going to get some

14   food, because there was some food on the table, for

15   myself; and I went in line to get food to bring back to

16   the table to eat.

17        While I was in line, I observed the CI leaving from

18   Carl Martin and Bryan Correa Santiago toward the

19   bathroom and motioning me to go to the bathroom with the

20   CI.

21        When I went to the bathroom, the CI provided --

22   produced about one ounce of cocaine, stating it was from

23   Carl Martin and Bryan Correa Santiago.  I gave the CI

24   the $1,800 in ATF funds.  I instructed the CI to go back

25   to Carl Martin and Bryan Correa Santiago and pay the

1   $1,800 for the cocaine.  I exited the bathroom with the

2   CI.  I observed the CI go back to the table with Carl

3   Martin and Bryan Correa Santiago, and I exited the

4   McDonald's, drove to a meet location where I met with

5   Special Agent Sam Brown of the ATF, and eventually the

6   CI as well, and I turned over the purchased cocaine to

7   Special Agent Sam Brown.

8   Q    And do you know if that substance was later tested

9   by the lab?

10  A    It was.

11  Q    And what were the results of that test?

12  A    It tested as being cocaine.

13  Q    So you have mentioned a couple times the name of

14  Bryan Correa Santiago.  Who is that in connection with

15  this investigation?

16  A    Our investigation determined he was the suspected

17  source of supply of cocaine at times to Carl Martin.

18            MS. FULLER:  Can we bring up Exhibit 94,

19  please.

20  BY MS. FULLER:

21  Q    Who is that?

22  A    Bryan Correa Santiago.

23  Q    Okay.  So what happens in your investigation after

24  the buy on July 23rd, 2019?

25  A    After that purchase, I continued to communicate

1   with the CI to facilitate me dealing directly with Carl

2   Martin for future purchases in the same -- used the same

3   technique we talked about earlier.  I was staging

4   conversations to kind of communicate directly that I was

5   either going to deal with Carl Martin directly or I

6   wasn't going to deal with him, and that I was not going

7   to continue to deal with him through the CI.

8   Q    What do you mean by that?

9   A    We -- the CI -- I would speak with the CI and talk

10  about -- you know, that the goal was for me to deal

11  directly with Carl Martin.  I would have a conversation

12  with him, a staged conversation, in which I would say, I

13  am not driving you to anymore of these purchases.  If he

14  wants to deal with me directly, he can deal with me

15  directly.  And at one point I said, If he doesn't, then

16  basically just leave it alone.

17  Q    So meaning if Mr. Martin doesn't agree, just leave

18  it alone?  Just drop it?

19  A    Correct.

20  Q    Is that what you mean?

21  A    Yes.

22  Q    At any point after this July 23rd buy, did the CI

23  provide you with Mr. Martin's phone number?

24  A    He did.

25  Q    And did you call Mr. Martin?

1    A    I did not.

2    Q    Did you text him?

3    A    I did not at that time.

4    Q    Not at that time.

5    When was the first -- well, was there eventually a

6    communication between you and Mr. Martin?

7    A    There was.

8    Q    And who initiated that conversation?

9    A    Carl Martin.

10    MS. FULLER:  So would you bring up

11    Exhibit 128, please.

12    BY MS. FULLER:

13    Q    So let's talk about some of those initial messages.

14    Can you tell us what we are looking at on Exhibit 128?

15    A    This is the text message I observed between Carl

16    Martin and myself --

17    Q    Okay.

18    A    -- from August 4th, 2019.

19    Q    All right.  And do you recognize the phone number?

20    A    I do.

21    Q    Okay.

22    A    That was the phone number used by Carl Martin to

23    me -- to communicate with me.

24    Q    Okay.  Back yesterday when we had -- we were first

25    talking about the buy with Carl Martin on September

1    20th, do you know whether this phone number is the same

2    phone number you were communicating with on September

3    20th?

4    A    Yes, it was.

5    Q    All right.  So if I could just have you read the

6    first page of those text messages, please.

7    A    He said, "What's good, man?  It's Red boi.  You

8    need anything?"

9        And I said, "What's good, man?  I gotta move a few

10   things but I'm going to be ready to get lunch with you

11   soon.  Friday's payday for me so I'm definitely good by

12   then.  Gotta be good though, you know.  Looking to maybe

13   get two meals a week."

14       Then he said, "Cool.  Just let me know."

15       And then I said, "For sure."

16   Q    Okay.  So back to the top of that message, the

17   first message that is sent, it says, "What's good, man?

18   It's Red boi."  What did you understand that to mean?

19   A    I understood that to be Carl Martin introducing

20   himself as Red's boy, referring to the CI, also known as

21   Red, see his boy or his buddy, his friend, because

22   that's how we became introduced was through Red.

23   Q    Okay.  And your third message down at the bottom,

24   you referred to two meals a week.  Can you tell us what

25   you meant by that?

1   A    At the time I was looking for either purchasing two

2   times a week or maybe two ounces a week.  It was -- it's

3   not -- it wasn't meant to be anything exactly specific.

4   It was just kind of open-ended.  It could be interpreted

5   either way.

6   Q    Okay.  If you can just continue reading at the

7   bottom and on to the next couple pages, please?

8   A    Thursday, August 8th, he wrote, "What time you

9   thinking?"

10       I replied, "12 tomorrow?"

11       Then he replied, "Yeah, that works."

12       And I said, "Cool.  You wanna eat at the same

13   spot?"

14       Then he said, "We could.  Or in South Burlington.

15   By Al's."

16       I said, the "last spot is closer for me if that's

17   cool.  Just let me know."

18       And then he said, "One or two pie?"

19       And I said, "Two.  I'm hungry."

20       Then he said, "Gotcha.  Separate or two in one?"

21       And then I said, "Two in one is good."

22       And he replied, "Gotcha."  Then he says, "So Al's

23   is close to job."

24       And I replied, "Yeah.  No problem.  I'll be there."

25   Q    Okay.  Just read that next message.

1    A    Then I said on Friday, I said, "What's good, man?

2    We good for lunch?  What's the number on two?"

3         And he replied, "Yes, sir."

4    Q    Okay.  So let's talk about a couple phrases in

5    there.

6         During one of the texts, it says "eat at the same

7    spot."  What was meant by that?

8    A    The last spot that I had met with him at was the

9    McDonald's in Colchester, so that was my way of

10   suggesting that as the meeting spot.

11   Q    Okay.  And it seemed like there was a different

12   spot that was chosen?

13   A    Yes.  Eventually Al's in South Burlington.

14   Q    All right.  And when he referenced one or two pie,

15   and you said, "Two.  I'm hungry," what was meant by

16   that?

17   A    It's referring to ounces of cocaine.

18   Q    Okay.  So one or --

19   A    So one to two ounces, and then I said two ounces.

20   Q    I'm sorry.  I don't mean to step on you here.

21   A    So when he says one or two, he is saying one or two

22   ounces of cocaine, and then I replied two ounces.

23   Q    And what did you understand when he said, "Separate

24   or two in one"?

25   A    I understood that to mean separate packages or

1    separate pieces, one ounce each, or if it was okay, just

2    to have one package of two ounces.

3    Q    Okay.  So you responded, "Two in one is good,"

4    meaning two ounces in the same package is okay with you?

5    A    Yes.

6    Q    All right.  So what ultimately happens after these

7    series of communications?

8    A    I drove to Al's parking lot to conduct the

9    controlled purchase with Carl Martin.  He then directed

10   me to the Price Chopper parking lot area, which is kind

11   of next door.  There's a hotel right in that area too.

12        I then drove to the Price Chopper parking lot.  He

13   directed me to an area to park near like a shopping cart

14   return.  I parked, and he motioned me to kind of get in

15   the back of the vehicle he was in.  It was a dark Chevy

16   Equinox.  I got in the back seat.  There was two females

17   in the back seat, Mirnes was in the driver's seat and

18   Carl Martin in the passenger seat.

19        When I got in the vehicle, Carl Martin handed me

20   approximately two ounces of supposed cocaine.  I asked

21   him what's the number, as I did in the text messages,

22   referring to the price, how much was it going to cost.

23   He replied 36, or $3,600 dollars.  I handed him $3,600.

24   I talked about him making the price better moving

25   forward, then exited the vehicle.  I returned to my

1    vehicle.  I drove and met with Special Agent Brown and

2    turned over the about two ounces of supposed cocaine to

3    Special Agent Brown.

4    Q    And was that substance later tested by the lab?

5    A    It was.

6    Q    What did that test for?

7    A    It tested positive for lidocaine, not for cocaine.

8    Q    Okay.  I think we covered this a little earlier,

9    but remind us again, when you send a substance to the

10   lab and it's tested by the lab, how long does that

11   process take generally?

12   A    A month or more.

13   Q    Okay.  So right -- so in the weeks after you

14   received this substance, did you know whether it was

15   real or not?

16   A    No.

17   Q    All right.  Do you remember when you found out

18   whether this substance was real?

19   A    Yes.  It was September 10th, 2019.

20   Q    So the buy that we were just talking about was on

21   August 9th; is that correct?

22   A    Yes.

23   Q    So it's almost exactly a month after this buy that

24   you find out that it's lidocaine and not cocaine?

25   A    Correct.

```
1    Q    So what happens after the controlled buy on August
2    9th?
3    A    I continued to communicate with Carl Martin
4    regarding future purchases.
5              MS. FULLER:  Okay.  If we could bring up
6    Exhibit 129.
7    BY MS. FULLER:
8    Q    So the buy we were just talking about is on the
9    9th.  If you could tell us what's happening in these
10   next series of text messages that we are about to read?
11   A    We are talking about the -- the buy on August 9th.
12   I had thanked him and again talk about the price, just
13   as I had when I was in the vehicle with him and previous
14   to that.
15   Q    Okay.  If you could just read through the top part
16   of that page, please.
17   A    Yep.
18        On Friday August 9th, I said:  "Hey, man.  Thanks
19   for lunch.  Help me on that number next time."
20        He replied, "Gotcha.  How 32 sound.  What you think
21   is fair."
22        And I replied, "32 works for me."
23   Q    32 what?
24   A    $3,200 for two ounces of cocaine.
25   Q    All right.  And so that's the end of the
```

1    conversation on Friday, August 9th; is that right?

2    A    Yes.

3    Q    Okay.  What's the next communication?

4    A    On Saturday, August 10th, he sent me a message that

5    said, "6,500 for five onion."

6    Q    What does that mean?

7    A    $6,500 for five ounces of cocaine.

8    Q    Okay.  Weren't you just talking about an amount of

9    product for $3200?

10   A    Yes.

11   Q    Okay.  So what's happening here in this 6500 for

12   five onion?

13   A    Carl Martin is trying to sell five ounces to me

14   instead of the two ounces that we are talking about the

15   day before.

16   Q    And the word "onion," what do you understand that

17   to mean in connection with this case?

18   A    Onion, slang for ounce.  They both start with "O"

19   and they're used interchangeably.

20   Q    All right.  What's your response to 6500 for five

21   onion?

22   A    I said, "I like that number, my man, but let me see

23   how fast these two go, and see if I can get some bigger

24   mouths to feed."

25        He replied, "Let me know."

1     And I replied, "Will do."

2  Q    And when's the next communication between the two

3  of you?

4  A    On Tuesday, August 13th.

5  Q    Is there any communication between you and Mr.

6  Martin between Saturday, August 10, and Tuesday, August

7  13?

8  A    No.

9  Q    Okay.  What is the next communication?

10 A    Carl Martin sent me a message that says, "When do

11 you wanna get some lunch?  That way I have it prepared

12 for you."

13 Q    Okay.  So before Tuesday, August 13th, had you

14 talked about specifically meeting with him again?

15 A    No.  Just the -- the price conversation.

16 Q    Okay.  So what was your response to him asking if

17 you want to get some lunch?

18 A    I replied, "I'll be good for lunch Friday.  Two for

19 32?"  And I said, "I don't know where I'm working Friday

20 yet, but when I know, I'll let you know what time I can

21 swing by."

22     He replied, "Just let me know and I'll make it

23 happen."

24     I said, "Thanks, bud."

25     And he replied, "No problem."

```
 1   Q    Okay.  And if we can go on to document 156, please.
 2   Just continue reading at the top, please.
 3   A    After he said, "No problem," he said, "My main
 4   man's wanna give you a sweet deal.  Basically you get
 5   one plus for free.  If you get five, it's only 6,000."
 6   Q    Can you break that down and help us understand what
 7   that means?
 8   A    Yeah.
 9        So he is saying his supplier is giving a deal, or
10   discount, and he is saying basically with this price I
11   will get one plus ounces of cocaine for free compared to
12   the prices we dealt with previously.
13   Q    Okay.
14   A    And then he said, "If you get five," referring to
15   five ounces, "it's only $6,000."
16   Q    Okay.  How did you interpret -- what did you
17   interpret that as?  What did you understand that
18   communication as being?
19   A    An attempt by Carl Martin to sell me five ounces of
20   cocaine instead of the previously discussed two ounces
21   of cocaine.
22   Q    And you responded a little later on the 13th,
23   right?
24   A    Yeah.  I responded --
25   Q    Can you read that to us?
```

1     A     Yes.

2           On August 13th I responded, "I'm trying, man.  I'm

3     still a little light on paper right now.  I'm still

4     sitting on some hammers I was gonna be moving last

5     weekend."

6     Q     All right.  When you said, "a little light on paper

7     right now," what do you mean?

8     A     A little light on money, as in I don't -- I don't

9     have as much money as I would need to do that purchase

10    at that time.

11    Q     Okay.  And what does the comment, "I'm still

12    sitting on some hammers I was going to move last

13    weekend" refer to?

14    A     Hammer is referring to guns or firearms.  In this

15    context, when working undercover, I generally establish

16    myself as someone who is around firearms or handles

17    firearms.  For the purpose of anyone associated with the

18    investigation, you know, in this case Carl Martin, or

19    any of his associates, if anyone shows any interest in

20    firearms, just kind of establish myself as someone that

21    might be involved with that and see if anyone has

22    anything to say about that.

23    Q     Okay.  So I think you heard a minute -- I think I

24    heard you say a minute ago that it was for Mr. Martin

25    and anyone involved with Mr. Martin that you make that

1   statement?

2   A    Yes.  It's --

3   Q    Can you tell us a little bit more about what you

4   meant by that?

5   A    Yes.

6        So when I'm acting as undercover agent, it's --

7   it's not every day.  It's kind of a somewhat rare

8   occasion where I have direct communication with people

9   in this capacity that I don't usually have communication

10  with.  And because of that, I kind of get an inside

11  access to -- to criminal activities and such.

12       So while I am in that capacity to kind of, you

13  know, fully -- just fully investigate the types of

14  crimes that we investigate -- violent crimes, firearm

15  crimes -- just in case someone associated with the

16  investigation is involved in that type of activity, I

17  like to be ready to collect that evidence or receive

18  that information or receive that phone call or text.

19  Q    Okay.  So is this just about Mr. Martin possibly

20  having firearms?

21  A    No, not at all.  That's a message that I hoped that

22  Mr. Martin kind of receives and shares or understands

23  and keeps in the back of his mind in case maybe an

24  associate of his also says, Hey I'm looking for a

25  firearm, and that person might be prohibited or looking

1    to possess that firearm illegally.  And, again, it's

2    just establishing myself as that person in case an

3    opportunity like that might arise during the

4    investigation.

5    Q    Okay.  So I think I hear you saying that it's part

6    of the investigation itself to -- to investigate whether

7    there's people involved in firearms that shouldn't be?

8    A    Yes, absolutely.

9    Q    All right.  Is there anything specific to this case

10   and Mr. Martin specifically that would have you send

11   that text message?

12            MR. MATSON:  Judge, objection.  I don't know

13   the answer, but I'm afraid or concerned it's going to

14   contain hearsay.  And however it's offered, it's going

15   to contain substantive allegations, and it can't be

16   interpreted for anything but the truth.  So I don't have

17   a foundation for it.

18            THE COURT:  Do you anticipate a hearsay

19   response?

20            MS. FULLER:  So he has previously testified

21   yesterday being aware of Mr. Martin's involvement with

22   firearms the year previous, as to investigate -- it's

23   part of ATF's motivation for investigating Mr. Martin.

24            THE COURT:  Objection overruled.  In light of

25   the -- in light of the context of this particular case,

1    what is behind the officer's decision to ask the

2    question becomes relevant.  So that technically is not

3    for the truth of the matter asserted therein.  It is for

4    the purpose of understanding exactly why the

5    investigation proceeded the way it did.

6              MR. MATSON:  Understood, your Honor.  Note my

7    objection.  And so I don't have to keep doing this, I

8    will add there is a limited response that can convey why

9    someone did something that did not contain substantive

10   allegations of hearsay against Mr. Martin.

11             THE COURT:  Your objection is noted.  Go

12   ahead.

13   BY MS. FULLER:

14   Q    So is there something specific to Mr. Martin and

15   this particular investigation which would cause you to

16   send this particular message to Mr. Martin?

17   A    Yes.

18        Knowing that in February of 2018 carl Martin had

19   previously possessed a firearm and in the manner that I

20   described before, that I observed on the surveillance

21   video from that incident.

22   Q    So what ultimately happens after this conversation

23   between you and Mr. Martin on August 13?

24   A    We agreed to meet for another controlled purchase

25   on August 16th, 2019.

1    Q    Okay.  And what happens during that meeting with

2    him?

3    A    So we agree that I will purchase five ounces of

4    cocaine for $6,000.

5    Q    Okay.

6    A    We agree to meet in the same area, the Price

7    Chopper parking lot area, so I go to that parking lot.

8    Carl Martin directs me to the area in front of the Rite

9    Aid right there.  I park.  I observe eventually Carl

10    Martin exiting the Rite Aid.  I wave to Carl Martin, and

11    he waved back to me.  And then he went towards the Chevy

12    Equinox, and shortly after that I observed Mirnes

13    walking from the Chevy Equinox to my vehicle.

14         Mirnes got in my vehicle, handed me a package

15    containing approximately five ounces of supposed

16    cocaine.  He made a comment about how it's easier to --

17    just to walk over than to pull the vehicle over.  In

18    exchange, I gave him the $6,000.  After -- when I gave

19    him the $6,000, he made a comment about not having to

20    count it.  He referenced towards the Equinox that Carl

21    Martin had walked towards, and said, "I'll have him do

22    it" or "I'll make him do it," something along those

23    lines.

24         He then exited my vehicle after the purchase and

25    walked back towards the Equinox.  I left the parking

1    lot.  I drove to meet Special Agent Sam Brown and turned

2    over the supposed cocaine to Special Agent Sam Brown.

3    Q    Okay.  I'm not sure we talked about this in the buy

4    on the 9th, but you mentioned the Chevy Equinox in the

5    buy on the 9th.  Did you recognize anybody aside from

6    Carl Martin in that Equinox on the buy on the 9th?

7    A    Yes.  Mirnes.

8    Q    And what's his full name, do you know?

9    A    Mirnes Julardzija.

10   Q    And what's his involvement in this?

11   A    Generally he would drive Carl Martin to these

12   controlled purchases.  He would often middle the

13   controlled purchases between myself and Carl Martin.

14   Q    What do you mean by middle?

15   A    At one point he describes himself as the middleman,

16   as in he would bring the controlled -- or the cocaine or

17   supposed cocaine from Carl Martin to me.  I would give

18   him, Mirnes, the money, and he would bring that back to

19   Carl Martin.

20   Q    Okay.  So this buy that we were just talking about,

21   the buy on August 16th, 2019, was that substance sent to

22   the lab?

23   A    It was.

24   Q    And what were the results of that?

25   A    It was positive for lidocaine, and it was not

1    positive for cocaine.

2    Q    Okay.  And the same series of questions as in the

3    buy on the 9th:  When did you learn that this substance

4    did not test positive for cocaine?

5    A    It was -- this substance was much later.

6    Q    Okay.  Much later than the 10th?

7    A    It was after.  I believe it was after August 10th.

8    It was a -- I believe this substance went to the -- the

9    DEA lab, not the Vermont State Lab.

10   Q    Okay.  But you didn't know shortly after this

11   controlled buy what the substance was?

12   A    I did not.

13   Q    Okay.  So after this controlled buy, what happened

14   in terms of -- was there more communications with Mr.

15   Martin?

16   A    There was.

17   Q    And what were the gist of those communications?

18   A    I told -- we discussed Carl Martin distributing me

19   higher-quality cocaine than what had been happening.  We

20   would refer to it as fish or scales, referring to a

21   high -- is the higher quality of cocaine.

22   Q    So if you didn't know the results of that previous

23   cocaine, why are you engaging in that communication with

24   him?

25   A    Sometimes -- I mean, part of it is just in general,

1   just -- just more communication, and -- you know, just

2   more communication.  And also knowing that previously he

3   had distributed cocaine and -- and then substances that

4   did not look consistent with the previous purchase,

5   talking about the June -- the two buys in June.  You

6   know, just kind of to challenge him regarding the

7   quality and make sure that we were pushing to get the

8   best quality possible.

9   Q    Okay.  So it wasn't necessarily that you knew at

10  the time you were communicating about the substances

11  being poor; that you knew that these two recent

12  substances were not cocaine?

13  A    Correct.  It's common practice to kind of have

14  conversations like that, constantly looking for -- to

15  make sure you are getting the best quality.

16  Q    Okay.  At the time you are talking to Mr. Martin,

17  just so the -- it's clear --

18       I'm worried that some of this is a little

19  confusing.

20       At the time you are talking to Mr. Martin on August

21  16th, 2019, you had just talked about five controlled

22  buys; is that right?

23  A    Yes.

24  Q    Out of those five controlled buys, how many of

25  those controlled buys were you aware of what the

1    substance actually was?

2    A    None of the controlled buys.

3    Q    Out of five, didn't we talk about knowing that

4    there was one in -- oh, so you hadn't received the lab

5    report even on that fifth controlled -- okay.

6    A    No, I had not.

7    Q    So as of August 16th, you had five controlled buys

8    into Mr. Martin and you weren't aware from the lab as to

9    what any of those substances were?

10    A    Correct.

11    Q    You just had a suspicion, it sounded like, of the

12    buy on June 20 -- June 28th?

13    A    Correct.

14            MS. FULLER:  All right.  So if we could pull

15    up Exhibit 3, please.

16    BY MS. FULLER:

17    Q    So can you describe for us -- I think you just did

18    a little bit, but these next series of communications

19    with Mr. Martin, what are those about?

20    A    It's about the quality of cocaine purchased, and

21    then -- and then eventually talking about further

22    controlled purchases.

23    Q    So if you could just read from the top of that

24    communication.

25    A    On Friday, August 16th, I sent a message that said:

1    "So far so good.  No complaints."

2          He replied, "That's good.  I should have something

3    better."

4          I replied, "Good, man.  I used to get those fish

5    sandwiches for lunch, you know.  The closer to that, the

6    better for me."  And he --

7    Q    And when you refer to fish sandwiches, just remind

8    us what you mean.

9    A    The term "fish" referring to high-quality cocaine.

10   Q    And what is the next communication you have with

11   him?

12   A    After he replied, "Yes," the next communication is

13   August 20th, 2019.

14   Q    All right.  So there's a gap of four days?

15   A    Yes.

16   Q    And did you reach out to him in those four days?

17   A    I do not.

18   Q    All right.  And the next communication is what?

19   A    He asked me, "How's everything?"

20         Then I reply, "Going all right, man."

21         And then he replies, "That's good.  Let me know

22   when you are trying to eat some lunch."

23   Q    And what did you understand him to mean by that?

24   A    Him -- I understood it to mean him encouraging me

25   or asking me when he can distribute more cocaine to me.

1    Q    Okay.  So I just want to be clear:  At the time he

2    is sending you this text message on August 20th, 2019,

3    had you talked to him between August 16th, the date of

4    the last buy -- had you talked to him by that date and

5    August 20th, 2019, about setting up another deal?

6    A    No.

7    Q    All right.  So the first indication of that comes

8    from this text message --

9    A    Yes.

10    Q    -- from Mr. Martin:  Let me know when you are

11    trying to get something to eat -- some lunch?

12    A    Yes.

13    Q    You can continue reading, please, to the next page.

14    A    After he said, "That's good.  Let me know when you

15    are trying to eat some lunch," I replied, "For sure,

16    man.  Might be a minute.  Still a little full from that

17    last lunch, but I should be good after this weekend.

18    I'll let you know."

19    Q    What do you mean by that?  What are you trying to

20    tell him in that message?

21    A    Just that I'm not ready yet, that I'm not looking

22    to do -- purchase at that time, that it's going to be a

23    little bit and I will let him know when I'm ready and

24    that maybe it will be after this weekend.

25    Q    When's the next communication you get from him?

1    A    On Wednesday, August 21st, 2019.

2    Q    What did he say?

3    A    He sent me a message that says, "That fish came in.

4    Let me know when you want to have lunch."

5    Q    What did you understand that to mean?

6    A    I understood that to mean him saying like the

7    high-quality cocaine that I was looking for, that I

8    talked about having purchased previously, that he had --

9    that he had received that, and he was ready to

10   distribute that to me.

11   Q    Okay.  If you can just keep reading for me, please.

12   A    I replied, "Perfect.  Let me know on what you're

13   thinking on numbers.  I'm going camping with wifey till

14   Sunday, but I should be good for lunch when I get back.

15   And please tell me it's better than the last lunch.

16   That's been slow and I'm not -- and I'm hearing not

17   great."

18   Q    And his response?

19   A    He replied, "Yes.  Lots better."

20        And I said, "Cool."

21   Q    Okay.  And the next response -- or the -- is there

22   another -- when's the next response you receive from

23   him?

24   A    On Thursday, August 22nd, 2019, he sent me a

25   message saying, "I'll give you a good deal."

1    Q    Okay.  So this August 22nd communication is a day
2    after he had sent you the text that said, That fish came
3    in.  Let me know when you want to have lunch?
4    A    Yes.
5    Q    What did you interpret that message to mean, the
6    one on August 22nd?
7    A    That he would give me a good deal on the
8    high-quality cocaine he had received and was ready to
9    distribute to me.
10   Q    Okay.  And if you can keep reading down that page.
11   A    I replied, "That's what's up, my man.  Let me know
12   the number for the same as last time."
13        He replied, "You think that number is fair?  If
14   not, I'll work something out for you."
15        I said, "It's definitely fair if it's as good as
16   you are saying.  Let's do the same, my man."
17   Q    And so after you say, "It's definitely fair if it's
18   as good as you're saying.  Let's do the same, my man,"
19   what happens after that?
20   A    So after that he communicates to me further of the
21   high quality that it is.  He eventually sends me a video
22   of supposed high-quality cocaine, calling it fish, and
23   then tells me that because it's so high quality, that
24   the supplier's asking for more, a little bit more money
25   per ounce for the cocaine.

1    Q    The supplier is?

2    A    Yes.

3    Q    Okay.  The video that he sent to you, did you

4    memorialize that?

5    A    I did.

6    Q    How did you do that?

7    A    I took the video, put it on a disk and preserved it

8    as evidence and put it in our vault.

9          MS. FULLER:  Could we play Exhibit 4, please.

10          (A digital recording was played in open

11    court.)

12          MS. FULLER:  So could we bring up document

13    180, please.

14    BY MS. FULLER:

15    Q    Is that the video that was sent to you?

16    A    It is.

17    Q    Okay.  And can you walk us through the text

18    messages that we see on page 180.

19    A    So after I said, "It's definitely fair if it's as

20    good as you are saying.  Let's do the same, my man,"

21    he sent the message saying, "It's that fish" and sends

22    the video.

23          I replied, "Bro, that's what I'm talking about.

24    You can see the scales."

25    Q    What do you mean by scales?

1    A    You can see the small, shiny, parts on the blocks

2    of the white substance that -- referring to those as

3    scales that you will sometimes see in high-quality

4    cocaine, referred to as fish.

5    Q    So if you can keep reading, please.

6    A    Yep.

7        He replied, "Yeah.  Now boy tripping though, wanna

8    do 15 to 16 a onion.  I'll let you decide if you want to

9    or no.  Just let me know.  I'll go get it now for you."

10    Q    What did you understand him to mean by, "Now boy

11    tripping though wanna do 15 to 16 a onion"?

12    A    I understood that to him saying that his -- the

13    supplier of this cocaine was telling him he was going to

14    charge Carl Martin more per ounce of cocaine than he had

15    previously, and -- or than they had talked about

16    previously, and now he was planning to charge him 1,500

17    to 1,600 per ounce.

18    Q    Okay.  So what does that mean for you?

19    A    It would mean that I would also end up paying more

20    for the cocaine than we had previously discussed.

21    Q    If you could just read on to the next page, please.

22    A    Yes.

23        "I buy from him" -- he says, "I buy for him for 15.

24    So just let me know what you want to do."

25        I replied, "Let me know if you are thinking 15 or

1    16 for me.  If it still looks like that when you get it,
2    I want some for sure.  But I'm at camp with wifey till
3    Sunday, so it gotta wait a minute."
4        He replied, "Are you trying to get the same five?
5    If so, what do you want to pay?  15 or 16?  I'll make it
6    happen for you.  I'll get it now and hold it for you,
7    same thing I just showed you."
8        I said, "Five for 15 would be perfect, my man.
9    Thanks."
10       He said, "15 a piece, that would be 75."
11   Q    All right.  There's a lot of numbers in there.
12   A    Yes.
13   Q    Can you tell us essentially what price you are
14   agreeing to pay and for how much?
15   A    I am agreeing to pay 1,500 per ounce of cocaine.
16   With us talking about five ounces of cocaine, the total
17   being $7,500 for five ounces of cocaine.
18   Q    All right.  So that's that last text message from
19   Carl Martin which says, "15 a piece, that would be 75"?
20   A    Yes.
21   Q    So 1,500 a piece for five ounces would be 75?
22   A    Yes.
23           MS. FULLER:  So if we can go to document 182.
24   BY MS. FULLER:
25   Q    Is this a continuation of the text messages?

1    A    It is.

2    Q    All right.  Can you just read from the top down.

3    A    Yep.

4         He sent me a message saying, "Gotcha.  I'll pick

5    soon as I get off work and hold for you."

6         I replied, "Thanks, man.  I'll hit you up when I'm

7    back."

8         And he said, "No problem."

9    Q    And so later that night, do you have more

10   communication with him?

11   A    The next communication I have is Sunday.

12   Q    So these communications that we were just talking

13   about, those all happened --

14        MS. FULLER:  If we can go back to document

15   179, please.  And scroll down.

16   BY MS. FULLER:

17   Q    The communications start on August 22nd?

18   A    Yes.

19   Q    That was the day that he sends you the video of the

20   cocaine?

21   A    Yes.

22        MS. FULLER:  Okay.  If we can just scroll to

23   180.  This is the next page.  181 is the page after

24   that.  And then top of 182.

25   BY MS. FULLER:

1    Q    That's all until we get to Sunday.  That's all
2    Thursday, August 22nd?
3    A    Correct.
4    Q    Okay.  So there's no communication between you --
5    between August 22nd and this Sunday?
6    A    Correct.
7    Q    Okay.  And so who reaches out next?
8    A    Carl Martin sends me a message on Sunday saying, "I
9    have lunch prepared when you're ready eat.  Let me
10   know."
11        I reply, "Sorry, bud.  Had bad service at camp.
12   Tried hitting you back this morning.  Let's do lunch
13   tomorrow."
14        He replied, "Sounds good to me."
15        And I said, "Thanks for grabbing that lunch."
16   Q    What ultimately happens after these text messages?
17   A    We conducted another controlled purchase from Carl
18   Martin.
19   Q    Okay.  Was this on August 26th, 2019?
20   A    It was.
21   Q    Walk us through what happens during that buy.
22   A    On August 26th, 2019, I drove to the same area, the
23   Price Chopper parking lot area after communicating with
24   Carl Martin, to conduct a controlled purchase of five
25   ounces of cocaine from Carl Martin in exchange for

1    $7,500.

2         I arrived at the parking lot.  Then observed Mirnes

3    driving the Chevy Equinox into the lot and Carl Martin

4    in the passenger seat.  I observed Mirnes exit and walk

5    from the Chevy Equinox to my vehicle and come to me and

6    hand me a -- a takeout food container, a tan takeout

7    food container that contained about five ounces of

8    cocaine.  In exchange, I paid him $7,500.

9         During the deal, we had conversations -- when he

10   first gave me the takeout food container containing the

11   cocaine, he said that it wasn't that fish but it should

12   be better.

13   Q    What do you mean -- what did you understand him to

14   mean by "it wasn't that fish"?

15   A    He was saying it wasn't the very high-quality

16   cocaine we had talked about, but it was -- it was higher

17   quality than I had previously purchased.

18   Q    Okay.  I just have a question -- when we talked

19   about the previous buy, the one on August 16th, that was

20   for the same amount but less money?

21   A    Yes.

22   Q    So can you just describe for us why this was five

23   ounces but now the price went up to 7500?

24   A    Because of the discussion I talked about about the

25   higher-quality cocaine, the video describing it as fish.

1    It's him indicating that this was a very pure or

2    high-quality cocaine that someone would charge more

3    money for.

4    Q    Okay.  So I think you got to the point where you

5    are describing Mirnes being at your car.  What happened

6    after that?

7    A    Yes.  So he told me, "It's not that fish but it's

8    better."  He --

9         I pushed back a little bit and I said that I'm --

10   "That's what I'm looking for, I want that fish."

11        Mirnes said -- told me, "You know how we get that?"

12   He said, "I go down to Philly to get it."

13        And then I suggested I would go with him, and then

14   he indicated towards the Chevy Equinox, and he said,

15   "The three of us."

16        And then I pushed back on the $7,500.  I said,

17   "Listen, it's not what we talked about.  Can we do seven

18   for this?"

19        That's when Mirnes said that it's not his deal.  He

20   referenced towards Carl Martin in the Chevy Equinox

21   saying that it was his deal, and Mirnes said that he,

22   Mirnes, is just the middleman.

23   Q    Now, was this interaction with Mirnes recorded?

24   A    It was.

25             MS. FULLER:  Could we bring up and play

1    Exhibit 6 and Exhibit 7, the transcript, please.
2              (A digital recording was played in open
3    court.)
4              MS. FULLER:  Can I stop.
5    BY MS. FULLER:
6    Q    Just so we can orient the jury here, can you walk
7    us through what we're seeing in the video?
8    A    So this is -- this is being recorded out my
9    driver's side window.  And then you see Mirnes approach
10   my driver's side window and hand me the tan takeout food
11   container through my driver's side window.
12   Q    What does he mean by, "It's shrimp"?
13   A    I understood it just to be him talking in code.  He
14   refers to it as shrimp and stir fry, I think, and it's
15   just his way of not saying cocaine.
16   Q    Okay.  And he mentioned in there -- there was some
17   talk about the quality, and he said, "It'll come back.
18   It'll come back."  What did you understand him to mean
19   by that?
20   A    I understood him to either mean that this -- that
21   the high-quality cocaine that we had talked about is
22   going to come back into play, and -- and -- or possibly
23   he was saying that the cocaine he was giving me would
24   come back with good reviews.  One or the other.
25             MS. FULLER:  If we can continue, please.

```
 1                    (A digital recording was further played in
 2      open court.)
 3      BY MS. FULLER:
 4      Q    So what was the purpose in negotiating -- talking
 5      about the price?  You had already agreed to pay 7500.
 6      What's the purpose in negotiating it down to 7?
 7      A    Oh, he said that it's not -- he said it's not
 8      scales, you know, and it's not -- saying that it's not
 9      that high quality that we talked about, why we were
10      going to pay that price, but then he also repeatedly
11      says, "It's better.  It's better."  But that's why I
12      pushed back.
13                    MS. FULLER:  Okay, you can continue.
14                    (A digital recording was further played in
15      open court.)
16      BY MS. FULLER:
17      Q    Was that the end of the interaction with Mirnes on
18      that day?
19      A    It was.
20      Q    So there was some reference in that text message
21      again as to Philly.  I think you touched on this
22      yesterday, but if you can just remind us again, what did
23      you understand that reference to Philly and taking a
24      trip to mean?
25      A    I understood it to mean talking about the same
```

1    conversation that I had with Carl Martin, about him

2    obtaining high-quality cocaine from Philly.  At one

3    point Carl Martin says, "My brother's on his way back

4    from Philly."  Just more of that conversation to obtain

5    the high-quality cocaine from Philly and also knowing

6    that Carl Martin is from the Philadelphia area as well.

7    Q    Okay.  So walk us through, for this specific buy,

8    what you do with the substance that you received on that

9    date.

10   A    On August 26th, 2019, I drove and met with Special

11   Agent Sam Brown, and I turned the substance over to

12   Special Agent Sam Brown.

13   Q    Okay.  And do you know what happens with that

14   substance after that point?

15   A    It's processed and placed in our evidence vault and

16   eventually sent to the lab for testing.

17   Q    Okay.  And what is that processing of that

18   substance and where does it happen?

19   A    At our -- at our office, it is sealed in a

20   heat-sealed plastic, and by -- and then signed -- or

21   initialed and dated by two agents that are doing that

22   process together.

23   Q    Okay.  Were you the agent who was part of the

24   heat-sealing process for this particular substance?

25   A    I don't -- I don't remember off the top of my head

```
1    if I was one of the two agents that processed this
2    substance.
3    Q    I'm going to show you what's been marked as
4    Government's Exhibit 66.  So can you tell us what
5    Government's Exhibit 66 is?
6    A    This is the -- the cocaine purchased on August
7    26th, 2019, in the video we just saw from Carl --
8    Q    Now, is there anything special about that?  It
9    looks like a package to me --
10   A    I can tell --
11   Q    But is there anything you can identify about that
12   which indicates to you that it is the same substance you
13   purchased?
14   A    It contains the packaging.
15   Q    What do you mean by that?
16   A    The packaging that I received the substance in.
17   You can see the tan takeout container right here.
18              MS. FULLER:  Okay.  Can we bring up
19   Government's Exhibit 10, please.
20   BY MS. FULLER:
21   Q    What is Government's Exhibit 10?
22   A    The -- the takeout container from the purchase.
23   Q    Okay.  So is that takeout container in that bag?
24   A    Yes.
25   Q    And the substance that's in that bag, do you know
```

1    if it was tested by the lab?

2    A    It was.

3    Q    Do you know what it tested for?

4    A    Cocaine.

5            MS. FULLER:  So can we bring up Government's

6    Exhibit 11, please.

7    BY MS. FULLER:

8    Q    What is that?

9    A    That is the -- the takeout container with further

10   packaging inside that contained the cocaine.

11   Q    Okay.  And what is --

12           MS. FULLER:  Government's Exhibit 13, please.

13   BY MS. FULLER:

14   Q    And what is that?

15   A    That is the cocaine on a scale, weighed.

16   Q    All right.

17   A    From the August 26th.

18   Q    Okay.  Take that back from you.

19        So the substance that's found in Government's

20   Exhibit 66, you indicated a minute ago that you took the

21   substance and you gave it to Special Agent Brown for

22   further processing.

23   A    Yes.

24   Q    Is that what you said?

25   A    I did.

1    Q    Did you modify or tamper with that substance while

2    you had it before you gave it to Special Agent Brown?

3    A    No, I did not tamper with the substance while I had

4    it.

5    Q    Now, did you hear -- did you have communications

6    with Mr. Martin after the buy on the 26th of August?

7    A    Yes.

8    Q    Can you describe for us what some of those were.

9    A    There was more conversation about previous purchase

10   and the -- of potential -- further purchases from Carl

11   Martin.

12          MS. FULLER:  So if you could bring up

13   Government's Exhibit 3, page 185, please.

14   BY MS. FULLER:

15   Q    So if you could describe for us what the top of

16   that message is?

17   A    The top of the message is from the previous

18   meeting, me saying, "I'm here," and then Carl Martin

19   asking if I'm in front of Rite Aid and saying he doesn't

20   see me.

21   Q    So this was part of the buy that we were just

22   talking about --

23   A    Yes.

24   Q    -- on August 26th?

25   A    Yes.

1    Q    Okay.  What's the next communication between the

2    two of you?

3    A    I received a message from him that says, "How's

4    lunch?"

5         I replied, "Definitely better than last week.  I'll

6    let you know what I'm hearing later too.  I might give

7    it a seven, not seven five" -- or 75 -- "but let's see

8    how it goes.  Thanks, bud."

9         He replied, "Just let me know.  I'm gonna take that

10   trip myself so we can have A1."

11        And I replied, "Perfect."

12   Q    What did you understand his comment -- we talked

13   about -- a few minutes ago about him taking a trip.  You

14   have explained that.  But that phrase, "So we can have

15   A1," what did you understand that to mean?

16   A    A1 describes something as high quality.  The

17   same -- an extension of the conversations we had been

18   having about obtaining high-quality cocaine.

19   Q    Okay.  What happens after this text message with

20   Mr. Martin?

21   A    We eventually set up another controlled purchase,

22   and we discussed meeting on September 5th, 2019.

23             MS. FULLER:  Okay, can we bring up

24   Government's Exhibit 14, please.

25   BY MS. FULLER:

1    Q    So just to be clear, you just read for us in

2    Government's Exhibit 3, page 185, that you had a

3    conversation with him where you ended by saying,

4    "Perfect."  He was talking about going on the trip and

5    you said, "Perfect"?

6    A    Correct.

7    Q    What is the next time you have a communication with

8    him?

9    A    On Thursday, August 29th.

10   Q    Is there any communication between that last

11   communication, where you say, "Perfect," and this next

12   communication, which is Government's Exhibit 14,

13   document 222?

14   A    No.

15   Q    All right.  So you hadn't reached out to Carl

16   Martin in that time, in that span of time between the

17   last communication where you said, "Perfect," and this

18   one?

19   A    No.

20   Q    All right.  And if you could just read from the

21   top?

22   A    Yep.

23        On Thursday, August 29th, 2019, he sent me a

24   message saying, "How's everything going?"

25   Q    So he is checking in with you?

1    A    Yes.

2    A    I replied, "Good, my man."

3         He said, "That's good."

4         I replied, "Yeah, man.  Good meal."

5         And he said, "Let me know when you wanna do lunch

6    again."

7    Q    So just to be clear, had you talked with Mr. Martin

8    between the last deal and this statement that he makes

9    to you, "Let me know when you wanna do lunch again" --

10   had you talked with him about setting up another deal?

11   A    No.

12   Q    Keep going.

13   A    I said, "Yeah, bud.  Will do.  Thanks."

14   Q    Okay.  When's the next communication you have with

15   him?

16   A    On Monday, September 2nd, 2019.

17   Q    And same series of questions.  Did you talk with

18   Mr. Martin between August 29th, when you said, "Yeah,

19   bud.  Will do.  Thanks," and September 2nd?

20   A    No.

21   Q    And what did he say to you on September 2nd?

22   A    He asked, "What's good, my guy?  When you wanna do

23   lunch?"

24   Q    What did you understand that to mean?

25   A    I understand it -- understood it to mean him -- he

1  was asking me when I would purchase from him again, when

2  I would purchase cocaine from him again.

3  Q    Okay.  Keep reading, please.

4  A    I replied, "Soon, my man."  Then I said,

5  "Definitely by payday Friday.  Last meal is good but

6  it's having to be served with the other one because it

7  was no good, so still catching up."

8  Q    What was the purpose of that?

9  A    Just more general conversation pushing back about

10  quality, saying that this was better but I still had

11  some left over from the -- the lower quality because

12  he's -- they were describing what I'd received as

13  higher, which would say the stuff before was lower than

14  that.  I was saying I had to mix it in order to be able

15  to sell it --

16  Q    Okay.  And then --

17  A    -- and that was taking time.

18  Q    When's the next communication you have with him?

19  A    On Tuesday, September 3rd, 2019, I received a

20  message from him saying, "Just let me know.  How many

21  fish you looking for for lunch?"

22       I replied, "Looking for five fish for lunch."

23       He said, "Gotcha."

24       The next day I asked, "You wanna do lunch

25  tomorrow?"

1          And he said, "We can.  What time?"

2     Q    Okay.  If you can stop there.

3          So what happens after these series of -- this

4     upcoming series of text messages about meeting again?

5     A    We conducted a controlled purchase from Carl Martin

6     on September 5th, 2019, in the same area.

7     Q    Okay.  And what happens during that deal?

8     A    So we discussed meeting and purchasing, again, five

9     ounces of cocaine for $7,500 in the same area.  I drove

10    to the Price Chopper parking lot.  I observed Mirnes

11    driving the Chevy Equinox and with Carl Martin in the

12    passenger seat.  I observed Mirnes come to my vehicle

13    and bring me a rectangular cardboard box.  He described

14    it as a filter for a Toyota when he handed it to me.

15    And the box contained about five ounces of cocaine.  In

16    exchange for that, I paid $7,500.

17    Q    Okay.  Now, was this buy recorded as well?

18    A    It was.

19          MS. FULLER:  If we can play, please,

20    Government's Exhibit 16 and 17.

21          (A digital recording was played in open

22    court.)

23    BY MS. FULLER:

24    Q    Can you walk us through what we are seeing on the

25    video?

1    A    Yes.

2         That's Mirnes.  The recording, again, is going out

3    my driver's side window.

4    Q    Okay.

5    A    And you see Mirnes approaching my driver's side

6    window, handing me the box I described containing the

7    cocaine, and then having a conversation with me through

8    the window.

9    Q    When he says, "Smell it, smell it.  You'll know.

10   Just smell it," what did you understand that --

11   A    He was telling me to smell the cocaine and that I

12   would -- by smelling it, I would be able to tell that it

13   was of high quality.

14              MS. FULLER:  Okay.  If we can keep going,

15   please.

16              (A digital recording was further played in

17   open court.)

18   BY MS. FULLER:

19   Q    When you indicated in the video, "Let's go down and

20   do a big one," what did you mean?

21   A    To do a purchase of the high-quality cocaine in --

22   in Philadelphia that we had discussed previously, and if

23   we're going to go down and make a purchase like that,

24   let's make it worth our trip basically.

25   Q    And just to be clear, in all of the text messages

1    that we have read so far, whose suggestion was it -- was

2    it your suggestion initially to go down and take the

3    trip?

4    A    No.

5    Q    So you said you purchased a substance that came in

6    a box, like an air filter box?

7    A    Yeah.  It was a rectangular cardboard box, kind of

8    long.

9    Q    Okay.  What did you do with the substance after you

10    purchased it?

11    A    I met with Special Agent Sam Brown and turned the

12    substance over to Special Agent Sam Brown.

13    Q    Okay.  Did you tamper with that substance in any

14    way from the time you received it from Mirnes to the

15    time you dropped it off to Special Agent Brown?

16    A    No, I did not tamper with it.

17         MS. FULLER:  Can we show the jury Exhibit 21,

18    please.

19    BY MS. FULLER:

20    Q    What is that?

21    A    That's the cardboard box that I described that I

22    received the cocaine in.

23    Q    Okay.

24         MS. FULLER:  Exhibit 22, please.

25    A    That's the cocaine that was contained within the

1    cardboard box.

2    BY MS. FULLER:

3    Q    And I'm showing you what's been marked as

4    Government's Exhibit 69.  Can you identify that for me?

5    A    Yes.

6         This is -- contains the cocaine purchased during

7    that controlled purchase, as well the packaging.  You

8    can see the cardboard box here folded up inside.

9    Q    Can you just explain to us -- and if you can't, I

10   understand, but there seems to be a lot of packaging and

11   a lot of plastic in these bags.

12        Can you walk us through -- why do these bags

13   contain more than just the actual controlled substance?

14   A    So when we receive the controlled substance, we

15   package it and -- the way that we do it, and then when

16   we turn it over to another agency such as DEA, they

17   package it in the way they package it, and when they

18   send it to their lab, the lab tests it and they

19   repackage it the way they package it, and along the way,

20   the packaging kind of accumulates, and you will see a

21   lot of, you know, our packages, some of their original

22   when they received the packaging, and they maintain all

23   that along the way.  So it's -- kind of accumulates

24   during that process.

25   Q    So that's a package with all the other previous

```
1    packaging?

2    A    Yes.

3    Q    In addition to the controlled substances?

4    A    Yes.

5    Q    So the substances I just showed you, Government's

6    Exhibit 69, do you know whether that was sent to the

7    lab?

8    A    It was.

9    Q    Do you know what the results of that substance was

10   at the lab?

11   A    It tested positive for cocaine.

12   Q    What happened between you and Mr. Martin after this

13   particular deal of September 5th of 2019?

14   A    We continued to have conversations much like the

15   previous ones about what potential future purchases and

16   such.

17   Q    Okay.

18            MS. FULLER:  Can we bring up Government's

19   Exhibit 25, please.

20   BY MS. FULLER:

21   Q    And if you can read from the top?

22   A    Yes.

23       On Thursday, September 5th, 2019, he sent me a

24   message asking, "Did you like the lunch."

25       I replied "Yeah, bud.  Might be best lunch yet."
```

1        He said, "I think the one I'm getting tomorrow

2    should be even better.  I should have seven."

3    Q    So I'll stop you there.

4        What did you understand that to mean?

5    A    He is saying that the -- that he is receiving more

6    cocaine the following day, and that it should be even

7    higher quality, and he should have about seven ounces to

8    distribute to me.

9    Q    If we can flip down to towards the bottom of the

10   page at 8:12 p.m.  Can you talk us through those

11   communications?

12   A    Yes.

13       He sent me a message asking, "I get one for 16.

14   What you thinking you can pay for one?"

15   Q    One for 16 is what?

16   A    Referring to one ounce of cocaine for $1,600.

17   Q    So that's a little bit more expensive than what you

18   had been paying?

19   A    Yes.  A hundred dollars more per ounce.

20   Q    And what's your response to that?

21   A    And I respond, "If it's even better, I can go a

22   little more for one after I finish this lunch."  And I

23   said, "We have done a few lunches now, so you know I'm

24   good with a fair number.  Let me know if it looks that

25   good and I'll get you the number you say is fair.  If we

1    can do a big fish meal and get the number way down, I

2    don't care if the place to eat is a long drive, you

3    know, worth it for good food and good price."

4    Q    And what are you talking about there?

5    A    Just referencing again if he wanted to make the

6    trip to Philadelphia to purchase the higher-quality

7    cocaine, that I would be interested in that.

8    Q    Okay.  Keep going.

9    A    He replies, "It's better.  How much you willing to

10   take?  All seven?"

11   Q    Can I just stop you right there.  What's the most

12   amount you had purchased from Mr. Martin up until this

13   time?

14   A    Five ounces on one purchase.

15   Q    So this suggestion of seven, what did you

16   understand this to refer to?

17   A    Him attempting to sell me a higher amount.  Instead

18   of five ounces, him attempting to sell me seven ounces

19   of cocaine for the next purchase.

20   Q    Okay.  Had you talked about buying seven from him

21   before?

22   A    No.

23           THE COURT:  All right.  It is 10:30.  Now's

24   the time for our break, so let's take a 15-minute recess

25   and be back at quarter of.

```
1    (Court was in recess at 10:32 a.m.)

2    (The following was held in open court with the jury

3    present at 10:50 a.m.)

4              THE COURT:  Okay.  Ready?  Is the government

5    ready to proceed?

6              MS. FULLER:  Yes, your Honor.  Thank you.

7    BY MS. FULLER:

8    Q    So I believe we were at Government's Exhibit 25,

9    document 230.  And I think, Agent Wood, you had just

10   read to us the text message at the bottom that said,

11   "How much are you willing to take for all seven?"

12   A    Yes.

13   Q    Could you read for us the text after that.

14   A    "I was thinking about taking the drive the end of

15   month or next month."

16   Q    And if you continue on to the next page.

17   A    I replied, "Yeah, I can do all seven after this

18   lunch is gone for sure.  Yeah, that would be great, bud.

19   That's how we get the good numbers."

20        And he replied, "Yes, sir."

21   Q    Okay.  And when's the next time you heard from him?

22   A    Monday, September 9th, 2019, I received a message

23   from him that said, "Trying to get some lunch this

24   week."

25   Q    Okay.  And at the time of that message on Monday,
```

1    September 9th, had you talked to him again about any

2    further -- any further purchases from him?

3    A    No, no conversation after "yes, sir" and before

4    that message that Monday, no.

5    Q    But as of the message on September 9th, before that

6    date had you been in the process of setting up another

7    transaction?

8    A    Yes.  The --

9         When I said, "Yeah, I can do all seven after this

10    lunch is gone," we could -- yes, we could continue to do

11    purchases.

12    Q    Okay.  Now, is there something that happened after

13    these series of text messages on September 9th that --

14    that changed the direction of the case?

15    A    Yes.

16         On September 10th, 2019, we received lab reports

17    back from the Vermont State Lab that gave us results

18    from the first four controlled purchases to include June

19    25th, June 28, July 23rd, and August 9th.

20    Q    Okay.

21    A    The results of those indicated that, as I said

22    earlier, the -- on June 25th, it was cocaine base, or

23    crack cocaine, purchased.  On the 28th was aspirin.  On

24    July 23rd, it was cocaine.  And on August 9th, it was

25    lidocaine.

1   Q    All right.  And when was the date you heard back

2   from the lab?

3   A    September 10th, 2019.

4   Q    All right.  So just to make sure I understand this,

5   so on September 10th, you get four lab results?

6   A    Yes.

7   Q    Okay.  And I think you just said a minute ago that

8   two of those were positive for cocaine and two of those

9   were negative?

10  A    Yes.

11  Q    Okay.  So with that information, what did you do?

12  A    We -- we decided to not just continue to conduct

13  purchases at that time but continue conversations with

14  Carl Martin.  We decided to send -- make sure that we

15  had all our -- our drugs to the lab and get those

16  results back to kind of help navigate what our next

17  direction would be.

18       In the meantime, I continued to talk to Carl Martin

19  as he continued to make statements about his drug

20  distribution, his cocaine distribution, but we were not

21  planning on doing a purchase in the near future at that

22  time.

23  Q    Is there any other investigative technique that you

24  used right around this time to deal with this issue of

25  two positive tests, two negative tests for drugs?

1    A    Yeah.

2         We placed two recorded phone calls in to Carl

3    Martin.  One I placed myself, and I acted as if my phone

4    wasn't working, and I -- I said, "Dre?  Dre?"  Repeated

5    his name.  And he replied in the affirmative, "Yeah,

6    yeah."  And then that was basically the end of the call.

7    The purpose being for, you know -- I hadn't had a phone

8    conversation with him.  This opportunity, you know, to

9    have that and this -- when we weren't planning to make

10   purchases.

11        The other technique was to have the confidential

12   informant place a recorded phone call in to Carl Martin.

13   Q    Up until you used that technique, when was the last

14   time you had had involvement with the CI in a controlled

15   transaction in to Mr. Martin?

16   A    During the July 23rd controlled purchase at

17   McDonald's.

18   Q    All right.  So what happened -- what happens to the

19   CI in terms of his involvement in this case after July

20   23rd and up until this time in September you are talking

21   about?

22   A    No -- we did not use the CI in any -- you know, the

23   manners that we did before.  There was no involvement.

24   Q    Okay.  And so what does his involvement become in

25   September?

```
1    A    We had the confidential informant place a phone
2    call in to -- recorded phone call in to Carl Martin, and
3    the -- the plan was to have the confidential
4    informant -- you know, have -- say that he had heard
5    from me and that I was complaining and I was angry about
6    the substances, that they weren't -- they weren't high
7    quality, and to ask him if -- if it was real coke, or
8    real cocaine.
9    Q    Were you present for the call?
10   A    I was.
11   Q    And do you recognize the voices on each side of the
12   call?
13   A    I did.
14   Q    Who did you recognize the voices to be?
15   A    The CI, John Latimer, and the other side, Carl
16   Martin.
17   Q    Now, were you in the same room as Latimer at the
18   same time?
19   A    In the same vehicle, yeah.
20   Q    I'm sorry?
21   A    In the same vehicle.
22   Q    In the same vehicle?  Right.
23   A    Yes.
24   Q    Okay.  But you recognized the voice on the other
25   line as Carl Martin?
```

1    A    I did.

2    Q    Could you tell us what Mr. Martin said about the

3    cocaine being real or not?

4    A    The CI asked, "Is the coke real?"  And Carl Martin

5    replied, "Yes."

6    Q    And so what impact did this recorded call with Mr.

7    Martin have on the investigation, on the path of the

8    investigation?

9    A    Well, it -- as I discussed earlier, and the

10   decisions that we had made about continuing the

11   investigation to keep -- because the -- again, that he

12   was -- the fact that he was distributing cocaine at

13   times, and other times not distributing cocaine, but

14   this call further showed that he was, you know,

15   purportedly distributing cocaine or saying, you know,

16   "This is cocaine I'm distributing," that again didn't

17   lessen our concerns about the violence.

18        We continued our investigation with communications

19   and such, but, again, didn't make controlled purchases

20   until we had a better idea of -- of the totality of

21   other lab results and other factors involved.

22   Q    Okay.  So at the time this call was made to Mr.

23   Martin from Mr. Latimer, had you received lab results

24   for the other buys in this case?  So the buy that you

25   had conducted on the 26th of August and September 5th.

1    A    We had not received those lab results, no.

2    Q    All right.  So around this same time, what was

3    happening between you and Mr. Martin in terms of

4    communication?

5    A    So I -- I -- at this time I pushed back.  At first

6    I -- I said my phone wasn't working, or I sent messages

7    that didn't make sense, like I -- we were having a

8    hard -- showing that we were having a hard time

9    communicating via text message and then recorded phone

10   call.

11        I then complained to him about the quality through

12   text message, and -- and complained that I had lost

13   money and, you know, that it wasn't okay, that I

14   couldn't purchase more.

15   Q    So why do the first part?  Why, you know, the ruse

16   to My phone isn't working and --

17   A    Just -- just to buy time at that point.  Just to

18   give us an opportunity to think about, you know,

19   direction and what we wanted to do next.  Just kind of

20   afforded us a little bit of time.

21             MS. FULLER:  Let's look at some of those text

22   messages.  Can we look at Exhibit 25, document 232,

23   please.

24   BY MS. FULLER:

25   Q    So if you can read for us starting Friday,

1    September 13th, at 9:07 a.m.

2    A    Yes.

3        "What's the word for the day?" was sent to me.

4        And then I replied, "What's good, bud?  Give me the

5    weekend to find that bread you like for those

6    sandwiches, and we can do lunch Monday."

7    Q    What do you mean when you refer to bread for those

8    sandwiches?

9    A    So I'm saying give me the weekend to get my money

10    together in order to be able to purchase cocaine.

11    Q    Okay.  Keep going.

12    A    He replied, "You want all 10 or just seven?"

13    Q    What does that refer to?

14    A    He had previously talked about having seven ounces

15    of cocaine for distribution, and had asked me if I

16    wanted all seven.  At this point he changes what he has

17    to asking me if I want all 10 or just seven ounces.

18    Q    Had you had a previous conversation with Mr. Martin

19    about buying 10 from him?

20    A    No.

21    Q    And 10 you understood to be what?

22    A    10 ounces of cocaine.

23    Q    All right.  So in this, he is talking about selling

24    you 10 ounces of cocaine versus seven?

25    A    Yes.

1    Q    Can you describe what happens after that?

2    A    I replied, Let me see how we're looking after

3    work," and he replied, "Copy."

4                MS. FULLER:  If we can skip to document 234.

5    BY MS. FULLER:

6    Q    And then read starting at the middle to bottom of

7    the page.

8    A    On Sunday, September 15th, 2019, I sent a message

9    saying, "All set for lunch, my man.  It's like

10   definitely good to go.  Can't get anything like those

11   bad meals.  I'm still paying for 'em, and that bread's

12   gone for good if we mess up."

13        He replied, "It's good lunch."

14        I replied, "All right.  Cool."

15   Q    And so what happens after these text messages with

16   him?

17   A    We -- we're talking about meeting up for another

18   purchase, but we do not conduct a controlled purchase

19   from Carl Martin surrounding these messages.

20   Q    Okay.  So just going from the date on the message,

21   this is Sunday, September 15th?

22   A    So -- yes.

23        So following these messages, I don't -- I end up

24   not offering to purchase cocaine.  I complain about the

25   cocaine, tell him I'm in no position to purchase

1    cocaine, and eventually leading up to the September

2    20th, 2019, meeting I talked about earlier between

3    myself and Carl Martin at McDonald's in Colchester.

4        He offers to front me cocaine, or give me, you

5    know, cocaine on consignment as a -- as a way to build

6    back trust and to get me going again to purchase cocaine

7    from him.

8            MS. FULLER:  Okay.  So can we go to document

9    236, please, of Exhibit 5.

10   BY MS. FULLER:

11   Q    And if you can describe for us what's happening on

12   this page.

13   A    So on Monday, September 16th, he says, "Can you

14   meet at Price Chopper next to McDonald's in Colchester

15   where we meet first time?  My guy, let me know so I can

16   make a move.  Everything good" question marks.

17       "Can you meet at Price Chopper next to McDonald's

18   in Colchster where we meet the first time?"

19   Q    Okay.  If you can look over page 237 for me, and

20   238, and rather than read all those, can you describe

21   for us what's happening on 237 and 238?

22   A    What I described earlier about acting as if our

23   phones are not working or not connecting and I'm not

24   receiving messages or thinking he is not receiving

25   messages from me.  Again, just to buy time to not

1    conduct a controlled purchase we had been discussing.

2    Q    Okay.  So let's start again at the bottom of 238.

3    If you can read that.

4    A    Monday, September 16th, I sent, "Yo, don't know

5    what's up?  This shit ain't working."

6    Q    And keep reading.

7    A    Then he replied, "Give me an address.  I'll come to

8    you.  I'm trying to call you," question marks, "or

9    McDonald's work for you?"

10    And then at 10:25, he sent -- he asked, "What's the

11    word?"  And then --

12    Q    And you don't respond to him anymore on the 16th?

13    A    I don't.

14    Q    All right.  What's the next communication you have

15    with him?

16    A    The next day, Tuesday, September 17th, he asks,

17    "What's good?"

18    Q    And continue on, please.

19    A    On Tuesday, September 17th, I wrote, "Got new

20    phone.  Shit's not good right now though."

21    And he replied, "When you thinking we can do

22    lunch?"

23    Then I replied, "Shit ain't good right now."

24    And he asks, "Anything I can help with?"

25    And I said, "No, no.  What's done is done.  That

1    shit ain't good and now my money's all fucked up."

2    Q    What do you mean your money's all fucked up?

3    A    Because of the poor quality of cocaine, my money's

4    gone, I'm not getting paid for it because it's such poor

5    quality, and so I don't have money to do anything with,

6    including purchase cocaine from Carl Martin.

7    Q    Continue on.

8    A    And he asks, "Are you talking about the lunch?"

9         And I replied, "Yeah."

10        Then he replied, "How come you never said that

11   before?  Had I known, I would go back and get the money

12   back for you and me.  I'm -- angry face.  I don't like

13   that.  If you are spending money, then you should get

14   what you pay for.  I'm going to the city myself and get

15   my own fish.  I cannot afford nothing like this,

16   especially to someone like you who spend good money.

17   Will you be willing to bring someone with you to test

18   the lunch?"

19   Q    What does he mean by that?

20   A    He is referring to kind of testing, bring someone

21   with me to check the cocaine and make sure it's good, to

22   test it.  So he is saying, "I'm going to give you good

23   cocaine.  Would you be able to bring someone to help you

24   make sure it's good to go."

25   Q    Does he know that you don't use controlled

1    substances?

2    A    He does not know that.

3    Q    Okay.  Keep going.

4    A    I replied, "Because I just needed it to move and it

5    takes time to hear it ain't moving," and I said it's

6    straight from the city -- "If it's straight from the

7    city, yeah, I can probably get the bread back if I get

8    just a little something to show people it's the real

9    deal.  I'm seriously done with this other shit."

10        And he replied, If you want me -- "If you want, me

11   and you can take that trip together.  I'm -- angry

12   faces.  Not only did this fool fuck up your money, he

13   did mines too."

14   Q    What did you understand that to mean?

15   A    He's saying because -- because I received

16   poor-quality cocaine, and now I'm not dealing with him,

17   it's messing with his profits that he is making from --

18   from distributing as well, not just me.

19   Q    Okay.

20   A    I replied, "That's what's fucked up all that bread

21   and I can't get anything that moves."

22        And then he replied, "I got you.  My word.  I'm

23   gonna do my own shit from now on."

24        I replied, "Look, I definitely was thinking you

25   screwed me, but I hear you.  I had to miss work all day

1    today to deal with these people and get a new phone."

2         He replied, "Damn, man.  I don't like to hear that.

3    And I wouldn't do that to you.  You spend money, so I'm

4    really mad that this dumb-ass dude gives you bullshit.

5    Now I will have to make it up 'cuz that's not who I am."

6         And I replied, "Thanks, man.  Been shitty two days.

7    Gonna need to work a bit before I can get anything

8    together to make that trip.  If you go get anything and

9    can give me a little something to show my people, let me

10   know."

11        He replied, "Yes, of course.  I'll definitely give

12   you something to get that trust back.  I apologize for

13   this fuckup."

14   Q    So in those text messages we heard you say, "If you

15   can give me something that I can show my people," and he

16   mentions getting -- give you something to get that trust

17   back.  I think you have explained this before, but just

18   tell us one more time what that is referring to.

19   A    He was indicating to get -- he would get my trust

20   back.  After giving me poor-quality cocaine or supposed

21   cocaine, he's saying he is going to give me something

22   that will make me trust him more, trust him again,

23   something of higher quality.

24   Q    Okay.  And remind us again, the next deal you do

25   with him was the one we talked about at the beginning?

1    A    Yes.  September 20th at the McDonald's in

2    Colchester.

3    Q    Does that deal follow these -- follow these

4    communications?

5    A    It does.

6    Q    So that long string of text messages that we were

7    just talking about -- if we go back to document 240 --

8    what date did those start on?

9    A    So on Thursday, September 17th, 2019.

10    Q    Okay.  On Tuesday?

11    A    Sorry.  Tuesday.

12            MS. FULLER:  Okay.  And so if we can go to

13    document 245.

14    BY MS. FULLER:

15    Q    So there's a communication on "Gotcha.  I'll make

16    it happen."  Is that part of -- is that on Tuesday?

17    A    Yes.

18    Q    All right.  What's the next communication?

19    A    On Wednesday, he sent me a message that said, "I

20    have some good news.  One of my brothers on his way from

21    Philly right now with some raw fish that you can cook

22    yourself if needed.  Only thing is he wants more for

23    one."

24    Q    So is this the communication we talked about at the

25    beginning?

1    A    It is.

2    Q    All right.  So this leads into the buy on September

3    20th?

4    A    It does.

5    Q    Okay.  Now, after the buy on September 20th, what

6    happens?

7    A    I push back on quality again, and again only for

8    the reason to buy time.  We were not planning to make

9    controlled purchases from him at that time or any time

10   soon; just, you know, conducting the investigation

11   without controlled purchases at that time.

12   Q    Well, you said conducting the investigation without

13   controlled purchases, but you did have a controlled

14   purchase with him on September 20th?

15   A    Yes.  After September 20th.  Sorry.

16   Q    Is there a difference between -- I mean,

17   investigatively, is there a difference between the

18   controlled purchase on September 20th and the other

19   controlled purchases that were happening in this case?

20   A    Well, in the previous controlled purchases, we had

21   exchanged money for the cocaine or supposed cocaine, and

22   September 20th, we didn't pay for the substance that was

23   given to us -- that was fronted to me or given to me on

24   consignment, and that we were willing to meet to collect

25   that evidence instead of paying for more cocaine.

1    Q    Okay.  Did you have communications with him after

2    the September 20th deal?

3    A    I did.

4             MS. FULLER:  If we can bring up Exhibit 34,

5    please.

6    BY MS. FULLER:

7    Q    And just start at the top.

8    A    He asked, on Friday, September 20th, "Any word on

9    that?"

10            And I --

11   Q    What was he referring to?

12   A    The cocaine I received from him that day on

13   September 20th, asking if I had heard if it was quality

14   or not.

15   Q    Keep going.

16   A    I replied, "Not yet.  Be a minute."

17            Then on September 21st I sent him a message saying,

18   "Thanks for trying, man, but my people saying it's no

19   good.  Still got no zip.  Ain't anything close to raw

20   fish.  If I were you, I'd get your bread back if you

21   gave it."

22   Q    So what's the purpose of that text message to him?

23   A    To tell him that I'm not going -- to indicate that

24   I'm not going to purchase cocaine from him at this time.

25   Q    Do you know at the time you are reading that text

1    message what the lab report says for the most recent

2    substance you purchased on September 20th?

3    A    I don't believe I do at that time, no.

4    Q    Okay.  Go ahead.

5    A    Sorry.  On September 20th, I do not know what the

6    lab says.  I said, "I don't believe."  I did not know.

7    Q    Okay.

8    A    So he replied, "Yeah, I will.  Just gonna need that

9    back to give this fool.  I'm just gonna go get my own.

10   Just message him waiting for answer."

11   Q    Keep going.

12   A    I sent a message saying, "Yeah, I'm getting hunting

13   camp ready all weekend.  I'll see what's up when I'm

14   back.  Just tell him it's straight garbage, like if he

15   burned you, you don't need shit back.  That's why I told

16   you you just making shit worse; we keep pulling shit

17   out, putting shit out there, like you said it was Philly

18   fish, and it's the same garbage."

19   Q    So can you just review this series of text messages

20   on document 291 and 292 for us?

21   A    Yes.

22   Q    And tell us just generally what's happening in

23   those.

24   A    At first he asks me for the -- what he gave me on

25   September 20th, he is asking for it back, and I tell him

1    to push back to whoever gave it to him.  And just going

2    on talking about that I'm not going to deal with that

3    anymore, and that I'm going to need time and I'm not

4    gonna be dealing with him, kind of moving forward.

5    Q    Okay.  Can I direct your attention to document 292,

6    in the middle of that page.

7    A    Yes.

8    Q    Can you tell us -- so when is the -- is there a

9    communication with him on September 30th?

10   A    Yes.

11   Q    Okay.  And the communications that you had previous

12   to that were on what date?

13   A    The previous to September 30th were the -- I don't

14   remember the exact date of those.

15            MS. FULLER:  If we can go back to 290.

16            THE WITNESS:  Sorry.

17            THE COURT:  Then September 21st, 2019.

18   BY MS. FULLER:

19   Q    So you had a series of communications on September

20   21st.  That's on document 290 and then 291, and then we

21   get to 292.

22        That communication that we see on September 30th,

23   is that the first communication since September 21st --

24   A    Yes.

25   Q    -- with Mr. Martin?

1    A    Yes.

2    Q    All right.  And he is reaching out to you?

3    A    He is.  He is -- he's attempting to sell me more

4    cocaine.

5    Q    And what does he say?

6    A    He says, "What's the word?  I have some new food."

7    Q    All right.  And your response?

8    A    I said, "Sorry, bud.  Not around.  Making bread

9    working out of town for a bit.  I'll let you know when

10   I'm back."

11   Q    And that's a day after he sent you that first text

12   on September 30th.

13   A    Yeah, the next day.

14            MS. FULLER:  Okay.  If we can keep going to

15   293.

16   BY MS. FULLER:

17   Q    When's the next date you hear from him?

18   A    So then on Sunday, October 6th, he sent me a

19   message that said, "Got the best fish right now.  Just a

20   little bit more."

21   Q    And then, to be clear, had there been any

22   communications with you and Mr. Martin between October

23   1st and October 6th?

24   A    No, there was not.

25   Q    Okay.  And when did you respond to that?

1    A    Two days later, on October 8th, I replied, "Yo

2    shit, sorry my man.  Didn't even see this with the new

3    number.  I still ain't ready for it.  Moving those

4    hammers to get my bread right now.  Let me know if you

5    know anyone trying to get rid of 'em" so I can deal you

6    in -- "and I can deal you in on the bread if you want."

7    Q    All right.  There's a couple things to talk about

8    there.

9         In the communication that he sends to you

10   on Sunday, October 6th, he said, "Got the best fish

11   right now."  Can you tell us what you understood that to

12   mean?

13   A    I understood it to be him again talking about

14   high-quality cocaine that we had talked about obtaining

15   and he had talked about distributing to me, and he was

16   saying that he had obtained it and was able to

17   distribute it to me.

18   Q    Okay.  And your response on October 8th mentions

19   moving those hammers to try to -- I'm sorry, "moving

20   those hammers to get my bread right."  We talked about

21   the word "hammer" before, I think.

22        Just to the extent we didn't do it before, can you

23   tell us what you mean by hammers?

24   A    It's referring to guns.  Firearms.

25   Q    All right.  And why send this communication to him

1    on October 8th?

2    A    So we weren't conducting controlled purchases at

3    the time.  Again, we were exploring other investigative

4    avenues, and as I said earlier, while acting in an

5    undercover capacity, I had established myself as someone

6    who deals in guns in case opportunities arise.

7         In this instance, I'm seeing if Carl Martin might

8    know anyone that is selling firearms.  His involvement

9    in drug distribution, given that involvement, and his

10   associates were involved in selling firearms, that might

11   be an investigative outlet we might want to explore.  So

12   I put it out there that maybe I would purchase firearms

13   from someone.

14   Q    Okay.  And what was his response to that?

15   A    "I'll check around for you."

16   Q    Okay.  Keep going.

17   A    I replied, "Thanks."

18   Q    And when was the next communication between the two

19   of you?

20   A    After I said thanks on October 9th, on October

21   16th, he sent me a message asking, "What's the word?"

22   Q    And the next communication?

23   A    And then the next day on October 17th, he sent me a

24   message stating, "I have the real deal holyfield."

25   Q    And so your communication on October 9th, that said

1    thanks, was there any communication from you to Carl
2    Martin between the 9th and the 17th?
3    A    No.  Again, I was purposely not engaging with him
4    about receiving controlled substances from him at that
5    time.
6    Q    So there's no other text messages here than the
7    ones we see?
8    A    Correct.
9    Q    What's your response on October 17th at 6:10 p.m.?
10   A    I responded, "What's good, my man?"  And then I
11   said, "I'm trying be working back in Vermont next week.
12   I'll hit you up when I'm around about getting lunch."
13   Q    Okay.  And when's the next day you hear from him?
14   A    On Monday, October 21st, he sent me a message
15   stating, "Just let me know number of fish."
16   Q    So that's a four-day gap between the two of you?
17   A    It is.
18   Q    Is there no other communications than the ones we
19   see here?
20   A    Correct.
21   Q    And what do you respond?
22   A    I respond, "Yeah, I'm not trying to eat too much
23   until my people are saying it's good.  What's the number
24   on like one or two?"
25   Q    So I want to stop for a minute, and if we can go

1    back to document 293.

2        This is the text message, that you read to us a

3    moment ago, on October 6th where it says he has got the

4    best fish right now.  Is there anything that you noted

5    about the phone number on this particular text message?

6    A    Starting with that text message, the phone number

7    changed from the one that he was communicating with me

8    on to the one you see at the top, (413) 273-6250.

9    Q    Okay.  So if -- just one page before that, on

10   document 292, the phone number being used was

11   (802) 335-2236?

12   A    Yes.

13   Q    And then on 293, you just read it to us, it changed

14   to that number?

15   A    It did.

16   Q    Who do you believe was communicating over the phone

17   number (413) 273-6250?

18   A    Carl Martin.

19   Q    How come?

20   A    Because it was a clear extension of the

21   conversations we had been having.  "We got that best

22   fish right now," "Just a little bit more," those clearly

23   the same language we had been using.  I wasn't

24   communicating with anyone else at this point in this way

25   about anything like this, using that phone number.

```
1    Q    So that phone number is the same on document 294?
2    A    Yes.
3    Q    And we were just at the top of 295 where you had
4    read us the text message on October 21st at 7:04 p.m.
5    Same phone number?
6    A    Yeah.  I was waiting for it to --
7    Q    Sorry?
8    A    Yes.  Yes, same phone number.
9    Q    Okay.  Can you just continue reading down the page,
10   please.
11   A    Monday, October 21st, I sent a message stating,
12   "Yo, Red says you're looking for something.  Let me know
13   if I can help."
14   Q    Without telling us conversations you had with
15   people outside of this courtroom, what was your
16   motivation for sending this particular text message?
17   A    I learned that Carl Martin was looking to obtain a
18   firearm.
19   Q    Okay.  And when you reference Red, who are you
20   referencing in that message?
21   A    The CI, John Latimer.
22   Q    All right.  And Mr. Martin's response?
23   A    "Yeah, like a .357.  Has to be clean."  Then he
24   says, "My paying 2,000 for one, I'm getting good
25   feedback.  It's the real deal.  Just let me know what
```

1    you think.  I could give you the same as me.  I could
2    give you for the same -- for same as me or 21."
3    Q    Okay.  Keeping going.
4    A    Then I stated, "Yeah, I got a .38 right now I can
5    trade ya and let you try it out and can swap it for the
6    .357 still if you want when -- when I get one in.  It's
7    clean.  I tried it.  It's nice."
8    Q    Keep going.
9         MS. FULLER:  The next page, please.
10   A    "I'd do it for like 3 or like a small lunch."
11        He replied, "300?  I could do that.  Do you still
12   want to do those two lunch too?  If so, we can make it
13   all happen at once."
14        I replied, "Yeah, and I can grab that thing at
15   lunchtime if you're good after work."
16        MS. FULLER:  Okay.  So can we go back to
17   document 295, please.
18   BY MS. FULLER:
19   Q    So at the time that Mr. Martin indicates to you,
20   "Yeah, like a .357.  Has to be clean," had you had any
21   specific conversation with Mr. Martin about trading any
22   particular firearm?
23   A    No, not -- no, I had not.
24   Q    And when you responded, "Yeah, I got a .38 I can
25   trade ya, and then I can swap it out for a .357,"

1    describe for us what that was talking about.

2    A    I was saying that I had a .38 caliber firearm that

3    I can provide him instead of the .357, and then if he

4    wanted, when I received the .357 in my possession, I

5    would trade him for -- trade that firearm out for him

6    and give him the .357 that he originally wanted.

7    Q    So why have this conversation with him?  If you are

8    willing to trade him a firearm, why not trade him the

9    .357?

10   A    Well, at this point we were looking at

11   investigative options, and we were considering a firearm

12   reverse.

13   Q    What is that?

14   A    A firearm reverse is a technique used by the ATF to

15   address individuals looking to illegally possess

16   firearms, and it's considered a safer alternative to

17   waiting until those individuals, by other means, obtain

18   those firearms and any violent acts that might follow.

19   Instead, we would offer to provide someone a firearm

20   and -- and you sell it to them or trade to them if they

21   prefer to trade it, and then immediately would arrest

22   that person after for taking possession and illegally

23   possessing that firearm.

24   Q    So in a reverse, just generally, the firearm is

25   provided to a person, and in that transaction that

1    person's immediately arrested?

2    A    Yes.

3    Q    Okay.  So you were continuing on with thinking that

4    you would employ this technique.  How does that fit in

5    with the .38 and the .357?

6    A    So we have what we refer to as prop firearms that

7    we use in operations like these.  Some prop firearms are

8    closer or easier to access locally.

9    Q    What do you mean closer and easily to access?

10   A    Like we -- they're available locally.  So we might

11   have prop firearms available as close as Burlington, and

12   then there might be other prop firearms available in

13   Boston, and then we may have prop firearms elsewhere in

14   the country at other offices.

15   Q    What's the process for ATF obtaining a prop

16   firearm?

17   A    So the agency deems firearms acceptable for use as

18   props, and then they're maintained by members of the

19   agency and used in that fashion.  They are -- they're

20   real firearms.  They're working firearms.  The term

21   "prop" just refers to the fact that ATF has deemed them

22   appropriate for use in this manner.

23   Q    Okay.  Do you have a cache of prop firearms in your

24   office here in Burlington?

25   A    We do.

1    Q    Okay.  And so you were explaining sort of where you

2    get these prop firearms from.  How does that relate to

3    this .357/.38 conversation you are having?

4    A    So at the time of this conversation, we didn't have

5    a .357 prop firearm available right at our office, and

6    aside from -- we were willing to seek one, but commonly

7    I will ask if someone might want -- accept a different

8    firearm because, again, the fear being that they will go

9    out and obtain a firearm by other means in the meantime

10    if it takes a while.

11         The process can take a little bit sometimes, if I

12    was to request a .357, to receive it and be able to use

13    it.  So I offered him something that we had locally and

14    see if he would be interested in that instead of the

15    .357 for now.

16    Q    Okay.  So that's what you meant when you said, "I

17    have a .38 I can trade ya and then we'd swap it out

18    later?

19    A    Yes.  And I say .38.  I was actually referring to a

20    .380 auto caliber.  There are differences in the

21    ammunition used by those two firearms.  .38 is just --

22    it's just a different way to reference it.  The .380

23    auto, someone who's not familiar with firearms might not

24    be familiar with that, so I referred to it as a .38.

25    Q    Okay.  On document 296, it's the continuation of

1    your conversation.  I want to go back a little bit.

2         When Mr. Martin asked you, "Has to be clean," and

3    then on 296 you also reference, "It's clean.  I tried

4    it.  It's nice," what do you mean by clean?

5    A    By clean, I mean not stolen.

6    Q    Okay.

7    A    It means that the firearm is not stolen.  If they

8    were to run it, it wasn't going to come back as stolen

9    if anyone ever ran checks on it.

10   Q    And when you said, "I'd do it for like three or a

11   small lunch," what --

12   A    I was saying I would sell it to him for $300 or

13   exchange it for a small lunch once.  We had referred to

14   cocaine as lunch or meals.  Bring a small amount of

15   cocaine, the equivalent of $300.

16   Q    Okay.  And I think you read to us his response on

17   296.  What did you understand him to mean when he said,

18   "300, I could do that.  You still want to do those two

19   lunch too?  I can make it happen at once"?

20   A    I understood him to be saying that he would pay

21   $300 for the firearm.  He was asking me if I still

22   wanted to purchase the two ounces of cocaine from him we

23   had previously discussed, and he was saying if I did

24   want to, he suggested that we do the cocaine purchase

25   and -- and him purchasing the firearm from me all at

1   once.

2   Q    Okay.  So what date is this that you're having

3   these conversations with him?  Looking back up to 295.

4   A    I started on October 21st.

5   Q    Okay.  But the communication from Mr. Martin about

6   the .357 and your response about the .38, is that on

7   October 22nd?

8   A    It is.

9   Q    So what happens after that?  What happens after

10  these messages?

11  A    We agreed to meet and conduct the controlled

12  purchase of cocaine and the -- his purchase of the

13  firearm from me, and -- at -- and end up meeting at the

14  McDonald's in Colchester that we previously discussed.

15  Q    Okay.  I'm going to show you what's been marked as

16  Government's Exhibit 38, or marked and admitted.  What

17  is that?

18  A    That's the -- the prop firearm that was used during

19  a reverse operation with Carl Martin on October 23rd --

20  Q    Okay.

21  A    -- 2019.

22  Q    And during this operation that you say happened on

23  October 23rd, what are you expecting to happen during

24  the deal?

25  A    I was expecting Carl Martin to exchange a quantity

1    of cocaine to me in exchange for my payment for the

2    cocaine and the prop firearm.  I -- I did not expect

3    Carl Martin to give me $300 for the firearm.

4    Q    How come?

5    A    In my experience, in operations like these, when --

6    even when someone has said that they're going to --

7        Someone that's involved in distributing controlled

8    substances and they are asking to do a firearm deal

9    during a controlled substance deal, even if they say

10   they are going to pay money for the firearm, they end up

11   paying in cocaine, in this instance, or whatever

12   controlled substance is involved.

13   Q    Okay.  So how much money was involved in this

14   transaction that we are going to talk about?

15   A    $3,900.

16   Q    Okay.  And what was that for?

17   A    That was for the cocaine, and it --

18   Q    How much cocaine?

19   A    For the two ounces of cocaine.

20   Q    Okay.

21   A    We discussed a price that -- a range between what

22   would have been $4,000 and $4,200.  I was prepared with

23   $3,900 because I did not expect him, again, to bring

24   $300.  That price was -- I assumed was just going to

25   come out of what I was paying him for the cocaine.

1    Q    Got it.  So -- all right.  So how much money did

2    you show up to the deal with?

3    A    $3,900.

4    Q    And you were expecting to get what?

5    A    Two ounces of cocaine.

6    Q    Now, leading up to the deal, was there some

7    communications between you?

8    A    There was.

9    Q    Can we look at those on -- starting at 298.  If you

10   could just note for us the phone number.

11   A    The phone number's (413) 273-6250.

12   Q    Is that the same number you had been communicating

13   with in the past day or so?

14   A    It was.

15   Q    If you please, can you just start from the top and

16   read.

17   A    So he says, "So it's gonna have to be lunchtime

18   tomorrow.  My man's at work till 7:30."

19        I replied, "Yeah, that, that works."

20        He replied, "I'm bringing good stuff."

21        And I replied, "That's what's up, my man.  I'll

22   bring the other thing too."

23   Q    Keep going.

24   A    On Wednesday, October 23rd, he sent a message

25   stating, "What time you thinking?  What the word?"

```
1              I replied, "Like 12:30?"

2              And he replied, "Gotcha."

3      Q      Keep going.

4      A      Then he replied, "Where you at?"

5              And I replied, "Here.  Where you at?"

6              And he asked, "Where?"

7              And I said, "By bus out back, white truck."

8      Q      Okay.  And when you are referring to you're here,

9      where are you?

10     A      I'm at McDonald's in Colchester.

11     Q      Is this the same location as some of the other

12     deals?

13     A      It is.

14     Q      Okay.  And the top of document 30?

15     A      He sent me a message from a new number,

16     (628) 250-1735.

17     Q      So this is a new phone number to you?  Had you seen

18     this one in this case before?

19     A      Not that I remember.

20     Q      Okay.  Can you read that for us?

21     A      I received a message from this phone number

22     stating, "On Beltline now.  Be there in four."

23             And I replied, "K."

24     Q      So what happens close in time to after you received

25     this message?
```

1    A    I was in the parking lot of McDonald's in

2    Colchester, and I observed the same Chevy Equinox drive

3    in, being driven by Mirnes, with Carl Martin in the

4    passenger seat.  I approached their vehicle.  I got in

5    the back seat of the vehicle.  Around the same time I

6    got in the back seat, Carl Martin exited the front

7    passenger seat, and he went to the -- the trunk cargo

8    area of the Equinox.

9         At that time Mirnes told me he's just getting it

10   out of the trunk.  Carl Martin then tossed a -- a

11   black-and-white checkered fanny pack near me in my --

12   you know, my passenger compartment there.  Then he got

13   back up in the front, the front passenger seat.

14        At that time I took out a -- the -- I had put the

15   prop firearm in, like, a McDonald's-like sandwich

16   container kind of.  I took that and I had that in a

17   McDonald's bag as well as the $3,900, so I came in with

18   kind of a McDonald's bag full of those two things.

19        I took that out and showed it to Carl Martin.  He

20   looked at it, and -- and he told me to get into the big

21   pocket of the fanny pack.  I opened the big pocket of

22   the fanny pack and pulled out -- there was two

23   quantities of cocaine.  The larger quantity, it was

24   about two ounces, and a smaller quantity, that was

25   closer to about 3.5 grams.

1    Q    And so -- let me stop you there for a minute.

2         You said there were two packages.  One was a larger

3    and one was a smaller.  What did you interpret that as?

4    A    When I saw that, it looked to me as the -- the

5    larger package of cocaine was the -- likely the two

6    ounces that I had agreed to purchase, and the smaller

7    package of cocaine appeared to be approximately $300

8    worth, or what I had expected him to pay me with for the

9    firearm I was giving him.

10   Q    And just to remind us, you said earlier, you showed

11   up with approximately $3900?

12   A    I did.

13   Q    What is the -- through this case, you know, what is

14   the average cost of an ounce of cocaine that you were

15   paying?

16   A    Well, it did vary.  It was -- you know, at one time

17   it was -- and it varied by quantity too.  So it was, you

18   know, 1,800 an ounce for a couple times, and then it

19   ended up being 1,200 for the supposed cocaine on that

20   one deal, and then it was 1,500 per ounce.  And then on

21   this deal he was asking for between 2,000 to 2,100 per

22   ounce.

23   Q    Okay.  So for this controlled purchase, was it

24   audio-video recorded?

25   A    It was.

1          MS. FULLER:  Can we play Government's Exhibits

2     40 and 41.

3          (A digital recording was played in open

4     court.)

5          MS. FULLER:  Stop it right there.

6     BY MS. FULLER:

7     Q    So that person was just talking, "I got a little

8     concussion at work."  Who was that speaker?

9     A    Mirnes.

10         MS. FULLER:  Go ahead.

11         (A digital recording was further played in

12    open court.)

13    BY MS. FULLER:

14    Q    So you said, "You want me to dig in here.  This

15    one, the big one.  How you been, Bud?"

16         Who were you speaking to?

17    A    I was speaking to Carl Martin at that point, and he

18    replies, "Yeah."

19    Q    Okay.

20         (A digital recording was further played in

21    open court.)

22    BY MS. FULLER:

23    Q    If you can tell us what you said when you said,

24    "Ah, so I'll do the trade for" --

25         Keep reading.

1    A    "So I'll do the trade for the fucking .357," is

2    what I said.

3    Q    Is that a typo?

4    A    It is a typo, yeah.  I said .357.

5    Q    Go ahead.

6    A    And then I -- sorry.

7            (A digital recording was further played in

8    open court.)

9    BY MS. FULLER:

10   Q    Who asks you if it's clean?

11   A    I believe it was Carl Martin.  The audio's --

12           MS. FULLER:  Go ahead.

13           (A digital recording was further played in

14   open court.)

15   BY MS. FULLER:

16   Q    So who says, "That shit that keeps the shells

17   inside is good shit"?  Who said that?

18   A    Mirnes.

19   Q    What does that refer to?

20   A    So the -- a .357 revolver, if you were to shoot

21   that firearm, it won't expel the shells when you shoot

22   it.  Some people use a .357 and shoot it and don't want

23   shells left behind oftentimes because they have

24   evidentiary value.  A .357 would accomplish that by

25   holding them inside the bar.

1    Q    Okay.  So if you shoot the gun, the shells stay

2    inside of it?

3    A    Correct.

4    Q    This is just for the .357?

5    A    This is in reference to the .357 revolver, yes.

6          MS. FULLER:  Okay.  Keep going.

7          (A digital recording was further played in

8    open court.)

9          MS. FULLER:  So I am wondering if we can back

10   that video up a little bit.  I think we missed some

11   important pieces of it.

12   BY MS. FULLER:

13   Q    If you know, was there other communication -- I

14   mean, it's in there.  I think we just skipped over it,

15   but is there other communications in that video that

16   relates to the shells and the firearm?

17   A    There's communication following the conversation

18   with Mirnes about the -- him saying, "It's good.  It

19   keeps the shells inside."  After that, Carl Martin makes

20   a statement.  He is saying, "Because, you know, if I'm

21   going to be traveling with it, you know," along those

22   lines, talking about traveling while carrying the

23   firearm.

24   Q    Okay.  And that's in the video?

25   A    It is.

1    Q    What is the relevance of that, "If I am going to be

2    traveling"?

3    A    The only conversations --

4                MR. MATSON:  Objection, your Honor.  Calls for

5    surmise.

6                THE COURT:  Objection overruled.  You can

7    answer that.

8                MS. FULLER:  Go ahead.

9    A    The only conversations that I had had previously

10   with Carl Martin about traveling were about traveling to

11   Philadelphia to obtain high-quality cocaine.

12   BY MS. FULLER:

13   Q    So that's what you understood that to refer to?

14   A    I understood that, again, to be a furtherance of

15   our conversation about traveling to get cocaine,

16   referring to carrying the firearm during that travel.

17   Q    Okay.  So what happens after you leave that

18   transaction?

19   A    I get in a vehicle with South Burlington detective

20   Mike DeFiore, and we leave the parking lot in the

21   vehicle at the same time Carl Martin and Mirnes were

22   arrested by other agents on scene.

23   Q    Okay.  Do you have the controlled substances with

24   you?

25   A    I do have the controlled substances with me at that

1    time.

2    Q    And what do you do with them?

3    A    I take them, I meet up with Special Agent -- ATF

4    Special Agent Joe Davis and go to our office with him

5    and process the -- that substance to be entered into the

6    vault and eventually is turned over to Special Agent Sam

7    Brown later to be entered into the vault.

8    Q    Okay.  So you take the substance from the car that

9    you are in with Mirnes and Mr. Martin?

10   A    Yes.

11   Q    And you get into Officer DeFiore's car?

12   A    Yes.

13   Q    Did you tamper with the substance between the time

14   you left Mirnes's car and the time you got into

15   DeFiore's car?

16   A    I did not.

17   Q    Same question:  When you were in DeFiore's car till

18   when you got back to the ATF office and met with the

19   other agent, did you tamper with the substance?

20   A    I did not.

21   Q    I am going to show you what's been marked as

22   Government's Exhibit 75.  This has been -- well, it's

23   been marked for right now.  Ask you if you can identify

24   that?

25   A    This contains the cocaine that I purchased and

1    received in trade for the firearm during that October

2    23rd firearm reverse/cocaine purchase operation.

3    Q    Earlier you had talked to us about the process that

4    happens back at ATF where you seal this plastic bag that

5    you put it in and then it goes into the vault.  Were you

6    involved in that process for this particular controlled

7    buy?

8    A    I was.  I can see my initials right here and where

9    I wrote the date on the seal.

10   Q    Okay.  Yeah, I was going to ask -- I should have

11   asked you that before.  When you heat seal a bag like

12   that, what do you do after it's heat-sealed?

13   A    Write initials on the seal and date it.

14   Q    Are you the only agent to do that?

15   A    No.  I'm the -- we always use two agents to do

16   that, and in this particular case, I did this with Joe

17   Davis.  He's the other agent who marked and dated this.

18   Q    Okay.  So you had indicated a minute ago that after

19   you left, other agents continued the investigation and

20   arrested Mr. Martin and Mr. Mirnes?

21   A    Yes.

22   Q    Or Mr. Julardzija.

23        Okay.  I am going to show you Exhibit 52.  Can you

24   tell me what that is?

25   A    Yes.  That's the -- that's the currency that I

1    brought to the deal, the $3,900.  You can see a food

2    wrapper, a yellow food wrapper right there.  I kind of

3    packaged the currency up in that when I put it inside

4    the McDonald's bag that I carried it in.

5    Q    So is this -- what vehicle is this?

6    A    This is the Chevy Equinox that was involved in this

7    and the previous purchases that I described.

8              MS. FULLER:  And Government's Exhibits 45 and

9    47, please.

10   BY MS. FULLER:

11   Q    What is that?

12   A    That's the cocaine that I purchased -- and --

13   that's the cocaine that I purchased from Carl Martin

14   during the October 23rd operation at McDonald's.

15   Q    And how about 47?

16   A    That's the cocaine that I received as trade for the

17   firearm during the same October 23rd, 2019, event.

18   Q    So you testified earlier about how there were two

19   different bags.  Is that what those two different

20   pictures are?

21   A    Yes.  The first was the larger bag, and this is the

22   smaller bag.  The first being about two ounces and this

23   being --

24   Q    So are you --

25   A    The first being the -- about two ounces and this

1    being about the 3.5 ounces.

2    Q    I should have asked you a moment ago, Government's

3    Exhibits 75 that you have in front of you, was the

4    substance contained in that lab -- contained in that

5    package sent to the lab?

6    A    It was.

7    Q    Do you know the results of that?

8    A    It was cocaine.

9    Q    And I am going to show you Government's Exhibit 117

10   and ask you if you can identify that?

11        What is that?

12   A    That's the prop firearm that was used.  It's a

13   Davis Industries Model P-380 .380 auto caliber

14   semiautomatic pistol, and it's the prop firearm we used

15   during the October 23rd exchange with Carl Martin.

16   Q    I see there's a zip-tie or something like that on

17   that firearm.  Was that on the firearm during the

18   controlled purchase with Mr. Martin?

19   A    It was not.  This zip-tie is here -- it's procedure

20   for us to -- for safety, so the firearm stays out of

21   battery and just a safety way that we present it in a

22   situation like this.

23        During that transaction, it did not have a zip-tie

24   on it.  It was functional.

25            MS. FULLER:  Okay.  If I could just have a

1    moment, your Honor?

2                    THE COURT:  Yes.

3                    (Brief pause.)

4    BY MS. FULLER:

5    Q    And one final question, Agent Wood:  Wondering if

6    you can identify or do you see Mr. Martin here in the

7    courtroom?

8    A    It appears to be Carl Martin on this side of the

9    courtroom where I am pointing, but if there's any way I

10   could -- if we could see without the mask.

11        That is Carl Martin sitting right there that just

12   pulled down his mask.

13                   MS. FULLER:  Your Honor, could you let the

14   record reflect that he has identified the defendant,

15   Carl Martin?

16                   THE COURT:  Yes.

17                   MS. FULLER:  I have no further questions for

18   this witness.

19                   THE COURT:  Ready to begin cross?

20                   MS. FULLER:  Your Honor, if I could have two

21   seconds?

22                   THE COURT:  Yes.

23                   (Brief pause.)

24                   MS. FULLER:  Your Honor, I do have a

25   stipulation of the parties, and given that we are short

1    on time, it might make sense for me to read it now.

2                    THE COURT:  All right.  Any objection to that?

3                    MR. MATSON:  No, your Honor.  That makes

4    sense.

5                    THE COURT:  Okay.

6                    MS. FULLER:  Thank you, your Honor.

7                    THE COURT:  Okay.

8                    MS. FULLER:  The parties have entered into a

9    stipulation, and the stipulation reads as follows.  This

10   is in Government's Exhibit 133.  It says:

11        It is hereby stipulated and agreed by and between

12   the undersigned parties that:

13        1.  The document attached hereto as Exhibit A is a

14   true and correct copy of a report completed by senior

15   forensic chemist Michelle G. Camillari.  Exhibit A

16   accurately reflects the conclusions and results of

17   testing conducted by senior forensic chemist Michelle G.

18   Camillari on or about October 22nd, 2019, as to

19   Government's Exhibits 62 seized by law enforcement on

20   August 26th, 2019.  As concluded in Exhibit A,

21   Government's Exhibit 62, as tested by chemist Camillari,

22   contains cocaine.

23        2.  The document attached hereto as Exhibit B is a

24   true and correct copy of a report completed by senior

25   forensic chemist Michelle G. Camilleri.  Exhibit B

1    accurately reflects the conclusions and results of

2    testing conducted by senior forensic chemist Michelle G.

3    Camilleri on or about October 24th, 2019, as to

4    Government's Exhibit 66 seized by law enforcement on

5    September 5th, 2019.  As concluded in Exhibit B,

6    Government Exhibit 66 as tested by chemist Camillari

7    contains cocaine.

8        The document attached hereto as Exhibit C is a true

9    and correct copy of a report completed by senior

10   forensic chemist Michelle G. Camilleri.  Exhibit C

11   accurately reflects the conclusions and results of

12   testing conducted by senior forensic chemist Michelle G.

13   Camilleri on or about October 17th, 2019, as to

14   Government Exhibit 69 seized by law enforcement on

15   September 20th, 2019.  As concluded in Exhibit C,

16   Government Exibit 69 as tested by chemist Camillari

17   contains cocaine.

18       The document attached hereto as Exhibit D is a true

19   and correct copy of a report completed by senior

20   forensic chemist Hendri P. Chauca.  Exhibit D accurately

21   reflects the conclusions and results of testing

22   conducted by senior forensic chemist Hendri P. Chauca on

23   or about April 27th, 2001 -- 2021, excuse me, as to

24   Government's Exhibit 75 seized by law enforcement on

25   October 23rd, 2019.  As concluded in Exhibit D,

1    Government's Exhibit 75 as tested by chemist Chauca
2    contains cocaine.
3         The document attached hereto as Exhibit E is a true
4    and correct copy -- I'm sorry.  This is 5.
5         The document attached hereto as Exhibit E is a true
6    and correct copy of a report completed by forensic
7    chemist Rebecca Meade.  Exhibit E accurately reflects
8    the conclusions and results of testing conducted by
9    forensic quality manager Rebecca Meade on or about
10   September 10th, 2019, as to a substance seized by law
11   enforcement on June 25th, 2019.  As concluded in
12   Exhibit E, the substance seized by law enforcement on
13   June 25, 2019, as tested by chemist Meade, contains
14   cocaine base.
15        6.  The document attached hereto as Exhibit F is a
16   true and correct copy of a report completed by forensic
17   quality manager Rebecca Meade.  Exhibit F accurately
18   reflects the conclusions and results of testing
19   conducted by forensic quality manager Rebecca Meade on
20   or about September 10th, 2019, as to a substance seized
21   by law enforcement on June 28, 2019.  As concluded in
22   Exhibit F, the substance seized by law enforcement on
23   June 28th, 2019, as tested by chemist Meade, does not
24   contain controlled substances.
25        7.  The document attached hereto as Exhibit G is a

1    true and correct copy of a report completed by forensic

2    quality manager Rebecca Meade.  Exhibit G accurately

3    reflects the conclusions and results of testing

4    conducted by forensic quality manager Rebecca Meade on

5    or about September 10th, 2019, as to a substance seized

6    by law enforcement on July 23rd, 2019.  As concluded in

7    Exhibit G, the substance seized by law enforcement on

8    July 23rd, 2019, as tested by chemist Meade, contains

9    cocaine.

10           The document --

11           8.   The document attached hereto as Exhibit H is a

12   true and correct copy of a report completed by forensic

13   chemist -- forensic quality manager Rebecca Meade.

14   Exhibit H accurately reflects the conclusions and

15   results of testing conducted by forensic quality manager

16   Rebecca Meade on or about September 10th, 2019, as to a

17   substance seized by law enforcement on August 9th, 2019.

18   As concluded in Exhibit H, the substance seized by law

19   enforcement on August 9th, 2019, as tested by chemist

20   Meade, does not contain controlled substance.

21           The document attached hereto as Exhibit I is a true

22   and correct copy of a report completed by senior

23   forensic chemist Michelle G. Camillari.  Exhibit I

24   accurately reflects the conclusions and results of

25   testing done by senior forensic chemist Michelle G.

1    Camilleri on or about October 18th, 2019, as to a
2    substance seized by law enforcement on August 16th,
3    2019.  As concluded in Exhibit I, the substance seized
4    by law enforcement on August 16th, 2019, as tested by
5    chemist Camillari, does not contain controlled
6    substances.

7        10.  The document attached hereto as Exhibit J is a
8    true and correct copy of a report completed by forensic
9    chemist -- forensic quality manager Rebecca Meade.
10   Exhibit J accurately reflects the conclusions and
11   results of testing conducted by forensic quality manager
12   Rebecca Meade on or about October 17th, 2018, as to a
13   substance seized by law enforcement on October 4th,
14   2018.  As concluded in Exhibit J, the substance seized
15   by law enforcement on October 4th, 2018, as tested by
16   chemist Meade, does not contain controlled substances.

17       The document attached hereto as Exhibit K is a true
18   and correct copy of a report completed by forensic
19   quality manager Rebecca Meade.  Exhibit K accurately
20   reflects the conclusions and results of testing
21   conducted by quality manager Rebecca Meade on or about
22   October 17th, 2018, as to a substance seized by law
23   enforcement on October 8, 2018.  As concluded -- as
24   concluded in Exhibit J, the substance seized by law
25   enforcement on October 8, 2018, as tested by chemist

1    Meade, does not contain controlled substances.

2        And it is further stipulated and agreed between the

3    parties that if the chemists were to testify in this

4    case, they would testify consistent with the factual

5    stipulations above.

6        And there are -- contain signatures of AUSA Andrew

7    Gilman; Carl Martin, the defendant; and Chandler Matson,

8    counsel for the defendant.

9            THE COURT:  Okay.

10            MS. FULLER:  Your Honor, I have one -- given

11    the stipulation and the testimony of Special Agent Brian

12    Wood, the government would move to admit -- I don't

13    believe we have a stipulation.  Or, actually, we do have

14    a stipulation as to that, so I don't need to move to

15    admit it.  Just want to be sure that Government's 62,

16    66, 69 and 75 are formally admitted into evidence.

17            THE COURT:  All right.  Okay.

18            (Government's Exhibits 62, 66, 69 and 75 were

19    received in evidence.).

20            THE COURT:  All right.  Let's take our noon

21    recess at this point, and we will reconvene at one

22    o'clock.

23    (Court was in recess at 12:00 p.m.)

24    (The following was held in open court with the jury

25    present at 1:07 p.m.)

```
1              THE COURT:  Okay.  Welcome back.  I think we
2    are set to proceed.  Cross examination?
3              MR. MATSON:  Thank you, your Honor.
4                       CROSS EXAMINATION
5    BY MR. MATSON:
6    Q    Agent Wood, I am Chandler Matson.  As you surmised,
7    I represent Mr. Martin.
8    A    Good afternoon.
9    Q    Good afternoon, Agent.
10        Where I want to start, we spent a lot of time over
11   the past two days now talking about these text messages.
12   Right?  The text messages that came into evidence as
13   Government's Exhibits 128 and 129.  I am just going to
14   show you the first page of 128.  You see that?
15   A    Yes.
16   Q    All right.  So these are the text messages, the
17   whole text message chain that you just went through with
18   Miss Fuller.
19        Now, Agent Wood, this is an obvious sounding
20   question, but you don't see the person write the text
21   message, right?
22   A    Correct.
23   Q    Right.  It's the point of the text message.  They
24   are not around you, right?
25   A    Right.
```

1    Q    Okay.  So you don't really know who's writing the

2    text message, right?

3    A    I believe I know.

4    Q    Right.  Yesterday you told everyone here the answer

5    to that question, that you had put together a plan of

6    text messages and then you said, "And then Carl would

7    show up at that place."  Do you remember that?

8    A    I do.

9    Q    Okay.  That's not entirely true, is it?

10    A    I believe it to be true.

11    Q    Okay.  Well, let me help you.

12    A    Okay.

13    Q    You wrote the text messages.  Mirnes Julardzija

14    showed up.  He showed up too, right?

15    A    He did.

16    Q    Okay.  As a matter of fact, Mirnes Julardzija

17    showed up on August 16th, right?

18    A    Yes.

19    Q    Mirnes showed up on August 26th, right?

20    A    Yes.

21    Q    He showed up on September 5th, didn't he?

22    A    He did.

23    Q    Okay.  And he showed up on August 23rd -- or

24    October 23rd as well, right?

25    A    He did.

```
1    Q    Right.  So when you say you know it's Carl because
2    Carl showed up, it's just as easy to say we know it's
3    Mirnes because Mirnes showed up, right?
4    A    No, not at this time.
5    Q    Okay.  Well, let's get into the text messages.  And
6    I know you are extrapolating.  You extrapolate on this
7    too.
8         Showing you Government Exibit 128.  I am going to
9    try and zoom this out.  Many things will go wrong.
10        Okay.  Government Exhibit 128.  Do you see that
11   document?
12   A    I do.
13   Q    Now, it starts off, and the text says, "What's good
14   man?  It's Red boi."  That's what it says.  That's what
15   the text message says.  Right, Agent Wood?
16   A    It is.
17   Q    But you said you took it to mean something
18   different.  You took it to mean it's Red's boy.  Was
19   that what you testified to?
20   A    It is.
21   Q    Right.  So you put that on there.  There's no S
22   after Red.  It says, "It's Red boi," right?
23   A    It does.
24   Q    Safe to say Mr. Martin doesn't have red hair?
25   A    That's true.
```

1    Q    Okay.  Well, let's go on to another text message.

2    And this comes from Government's Exhibit 3.  The Bates

3    stamp at the bottom is 185.

4        Do you recognize that text message?

5    A    I do.

6    Q    Okay.  Is that a text message right around the

7    August 26th transaction?

8    A    Yes.

9    Q    Yes?  Okay.

10        Do you see where it says, "You in front of elite

11   aid?"

12   A    I do.

13   Q    And then, "Rite"?

14   A    Yes.

15   Q    And then it says, "I don't see you, broski"?

16   A    Yes.

17   Q    Is that a term that you have heard Mirnes

18   Julardzija use?

19   A    I don't recall him using that term.  I can't

20   say that --

21   Q    You didn't have a lot of communications that you

22   thought were with Mirnes, right?

23   A    I'm sorry.  Could you repeat the question again.

24   Q    Sure.

25        You don't think that you had a lot of communication

1    with Mirnes; is that a safe statement?

2    A    Short of in-person communications, we -- when we

3    would meet, I had -- we'd communicate in person.

4    Q    You thought you were communicating with Carl

5    Martin, right?

6    A    Via text message.

7    Q    Yes.

8    A    Yes.

9    Q    Was broski a term that you thought Carl Martin used

10   a lot?

11   A    I don't know.

12   Q    Okay.  During that August 26th buy -- we just saw

13   the video, right?  That's where Mirnes came to your

14   vehicle, right?

15   A    Yes.

16   Q    He was speaking to you through the window, right?

17   A    Yes.

18   Q    And I believe Mirnes said something to you along

19   the lines of, "The only way this is going to work is if

20   you give me the money directly and I go to Philadelphia

21   myself," right?

22   A    Yes.

23   Q    That's what he said, right?  That's what he said.

24   A    I don't remember him saying the word "myself."

25   Maybe he did, but in effect, yes, he said he would go to

1    Philadelphia.

2    Q    Well, did he say, "You give me the cash and I go

3    pick it up in fucking Philly and fucking get my own shit

4    and pick it up"?  Is that what he said?

5    A    That sounds accurate, yes.

6    Q    Okay.  I mention that because there's a text

7    message that came from Mirnes.  And there's a text

8    message here about -- what do you know? -- "Just let me

9    know.  I'm gonna take that trip myself."

10        You see that?

11   A    I do.

12   Q    Sounds a lot like what Mirnes said.  Would you

13   agree with that?

14   A    It -- along the same lines as what he said, yes.

15   Q    I also -- Government's Exhibit 4, Agent Wood --

16        If I can do this, it will be a miracle.

17        Do you see that?

18   A    I do.

19   Q    That came in, and that was allegedly a video that

20   was texted to you; is that correct?

21   A    Yes.

22   Q    Let's take a look at it again.

23            (A digital recording was played in open

24   court.)

25   BY MR. MATSON:

```
 1    Q    Okay.  See that hand?

 2    A    I do.

 3    Q    Looks to be a light-skinned black man, maybe a

 4    Hispanic man?

 5    A    It does.

 6    Q    Would you say that Carl is dark skinned?

 7    A    I would.

 8    Q    A dark-skinned black man, right?

 9    A    Yes.

10    Q    So looking at that, unlikely that's Carl, right?

11    A    Correct.

12    Q    Agent Wood, I don't say this in the pejorative, but

13    a big part of your job is lying, right?

14    A    No.

15    Q    Okay.  And, again, I didn't mean that --

16    A    Right.

17    Q    So let's be more specific about it.  Undercover

18    work.

19    A    Yes.

20    Q    It's about deception.  It has to be, right?

21    A    There is an element of deception to undercover

22    work, yes.

23    Q    I mean, you have gotta convince people that either

24    you're a drug user -- which looking at you would be kind

25    of hard, right?  You're a fit, healthy young man?
```

```
1    A    Yes.  I guess.

2    Q    Okay.  So you gotta convince people you are

3    actually a drug dealer, right?  Safe to say?

4    A    At times, I've done one or the other.

5    Q    I mean, what we are talking about here today, the

6    appearance that you were trying to create is that you

7    would get the drugs and then you would resell them,

8    right?

9    A    Yes.

10   Q    Again, I understand it's a necessary part of

11   things, but by its nature, your activities are to

12   deceive people, right?

13   A    Yes, that's a part of working undercover.

14   Q    And at times it creates pressure on people; would

15   you agree with that?

16   A    No.

17   Q    No?  Okay.

18       Well, you concocted text messages for John Latimer,

19   the confidential informant, to use; fair statement?

20   A    Yes.

21   Q    Right.

22       You write the text messages very purposefully, and

23   you want John Latimer to then pass them along to, let's

24   say, Carl Martin, right?

25   A    Yes.
```

1    Q    Some of those text messages are angry, you would

2    agree?

3    A    Yes.

4    Q    All right.  So you are saying, to go back to a

5    previous question, that you don't think an angry drug

6    dealer is putting pressure through those text messages

7    on the intended recipient?

8    A    No.

9    Q    Okay.  Let's start to look at them.  Actually,

10    before we do, because I don't quite understand the

11    involvement here.

12        June 25th, 2019, there is a planned buy, right?

13    A    Yes.

14    Q    Okay.  Were you present for that planned buy?

15    A    Yes.

16    Q    Okay.  And were you -- did you drive John Latimer

17    to the buy?

18    A    No.

19    Q    You were doing surveillance?

20    A    Yes.

21    Q    Okay.  And during that June 25th buy, Carl's

22    nowhere to be seen; safe to say?

23    A    I don't remember seeing Carl Martin during that

24    buy.

25    Q    You were probably looking for Carl Martin, I have

1    to imagine, right?

2    A    If I had seen him, I think I would have noticed,

3    yes.

4    Q    Right.  So Carl Martin nowhere to be seen; you

5    would agree with that?

6    A    I did not see Carl Martin during that buy.

7    Q    A lot of officers present for that June 25th buy.

8    Do you remember which officers were present?

9    A    I don't remember all, no.

10   Q    Do you remember if Special Agent Brown was there?

11   A    Yes.

12   Q    Okay.  Do you remember -- what about Agent Schmidt?

13   A    Yes.

14   Q    Agent Ekstrom?

15   A    I don't remember him being there, but I -- it would

16   make sense if he was.

17   Q    Okay.  Agent Cohen?

18   A    Same as Agent Ekstrom.  I don't remember the

19   other -- some of the other exact agents that was there,

20   but he is a a member of our office, so it would make

21   sense.

22   Q    Okay.  Just let me know.

23        Agent Premo.

24   A    Same.

25   Q    Agent Murray?

1    A    Same response as before.

2    Q    Detective Prack?

3    A    Same as before.

4    Q    As long as we have got Detective Prack, was it your

5    understanding that Detective Prack was working with John

6    Latimer before you?

7    A    Yes.

8    Q    When did John Latimer start working with law

9    enforcement?

10    A    Ever?  Is the question --

11    Q    Yes.

12    A    Or in this --

13        I don't know.

14    Q    Do you know that he was working with law

15    enforcement in 2018?

16    A    Yeah, I believe he was.  Yes.

17    Q    So moving along.  Do you remember if Detective

18    DeFiore -- I might not get that name right.  DeFiore?

19    A    Yes.

20    Q    Was he there?

21    A    Yes.

22    Q    Did anyone see Carl Martin?

23    A    Not that I remember anyone saying.

24    Q    Okay.  I think I understand that a little bit

25    better now.

1      Moving along to June 28th, were you present at that
2   one as well?
3   A    I was.
4   Q    But that time you drove Mr. Latimer to this planned
5   controlled buy, right?
6   A    I did.
7   Q    Were all those same officers present for that one
8   as well?
9   A    I don't remember if all those same officers were
10  present for that one.
11  Q    Do you remember if there was any aerial
12  surveillance done?
13  A    I remember that there was aerial surveillance done
14  around that time.  I don't remember which buy or buys.
15  But I do remember that being a part of one of the
16  operations at least.
17  Q    An ATF agent in a helicopter; is that a proper
18  description of surveillance?
19  A    Sometimes we have an agent in a helicopter;
20  sometimes we have an agent on the ground communicating
21  with the helicopter.
22  Q    Including one of these buys, you just don't
23  remember which one?
24  A    Correct.
25  Q    On the June 28th buy, once again you were there,

1    and you didn't see Carl Martin, right?

2    A    I don't remember seeing Carl Martin in that buy,

3    no.

4    Q    Do you recall if anyone reported seeing Carl Martin

5    at that buy?

6    A    I don't remember if anyone reported seeing Carl

7    Martin during that buy.

8    Q    Do you remember those drugs -- in any case, you

9    know, whether Carl Martin was there or not, which no one

10   saw him, but -- that those drugs were fake?

11   A    I remember that, yes.

12   Q    Let's start to go through a little bit when you had

13   more involvement.  Because, again, that one was just you

14   drove Latimer and sort of watched to see how it unfolds;

15   is that fair?

16   A    That's fair.

17   Q    This is all not for you, Agent.  Don't worry.

18        Okay.  So leading up to July 23rd, and really

19   starting early July, that's when you really started to

20   work with John Latimer, right?  Started to direct him a

21   little bit more?

22   A    Sounds accurate, yes.

23   Q    And a lot of this plan if not all of your plan with

24   Latimer was to do deals with Carl Martin; is that also a

25   fair thing to say?

1    A    Yes.

2    Q    And that's when you started sending the fake text

3    messages to Latimer in July?

4    A    Sounds accurate, yes.

5    Q    Again, Z2 now.

6              MR. MATSON:  Your Honor, may I approach the

7    witness?

8              THE COURT:  Yes.

9    BY MR. MATSON:

10   Q    Agent Wood, I am handing you what's been marked as

11   Defendant's Exhibit Z2.  There's this last page.  I

12   apologize.

13   A    Yes.

14   Q    Do you recognize those documents?  Take a minute to

15   flip through if you have to.

16   A    Yes.  Absolutely.

17        There's a lot of documents.

18   Q    I'm sorry?

19   A    I'm sorry.  There's a lot of documents.

20   Q    It's okay.  Take whatever time you need.

21             THE COURT:  Let me ask you, are there a lot of

22   pages?  How many approximately?

23             MR. MATSON:  56, your Honor, through --

24             THE COURT:  56?

25             MR. MATSON:  Yeah.

1    BY MR. MATSON:

2    Q    All set, Agent Wood?

3    A    Sorry.

4    Q    Okay.

5    A    I think you asked the question before but I don't

6    remember what it was that --

7    Q    That's all right.  I will re-ask.

8    A    Thank you.

9    Q    Do you recognize those documents?

10   A    I do.

11   Q    Agent Wood, the bottom there's a Bates number 566,

12   and it goes, 57, 68, all the way through 619.

13        Agent Wood, did you produce these documents in this

14   format to the government?

15   A    I did.

16   Q    They're a little out of order, right?

17   A    The beginning part is out of order.

18   Q    Yeah.  It starts at September 30th at 566, and then

19   at 572 we're at July 8th; is that --

20   A    That's true.

21   Q    Okay.  So I'm taking it that you just did some

22   screenshots.  Was it screenshots and then you handed it

23   over to the government and it just got out of order?

24   A    I did screenshots.  I kind of combined them.  I did

25   try to make it in order, and this beginning part I did

1    not get in proper order.  I believe it shows up later on

2    again, and this could -- this should not be here, I

3    guess, if that makes sense.  The --

4    Q    Okay.  I guess what I'm just trying to be clear on

5    is that are these all the text messages between you and

6    John Latimer or are there more?

7    A    These are all the messages that I exchanged with

8    John Latimer around this investigation, yes.

9    Q    Okay.  Well, let's not go through 'em all.

10   A    Okay.

11   Q    Let's go to a few specifics.

12              MR. MATSON:  Judge, these are coming into

13   evidence by stipulation.

14         Agent Wood, you can hold onto that, all right?

15              THE COURT:  Have they introduced -- have you

16   introduced the documents by stipulation?

17              MS. FULLER:  We have agreed that they should

18   be admitted, your Honor.

19              THE COURT:  How are they marked?

20              MR. MATSON:  I would, your Honor, move for the

21   admission of Defendant's Exhibit Z2.

22              THE COURT:  Okay.  So admitted.

23              (Defendant's Exhibit Z2 was received in

24   evidence.)

25   BY MR. MATSON:

```
 1    Q    So, Agent Wood, I am going to use this.  Whatever's
 2    easiest for you.
 3    A    Okay.
 4    Q    But hopefully that shows up on your screen.
 5    A    It's a little blurry right now, but --
 6    Q    It is a little blurry.  The auto focus is on, too.
 7         Better.  Not great.
 8         So I'm looking at Bates 572.
 9    A    Yes.
10    Q    Do you see that on the right-hand side -- ah,
11    better.  Okay.
12         On the right-hand side it says, "K, WTF, K, K."  Is
13    that you, Agent Wood?
14    A    That is me.
15    Q    Okay.  So on the left, "Hey what's, haha, Dish."
16    Is that Latimer?
17    A    It is.
18    Q    Okay.  And then, "K, Yo, K, WTF."  This is you
19    again?
20    A    It is.
21    Q    Is that the way you normally talk?
22    A    No.
23    Q    No.  Okay.
24         And looking at 573, "WTF, Why can't we link up
25    tomorrow."  Do you see that?
```

1    A    I do.

2    Q    "Because he's not gonna be around he said."

3         Who's "he"?

4    A    I believe he is referring to Carl Martin.

5    Q    Okay.  "Listen, when we did our thing, I did you

6    right, and now you are fucking me."

7         Do you see that, Agent Wood?

8    A    I do.

9    Q    Again, you don't normally talk like that, right?

10   A    I don't.

11   Q    No.  But you are pretending to be a drug dealer,

12   right?

13   A    Yes.

14   Q    Yeah.  And these text messages are meant to give

15   the impression that you are angry and someone is F'ing

16   me.  That's the fair import of that text message, right?

17   A    Yes.

18   Q    Yes.  And you concocted that text message so that

19   Mr. Latimer would use it to communicate with Carl Martin

20   or whoever it is that Mr. Latimer was communicating

21   with, right?

22   A    Yes.  I did it so he would communicate that with

23   Carl Martin.

24   Q    Okay.  So keeping up again with your text message,

25   "We can make bank on this, but I ain't getting fucked

```
1     again with this shit."
2          Do you see that?
3     A    I do.
4     Q    You don't see how that could apply pressure to
5     somebody?
6     A    No.
7     Q    That doesn't sound like you, though fake, a drug
8     dealer, is angry?
9     A    No.  Yes, I can see how it would show that I was --
10    that I was angry about what had happened, but no to your
11    first question about pressure.
12    Q    Okay.  I am going to look at 574.  You see where it
13    says, "Fuck that.  I still ain't got the last shit"?
14    A    I see that.
15    Q    That's you.
16    A    It is.
17    Q    Okay.  "Why don't we just link up with him and talk
18    about making it right.  Then I will do onions all day."
19         Continuing, "You know I'm good for it, but it's
20    gotta be fire enough I can make mine too, ya know?"
21         That's you?
22    A    It is.
23    Q    Not the way you talk?
24    A    Not generally, no.
25    Q    And you can't see how that might be putting
```

1    pressure on somebody?

2    A    No.

3    Q    Okay.  But why create the deception that you are

4    angry at all if you don't intend to influence somebody?

5    A    Because I saw it as an opportunity to facilitate

6    the introduction.  I was trying to show anger at the CI

7    as well, and to -- in order to kind of change the

8    situation so I was dealing directly with Carl.

9    Q    Were you mad at the CI?

10   A    No.

11   Q    Right.  You never talked to the CI like that?

12   A    Correct.

13   Q    Terribly unprofessional, right?

14   A    Correct.

15   Q    Because if you talk that way in your professional

16   capacity, people would say, This guy's got a real anger

17   problem and it kind of unnerves me.

18        That would be a natural reaction, right?

19   A    I don't know.

20   Q    Okay.  "I can hit him up and see about us getting

21   together to talk business."

22        Are you specifically referring there to Carl

23   Martin?

24        I'm sorry.  I know you are looking at it; you folks

25   aren't.

1    A    Yes.

2    Q    "I can hit him up"?

3    A    Yes.

4    Q    All right.  So now I am looking -- at the bottom it

5    says 575.  At the top, it says, "Ight bro, just don't

6    cuz me out of this please."

7         That's John Latimer.  Did you know what that meant?

8    A    I took that as -- where he says, "cuz," I took that

9    as should be cut.

10   Q    Okay.  So that is another fake text.  Did you tell

11   John Latimer to write something like that?

12   A    Yes.

13   Q    To create the impression that you were going to cut

14   him out of your drug dealing, right?

15   A    In the sense of -- of what we were doing right then

16   or supposedly doing, yes, in the -- you know, getting

17   profits as well or, you know, getting paid for middling

18   or introducing me in that "in" role, I guess if that

19   makes sense.  Yes.

20   Q    In order to create the appearance that, well, if we

21   don't make this guy happy, he is going to cut out

22   Latimer.  That's the appearance you were trying to

23   create.  Again, you wanted it to get through to Carl

24   Martin, but that's a fair statement, right?

25   A    That if we don't make me --

1          I just want to make sure I understand your
2     question.  Sorry.
3     Q    It's difficult when you're talking about different
4     roles.
5     A    It is.
6          If we -- so you are asking if it gives the
7     impression then if we don't make me happy, I will cut
8     out John.
9          So this was more -- this -- the reason I had him
10    sent this -- send this was more to -- it was more of a
11    ruse because it made sense, because why would he be
12    going to this trouble if he, you know, wasn't going to
13    keep a part of it.  People don't generally make
14    introductions for free or anything like that.  This was
15    a kind of like, well -- so it didn't look as weird of
16    him being like, Hey, guys do your thing and I don't need
17    anything out of this.  It was -- it was just more
18    theater to --
19    Q    No.  I understand.  More theater to try and get
20    someone to do what you wanted them to do.  That's a fair
21    statement?
22    A    No.
23    Q    No.  Okay.
24         Now, in a way, it worked because -- I'm going to
25    turn your attention to August 9th.  Do you remember a

1  controlled purchase on August 9th?

2  A    I do.

3  Q    All right.  Now, was it your understanding that

4  Latimer had set up a deal with Carl Martin?

5  A    On August 9th?

6  Q    On August 9th.

7  A    No.  I believe I was communicating directly with

8  Carl Martin leading up to August 9th.

9  Q    Okay.  So you had set up a deal with Carl Martin on

10  August 9th?

11  A    That's, yes, how I remember it.

12  Q    That's your understanding?  That's your memory?

13  A    Yes.

14  Q    Okay.  Fair enough.

15       On August 9th, did you indeed meet with Carl

16  Martin?

17  A    I did.

18  Q    All right.  And it was in a vehicle, right?

19  A    It was.

20  Q    Mirnes was driving the vehicle, right?

21  A    Yes.

22  Q    You got into the vehicle and you sat in the back?

23  A    I did.

24  Q    There were two girls in the back of the car?

25  A    Yes.

1    Q    Do you know who they are?

2    A    I don't.

3    Q    Okay.  Carl Martin directly handed you something,

4    right?

5    A    He does.

6    Q    And you paid $3600 in ATF buy money; is that right?

7    A    It is.

8    Q    Okay.  And what you bought is fake drugs; fair

9    statement?

10    A    Yes.

11    Q    Okay.  And that's again directly from Carl to you,

12    fake drugs?

13    A    Yes.

14    Q    So I am now looking at the same exhibit, and I need

15    to -- it's blurry with my glasses here and not here.  I

16    am looking at 595.

17        All right.  At the top, is that a message from

18    Latimer?  "You almost ready to get some work?  My man's

19    got fire right now, bro."

20    A    It is.

21    Q    Okay.  And down below, there are some messages that

22    are fairly consistent with some other text messages

23    introduced, but, "Yeah, I'm light on paper right now.

24    Still trying to move some of that trash I got last

25    week."

1          You see that?

2     A    Yes.

3     Q    And here, "Got some hardware I'm moving too.

4     Should be good soon."

5          That's you introducing the concept of a firearm,

6     right?

7     A    That's me saying that I'm involved with firearms,

8     yes.

9     Q    Right.  You are introducing that you are also

10    potentially moving firearms, not hardware?

11    A    Correct.

12    Q    And these are more concocted text messages, safe to

13    say?

14    A    They are.

15    Q    Okay.  Just going on to 596, do you see right in

16    the middle it says, "You know I got you.  Just please

17    don't waste my time if this shit ain't for real."

18         Again, still pretending to be mad, right?

19    A    Yes.

20    Q    Okay.  And are you pretending to be mad -- do you

21    remember that there's no date on these texts, but does

22    this look to be right around the time after the fake

23    drugs that came from Carl Martin?

24    A    This is -- I believe this is somewhere around early

25    August, if that makes sense.  So yes, after.

1    Q    Just to be clear about those fake drugs:  Were they

2    aspirin?

3    A    The June 28th, yes, aspirin.

4    Q    Aspirin, okay.  So $3600 worth of aspirin?

5    A    Sorry.  No.  That's -- June 28th was not $3600.

6    Q    Oh, no.  You're right.  June 28th.  I'm actually

7    talking about the August 9th.

8    A    Yes.

9    Q    Was that aspirin?

10   A    No.

11   Q    Lidocaine?

12   A    Yes.

13   Q    What's lidocaine?

14   A    I have limited knowledge, but I -- I believe it's

15   like a -- like a numbing agent maybe.

16   Q    Not a regulated substance?

17   A    Not to my knowledge, no.

18   Q    Okay.  So, Agent Wood, just looking at 597,

19   starting from the top -- you might want to look at your

20   hard copy -- this looks to me to be something that

21   Latimer copied and pasted and sent back to you.  Correct

22   me if I'm wrong.

23   A    Yep, it seems accurate.

24   Q    Okay.  So is -- was Latimer saying, I took our fake

25   text messages, yours and his, and I passed them along to

1    Carl Martin?  Is that what you understand that to be?

2    A    Yeah, that's my understanding.  That looks like

3    what we were doing there.

4    Q    And there it is, your fake text message:  "Yeah,

5    I'm light on paper right now.  Still trying to move some

6    of that trash I got last week."

7         That was your fake text message, but now it's been

8    passed long to somebody else, right?

9    A    As far as I know.

10   Q    Well, that's why Latimer sent it to you, right?  So

11   that you would know that he did what you asked him to

12   do?

13   A    Send it to me to -- for me to say that it looked

14   good.  I guess I can't be certain that he sent it to

15   him.

16   Q    As a confidential informant, was he supposed to

17   follow your instructions?

18   A    Yes.

19   Q    And just -- this is the next page.  It's -- seems

20   to be a duplicate of the prior page?  Ending in, "I

21   know, bro.  It's a waste of time.  My boy wants your

22   number.  Is that cool?"

23        Same as the page prior?

24   A    Yes.

25   Q    And then looking at 599, it's that whole

1    copy-and-paste text message, and it ends with now you

2    saying, "If he starts asking questions or anything, let

3    me know before you say anything."

4        Is that you?

5    A    Yes.

6    Q    And are you saying there to Latimer, if Carl

7    reaches out to Latimer, Latimer, you don't say anything.

8    I'll let you know what to say?

9    A    More or less.

10    Q    Is Latimer being paid for this?

11    A    For this, like during this investigation?

12    Q    Um hum.

13    A    Yes.  He was paid during this investigation.

14    Q    So -- now I am looking at 601.  Is that Latimer

15    that says, "Ight word bro.  I'm glad.  Now he can bother

16    you.  LOL."

17        Do you see that?

18    A    Yes.

19    Q    And is he referring -- where he says, "now he," is

20    he referring to Carl Martin, to your understanding?

21    A    It was my understanding he was referring to Carl

22    Martin, yes.

23    Q    And then, "Quick question.  Do you think I'd be

24    able to get paid for my work tomorrow?  I gotta get the

25    sensor for my shifter."

1          Do you see that?

2     A    I do.

3     Q    So he wants to know if he's being paid for putting

4     you in contact with Carl Martin, right?

5          Latimer merely wants to know if he is going to get

6     paid for putting you in contact with Carl Martin; is

7     that right?

8     A    I don't know if that's exactly what he was looking

9     to be paid for or -- he had done the previous controlled

10    purchases too, so I can't say that was the exact reason

11    that he was thinking he was going to get paid at that

12    moment.

13    Q    But a payment related to Carl Martin; that's safe

14    to say, isn't it?

15    A    Yes.  To the investigation.

16    Q    So on August 16th then, some more fake drugs were

17    purchased; is that right?

18    A    Correct.

19    Q    Okay.  Those fake drugs were handed to you by

20    Mirnes; is that also right?

21    A    That's correct.

22    Q    Okay.  Mirnes gets into your car and you give him

23    $6,000?

24    A    Correct.

25    Q    Right.  At this point, August 16th, how much money

1    has been spent?

2    A    About -- around 12,000.

3    Q    Okay.  I know.  I actually didn't expect you to do

4    the math that quickly.  That was good.

5         And then I think that brings us up to the August

6    26th controlled purchase at the Rite Aid, and that's

7    when we saw the video on, right?

8    A    Yes.

9    Q    Now, you've described that as getting drugs from

10   Carl Martin.  You said that on direct, right?

11   A    Correct.

12   Q    But you didn't.  You got it from Mirnes, right?

13   A    I still consider --

14   Q    I know, you got it, but I am asking you who handed

15   you the substance on August 26th?

16   A    Mirnes handed me the substance on August 26th.

17   Q    Right.  And I understand that Mirnes did not say,

18   "Hey, I'm a big drug dealer."

19        Right?

20   A    Correct.

21   Q    Right.  And it's pretty common for people to try

22   and put blame elsewhere, right?

23   A    It's very common, yes.

24   Q    Yeah.  And Mirnes going out of his way to say, "I'm

25   a middleman," right?

1    A    He says he was the middleman, yes.

2    Q    And in the exact same conversation, he says, "The

3    only way this is going to work is if you give me the

4    money myself and I go to Philly."

5         Remember that?

6    A    I do.

7    Q    All right.  At this point are you sensing that

8    Mirnes is responding to maybe your angry texts

9    complaining about the quality of the drugs or lack

10    thereof?

11    A    No, not at all.

12    Q    Okay.  And yet he is saying "the only way this is

13    going to work," so it does sound like he is trying to

14    appease you in some fashion about making things right.

15    A    It was my impression he was trying to impress me in

16    the moment more than appease me.

17    Q    And, again, on September 5th there's another

18    controlled purchase.  And on that one, again, Mirnes

19    actually hands you the substances, right?

20    A    Correct.

21    Q    Okay.  Is the term "fish" an odd term?  I mean, do

22    you commonly see the term "fish" in regard to cocaine?

23    A    Sometimes, yes.  It with --

24    Q    Is it common?

25    A    It -- I have seen it used frequently in some -- a

1    lot of times different -- if I could explain a little

2    bit.

3            Different groups will use different terms, and I

4    have heard that more than once in reference to scales

5    and fish of high-quality cocaine, yes.  Common enough.

6    Q    Now, look.  There's been a lot of talk about fire

7    and it's good and whatnot, but the fact is, even the

8    drugs that tested positive for drugs were all garbage,

9    right?

10   A    I don't -- I know they contained cocaine.  I

11   don't -- I don't think they were high quality, I guess.

12   Q    Well, did you ever use the word "garbage" to

13   describe them?

14   A    I did.

15   Q    Okay.  Now, after that September 5th purchase --

16   again, Mirnes hands it to you, right -- is there a plan

17   to arrest Carl Martin?

18   A    We had a tentative plan to arrest Carl Martin at

19   some point after that purchase, yes.

20   Q    So at this point, you know, there's the August 9th,

21   2019, buy.  At that point did you know -- when you made

22   the plan to arrest Carl, did you know the August 9th

23   drugs were fake?

24   A    No.

25   Q    Okay.  Was there a plan to arrest Carl on September

1    16th?

2    A    There was.

3    Q    All right.  But something happened in between the

4    plan and September 16th; is that fair to say?

5    A    Yes.

6    Q    At the station, all the drugs were tested with

7    something called TruNarc?

8    A    I don't know that -- I don't remember that all of

9    them were, but I do know that some of them were.

10    Q    Okay.  And the TruNarc came up negative, which is

11    to say no drugs found?

12    A    I would -- I guess I would say presumptive

13    negative.

14    Q    I'm just asking what the TruNarc reported.  I am

15    not vouching for TruNarc.  Just what did the TruNarc

16    report?

17    A    So I am not a TruNarc expert.  I don't use it.  But

18    I don't -- it doesn't say what's not in the substance,

19    if that makes sense.  So it doesn't say something is not

20    in there.  So, no, it didn't say that there wasn't

21    cocaine in there, no.

22    Q    Well --

23             THE COURT:  I wonder if you can get a little

24    closer to the microphone.

25             THE WITNESS:  Yep.

```
1              THE COURT:  Just so that those of us who are
2    older can hear you.
3              THE WITNESS:  Yes, your Honor.
4    BY MR. MATSON:
5    Q    Let's just be simple about it.  The TruNarc is used
6    at the station just to do a sort of presumptive "are
7    these drugs or aren't they," right?
8    A    A presumptive field test, yes.
9    Q    Right.  And the TruNarc said presumptively these
10   are not drugs.  That's all I'm saying.
11   A    Yes.
12   Q    Okay.  And at that point you shifted gears, and the
13   plan to arrest Carl on the 16th, that got delayed and
14   pushed off; just fair to say that?
15   A    Yes.
16   Q    All right.  Now, at this point you reached out to
17   Latimer once again, and you wanted him to do a call
18   directly to Carl, right?
19   A    I did.
20   Q    We have talked about that call earlier, but that
21   call is basically to yell at Carl, right?
22   A    To -- to send a message to Carl and to have a
23   conversation about the quality of the drugs.
24   Q    Well, a conversation.  It was more to say Latimer
25   was pissed, right?  Because the drugs were fake?  Yep?
```

1  The drugs were garbage, to use the word?

2  A    Right.  I guess to convey my -- my displeasure with

3  the fact that we had -- that the drugs were not good.

4  Q    Agent Wood, you didn't say, Please call Carl Martin

5  and let him know I'm displeased.  Right?

6  A    I don't know the exact --

7  Q    It's all right?

8  A    -- the exact words, but the purpose of the call was

9  to have a conversation about what it was that Carl

10  Martin was selling.

11  Q    Look, you used it as an opportunity, as an

12  opportunity for Latimer to reach out to Carl and tell

13  him, I'm mad, Carl, because these drugs are garbage.

14  Right?

15  A    Again, the purpose of the conversation was to -- to

16  talk to him about the -- to have a conversation about

17  the quality, not to -- the purpose truly wasn't to

18  express anger, more or -- it was more to -- to talk and

19  to engage in conversation and get him to talk about it

20  and see what he would respond when he asked the question

21  about the quality of the drugs.

22  Q    I mean, did he say something like, The shit's

23  fucked up?

24  A    I don't remember the exact conversation.

25  Q    Did he say -- you heard the conversation though,

1    right?  You were there?

2    A    Yes, I was.

3    Q    Did he say, you know, referring to you in your

4    under- -- in your fake world, that your money's fucked

5    up now?

6    A    It sounds consistent with what he might have said,

7    but again, without hearing it or -- it's hard to

8    remember exactly what was said.

9    Q    And that the people that you were selling to, they

10   were mad too?

11   A    Again, the same response without hearing it.

12   Q    But that's generally what you remember, isn't it?

13   A    I remember the conversation being along those

14   lines.

15   Q    Agent Wood, I want to go back.  I know that, you

16   know, you're asked about tampering with the drugs, and I

17   don't want to use that word.  I just -- I want to be

18   clear about what happens to a substance after you

19   purchase it.  Okay?

20   A    Okay.

21   Q    You said you didn't tamper with the drugs, but on

22   August 9th, you did a NIK wipe on those substances,

23   right?

24   A    Yeah.  Either -- I can't remember if it was NIK or

25   I think Mistral is the other.  One of those, a cocaine

1   detection wipe.

2   Q    But in general, what that means is you go into the

3   bag and you field test some drugs, a sample of them; is

4   that accurate?  You can describe what you do.

5   A    Yeah.  Take the -- the cocaine testing wipe and you

6   rub it, you know, somewhere to test to see if the color

7   blue shows, indicates the possible presence of cocaine.

8   Q    Um hum.  So, I mean, again, to do this, you have to

9   go into the bag in some fashion, right?

10  A    Yes.

11  Q    And you did it again on August 26th, right?

12  A    Yes.

13  Q    And when you do this, it's just you in the car.

14  There's no one around.  Right?  Just you in the car and

15  you are doing this after the buy?

16  A    In my memory, for the most part, yes.  In the

17  moment.

18  Q    And then you did it again on September 5th as well?

19  A    Yes.

20       MR. MATSON:  Your Honor, may I have just a

21  moment?

22       THE COURT:  Yes.

23       MR. MATSON:  Thank you.

24  BY MR. MATSON:

25  Q    Well, I just have a few more questions, Agent Wood.

1           Look, you mentioned something about a Nectar's
2     shooting in early 2018.
3     A    I did.
4     Q    Carl didn't shoot anybody, right?
5     A    He did not.
6     Q    No.  That was -- what was his name?  Rashid?
7     A    Last name Nashid.  Rashad Nashid.
8     Q    Okay.  I don't know.
9     A    Nashid.
10    Q    Not Carl?
11    A    Nashid.  Correct.
12    Q    No.  That guy shot into a crowd, right?
13    A    He did.
14    Q    And actually shot somebody, unfortunately?
15    A    He did.
16    Q    Carl punched him in the face?
17    A    He did.
18    Q    It's true Carl did have a firearm at the time,
19    right?
20    A    Yes.
21    Q    He didn't fire it, right?
22    A    Correct.
23    Q    He had an opportunity to fire it and he did not; is
24    that a fair statement?
25    A    He did not fire the firearm; that's fair.

1   Q    Yeah.  It would have been possible for him to do

2   so.  You would agree with that?

3   A    I don't know that I can agree to that --

4   Q    Sure.

5   A    -- due to the -- not knowing the status of the

6   firearm.  If a round's not chambered and someone

7   attempts to pull the trigger to fire, then one could,

8   you know, attempt to fire, and I don't know --

9   Q    Well, let's not get into theoreticals then.

10  A    Okay.

11  Q    Let's get into what we do know.

12  A    Okay.

13  Q    What he chose to do was to punch somebody in the

14  face who was posing a grave danger to the people around

15  him.  You agree with that?

16  A    I don't know that that person was posing a grave

17  danger to the people around him.

18          MR. MATSON:  I have no more questions.  Thank

19  you, Judge.

20          THE COURT:  Okay.  Any redirect?

21          MS. FULLER:  Yes, your Honor.  Thank you.

22          THE COURT:  Okay.

23                  REDIRECT EXAMINATION

24  BY MS. FULLER:

25  Q    So, Agent Wood, you have been asked a lot about

1    these text messages between you and John Latimer.  I

2    just want to go through some of them.  I think it might

3    be easiest to start at the beginning.  We won't go

4    through all of them, but I want you to explain the

5    context of these.

6         So this is the first -- sorry.  The first

7    communication you have with him -- this is Defendant's

8    Exhibit Z2.  Is this the first communication you have

9    with Latimer?

10   A    Yes.

11   Q    Okay.  And it continues -- continues on to the

12   second page, and there was -- Attorney Matson asked you

13   about this conversation and why it was that you appeared

14   angry.

15        Can you explain to the jurors what happened before

16   this conversation that led to this confrontation?

17   A    Prior to this was the June 28th purchase of

18   supposed cocaine from Carl Martin.  During that

19   purchase, I'd acted in an undercover capacity and drove

20   the CI to the purchase and acted as the person that was

21   purchasing it and the CI was supposed to be more of the

22   middleman, kind of getting me -- you know, hooking me up

23   with this source of cocaine.

24        And this was the same cocaine that did not look

25   consistent with previous cocaine, and we felt was poor

1    quality or not cocaine.

2    Q    Okay.  So in your capacity as someone who's

3    pretending to be a buyer, you testified earlier that you

4    realized that the substance didn't look quite right to

5    you?

6    A    Correct.

7    Q    So explain to us a little bit more why would you

8    send this message to Latimer knowing it was going to

9    make its way to Carl Martin?

10   A    Well, in order to, you know, facilitate the -- in

11   one part, to kind of facilitate the introduction so I

12   could deal directly with Carl Martin.  Also, because if

13   I did receive something that was -- was not cocaine when

14   it was supposed to be cocaine, then it's natural to push

15   back or complain about that, and it would be unnatural

16   and suspicious to not complain about it.

17   Q    Okay.  So when we get down to the bottom of this

18   message -- and this is early on in your texting with

19   Latimer -- when Latimer said, "He said 10 zip is 1800,"

20   and then underneath he said, "One," what does he mean by

21   that?  What did you understand that to mean?

22   A    When he said, "He said 10" -- so I believe "the" is

23   supposed to be where "10" is.  And he is saying, "He

24   said the zip is 1800."  When he says zip, it's another

25   slang term for an ounce, the same way onion is used.  So

1    one ounce of cocaine is $1800.  $1,800 for the ounce.

2    Q    Okay.  So Latimer is referring to who here?

3    A    Carl Martin.

4    Q    All right.  He is indicating to you that Carl said

5    that the next zip is 1800?

6    A    Yes.

7    Q    Okay.  And the next couple texts that we have here,

8    you were shown, where you talk about -- you use the

9    language -- the F-word a number of times, being unhappy

10   with the quantity -- or the quality, is that all related

11   to what you had just testified?

12   A    Yes.

13   Q    Okay.  And this texting goes on for a little while.

14   What's the next event that happens with your interaction

15   with the CI and Mr. Martin?

16   A    The July 23rd purchase of -- of one ounce of

17   cocaine --

18   Q    Okay.

19   A    -- for $1800.

20   Q    Okay.  And can you remind us what quantity and what

21   amount you paid for that quantity during that deal?

22   A    So on that July 23rd purchase, I paid $1,800 for

23   one ounce of cocaine.

24   Q    What was referenced in the text messages earlier

25   that we just read?

1   A    Correct.

2   Q    Okay.  Mr. Matson asked you a series of questions

3   about other controlled buys in which Mirnes had handed

4   you the drugs.  Do you remember he talked to you about

5   the August 9th and the August 16th buy?  Is that right?

6   A    I do.  The -- sorry, not the -- the August 26th

7   buy?

8   Q    Okay.

9   A    And the August 16th buy?

10      Not the August 9th buy, I guess is what I am

11  saying.

12  Q    Okay.  But he talked to you about a number of buys;

13  that it was Mirnes that came to the window of your car

14  and handed you the drugs, right?

15  A    Yes.

16  Q    And he indicated -- seemed to indicate to you that

17  this was Mirnes communicating with you regarding these

18  buys?

19  A    Right.

20  Q    Can you tell the jury who was present for the July

21  23rd, 2019, buy in Colchester at McDonald's?

22  A    Carl Martin, Bryan Correa Santiago, the CI, and me.

23  Q    Was Mirnes present for that buy?

24  A    He was not.

25  Q    There was also -- there was also a question from

1    Mr. Matson about a conversation that you had over text

2    messages about Philly.  Do you remember that question?

3    A    I do.

4              MS. FULLER:  Can we bring up Government's

5    Exhibit 26, page 248.

6    BY MS. FULLER:

7    Q    So do you remember talking about this text message

8    early on in your testimony yesterday?

9    A    I do.

10   Q    Okay.  And there's indication in this text

11   message -- well, why don't you read it for us.

12   A    If I start Wednesday, "I have some good news.  One

13   of my brothers on his way from Philly right now with

14   some raw fish that you can cook yourself if needed."

15   Q    Okay.

16   A    "Only thing is, he wants more for one."

17   Q    And remind us who was from the Philadelphia area?

18   A    Carl Martin.

19   Q    There was a question a moment ago about the fact

20   that one of the substances that was purchased in this

21   case contained lidocaine?

22   A    Yes.

23   Q    Through your training and experience and your drug

24   work purchasing controlled substances, are you aware of

25   what lidocaine is used for in the drug trade?

1    A    Yeah.  At times it's used as a cutting agent.

2    Q    And what is that?

3    A    A cutting agent being something you would add to,

4    in this case cocaine, to make it a larger quantity but

5    hopefully still give somewhat of the same effect so it

6    could still pass as cocaine.

7    Q    So in your earlier testimony today when you talked

8    about stepping on drugs -- stepping on it, right?

9    A    I did.

10   Q    How does that figure in with what you were just

11   describing about lidocaine?

12   A    So lidocaine is a substance that someone would use,

13   that is seen used to step on or cut the drugs.  So if

14   you were going to step on it, you may add lidocaine to

15   the cocaine to make, again, more product of a lower

16   quality.

17   Q    Is that something you personally have experienced

18   in your work as a UC buying controlled substances from

19   people?

20   A    Yes.

21   Q    Okay.  Mr. Matson also asked you about this test

22   called the TruNarc test; do you remember that?

23   A    I do.

24   Q    And he told you there were two occasions -- there

25   are actually three occasions when the TruNarc test

1    tested negative.  Do you remember that?

2    A    I do.

3    Q    Okay.  Do you know whether those substances that he

4    was referring to had tested positive when they were

5    tested with the swipe test that you were referring to?

6    A    I do.  And they were -- tested positive with the

7    swipe test.

8    Q    Okay.  So how would you characterize the swipe

9    test?  Without talking about its accuracy or -- what are

10   those kinds of tests called?

11   A    We call it a field test.  It's used for kind of

12   immediate results but not as nearly as reliable as a

13   lab.  And in situations like these, we use those kind of

14   in the moment to determine immediate course of actions.

15   Again, it's used just to make sure like should we push

16   back on something or something like that.  That's what

17   it's used for, for an immediate, less reliable result.

18   Q    And the TruNarc test, what category does that fall

19   into?

20   A    Same presumptive field test kind of -- it's not a

21   lab, not as reliable.

22   Q    So it's just a different kind of presumptive test?

23   A    Right.  It's still -- we still consider that like a

24   field test.

25   Q    Okay.  So for the test that Mr. Matson was talking

1    to you about, the fact that there were three TruNarc

2    tests on the substances you purchased that were

3    negative --

4    A    Right.

5    Q    -- I just want to be clear:  Those were tested,

6    those same three tested -- substances were tested by you

7    previously, right?

8    A    Yes.

9    Q    And what did those test for, according to the

10   presumptive test you applied?

11   A    Presumptive positive.

12   Q    All right.  So you had a positive test on the same

13   drugs, and then a negative test?

14   A    Correct.

15   Q    And what did you do with all three of those

16   substances?

17   A    We sent them to the lab for testing from the lab.

18   Q    All right.  And remind us again, at least for two

19   of those substances, what did they test for?

20   A    They did not test positive for the presence of

21   cocaine.  In -- well, the earlier test, I guess -- it

22   would be easier to reference the dates, I guess.

23   Q    Yes.  Okay.

24   A    So.

25   Q    Fair enough.

1    A    I can tell you on August 9th and August 16th -- I'm

2    sorry, on August 16th, the substances purchased then,

3    the lab determined did not contain cocaine, but the

4    substances purchased on August 26th and September 5th,

5    the lab both determined did contain cocaine.

6    Q    And those were the three substances that TruNarc

7    was used on?

8    A    Yes.

9    Q    So there was also some questions for you about the

10   controlled call that was placed to Mr. Martin.  Can you

11   describe for us, what reason would there be for ATF to

12   want to know from Mr. Martin's perspective if the drugs

13   he was selling were real?

14   A    Well, because for -- in our investigation, we want

15   to understand as much truth as possible, I guess is one

16   way to put it.  I want to know what he thinks he is

17   selling me when it's cocaine and when it's not cocaine.

18   And as I talked about before, I want to know if -- if he

19   is selling, you know, cocaine sometimes and not cocaine

20   other times.  Again, there's other safety concerns.

21   Q    And I think -- just want to swing back really

22   quickly to defense Exhibit Z2.

23   A    Yep.

24   Q    If we can look at 605.

25   A    Okay.

1    Q    So in the middle of the page -- this is August

2    10th, 2019.  By this time are you communicating with

3    Carl Martin directly?

4    A    I am.

5    Q    Okay.  And Red says to you, "This dude is fucking

6    crazy.  I'm sorry if you're sleeping, but damn."

7    A    Yes.

8    Q    And then what happens after that, do you know?

9    A    He sends me a message that he later tells me came

10   from Carl Martin.  That's -- it's kind of a screenshot

11   of a message.

12   Q    Is that the message we see at the top of 605?

13   A    It is.

14   Q    And can you read that for us?

15   A    Yep.

16        It says, "Where was you today?  Could have gave you

17   something nice."

18   Q    And just to remind the jurors, this message is sent

19   to you on August 10th.  What happens in the day prior to

20   this message?

21   A    We conducted a controlled purchase of supposed

22   cocaine from Carl Martin.

23   Q    Okay.  So you are getting this message sent to you

24   from Red --

25   A    Yes.

1    Q    -- that Carl Martin sent to him the day after your

2    controlled buy with Carl?

3    A    Yes.

4    Q    Okay.  Keep going.

5    A    "Where was you today?  Could have gave you

6    something nice.  If you buy 16 onion, I will give it to

7    you guys for 20 racks.  Has to be 16 though."

8    Q    So just to be clear, who is sending the message,

9    "Where was you today?  Could have gave you something

10   nice"?

11   A    Carl Martin.

12   Q    And to break that down, what does he mean by -- or

13   what do you understand it to mean by, "If he buy 16

14   onion, I'll give it to you guys for 20 racks"?

15   A    I understand that to be him offering to sell 16

16   ounces of cocaine for $20,000, racks referring to

17   thousands of dollars.

18   Q    Okay.  And up until that point, did your controlled

19   buys with Mr. Martin come close to that amount?

20   A    No.

21   Q    I think I have a couple final questions.

22        Mr. Matson asked you about substances -- substances

23   in which Mr. -- Mr. Julardzija did the hand-to-hand

24   transaction directly with you.  Do you remember those

25   questions?

1    A    I do.

2    Q    And could you remind us, on July 23rd, 2019, you

3    indicated a minute ago that Mirnes wasn't there?

4    A    Correct.

5    Q    Okay.  Did that substance test positive for

6    cocaine?

7    A    It did.

8    Q    And how about the controlled buy on September 20th;

9    can you remind us what -- who conducted the hand-to-hand

10   transaction in that transaction?

11   A    Carl Martin handed me the ounce of cocaine during

12   that transaction.

13   Q    Handed it to you?

14   A    Yes.

15   Q    And did that substance test positive for cocaine?

16   A    It did.

17   Q    And how about the July -- the October 23rd

18   transaction?

19   A    On October 23rd, Carl Martin retrieved the fanny

20   pack from the back of the Equinox and gave me the fanny

21   pack which contained the two packages of cocaine.

22   Q    And that substances tested positive for what?

23   A    Tested positive for cocaine.

24        MS. FULLER:  I have nothing further.  Thank

25   you.

1          THE COURT:  All right.  Any recross?

2          MR. MATSON:  Just briefly, your Honor.

3                    RECROSS EXAMINATION

4    BY MR. MATSON:

5    Q    Agent Wood, I don't want to know what people told

6    you, right?

7    A    Okay.

8    Q    But I want to ask -- Carl's from the Philly area.

9    Have you ever seen Carl in Philly?

10   A    I have not.

11   Q    Do you have any personal knowledge that he is from

12   Philly whatsoever?  Personal knowledge, Agent Wood.

13   A    No.

14   Q    That text that we just referred to, or Attorney

15   Fuller just referred to, "Could have gave you something

16   nice," do you remember that text?

17   A    I do.

18   Q    That was received the day after the August 9th

19   transaction, right?

20   A    Yes.

21   Q    And August 9th was again a fake drug purchase,

22   right?

23   A    Correct.

24   Q    So it really should have said, "Could have gave you

25   something fake"?

1    A    I don't know.

2    Q    On October 23rd, Carl Martin handed you a fanny

3    pack, right?

4    A    Yes.

5    Q    It was closed, right?

6    A    It was.

7    Q    Did you hear Mirnes say, "Hand that to him"?

8    A    I don't remember him saying that.

9    Q    Okay.

10           MR. MATSON:  No more questions.  Thank you,

11    Judge.

12           THE COURT:  All right.  Thank you, Agent.

13           THE WITNESS:  Thank you.

14           (Witness excused.)

15           THE COURT:  All right.  Well, let's take our

16    break at this point.  The government ready to call the

17    next witness?

18           MS. FULLER:  Yes, we are.

19           THE COURT:  Let's take our 15-minute break at

20    this point, and we will see you back in 15 minutes.

21    (Court was in recess at 2:20 p.m.)

22    (The following was held in open court with the jury

23    present at 2:35 p.m.)

24           THE COURT:  Okay?  The government ready to

25    proceed?

1           MS. FULLER:  Yes, your Honor.  We call

2    Detective Michael Beliveau.

3                      MICHAEL BELIVEAU,

4        having been duly sworn by the courtroom deputy,

5        was examined and testified as follows:

6           THE COURT:  Good afternoon.

7           THE WITNESS:  Good afternoon, your Honor.

8                    DIRECT EXAMINATION

9    BY MS. FULLER:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    Could you introduce yourself to the jury, please.

13   A    Sure.

14        My name's Mike Beliveau, and I am a detective

15   sergeant with the Burlington Police Department.

16   Q    How long have you worked for them?

17   A    A little over nine years now.

18   Q    Do you work in any special capacity for them right

19   now?

20   A    Yes.  I supervise the narcotics unit within the

21   detective bureau.

22   Q    Okay.  So how about back in February of 2018,

23   specifically February 26th, 2018, were you working for

24   them then?

25   A    Yes.  I was a detective in 2018.

1    Q    Okay.  And were you involved in the investigation

2    into a shooting that happened in front of Nectar's on

3    that date?

4    A    Yes.

5    Q    All right.  So what was your involvement?

6    A    I was the on-call detective that night, and I was

7    called to the scene by my boss, Lieutenant Mike Warren,

8    at the time, who supervised the detective bureau.

9    Q    Okay.  And can you tell us a little bit about where

10    the incident was in Burlington?

11    A    Sure.

12         The incident happened in front of Nectar's on Main

13    Street in Burlington, Vermont, which is kind of a social

14    hub.  There's a lot of stores, restaurants, other bars

15    in the area.  It's just -- it's just off of the

16    intersection of Church Street and Main Street.

17    Q    And what time did the incident occur?

18    A    Shortly after two a.m.

19    Q    Now, were you  involved in the investigation

20    surrounding all aspects of that shooting?

21    A    Yes.  I was the lead detective for that shooting.

22    Q    Okay.  Can you tell us, just generally, what were

23    the events that led up to the shooting?

24    A    Generally leading up to the shooting, there was a

25    disturbance or altercation within Nectar's between three

1  males:  Rashad Nashid, Carl Martin and Dennis Martin.

2  Q    And what's the relationship between Carl Martin and

3  Dennis Martin?

4  A    They are brothers.

5  Q    Go ahead.

6  A    And we received information that they were flashing

7  guns in the bar.  So that happened at about 11:30 p.m.

8  that night, so that would have been 2/25/2018, and --

9  Q    2/25/2018.  You mean February?

10  A    Yes.

11       MR. MATSON:  Your Honor, I apologize.  I'm

12  standing.  Just didn't mean to interrupt.

13       I'm going to move to strike.  It does appear that

14  most of this testimony is based on --

15       THE COURT:  I'm sorry.  I can't hear --

16       MR. MATSON:  Most of this testimony is based

17  on hearsay, your Honor.

18       THE COURT:  Objection overruled.

19  BY MS. FULLER:

20  Q    So you said that there was a dispute in Nectar's on

21  February 25th around 11:30?

22  A    Yes.

23  Q    Okay.  And we talked about who was involved in that

24  dispute.

25  A    Yes.

1    Q    Could we fast-forward to approximately two a.m. and
2    tell us what occurred at that time.
3    A    So at about two a.m. the bar let out, and we
4    received a report of gun at about 2:06 p.m. *[sic]*, I
5    believe.
6    Q    Okay.  And is there a recording of what happened
7    during that incident?
8    A    There is.
9    Q    And tell us a little bit more about where that
10   recording comes from.
11   A    So there's a neighboring bar next to Nectar's.
12   It's called Esox.  And it's probably about a driveway's
13   width away from Nectar's.  And there's a security camera
14   that was on the exterior of that bar, and it was facing
15   the direction of Nectar's.
16   Q    Have you reviewed the video?
17   A    Yes.
18            MS. FULLER:  Okay.  We are going to watch the
19   video in a minute.
20        Your Honor, we do just have a stipulation as to
21   Government's Exhibit 59, Government's Exhibit 101, and
22   24.  We'd move for their admission.
23            THE COURT:  Okay.  They are admitted.
24            (Government's Exhibits 24, 59 and 101 were
25   received in evidence.)

1    BY MS. FULLER:

2    Q    But before we get into that, can you just orient us

3    to what we are going to see on the video so we can

4    understand who the people are?

5    A    Yes.

6         You are going to see a crowd, or small group of

7    people, exiting the bar of Nectar's.  One of those

8    people is Dennis Martin.  You are going to see another

9    individual walking towards Dennis Martin from the area

10   of Esox.  That is Mr. Rashad Nashid.  And then you will

11   see a gentleman walk from across Main Street towards

12   Nectar's, and that would be Carl Martin.

13   Q    And towards the end of the video, is there another

14   person of relevance that we are going to see?

15   A    I'm --

16   Q    The victim of the shooting?

17   A    Oh.  Miss Chelsea Parker.  Yes.  You will see a

18   Miss Chelsea Parker who was struck by gun fire.

19              MS. FULLER:  Could we play 59, please.

20              (A digital recording was played in open

21   court.)

22              MS. FULLER:  Can I stop you right there.

23   BY MS. FULLER:

24   Q    The video just seemed to jump a little bit.  Can

25   you describe for us what's happening?

```
1    A    The way the camera was set up, according to the
2    staff at Esox, is that's it's motion-activated
3    recording.
4    Q    Okay.  So this picture that we see right now, is
5    there anybody of relevance or interest to this case?
6    Have we seen anybody yet?
7    A    Not that I can see right now.
8    Q    Okay.
9              (A digital recording was further played in
10   open court.)
11             MS. FULLER:  Could you stop the video.
12        Did you stop it?
13             LIZA LABOMBARD:  I did.
14   BY MS. FULLER:
15   Q    Okay.  So I believe, Detective, do you see the -- I
16   believe you can write on the screen.  If you want to
17   circle with your finger on the screen the person we just
18   saw sort of walk from the bottom of the screen.
19             COURTROOM DEPUTY:  The witness screen is not
20   working.
21             MS. FULLER:  Oh, it's not.  Then no.
22   BY MS. FULLER:
23   Q    How about that?  Who is that person that I just
24   circled?
25   A    That's Mr. Rashad Nashid.
```

1    Q    Okay.  And he came from the direction down here

2    moments before, right?

3    A    Yes.

4    Q    Where I have the X placed at the bottom of the

5    screen, that's in front of what building?

6    A    That would be in front of the Esox bar.

7    Q    Okay.  And can you help us -- so that the jurors

8    know where to watch, looking at the screen right now,

9    can you help us understand where they should sort of

10   focus their attention?

11   A    Yeah.  You'd want to pay attention to the top right

12   corner of this screen for the most part, right about

13   where Mr. Nashid is walking.

14   Q    Okay.  Have you --

15   A    He is heading towards the direction of the front of

16   Nectar's where an altercation occurs.

17   Q    Now, is there another aspect that you can see sort

18   of at the top left?  You able to see -- from which

19   direction does Mr. Martin come?

20   A    Mr. Martin comes from the -- the direction of the

21   street, so the left side of the screen.  That's Main

22   Street there.

23   Q    So from where I am circling right here?

24   A    Yes, that is Main Street, and that is where Mr.

25   Martin, Carl Martin, comes from.

1          MS. FULLER:  Okay.  So I will let the video

2    play.  Go ahead.

3          (A digital recording was further played in

4    open court.)

5          MS. FULLER:  So can we stop the video, please.

6    BY MS. FULLER:

7    Q    So if I can direct you to the top where I am going

8    to circle near the top left, we are seeing sort of the

9    bottom aspect of someone's body.  Who is that?

10   A    That would be Carl Martin.

11   Q    All right.  And is it -- can you see where Rashad

12   Nashid is in this picture?

13   A    I can't really tell where he is specifically, but

14   he's in the top right corner where the -- it's a little

15   bit lighter.  Yeah.

16   Q    So is this where I'm circling right now?

17   A    Yes.

18   Q    All right.

19          MS. FULLER:  Keep playing, please.

20          (A digital recording was further played in

21   open court.)

22          MS. FULLER:  Can you stop it.

23   BY MS. FULLER:

24   Q    Okay.  So the person we just watched come into the

25   picture here, who is that?

1   A    That's Carl Martin.

2   Q    And this person that's here, who is that?

3   A    That is Dennis Martin.

4   Q    Okay.  And where did Mr. Nashid go?  In the middle?

5   A    He is in the middle right now.

6   Q    So right here.  If I can just change my color here.

7        So this is Carl Martin, this is Rashad Nashid, and

8   this is Dennis Martin?

9   A    Yes.

10  Q    Okay.

11           MS. FULLER:  Keep playing.

12           (A digital recording was further played in

13  open court.)

14           MS. FULLER:  Keep playing.

15           LIZA LABOMBARD:  I think that's it.

16           MS. FULLER:  It shouldn't be it.

17  BY MS. FULLER:

18  Q    Okay.  I am going to ask you who this person is

19  right here?

20  A    That's Chelsea Parker.

21  Q    All right.  So it was a little -- the action was

22  pretty quick.  How many times have you seen this video?

23  A    Dozens.

24  Q    Okay.  Can you describe for us -- the jurors can

25  watch it, but just can you describe for us what happens,

1    what Carl Martin does when Mr. Nashid is in this general

2    area?

3    A    Mr. Martin, or Carl Martin, crosses Main Street,

4    approaches Mr. Nashid, punches him, and then draws a

5    firearm and points it at Mr. Nashid, and then Mr. Nashid

6    runs away from Carl and fires two shots towards the

7    lake, or westbound, one of which strikes Chelsea Parker

8    in the chest and the other goes through an upstairs --

9    or a second-floor window at an apartment building above

10   Manhattan Pizza.

11   Q    Did Miss Parker survive?

12   A    She did.

13   Q    And was anybody occupying that second-story

14   apartment?

15   A    There was.

16   Q    Now, did Carl Martin go to the police after the

17   shooting?

18   A    No.

19   Q    Did you have an opportunity to interview him --

20   A    I did.

21   Q    -- after the shooting?

22   A    I did.

23   Q    All right.  Was that on February 28, 2018?

24   A    Yes, it was.

25   Q    Can you walk us through how that interview took

1    place?

2    A    Yes.

3         Me and my supervisor at the time, Lieutenant Mike

4    Warren, approached his residence in Colchester.

5    Q    Do you remember the address that you went to?

6    A    I believe it's 192 Grey Birch Drive in Colchester.

7    Q    Okay.

8    A    And we approached his residence, knocked on the

9    door.  I was filming with my body camera.  And Mr.

10   Martin came to the door, invited us inside, allowed me

11   to continue recording with my body camera.  And I asked

12   him if I could also record with an audio recorder, which

13   he agreed to.

14   Q    Okay.  What did he say with regard to his

15   possession of the firearm that night?

16   A    That he -- he retrieved it from the vehicle that

17   was parked on Main Street across from Nectar's.

18   Q    Okay.  Let me back up a little bit --

19   A    Sure.

20   Q    -- before that.  Before he goes to get the firearm,

21   where is he, according to Mr. Martin?

22   A    Before Carl goes to get the firearm, he was inside

23   Nectar's.

24   Q    Okay.  So walk us through about what he said about

25   leaving Nectar's and going to get the firearm.

1    A    Following the disturbance between Dennis and

2    Rashad, Carl said that his night had been ruined, so he

3    stopped drinking.  He hardly started drinking, he said.

4    There's a point when Mr. Rashad Nashid exited Nectar's

5    and went to the nearby bar, which was Esox.  That was

6    shortly after midnight.  At about 1:30 in the morning,

7    Carl left Nectar's and went to the vehicle and retrieved

8    the firearm from the vehicle and also retrieved a

9    magazine which held the bullets for the firearm.  And

10    then he waited across the street to watch out for Rashad

11    and Dennis.

12    Q    So he waited across the street?

13    A    Yes.

14    Q    Did he give any more explanation of what that was

15    for?

16    A    Because Rashad had threatened to kill or harm his

17    brother earlier in the night, so he waited by the

18    vehicle where Rashad would not see him.

19    Q    Was he armed with a firearm while he was waiting

20    across the street?

21    A    Yes.

22    Q    What does he say happened next?

23    A    He says that he sees Rashad approaching his brother

24    as his brother came out of Nectar's, and that was at

25    about two a.m., shortly after two a.m.  He says that he

1    sees Rashad lift his shirt up and is holding or has a

2    hand on a firearm which is tucked into his pants in the

3    front of his pants.  So he approaches Rashad and punches

4    him and then points his firearm at Rashad to make him

5    back down.

6    Q    Okay.  So let me back up a little bit.

7    A    Sure.

8    Q    Does Mr. Martin say anything about loading the gun

9    he had?

10    A    He retrieved the firearm, which was separate from

11    the magazine, and he put the magazine inside the

12    firearm.

13    Q    As he was waiting across the street?

14    A    Yes.

15    Q    So he walks -- you just described he walked across

16    the street after he saw Mr. Nashid.  Did he say anything

17    about hitting Mr. Nashid?

18    A    He punched him.

19    Q    All right.  And what did he say he did with the gun

20    after he punched Mr. Nashid?

21    A    He pointed the firearm at Mr. Nashid after punching

22    him.

23    Q    Now, in connection with the interview you had with

24    Mr. Martin, did you recover the firearm that was used by

25    Mr. Martin in the Nectar's incident?

1    A    Yes.

2    Q    I'm going to show you what's been marked as -- so I

3    am going to show you what's been marked as 101 and 101A,

4    and tell me if you can identify that.

5    A    Yes.

6         That's the firearm that we recovered from Mr.

7    Martin.

8    Q    Okay.  So this firearm -- again, I will ask you,

9    was the zip-tie on it at the time you recovered it?

10   A    No.  We put that there for safety.

11   Q    Okay.  And there's also what appears to be a

12   magazine in this box.  Does that go with that firearm?

13   A    Yes.

14   Q    Did you recover both from Mr. Martin's residence --

15   from Mr. Martin?

16   A    At the same time.  Yes, we did.

17        Yes, Mr. Martin voluntarily brought us to the

18   firearm with -- it was myself and Lieutenant Mike

19   Warren.  He brought us upstairs and pointed out where

20   the firearm was so that Lieutenant Warren could secure

21   the firearm safely.

22   Q    Okay.  And has this been in law enforcement custody

23   since the time you took it?

24   A    Yes.

25   Q    Are you aware of -- did you -- strike that.

1      Did you speak with Mr. Martin about that particular

2  firearm at any point after you had talked with him

3  initially in the days after the shooting?

4  A    Yes.

5  Q    And what was the substance of that conversation?

6  A    I believe he called in looking to pick up his

7  firearm, and I spoke with him over the phone saying that

8  it was held as evidence.

9  Q    It was held as evidence?

10  A    Yes.

11  Q    Do you have a time frame?  Do you have any idea

12  when that was?

13  A    I don't recall the time.

14  Q    Okay.  Now, were you aware -- if I can fast-forward

15  a year, back into 2019.  Were you aware that ATF had an

16  investigation into Mr. Martin?

17  A    Yes.

18  Q    Did you assist in any way with that investigation?

19  A    I assisted with surveillance.

20  Q    Okay.  Do you remember the date of that?

21  A    September 5th, 2019.

22  Q    And when you say you assisted with surveillance,

23  what do you mean?

24  A    So ATF, I think, was trying to purchase controlled

25  substances from Mr. Martin, so I parked an unmarked car

1    nearby the expected or anticipated location of the

2    transaction, and I video recorded what I could of the

3    transaction.

4              MS. FULLER:  Okay.  Could we play Exhibit 24

5    that's been admitted into evidence.

6              (A digital recording was played in open

7    court.)

8              MS. FULLER:  So please stop.  It's okay.

9    BY MS. FULLER:

10    Q    Did you recognize the first little bit that you --

11    the first beginning of that video?

12    A    Yes.  That was a video that I took from that

13    surveillance that I conducted during that transaction.

14              MS. FULLER:  Okay.  We can keep going.

15              (A digital recording was further played in

16    open court.)

17              MS. FULLER:  Stop it there.

18    BY MS. FULLER:

19    Q    So you were trying to focus in on a vehicle.  Can

20    you tell us what that was about?

21    A    That was the vehicle of interest that I had been

22    informed about from ATF agents.

23    Q    Do you remember what kind of car that was?

24    A    I think it was a Chevy, a black Chevy SUV.

25    Q    Okay.

1    A    Maybe an Equinox.

2                MS. FULLER:  Go ahead.

3                (A digital recording was further played in

4    open court.)

5    BY MS. FULLER:

6    Q    Is that the vehicle that we are seeing now?

7    A    Yes.

8                MS. FULLER:  Can you stop it here.

9    BY MS. FULLER:

10   Q    Can you remind us where you are at this point?  You

11   said you were in a parking lot, but where?

12   A    It was the general area of the Price Chopper

13   parking lot on Williston Road.

14               MS. FULLER:  Okay.  Go ahead.

15               (A digital recording was further played in

16   open court.)

17               MS. FULLER:  Okay.  So that's the first clip.

18   We are going to fast-forward a little bit to another

19   clip.  See if you can recognize that.

20               (A digital recording was further played in

21   open court.)

22   BY MS. FULLER:

23   Q    Is this video you have taken also?  You took also?

24   A    Yes.

25               (A digital recording was continuing to be

1  played in open court.)

2  BY MS. FULLER:

3  Q    Are you in the same parking lot?

4  A    Yes, I believe so.

5  Q    So do you know what you are focusing in on there?

6  A    I believe I am focusing on a meeting between one of

7  the ATF agents and one of the occupants from the

8  vehicle.

9  Q    And the person that you just focused in on there,

10  is that the same person that you saw meeting at the car?

11  A    Yes.

12  Q    Is that the same vehicle that we saw earlier at the

13  beginning of the clip?

14  A    Yes.

15  Q    Where is that vehicle going?

16  A    It goes to a nearby gas station.

17  Q    Are you involved in the investigation such that you

18  can identify the people in the car?

19  A    Yes.

20  Q    And who were the people that you saw in the car?

21  A    Carl Martin sitting in the passenger seat and

22  Mirnes -- I have a hard time pronouncing his last

23  name -- is the driver.

24          MS. FULLER:  That's it.  Thank you.

25      Your Honor, I don't have any further questions but

1    I would like to publish the gun to the jury.

2            THE COURT:  Publish what?

3            MS. FULLER:  Just publish the gun, just show

4    it to them.

5            THE COURT:  That's fine.  Right.

6            (Government's Exhibit 117 was published to the

7    jury.)

8            MS. FULLER:  Nothing further, your Honor.

9            THE COURT:  Okay.  Cross examination?

10            MR. MATSON:  Excuse me, Judge.  Could I have

11    just a moment to speak with Attorney Fuller?

12            THE COURT:  Yes.

13            (Brief pause.)

14            MR. MATSON:  Judge, can we be heard at

15    sidebar?

16            THE COURT:  Yes.

17    (The following was held at the bench.)

18            MR. MATSON:  Afternoon, Judge.  There is a

19    recording of --

20            THE COURT:  Recording of?

21            MR. MATSON:  Officer Beliveau just talked

22    about a conversation he had with Carl Martin and what

23    Carl Martin said.  There's a recording of that full

24    conversation.  We talked about admissibility before.  I

25    think at this point the door is open to give the full

1    conversation now that he has spoken about it.

2             THE COURT:  Okay?

3             MS. FULLER:  I just don't want to -- if Carl

4    Martin wants to give his story about the shooting, he

5    should get on the stand and do that.  The defense has

6    put in the issue of the government's motivation, which

7    is the sole reason for this line of questioning as to

8    what happened, you know, the incident at Nectar's.  So I

9    think this is sort of an end run around -- I mean, it's

10   clearly hearsay.  There's no exception that gets this in

11   for the defense.  So I think it's an end run around Mr.

12   Martin.

13            THE COURT:  It's not hearsay.  He is a

14   defendant.  There is no such thing as hearsay.

15            MS. FULLER:  Right, but he --

16            MR. MATSON:  But the -- okay.  Go ahead.

17            MS. FULLER:  I think the government's offering

18   it as true.  But, I mean, he is not -- he is not an

19   adverse party to himself.

20            THE COURT:  Sure.

21            MS. FULLER:  So I think, you know, he is

22   trying to make an end run around explaining the incident

23   without getting on the stand to do it.

24            MR. MATSON:  Well, I wouldn't have any

25   opportunity to do so, but now the statements are out

1    there.

2                    THE COURT:  Yeah, I think the statements are

3    out there with sufficient particularity that you should

4    be able to put in the whole interview and show the

5    context in which he said it.  So I appreciate the fact

6    that maybe it's going to require a disclosure of what

7    his theory of the situation was, but regardless, you

8    have the opportunity to put in context what he said

9    according to the government's direct examination.

10        So you can go ahead and play it.

11                    MR. MATSON:  Thank you, your Honor.

12                    MS. FULLER:  Okay.  Thank you.

13    (The following was held in open court.)

14                         CROSS EXAMINATION

15    BY MR. MATSON:

16    Q    Good afternoon, Officer Beliveau.

17    A    Afternoon.

18    Q    I'm Chandler Matson.  I represent Carl Martin.

19        I have been reading and mispronouncing your name

20    for two years.  Nonetheless, Officer Beliveau, it's nice

21    to meet you.

22        So there may be a time where I get stumped up on

23    technical stuff.  We'll get to that in a second.

24    A    Okay.

25    Q    I want to draw your attention back to the Nectar's

1    shooting, and I think it's clear that Carl Martin did

2    not fire that weapon; is that right?

3    A    He did not fire his weapon.

4    Q    Okay.  And this Rashid character did; fair

5    statement, right?

6    A    Mr. Nashid did, yes.

7    Q    Did Mr. Nashid have the firearm on him when he was

8    standing right next to Dennis Martin?

9    A    Yes.

10    Q    And Dennis Martin is Carl's brother?

11    A    Correct.

12    Q    Officer Beliveau, I know you interviewed a lot of

13    people in regard to that Nectar's shooting.  Do you know

14    how many people you interviewed?

15    A    I don't.  Dozens.

16    Q    You wrote a report in this matter related to that

17    Nectar's shooting; is that accurate?

18    A    Yes.

19    Q    Maybe that report would refresh your recollection

20    as to how many people you interviewed?

21    A    Yes.

22        MR. MATSON:  Your Honor, may I approach?

23        THE COURT:  Yes.

24    BY MR. MATSON:

25    Q    And just for identification --

1          THE COURT:  But I just want to clarify:  I

2    mean, we are talking about the defendant's role in this

3    particular situation and, in particular, in regard to

4    possession of a firearm.  I don't think that the whole

5    interview with all of the other interviews --

6          MR. MATSON:  No, your Honor.  I --

7          THE COURT:  The whole investigation with all

8    the other interviews are relevant, really.

9          MR. MATSON:  Okay.

10          THE COURT:  So if you can just limit your

11    examination to what relates directly to your client,

12    that would be helpful.

13          MR. MATSON:  Okay.

14    BY MR. MATSON:

15    Q    Well, let's just orient ourselves then to February

16    28th, 2018.  Officer Beliveau, on that day, did you go

17    to Carl Martin's house?

18    A    Yes.

19    Q    Did you tell him that you were coming?

20    A    No.

21    Q    No.  Were you with anybody?

22    A    Yes.

23    Q    Who were you with?

24    A    My boss, Lieutenant Mike Warren, and then I think

25    we had some other detectives nearby.

1    Q    Okay.  When you say nearby, what are you talking

2    about?  Across the street?

3    A    I don't remember where they were parked, but they

4    were in a vehicle just down the street from the house.

5    Q    Okay.  Did you have a gun on you?

6    A    Yes.

7    Q    And did your supervisor, or your boss, did he have

8    a gun?

9    A    I think so.

10    Q    Okay.  Carl answered the door, right?

11    A    He did.

12    Q    He was with his two children; is that right?

13    A    They were upstairs.

14    Q    Okay.  And he let you right in, right?

15    A    Yes.

16    Q    He didn't say, Shut the door while I move things

17    around?  He just let you right in.  Right?

18    A    Correct.

19    Q    And he was polite and he was courteous, right?

20    A    Yes.

21    Q    And at some point did you search his apartment?

22    A    I didn't search it other than when he directed us

23    to the firearm.

24    Q    Okay.  So he let you into a closet?

25    A    It was a bedroom.  I don't recall specifically.  It

1    may have been a closet or a dresser or something

2    upstairs, but -- I just don't remember.

3    Q    Was that -- was that interview recorded?

4    A    Yes.

5    Q    Okay.

6              MR. MATSON:  Your Honor, I am going to play

7    the recording and ask the witness to authenticate it.

8              THE COURT:  I'm sorry?

9              MR. MATSON:  I am going to play the recording.

10   At the end I will ask the witness if he recognizes that

11   video.

12             THE COURT:  Okay.  That's fine.

13             (A digital recording was played in open

14   court.)

15   BY MR. MATSON:

16   Q    Stopping right here.

17        Officer Beliveau, have you heard this recording

18   before?

19   A    Yes.

20   Q    And do you recognize your voice on the recording?

21   A    I do.

22   Q    And does this appear to be the recording from that

23   day?

24   A    Yes.

25   Q    I may skip ahead, Officer Beliveau, because it

1    sounds as if --

2              (A digital recording was further played in

3    open court.)

4              MR. MATSON:  So we appear to have a technical

5    issue.  Your Honor, I don't want to hold these folks up.

6              THE COURT:  Okay.  So you might, well, as a

7    part of your case --

8              MR. MATSON:  What I'm going to do is continue

9    my questions.

10             THE COURT:  Just hold it a second.

11        As a part of your case, you can actually introduce

12   that if you want to.  By that point, you will have

13   learned technologically how to present it.

14             MR. MATSON:  Okay.  So let's move on.  I am

15   going to leave this here.  If it decides to cooperate,

16   great.

17   BY MR. MATSON:

18   Q    So Officer Beliveau, just briefly, because we'll

19   listen to it, but did Martin essentially say that Rashad

20   had threatened to kill his brother?  Is that about

21   right?

22   A    Yes.

23   Q    And did he say that Rashid actually was approached

24   by a bouncer -- initially a bouncer took Rashid's gun

25   that night?  Did he say that?

1    A    Yes.

2    Q    All right.  And that's because Carl Martin told the

3    bouncer, Hey, that guy threatened to kill my brother.

4    Is that about right?

5    A    I'm not sure if Carl told the bouncer or another

6    patron did the night of the shooting.

7    Q    But then at some point, unfortunately Rashid was

8    given that gun back, right?

9    A    Yes.

10    Q    When you seized the gun, did Carl ask you to do any

11    testing or did he say, Feel free to do any testing on

12    the gun?

13        When you seized the gun, did Carl ask you or give

14    you permission to do any testing you wanted on that gun?

15    A    I don't recall specifically.  He said that we could

16    seize it to do some tests, but I don't recall

17    specifically the extent.

18    Q    Were any tests done to see if it had been fired?

19    A    I don't recall.

20    Q    All right.  Did you determine that gun was stolen

21    or was involved in any other wrongdoing, anything like

22    that?

23    A    No.

24    Q    All right.  And at that point -- at that point,

25    Officer Beliveau, was it your understanding that Carl

1    was allowed to possess a firearm --

2    A    Yes.

3    Q    -- under the law?

4    A    Yes.

5    Q    And he would be allowed to just buy a firearm in a

6    store, right?

7    A    Yes.

8    Q    Officer Beliveau, did you go back and talk to Mr.

9    Martin a second time?

10   A    Yes, I did.

11   Q    On March 2nd?

12   A    I'd have to look at a report to firm that up, but

13   if that's what you are saying, it's probably --

14   Q    Well --

15   A    I think it was two days after -- after this

16   recording, or around there.  After this recording or

17   close to it.

18   Q    And was this an announced visit or unannounced

19   visit?

20   A    I don't -- I don't remember if we called him ahead

21   of time or not.

22   Q    Did he let you right in again?

23   A    Yes.

24   Q    And this time were you with Agent Brown?

25   A    Yes.

1    Q    Okay.  And I am pointing to the audience.  That's

2    Agent Sam Brown from the ATF; is that right?

3    A    That's correct.

4    Q    Okay.  On this occasion, once again, Carl let you

5    in?

6    A    Yes.

7    Q    And he didn't hesitate?  He didn't shut the door

8    and say, Hey, let me clean up a few things?  Right?

9    A    No.

10   Q    And he was again polite?  He was courteous?

11   A    Yes.

12   Q    He answered all your questions, right?

13   A    Yes.

14   Q    Can you describe the apartment?

15   A    It didn't seem out of the ordinary.  I mean, I have

16   certainly been in some messy apartments.  It seemed like

17   a normal apartment.  I don't know.

18   Q    I was more interested in the size of it.

19   A    Two-story apartment.  I didn't really go too far

20   into it.  I think in the door to the right is kind of

21   like a dining room or kitchen-type area.  At least we

22   sat at a table aiming to the right.  And then the stairs

23   were on the left, and then the stairs went straight up

24   to some bedrooms.

25   Q    The bedroom where the closet was where the firearm

1  was, is that upstairs?

2  A   Yes.

3  Q   Okay.  On either occasion, did you see any drugs?

4  A   Not that I recall, no.

5  Q   Any baggies?

6  A   No.

7  Q   Money?

8  A   No.

9  Q   Anything associated with drug paraphernalia

10  whatsoever?

11  A   No.  I wasn't really looking for that either, so.

12  Q   Right.  But if you saw it, it might catch your

13  attention, right?

14  A   I would hope so.

15  Q   Right.  And safe to say you did not see anything?

16  A   No.

17  Q   All right.  Officer Beliveau, at some point your

18  case file on the Nectar's shooting is presented to the

19  state's attorney's office, right?

20  A   Yes.

21  Q   And in that case file, again -- well, let me just

22  ask you this:  Was it an extensive investigation?

23  A   Yes.

24  Q   And was there anything in that investigation that

25  indicated that Carl was a drug dealer?

1    A    No.

2    Q    So of all the people you interviewed and all the

3    evidence you took in, there was nothing to indicate he

4    was involved in drugs, was there?

5    A    Not that I recall, no.

6    Q    On August 31st or thereabouts, did you receive a

7    letter from the Chittenden state's attorney that they

8    would not be prosecuting Mr. Martin?

9              MS. FULLER:  Objection, your Honor.

10             THE COURT:  Objection sustained.

11             MS. FULLER:  I don't know what relevance that

12    has.

13             THE COURT:  Objection sustained.  You are not

14    getting into a prosecution decision.  That's irrelevant

15    at this point.

16             MR. MATSON:  Okay.

17    BY MR. MATSON:

18    Q    Officer Beliveau, I'm sorry.  I am just looking

19    through my notes, because in September of 2018, I think

20    you became aware of a confidential informant named John

21    Latimer?

22    A    I am familiar with John Latimer.  I don't remember

23    when I became aware that he may be an informant or not.

24    Q    Did you work with John Latimer at all?

25    A    I don't know if I specifically did.

1    Q    Well, let me limit the time frame.  Did you work

2    with John Latimer September of 2018?

3    A    I don't recall if I did or not.

4    Q    Okay.  Let me just -- it might be the same answer.

5    It's okay.

6         October of 2018, do you remember working with John

7    Latimer?

8    A    I -- I was a general detective.  I didn't have

9    informants that worked for me, so I really don't -- I

10   don't remember.  I mean, now that I am in the drug unit,

11   I do have informants, but --

12   Q    Okay.

13             MR. MATSON:  Your Honor, can I have a moment?

14             THE COURT:  Yes.

15             (Brief pause.)

16             MR. MATSON:  So, your Honor, I would move for

17   admission of what we marked as Defendant's Exhibit C,

18   which is the interview, but I will provide it to the

19   Court and play it at a time when the technical issue is

20   resolved.

21             THE COURT:  That's fine.  Great.

22             MR. MATSON:  Thank you, Judge.

23             THE COURT:  Okay.

24             (Defendant's Exhibit C was received in

25   evidence.)

 1          MR. MATSON:  Thank you, Officer Beliveau.  I

 2   appreciate it.

 3          THE COURT:  Any further questions?

 4          MS. FULLER:  No further questions.

 5          THE COURT:  All right?  Thank you, Sergeant.

 6          THE WITNESS:  Thank you, your Honor.

 7          (Witness excused.)

 8          THE COURT:  Okay, next witness?

 9          MS. FULLER:  Your Honor, we call Special Agent

10   Matthew Ekstrom.

11                    MATTHEW EKSTROM,

12      having been duly sworn by the courtroom deputy,

13      was examined and testified as follows:

14          THE COURT:  All right.  Good afternoon, Agent

15   Ekstrom.

16          MS. FULLER:  Your Honor, before we start, I

17   believe the defense and the government have some

18   stipulations as to the admission of the following

19   evidence.

20          THE COURT:  Okay.

21          MS. FULLER:  Exhibit 53 and 54, Exhibit 125,

22   126, 96, 97, 97A through D, 110, 111, 112, 112A through

23   B, 113, 114, 115, 116A through E, 120, 120A through H,

24   121, 122, 124, 127, and Exhibit 34.

25          THE COURT:  All right.  Is that correct?  From

1    defense counsel, is that correct?

2            MR. MATSON:  That's correct, your Honor.

3            THE COURT:  All right.

4            MR. MATSON:  I apologize.

5            THE COURT:  They are admitted.

6            (Government's Exhibits 34, 53, 54, 96, 97,

7    97A-D, 110, 111, 112, 112A-B, 113, 114, 115, 116A-E,

8    120, 120A-H, 121, 122, 124, 125, 126, and 127 were

9    received in evidence.)

10                        DIRECT EXAMINATION

11   BY MS. FULLER:

12   Q    Good afternoon.  Could you introduce yourself to

13   the jury, please.

14   A    Yes.

15        My name is Matthew Ekstrom.  I am a special agent

16   with the Bureau of Alcohol, Tobacco, Firearms and

17   Explosives.

18   Q    How long have you worked for them?

19   A    About 20 years.

20   Q    Okay.  And do you currently have any area that you

21   specialize in in your work with ATF?

22   A    Yes.

23        I specialize in the collection of digital media for

24   ATF.  We have a position called the digital media

25   collection specialist.

1  Q    Is that you?

2  A    That's me.

3  Q    And what kind of training have you gone through to

4  be in that position?

5  A    About 10 years ago I started with the -- it was a

6  new program and was trained on the use of forensic

7  software, which is used to collect data from cellular

8  telephones or mobile devices as well as I studied some

9  computer forensics on how to image and copy data from

10 computers.

11 Q    Okay.  So are you aware of the investigation into

12 Carl Martin?

13 A    Yes.

14 Q    Did you have any involvement in that investigation?

15 A    I did.

16 Q    What was your involvement?

17 A    As an agent in the office, I worked with the case

18 agent.  I was part of the arrest team when Mr. Martin

19 was arrested.  And also as a vault custodian for the

20 office, I collected and maintained some of the evidence

21 in the case.  And as the digital media collection

22 specialist for the office, I collected the cellular

23 telephones from the arrest scene.

24 Q    Okay.  Let's focus on that latter part of your

25 involvement here.  You said the collection of phones.

1    Can you tell us about any of the phones that were seized

2    in this case?

3    A    Yes.

4         When Mr. Martin was arrested, I collected a Samsung

5    brand cellular telephone from him and then maintained

6    custody of it.  I later took it to the interview room

7    where he was interviewed and had him unlock it using his

8    passcode, and then transported it to the office and

9    entered it as evidence.

10   Q    I am going to shown you what's been just marked for

11   identification as Government's Exhibit 55 and ask you if

12   you can identify that for me?

13   A    Yes.  This is the cellular telephone recovered -- I

14   recovered from Mr. Martin at the time of his arrest.

15   Q    Okay.  And just to be clear, was this phone -- I

16   think you said it a minute ago -- was on his person?

17   A    Yes.

18   Q    Was there any other phones involved in this case?

19   A    Yes.  There was another phone that I recovered from

20   the vehicle.  Mr. Martin and Mr. -- I don't know how to

21   pronounce the last name.  His first name is Mirnes.

22   Julargeena.

23   Q    Julardzija?

24   A    Julardzija.

25        I recovered a phone from the vehicle they were in

1    and put that into evidence as well.

2                MS. FULLER:  Can I bring up Government's

3    Exhibit 53 and 54, please.  53 first.

4    BY MS. FULLER:

5    Q    What is that?

6    A    That is the phone recovered from the vehicle, I

7    recovered from the vehicle.

8    Q    All right.  And how about 54?

9    A    That is the back side of that cellular telephone

10   from the vehicle.

11   Q    So I am going to show you what's been marked for

12   identification as Government's Exhibit 95.  Ask you if

13   you can identify that?

14   A    Yes.  This is the phone that I recovered from the

15   vehicle after Mr. Martin's arrest.

16   Q    Okay.  This was the phone seen in the pictures we

17   just saw?

18   A    Yes.

19   Q    So what did you do with both of these phones,

20   Exhibit 55 and Exhibit 95, after you took possession of

21   them?

22   A    After I took possession of them, I -- I brought

23   them to our office and put them in as evidence, marked

24   them as evidence in the case.

25   Q    Okay.  What's the next step?  What do you do then

1    with phones that you have seized?

2    A    Once I -- we -- the phone recovered from Mr.

3    Martin, we obtained consent from him to search that

4    telephone.  So I connected it to our -- the software

5    that we use to collect digital evidence from cellular

6    telephones, from a company called Cellebrite.

7        With that phone, I was able to extract a data set,

8    which was a -- a set of data that was present on the

9    phone at the time when I examined it, which means it was

10   a basic examination of the phone.  I was able to collect

11   the call logs, the text messages, the calendar,

12   pictures, as well as some files from some third-party

13   applications.

14   Q    Can you talk to us a little bit more about

15   Cellebrite, how it works.  Do you need training to use

16   it?  I mean, what is this?

17   A    Yes.  Cellebrite's the name of a company that

18   produces this -- this software that we use to examine

19   cellular telephones.

20       Basically what you do is it's a program on a

21   computer.  You connect your -- the cellular telephone

22   that you are examining to that program, and it can

23   identify certain levels of examinations it can perform

24   on the phone.

25       There are three levels of examinations that you can

1    do on a cellular telephone with the software.  There's

2    an advanced logical, a file system, or physical

3    examination.  The physical examination's a full copy of

4    the cellular telephone's memory.  The file system copies

5    the file structure of the phone, kind of like if you

6    were looking at your computer and the files that are

7    basically on the computer.

8         And the third is an advanced logical, which is

9    basic collection of the call logs and text messages and

10   other data.

11        At the time when I examined these phones, I was

12   only able to do that advanced logical examination on

13   them.

14   Q    How come?

15   A    Because of the make and manufacturer of the cell

16   phone.  So those were Samsungs and they were running an

17   Android operating system, the software that runs the

18   phone.  And basically with the technology at the time,

19   that was the only level of examination I was able to do.

20   Q    So the examination we are going to talk about is --

21   is what you just said, was an advanced logical, not the

22   other two?

23   A    Correct.

24   Q    All right.  So I think we were talking as to the

25   examination of Government's Exhibit 55 which you

1    identified as Mr. Martin's phone.  Did you do the same

2    thing with the phone that you seized from the vehicle?

3    A    Yes, I did.

4    Q    Now, when you examine a phone, you said you hooked

5    it up to the software, the Cellebrite software, and you

6    told us a little bit about the kinds of information that

7    it generates.  In preparation for trial here today, did

8    you generate some PDFs or some files that you found on

9    these phones?

10    A    I did.

11            MS. FULLER:  Okay.  I am going to start with

12    Exhibits 125 and 126.  Could you bring up 125, please.

13    BY MS. FULLER:

14    Q    So is this something you generated?

15    A    Yes, it is.

16    Q    All right.  Do you know whose phone this was off

17    from?

18    A    Yes.  This was Mr. Martin's phone.

19    Q    Okay.  And what is this?  What are we looking at?

20    A    This is the contact list from Mr. Martin's cellular

21    telephone displayed in an Excel spreadsheet format.

22            MS. FULLER:  Okay.  Can we go to the next

23    page, please.

24    BY MS. FULLER:

25    Q    So walk us through sort of a layman's term.  If I

1  open up my phone, it doesn't look like that.  Can you

2  help the jurors understand what this is compared to what

3  they would see on their own cellphones?

4  A    Yes.  So when you are looking at this, you can see

5  the first column is the name, and that's the name that

6  the phone number would be stored under in your contact

7  list.

8       So, for example, you know, Dad, line number 48,

9  that's the name that the contact was stored under.

10      The second column are the telephone numbers that

11  are stored along with that -- that contact name.

12      And the third column is where that -- where that

13  data was stored, either on the phone or in a third-party

14  application.

15 Q    Okay.  So for most of these, I see on page two, it

16 says phone, phone, phone, phone; and then down, sort of

17 near the top, I see something that says TextNow under

18 the user Choppa.  Can you explain that, what we are

19 seeing there?

20 A    Yes.

21      So on the phone, you have your contacts that you

22 store on the phone, usually in the application that

23 comes with the operating system from the phone.  So in

24 this case it was a Samsung and it was running an Android

25 operating system.  So when you are looking at your

1    phone, there's a built-in application in order to store

2    contacts.  And that would be in the -- stored on the

3    phone or in the phone's memory.

4         There are also third-party applications which you

5    can also use in order to store contacts sort of to

6    communicate with.  And one of those applications is

7    called TextNow.

8         Inside the TextNow application, you can also store

9    contacts, and this exhibit is just showing all of the

10   contacts that were recovered from the phone and

11   differentiating whether they came from the phone or from

12   a different application inside the phone.

13   Q    So this might be more clear if we get to

14   Government's Exhibit 126.

15             MS. FULLER:  Can we enlarge that.

16   BY MS. FULLER:

17   Q    So is this another file that you created off from

18   the phone extraction from Mr. Martin's phone?

19   A    Yes, it is.

20   Q    Can you walk us through what we are looking at

21   here?

22   A    Yes.

23        You can see the top right corner, it's from

24   Cellebrite.  That's the name of the company that makes

25   that software.  This is a representation of the accounts

1  that were found on the phone.  You can see under the

2  device information box, you will see the -- that it's an

3  advanced logical through the extraction that I was able

4  to do.  The make and model of the phone, the phone

5  revisions, the operating system.  The IMEI is the

6  specific identification number for the device.  As well

7  as some of the other identification numbers for the

8  device.

9  Q    Are we able to see anywhere on this top box, the

10  device information, what the phone number is that was

11  assigned to that particular phone?

12  A    Yes.

13       Under the MSISDN line, that's the --

14  Q    So is it right here that I am circling?

15  A    Yes.

16  Q    Okay.

17  A    It's the mobile station international service

18  directory number, which is a phone number for the phone.

19  Q    So that's the phone number -- so for this

20  particular phone, the phone number assigned to the phone

21  is (628) 250-1735?

22  A    Yes.

23  Q    Okay.  And just to help us understand, that's a

24  number you call and somebody would pick it up, right?

25  That's what that means?

1    A    Yes.

2         In this case you can see underneath that is the

3    IMSI, and that's basically the account number for which

4    phone company is assigned to that number.  And you can

5    see that the IMSO in this case is 311480, which is a

6    Verizon account.

7    Q    Okay.  So this is a phone number assigned through

8    Verizon?

9    A    Yes.

10   Q    All right.  What information do we see here at the

11   bottom where it says "user accounts"?

12   A    So those are the other users accounts that were

13   found on the device, according to Cellebrite.  You can

14   see that there -- on the left column, it says "source,"

15   and there's TextMe and TextNow in both of those columns.

16   Q    Can you describe for us what TextMe and TextNow

17   are?

18   A    So TextMe and TextNow are both third-party

19   applications.  Basically what that means is when you get

20   a phone and it's running an Android operating system,

21   there's certain applications on there that are built in

22   to that operating system.  Like when you first turn it

23   on, you will see one for text messages or phone icon for

24   using -- just making phone calls.

25        TextMe and TextNow are applications that you can

1    obtain from either the Google Play Store or from the

2    Apple app store and you can install on your phone and

3    use those in order to communicate.  Both applications

4    offer text communications as well as voice

5    communications through the application instead of using

6    your phone's text or voice.

7    Q    So this may seem obvious, but when you say

8    third-party application, you just mean an app?

9    A    I just mean an app that wasn't made by the phone

10   company.

11   Q    All right.  So these are apps that somebody came

12   and put onto the phone?

13   A    Yes, that you would install on your phone yourself.

14   Q    All right.  And TextMe and TextNow, I think you

15   started to say, that they're -- they're texting apps?

16   They're ways to communicate; is that what you said?

17   A    Yes.  You can both text and you can make voice

18   calls through the app.

19   Q    All right.  So these user accounts, this shows us

20   that he has those apps on the phone?

21   A    Yes.

22   Q    What other information can we glean from this user

23   account section?

24   A    From the user accounts, you can see the username.

25   So under TextMe, you can see that the username is

1    Stephanie Bilodeau and then a series of numbers after.

2    Under entries, it shows the e-mail address associated

3    with that user name and that account, as well as the

4    phone number.

5    Q    Can you tell us a little bit more about what this

6    indicates for this account?

7    A    This means that when the application gets installed

8    on the phone, it will ask you to create an account or to

9    log in with an existing account, and the person using

10    this application logged into that account using the

11    "Stephanie Bilodeau and then series of numbers" account

12    in order to gain access to the application.

13    Q    Okay.  And the phone number -- here we have a

14    different phone number than the one assigned to the

15    phone up here.  What's this different phone number down

16    here?

17    A    That's the phone number assigned through the TextMe

18    application.  So you can also be contacted through the

19    application by that phone number.  It wouldn't be

20    through, like, a Verizon or Sprint account.

21        It wouldn't be through Verizon or Sprint or another

22    phone company.  It would be through the TextMe

23    application.

24            MS. FULLER:  All right.  So if we go to the

25    next line down, if we can --

1          LIZA LABOMBARD:  Do you want me to blow up the

2    user account first?

3          MS. FULLER:  Yes, please.

4    BY MS. FULLER:

5    Q    So if we go to the next line down, two, that's a

6    TextNow.  Is that similar to TextMe?

7    A    Yes.

8    Q    And talk us through what information we see about

9    the user.

10   A    TextNow operates the most -- in the same way as

11   TextMe does, and you can create an account through their

12   application.

13        This one, the username for that account was

14   Jamaicaman84.  The phone number used for the account is

15   (802) 335-2236, and logged into the account, or supplied

16   to the account, was jamaicaman84@gmail.com.

17   Q    Okay.  So this is another phone number.  This

18   (802) 335-2236, that's not the device phone number,

19   right?

20   A    Correct.

21   Q    But -- well, how would you describe the association

22   of this phone number, this (802) 335-2236 -- how would

23   you describe the association of this phone number with

24   this phone?

25   A    It is assigned through that TextNow account, that

1    phone number is.

2    Q    Okay.  And down to line three, can you talk to us

3    about line three and line four?

4    A    Three is one way that you can log into the TextMe

5    account, is by using your Facebook username and ID.  The

6    line three and four shows that -- that the account name

7    of André Martin was used as a Facebook login for TextMe.

8    Q    Okay.  And the line underneath it, number four?

9    A    It's -- that one was recovered from the memory of

10   the device, but it wasn't associated with an account.

11   So it's just showing that at some point an André Martin

12   Facebook account with that Facebook user identification

13   was logged into through the phone.

14   Q    Okay.

15           MS. FULLER:  You can take that down.

16   BY MS. FULLER:

17   Q    So I am going to show you a whole series of

18   exhibits.  I know you have gone through these outside

19   the courtroom, but if you could just look at the front

20   page quickly and ask -- and tell me whether you can

21   identify those?

22           MS. FULLER:  Your Honor, for the record, I am

23   showing the witness Exhibits 96, 97, 97A through D, 110,

24   111, 112, 112A through B, 113, 114, 115, 116A through E,

25   120, 120A through H, 121, 122, 124, 127 and 34.

1    THE COURT:  Okay.

2    A    Yes, I do recognize these.

3    BY MS. FULLER:

4    Q    And so what -- what are those generally, and then

5    we will narrow it down.

6    A    Generally they are either exhibits that I created

7    from data recovered from the phone, or images recovered

8    from the phone, or images of communications with the

9    phone.

10   Q    Okay.  So let's just start with 96.  If you can

11   look at that.

12        Can you describe for us what that is?

13   A    Yes.

14        These are text messages to and from the phone

15   number assigned to the Carl Martin phone in instant

16   messages or call logs.  It's a timeline report of

17   contacts with the phone from the --

18   Q    Is that what Exhibit 96 is?

19   A    Yes.

20        MS. FULLER:  Can we bring up Exhibit 96.

21   BY MS. FULLER:

22   Q    So let me just ask you a better question.  Did you

23   analyze another phone in this case?

24   A    I did.

25   Q    Okay.  The phone belonging to Mirnes?

```
1    A    Yes.

2    Q    And do you know whether this particular exhibit

3    came from the Mirnes phone or the Martin phone?

4    A    This exhibit came from the Mirnes phone.

5    Q    Okay.  How do you know that?

6    A    Because there are calls to and from phone number.

7    (628) 250-1735, which is the --

8    Q    And we saw that number a minute ago --

9    A    Yes.

10   Q    -- on Mr. Martin's phone, being the phone number

11   associated with the phone?

12   A    Yes.

13   Q    And so since we are about to talk about a number of

14   exhibits that look exactly like this or similar to this,

15   can you tell me what this is?

16   A    This is a filtered-down timeline of phone calls to

17   and from Mirnes's phone to Martin's phone.

18              MS. FULLER:  Okay.  For the sake of time here,

19   I am trying to shorten this up.

20        Exhibit 97?  Can you bring that up?

21   BY MS. FULLER:

22   Q    That looks very similar.  Is there differences with

23   this one?

24   A    Yes.  This is a timeline report of incoming and

25   outgoing calls.
```

1    Q    Do you know whose phone this is?

2    A    This is from Martin's phone to phone number

3    (802) 318-0276, who he had in his contacts as Chango.

4    Q    Okay.

5              MS. FULLER:  Can I just have a minute,

6    your Honor?

7              (Brief pause.)

8              MS. FULLER:  Your Honor, these are in evidence

9    already and we will have another witness discuss

10   these --

11             THE COURT:  Um hum.

12             MS. FULLER:  -- so I'm inclined to --

13             THE COURT:  They're already in evidence.  You

14   have another witness to talk about them --

15             MS. FULLER:  Yes.

16             THE COURT:  -- all so obviously you can put

17   them together in summation.

18             MS. FULLER:  That's correct.

19        I don't have any further questions of this witness.

20             THE COURT:  Okay.

21             MR. MATSON:  Just briefly, your Honor.

22                        CROSS EXAMINATION

23   BY MR. MATSON:

24   Q    I'm sorry.  Was it detective?

25   A    Special agent.

1    Q    Special agent.  I apologize.

2         Special Agent Ekstrom, I'm Chandler Matson.  I'm

3    Carl Martin's attorney.

4              MR. MATSON:  Madam clerk, could I have the --

5    thank you.

6    BY MR. MATSON:

7    Q    I just want to try and understand something.

8    Special Agent, I am looking at Government Exhibit 126,

9    and now I am looking down at the bottom.  So if I

10   understand this correctly, there's an application on

11   this particular phone called TextNow; is that right so

12   far?

13   A    Yes.

14   Q    And that TextNow application enables that phone to

15   text using a phone number that's not associated with the

16   physical phone?

17   A    Yes.

18   Q    Okay.  That's what I thought.

19             MR. MATSON:  Thank you, your Honor.  That's

20   all.

21             THE COURT:  Okay.  Anything further?

22             MS. FULLER:  No, your Honor.  No further --

23             THE COURT:  All right.  Thank you, Agent.

24             (Witness excused.)

25             THE COURT:  Okay, you want to call your next

1    witness?

2           MS. FULLER:  I do.

3           MR. GILMAN:  The government calls Mirnes

4    Julardziga.

5           THE COURT:  Okay.

6                    **MIRNES JULARDZIGA,**

7        being first duly sworn by the courtroom deputy,

8        was examined and testified as follows:

9           THE COURT:  Good afternoon.

10          THE WITNESS:  Good afternoon.

11                   DIRECT EXAMINATION

12   BY MR. GILMAN:

13   Q    Good afternoon, Mr. Julardzija.

14   A    Good afternoon.

15   Q    Directing your attention to August 26, 2019, I am

16   going to show you the first seconds of what's in

17   evidence as Government Exhibit 6.

18          MR. GILMAN:  Could we pull up the video.

19          (A digital recording was played in open

20   court.)

21          MR. GILMAN:  Could we stop there.

22   BY MR. GILMAN:

23   Q    Mr. Julardzija, do you appear in that video clip?

24   A    Yes, I do.

25   Q    Could you identify yourself for the jury in that

1    video?

2    A    Yes.  I'm wearing the white shirt and a baseball

3    hat.

4    Q    What were you doing in that video clip?

5    A    I was making a sale of cocaine with the undercover.

6    Q    Who were you delivering that cocaine on behalf of?

7    A    Dre.  Carl Martin.

8    Q    Do you see Carl Martin in this courtroom?  You may

9    stand if you need to.

10    A    Yeah, I do.  The gentleman with the black shirt

11    sitting right there.

12            MR. GILMAN:  May the record reflect that the

13    witness has identified the defendant?

14            THE COURT:  Yes.

15    BY MR. GILMAN:

16    Q    Were you later arrested with Mr. Martin?

17    A    Yes.

18    Q    Did you plead guilty to charges related to your

19    involvement with Mr. Martin?

20    A    I did.

21    Q    What did you plead guilty to?

22    A    Conspiracy of distribution of cocaine.

23    Q    Have you been sentenced for that crime yet?

24    A    I have not.

25    Q    I want to take a step back and talk about your

```
 1    background.  How old are you?
 2    A    36.
 3    Q    Where are you from?
 4    A    Bosnia and Herzegovina.
 5    Q    When did you come to the United States?
 6    A    October of 1997.
 7    Q    Why the United States?
 8    A    Well, it was the United States or back home where
 9    it was war-torn, so we had sponsorship here in Des
10    Moines, Iowa.  My aunt sponsored us, and we decided to
11    move there and have a fresh start.
12    Q    Did you become a United States citizen?
13    A    I did.
14    Q    When approximately?
15    A    2012.
16    Q    How far did you go in school?
17    A    I have finished my high school and got two years of
18    college, but I did not finish.
19    Q    Where did you take your two years of college?
20    A    Des Moines Area Community College.
21    Q    What did you study there?
22    A    I started off with computer programming and changed
23    that to liberal arts.
24    Q    Why?
25    A    Undecided.  Just -- you know.
```

1   Q    Okay.  What did you do after leaving community

2   college?

3   A    I was just working, like, different jobs, you know,

4   construction.

5   Q    Okay.  Did you eventually moved to Vermont?

6   A    Yes.  2009.

7   Q    Why?

8   A    My sister was here.  I just wanted to get the

9   family close because all our lives, you know, we have

10  been living together, and then for like a few years --

11  she got married in Vermont, and we were separated for

12  maybe like five, six years.  Just decided to come here

13  and rejoin.

14  Q    Okay.  At that time what did you do for work in

15  Vermont?

16  A    At that time, first two weeks I was working for my

17  brother-in-law's buddy, construction company roofing,

18  and then, you know, three months after that, September

19  or so, I got hired at Heritage Aviation.

20  Q    Heritage Aviation, where is that located?

21  A    At the Burlington International Airport.

22  Q    Okay.  And what was your position when you first

23  started there?

24  A    A line service technician.

25  Q    Did you move on to other positions there?

```
1    A    Yes.
2         I was a QA-QC inspector for the fuel firm field
3    guys.  I was also doing administrative work for the
4    maintenance department.  And then I was a parts clerk
5    for the maintenance department.
6    Q    Is that where you were working when you were
7    arrested in this case?
8    A    Yes.
9    Q    I want to ask you about drug use.  Have you used
10   cocaine?
11   A    Yes, I have.
12   Q    When did you first use, approximately?
13   A    20, 21.  College.
14   Q    Did your cocaine use change over time?
15   A    It did.
16   Q    How did it change?
17   A    Well, it increased.  It increased definitely 2018
18   after my father passed.  You know, it increased, but it
19   usually was just a social drug, and I didn't use it
20   until -- 2009 -- I didn't have any until, like, 2017,
21   so.
22   Q    Picking up in 2017, you just said you were still
23   using cocaine?
24   A    2017 I started using it again, yes.
25   Q    Where did you get your cocaine from in 2017?
```

1    A    I was getting it from Dennis Martin and then Carl

2    Martin.

3    Q    How did you meet Dennis Martin?

4    A    I met him fishing at the salmon hole.

5    Q    And where is that approximately?

6    A    That's Burlington area, right there where those

7    falls are, the waterfalls.

8    Q    How did you meet Carl Martin?

9    A    I met him over to Dennis's, but first we helped

10   him -- they were living at Church Street, so I helped

11   'em move to Grey Birch, that place, their new place.

12   Yeah, but I initially met -- you know, like formally met

13   Carl like -- like more than two weeks after that.

14   Q    Okay.

15   A    That's when I eventually formally met him, so not

16   right away with the moving.  We didn't really -- we

17   just --

18   Q    Okay.  In the summer of 2017, did you obtain

19   cocaine from Carl Martin?

20   A    Yes.

21   Q    What amounts of cocaine were you getting from Mr.

22   Martin in 2017?

23   A    It depends.  Sometimes a gram, sometimes two.

24   Sometimes an eight-ball.

25   Q    And when I say Mr. Martin, I'm referring to Carl

1    Martin.

2    A    Yes.

3    Q    Is that correct?  Your answers are still correct

4    with respect to Carl Martin, correct?

5    A    Yes.

6    Q    Now, what was your relationship with Mr. Martin,

7    Carl Martin, in 2017 like at the time?

8    A    I mean we were friends.  It was pretty good.  I was

9    giving him rides to work, rides to see his kids, you

10   know.  Just taking care of him, he was taking care of

11   me.

12   Q    When you say he was taking care of you, what do you

13   mean?

14   A    Well, he would give me drugs in exchange, you know,

15   for rides.

16   Q    What drugs specifically?

17   A    Cocaine.

18   Q    Directing your attention to October of 2018, I

19   believe you said your father passed away then?

20   A    Yes.

21   Q    I'm sorry.

22        How did that, if at all, affect your cocaine use?

23   A    It increased.  It significantly increased.

24   Q    Why was that?

25   A    Just stressed out, you know.  Couldn't bear him

```
 1   being gone, you know, and I just dealt with it in the
 2   wrong way.
 3   Q   Approximately how much cocaine were you using at
 4   the time?
 5   A   Two, three times a week.
 6   Q   And how much approximately on a weekly basis?
 7   A   From grams to eight-balls.
 8   Q   And approximately how much weight is an eight-ball
 9   of cocaine?
10   A   3.5 grams.
11   Q   Where did you get that cocaine from?
12   A   Carl Martin.
13   Q   How did you compensate Carl Martin for that
14   cocaine?
15   A   Well, sometimes I would buy it; other times I would
16   give him rides to work, different places like that.
17   Q   Did Mr. Martin drive, to your knowledge?
18   A   No.
19   Q   What approximate quantities of cocaine did you see
20   Carl Martin with in 2017 and early 2018?
21   A   I would see him with, you know, anywhere from
22   eight-ball, half an ounce to an ounce at a time.
23   Q   Turning your attention to January 2019 --
24              THE COURT:  All right.  That might be a good
25   place to stop.  We're at four o'clock.
```

1           MR. GILMAN:  Thank you.

2           THE COURT:  All right.  Let's stop at this

3     point.  I just want to remind you not to conduct your

4     own investigation, not to talk to anyone about the case,

5     and we'll see you tomorrow at nine o'clock.

6        I'm going to stay on the bench to speak with

7     counsel.  We'll see you tomorrow.

8     (The jury was excused for the day after which the

9     following was held in open court at 4:00 p.m.)

10          THE COURT:  Okay.  Thank you.

11          (Witness temporarily excused.)

12          THE COURT:  All right.  First I want to put on

13    the record reasons for the Court's earlier ruling in

14    regard to the incident at Nectar's.

15       The purpose of the testimony related directly to

16    predisposition.  So the relevance of the testimony on

17    the incident dealt with the possession of the firearms

18    and his predisposition to be in possession of firearms.

19    It did not extend to whether he was guilty or innocent

20    of any particular offense at Nectar's.

21       Now, some of the questions following up the

22    description of the defendant in possession of a firearm

23    explained a little bit about the fact that he did not

24    shoot at anyone.  I thought to at least put in context

25    the fact there was no shooting caused by him would, you

1    know, be fair.  But, frankly, anything beyond that is

2    totally irrelevant.  Whether he was prosecuted or why he

3    was prosecuted or why he was not prosecuted or anything

4    in regard to that particular case is totally irrelevant.

5         The only purpose of that testimony was on

6    predisposition for the possession of the firearm.  So,

7    you know, the government is not permitted to argue that

8    he used the weapon in some particular way during that

9    incident because that's irrelevant.  The defense should

10   not be arguing that he was not charged with a particular

11   offense because that's irrelevant.

12        The only relevance and the only thing that can be

13   used during the course of summation is the fact that

14   there was evidence of predisposition to possess a

15   firearm.  That's it.  And that's why I ruled that

16   whether Sarah George made a determination as to whether

17   he should be prosecuted or not is totally irrelevant.

18        I don't know if you are going to call Sarah George

19   as a witness, but if Sarah George is to be called to

20   testify about her review of the facts of the Nectar

21   incident and made a determination that the defendant

22   should not be charged with anything, again, is just --

23   is just not relevant.

24        Again, so I am limiting both the government and the

25   defense to what is the ultimate purpose of that

1    testimony.  That is limited to a showing of

2    predisposition, that is he has a gun.

3        Okay.  Now, so we are going a little bit more

4    slowly than anticipated, I think.  So tell me what is

5    the expectation for tomorrow.

6            MS. FULLER:  I think we are going a little

7    more slowly than we had hoped.  I'm hopeful -- I think

8    Mr. Julardzija will take quite a bit of time; most of

9    the morning, I expect.  The afternoon should go faster,

10   although we do have Daniel Lathrop, who is not as

11   extensive as Mr. Julardzija but does have some -- you

12   know, I expect there would be a robust cross examination

13   of him.

14           THE COURT:  Well, knowing full well that

15   whatever incident you are talking about is relevant only

16   for predisposition, right?  That's what you're

17   arguing --

18           MS. FULLER:  Well, Mr. Lathrop actually

19   purchased cocaine from -- the testimony will be that

20   Mr. Lathrop purchased cocaine from Mr. Martin.

21           THE COURT:  Oh, All right.  Okay.

22           MS. FULLER:  So it is -- it's not

23   predisposition.  It's case-in-chief evidence.

24           THE COURT:  Okay.

25           MS. FULLER:  So I -- the way it looks right

1    now, I think the government will take most of Thursday,

2    given that tomorrow -- I think tomorrow is going to be

3    taken up by Mr. Julardzija and other witnesses.

4              THE COURT:  Okay.  So I need to advise these

5    folks that we are going into Friday.

6              MS. FULLER:  Yes.  And I'm not sure if -- I

7    don't know what the defense has, but it wouldn't

8    surprise me if we weren't able to close on Friday.

9              THE COURT:  Well, that would cause a

10   difficulty because there's at least one juror, I think,

11   said something about problems if it goes into the

12   following week.  I had really understood that this case

13   could be done in four days and maybe extend into five.

14   So we may have some difficulties with jurors.  I don't

15   know who it is.  I haven't -- I just heard this.

16             MS. FULLER:  Okay.

17             THE COURT:  Okay?  Is that your expectation?

18             MR. MATSON:  Judge, I mean, I think that mine

19   would take a day.  You know, there are two fairly robust

20   witnesses.  You know, these aren't ancillary matters.

21   Trooper Prack worked directly with John Latimer.  John

22   Latimer obviously was involved for a year and a half, so

23   it would be unrealistic to say it would be less than a

24   day.

25             THE COURT:  Okay.  Well, let's try to move it

1    along a little bit so that hopefully you might be able

2    to finish by Thursday morning and then you are given as

3    much time as you need, and we don't run into a problem

4    if we are through Friday -- to Friday.

5            MS. FULLER:  We are certainly working on -- I

6    mean, I think your Honor has seen today that we try very

7    hard to deal with the evidence without, you know,

8    needing foundations.  So there's a lot that's come in.

9    We're going to continue to try to do that.

10            THE COURT:  Okay.  Good.

11        All right.  Now, is there any reason for us to meet

12    before testimony starts tomorrow?  Anything coming up

13    that you need to discuss?

14            MR. MATSON:  We have started to have a daily

15    conference at the end.  I don't think so, Judge.  I

16    think tomorrow, if the expectation is the witnesses I

17    have in mind, I think there's no need.  There's nothing

18    complicated coming tomorrow, Judge.

19            THE COURT:  Okay.  I'll be here.

20            MS. FULLER:  Okay.

21            THE COURT:  So if you need to discuss

22    anything, just let me know.

23            MS. FULLER:  Okay, thank you.

24            MR. MATSON:  Thank you, your Honor.

25            THE COURT:  All right.  Thank you.

1          (Court was in recess at 4:06 p.m.)

2                        *** ** ***

3

4              C E R T I F I C A T I O N

5      I certify that the foregoing is a correct
       transcript from the record of proceedings in the
6      above-entitled matter.

7                              _Anne Nichols Pierce_ (signature)

8      July 7, 2023            _____
       Date                    Anne Nichols Pierce
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25