UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA     *
                             *
          V                  *
                             *
CARL MARTIN                  * CRIMINAL FILE NO. 19-157

JURY TRIAL
Wednesday, June 8, 2022
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        Senior District Judge

APPEARANCES:

    WENDY L. FULLER, ESQ., and ANDREW C. GILMAN, ESQ.,
        Assistant United States Attorneys, Federal
        Building, Burlington, Vermont; Attorneys for the
        United States

    CHANDLER W. MATSON, ESQ., The Law Offices of
        Chandler W. Matson, 125 Mountain Road, Stowe,
        Vermont; Attorney for Defendant Carl Martin

ANNE NICHOLS PIERCE
United States District Court Reporter (ret'd.)
*fortherecordinvermont@gmail.com*

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **BRANDON HOPE** | | |
| Direct by Mr. Gilman | 8 | 24 |
| Cross by Mr. Matson | 22 | 10 |
| Redirect by Mr. Gilman | 28 | 24 |
| **MIRNES JULARDZIGA** | | |
| Direct by Mr. Gilman | 30 | 3 |
| Cross by Mr. Matson | 93 | 4 |
| Redirect by Mr. Gilman | 116 | 20 |
| Recross by Mr. Matson | 119 | 7 |
| **FRANCIS GONYAW** | | |
| Direct by Ms. Fuller | 122 | 6 |
| Cross by Mr. Martin | 127 | 13 |
| Direct by Mr. Gilman | 130 | 22 |
| Cross by Mr. Matson | 149 | 11 |
| **FRANK SCALISE** | | |
| Direct by Mr. Gilman | 157 | 2 |
| **PETER NGUYEN** | | |
| Direct by Ms. Fuller | 175 | 9 |
| Cross by Mr. Matson | 190 | 5 |
| Redirect by Ms. Fuller | 194 | 8 |
| **SAMUEL  BROWN** | | |
| Direct by Ms. Fuller | 195 | 7 |

**E X H I B I T S**

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 49 | Photos of items found in car | 89 |
| 123 | Colchester incident gun | 124 |
| 131 | Colchester PD video, body cam of Officer Gonyaw | 124 |
| 132 | Transcript of Exhibit 131 | 124 |

**E X H I B I T S**

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| D3 | Supplement to text messages | 100 |

1    WEDNESDAY, JUNE 8, 2022

2    (The following was held in open court without the jury

3    present at 8:57 a.m.)

4              THE COURT:  Okay.  Good morning.

5              MS. FULLER:  Good morning.

6              MR. MATSON:  Good morning, your Honor.

7              COURTROOM DEPUTY:  Your Honor, this is

8    criminal number 19-157, defendant number one, United

9    States of America versus Carl Martin.  The government is

10   present through Assistant United States Attorneys Andrew

11   Gilman and Wendy Fuller.  The defendant is present with

12   his attorney, Chandler Matson.

13       The matter before this Court is jury trial day

14   three.

15              THE COURT:  Okay.  Is the defendant --

16              MR. MATSON:  Approaching, your Honor.

17              THE COURT:  Okay.

18       All right.  So what are the issues that need to be

19   resolved?

20              MS. FULLER:  So we just have a request.  I

21   believe we -- both parties agreed to this, but we have a

22   DEA agent who needs to be on his way to Albany by noon,

23   and given that Mr. Julardzija just got on the stand, I

24   don't think that's going to be possible.  So we're

25   wondering if the Court would be okay with calling him

1    out of order first thing this morning, getting him done,
2    and then putting Mr. Julardzija back on the stand.
3              THE COURT:  That's fine with me.  Any
4    objection to that?
5              MR. MATSON:  No.
6              THE COURT:  That's fine?
7              MR. MATSON:  That's fine.
8              MS. FULLER:  And the other thing:  We talked
9    about timing a little bit yesterday.  Depending on how
10   today goes, I'm hopeful that the government will be done
11   its witnesses at least by early afternoon tomorrow; that
12   doesn't include the cross.  So I know with that, we're
13   probably definitely running into Friday.  I'm not sure
14   how much Mr. Matson has, obviously, and whether his
15   client wants to testify.  Perhaps he can speak to that.
16   But your Honor was wondering about timing.
17             THE COURT:  Right.  I just want to tell the
18   jury that it looks like we are going into Friday at
19   least, and I just don't want to tell them that we're
20   necessarily going into the following week at this point,
21   but just say it looks like at least Friday.  Looks like
22   we're going into -- I'll say at least it looks like
23   we're going into Friday.
24             MR. MATSON:  We're definitely going into
25   Friday.

1          THE COURT:  Yeah.  Just so that they

2    understand that.

3          MS. FULLER:  Okay.

4          THE COURT:  Okay.  Anything else that we need

5    to -- okay.  Great.

6          MS. FULLER:  Thank you.

7          THE COURT:  So I'll go off.  Are they here now

8    and ready to go?  Can you bring them out now or --

9          COURTROOM DEPUTY:  They haven't lined up.

10         THE COURT:  Pardon me?

11         COURTROOM DEPUTY:  They haven't lined up yet,

12   so it will take a couple of minutes.

13         THE COURT:  Oh, they have to --

14         MS. FULLER:  Just to close this loop:  Will

15   your Honor talk to the jury about the out-of-order

16   witness?

17         THE COURT:  Yes.

18         MS. FULLER:  Okay.

19         THE COURT:  I will.

20         MS. FULLER:  Thank you.

21         THE COURT:  Yes.  Okay.

22   (Court was in recess at 8:58 a.m.)

23   (The following was held in open court with the jury

24   present at 9:04 a.m.)

25         THE COURT:  Okay.  Good morning.

1          COURTROOM DEPUTY:  Your Honor, this is

2     criminal number 19-157, defendant number one, United

3     States of America versus Carl Martin.  The government is

4     present through Assistant United States Attorneys Wendy

5     Fuller and Andrew Gilman.  The defendant is present with

6     his attorney, Chandler Matson.

7          The matter before the Court is day three of jury

8     trial.

9          THE COURT:  All right.  Good morning again and

10    welcome back.  Have you talked about this case among

11    yourselves?  Have any of you learned anything about this

12    case from outside of the courtroom?

13          (The jury all indicate in the negative.)

14          THE COURT:  All right.  Everybody has

15    indicated no.

16          There are a couple of things that I want to talk

17    about first just very briefly.

18          The parties have agreed that because one agent who

19    is scheduled to testify a little bit later, has a

20    scheduling conflict, has to be back I think to Albany,

21    but back in some other place, both sides have agreed

22    that this person would be taken out of order and would

23    come in at the very beginning, now, and testify, and

24    then the previous witness would be called back after

25    that.

1          Second, the expectation is that the trial will go

2     into Friday, and I just want to make sure that you know

3     that so that you can make plans accordingly.

4          How was breakfast?  I mean, would you call it a

5     breakfast or would you call it -- right.

6               COURTROOM DEPUTY:  It came from a bakery

7     today.

8               THE COURT:  Pardon?

9               COURTROOM DEPUTY:  It came from a bakery.

10              THE COURT:  Oh, it came from a bakery today?

11              COURTROOM DEPUTY:  An actual bakery.

12              THE COURT:  An actual bakery.  An actual

13    bakery as opposed to a phony bakery.  Well, that's

14    great.

15         Okay, I think we are ready to proceed.

16              MR. GILMAN:  Thank you, your Honor.  The

17    government calls Special Agent Brandon Hope.

18              THE COURT:  Okay.

19                        BRANDON HOPE,

20         having been duly sworn by the courtroom deputy,

21         was examined and testified as follows:

22              THE COURT:  Good morning, Agent Hope.

23              THE WITNESS:  Good morning, sir.

24                     DIRECT EXAMINATION

25    BY MR. GILMAN:

1    Q    Good morning, Special Agent Hope.

2    A    Good morning.

3    Q    Who do you work for?

4    A    I work for the United States Department of Justice,

5    Drug Enforcement Administration.

6    Q    And is that also known as the DEA?

7    A    It is.

8    Q    Just for the record, what's your title there?

9    A    I am a special agent.

10    Q    How long have you been a special agent with the

11    DEA?

12    A    Since approximately 2014, July 2014.

13    Q    Are you assigned to a particular unit within the

14    DEA?

15    A    Currently I am assigned to the aviation division.

16    Q    Briefly, what's your role there?

17    A    I am a special agent pilot.

18    Q    What's the mission of that unit?

19    A    Primarily to conduct surveillance and assist with

20    aviation needs.

21    Q    Prior to being assigned to that unit, where were

22    you assigned within DEA?

23    A    I was assigned here to Burlington, Vermont.

24    Q    Okay.  Here in Vermont, can you briefly describe

25    your duties and responsibilities?

1    A    Sure.

2         Primarily conducting drug investigations throughout

3    the state.

4    Q    Were you involved in an investigation of an

5    individual by the name of Carl Martin?

6    A    I was.

7    Q    Can you briefly describe some of your involvement

8    in that investigation?

9    A    Sure.

10        So I was working with the ATF conducting the drug

11   part of the investigation, helping with surveillance,

12   technical aspects of the investigation, and applying and

13   obtaining a tracker warrant.

14   Q    Okay.  When you talk about surveillance, could you

15   just tell us, what do you mean?

16   A    Surveillance is primarily just trying to understand

17   what people are going through:  visual surveillance,

18   following them around, and technical surveillance,

19   monitoring phone calls, phone records, things like that.

20   Q    Okay.  See if this helps a little bit.  I am

21   hearing a little feedback.  Do you mind just bringing

22   the microphone a little closer?

23   A    Is that better?

24   Q    Worse.

25   A    Okay.

1    Q    Sorry.

2            COURT REPORTER:  Just back up a little bit.

3            THE WITNESS:  Okay.  How's that?

4            MR. GILMAN:  That sounds good.

5            THE WITNESS:  Okay.

6            MR. GILMAN:  All right.  Thanks.

7        Thanks, Special Agent Hope.

8    BY MR. GILMAN:

9    Q    All right.  And I think you mentioned there a GPS

10   tracker.  What is a GPS tracker?

11   A    A GPS tracker is a device that we use on a vehicle

12   that gives us GPS location of where the vehicle's

13   traveling to.

14   Q    Okay.  Did you use such a device in this case?

15   A    I did.

16   Q    Did you obtain a court authorization to use that

17   device?

18   A    I did.

19   Q    Okay.  Now, did you also, as a special agent within

20   the DEA, have a role with respect to the drug evidence

21   in this case?

22   A    I did.

23   Q    What was your role?

24   A    It was taking the evidence from the ATF and

25   submitting it to the DEA lab.

1    Q    Okay.  Now, going back to the GPS tracker for a

2    moment, do you recall what vehicle, if any, you placed

3    that GPS tracker on in this case?

4    A    Yes.

5         I placed it on a Chevy -- I'm sorry.  I forget the

6    model, but it was a black Chevy operated by Mr. Mirnes

7    Julardziga.

8    Q    Okay.  Was that an SUV?

9    A    It was.

10   Q    Okay.  Now, at times did you perform surveillance

11   to assist the ATF?

12   A    I did.

13   Q    And at other times you performed surveillance just

14   with the DEA; is that correct?

15   A    That's correct.

16   Q    I want to direct your attention to September 12th,

17   2019.  Were you working that day?

18   A    I was.

19   Q    What were you doing?

20   A    I was conducting surveillance related to the

21   tracker that was on Mr. Julardzija's vehicle.

22   Q    Okay.  And do you remember what general area you

23   were in that day?

24   A    Yes.

25        So the vehicle was in the area of Cottage Grove in

1    South Burlington, and so we had surveillance officers,

2    agents, just kind of in that general vicinity.

3    Q    And on that day, September 12th, 2019, during your

4    surveillance, did you observe a blue Toyota Tundra?

5    A    I did.

6    Q    I'm sorry?

7    A    I did.  Yes.

8    Q    What, if anything, did you learn about the blue

9    Toyota Tundra before you saw it yourself?

10   A    So prior to seeing it, I was informed by another

11   task force officer that was conducting surveillance that

12   the Toyota Tundra appeared to have met with someone

13   appearing to be Mr. Carl Martin and Mr. Julardzija

14   behind an apartment building associated with both Mr.

15   Martin and Mr. Julardzija over on Cottage Grove.

16   Q    So that day, you yourself eventually saw that blue

17   Toyota Tundra; is that right?

18   A    Correct.

19   Q    Where did you locate the blue Toyota Tundra that

20   day?

21   A    So I was told by the radio that the blue Toyota

22   Tundra was leaving the area of Cottage Grove traveling

23   towards White Street and then ultimately past Burlington

24   airport.  I was at the intersection of Williston Road

25   and Aviation Drive.  I saw the blue Toyota Tundra there

1    at that intersection.

2    Q    Do you remember what approximate time that was that

3    day?

4    A    It was midday.  I don't remember the exact time.

5    Q    Okay.  Is there anything that would refresh your

6    recollection as to the precise time?

7    A    There was a report that was written that would

8    refresh my memory.

9              MR. GILMAN:  Your Honor, may I approach with

10    the report?

11              THE COURT:  Yes.

12    BY MR. GILMAN:

13    Q    Special Agent Hope, I am going to ask you to read

14    that report briefly, see if you can find the relevant

15    section and see if that refreshes your recollection, and

16    when you are done, just look up to let me know.

17              MR. GILMAN:  May I approach?

18              THE COURT:  Yes.

19    BY MR. GILMAN:

20    Q    Okay.  Did that report refresh your recollection as

21    to the time you observed the Toyota Tundra

22    approximately?

23    A    Yes, sir.

24    Q    Okay.  What time was that on that day?

25    A    Approximately 11:44 a.m.

1    Q    Okay.  Now, after you first observed that Toyota

2    Tundra on September 12th, 2019, at 11:44 a.m., what did

3    you observe next?

4    A    I observed that vehicle and the vehicle operated by

5    Mr. Julardzija also at the intersection but approaching

6    from a different direction.  Both vehicles traveled

7    eastbound on Williston Road towards kind of like the

8    back section of the Burlington airport.  They turned

9    down and went into Heritage Aviation, which is like the

10   back section of Burlington airport.

11   Q    What did you observe next?

12   A    The Toyota Tundra parked near Heritage Aviation,

13   and an operator, the operator of that vehicle, a white

14   male, exited the vehicle and went into one building of

15   Heritage Aviation.  And then the other vehicle, the

16   other target vehicle operated by Mr. Julardzija,

17   continued, parked in another section, and he went into

18   Heritage Aviation.

19   Q    And do you recall that vehicle?  Was that -- from

20   the report you saw, was that a dark-colored Chevy

21   Equinox?

22   A    Yes, sir, it was.

23   Q    Okay.  Now, did you observe the license plate of

24   the Toyota Tundra?

25   A    I did.

1    Q    And did you learn who that license plate was

2    assigned to?

3    A    So I saw the license plate of the vehicle, and I

4    was later able to see that the registration returned to

5    a Mr. Daniel Lathrop.

6    Q    Did you obtain a picture of that individual?

7    A    I did.

8    Q    With respect to that picture and your observations

9    during surveillance, what conclusion, if any, did you

10   reach at that time?

11   A    The operator of the Toyota Tundra and the picture

12   of the registered owner, Mr. Lathrop, appeared to be

13   substantially similar.

14   Q    All right.  I'm going to talk about some of the

15   drug evidence in this case.  You mentioned earlier that

16   you helped the ATF with some of the drug evidence?

17   A    Yes.

18   Q    What was your role again?

19   A    My primary role was to take the evidence that was

20   obtained from the ATF and submit it to our drug lab.

21   Q    I'm going to grab two exhibits for you.  One

22   moment.

23            MR. GILMAN:  May I approach, your Honor?

24            THE COURT:  Yes.

25            MR. GILMAN:  I feel like I am back in

1    elementary school with my binder broken open.  Excuse me

2    for a moment, your Honor.

3                THE COURT:  Yes.

4                MR. GILMAN:  Okay.  Thank you.

5    BY MR. GILMAN:

6    Q    Special Agent Hope, do you recognize those two

7    items I have -- for the record, I've provided you with

8    Government Exhibits 66 and 62.

9    A    I have 66 and 69, I believe.

10   Q    Oh.  I apologize.  I believe that --

11               MR. GILMAN:  May I approach?

12               THE COURT:  Yes.

13               MR. GILMAN:  66 and 69.  Thank you.

14        Okay.  May the record reflect I have provided the

15   witness with Exhibits 66 and 69.

16               THE COURT:  Yes.  Okay.

17   BY MR. GILMAN:

18   Q    Do you recognize those exhibits?

19   A    Yes, sir, I do.

20   Q    And how do you recognize them?

21   A    Both exhibits were provided to me by the ATF.  With

22   the exception of some packaging, they appear to be the

23   same exhibits.

24   Q    Okay.  And what are those exhibits?

25   A    They were provided to me as like white, powdery,

1    rock-like substance which is consistent with cocaine.

2    Q    Okay.  And when did you first see those exhibits?

3    A    I believe I first saw them around September 16th of

4    2019 --

5    Q    Okay.

6    A    -- when they were provided to me.

7    Q    And who did you receive those exhibits from?

8    A    I received them from ATF Special Agent Brian Wood.

9    Q    Okay.  And who if anyone was with you when you

10   received those exhibits?

11   A    DEA Task Force Officer Frank Scalise.

12   Q    Okay.  Now, do those exhibits appear in

13   substantially the same form as you saw them that day?

14   A    Yes.  With the exception of some packaging, they

15   do.

16   Q    Sorry?

17   A    Yes.  With the exception of some added packaging,

18   they appear to be the same exhibits that were provided

19   to me.

20   Q    Where is the added packaging from this exhibit

21   here?

22   A    On the interior of our evidence bags.

23   Additionally, they're kind of wrapped more around the

24   initial exhibit that was given to me.

25   Q    Okay.  And are those additional packagings -- is

1    that from the laboratory?

2    A    Yes.  That's my understanding; yes, sir.

3    Q    Okay.  And so after you received those evidence

4    items from the ATF, what did you do with them?

5    A    I received the exhibits, I processed them by

6    putting them into DEA evidence bags, and then maintained

7    custody of them, either my physical custody or in a

8    locker, until they're submitted to the DEA evidence lab.

9    Q    Okay.  And did you submit those exhibits to the DEA

10   evidence lab?

11   A    I did.

12   Q    And to your knowledge, what does the DEA lab do

13   with them?

14   A    They take possession of them and store them until

15   they are tested.

16   Q    And does the lab test them for the presence of

17   controlled substances?

18   A    They do.

19           MR. GILMAN:  Thank you.  One moment?

20           (Brief pause.)

21           MR. GILMAN:  Okay.  MR. GILMAN:  May I

22   approach, your Honor?

23           THE COURT:  Approach the bench?

24           MR. GILMAN:  No, sorry.  The witness.

25           THE COURT:  Oh, all right.  Yes.

1          MR. GILMAN:  May the record reflect I'm

2     providing the witness with two reports.  It's a --

3     they're on our evidence list as Government's Exhibit 84

4     and 85.

5          I'm going to ask the witness to read the narrative

6     section in those exhibits.

7          THE COURT:  84 and 85, are they accepted into

8     evidence?

9          MR. GILMAN:  They are not in evidence,

10    your Honor.  I'm hoping to refresh the witness's

11    recollection on this.

12         THE COURT:  Oh, you are asking him to read it

13    to himself --

14         MR. GILMAN:  Just read it to yourself.

15         THE COURT:  -- as opposed to read it out loud.

16         MR. GILMAN:  Yes, just read it to yourself.

17         THE COURT:  Oh, okay.

18         MR. GILMAN:  Thank you, your Honor.

19         (Brief pause.)

20         MR. GILMAN:  Okay, I am going to grab those

21    reports.

22    BY MR. GILMAN:

23    Q    Special Agent Hope, I just want to walk through the

24    chain here as recorded.  It appears that -- is it your

25    understanding that on August 26th, 2019, ATF Special

1    Agent Brian Wood purchased what's before you as

2    Exhibit 66?

3    A    Yes, sir.  That's correct.

4    Q    And on that same day, Special Agent Wood turned

5    that exhibit over to ATF Special Agent Sam Brown?

6    A    That's correct.

7    Q    And then on September 16th, 2019, Special Agent

8    Wood turned that exhibit over to you and Special Agent

9    Frank Scalise?

10   A    Correct.

11   Q    Okay.  And after you received that exhibit, you

12   sent it to the lab?

13   A    That's correct.

14   Q    Okay.  Now, with respect to 69, DEA Exhibit 8,

15   on -- is it your understanding on September 5th, 2019,

16   Special Agent Wood came into possession of that item?

17   A    Correct.

18   Q    And that he turned that exhibit over to Special

19   Agent Sam Brown on that date?

20   A    That's correct.

21   Q    And then on September 16th as well as with the

22   prior exhibit, Special Agent Wood turned that exhibit

23   over to you --

24   A    Yes.

25   Q    -- after which you held it in your custody --

```
1    A     Yes.
2    Q     -- until such time as you sent it to the lab for
3    drug testing?
4    A     That's correct.
5              MR. GILMAN:  Okay.  Thank you.
6              THE COURT:  Okay.
7              MR. GILMAN:  Thanks.
8              THE COURT:  Any cross examination?
9              MR. MATSON:  Yes.  Thank you, your Honor.
10                      CROSS EXAMINATION
11   BY MR. MATSON:
12   Q    Good morning, Special Agent.  Is it Special Agent
13   Hope?
14   A     Yes, sir, it is.  Good morning.
15              MR. MATSON:  This is perfectly designed to
16   dump your file with no edge.
17   BY MR. MATSON:
18   Q    Special Agent Hope, my name's Chandler Matson.  I
19   represent Carl Martin.
20         Special Agent Hope, I want to ask, on September
21   12th -- let's just call it the occurrence you were just
22   talking about -- you had installed a GPS monitoring
23   system on the vehicle driven by Mirnes Julardziga,
24   right?
25   A     I don't believe the tracker was installed on the
```

1    12th.  If you mean the day that we were surveilling both

2    of the vehicles operated by Mr. Julardziga, we were

3    doing surveillance on him, and the tracker had been

4    installed on that vehicle.

5    Q    What date do you think the tracker was installed?

6    A    I would have to reference one of my reports.

7    Q    Okay.  I'm going to hand you what's been just

8    marked for identification -- so we know what we're

9    talking about, it would be Government Exhibit 80.  And

10   perhaps this is the report.

11              MR. MATSON:  Your Honor, may I approach?

12              THE COURT:  Yes.

13              MR. MATSON:  Thank you.

14   BY MR. MATSON:

15   Q    I can't tell you if that helped or not, but did

16   that help?

17   A    No, sir, it doesn't.  It was -- it was installed

18   prior to that, I believe.

19   Q    Okay.  Well, that's important.  The report I just

20   handed you involved surveillance done on September 5th,

21   right?

22   A    Yes, sir.

23   Q    Okay.  So it's safe to say there's GPS monitoring

24   on Mirnes Julardziga's vehicle as of September 5th,

25   right?

1    A    That's correct.

2    Q    Okay.  Let's start with September 12th because

3    that's what we were just talking about.  You say that

4    you were involved in an investigation into Carl Martin,

5    right?  That was your testimony?

6    A    Yes, sir.

7    Q    That investigation also involved Mirnes Julardziga,

8    right?

9    A    Through the course of the investigation, yes, sir.

10   I mean, Mr. Julardziga was identified as an associate of

11   Mr. Carl Martin.

12   Q    Well, I'm not asking you that because the GPS

13   warrant was for Mirnes Julardziga's vehicle.  Correct?

14   A    Yes, sir.

15   Q    So he was a target of the investigation as well,

16   correct?

17   A    He was identified as an associate of Mr. Carl

18   Martin, and so --

19   Q    I understand you draw that conclusion, but you got

20   a GPS warrant for Mirnes Julardziga's vehicle.  That's a

21   simple question.  Yes or no?

22   A    Yes, sir, I did.

23   Q    Okay.  Thank you.

24        On that date, September 12th, you were doing

25   surveillance in the area around an apartment building,

1    right?

2    A    Yes, sir.

3    Q    Okay.  Is that apartment building very far from the

4    Burlington airport?

5    A    No, sir, it isn't.

6    Q    How far?

7    A    Approximately a two-mile -- I'm sorry, a two-minute

8    drive.  I don't recall -- I don't know the exact

9    distance.  It's pretty close though.

10   Q    Okay.  You say that you saw Mirnes Julardziga and

11   Carl Martin behind the apartment building, right?

12   A    I did not, sir, but on that date other

13   investigators did.

14   Q    All right.  So when Daniel Lathrop, who was driving

15   the blue Tundra -- am I right there?

16   A    Yes, sir.

17   Q    When Daniel Lathrop arrived at the apartment

18   building, you didn't see what happened behind the

19   apartment building; safe to say?

20   A    Information about what occurred behind the

21   apartment building --

22   Q    Right.

23   A    -- was relayed to me.

24   Q    You did not see it?

25   A    I did not; no, sir.

1    Q    But after whatever happened, you saw Daniel Lathrop
2    return to Heritage Aviation; is that right?
3    A    Yes, sir.
4    Q    Okay.  And Mirnes Julardziga also returned to
5    Heritage Aviation.  Is that also right?
6    A    Yes, sir.  And just for clarification, there's two
7    different buildings associated with Heritage, and each
8    went to different buildings.
9    Q    Same company?
10   A    Yes, sir.
11   Q    Owns two different buildings, right?
12   A    Yes, sir.
13   Q    And they each returned to a building owned by and
14   run by Heritage Aviation, right?
15   A    That's my understanding; yes, sir.
16   Q    So that wasn't the first time you saw something
17   like that, however.  You saw something like that on
18   September 5th as well, right?
19   A    I do not recall.  Do you mean with --
20   Q    Well, it's not a great question, I'll concede.
21        On September 5th, were you also doing surveillance?
22   A    Yes, sir.
23   Q    Okay.  And again, at this point there's a GPS
24   tracker on Mirnes's vehicle, right?
25   A    Yes, sir.

1   Q    All right.  And you actually saw Daniel Lathrop

2   make some contact with Mirnes Julardzija and Carl

3   Martin; is that a fair summation?

4   A    Perhaps I'm getting the days mixed up, but I have

5   only seen Mr. -- I'm sorry.  Are you asking about

6   Mr. Lathrop or are you asking about Mr. Julardzija?

7   Q    I am asking about Mr. Lathrop --

8   A    Okay.  So --

9   Q    -- on September 5th.

10  A    Okay.  So there's only one day where I saw

11  Mr. Lathrop interacting or -- coming across -- this is

12  on the surveillance, and so I -- maybe I'm mixing the

13  days up, but there was only one day that I recall seeing

14  that.

15  Q    Only one day that you saw Daniel Lathrop

16  interacting with Carl Martin and Mirnes Julardzija; is

17  that --

18  A    Or that was relayed to me, yes, sir.  Like in terms

19  of Mr. Lathrop being involved in the surveillance that I

20  was a part of, there was only one day that I recall.

21  Q    Okay.  So what was the purpose of the September 5th

22  surveillance that you were doing?  Tell me what you saw

23  on September 5th.

24  A    I would have to reference the report to --

25  Q    Sure.  Let me draw -- this is Government's

```
1       Exhibit 80.  Let me draw your attention to paragraph
2       six.  Can you just read paragraph six for me.
3       A    Would you like me to read it out loud, sir?
4       Q    No.  Just read it to yourself.
5            So on that date, Special Agent Hope, you saw Mirnes
6       Julardziga go to an ATM, right?
7       A    That's correct.
8       Q    Fair to say?
9            And you say you saw him manipulate the ATM, right?
10      A    Yes, sir.
11      Q    Now, you can deposit into an ATM, right?
12      A    Yes, sir.
13      Q    Just as easy as withdraw, right?
14      A    Yes, sir.
15      Q    You didn't see which of those he did, right?
16      A    That's correct.
17      Q    So it could have been either one?
18      A    That's correct.
19      Q    Okay.
20              MR. MATSON:  Thank you very much, Judge.
21              THE COURT:  Any further questions?
22              MR. GILMAN:  Just very briefly, your Honor.
23              THE COURT:  Okay.
24                      REDIRECT EXAMINATION
25      BY MR. GILMAN:
```

1    Q    Special Agent Hope, Mr. Matson just asked you about

2    September 5th, 2019, right?

3    A    That's correct.

4    Q    And on that day, you told Mr. Matson that you saw

5    Mr. Julardziga go to an ATM; is that right?

6    A    That's correct.

7    Q    Okay.  My questions to you exclusively focused on

8    September 12th; is that right?

9    A    That's correct.

10   Q    And on September 12th, what person did you see

11   other than Mirnes Julardziga?

12   A    I also saw Mr. Daniel Lathrop.

13            MR. GILMAN:  Thank you.

14            THE COURT:  Okay.  Anything further?

15            MR. MATSON:  No, your Honor.

16            THE COURT:  All right.  Thank you, Agent.

17            THE WITNESS:  Thank you, your Honor.

18            (Witness excused.)

19            THE COURT:  All right.  Government want to

20   call its -- recall its witness?

21            MR. GILMAN:  The government recalls Mirnes

22   Julardziga.

23            THE COURT:  Okay.

24                    MIRNES JULARDZIGA,

25       being first duly sworn by the courtroom deputy,

```
 1              was further examined and testified as follows:
 2                   THE COURT:  Good morning.
 3                      CONTINUED DIRECT EXAMINATION
 4   BY MR. GILMAN:
 5   Q    Good morning, Mr. Julardziga.
 6   A    Good morning.
 7   Q    So I believe when we left off yesterday afternoon,
 8   I had asked you about the summer of 2017 when you met
 9   Mr. Carl Martin?
10   A    Yes.
11   Q    And do you recall obtaining drugs from Mr. Martin
12   in the summer of 2017?
13   A    Yes.
14   Q    What approximate quantities -- well, let me ask a
15   more specific question.
16        Did you obtain cocaine from Mr. Carl Martin in the
17   summer of 2017?
18   A    I did.
19              MR. MATSON:  Objection.  Leading.  Judge?
20              THE COURT:  Objection overruled.  That's a
21   preliminary question, so you're going to ask
22   clarification.
23   BY MR. GILMAN:
24   Q    What approximate quantities of cocaine did you
25   obtain from Mr. Martin that summer of 2017?
```

1    A    Sometimes grams, sometimes two, sometimes an

2    eight-ball.

3    Q    Now, what approximate quantities of cocaine did you

4    see Mr. Julardzija with in early -- in 2017 and early

5    2018?

6    A    Eight-balls, half ounces, ounces.

7    Q    Now, at times in your life, you have used cocaine,

8    you testified?

9    A    Yes, I have.

10    Q    Okay.  Can you tell if the cocaine you are using is

11    real?

12    A    Yes.

13    Q    And how can you do that?

14    A    Well, you can taste it with your finger.  Depend --

15    if you put it on your gums to see if you numb up, if

16    your jaw numbs up.  And you sniff it.

17    Q    Sorry?

18    A    And you can sniff it --

19    Q    Okay.

20    A    -- to see if it gives you a rush, you get high.

21    Q    Okay.  So based on your knowledge and experience,

22    was the cocaine that Mr. Carl Martin provided you in the

23    summer of 2017 real?

24    A    Yes.

25    Q    Have you ever used Mr. Martin's cell phone?

```
1    A    No.

2    Q    Turning your attention to January of 2019, did your

3    involvement with Mr. Martin increase?

4    A    Yes.

5    Q    How so?

6    A    The sales, the cocaine sales increased.

7    Q    What do you mean by that?

8    A    Well, Dan Lathrop, the pilot, came and play.  Yeah,

9    so.

10   Q    Okay.  We're going to hear more about Mr. Lathrop.

11   A    Okay.

12   Q    And how did your involvement, if at all, change

13   during that time?

14   A    I gave more frequent rides and took him to work,

15   took him to other places, took him -- yeah.

16   Q    Okay.  And what did you get in exchange for giving

17   Mr. Martin rides?

18   A    Cocaine.

19   Q    How much cocaine?

20   A    Sometimes a gram, sometimes two.  It depends.

21   Sometimes an eight-ball.

22   Q    How often did Mr. Martin provide you cocaine in

23   exchange for your services?

24   A    Depends on how many times, but two to three times a

25   week at times.
```

```
1   Q    In the summer and fall of 2019, what, if anything,
2   happened with respect to Mr. Martin's cocaine sales?
3   A    The fall of 2019?
4   Q    '19.
5   A    They definitely increased.
6   Q    Okay.  Was there any change to your role?
7   A    Yes.
8   Q    What changed?
9   A    I drove more, and I also provided those
10  deliveries --
11  Q    Okay.
12  A    -- with him.
13  Q    And when you say deliveries, what do you mean?
14  A    The cocaine deliveries.  Sales.
15  Q    And when you were driving Mr. Martin, where did you
16  drive him to?  Like what for?
17  A    To do the exchange, to deal cocaine with -- well,
18  specifically in October with the undercover.
19  Q    And do you know where Mr. Martin obtained cocaine?
20  A    Yes.  From Bryan.
21  Q    Did you also know him by another name?
22  A    Pork Chop.
23  Q    Okay.  And how do you know that?
24  A    I saw it.
25  Q    Have you met Bryan, also known as Pork Chop?
```

```
 1    A    Yes, I have.
 2    Q    I'd like to show you what's in evidence as
 3   Government Exhibit 94.
 4              THE COURT:  Are you going to broadcast that?
 5              MR. GILMAN:  It's in evidence.  Yes, I would
 6   like to show that.
 7              THE COURT:  All right.
 8              MR. GILMAN:  Okay.
 9   BY MR. GILMAN:
10    Q    Do you recognize this photo?
11    A    Yes.  That's Bryan.
12    Q    Okay.  Did you ever go to Bryan's house?
13    A    Twice that I can recall.
14    Q    Okay.  Can you tell us about those times?
15    A    First time was when he -- he had a place on Bright
16   Street, in an apartment building.  I went up there.  I
17   think it was like fourth or fifth floor.  And the second
18   time was the day of the arrest.
19    Q    Was that October 23rd, 2019?
20    A    Yes.
21    Q    And where did Bryan live at the time, do you
22   recall?
23    A    Lived in Burlington.
24    Q    Okay.
25    A    Off of North Ave.  Starr Farm.
```

1    Q    Okay.  To your knowledge, did Mr. Martin obtain
2    cocaine from other sources?
3    A    Philadelphia.  He would get some in Philly.  I
4    don't know from who.
5    Q    Okay.  How do you know that?
6    A    He has brought some back before.  I saw it.
7    Q    Turning your attention to October 23rd, 2019, were
8    you arrested that day in this case?
9    A    Yes.
10   Q    After you were charged, did you meet with the
11   government?
12   A    Yes, I did.
13   Q    Why?
14   A    To tell the truth and cooperate.
15   Q    Approximately how soon after your arrest did you
16   meet with the government?
17   A    November of 2019.
18   Q    Okay.  And approximately how many times have you
19   met with the government prior to trial?
20   A    Maybe a handful of times.  Six -- six, seven.
21   Q    During the course of those meetings, did you admit
22   to the full scope of your criminal conduct?
23   A    Yes.
24   Q    For a moment, I want to walk you through some of
25   your prior involvements with law enforcement.

1    On June 28th, 2004 -- I will repeat -- June 28th,
2    2004, you pleaded guilty to possession of alcohol while
3    being under 21 in Iowa; is that right?
4    A    That is correct.
5    Q    And you received a $100 fine for that?
6    A    Yes, I did.
7    Q    On January 22nd, 2008, you were arrested for
8    assault causing bodily injury in Iowa; is that correct?
9    A    Yes.
10   Q    You later pleaded guilty to disorderly conduct,
11   specifically for fighting or violent behavior in Iowa,
12   and received 12 months' probation and a $65 civil
13   penalty; is that right?
14   A    That is correct.
15   Q    Now, following your arrest in this case on October
16   23rd, 2019, you were placed under the supervision of
17   pretrial services; is that right?
18   A    That is correct.  Yes.
19   Q    And you were required not to use drugs; is that
20   right?
21   A    That's correct.
22   Q    Were you able to uphold that requirement initially?
23   A    I only used once.
24   Q    Did you use cocaine and tested positive on November
25   4th, 2019?

```
 1    A    Correct.
 2    Q    Okay.  Also, at the time of your assessment with
 3    the Howard Center, you told them you used cocaine maybe
 4    every three months or so, and when you do, maybe it's a
 5    gram; was that correct?
 6    A    Yes.
 7    Q    At the time?
 8    A    At that time.
 9    Q    But before you were arrested, was that true?
10    A    Before my arrest, no.
11    Q    What was your cocaine use before your arrest?
12    A    Before the arrest, two to three times a week.
13    Q    Did you ultimately enter into a cooperation
14    agreement with the government?
15    A    Can you repeat the question again, please.
16    Q    Sure.
17         Did you ultimately enter a cooperation agreement
18    with the government?
19    A    Yes, I did.
20    Q    And are you testifying here today under that
21    cooperation agreement?
22    A    Yes, I am.
23    Q    What is your understanding of what you are required
24    to do as a part of this cooperation agreement?
25    A    I'm here to tell the truth.
```

1    Q    If you comply with the cooperation agreement, what
2    do you hope to get in return?
3    A    Hope to get a lesser sentence.
4    Q    Okay.  Does any part of your cooperation agreement
5    depend on whether or not the defendant in this case is
6    convicted at this trial?
7    A    No.
8    Q    What does your cooperation require?
9    A    To be truthful and honest.
10   Q    Now, we have discussed you have pleaded guilty to
11   conspiracy to distribute cocaine in connection with this
12   cooperation agreement.  Have you been sentenced for that
13   offense?
14   A    No.
15   Q    Has anyone promised you what sentence you will
16   receive?
17   A    No.
18   Q    Does the government decide whether or not you
19   receive a lower sentence?
20   A    No.
21   Q    Who decides?
22   A    The judge.
23   Q    If the government asks the Court to give you a
24   lower sentence, does the Court have to give you a lower
25   sentence?

1  A    No.

2  Q    Directing your attention to August 26th, 2019, what

3  was your involvement with Mr. Martin at that time?

4  A    What year is that again?

5  Q    August 26th, 2019.

6  A    We used to ride together and he used to sell drugs.

7  Q    Okay.  I'd like to show you what's in evidence as

8  Government's Exhibit 6.

9          MR. GILMAN:  Can we play that clip.

10          (A digital recording was played in open

11  court.)

12  BY MR. GILMAN:

13  Q    I think you said -- is it "the shrimp is the stir

14  fry"?  What do you mean by that?

15  A    That has the contents of cocaine in that box.

16  Q    Okay.  And did you say, "It's not the scales"?

17  A    Yes, meaning it's not the fish scales.  It's not

18  good -- not that good of quality of cocaine.

19  Q    Tell us about that.  What does that mean, fish

20  scales?

21  A    Stronger form, more pure of cocaine, more potent.

22          MR. GILMAN:  Okay.  You can continue.

23          (A digital recording was further played in

24  open court.)

25  BY MR. GILMAN:

1    Q    I want to break that down a little bit.  You talked

2    about a trip to Philly there.  What did you mean?

3    A    Trip to Philadelphia and get cocaine.

4    Q    Why would you go to Philadelphia?

5    A    Because that was one of Carl's sources.  He had --

6    he had a connection there.

7    Q    Okay.  And when you say connection, what do you

8    mean?

9    A    He had somebody that had cocaine there for him,

10   that he could get it from.  I don't know who.

11   Q    Okay.  Now, you talked about "the three of us"

12   there.  Is that right?

13   A    Yes.

14   Q    What do you mean by "the three of us"?

15   A    Me, the undercover, and Carl Martin.

16   Q    Now, at the time, did you know that person was an

17   undercover?

18   A    No.

19   Q    You only later learned that after your arrest?

20   A    Yes.

21   Q    Now, you also said you're helping Mr. Martin, that

22   you're just a middleman; is that right?

23   A    Correct.

24   Q    What did you mean by that?

25   A    He was -- he was running the -- that operation.  I

1    was just helping him out, and in exchange I would get a

2    little bit of cocaine here and there for my services,

3    for the rides and sales like that.

4    Q    Now, when you say Mr. Martin was running things,

5    what do you mean?

6    A    Meaning the cocaine was his.

7    Q    Okay.

8    A    From him.

9              MR. GILMAN:  Let's continue playing.

10             (A digital recording was further played in

11   open court.)

12   BY MR. GILMAN:

13   Q    Now, at that time, did the person you later learned

14   to be the undercover hand you a container?

15   A    Yes.

16   Q    Did you see what was in the container?

17   A    Later, after I handed it to Carl.

18   Q    Okay.  And tell us about that.  What did you see

19   then?

20   A    It was cash.  It was money.

21   Q    Did Mr. Martin open that container?

22   A    Yes.

23   Q    I want to direct your attention to September 4th,

24   2019, and show you what's in evidence as Government

25   Exhibit 97.

```
1                    MR. GILMAN:  Could we pull that up.
2           May I approach just to hand a hard copy to the
3      witness?
4                    THE COURT:  Yes.
5                    MR. GILMAN:  May the record reflect I just
6      handed the witness a hard copy of Government Exhibit 97.
7      BY MR. GILMAN:
8      Q    Mr. Julardzija, would you mind just looking through
9      that to make sure you are familiar with that exhibit
10     just briefly.
11          Do you recognize it?
12     A    Yes, I do.  That's my cell phone number and my
13     name.
14     Q    Okay.  I want to ask you -- let me ask you first:
15     What do you recognize that exhibit to be?
16     A    Text messages between me and Carl Martin.
17     Q    Now, you said you recognize the phone number?  You
18     see --
19     A    Yes.
20     Q    What phone number is that?
21     A    That is my phone number.
22     Q    Could you read it into the record.
23     A    (802) 318-0276.
24     Q    Is there a name next to that phone number?
25     A    Yes.  Chango.  My nickname.  My nickname.
```

```
1     Q    That's your nickname?

2     A    Yes.

3     Q    Why was that your nickname?

4     A    Since high school.

5     Q    Okay.

6     A    Yeah.

7     Q    And did Mr. Martin call you Chango at times?

8     A    Yeah.  Yes, he did.

9     Q    Okay.  Let's look at rows nine through 18 from

10    September 4th, 2019, of the messages between you and Mr.

11    Martin.  I'm going to ask you to read the messages you

12    sent, and I'll read the messages that Mr. Martin sent.

13         Could you begin reading on -- I'll begin reading,

14    rather, on row 19.

15         "WYA" -- and can I just stop right there.  I'm

16    going to ask you some questions as we read, if that's

17    all right.

18    A    That's okay.

19    Q    Okay.  What does WYA mean?

20    A    Where you at.

21    Q    "WYA, WYA, yo yo."

22    A    "What up."

23    Q    "What time he coming?"

24    A    Oh, so that's me.

25    Q    Sorry.  I read --
```

1    A    "What time he coming?"

2    Q    I apologize.

3         "He said 12:45."

4    A    "Porky I mean."

5    Q    "On his way now."

6    A    "Okay, make a basket ready for me quick.  Give him

7    some of that you have to the shit you're getting.  Now

8    I'll take at least basket out the flip.  LOL."

9    Q    "I got you."

10        All right.  Let's break that down a little bit.

11   Who's Porky in this conversation?

12   A    Bryan.

13   Q    And is that the person you identified the photo of

14   before?

15   A    Yes.

16   Q    The source of supply for Mr. Martin?

17   A    Yes.

18   Q    Okay.  Now, what did you mean here in this message

19   when you referred to "a basket ready for me"?

20   A    A basketball, eight-ball, 3.5 grams.

21   Q    Okay.  And what do you and Mr. Martin appear to be

22   doing in these messages?

23   A    We're getting ready to make a deal, and he is going

24   to give me this -- going to give me the cocaine to make

25   an exchange for money.

1    Q    A deal -- you have a deal with you and Mr. Martin?

2    A    Yes.

3    Q    And what are you and Mr. Martin doing with respect

4    to Bryan, or Porky?  Are you meeting with Porky?

5    A    No, we're not meeting with Porky.  He already --

6    meaning -- this means that Bryan already is coming to

7    Carl's house to meet him.

8    Q    Okay.

9    A    So.

10    Q    So you're all -- you're meeting up?

11    A    Yes.

12    Q    Okay.  What would the purpose of meeting Porky be?

13    A    To obtain cocaine.

14         MR. GILMAN:  All right.  Let's turn to rows 21

15    through 34 from September 19th, 2019.  That's document

16    2209.

17         And, Mr. Julardzija, if it's easier to read, it

18    will also be on the screen next to you.

19         THE WITNESS:  Yeah.  It's blurry.

20         MR. GILMAN:  Okay.  Well, we'll blow it up a

21    little bit.

22    BY MR. GILMAN:

23    Q    Okay.  Again, in these messages between you and Mr.

24    Martin, I'll read the messages Mr. Martin sent to you;

25    I'll ask you to read the messages that you sent Mr.

```
1    Martin.  I'll start.
2         "Bring Lisa."
3    A    "Or you want me to come now kinda late.  No Lisa is
4    MIA, man.  Two weeks vacation."
5    Q    Now, when Mr. Martin wrote -- I'll pause there for
6    a second.
7         When Mr. Martin wrote, "Bring Lisa," what did you
8    understand him to mean?
9    A    Lisa was a -- the name of my handgun.
10   Q    You gave your handgun a name?
11   A    Yes.
12   Q    Okay.  What type of handgun was it?
13   A    A revolver, .38 Special.
14   Q    Could you speak up a little bit.
15   A    .38 Special revolver.
16   Q    Okay.  And how did you respond when Mr. Martin
17   asked you for your revolver?
18   A    I just told him she -- she's on vacation.  That
19   means he's not getting it.
20   Q    Okay.  To your knowledge, did Mr. Martin have a gun
21   at that time?
22   A    September -- not that I know of.
23   Q    Okay.  Did Mr. Martin previously tell you that he
24   had a gun taken away from him?
25   A    Yes.
```

1    Q    What did he tell you about that?

2    A    He told me that something went down at Nectar's and

3    that the police department took his gun and he was going

4    to get it back.

5    Q    Now, before the incident at Nectar's, did you see

6    Mr. Martin carry a firearm?

7    A    Yes.

8    Q    Was it a handgun?

9    A    Yes.

10   Q    Where did he carry it when he carried it?

11   A    He would carry it in his hoodie or in his sweat

12   pant pocket.

13   Q    Have you seen Mr. Martin carry that firearm --

14   A    Yes.

15   Q    -- when you obtained cocaine from him?

16   A    Yes.

17   Q    Approximately when was that?  Was that before

18   February 2018?

19   A    Yes.

20   Q    Now, after you responded -- let's keep reading.

21        To Chango:  "LOL" -- L-O-L -- "yeah, come.  I need

22   it."

23   A    "He there now?"

24   Q    Just what do you understand when Mr. Martin wrote

25   "I need it"?  What did that mean?

1    A    Means he needs it.  He needs the gun.

2    Q    Did you lend Mr. Martin your handgun at this time?

3    A    No, I did not.

4    Q    Had you previously lent Mr. Martin your handgun?

5    A    I have, twice.  When he had his daughter over.

6    Q    In those instances, did Mr. Martin say why he

7    wanted your handgun?

8    A    He was just a little paranoid after that Nectar's

9    thing, incident, and the -- you know.  He would watch

10   his daughter sometimes home alone and just for safety

11   reasons.  I borrowed it twice to him.

12             MR. GILMAN:  Let's turn to Government

13   Exhibit 16 in evidence.  Let's play this video.

14             (A digital recording was played in open

15   court.)

16             MR. GILMAN:  Can we stop there.

17   BY MR. GILMAN:

18   Q    When you said -- or did you say -- you talked --

19   you mentioned something about an air filter; is that

20   right?

21   A    Yes, I did.

22   Q    When you mentioned air filter, what did you do?

23   A    Well, that was the air filter box that put the

24   contents of cocaine in it.

25   Q    Okay.  And who did you hand the cocaine to in that

1    instance?

2    A    The undercover.

3    Q    Where did you get that cocaine from?

4    A    From Carl Martin.

5            MR. GILMAN:  Okay.  And let's keep playing

6    Government's Exhibit 16 from September 5th, 2019.

7            (A digital recording was further played in

8    open court.)

9    BY MR. GILMAN:

10   Q    When you said "smell it" --

11        Did you say that?

12   A    Yes.

13   Q    -- what did you mean?

14   A    To smell the quality of the cocaine.

15   Q    Okay.  And then did the undercover talk about a

16   trip there?

17   A    Yes.

18   Q    What did you understand him to mean?

19   A    I understood him to mean the trip with the three of

20   us going down to Philadelphia, out of town, to pick up

21   the cocaine.

22   Q    And the undercover gave you a coffee cup there?

23   A    Yes, he did.

24   Q    What did you do with that coffee cup?

25   A    I gave it to Carl Martin.

1           MR. GILMAN:  Your Honor, I see it's around 10.
2    Should I keep going?
3           THE COURT:  Well, it goes to 10:30.
4           MR. GILMAN:  Oh, 10:30, okay.  Thank you.
5       Let's turn to messages from Mr. Martin on September
6    5th that day.  Let's turn to rows 36 to 47 on document
7    2210.
8    BY MR. GILMAN:
9    Q    Again, I will ask you to read the messages you sent
10   and I'll read the messages Mr. Martin sent.
11   A    Okay.
12        "What he say he en route."
13   Q    "'Bout to message him now."
14   A    "Do that so I know when to leave any time.  I can
15   go.  My boss is back."
16   Q    "I just text him."
17   A    "LMK I am waiting on your word."
18   Q    What does LMK mean?
19   A    Let me know.
20   Q    "He's on the way."
21   A    "So about 20 minutes until he there, I am
22   guessing?"
23   Q    "Probably."
24   A    "OMW to you."
25   Q    What does OMW mean?

1    A    On my way.

2    Q    "K."

3    A    "I am out here.  Bring lighter."

4    Q    "K."

5         Do you recall who you are talking about with Mr.

6    Martin in this conversation?

7    A    Yes.

8    Q    Who's that?

9    A    This was -- for the undercover deal.

10   Q    Okay.  And what do you appear to be doing with

11   respect to Mr. Martin in these messages?

12   A    Waiting for his word to go pick him up at his

13   apartment -- girlfriend's apartment so we can make this

14   deal --

15   Q    Okay.

16   A    -- with the undercover.

17   Q    Let's keep going.  Let's turn to your messages with

18   Mr. Martin from September 6th, 2019, rows 57 to 61 on

19   this document, beginning 2210.

20        Again, I'll read the messages sent to you from Mr.

21   Martin, and I'll ask you to read the messages you sent.

22        "Yo yo.  Pilot just hit me back".

23   A    "Nice.  Yeah.  I just saw him also.  It's been a

24   while.  Give him a little for me so I can clear up and

25   he will buy more, but see if he wants one for his

1    friend."

2    Q    "Ask him."

3    A    "I need to make up with him.  Hit 'em back.  I told

4    him you're close around."

5    Q    Who is Mr. Martin referring to when he writes "the

6    pilot"?

7    A    Dan Lathrop.

8    Q    How did you meet Mr. Lathrop?

9    A    We used to work together --

10   Q    Where --

11   A    -- at the airport.

12   Q    Sorry?

13   A    We used to work together at the airport.

14   Q    Did you provide cocaine to Mr. Lathrop?

15   A    I did.

16   Q    Approximately when did you begin providing cocaine

17   to Mr. Lathrop?

18   A    Maybe a couple months after I met Carl.

19   Q    Did there come a time when you introduced

20   Mr. Lathrop directly to Mr. Carl Martin?

21   A    Yes.

22   Q    When approximately was that?

23   A    Summer, I want to say 2017.  Summer.

24   Q    Okay.  Do you remember anything about the

25   temperature at that time?

1    A    It was fairly nice outside. A little breezy, but
2    it was sunny.
3    Q    Okay. Where did you introduce Mr. Lathrop to Mr.
4    Martin?
5    A    At my storage unit.
6    Q    And where is that?
7    A    Airport Road, right there. Airport Storage off of
8    Williston Road, by The Pour House.
9    Q    Did you ever meet Mr. Lathrop with Mr. Martin for
10   Mr. Martin to sell Mr. Lathrop cocaine?
11   A    Say again. Sorry.
12   Q    Were you ever with Mr. Martin when Mr. Martin sold
13   Mr. Lathrop cocaine?
14   A    Yes.
15   Q    Let's keep reading some of your messages. Let's
16   turn your attention to September 6th, 2019, rows 70 to
17   72.
18        I'll ask you to read your message and I'll read the
19   messages from Mr. Martin.
20   A    "My broski" --
21        "My broski, when you meet him, sit with him and
22   tell him he cool. Man he gonna be selling a lot of shit
23   I think and guns will be for sale. Also my guess, ask
24   him if he's selling one all legally but date back --
25   back date bill of sale to 2016 so you don't have to go

```
1    through gun shop this way with the new law."
2    Q    "Word.  Let's all go eat lunch."
3         Do you recall who you are talking about in this
4    first message in row 70?
5    A    Yes.  So he's always been asking me if, you know,
6    he wants a handgun.  I told him to talk to the pilot,
7    see if he will do any kind of deal with him.
8    Q    Who is it that always wants a handgun?
9    A    Carl.
10   Q    And here you seem to be suggesting a way to skirt
11   the law to transfer a firearm; is that correct?
12   A    Yes.
13   Q    Okay.  Let's turn to later that day, rows 80 to 86.
14   I'll ask you to read your messages, and I'll read the
15   messages Mr. Martin sent to you.
16   A    "Everything good, everyone happy?  Pilot probably
17   done with work now.  I see plane."
18   Q    "He said Tuesday.  Disn't had time."
19   A    "Oh, okay.  Cool.  Talking to my New York guy -- NY
20   guy how much available and what money."
21   Q    "What he looking for?"
22   A    "Told him to text me tomorrow."
23   Q    Okay.  Let's talk about what you are discussing
24   here with Mr. Martin.
25        So what do you understand the first discussion with
```

1    respect to the pilot to be?

2    A    A potential sale.  I mean, it -- what we probably

3    talking about.  So there was a planned sale for the

4    pilot.

5    Q    Okay.  What's the date of that message?

6    A    September 6th.

7    Q    September 6th, 2019?

8    A    Yes.

9    Q    Okay.  Now, later on in this conversation you say

10   you are talking about your New York guy?  NY guy?

11   A    Yeah.

12   Q    Who's that?  What did you mean by that?

13   A    It was a co-worker of mine, Hayden.  He was from

14   the Plattsburgh, so New York.

15   Q    And what was he interested in at this time?

16   A    Cocaine.

17   Q    All right.  Let's keep going.  Let's go to rows 89

18   to 93 on that page.

19        Direct your attention to messages between you and

20   Mr. Martin from September 7th, 2019.  I will again ask

21   you to read your messages; I will read Mr. Martin's.

22   A    "My Bosnia broski looking for basket.  What can we

23   do for him?  What's the number?  Can't overdo it.  We

24   need him."

25   Q    "3."

1    A    Question marks.

2    Q    "300."

3    A    "Damn.  He ain't gonna bite on that.  I'll let him

4    know.  Stand by."

5    Q    When you were talking about your Bosnian broski

6    looking for a basket, what does that mean?

7    A    Couple of friends of mine that live -- that they're

8    from Vermont.  One lives at Winooski, one in Colchester.

9    They're two cousins.  Just wanted to check with them if

10   they wanted some.

11   Q    Wanted some what?

12   A    Cocaine.

13   Q    And what does a basket mean here?

14   A    Eight-ball.

15   Q    And when Mr. Martin responded to you 3 and then

16   300, what did you understand that to mean?

17   A    That's the dollar amount.  The price.

18   Q    Is that $300?

19   A    Yes.

20   Q    Let's keep going.  Let's go to September 12th,

21   2019, rows 117 to 118.  I will ask you to read your

22   message; I will read the message from Mr. Martin.

23   A    "Outside."

24   Q    "Coming out."

25        So on September 12th, 2019, what appears to happen

1    here between you and Mr. Martin?

2    A    We're about to go make a deal.  I'm picking him up.

3    Q    Okay.  Let's keep going.

4         Turning your attention to Mr. Martin from September

5    14th, 2019, rows 121 to 126, I'll ask you to read your

6    messages and I'll read Mr. Martin's.

7         "You know where I can get any molly or E?  Any of

8    your people's.  Ask Kevo."

9    A    "Kevo maybe might know, but he don't fuck with it.

10   I know he'll say no so -- no.  Ask Pork Chop."

11   Q    "He can't find I've been ask his bitch ass for

12   months."

13   A    "Can't think of anyone right now -- can't think of

14   anyone right now really."

15   Q    Now, when Mr. Martin asked you for molly or E, what

16   did you understand him to be referring to?

17   A    Pills.  Molly and the Ecstasy.  E for Ecstasy.

18   Q    Okay.  Those are drugs that people take to get

19   high?

20   A    Yes.

21   Q    And who's Kevo?

22   A    A mutual friend of ours.

23   Q    What do you understand Mr. Martin to mean when he

24   told you that "he can't find I've been ask"?

25   A    Meaning he has been looking to get pills, drugs.

1    Q    To your knowledge, did Mr. Martin use molly or E?

2    A    No.

3    Q    Turning your attention to your messages with Mr.

4    Martin from September 19th, 2019, rows 151 to 161, I'll

5    ask you to read the messages that you sent and I'll read

6    the messages that Mr. Martin sent.

7         "Okay broski.  Could you pick me up from work

8    after."

9         Can I pause right there.

10        In that message, did Mr. Martin call you broski?

11   A    Yeah.

12   Q    Did he call you broski at times?

13   A    Yes.

14   Q    Did you call people broski at times?

15   A    Yes.

16   Q    Okay.  Let's keep reading.

17   A    "Just hit me afterward, broski."

18   Q    "Gotcha.  Boi wanna meet tomorrow for lunch?"

19   A    "Okay.  I am game with that.  Glad you worked it

20   in.  Where at though?  I need that flow LOL."

21   Q    Just for the record, I think most people know this

22   by now, but LOL, what's that mean?

23   A    Laugh out loud.

24   Q    Not lots of love?

25   A    No.

1    Q    All right.

2          When he -- when Mr. Martin talks about "boi," do

3    you know who he was talking about then?

4    A    Boi, the undercover.

5    Q    Okay.  All right.  I'll keep reading.

6          On September 19th, 2019, Mr. Martin is sending the

7    message:  "I'm gonna give him three till next week.  Get

8    this going again."

9    A    "So he getting three onion tomorrow, right?"

10   Q    "Yeah."

11   A    "So where at mang?"

12   Q    "McDonald's or Price Chopper."

13   A    "Your side there, right?"

14   Q    "Yes."

15         Okay.  Let's break that down.

16         When Mr. Martin wrote you, he said, "I'm going to

17   give him three till next week.  Get this going again,"

18   what did you understand Mr. Martin to mean?

19   A    He's going to give the undercover three ounces.

20   Q    And how do you know three ounces?

21   A    That's what we call onions, are ounces.

22   Q    And these locations, McDonald's or Price Chopper,

23   are you familiar with those?

24   A    Yes.

25   Q    Where are those locations?

1    A    The McDonald's here in Colchester, Prim Road, and
2    Price Chopper off of Williston Road.
3    Q    And when you said "your side there right," what do
4    you mean?
5    A    Basically it's McDonald's.  It means that he was
6    staying at his house, that Carl was staying at Grey
7    Birch in Colchester.  And when he says Price Chopper,
8    that's the side where his girlfriend lives.
9              MR. GILMAN:  Okay.  Let's turn to what's in
10    evidence as Government Exhibit 29, a video recording
11    from the September 20th, 2019, sale.  Let's play it.
12              (A digital recording was played in open
13    court.)
14              MR. GILMAN:  Okay.  Let's pause it there.
15    BY MR. GILMAN:
16    Q    How many voices do you hear in that conversation,
17    Mr. Julardziga?
18    A    Three.
19    Q    Could you identify those voices for the jury?
20    A    The undercover's voice, mine and Carl's.
21    Q    Okay.
22              MR. GILMAN:  Let's keep playing.
23              (A digital recording was further played in
24    open court.)
25              MR. GILMAN:  Okay.  I'm sorry, can we go back

1    to the beginning of that video.  Thank you.

2              (A digital recording was further played in

3    open court.)

4              MR. GILMAN:  Okay, you can pause.

5    BY MR. GILMAN:

6    Q    Did you hear Mr. Martin talk about gaining trust

7    back in that video?

8    A    Yes.

9    Q    What did he mean by that?

10   A    I think the deal before that, that batch that he

11   sold to the undercover, wasn't good quality, so he

12   wanted to make it up.

13   Q    Okay.  And did Mr. Martin also talk about making a

14   trip or taking a trip there?

15   A    Yes.

16   Q    What did Mr. Martin mean by that?  What do you

17   understand him to mean?

18   A    Take his own trip, pick up his own drugs.

19   Q    And where did you understand that trip would be to?

20   A    Philadelphia.

21   Q    Let's go to your messages from that day, September

22   20th, 2019, rows 171 to 173.

23        I'll read the messages from Mr. Martin; I will ask

24   you to read your messages.

25        "Yo.  Though you was taking me mang."

1    A    "Who is this?"

2    Q    Can you tell us what's going on in these messages?

3    A    That's just me kidding with him, like, you know,

4    asking who is it.  I'm just saying who is this for -- I

5    mean, I knew it was him.

6    Q    What was Mr. Martin asking you to do there?

7    A    At that time, make a deal.

8    Q    And when you say make a deal, drive him somewhere?

9    Take him someplace?

10    A    Drive him somewhere.

11    Q    Okay.  Let's keep going through the messages.

12    Let's just forward to September 30th, 2019, rows 181 to

13    186.

14        I will ask you to read your messages sent and I

15    will read the messages from Mr. Martin.

16        September 30th, 2019:  "Word.  I have that white

17    girl.  Need some money."

18    A    "Word Pork Chop?"

19    Q    "Yeah."

20    A    "Tell white boy."

21    Q    Now, when Mr. Martin wrote you, "I have that white

22    girl," what do you understand him to mean?

23    A    Cocaine.

24    Q    Okay.  When he said, "Need some money," what did

25    you understand him to mean?

1    A    He needs some money.  Wants to get rid of it, the

2    cocaine, to get some money.

3    Q    Okay.  And when you asked him, "Word Pork Chop,"

4    what did you mean?

5    A    Meaning is it from Bryan.

6    Q    And Mr. Martin told you it was?

7    A    Yeah.

8    Q    You said, "Tell white boy."  What did you mean?

9    A    Tell the undercover.

10   Q    Okay.  And again, at that time you didn't know he

11   was an undercover, right?

12   A    No.

13   Q    Okay.  Let's continue a message from October 3rd,

14   2019, rows 189 to 205.

15        I'll ask you to read the messages you sent, and

16   I'll read the messages Mr. Martin sent.

17        October 3rd, 2019 to Chango:  Have a onion in the

18   safe."

19        Let's stop there.  What do you understand that to

20   mean?

21   A    I have an ounce in the safe.

22   Q    Okay.  Let's keep reading.

23   A    "Yeah, man.  I texted guy my Bosnian dude.  We'll

24   see.  I'm in a hole.  Also they threatening to close my

25   account.  Still didn't pay off $500 I owe them and I got

1  house and mom's mortgage now two days late."

2  Q    "Damn.  Let's see what your mang say and we both

3  can eat."

4  A    Sent it to him same day you was Gucci.  I'm trying,

5  broski."

6  Q    Okay.  Now --

7  A    That's his cousin.  They will want --

8  Q    Hold on one second.

9  A    Sorry.

10  Q    There's some -- I want to keep reading with these.

11       Okay.  So on 194, it looks like there's a blank

12  space in that message box?  Is that correct?

13  A    Yeah.

14       MR. GILMAN:  Could we zoom out just a little

15  bit?  Back to the main document?  Okay.  Could we look

16  at the attachment number one row.

17  BY MR. GILMAN:

18  Q    And it appears you sent something to Mr. Martin

19  that day; is that right?

20  A    Yes, it looks like.

21  Q    Okay.

22       LIZA LABOMBARD:  Is that 947?

23       MR. GILMAN:  Yes.  Let's pull up Government's

24  Exhibit 97B.  Okay.

25  BY MR. GILMAN:

1    Q    What is this?

2    A    That's a screenshot of my messager between me and

3    that Bosnian, one of the Bosnian guys, Nihad, from those

4    two cousins we talked about briefly.

5    Q    Is that who you referred to as your Bosnian broski?

6    A    Yes.

7    Q    Okay.  What I will do here, I will -- I will read

8    the messages that it looks like Nihad sent.  I will ask

9    you to read the messages it looks like you sent.

10        Is that correct?  This is a conversation between

11   you and Nihad?

12   A    Yes.

13   Q    Are those messages you received from Nihad?

14   A    Nihad.

15   Q    Are those the messages you sent him?

16   A    Yes.

17   Q    Okay.  I will read those messages to you.

18        "Looks like homie is all set.  He was supposed to

19   come through but he ain't hitting mister back my dude."

20   A    "Next time let me know if anything tomorrow.  Just

21   text me on 8023180276.  That's my new number.  Lost all

22   contacts."

23   Q    "Bet."

24   A    "We Gucci bari."

25   Q    "Valjal?" (pronouncing).

1    A    "Vi-yal" (pronouncing).

2    Q    How did you respond?

3    A    "Nako trebas probati nexnam."

4    Q    What languages are those two lines in?

5    A    Bosnian.

6    Q    Do you speak Bosnian?

7    A    Yes.

8    Q    Could you please tell us what those messages mean.

9    A    So the one you read, valjal, means, "Is it good?"

10   And my response is, "So so.  You gotta try it.  I don't

11   know."

12   Q    Okay.  Let's go back to Government's Exhibit 97,

13   rows -- on October 23rd, 2019, rows 189 to 205.

14              LIZA LABOMBARD:  Do you want me to start at

15   194?

16              MR. GILMAN:  Sure.  Thank you.  And could

17   you -- yes, perfect.  Okay.

18   BY MR. GILMAN:

19   Q    All right.  So after you sent that screenshot to

20   Mr. Martin, what did you send him?  Can you read row

21   195.

22   A    "That's he's cousin.  They all want that fire.

23   Chop -- Chop don't provide that."

24   Q    What do you mean there in that message?  What are

25   you saying?

1    A    Meaning they want that better quality of cocaine,

2    and Chop, meaning Bryan, doesn't provide that.

3    Q    Okay.  Let's keep reading.

4    A    "So we will see what they talking about.  Can't

5    believe white boy fell outta the game mang."

6    Q    "It's the fat boi fault."

7    A    "Yeah, I know well of my little Bosnian homies

8    looking for half a G 'cuz they don't know if it's good.

9    Might have to let 'em try before they buy.  I don't fake

10   these dudes."

11   Q    Let's stop there.

12        When Mr. Martin wrote you -- wrote to you, "It's

13   the fat boi fault," what do you understand him to mean?

14   A    It's Bryan's fault.  Pork Chop.

15   Q    And white boy -- when Mr. Martin says white boy,

16   who is Mr. Martin referring to there?

17   A    The undercover.

18   Q    Okay.  So Mr. Martin is telling you that it's Pork

19   Chop's fault that he's not selling to the undercover at

20   this time?

21   A    Yes.

22   Q    Okay.  Now, when you are talking about your little

23   Bosnian homies, can you tell us what that message means?

24   Looking for a half G?  What does that mean?

25   A    Yes.  That Nihad guy, that he was a potential

1    buyer, but that didn't go through.

2    Q    Okay.  And that you might have to let them try

3    before they buy; is that right?

4    A    Yes.

5    Q    Is this a way of gaining back trust?

6    A    Yes.

7            THE COURT:  All right.  It is 10:30 at this

8    point.  Let's take a break and be back in 15 minutes.

9    (Court was in recess at 10:30 a.m.)

10   (The following was held in open court with the jury

11   present at 10:50 a.m.)

12           THE COURT:  All right.

13           MR. GILMAN:  Thank you, your Honor.

14      Let's begin with Government Exhibit 97.  Could we

15   look at rows 194 to 205 from October 3rd, 2019.  Okay.

16   BY MR. GILMAN:

17   Q    And I believe before we left off we had just looked

18   at that screenshot you had taken of a conversation you

19   had with another person about cocaine.  Just setting the

20   scene.

21      Okay, so let's start reading again with row 200,

22   please.

23   A    "Anyways, we will see.  Waiting on them.  I guess

24   maybe he's gonna try and make some more sales."

25   Q    "Let me know."

1    A    "Doing what I can.  It only goes so far.  Can't

2    force 'em."

3    Q    "Word.  I'm hungry mang."

4    A    "Text pilot.  Tell him you give him two for the

5    price of one.  He might bite."

6    Q    "Pilot said Sunday 1:45."

7         All right.  Let's break that down a bit.  When Mr.

8    Martin messaged you, "Word.  I'm hungry, man," what did

9    you understand him to mean?

10   A    Means he's hungry for some money, to make some --

11   to make some sales happen so he can get some money.

12   Q    Sales of what?

13   A    Cocaine.

14   Q    And when you reference pilot, who are you referring

15   to?

16   A    Dan Lathrop.

17   Q    And when you said "two for the price of one," what

18   do you mean?

19   A    To give him two for the price of one.  So --

20   eight-balls maybe.

21   Q    Eight-balls of what?

22   A    Cocaine.

23   Q    Okay.  And when Mr. Martin responded to you, "Pilot

24   said Sunday 1:45," what did you understand that to mean?

25   A    That they will meet at 1:45 on Sunday --

1   Q    Okay.

2   A    -- the pilot and Carl.

3            MR. GILMAN:  Okay.  Let's keep going on

4   October 3rd, 2019, rows 213 to 215.  Can we include the

5   attachment row, one more?

6            LIZA LABOMBARD:  Sure.

7            MR. GILMAN:  Thank you so much.  Okay, great.

8   BY MR. GILMAN:

9   Q    Let's read again the same that we have been.  I

10  will ask you to read your messages; I'll read the

11  messages -- well, these actually are just yours.  Thank

12  you, Mr. Julardziga.

13  A    "Anyways, my Bosnian brother gonna try before he or

14  his homie buy.  I told him to hit me later.

15       "Don't want trash.  Told him I didn't try it, so

16  we'll see."

17  Q    Okay.  And in that message between, does it appear

18  you sent the screenshot?  Sorry.

19       In that message between, in row 214, does it appear

20  you sent what's listed as a screenshot?

21  A    Yes.

22            MR. GILMAN:  Could we pull up Government

23  Exhibit 97C.

24  BY MR. GILMAN:

25  Q    Okay.  What is this that we are looking at?

1    A    That message is between me and one of those Bosnian

2    broskies, Denis.

3    Q    Okay.  I will ask you to read the messages you sent

4    and I will read the messages Denis sent.

5    A    Okay.

6         "We gucci on that thing buraz nisam probo.  LMK if

7    anyone hungry for snjezana."

8    Q    Could you translate for us, or what did you mean by

9    that?

10   A    Basically what I'm saying, we gucci, we're good on

11   that thing, which I'm implying to cocaine.

12        Buraz nisam probo; I told him, bro, I didn't try

13   it.  Let me know if anyone hungry for snjezana, which

14   means snow white.

15   Q    And what is snow white?

16   A    Cocaine.

17   Q    And then the person responds, "Shit, man, I ain't

18   been in the game for a min."

19   A    I said, "Okay, okay, no siki riki.  Ako neko bude

20   trazijo javi."

21   Q    What did you write there?

22   A    I wrote that it's okay, no worries.  If somebody's

23   looking for it, let me know.

24   Q    Okay.

25        "See if is good too man."

1    A    "You can try."

2    Q    Okay.  When you -- why did you write, you know, "If

3    someone's looking for it, let me know"?

4    A    So if any of his friends need it too, let me know.

5    I mean --

6    Q    And you are talking about cocaine?

7    A    Cocaine, yes.

8    Q    And who is that cocaine from that you wanted to

9    sell?

10   A    Carl Martin.

11   Q    And why would you offer someone to try it?

12   A    Guy like that wants to try it first.  He's -- you

13   know.

14   Q    What's the purpose of trying cocaine before you buy

15   it?

16   A    To build trust, I guess.

17   Q    Okay.  If the person tried the cocaine, could they

18   tell if it was cocaine or not?

19   A    Yes.

20   Q    Okay.

21        MR. GILMAN:  Can we go back to rows 213 to 215

22   in Government Exhibit 97.

23        THE COURT:  Can we just try to step it up a

24   little bit?

25        MR. GILMAN:  Sure.

1          Let's skip ahead then to rows 216 --

2                THE COURT:  Just keep it moving.

3                MR. GILMAN:  You got it, your Honor.

4          Rows 216 to 237, from October 3rd, 2019.

5     BY MR. GILMAN:

6     Q    I guess let's start with just this page.

7          Okay.  Mr. Martin writes to you on October 3rd,

8     2019, "I need to hold Lisa for the night."  I'm going to

9     stop there.

10         When Mr. Martin wrote "Lisa," what did you

11    understand him to mean?

12    A    That's my handgun's name, so.  The gun.

13    Q    Let's keep reading.

14    A    "No.  Can't do, broski.  She MIA."

15    Q    What did you mean when you wrote that?

16    A    That means no, you can't have her.  She's missing

17    in action, meaning I have her, but for you, she's

18    missing.

19    Q    "No problem."

20    A    "My boy might buy her.  I'll get something else

21    mang possibly."

22    Q    "Okay."

23         Let's continue on the next page, going up to row

24    237.

25         I'll ask you to keep reading your messages.

```
 1    A    "Lisa got wanna get her cousin Donna 357."

 2    Q    What does that mean?

 3    A    Basically I was going to trade in to -- to the gun

 4    shop, trade in my handgun for a .357.

 5    Q    Why did you want a .357?

 6    A    It's just a nicer handgun.

 7    Q    Why -- what's nicer about it?

 8    A    It's more accurate.  Just -- I always wanted one.

 9    Q    Okay.  Let's keep reading.

10    A    "Lisa hot I think, but Donna sexy."

11    Q    "I'm going on a mission tonight.  What's up with

12    the rifle."  Let's stop there.

13         When Mr. Martin told you he was going on a mission

14    tonight, what did you understand him to mean?

15    A    I understood he was going to go on a mission,

16    possibly to get some money or drugs.

17    Q    And then he asked you about a rifle?

18    A    Yes.

19    Q    What's he asking about?

20    A    Oh, my hunting rifle.

21    Q    What was your understanding of why he'd want a

22    rifle?

23    A    To use it.  Potentially use it.  Just wanted to

24    borrow it.

25    Q    Okay.  Let's keep reading.
```

1    A    "Jah feel bro, yo ask pilot if he wanna trade a

2    strap for like two baskets mang.  He might definitely

3    have some."

4    Q    What did you mean there when you said trade a strap

5    for two baskets?

6    A    He might -- to ask the pilot if he will trade him a

7    handgun for two eight-balls.

8    Q    And when you say the pilot, who are you referring

9    to?

10   A    Dan Lathrop.

11   Q    Okay.  Could you keep reading your next message on

12   227 on October 3rd, 2019.

13   A    Yeah.

14       "My guy, that's my hunting rifle.  Strictly hunting

15   and long distance."

16   Q    "He said Sunday."

17   A    "Oh Y U got good tip from Pork Chop."

18   Q    I believe that says Chop --

19   A    "Chop Porky."

20   Q    "Yeah.  I need some money bad."

21   A    "Be careful, broski.  Yeah, man."

22   Q    "Just got BNB to find a hammer."

23   A    "Got the air, one look real" --

24       "Got the air one.  Look real as shit."

25   Q    "I'll take anything."

1    A    "Okay.  I'll let you hold that one."

2    Q    "Okay."

3         Let's break that down.

4         Mr. Martin asked you about your hunting rifle.  You

5    told him no.  And then he said, "I got to find a

6    hammer."

7         What did you understand Mr. Martin to be referring

8    to when he said, "I have to find a hammer"?

9    A    A gun.

10   Q    You responded, "You got the air one."  What are you

11   talking about there?

12   A    A CO2 air, gas-propelled BB gun.

13   Q    Okay.  And what does that gun look like?

14   A    It's one of those Daisy gun, $20 CO2 from Walmart.

15   Q    Okay.

16   A    It looks real, I mean.

17   Q    Real like what?

18   A    It looks like a real handgun.

19   Q    Okay.  Let's keep reading on October 3rd, 2019,

20   rows 240 to 264.

21        I'll ask you to read your messages; I'll read Mr.

22   Martin's.

23   A    Okay.

24   Q    "What up."

25   A    "Home."

1    Q    "I'm coming to get that really quick."

2    A    "Lisa not here but got the other little joint."

3    Q    "Yeah.  I'll take it."

4    A    "How long until you at the little store near my

5    place?

6         "You want big shank also?"

7    Q    "Yeah."

8    A    "Okay."

9    Q    "I'm leaving work like 20 minutes."

10    A    "Okay.  Let me know when you at the store here or

11    go by my mailbox down the next street, Abigail Road off

12    Malletts Bay road."

13    Q    What did you mean when you wrote, "Lisa not here

14    but I got the other little joint"?

15    A    So I didn't want to give him the real gun, and

16    decided -- he decided he wants that air gun.

17    Q    And Martin agreed to take it, correct?

18    A    Yes.

19    Q    Then you offered him a big shank.  What's a big

20    shank?

21    A    It's a -- I got it from my co-worker.  It has

22    sentimental value.  It was one -- Okinawa, like hunting

23    knives.  It's older.  It was a hunting knife.

24    Q    Approximately how large?

25    A    I'd say the blade probably four, four and a half

1    inches.  With handle and everything, maybe eight.

2    Q    Okay.  Did you meet Mr. Martin?

3    A    I did.

4    Q    What, if anything, did you give him?

5    A    Yeah, I gave him that -- that BB gun, and I gave

6    him that hunting knife.

7    Q    And again, you say BB gun.  You said that resembles

8    a real handgun?

9    A    Yes.

10   Q    Is that right?

11   A    Yes.

12        MR. GILMAN:  Okay.  Let's turn to the next

13   day, October 4th, 2019, rows 267 to 283.  Let's start

14   with 267, and let's go to the bottom of this page.

15        Okay.  Great.

16   BY MR. GILMAN:

17   Q    Let's read these messages.  I will ask you to read

18   your messages; I will read Mr. Martin's.

19   A    Okay.

20        "Everything gucci?"

21   Q    I'm sorry.  I apologize.  I didn't ask this before.

22   When you say gucci, what do you mean?

23   A    Good.

24   Q    Okay.

25        "Yeah, broski.  It didn't happen last night."

```
1    A    "What the fuck.  Really?"

2    Q    "Too much people was in the building."

3    A    "Wow.  That sucks mang.  Had your peeps all the way

4    there.  Damn.  I feel you."

5    Q    "Word.  Pork Chop didn't line it up right."

6    A    "I don't think it's gonna happen any different.

7    People always gonna be there.  I knew Chop gonna fuck it

8    up as usual."

9         "Who else but Chop."

10   Q    "Nah, it will.  I'll.  I'll fallow him after the

11   club one of these nights."

12   A    "Yeah, I guess.

13        "Damn.  We was ready to eat.  Now we still hungry.

14   Fuck.  It's okay.  Everything happens for a reason."

15   Q    "It will happen though, even if it's just me."

16        What's going on here?  Can you tell us what this

17   conversation means?

18   A    Yes.

19        So Bryan had a hint of someone potentially has

20   either drugs or money, and the --

21             MR. MATSON:  Objection, your Honor.  It sounds

22   like it's based on hearsay.

23             THE COURT:  The question is whether this is

24   speculation.  You want to lay a foundation for his

25   understanding?
```

```
1              MR. GILMAN:  Sure.
2    BY MR. GILMAN:
3    Q    Did Mr. Martin tell you what happened or did he
4    tell you what his plan was that night?
5    A    Yes.
6    Q    Okay.  Let's hear it.
7              THE COURT:  Well, then, what did he say?
8              MR. GILMAN:  Right  What did he --
9              THE COURT:  So then what did he say?
10             MR. GILMAN:  Thank you, your Honor.
11             THE WITNESS:  He said he was going to go out
12   and get some drugs or money.
13   BY MR. GILMAN:
14   Q    Okay.  What did Mr. Martin tell you his plan?
15   A    That he was going to get it, you know, potentially
16   rob somebody, but he's --
17   Q    Who was Mr. Martin working with?
18   A    Bryan.  Pork Chop.
19   Q    Okay.  Did it work out?
20             MR. MATSON:  Objection, your Honor.
21   A    Not that night.
22             MR. MATSON:  Again, just as long as there's a
23   foundation for it.
24             THE COURT:  Pardon me?
25             MR. MATSON:  As long as there's an evidentiary
```

1   foundation for it that's not hearsay from somebody else.

2                THE COURT:  Well, right.

3                MR. GILMAN:  Well, I am going to ask Mr.

4   Julardzija what Mr. Martin told him.

5   BY MR. GILMAN:

6   Q    What did Mr. Martin tell you with respect to

7   whether it worked out or not?

8   A    Like it says on the text, it didn't work out for

9   him that night.

10  Q    Okay.  And again, what did you understand Mr.

11  Martin to mean when he wrote, "It will happen though,

12  even if it's just me"?

13  A    Meaning he's going to try it again.

14  Q    Great.

15               MR. GILMAN:  Let's continue on to the next

16  page.  Up to row 283 on the next page, starting at the

17  top.

18               LIZA LABOMBARD:  283?

19               MR. GILMAN:  We are going to start at 280 and

20  we are going to go to 283.

21  BY MR. GILMAN:

22  Q    I will ask you to read your message.

23  A    "Yeah, just be careful.  I don't trust Chop.  Gotta

24  cut him out off that play."

25  Q    "Word."

1    A    "Yeah.  Trust no one, broski."

2    Q    "Facts."

3         Okay.  Let's continue that day reading October 4th,

4    2019, rows 284 to 289.

5    A    "Tell pilot when you see him with that transaction,

6    him and I even, so he clear jah feel."

7         "If you can" -- "If you can so he don't avoid me or

8    something and business flow will continue."

9    Q    "Yeah.  I gave him one for you last time."

10        "But let him know that this" -- excuse me.

11        "But I'll let him know that this time."

12   A    "Yeah, but he paid you for that one.  It's okay.

13   No worries.  Either way, I just want him to be clear.

14        "Okay.  Sounds good, broski."

15   Q    Okay.

16   A    "Thanks.  Let's see if these fucking Bosnian homies

17   will holla."

18   Q    Thank you.

19        So when you talk about the pilot here, Mr.

20   Martin -- what does Mr. Martin tell you about his

21   exchange with the pilot?

22   A    That's -- he says he is going to meet him later and

23   they're going to do a transaction.  They're going to --

24   drugs for money.

25   Q    Okay.  And does Mr. Martin also tell you that he

1    gave one to the pilot last time they met?

2    A    Yes.

3    Q    Okay.  And the Bosnian homies you're talking about,

4    are those people you previously testified about trying

5    to sell drugs to?

6    A    Ye.

7    Q    Correct?

8    A    Yes.

9             MR. GILMAN:  Okay.  October 18th, 2019, rows

10   327 to 311.

11   BY MR. GILMAN:

12   Q    I'll ask you to read your messages; I'll read Mr.

13   Martin's.

14   A    "You got flame?  Lucian might want a little pie."

15   Q    "I can get if he need."

16        Does it appear that you guys connected by phone

17   here?

18   A    Yeah.

19   Q    Okay.

20        "Let me know."

21        Who is Lucian?

22   A    A co-worker of mine.

23   Q    When you said "might want a little pie," what do

24   you mean?

25   A    A little pie, a gram.

1    Q    Okay.  Pie, like a piece of cocaine or something?

2    A    Yes.  One gram.

3    Q    Okay.  Let's turn to October 23, rows 370 to 395.

4    I'll ask you to read your messages; I will read the

5    messages from Mr. Martin.

6         "What's the word?"

7    A    "Working, broski.  Dreaming about better days where

8    we have money and power.  Sometimes don't wanna wake up,

9    it feels that good.  Laugh out loud."

10   Q    "Word.

11        "I'm supposed to drop two off to white boy."

12        Who do you understand white boy to be?

13   A    The undercover.

14   Q    And when Mr. Martin says two, what did you

15   understand that to mean?

16   A    Two ounces.

17   Q    Okay.  I will ask you to continue reading.

18   A    "Broke as usual.  Don't even have like gas, fuck.

19   My woman don't get paid till tomorrow.  She can float me

20   some gas."

21   Q    "I can give you something out of it."

22        What do you understand Mr. Martin to mean when you

23   wrote that?

24   A    He can give me some money out of it.

25   Q    Some money or cocaine?

1   A   Well, to fill the tank, this time was money.

2   Q   I understand.  Okay, let's keep reading.

3   A   "Okay.  No problem, broski.  What time?

4       "And WYA?"  Where you at?

5   Q   "I can buy you some after this deal -- or diesel.

6       "Choppa.

7       "12."

8   A   "Okay.  What time exactly you want me there at

9   Choppa?"

10  Q   "Like 12."

11      Let's stop there.  Choppa, does that refer to Price

12  Chopper?

13  A   Yes.

14  Q   And 12, is that around noon?

15  A   Well, Choppa is also a nickname for his girlfriend.

16  Q   Oh, sorry.

17  A   But she lives right there near Price Chopper.

18  Q   And 12, is that around noon?

19  A   Yes.

20  Q   Okay.  Let's continue with your message on 383 on

21  October 23rd, 2019.

22  A   "Can you C, make me like a little basket, maybe if

23  possibly, or two baskets?  LOL."

24  Q   When you say basket, what do you mean?

25  A   Eight-balls.

1    Q    Okay.

2    A    One or two eight-balls.

3    Q    So that's one or two eight-balls?

4    A    Yes.

5    Q    "Okay.  I be there at 12 please and thanks.

6         "I'll make something now" -- excuse me.

7         "I'll make you something now."

8    A    "I will have maybe $80 for you Friday.  I am broke,

9    my broski.

10         "Okay, but the fire stuff, please."

11    Q    Okay.  When you wrote "the fire stuff," what did

12    you mean?

13    A    Like the better quality of cocaine.

14    Q    Did Mr. Martin have that at times?

15    A    At times, yes.

16    Q    Okay.  And it looks like you connected by phone

17    here?

18    A    Yes.

19    Q    Okay.  I'll ask you to keep reading.

20    A    "I'll deliver by myself the onions.  You just give

21    to me if you don't wanna ride.  Boi said 12:30."

22         Sorry.  That's you.

23    Q    I will read that last line.

24         "Boi said 12:30."

25    A    Yeah.

1    Q    When you wrote, "I'll deliver by myself the onions.

2    You just give to me if you don't wanna ride," what did

3    you mean?

4    A    Meaning I will meet the undercover right there at

5    Price Chopper if he is busy with the kids or whatever.

6    Q    Okay.  And "Boi said 12:30," the "boi," who does

7    that refer to?

8    A    The undercover.

9    Q    Now, on that day, did you meet up with Mr. Martin?

10   October 23rd, 2019.

11   A    Yes.

12   Q    Where did you go?

13   A    I went to pick him up at his girlfriend's house on

14   Cottage Grove, right there at that apartment complex.

15   Q    And then where did you go?

16   A    And then we headed to -- first to Price Chopper,

17   and that location changed via him and the undercover to

18   McDonald's location.

19   Q    Okay.  Did you pick up anything before you went?

20   A    Yes, we did.

21   Q    What did you pick up?

22   A    We picked up cocaine at Bryan's house.

23   Q    And where was that at this time?

24   A    At this time it was at -- off of North Avenue,

25   Burlington area, by the Starr Farm Road.

1    Q    Okay.  I'm going to show you for identification

2    what's marked as Government Exhibit 49.

3                MR. GILMAN:  May I approach, your Honor?

4                THE COURT:  Yes.

5    BY MR. GILMAN:

6    Q    I'll ask you to look at those briefly.  And I'm

7    going to ask you, do you recognize those?

8    A    Yes, I do.

9    Q    What are they?

10    A    This is the -- the first one is a -- the back seat

11    of my car with the money from the undercover.  This was

12    our last day before we got arrested.  Our last meeting

13    with the undercover where he was also, on top of cocaine

14    sale, doing a gun sale with the undercover.  And that is

15    the gun in my middle console.

16          And then there is that fanny pack, that checkered

17    fanny pack that contains the cocaine, which -- yeah --

18    is in the front passenger seat.  Yep.  And right there

19    it's in the front passenger floor, that same bag that

20    contained the cocaine.

21    Q    Are those photographs true and accurate

22    representations of your car on October 23rd, 2019?

23    A    Yes, they are.

24                MR. GILMAN:  The government moves to admit

25    Government's Exhibit 49.

1           THE COURT:  Any objection?

2           MR. MATSON:  No objection.

3           THE COURT:  So admitted.

4           (Government's Exhibit 49 was received in

5    evidence.)

6           MR. GILMAN:  May we publish Government's

7    Exhibit 49 to the jury?

8           THE COURT:  Yes.

9    BY MR. GILMAN:

10   Q    Could you describe what we see here?

11   A    Yes.  That's the money exchanged that's wrapped up

12   in the McDonald's wrapper from the undercover on the

13   back seat.  The --

14   Q    Sorry to interrupt.

15          MR. GILMAN:  Next photo, please.

16   BY MR. GILMAN:

17   Q    What do we see here?

18   A    We see the handgun, that Carl was trying to

19   purchase from the undercover, in the middle console.

20          MR. GILMAN:  Okay.  And let's go to the next

21   photo.

22   BY MR. GILMAN:

23   Q    What's that black and white thing?

24   A    That is that fanny pack that had the contents of

25   cocaine in it.

1    Q    Okay.  When did you first see that fanny pack that

2    day?

3    A    That day?  I saw it when we went to Bryan's house.

4    Carl walked in first, and I was parked outside, and they

5    just called me in the house -- Bryan called me in the

6    house.  He gave me a Gatorade.  Carl already had it in

7    his hand, that bag, that he got from Bryan.

8    Q    Okay.  And what was in that bag?

9    A    Cocaine.

10             MR. GILMAN:  Let's go to Government Exhibit 40

11   of the video from October 23rd, 2019.  Let's play it.

12             (A digital recording was played in open

13   court.)

14             MR. GILMAN:  Okay.  Thank you.

15   BY MR. GILMAN:

16   Q    Okay.  Who is in that car at that time?

17   A    Myself, Carl, and the undercover.

18   Q    Do you hear three voices on that recording?

19   A    I do.

20   Q    What voices are they?

21   A    Mine, Carl's, and the undercover.

22   Q    Okay.  Now, someone talked about travel there.  Did

23   you hear that?

24   A    Yes.

25   Q    Who was that?

1    A    Carl.

2    Q    You also hear a discussion of shells inside?

3    A    Yes.

4    Q    Are you familiar with that?

5    A    Well, revolvers.  They don't spit shells out, so

6    that's --

7    Q    Okay.  Whereas the .357 keeps the shells in?

8    A    Yes.

9    Q    Can you tell us what happened in the car that day?

10   A    That was -- that day we were supposed to meet, make

11   the drug deal with the undercover, and that's the day we

12   got arrested.

13   Q    Did Mr. Martin provide the cocaine to the

14   undercover?

15   A    He did.

16   Q    Did he receive the handgun in return?

17   A    Yes.

18        MR. GILMAN:  Just a last item here.  Can we

19   pull up Government's Exhibit 96 in evidence.  I believe

20   there's two pages here, this page and the next.  If we

21   look at the next.

22   BY MR. GILMAN:

23   Q    Do you recognize this exhibit, Mr. Julardziga?

24   A    Yes.

25   Q    What is it?

1    A    It's a text between me and Carl.

2    Q    Okay.  And what name appears there?

3    A    Drizzle.

4    Q    Okay.  And --

5    A    For Dre.

6    Q    Okay.  That was my question.  What is --

7    A    Yeah.

8    Q    Who's Drizzle?

9         Sorry.  Who's Drizzle?

10   A    Dre.  Carl Martin.

11   Q    Now, these appear to be the only messages between

12   you and Mr. Martin on your phone.  Why is that?

13   A    I don't know.  It's --

14   Q    Did you delete messages on your phone between you

15   and Mr. Martin at times?

16   A    At times I did.

17   Q    Why did you delete them?

18   A    So my wife wouldn't, you know, read texts, because

19   she didn't know anything what was going on, so I do it

20   once in a while, but -- mainly because of her.

21   Q    Okay.  Thank you.

22   A    Yes.

23         MR. GILMAN:  May I have one moment,

24   your Honor?

25         (Brief pause.)

```
 1              MR. GILMAN:  No further questions at this
 2    time, your Honor.
 3              THE COURT:  Okay.  Cross examination?
 4                      CROSS EXAMINATION
 5    BY MR. MATSON:
 6    Q    Good morning, Mr. Julardziga.
 7    A    Good morning.
 8    Q    My name's Chandler Matson.  I represent Carl
 9    Martin.
10         Am I pronouncing your name correctly?  Julardziga?
11    A    Julardziga.
12    Q    Julardziga.  Okay.  My apologies.
13         Mr. Julardziga, let's start with October 23rd in
14    that video we just saw.
15    A    Yes.
16    Q    I imagine it was a pretty scary day for you?
17    A    Yes, it was.
18    Q    How many officers showed up?
19    A    I couldn't tell you, the top of my head, but --
20    Q    Too many to count?
21    A    Yes.
22    Q    Were you taken into custody?
23    A    Yes.
24    Q    Did they put handcuffs on you?
25    A    They did.
```

1    Q    Did they put you in the back of a police car?

2    A    Yes.

3    Q    How many officers did that?

4    A    Two, three.

5    Q    Did they arrest Mr. Martin as well?

6    A    Yes, they did.

7    Q    Did you see that?

8    A    Yes.  He was right next to me.

9    Q    Yep.  How many officers arrested Mr. Martin?

10   A    I couldn't tell you, top of my head.

11   Q    A lot?

12   A    Yeah.

13   Q    Mr. Julardziga, after you were arrested and taken

14   and put in the back of that police car, were you taken

15   to this building?

16   A    No.

17   Q    Where were you taken?

18   A    I was taken to the North Avenue Burlington jail.

19   Q    You were booked and they took your mug shot?

20   A    Yes.

21   Q    And you were trying to hide this.  You just

22   testified that you deleted text messages because you

23   were afraid of being caught by your wife, right?

24   A    Sometimes.

25   Q    Well, you did delete text messages, right?

1  A    I did.

2  Q    Because you didn't want anyone to see those text

3  messages, right?

4  A    Didn't want my wife to see 'em, right.

5  Q    Sure.  Probably didn't want law enforcement to see

6  those text messages either, did you?

7  A    I don't mind.

8  Q    You don't mind the law enforcement would see all of

9  those text messages?

10  A    No.

11  Q    So you were happy to be arrested?

12  A    No.

13  Q    Right.  I know.

14        You were arrested.  Were you brought to the sixth

15  floor at some point, into lockup?

16  A    Yes.

17  Q    And then you were brought down for arraignment,

18  correct?

19  A    I believe, yes.

20  Q    Well, came into a courthouse, and you were

21  confronted with the federal charges against you.  That's

22  fair, right?

23  A    Yes.

24  Q    But you were released; is that right?

25  A    Yes.  On probation.

1   Q    On probation.  Or pretrial release maybe?

2   A    Yes.

3   Q    Same thing.

4        Mr. Julardzija, obviously one of those conditions

5   is that you don't possess or use any controlled

6   substances, right?

7   A    Correct.

8   Q    And yet not more than two weeks later, you tested

9   positive for the use of cocaine.  That's true, right?

10  A    Yes.

11  Q    Now, Mr. Martin was detained after his arrest.  Are

12  you aware of that?

13  A    Yes.

14  Q    So you obviously --

15           MR. GILMAN:  Objection.

16  Q    -- didn't get that cocaine from Mr. Martin, right?

17           MR. GILMAN:  Objection, your Honor.  I'm not

18  sure it's a really proper scope of cross at this point.

19           THE COURT:  Objection overruled.  Go ahead.

20  BY MR. MATSON:

21  Q    Safe to say you didn't get those drugs from Mr.

22  Martin, right?

23  A    I did.  That was cocaine left over that I had at

24  the house from him.

25  Q    Oh.  Did the police officers search your house?

```
1   A    No.
2   Q    No.  You were released, you did more cocaine, and
3   you claim that you got that cocaine from Mr. Martin?
4   A    From Mr. Martin, yes.
5   Q    Just to be clear:  Even though Mr. Martin had been
6   in custody for two weeks at that time, right?
7   A    Yes.
8   Q    Right.  And four days later, you were in the
9   government offices talking to the U.S. Attorney; is that
10  right?
11  A    Yes.
12  Q    You were warned, I'm sure, that your conditions of
13  release could be revoked if you were to violate any
14  terms and conditions, right?
15  A    That's correct.
16  Q    You violated the terms and conditions, right?
17  A    Yes.
18  Q    You did cocaine.  Correct?
19  A    Correct.
20  Q    But you weren't detained?
21  A    No.
22  Q    Right.  Instead, you were able to have a meeting
23  with the U.S. Attorney's Office and tell them about your
24  involvement; is that a fair statement?
25  A    Yes.
```

1    Q    Okay.  At some point, Mr. Julardziga, you must have

2    become familiar with the sentencing guidelines in

3    federal court?

4    A    Somewhat.

5    Q    Let's use a little common sense.  It's your

6    understanding people who are higher up in a drug scheme

7    face stiffer consequences, right?

8    A    I don't know.

9    Q    Sure.  Okay.  Well, let's take it.  A leader of a

10    cartel would get a lot of prison time, right?

11    A    Probably.

12    Q    And a user of drugs would get a lot less jail time,

13    right?

14    A    There's a possibility.

15    Q    Well, I mean, common sense would inform you that

16    that's the way the system works, right?

17    A    Sometimes.

18    Q    I mean, you are not completely ignorant of how

19    sentencing goes in federal court, are you?

20    A    I'm not ignorant.

21    Q    No, of course you're not.  And you are an

22    intelligent man.  You know how sentencing works, and you

23    know that higher-ups are going to get more prison time,

24    right?

25    A    I don't know that.

1    Q    Okay.  Well, I'll say this:  It seems like you do
2    because everything you have told to the government is
3    that you are a user, right?
4    A    I was using, yes.
5    Q    Sure.  And you weren't dealing, right?  That's what
6    you told them.
7    A    I was just helping Carl out.
8    Q    You were helping Carl out, okay.  You weren't
9    dealing drugs, Mr. Julardziga?
10   A    I was.
11   Q    Right.  And you were making money from dealing
12   drugs, right?
13   A    I did not.
14   Q    You did not.  Well, that's what you have told the
15   government, right?  Is that -- that's what you told the
16   government?
17   A    I did not.
18   Q    You did not tell the government that or you have
19   told the government that you didn't make money?
20   A    I didn't make money.
21   Q    Right.  Okay.  Well, let's get through that a
22   little bit.
23        In September 5th -- on September 5th, 2019, were
24   you having money problems?
25   A    Some.  I don't remember.

1          MR. MATSON:  Okay.  I'm going to be using the

2     overhead.

3          Judge, I am going to introduce an additional

4     exhibit that's been pre-marked as Defendant Exhibit D3.

5          THE COURT:  All right.  Is there any

6     objection?

7          MR. MATSON:  I will give the government just a

8     moment to review it.  It was produced to me in an Excel

9     sheet and I just made a PDF.

10         THE COURT:  Okay.

11         (An off-the-record discussion was held.)

12         MR. MATSON:  Your Honor, this came together

13    because it's a supplement to the texts that were

14    admitted today.

15         THE COURT:  All right.  Does the government --

16    you are offering Exhibit 3?

17         MR. MATSON:  I am, Judge.

18         THE COURT:  And does the government object to

19    Exhibit 3?  Or do you want a foundation laid?

20         MR. GILMAN:  No objection, your Honor.

21         THE COURT:  Pardon me?

22         MR. GILMAN:  No objection, your Honor.

23         THE COURT:  All right.  So admitted.

24         (Defendant's Exhibit D3 was received in

25    evidence.)

1          MR. MATSON:  Your Honor, may I approach the
2    witness?
3          THE COURT:  Yes.
4          MR. MATSON:  Thank you.
5    BY MR. MATSON:
6    Q   Mr. Julardziga, I am handing you what's now been
7    admitted into evidence as Defendant's D3.  I am going to
8    take a moment.  You can have a look at that.
9          Mr. Julardziga, do you recognize the communications
10   in that D3?
11   A   Yeah.  It's my number.
12        I don't, off the top of my head, no.
13   Q   Okay.  Well, let's look at a specific one then.  I
14   am going to turn to page five, and, Mr. Julardziga, I'm
15   going to turn this on so you can look at it as well.
16        MR. MATSON:  Madam clerk?
17        COURTROOM DEPUTY:  It should be on.
18        MR. MATSON:  It should be.
19        COURTROOM DEPUTY:  Have you selected
20   "document"?
21        MR. MATSON:  Yes.  Anyone but me can do it.
22        (Brief pause.)
23   BY MR. MATSON:
24   Q   Mr. Julardzija, please look at the screen there.
25   Now, you previously testified that your nickname,

1    Chango -- is that what you went by with Mr. Martin?

2    A    Yes.

3    Q    Do you see the box under column E where it says,

4    "Just enough in it -- just not enough in it for the

5    risk, broski."  Is that you?

6    A    That's me texting.

7    Q    Yeah.  Are you texting Carl Martin?

8    A    Yes.

9    Q    And it says, "I'll be working Monday come closer to

10   winter deicing airplanes like I used to."

11        You are in the aviation industry, Mr. Julardziga?

12   A    I was, yes.

13   Q    Okay.  "It will bring me an extra couple bucks here

14   and there to pay for bills.  We short 400 on the

15   mortgage."

16        Do you see that?

17   A    Yes.

18   Q    All right.  That indicates that money is an issue,

19   right?  Which is not uncommon.

20   A    Yeah, but it's okay.

21   Q    It's okay.

22        Continuing:  "She told me yesterday, just got the

23   fucking house and already short, but that's on me.  I

24   don't make enough to help out more, so I'll just have to

25   work extra Mondays soon in like next month or so.  You

1    know how it is."

2        You see that?

3    A    Yes.

4    Q    All right.  Continuing beneath it:  "This house

5    shit is killing me, but we love it and my little family

6    needed its own shelter, mon, like Bob Marley say."

7        You see that?

8    A    Yes.

9    Q    And that was you to Carl Martin?

10   A    Yes.

11   Q    So just safe to say, Mr. Julardziga, I mean, money

12   was an issue in September of 2019, right?

13   A    Yes, it was, because I was buying drugs from him

14   and wasting it there instead of my house.

15   Q    That's a great point, Mr. Julardziga, because when

16   you are having money problems, certainly spending money

17   on drugs doesn't help the money problems, right?

18   A    No.

19   Q    No.  Selling drugs would help your money problems,

20   though, wouldn't it?

21   A    Possibly.

22   Q    Yeah.  Again, money going out doesn't help; money

23   coming in helps.  You'd agree with that, right?

24   A    Yes --

25   Q    Okay.

1    A    -- but I didn't make a penny.

2    Q    Oh, I am just asking if you had the motivation to

3    sell drugs, and it appears that you did.  You'd agree

4    with that statement?

5    A    Yes.

6    Q    And then the text message next:  "Yeah.  I know, my

7    friend.  Just gotta be careful not to get too hungry.

8    This is a small world here.  Not all money is good

9    money.  And being too desperate can cloud one's

10    judgment.  You know how they said I been believing in

11    that since day one."

12        Is that you, Mr. Julardziga?

13    A    That is my text, yes.

14    Q    Yes.  And that certainly sounds like you were

15    making money off of drug deals, doesn't it?

16    A    No.

17    Q    Okay.

18        MR. MATSON:  Your Honor, can I take

19    defendant's exhibit back --

20        THE COURT:  Yes.

21        MR. MATSON:  -- and admit it into evidence.

22    We might revisit that.

23    BY MR. MATSON:

24    Q    The other thing that I heard in that text message

25    is that maybe you were perceiving some risk.  I mean,

1     you used the word "risk," right?

2     A     Right.

3     Q     Sure.  I mean, I'll just reread it for you.

4           "Yeah.  I know, my friend.  Just gotta be careful

5     not to get hungry.  This is a small world.  Not all

6     money is good money and being too desperate can cloud

7     one's judgment.  You know how I have been saying that

8     since day one."

9           Are you perceiving that there is some risk out

10    there in what you are doing?

11    A     I'm saying right there to him that he should slow

12    down before it's too late.

13    Q     Oh, not --

14    A     It's not --

15    Q     -- implicating yourself.  You're implicating Carl

16    Martin, right?

17    A     The text message is to him, yes.

18    Q     Oh, I understand.  Okay.

19          I tell you -- you just want to look at one more.

20          Beneath that, it says, "Facts," and that's Carl

21    Martin.  Is that right?  "Facts"?

22    A     Yes.

23    Q     And then you say, "I just don't wanna see you or me

24    in a bad position or locked up.  We got so much to do

25    with our kids and family to raise, you my brodder mang.

```
 1       I don't trust no one, especially crackers broski."
 2            You see that?
 3   A     I do.
 4   Q     Okay.  Carl Martin's African American, right?
 5   A     Yes.
 6   Q     All right.  "Broski," is that a term you use a lot?
 7   A     Yes.
 8   Q     All right.  Especially in text messages, right?
 9   A     Yes.
10   Q     So I am looking at what's previously been admitted
11   into evidence as Government Exhibit 97.  The Bates
12   number on this document is 2211.
13            This is September 6th, 2019, and the text message
14   that you previously talked about is -- that I am
15   interested in any way:  "My broski."  Is that you again,
16   Mr. Julardziga?
17   A     Yes.
18   Q     Okay.
19            "When you meet him, sit with him and tell him he
20   cool, man.  He could be selling a lot of shit, I think,
21   and guns will be for sale also.  My guess, ask him if
22   he's selling one all legally.  Just date back bill of
23   sale to 2016 so you don't have to go through gun shop
24   this way with new law."
25            Do you see that, Mr. Julardziga?
```

1    A    I do.

2    Q    Okay.  And that's your text messages to Carl

3    Martin, right?

4    A    Yes, it is.

5    Q    Who are you talking about there?  Sit down -- I

6    mean, with him.  Who is him?

7    A    Dan Lathrop, the pilot.

8    Q    Dan Lathrop.  Certainly sounds like Dan Lathrop is

9    selling drugs and guns, right?

10   A    No.

11   Q    No, okay.  Well, let's leave it there.

12        Mr. Julardziga, did you ever rob a Poker game?

13   A    No.

14   Q    You didn't rob a Poker game that Martin was at?

15   A    I did not.

16   Q    You did not?  You didn't use a gun, go in a Poker

17   game and steal some money around September of 2019?

18              MR. GILMAN:  Objection, your Honor.  The

19   witness has already answered.

20              THE COURT:  Yeah, objection overruled.  You

21   can answer that question.

22   A    The first time I've heard it, about this.  No.

23   Q    Okay.  October 23rd, during that transaction, did

24   you tell Mr. Martin, "Hand him that fanny pack in the

25   back"?

1    A    Did I tell Mr. Martin --

2    Q    Did you tell Mr. Martin, "Hand him that fanny pack

3    in the back seat"?

4    A    He knew it was in the back seat, so --

5    Q    I didn't ask that.  I said, did you tell Carl

6    Martin, "Hand him that fanny pack in the back seat"?

7    A    I did not.

8    Q    Okay.  That was your voice that asked about the

9    shell casings, the shell casings don't come out.  That

10   was you, right?

11   A    Yes.

12   Q    Okay.  You were looking for a .357 around this

13   time?

14   A    No, I wasn't.

15   Q    You weren't, okay.  Did you ever see a text message

16   earlier this morning that indicated you wanted a .357?

17   A    It wasn't that day, and I was -- I was going to

18   trade mine in for a .357 legally.  That was a gun he

19   also always wanted.

20   Q    Were you aware of any circumstances why Mr. Martin

21   couldn't buy a gun from a store?

22   A    No.

23   Q    Okay.  So it was your impression that he could buy

24   a gun from a store, right?

25   A    Yes.

1    Q    Yeah, legally.  Just like you.  Yes?

2    A    Yes.

3    Q    Okay.  You know, in addition -- let's get back to

4    the idea of sentencing, your conception of it.

5         You have to know that the person responsible for a

6    firearm in a drug transaction is in a lot of trouble,

7    right?

8    A    Yes.

9    Q    Okay.  And fair to say you have never taken

10   responsibility for that firearm, right?

11   A    Can you clarify that?

12   Q    You never told the prosecution, Actually, I was the

13   one looking for a firearm?

14        You never said anything like that, right?

15   A    I never was.

16   Q    No.  I get it.  You never were looking for anything

17   like a .357.  That's your testimony to me.  I mean,

18   fair?  That's what you just said, right?

19   A    The .357 was going to be for me at a gun shop

20   trade-in.  That's what I always wanted, to upgrade from

21   my -- from mine to a .357.

22   Q    Understand.  So back up to September 20th.

23   Actually, no.  We are going to have to go before that.

24   Let's go to the video.

25        Do you remember the video that you saw where you

1    approached the undercover's looks like driver's side

2    window and you had some conversation about shrimp?

3    A    Yes.

4    Q    And do you remember in that video it very

5    clearly -- and there was a transcript of it so I will

6    try and quote it.  And I'm just looking, for

7    identification purposes, at Government's Exhibit 7.

8        In that video you see, "You give me the cash" -- to

9    the undercover.  "You give me the cash and I go pick it

10   up in fucking Philly and fucking get my own shit and

11   pick it up."

12       Do you remember saying that to the undercover?

13   A    Yes.

14   Q    Okay.  At this point this is after those text

15   messages that I would say indicate you were a little bit

16   nervous.  Here you are, you said you'd go to "fucking

17   Philly and get my own shit," and just moments after, you

18   pointed to Carl Martin, didn't you?

19   A    That was his message.

20   Q    That was his message.

21   A    Yes.

22   Q    So you were quoting Carl Martin when you said that?

23   A    Yes.

24   Q    Okay.  So when you said, "You give me the cash,"

25   you meant, "You give me, Carl Martin, the cash."

1        That's what you are saying?

2   A    Yes.

3   Q    I think you caught yourself, and I think you said,

4   "Oopsy daisy, I'm nervous.  I'm going to blame Carl

5   Martin right now," because you did.  You pointed to him

6   and said, "Oh, I'm just the middleman."  Right?

7   A    No.  I just spoke the truth.

8   Q    I understand.  And I understand you were very

9   interested in just speaking the truth to the government.

10  But not once prior to your arrest did you report any of

11  this to law enforcement, right?

12  A    No.

13  Q    Mr. Julardziga, you've come a long ways.  You

14  immigrated to this country, right?

15  A    Yes.

16  Q    And, I mean, I just heard on the news when I was

17  here that you were fleeing a very bad, war-torn

18  situation in your home country; is that safe to say?

19  A    Yes.

20  Q    Okay.  And I understand.  And you came here and you

21  went to college, right?

22  A    Yes.

23  Q    Your family's here?

24  A    Yes.

25  Q    You got a wife --

1    A    Some.

2    Q    -- and you got kids?

3    A    Yes.

4    Q    And you made a pretty good life for yourself,

5    right?

6    A    It is all right.

7    Q    I mean, Mr. Julardziga, you were a friend to Carl

8    Martin, weren't you?

9    A    We were.

10   Q    I mean, Mr. Martin trusted you, didn't he?

11   A    Yes.

12   Q    Yeah.  At a personal level, right?

13   A    You could say that.

14   Q    Well, I mean, you gave him rides, right?

15   A    Yes.

16   Q    And sometimes you gave him rides to work, right?

17   A    Yes.

18   Q    He was a janitor?

19   A    Yes.

20   Q    And I think you said to the grand jury that he

21   didn't have a license because he was scared to drive?

22   A    That is correct.

23   Q    I mean, on top of that, you gave his kids rides as

24   well, right?

25   A    Him and his kids, yes.

1   Q    Yes.  Mr. Julardziga, I know that it's fine, you

2   are allowed to have a firearm, okay, and at times Mr.

3   Martin asked to borrow your firearm, right?

4   A    Yes.

5   Q    And during those times, because he was home alone

6   with his kids, right?

7   A    A couple of times, yes.

8   Q    And he said he was afraid, right?

9   A    Yep, in that context.  Not exactly "I'm afraid,"

10  but he seemed paranoid.

11  Q    Yeah.  Afraid for his personal safety; fair to say?

12  A    I guess.

13            MR. MATSON:  One moment, if I may, your Honor?

14            THE COURT:  Yes.

15            MR. MATSON:  Thank you.

16            (Brief pause.)

17  BY MR. MATSON:

18  Q    Just point of clarification.  Mr. Julardziga, you

19  say you met Mr. Martin in 2017?

20  A    Yes.

21  Q    Where was he living during that time?

22  A    He was living with his brother at Church Street.

23  Q    Okay.  Why do you believe that he was living with

24  his brother on Church Street?

25  A    Because I helped him move his stuff -- him and his

1    brother, their stuff to their new --

2    Q    So you are saying you helped Carl Martin and his

3    brother move into Church Street --

4    A    No.

5    Q    -- not from Church Street?

6    A    From Church Street.

7    Q    Okay.  Where were they moving to?

8    A    To Grey Birch.

9    Q    Mr. Julardziga, I just have a few more questions.

10         Mr. Julardziga, again, you and Mr. Martin talked a

11   lot about life in general over those text messages,

12   right?  It wasn't just the things that the government

13   was focusing on.  Again, you guys were friends, right?

14   A    Yes.

15   Q    Okay.  So let me bring you back to D3 at page five.

16         We left off where you said, "I just don't want to

17   see you or me in a bad position or locked up."  That's

18   where we left off.  Do you see that?

19   A    Yes.

20   Q    Okay.  It ends with, "I don't trust no one,

21   especially crackers, broski."  And I won't ask you what

22   crackers means.

23         Then you say, "You can still fuck with dude, but I

24   don't want to see him anymore.  Honestly just have that

25   weird feeling, you know."  You see that?

1    A    Yes.

2    Q    Okay.  So that's a little more what I am referring

3    to.  That's from Chango.  That's you, right?

4    A    Yes.

5    Q    And that's September 25th, 2019.

6         Continuing, Carl says, "That's facts, bro."

7         And you say, "Let's get that rent taken care of if

8    lawyer and take a vacation for a while from this BS.  I

9    know the money okay, but the risks not worth it.  After

10   all, they will always stick the minority, which is you

11   and Jah feel."  You see that?

12   A    Yes.

13   Q    Did you write that to Carl Martin?

14   A    Yes.

15   Q    And then you continue, after Carl says, "I feel

16   you, my brother," "That's all facts."

17        Your final text message looks like, "Let's pull

18   this plug.  Tell dude you're leaving to vacation for a

19   while.  You'll let him know when and if you come back,

20   business back on then again.  I say you can fuck with

21   them -- I fuck with them -- I fuck with him.  Still, I

22   won't especially after that message Mookie left.  You

23   never know.  Family will fuck you most.  Keep your eyes

24   open.  No trust, none of them.  Me love, my -- me

25   family, but no trust.  One of them have to take little

1    threats into consideration, my broski.  Whether you

2    believe 'em or not, you never know when the devil

3    strikes."

4         Those were your words, Mr. Julardziga?

5    A    Yeah.  I was telling him to stop doing what he was

6    doing with the undercover pretty much trying to --

7    Q    Mr. Julardziga, you never know when the devil

8    strikes.

9              MR. MATSON:  No more questions, Judge.

10              THE COURT:  Okay, any redirect?

11              MR. MATSON:  Actually, I better check with my

12    client.

13              THE COURT:  Okay.

14              (Brief pause.)

15              MR. MATSON:  No more questions, Judge.  Thank

16    you.

17              THE COURT:  Okay.  Any redirect?

18              MR. GILMAN:  Just briefly, your Honor.

19              THE COURT:  Okay.

20                      REDIRECT EXAMINATION

21    BY MR. GILMAN:

22    Q    Mr. Julardziga, you have never been charged with a

23    federal crime before, have you?

24    A    I have not.

25    Q    Are you very familiar with the federal criminal

1    process?

2    A    To some extent, yes.

3    Q    Is this your first go-round in the federal system?

4    A    It is.

5    Q    Have you ever been through a federal sentencing

6    before?

7    A    I have not.

8    Q    Do you understand what the sentencing guides are

9    thoroughly?  Sentencing guidelines are thoroughly?

10   A    Yes.

11   Q    I mean, do you understand them somewhat or are you

12   an expert in the sentencing guidelines?

13   A    I understand them somewhat.

14   Q    I want to turn your attention to the pilot, Daniel

15   Lathrop.  Was Daniel Lathrop selling drugs during this

16   time?

17   A    He might have.  I'm not sure, but I know he was

18   getting 'em.

19   Q    Sorry?

20   A    I know he was getting 'em, but I don't know if he

21   was selling 'em.

22   Q    Daniel Lathrop was using drugs, to your knowledge?

23   A    Yes.

24   Q    Now, I believe, in response to one of Mr. Matson's

25   questions, you said that Mr. Martin wanted a .357; is

1    that right?

2    A    Yeah.  That was always one of his dreams, to have

3    one of those.

4    Q    How do you know that?

5    A    He told me that.

6    Q    Mr. Matson also asked you about the times that Mr.

7    Martin asked for your firearm; is that right?

8    A    Correct.

9    Q    Okay.  And at the time Mr. -- I believe Mr. Matson

10   asked you that, suggested that Mr. Martin was afraid at

11   those times.  Is it your understanding that Mr. Martin

12   wanted that firearm for protection?

13   A    That was my understanding, yes.

14   Q    Now, we discussed your cooperation agreement

15   before.  Do you remember?

16   A    Yes.

17   Q    What is your understanding of what happens under

18   your cooperation agreement if you lie here today?  If

19   you don't tell the truth.

20   A    It's void.

21   Q    What does that mean, it's void?

22   A    Everything is canceled out.

23   Q    You don't get the benefit of the agreement?

24   A    Correct.

25            MR. GILMAN:  Nothing further at this time,

1    your Honor.

2              THE COURT:  Okay.  Any further recross?

3              MR. MATSON:  Briefly, Judge.

4              THE COURT:  Okay.

5              MR. MATSON:  I'm figuring three minutes.

6              THE COURT:  Okay.

7                        RECROSS EXAMINATION

8    BY MR. MATSON:

9    Q    I understand the agreement says you are to tell the

10   truth, right?  The cooperation agreement with the

11   government?

12   A    Yes.

13   Q    Conditions of release also said don't use drugs,

14   right?

15   A    Correct.

16   Q    You used drugs, right?

17   A    Once, yes.

18   Q    Yeah.  And you weren't detained.  The release

19   wasn't revoked, right?

20   A    Correct.

21   Q    Okay.  Now, your sentencing, I understand that you

22   haven't had it yet.  It was scheduled for before this

23   trial, right?

24   A    Correct.

25   Q    And it got moved when this trial moved, right?

1    A    Correct.

2    Q    And it got moved until after this trial, right?

3    A    I don't know yet, but --

4    Q    Okay.  Well, it hasn't happened yet, right?

5    A    It hasn't happened yet so.

6    Q    So it got moved until after you testified here,

7    right?

8    A    Yes.

9    Q    All right.

10            MR. MATSON:  Thank you.  No more questions.

11            MS. FULLER:  Your Honor, before we end, I

12    wonder if we could have a brief sidebar?

13            THE COURT:  You what?

14            MS. FULLER:  Before we end, I wonder if we

15    could have a brief sidebar?  It's relevant to what we've

16    heard just now.

17            THE COURT:  Okay.  I am going to turn the

18    husher on.

19    (The following was held at the bench.)

20            MR. GILMAN:  Your Honor, the government is

21    wondering if it would be appropriate for the Court to

22    instruct the jury that the jury should not draw any

23    conclusions as to the differing release statuses between

24    Mr. Julardziga and Mr. Martin following their

25    arraignment.  There's a lot of factors that go into

1    whether someone's detained or not pretrial, and Mr.

2    Matson's questions didn't fairly address that topic.

3            THE COURT:  I don't think it's necessary,

4    frankly.  First of all, that would open up -- that would

5    open up a whole Pandora's box about what the Court

6    considers and what it doesn't consider, and then the

7    defense would get back into, well, did the government

8    request, et cetera.  And I just don't think it's that

9    important, frankly, and -- to have a preliminary

10   instruction.

11       It's also sort of inappropriate because it really

12   emphasizes this particular area of examination when, in

13   fact, I don't think it's necessary.

14            MR. GILMAN:  Okay.  Thank you, your Honor.

15            THE COURT:  Okay.

16   (The following was held in open court.)

17            THE COURT:  All right.  Let's take our recess

18   at this point and see you at one o'clock.

19   (Court was in recess at 12:00 p.m.)

20   (The following was held in open court with the jury

21   present at 1:05 p.m.)

22            THE COURT:  Okay.  Good afternoon.  Is the

23   government ready to call its next witness?

24            MS. FULLER:  Yes, your Honor.  We call

25   Sergeant Francis Gonyaw.

<u>FRANCIS GONYAW,</u>

1

2          being first duly sworn by the courtroom deputy,

3          was examined and testified as follows:

4                    THE COURT:  Good afternoon, Sergeant Gonyaw.

5                    THE WITNESS:  Good afternoon, your Honor.

6                              DIRECT EXAMINATION

7     BY MS. FULLER:

8     Q    Good afternoon, Sergeant.

9     A    Good afternoon.

10    Q    Could you tell us your name for the record, please.

11    A    Yes.  Francis C. Gonyaw, G-O-N-Y-A-W.

12    Q    How are you employed?

13    A    With the Colchester Police Department.

14    Q    How long have you worked for them?

15    A    33 years.

16    Q    Do you work in any special capacity for them

17    currently?

18    A    For --

19    Q    You said you are a sergeant?

20    A    Yeah.  Currently my assignment is patrol sergeant.

21    Q    How long have you been been a patrol sergeant for

22    them?

23    A    Six, almost seven years.

24    Q    So you were a patrol sergeant back on February

25    17th, 2019?

1    A    Yes, I was.

2    Q    And were you working that day?

3    A    Yes, I was.

4    Q    So I want to take you back to an incident that

5    happened.  Did you have an occasion to respond to 192

6    Grey Birch Drive in Colchester?

7    A    Yes, I did.

8    Q    And was that for a warrant?

9    A    Yes, it was.

10    Q    All right.  Now, who was the subject of that

11    particular investigation?

12    A    Dennis Martin.

13    Q    So it wasn't Carl Martin?

14    A    That is correct.

15    Q    When you arrived on scene, did you have an occasion

16    to encounter Carl Martin?

17    A    I did.  And it was -- it was -- you know, it was

18    sometime after I had been there.

19    Q    Okay.  And where was Mr. Martin when law

20    enforcement encountered him?  Carl Martin.

21    A    He was in a vehicle.

22    Q    All right.  And was there a search at some point of

23    that particular vehicle?

24    A    Yes, there was.

25    Q    And describe for us what was found during the

1    search.

2    A    There was a Ruger 380 caliber -- I believe it was a

3    model LCP -- handgun that was recovered from the

4    passenger seat pocket in the back.

5    Q    All right.  Where was Mr. -- where was Carl Martin

6    sitting in relation to where the firearm was recovered?

7    A    So I wasn't there at the time when that was

8    actually recovered.

9    Q    Okay.  But you are familiar that it was in the back

10   seat of the car?

11   A    Yes.

12   Q    All right.  I am going to show you --

13              MS. FULLER:  Your Honor, we have stipulations

14   to the admission of Government's Exhibit 123 --

15              THE COURT:  Okay.

16              MS. FULLER:  -- and Exhibit 131 and 132.

17              THE COURT:  Okay.  So they are admitted.

18              MS. FULLER:  Thank you.

19              (Government's Exhibits 123, 131 and 132 were

20    received in evidence.)

21   BY MS. FULLER:

22   Q    So I am going to show you what's been admitted as

23   Government's 123 and ask you if you can identify that?

24   A    Yes.  This is the -- the handgun that was recovered

25   from the pocket of the passenger seat of the vehicle

1    from 192, and the last four match up to the serial

2    number that was from the weapons log.

3              MS. FULLER:  Okay.  Your Honor, if I could

4    just publish this to the jury?

5              THE COURT:  Yes.

6              (Government's Exhibit 123 was published to the

7    jury.)

8    BY MS. FULLER:

9    Q    Now, Officer -- or Sergeant, sorry, I see that on

10   here there appears to be a zip-tie with what looks to be

11   a magazine.  Can you tell us what condition this item

12   was found in when it was in the car?

13   A    So it was found with the magazine in the handgun,

14   and the magazine was closed.  The zip-tie was not part

15   of that.

16   Q    Okay.  So what is this zip-tie?  Why is that there?

17   A    That's just to secure the weapon and to keep it

18   open so you can see there's nothing in the chamber.

19   Q    And was the magazine loaded?

20   A    Yes.  There was ammunition in the magazine.

21   Q    Okay.  So did you have an opportunity after this

22   was recovered to speak with Carl Martin about the

23   recovery of the firearm?

24   A    I did.

25   Q    Okay.  And was that interview recorded?

1    A    Yes, it was.

2    Q    Have you reviewed that recording?

3    A    Yes, I have.

4    Q    And have you also reviewed a transcript of that

5    recording?

6    A    Yes, I have.

7    Q    Does the transcript accurately reflect what we are

8    about to hear on the recording?

9    A    Yes, it does.

10        MS. FULLER:  If we can play 131, please.  The

11   first part, please.

12       Sergeant, if you want to look at your screen.

13        THE WITNESS:  Yeah, I just noticed that.

14        (A digital recording was played in open

15   court.)

16   BY MS. FULLER:

17   Q    So, Sergeant, we hear two voices in that clip.

18   A    Yes.

19   Q    Is that right?

20       Can you tell us who the two voices are?

21   A    So I'm the interviewer, Francis Gonyaw, and Carl

22   Martin is the person I am interviewing.

23   Q    Okay.  He is in the car with you?

24   A    Yes.  He is in the car with me.  He is in the

25   passenger seat.  I'm in the driver's seat of the car.

```
1    Q    Okay.

2              MS. FULLER:  Can we play the clip, please.

3              (A digital recording was further played in

4    open court.)

5    BY MS. FULLER:

6    Q    And so just to be clear, the person who stated at

7    the end, "I like to have protection on me just in case,"

8    whose words were those?

9    A    That was Carl Martin.

10             MS. FULLER:  I have no further questions,

11   your Honor.

12             THE COURT:  Okay.  Any cross?

13                        CROSS EXAMINATION

14   BY MR. MATSON:

15   Q    Good afternoon, Officer Gonyaw.  Gonya?

16   A    Gonyaw.

17   Q    Gonyaw.  Sorry.

18   A    That's all right.

19   Q    Officer Gonyaw, I'm Chandler Matson.  I'm Carl

20   Martin's lawyer.  I'm just --

21        Prior to speaking with Mr. Martin in the

22   conversation we just heard, had you applied for a search

23   warrant of 192 Grey Birch?

24   A    Yes.

25   Q    Was that 192 Grey Birch searched that day?
```

1    A    Yes, it was.

2    Q    Let me ask you, did you learn that Carl obviously

3    lived there at 192 Grey Birch?  Right?

4    A    Yes.

5    Q    Was there any evidence of drug dealing found during

6    that search?

7    A    No, not -- I don't remember anything -- any drug

8    distribution.

9    Q    And you probably would have remembered something

10   like that.  Yes?

11   A    Yes.

12   Q    I mean, that's something --

13   A    Yes.

14   Q    -- police are concerned with obviously?

15   A    Yes.

16   Q    And just to be clear, we are talking about, you

17   know, no scales, right?  Nothing like that?

18   A    Correct.

19   Q    No --

20   A    No scales.

21   Q    No large amounts of cash?  Nothing like that?

22   A    Correct.

23   Q    No little baggie, you know, what they use to wrap

24   it in?  Nothing like that?

25   A    Correct.

1    Q    So when you talked to Mr. Martin, he was polite,

2    right?

3    A    Yes.

4    Q    And he was cooperative with you?

5    A    Yes.

6    Q    That last bit where he said, "Not to say I'm

7    necessarily scared," it sounded more like -- and tell me

8    if you took it a different way -- he was saying,

9    "Actually I'm a little bit scared and I like to carry a

10   firearm."

11   A    I don't know.  I don't really have a judgment to

12   offer on that.  I don't think it would be a fair

13   representation for me to try to comment what his thought

14   was.

15   Q    Understood.  I appreciate that.

16        While the police are searching his house, Carl

17   Martin's house, was Carl Martin objecting to any of

18   that?

19   A    No.

20   Q    No.  So he didn't contest the search warrant or

21   anything like that?

22   A    No.  Correct.

23   Q    And, in fact, did he go to work while the police

24   were searching the house?

25   A    I don't know.  I interviewed him.  He was in the

1    car still when I met up with him, that they were leaving

2    in, that we stopped, and he -- I know we talked about

3    work when I was talking with him.  I don't remember if

4    he was going to go to work afterwards or not.

5    Q    Did he say he worked at Northland Janitorial?

6    A    Yes, that sounds right.

7         MR. MATSON:  Okay.  Officer Gonyaw, I have no

8    further questions.  Thank you very much.

9         THE COURT:  Okay.  Any redirect?

10        MS. FULLER:  No, thank you.

11        THE COURT:  All right.  Thank you, Sergeant.

12        (Witness excused.)

13        THE COURT:  Okay.  The government want to call

14    the next witness.

15        MR. GILMAN:  Your Honor, the government calls

16    Daniel Lathrop.

17        THE COURT:  Okay.

18                    DANIEL LATHROP,

19        being first duly sworn by the courtroom deputy,

20        was examined and testified as follows:

21        THE COURT:  Good afternoon, Mr. Lathrop.

22                    DIRECT EXAMINATION

23    BY MR. GILMAN:

24    Q    Good afternoon, Mr. Lathrop.

25    A    Good afternoon.

```
 1    Q    You may remove your mask entirely.  Thank you.

 2         How old are you?

 3    A    42.

 4    Q    Where do you live?

 5    A    Eden, Vermont.

 6    Q    What is your current employment?

 7    A    I am a pilot.

 8    Q    I'm sorry?

 9    A    I'm a pilot.

10    Q    And where do you work as a pilot?

11    A    Aspire Management.

12    Q    Where is that located?

13    A    In Burlington.

14    Q    And how long have you been working there?

15    A    Since 2012.

16    Q    Just very briefly, what's your educational

17    background?

18    A    I have a Bachelor of Science, professional pilot

19    major.

20    Q    Sorry?

21    A    A Bachelor of Science.

22    Q    Okay.

23    A    And it's a professional pilot major.

24    Q    Okay.  Thank you.

25         Now, have you received a subpoena to appear here to
```

```
 1    testify?

 2    A    Yes, I have.

 3    Q    Are you testifying here under an agreement?

 4    A    Yes, I am.

 5    Q    And that's an agreement with the government?

 6    A    Yes.

 7    Q    What's your understanding of what you have agreed

 8    to under that agreement?

 9    A    To tell the truth, and I cannot be -- if I don't,

10    then I can be punished or tried to -- for any crimes I

11    may have committed, or -- not crimes, but -- I don't

12    know.

13    Q    Okay.  Well, I just wanted to make sure we have for

14    the jury your understanding of the agreement.  And so

15    what's your understanding of what the government has

16    agreed to do for you under that agreement?

17    A    As long as I tell the truth, not to come after me

18    for anything that I say.

19    Q    Okay.  Do you know an individual you know as -- you

20    have known as Dre?

21    A    Yes.

22    Q    Okay.  Do you see that person in the courtroom?  If

23    you could look around.

24    A    Yes.

25    Q    Could you identify him by where he is seated?
```

1    A    Over there with the red shirt.

2    Q    What color is the shirt?

3    A    Red, I think.

4         MR. GILMAN:  May the record reflect that the

5    witness has identified the defendant.

6         THE COURT:  Yes.

7    BY MR. GILMAN:

8    Q    When did you meet Dre?

9    A    Probably about 2018.

10    Q    Okay.  What if anything have you bought from him?

11    A    Cocaine.

12    Q    I want to take a step back and want to talk about

13    your use of cocaine.  When did you first use cocaine?

14    A    I tried it probably when I was about 20 the first

15    time.

16    Q    When was the next time you used cocaine?

17    A    It was probably about 17 years later, in about

18    2017.

19    Q    And what was your cocaine use from then till

20    approximately the fall of 2019?

21    A    A few lines here and there.

22    Q    Okay.  What quantities would you buy typically?

23    A    A ball or two at a time.

24    Q    Briefly, what was going on in your life at the

25    time?

1    A    I was going through a very tough ending of a

2    marriage.

3    Q    At one point during this time did you and a

4    co-pilot transport cocaine on the plane on an overnight

5    trip?

6    A    Yes.

7    Q    Did you use cocaine on an overnight stay during

8    that trip?

9    A    Yes.  It was a two-night stay.  The first night.

10   Q    Sorry?

11   A    Yes.  It was a two-night stay and we did it on the

12   first night.

13   Q    Okay.  As a pilot, do you have a license from the

14   Federal Aviation Administration?

15   A    I do.

16   Q    As part of that licensing process, do you have to

17   submit a medical certification?

18   A    I do.

19   Q    Does the medical certification include anything

20   with respect to drug use?

21   A    It does.

22   Q    What does it require with respect to drug use?

23   A    Ask if you are convicted or if you have used

24   controlled substances.

25   Q    Are you required to swear to the truth of the

1    responses on that medical certification?

2    A    Yes.

3    Q    Did you file false medical certifications with the

4    Federal Aviation Administration while you were using

5    cocaine?

6    A    Yes.  I misunderstood and I filed false, yes.

7    Q    Approximately how many times?

8    A    Two or three.

9    Q    Did you eventually correct those medical

10   certifications?

11   A    Yes, I did.

12   Q    How did that come about?

13   A    I was subpoenaed, so I contacted an attorney, and

14   he sat down and went through and figured out -- he

15   started looking into the medical stuff and

16   realized that -- I always thought it was "convicted,"

17   the question was "convicted," but there's a little part

18   in the bottom that says "or have used."  So after 20

19   years of doing -- or 15 years of doing these medical

20   things, I just kind of thought I knew all the questions.

21   So --

22        What was the question again?  Sorry.

23   Q    Well, just asking how it came about that you filed

24   the corrected medical --

25   A    Okay.

```
1    Q    -- certificates.

2    A    So when I reached out to an attorney, he was

3    like -- he thought about it for a minute, and he went --

4    pulled up the medical form, and we realized that I

5    had been falsifying.  So we got in touch with an

6    attorney that deals with this stuff and corrected all my

7    previous medical forms.

8    Q    Okay.  Were there consequences in your career --

9    A    Yes.

10   Q    -- as a result of the filing of these certificates?

11   A    Yes.

12   Q    What happened?

13   A    I was unable to renew my medical for at least a

14   year, and then I have to go see a therapist -- or a

15   psychiatrist once a year, and I have to see a special

16   medical examiner once every six months, and I have to be

17   in touch with him every three months.

18   Q    As part of that program, do you receive drug tests?

19   A    Yes.

20   Q    Have you had a positive test?

21   A    No, I have not.

22   Q    What happens if you test positive for the use of a

23   controlled substance?

24   A    I could lose my license for up to five years or

25   indefinitely.
```

1    Q    When, if ever, does this period of increased

2    supervision end?

3    A    In five years.

4    Q    I want to turn back to talking about the defendant,

5    Dre.  How did you meet him?

6    A    Through a mutual friend, Mirnes.

7    Q    How did you meet Mirnes -- is that Mr. Julardziga?

8    A    Yes.

9    Q    Okay.  If I can -- we can refer to him as Mirnes.

10   How did you meet Mirnes?

11   A    Through Heritage Aviation where he worked.

12   Q    Okay.  And is that near where you work?

13   A    Yes.  Nearby.

14   Q    When approximately did you meet Mirnes?

15   A    Somewhere approximately around 2017.

16   Q    Did you obtain cocaine from Mirnes?

17   A    I did.

18   Q    Approximately what period of time did you obtain

19   cocaine from Mirnes?

20   A    Probably about 2017 to 2019, 2020.

21   Q    How often did you obtain cocaine from Mirnes?

22   A    It was hit or miss.  Sometimes once a month,

23   sometimes less, maybe sometimes more.

24   Q    How much at a time of cocaine did you obtain?

25   A    I would buy either a ball or two.

1    Q    What is a ball?

2    A    I don't know the exact size.  About that.

3            MR. GILMAN:  Okay.  Let the record reflect the

4    witness has indicated a small circle with his fingers.

5            THE COURT:  Yes.

6    BY MR. GILMAN:

7    Q    Now, how did you communicate with Mirnes?

8    A    Text messages.

9    Q    And did you use any code words for cocaine?

10   A    He would use "basketball."

11   Q    When approximately did Mirnes introduce you to Dre?

12   A    I would say it was probably summerish of 2018.

13   Q    You said the summer of 2018?

14   A    Yeah.  Probably somewhere around there.

15   Q    Do you recall meeting Mirnes at a storage unit?

16   A    Yes.

17   Q    Where was that storage unit?

18   A    Out behind The Poor House in Burlington.

19   Q    Who else was there, if anyone?

20   A    One -- one of the times, Dre was there.

21   Q    Okay.  When Mirnes introduced you to Dre, what did

22   Mirnes say?

23   A    "If you -- this is my buddy.  If you ever need

24   anything and I'm not available, you can contact him."

25   Q    Okay.  Do you recall what Dre called Mirnes?

1    A    Chango.

2    Q    Over the time period of approximately 2017 through

3    the fall of 2019, how many times did you purchase

4    cocaine from Dre or Mirnes?

5    A    I would say probably maybe a total of 18 to 20

6    times.

7              MR. MATSON:  Objection, your Honor.  This is a

8    compound question and now it's not clear if he is

9    talking about Mirnes or he is talking about Dre.

10             THE COURT:  Well, objection overruled.  It can

11   be clarified on cross examination.

12   BY MR. GILMAN:

13   Q    How much did they charge you for a ball of cocaine?

14   A    Usually 300, sometimes 280.

15   Q    How did you arrange purchases, cocaine purchases,

16   through Dre?

17   A    Text.

18   Q    Okay.  When you met Dre to purchase cocaine, where

19   did you meet him at times?

20   A    Cottage Grove.

21   Q    And where is that?

22   A    It's by the airport.

23   Q    Was there anyone with him when you met him?

24   A    There was a time, I think -- Mirnes was with him,

25   but not -- not -- not always.

1    Q    There are times when you met just with Dre?

2    A    Yeah.

3    Q    What code words, if any, did you use for cocaine

4    with Dre?

5    A    "Plywood."

6    Q    Okay.

7    A    He did --

8    Q    How much --

9    A    He did use a female once or twice to deliver stuff

10    to me.

11    Q    Okay.  Thank you.

12         I'd like to show you what's in evidence as

13    Government's Exhibit 20 -- excuse me.  Government

14    Exhibit 124.

15         It's a little -- if you could look on the screen

16    over your shoulder.  Are you able to see the text?

17    A    It's a little blurry but I can make it out.

18    Q    Let's start with the first four rows.  Directing

19    your attention to these messages.

20    A    Okay.

21    Q    Well, sorry.  Before I get there, I just would like

22    you to say, do you recognize the -- this exhibit?

23    A    Yes.

24    Q    What is it?

25    A    It's a text message log.

```
 1    Q    Excuse me?
 2    A    It's a text message log?
 3    Q    Okay.  Between who?
 4    A    Looks like me and Dre.
 5    Q    Okay.  Do you see the phone number there?
 6    A    Yes.
 7    Q    Do you recognize that phone number?
 8    A    Yes.
 9    Q    Whose phone number's that?
10    A    Mine.
11    Q    Do you see the contact name next to the phone
12    number?
13    A    Yes.
14    Q    What is that name?
15    A    "Pilot."
16    Q    All right.  Directing your attention to the
17    messages from August 27th, 2019, I am going to ask you
18    to read -- well, rather, these are all from Mr. Martin,
19    so what I will do is I will read the messages from Mr.
20    Martin, and I will ask you when they come up to read the
21    messages that you sent.  That sound okay?
22         Could we blow up those rows one through four again.
23    BY MR. GILMAN:
24    Q    Okay.  On August 27th, 2019, "What's good?  I have
25    some plywood for you from Chango.  It's Jamaicaman.
```

```
1    Chango is also."
2         Just would like to go through this with you just
3    briefly.  The reference to plywood here, what's that
4    mean?
5    A    Cocaine.
6    Q    And Chango?
7    A    Mirnes.
8    Q    Sorry?
9    A    Mirnes.
10   Q    Okay.  And this text, "It's Jamaicaman," what did
11   you understand that to mean?
12   A    Dre.
13   Q    Directing your attention to rows seven through 30,
14   Government's Exhibit 124.  I am going to ask you to read
15   the messages you sent, and I'll read the messages Dre
16   sent.
17   A    "Yo.  Been busy boss.  How are you?"
18   Q    "I'm good.  I have some good plywood."
19   A    "You around today?  12?"
20   Q    "Yes, sir.  Need some plywood?"
21   A    "Yeah."
22   Q    "Wanna do lunch, broski?"
23   A    "Lunchtime.  Yes.  Not a whole sheet."
24   Q    "Okay.  Just hit me.  I'm close by."
25   A    "A third of sheet works."
```

1    Q    Okay.  Let me stop you there.

2         When you are talking about a whole sheet, what do

3    you mean?

4    A    A ball.

5    Q    Okay.  And what's one third of a sheet?

6    A    Be like a hundred dollars worth, whatever it came

7    out to.

8    Q    Okay.  Let's continue reading.

9         "Of course.  Come through and we can do that."

10   A    "Where you at?"

11   Q    "I'm the barbershop now if you wanna scoop me and

12   we go back to the house.  463 St. Paul Street."

13   A    "You know what?  I'm a little tight on time.  I

14   think I'm going to wait till Tuesday.  Will that work?"

15   Q    "Yes.  Crib in South Burlington."

16   A    "I'm just running a tight schedule."

17   Q    "No problem."

18        What were you and Dre doing in those messages?

19   A    Talking about a plan to meet.

20   Q    Meet for what purpose?

21   A    Cocaine.

22   Q    Sorry.  What about cocaine?

23   A    To purchase some cocaine.

24   Q    Okay.  Thank you.

25        All right.  Directing your attention to the

1    messages with Mr. Martin, Dre, from September 10th,

2    2019, let's look at rows 33 through 36 of Government's

3    Exhibit 124.

4         I'm going to ask you to read your messages; I'll

5    read Mr. Martin's.

6         "What time you thinking?"

7    A    "Got held up with work.  Thursday."

8    Q    "No problem.  I understand."

9         Okay.  Let's keep going.  Directing your attention

10   to your messages with Mr. Martin from September 12th,

11   2019, let's look at rows 39 to 46.  I guess we will just

12   start with 39 to 42.

13        "What time you thinking?"

14   A    "11:30."

15   Q    "Okay."

16        Sorry.  Oh, yeah, that is me.

17        "Okay.  One or two plywood."

18        And what date are those messages on?

19   A    9/12.

20   Q    What year?

21   A    2019.

22   Q    And when Mr. Martin wrote "one or two plywood,"

23   what does that mean again?

24   A    Cocaine.  One or two balls.

25   Q    Okay.  Let's continue on the next page, rows 43

```
1    through 46.

2         Okay.  How did you respond to the question, "One or

3    two"?

4    A    "One."

5    Q    Sorry?

6    A    "One."

7    Q    Can you keep reading?

8    A    Oh.

9         "Where you at?"

10        Sorry for that.

11   Q    "12 Cottage Grove Ave., South Burlington."

12   A    "Here."

13   Q    Now, that address, 12 Cottage Grove, do you

14   recognize it?

15   A    Yes.

16   Q    What is that address?

17   A    It's a little white apartment building that's in

18   Burlington.

19   Q    Okay.  Have you met Dre there?

20   A    I have.

21   Q    From these messages, does it appear that you met

22   Dre on September 12th, 2019?

23   A    It does, yes.

24   Q    At the time, what car were you driving?

25   A    I believe it was a Tundra.
```

1    Q    What color?

2    A    Blue.

3    Q    And is that a Toyota?

4    A    Yes.

5    Q    Would anyone have been with you that day?

6    A    I don't believe so, no.

7    Q    Did you ever bring anyone to purchase cocaine from

8    Dre?

9    A    No.

10   Q    Let's go to your messages with Mr. Martin from

11   October 3rd, 2019.  Let's continue at rows 58 to 76.

12        I'll ask you to read your messages; I'll read

13   Mr. Martin's.

14        October 3rd, 2019:  "I'll give you two plywood for

15   the price of one."

16   A    "Sounds good."

17   Q    "Way.  WYA."

18   A    "Airport.  You available now?"

19   Q    "I'm downtown.  Would have to drive home.  Are you

20   available to pick me up?"

21   A    "I'm on a time crunch now.  Crap."

22   Q    "I could come to you in like 30 minutes.  WYA."

23   A    "Let me see what I can do."

24   Q    "I'm in SB WYA."

25        Sorry.  What did you understand that message, "I'm

1    in SB WYA," to mean?

2    A    South Burlington.

3    Q    And WYA?

4    A    Where you at.

5    Q    Okay.  How did you respond?

6    A    "Taking off.  You around Sunday?"

7    Q    "What time?  I'll make time for you.  Just tell me

8    when."

9    A    "1:30, 1:45-ish."

10   Q    "Yes.  I will be in Colchester.  Or I can meet you

11   somewhere."

12        Let's continue with October 5, 2019, rows 79 to 83.

13        I'll read Mr. Martin's messages; I will ask you to

14   read yours.

15        October 5th, 2019:  "Still good for tomorrow?"

16   A    "Yes.  10."

17   Q    "Gotcha."

18   A    "Thanks."

19   Q    "No problem."

20            MR. GILMAN:  Let's go to October 6th, the next

21   day, rows 86 to 91.  We'll take 86 first.  Okay.

22   Excellent.  All right.

23   BY MR. GILMAN:

24   Q    October 6th, 2019:  "What's good?"

25   A    "Plugging away.  Where I saw you last time?"

1    Q    "Yes."

2    A    "There in two."

3    Q    "Okay."

4         Now, does it appear that you planned to meet with

5    Mr. Martin --

6    A    Yes.

7    Q    -- on that day?

8    A    Yes.

9    Q    When you said, "There in two," what did you mean?

10   A    Two minutes.

11        MR. GILMAN:  Let's go to the final messages,

12   the three final messages on that page.  Higher up.

13        LIZA LABOMBARD:  94.

14        MR. GILMAN:  Yes, 94 and down.  Thank you.

15   BY MR. GILMAN:

16   Q    I will read these messages which appear to be --

17   which appear -- all appear to be from Mr. Martin.

18        October 9th, 2019:  "Everything good?"

19        October 12th, 2019:  "What's good?  I have some wat

20   better plywood."

21        When Mr. Martin texted you "plywood," what did you

22   understand that to mean?

23   A    Cocaine.

24   Q    October 22, 2019:  "What's good, my guy?"

25        Now, when Mr. Martin reached out to you, what was

1    your understanding of what he was trying to do when he

2    reached out to you with that "What's good my guy"?

3    A    Sell me some cocaine.

4              MR. GILMAN:  One moment, your Honor.

5              THE COURT:  Yes.

6              (Brief pause.)

7              MR. GILMAN:  Nothing further at this time,

8    your Honor.

9              THE COURT:  Okay.  Any cross examination?

10             MR. MATSON:  Yes, Judge.

11                    CROSS EXAMINATION

12   BY MR. MATSON:

13   Q    Good afternoon, Mr. Lathrop.  Is that Lathrop or --

14   A    Yeah, that's fine.

15   Q    I'm Chandler Matson.  I'm Carl Martin's attorney.

16        So, Mr. Lathrop, you said that you purchased drugs

17   from Mirnes Julardziga; is that right?

18   A    Approximately.

19   Q    Well --

20   A    Yes.

21   Q    Okay.  All right.  Sorry.  The "approximately," I

22   wasn't sure you understood my question, but you did.

23        Mr. Julardzija and you took a fishing trip at some

24   point to Pulaski; is that right?

25   A    Yes.

1    Q    When was that?

2    A    I believe it was probably in 2017.

3    Q    Okay.  So you and Mr. Julardzija were -- you're

4    friends, right?

5    A    Yes.

6    Q    And you are co-workers?

7    A    He worked for a different company, but yes.

8    Q    Okay.  Did you ever work for Heritage Aviation?

9    A    No.  I would ferry airplanes for them once in a

10   while but I didn't really work for them.

11   Q    Okay.  Got it.  Ferry airplanes, can you just

12   explain what that means?

13   A    Yeah.  So if their maintenance shop -- somebody

14   needed an airplane moved, the maintenance guys would

15   call and ask me if I'd move an airplane for the

16   airplane's owner.

17   Q    So in 2017, what was your job title?

18   A    I was a pilot.

19   Q    At some point were you the instructor?

20   A    Yes.

21   Q    Were you the chief instructor?

22   A    I was.

23   Q    2017?

24   A    Yes.

25   Q    Into 2018 as well?

1    A    Yes.

2    Q    So was that fishing trip to Pulaski that -- is that

3    when you first started doing cocaine again?

4    A    Yes.

5    Q    I understand you filled out some forms with the FAA

6    where you did not disclose that you were doing cocaine,

7    right?

8    A    Yes.

9    Q    You said at one point you were subpoenaed and

10   that's when you decided to readdress this; is that

11   right?

12   A    Yes.

13   Q    I just -- all I want to know is not subpoenaed and

14   anything related to this case, right?

15   A    Subpoenaed in relation to this case.

16   Q    Okay.  So you received a subpoena from the U.S.

17   Government; is that right?

18   A    Yes.

19   Q    And at that point you decide to what?  Look back at

20   all of your application forms and make sure they're

21   accurate?

22   A    I reached out to an attorney.

23   Q    And your attorney said you better make sure those

24   applications are accurate?

25   A    We need to take a look at that and amend them, yes.

1    Q    I mean, you were aware that the applications were
2    under the pains and penalties of perjury?  That part of
3    the application was clear?
4    A    Yes.
5    Q    You didn't think the cocaine use was something the
6    FAA might want to know about?
7    A    I thought it was "convicted."
8    Q    And, Mr. Lathrop, I'm not trying to trip you up,
9    but you don't think that the FAA might be concerned that
10   a pilot is using cocaine?
11   A    Yes.
12   Q    Yeah.  And, again, I'm not -- I am just trying to
13   get down to your understanding.
14       So, Mr. Lathrop, I mean at that point did you have
15   a problem with cocaine?  Was it sort of a social thing?
16   A    No.  I didn't have a problem.  It was just rough
17   end of my marriage.
18   Q    I understand.
19   A    I was in a dark place.
20   Q    But it wasn't a daily use thing where you wanted --
21   it was socializing, partying, whatever?  That type of a
22   drug?
23   A    Yes.
24   Q    Right?  Not a daily "I wake up in the morning and I
25   can't get out without it"?

1    A    No.

2    Q    Got it.  So you received the subpoena in 2019, it

3    sounds like, right?  When's the first time that you met

4    with the government?

5    A    I believe it was in December of 2019.

6    Q    All right.  Did you tell -- or talk to

7    Mr. Julardziga about the subpoena and your talking to

8    the government?

9    A    Did I talk to him about the -- who?  No.

10   Q    Mr. Julardziga.

11   A    No, I did not.

12   Q    Sorry.  Julardziga.  And I have trouble with it,

13   so -- and I apologize.

14   A    No, I have not.

15   Q    Have you ever talked to Mr. Julardziga about these

16   proceedings, anything to do with this case?

17   A    I have not.

18   Q    All right.  Has he attempted to contact you?

19   A    He has not.

20   Q    All right.  How much money do you think you gave to

21   Mr. Julardziga for drugs?

22   A    I wouldn't know.

23   Q    The term "plywood," is that a term that

24   Mr. Julardziga ever used to refer to drugs?

25   A    No.

1    Q    Okay.  What about "fish"?  Was that term ever used?

2    A    No.

3    Q    "Scales."  Was that term ever used?

4    A    No.

5    Q    Did you text quite a -- scratch that.

6         2017 and 2018, did you text quite a bit with

7    Mr. Julardziga?

8    A    I don't remember.

9    Q    Do you remember if "broski" was a term he used an

10   awful lot?

11   A    Yes.

12   Q    I noticed in the grand jury testimony -- and I

13   apologize.  Let me orient you to it.

14        Did you testify before the grand jury in January

15   16th of 2020?

16   A    I think -- yeah, that's when it was.  Yeah, that's

17   probably when it was.

18   Q    And did you say that Julardziga first introduced

19   Carl Martin as his buddy; is that right?

20   A    Yes.

21   Q    Also in that grand jury testimony, at some point --

22   and you were under oath during that testimony, right?

23   A    Yes.

24   Q    At some point did you inform the prosecution and

25   the grand jury that you had actually flown with drugs?

1    A    Yes.

2    Q    And you flew from Vermont to St. Louis; is that

3    right?

4    A    Yes, I believe.

5    Q    I don't know because I am not in the industry, but

6    needless to say, isn't transportation of drugs a pretty

7    serious offense in the aviation world?

8    A    Yes.

9    Q    Does the FAA know about that?

10   A    I believe they do.

11   Q    Did you report it to the FAA?

12   A    I don't know.

13   Q    Okay.  Why do you believe that they do?

14   A    I don't.

15   Q    Has the FAA ever contacted you about that?

16   A    No.

17   Q    And the U.S. Government has talked to you about

18   your agreement, but let's make it simple.  The U.S.

19   Government has granted you immunity for these drug

20   crimes that occurred in 2017 and 2018; is that right?

21   A    Yes.

22   Q    Okay.  Meaning they will not prosecute you for

23   those crimes, right?

24   A    Yes.

25   Q    And you still have your commercial pilot license,

1    right?

2    A    Yes.

3    Q    And I'm not making any untoward suggestions but

4    just saying, that license means the world to you,

5    doesn't it, Mr. Lathrop?

6    A    It does.

7    Q    Okay.

8          (Brief pause.)

9          MR. MATSON:  Excuse me, Mr. Lathrop.  I have

10    no more questions.  Thank you.

11          THE COURT:  Any redirect?

12          MR. GILMAN:  No, your Honor.  Thank you.

13          THE COURT:  Okay.  Thank you, Mr. Lathrop.

14          (Witness excused.)

15          THE COURT:  All right.  The government want to

16    call the next witness.

17          MR. GILMAN:  Yes, your Honor.  The government

18    calls Frank Scalise.

19                    FRANK SCALISE,

20      being first duly sworn by the courtroom deputy,

21      was examined and testified as follows:

22          THE COURT:  Good afternoon.  Is it "Agent"

23    Scalise?

24          THE WITNESS:  Corporal currently, sir.

25          THE COURT:  Corporal.

```
 1              THE WITNESS:  Thank you.
 2                      DIRECT EXAMINATION
 3    BY MR. GILMAN:
 4    Q    Good afternoon, Corporal Scalise.
 5    A    Good afternoon.  Thank you.
 6    Q    Who do you work for currently?
 7    A    The Milton Police Department.
 8    Q    And what's your title?
 9    A    Corporal.
10    Q    And how long have you been with the Milton Police
11    Department?
12    A    Approximately 12 years.
13    Q    During your time with the Milton Police Department,
14    were you ever assigned to the Drug Enforcement
15    Administration?
16    A    Yes.
17    Q    Is that also known as the DEA?
18    A    Yes.
19    Q    What was your assignment there?
20    A    I was a task force officer there detecting
21    narcotics violations both federal and state for
22    approximately two and a half years there.
23    Q    What time period were you assigned to the DEA?
24    A    April of 2019 to October 2021.
25    Q    And where were you assigned within the DEA?
```

1    A    At the Burlington, Vermont, office.

2    Q    Now, were you involved in an investigation

3    involving Carl Martin?

4    A    Yes.

5    Q    Can you briefly describe some of your involvement

6    in that investigation?

7    A    Sure.

8        We provided assistance to the ATF with surveillance

9    and drug evidence.

10    Q    Did you also assist in GPS tracking?

11    A    We did.

12    Q    Do you recall what vehicle was the subject of the

13    trafficking at that time?

14    A    Yes.  A Chevrolet Equinox.

15    Q    Do you recall who it was registered to?

16    A    I knew it was associated with Mr. Julardziga.

17    Q    Now, at times did you perform surveillance with the

18    ATF?

19    A    Yes.

20    Q    And at other times did you perform surveillance

21    just with the DEA?

22    A    Yes.

23    Q    Okay.  I want to direct your attention to September

24    12th, 2019.  Were you working that day?

25    A    I was.

1    Q    What were you doing?

2    A    Conducting surveillance in the area of Cottage

3    Grove in South Burlington.

4    Q    Do you remember the approximate time of day that

5    was?

6    A    Approximately 11, 11:30.

7    Q    Were you familiar with the area of 12 Cottage Grove

8    in South Burlington?

9    A    Yes.  We knew it to be associated with Mr. Martin.

10   Q    Directing your attention to that day on September

11   12th, 2019, what did you observe during your

12   surveillance?

13   A    At that time I observed the Chevy Equinox parked

14   near the rear of the building at the common door.

15   Q    What, if anything, did you observe next?

16   A    And after that, I observed Mr. Julardziga and then

17   a male consistent with Mr. Martin near that Chevy

18   Equinox.

19   Q    What did Mr. Julardziga and Mr. Martin appear to be

20   doing?

21   A    Appeared to be waiting for someone.  Mr. Julardziga

22   was smoking and the male subject, Mr. Martin, was

23   walking back and forth.

24   Q    What, if anything, did you observe next?

25   A    At that point a blue Toyota Tundra pulled in the

1    rear parking area of the Cottage Grove complex out of my
2    sight.
3    Q    Do you recall the approximate time you observed
4    that?
5    A    I'd have to reference my report.
6    Q    Okay.
7              MR. GILMAN:  Your Honor, may I approach?
8              THE COURT:  Yes.
9    BY MR. GILMAN:
10   Q    I'm showing you for identification Government
11   Exhibit 81.  I will just ask you to read this exhibit to
12   yourself, see if it refreshes your recollection.
13   A    Thank you.
14        Yes.  So at approximately 11:38 is when the blue
15   Toyota Tundra pulled in.
16   Q    Okay.  What did you observe with respect to the
17   blue Toyota Tundra?
18   A    It parked out of my view, and then another white
19   male appeared to be interacting with Mr. Julardziga and
20   the male consistent with Martin.
21   Q    What happened -- what did you observe after that?
22   A    After that, that male disappeared out of my view
23   and the blue Tundra left the complex.
24   Q    At that time did you observe the license plate of
25   the blue Toyota Tundra?

1    A    I did.  The Tundra drove towards Williston Road.  I

2    was able to observe and confirm the license plate as

3    well as observe the white male operator of the Tundra.

4    Q    Okay.  Did you follow the Tundra?

5    A    I did not.

6    Q    Did you -- what did you observe next?

7    A    The Tundra then turned around, then drove out of my

8    view, and then at that point the Chevy Equinox pulled

9    out of the complex.

10   Q    Okay.  Where did you observe the Chevy Equinox go?

11   A    The Equinox then traveled down Williston Road

12   towards the airport and at that point out of my view.

13   Q    From that license, did you determine to whom the

14   blue Toyota Tundra was registered?

15   A    Yes.  Mr. Daniel Lathrop.

16   Q    Did you later view a picture of Mr. Lathrop?

17   A    I did.

18   Q    What, if any, observation did you make with respect

19   to that picture and your observations of the person in

20   the blue Toyota Tundra?

21   A    I found it to be consistent to be the same person.

22   Q    Thank you.  I am going to switch to talking about

23   some of the drug evidence in this case.

24   A    Yes.  Thank you.

25            MR. GILMAN:  May I approach, your Honor?

```
 1                    THE COURT:  Yes.
 2   BY MR. GILMAN:
 3   Q    I am providing you with what's been admitted as
 4   Government Exhibit 66 and Government Exhibit 69.
 5        Before today, did these exhibits come into your
 6   possession?
 7   A    Yes.
 8   Q    Come into the DEA's possession?
 9   A    Yes, sir.
10   Q    Okay.  When and from whom?  I have a report, if
11   you'd like.
12   A    Yes, sir.  That would be easiest to refresh my
13   memory.
14   Q    Okay.
15   A    Thank you.
16              MR. GILMAN:  I am going to provide the witness
17   with what's identified as Government Exhibit 84 and 85.
18              THE COURT:  All right.
19              MR. GILMAN:  May I approach?
20              THE COURT:  Yes.
21              THE WITNESS:  Yes, sir.
22        So both of these exhibits were turned over to
23   myself and Special Agent Hope on September 16th, 2019.
24   BY MR. GILMAN:
25   Q    And who turned them over to you?
```

1    A    ATF Special Agent Brian Wood.

2    Q    Okay.  Do Government Exhibits 66 and 69 appear in

3    substantially the same condition as when you received

4    them?

5    A    Yes, aside from the lab markings and resealing.

6    Q    Okay.  After DEA received those exhibits, what does

7    DEA do with them?

8    A    We package them in these bags as seen, have them

9    signed by two and then sealed at the same time in our

10    presence.

11    Q    Okay.  And afterwards, are they typically submitted

12    to the laboratory for testing?

13    A    Yes.

14    Q    Does it appear these were submitted to the

15    laboratory?

16    A    Yes, sir.

17    Q    Okay.  Great.

18         MR. GILMAN:  I'm going to retrieve those

19    exhibits.

20         THE COURT:  Yes.

21         MR. GILMAN:  I have Government Exhibits 70 and

22    75 in evidence.  May I approach, your Honor?

23         THE COURT:  Yes.

24    BY MR. GILMAN:

25    Q    Do you recognize these?

1      A     I do.

2      Q     Okay.  Before today, did these exhibits come into

3      your possession?

4      A     Yes, sir.

5      Q     Let's address Exhibit 70 first.  Do you recall when

6      Exhibit 70 came into your possession?

7      A     I'd have to reference that report as well, sir.

8                MR. GILMAN:  Let the record reflect I'm

9      providing the exhibit -- what's been marked for

10     identification as Government Exhibit 86 and 87 to

11     refresh recollection.  May I approach?

12               THE COURT:  Yes.

13               THE WITNESS:  Thank you.

14     BY MR. GILMAN:

15     Q     Let's start with Government Exhibit 70 after you

16     have had a chance to review your report.

17     A     Yes, sir.

18               So on October 1st, 2019, Government Exhibit 70 was

19     turned over to myself and Agent Hope by ATF Special

20     Agent Sam Brown.

21     Q     Okay.  Now, what did DEA do with that exhibit after

22     receiving it?

23     A     Sealed in said package here and signed by both

24     myself and Agent Hope.

25     Q     Does that exhibit appear in substantially the same

1    condition as when you received it?

2    A    It is, aside from the lab markings and resealing.

3    Q    After you received that exhibit, what did you do

4    with it?

5    A    Maintained custody and control of it until we

6    mailed it out to the DEA lab.

7    Q    And the DEA lab tests for the presence of

8    controlled substances?

9    A    Yes, sir.

10   Q    Let's turn to Exhibit 75.  Do you recognize that

11   exhibit?

12   A    I do.

13   Q    Before today, did that exhibit come into your

14   possession?

15   A    Yes, sir.

16   Q    When and from whom?

17   A    So on September 16th, 2019, Special Agent Brian

18   Wood with ATF turned this exhibit over to myself and

19   Special Agent Hope.

20   Q    If you could read the full chain in that report

21   description.  Well, rather, read it to yourself.

22   A    Yes, sir.

23   Q    Okay?

24   A    Yes, sir.

25   Q    So what date again did you receive that exhibit?

```
 1    A     I'm sorry.  This is the incorrect report here.
 2    Q     Oh.
 3    A     This is for exhibit -- DEA Exhibit 8.
 4    Q     Oh, I apologize.  Oh, thank you.
 5    A     Apologies, sir.  Sorry.
 6    Q     No.  Sorry.
 7               MR. GILMAN:  Apologies, your Honor.  I am
 8    providing the witness now with Government's Exhibit 87
 9    for identification.
10        I apologize.  Thank you.
11               THE WITNESS:  Thank you.
12               MR. GILMAN:  Okay.
13               THE COURT:  I actually thought you gave him 86
14    and 87 before.
15               MR. GILMAN:  And I think I mistakenly gave him
16    two copies of 86.
17               THE COURT:  I see.  Okay.
18               MR. GILMAN:  Okay.
19               THE WITNESS:  My apologies.
20        So this exhibit was turned over on December 9th,
21    2019, by ATF Special Agent Sam Brown.
22               MR. GILMAN:  Okay.
23               THE WITNESS:  And that was to myself and TFO
24    Christopher May.
25    BY MR. GILMAN:
```

1    Q    And after you received that exhibit, what did you

2    do with it?

3    A    Same as the others.  We packaged it, signed and

4    sealed, until it was mailed to the DEA lab.

5    Q    Okay.  And the DEA lab tested for the presence of

6    controlled substances?

7    A    Yes, sir.

8              MR. GILMAN:  May I have a moment?

9              THE COURT:  Yes.

10             (Brief pause.)

11             MR. GILMAN:  No further questions at this

12   time.  Thank you.

13             THE COURT:  Okay.  Any cross examination?

14             MR. MATSON:  No questions, your Honor.

15             THE COURT:  All right.  Thank you, Corporal.

16             THE WITNESS:  Thank you, sir.  Have a good

17   day.

18             (Witness excused.)

19             THE COURT:  All right.  You want to call the

20   next witness?

21             MS. FULLER:  Your Honor, we do have a next

22   witness, but I wonder if we could have a sidebar before

23   that witness comes in?

24             THE COURT:  Okay.  You want to approach?  I'm

25   going to turn the husher on, so you are free to stretch.

1    (The following was held at the bench.)

2              THE COURT:  Is this going faster than

3    expected?

4              MS. FULLER:  It is.

5              THE COURT:  How did I figure that out?

6              MS. FULLER:  Well, no.  Only that your Honor

7    said the other day you want to have a factual proffer

8    before one of the witnesses took the stand.  I believe

9    that witness is here, but we would need to -- we want to

10   give your Honor that factual proffer before he gets on

11   the stand, so I don't know if you want to do it here or

12   outside the presence of the jury.

13             THE COURT:  I think we probably should do it

14   in open -- well, the jury will be returned to the jury

15   room, and we will just do that quickly.

16             MS. FULLER:  Okay.

17   (The following was held in open court.)

18             THE COURT:  All right.  I need to speak with

19   the lawyers just for a few minutes, so I am going to

20   permit you to go back to your room and relax.  Okay.

21   (The jury was excused after which the following was held

22   in open court at 2:05 p.m.)

23             THE COURT:  Okay.  If you can make a proffer

24   as to what the witness would testify to.

25             MS. FULLER:  Thank you, your Honor.

1    The witness would be Peter Nguyen.  Mr. Nguyen has
2    pleaded guilty, and the reason why I am telling you this
3    is it's relevant to the facts of this case.
4    He has pleaded guilty in state court to aggravated
5    assault.  Mr. Nguyen was present at the scene of a
6    homicide with a person named Octavious Allen-Napier.
7    Mr. Napier is Mr. -- is either related through blood --
8    is very closely connected to Mr. Martin.
9    So what Mr. Nguyen is prepared to testify to is
10   that Mr. Nguyen was present with Octavious Allen-Napier
11   and Mr. Martin on or approximately October 10th, 2019,
12   into the 11th, and he was part of the attempted robbery
13   of ca ertain person in Burlington.  Mr. Nguyen was there
14   with Mr. Martin.
15   Mr. Nguyen will testify that Mr. Nguyen, Mr.
16   Martin, Mr. Napier were all armed and that the robbery
17   ultimately didn't happen for reasons that he will
18   explain.  He said, you know, it took too long, they got
19   scared, they left.
20   He will also identify a picture in which there were
21   two guns in this picture recovered from Mr. Martin's
22   phone.  So there's a picture on Mr. Martin's phone of
23   two particular firearms.  Mr. Nguyen will say, "Those
24   are my firearms."  One of the firearms was later used by
25   Octavious Allen-Napier in a homicide on North Street

1    here in Burlington.

2         My intent was to try to cabin very closely just

3    sticking to the fact of the robbery, the fact that he

4    observed Mr. Martin in possession of a firearm in and

5    around the time of the robbery.  I did intend to elicit

6    that he had been charged with aggravated assault in

7    state court.  I wasn't going to get into the facts of

8    that because Mr. -- you know, Octavious Allen-Napier's

9    name will come up in -- I expect would come up in

10    connection with this attempted robbery.  So I didn't

11    want to elicit the facts of the homicide because of some

12    close connection with the defendant.

13              THE COURT:  Okay.  All right.

14              MS. FULLER:  He is -- Octavious Allen-Napier

15    will also come up in the testimony of Special Agent

16    Brown where there was another incident where the

17    defendant was present with Mr. Napier and there was a

18    firearm found.  So, I am trying to --

19              THE COURT:  So what's the date of this?

20              MS. FULLER:  This incident that he will

21    testify about is October 10th into the 11th, 2019.

22              THE COURT:  Okay.  All right?  So let me just

23    make sure that I understand at least in terms of your

24    objection.

25         The government is seeking to introduce this

1    particular incident in which Mr. Nguyen would testify

2    that they had planned to commit a robbery.  All three

3    were in possession of firearms.  This is in October of

4    2019, which is right just two weeks before they were

5    arrested.  Obviously it's being offered for

6    predisposition.

7        The government is saying that they will make every

8    effort not to mention the fact that -- of the homicide

9    that Mr. Nguyen is -- may be testifying as a witness in

10   regard to the homicide, because that has nothing to do

11   with Mr. Martin.

12       So they are going to make a real clear effort of

13   saying this is the incident that they are describing,

14   and the purpose of the incident would be just to show

15   predisposition to possessing a firearm.

16       And I assume that you would not have any objection

17   to some instruction to the jury at the close of the

18   evidence that these other crimes here are not in any way

19   related to show that the defendant is a violent person.

20   This is all introduced to show predisposition to possess

21   a firearm.

22            MS. FULLER:  From the government's

23   perspective; yes, your Honor.

24            THE COURT:  Right.  Okay, and so what

25   objection do you have to this?

1          MR. MATSON:  Well, you have already heard it

2    and rejected it.

3          THE COURT:  Pardon me?

4          MR. MATSON:  You've already heard it and

5    rejected it.

6          THE COURT:  Right, I have.

7          MR. MATSON:  I'll put it forward again.

8      You know, again, I do understand the predisposition

9    to possess and/or acquire firearms.  It's these

10   ancillary matters.  Obviously I appreciate the scrubbing

11   of the Napier murder case; that's great.  I still think

12   that robbery is not at all related to the charges that

13   Mr. Martin is facing today.  So predisposition to

14   robbery is different than predisposition to distribution

15   and firearm at the same time.

16         THE COURT:  Well --

17         MR. MATSON:  They're different crimes, but I

18   understand, Judge.

19         MS. FULLER:  Your Honor, may I just add -- I'm

20   just looking through my notes just to make sure I'm

21   complete -- Mr. Nguyen will also testify to the fact

22   that the robbery was for money and cocaine.  Mr. Nguyen

23   was interested in the cocaine, and he will testify that

24   Mr. Martin was interested in the cocaine.

25         THE COURT:  Okay.  You want to modify your

1       argument?  I mean, the fact is there is a possession

2       over --

3               MR. MATSON:  Are you saying it's no good

4       anymore, Judge?

5               THE COURT:  Pardon me?  Right.  All right.

6           So I -- you know, I appreciate the argument.  It

7       perhaps is a close question as to whether the robbery

8       makes it unduly prejudicial under 403, but, frankly, in

9       light of the disposition relevance, that outweighs its

10      prejudicial impact, especially in light of the fact that

11      the objective of the robbery was to recover cocaine as

12      well as money.

13          But the predisposition is the important thing, and

14      the fact that he is in possession of a firearm

15      especially to commit an unlawful act is really relevant

16      in this particular case, and so I'm going to permit

17      Mr. Nguyen to testify to that.

18          Again, you know, I have looked at the charge here,

19      and we'll do something to make sure that people

20      understand that the other wrongs or acts are relevant

21      only for predisposition and not to suggest that it's

22      character evidence against the defendant or it is used

23      to show that he is a violent person.  It's only intended

24      to be relevant for predisposition to possess a firearm.

25          So, he is permitted to testify.  You want to call

1    him at this point?

2             MS. FULLER:  Yes.  He is here, your Honor.

3             THE COURT:  Okay.  Let's bring the jury back

4    in, and he can be called as a witness.

5        I will say that the government does have the right

6    to say that he has been charged with aggravated assault.

7    I mean, obviously that may relate to credibility.

8             MS. FULLER:  I was going to say that,

9    your Honor.  I wasn't going to say more than that.

10            THE COURT:  Right.  But just limit it to that.

11            MS. FULLER:  Yes.

12            THE COURT:  Don't limit it to what the nature

13   of the assault was, and -- but at least that is relevant

14   to credibility.  Right.

15   (The following was held in open court with the jury

16   present at 2:15 p.m.)

17            THE COURT:  All right.  Thank you for your

18   patience.  We have had an opportunity to resolve the

19   legal issue that is outstanding.  I think in light of

20   the fact that you have had a little bit of a break,

21   let's go for half an hour and then you will get your

22   standard break at quarter of three.  And then we'll be

23   back at three o'clock and finish up at four.

24       All right.  The government ready to call its next

25   witness?

1          MS. FULLER:  Yes, your Honor.  We call Peter

2     Nguyen.

3                        PETER NGUYEN,

4          being first duly sworn by the courtroom deputy,

5          was examined and testified as follows:

6               THE COURT:  All right.  Good afternoon,

7     Mr. Nguyen.

8               THE WITNESS:  Good afternoon.

9                    DIRECT EXAMINATION

10    BY MS. FULLER:

11    Q    Good afternoon.

12    A    Good afternoon.

13    Q    Could you tell us your name for the record, please?

14    A    Peter Nguyen.

15    Q    And where do you live?

16    A    I live in North Lauderdale, Florida.

17    Q    Okay.  Who do you live with down there?

18    A    I live with my mother.

19    Q    Are you married?

20    A    No.  I am engaged.

21    Q    How old are you?

22    A    I'm 29.

23    Q    And what do you do for work?

24    A    At Door Dash.  And I was working for a yacht

25    refurbishing company for a little while.

1    Q    Are you still doing that now?

2    A    Yes.  As soon as I get back down, I can.

3    Q    How long have you been up here in Vermont?

4    A    I have been up here for about a month now.

5    Q    Do you have family here?

6    A    Yes.

7    Q    Where did you grow up?

8    A    I grew up in Burlington.

9    Q    Did you go to BHS?

10   A    Yes.

11   Q    So I want to ask you, in June 2020, did you plead

12   guilty to a state felony charge of aggravated assault?

13   A    Yes.

14   Q    Okay.  Did you have an agreement with state and

15   federal officials about that particular plea agreement?

16   A    Yes.

17   Q    Yes?

18   A    Yes.

19   Q    Okay.  And just to be clear, is it the case that

20   you pled guilty to, which prompted that plea agreement?

21   A    Yes.

22   Q    Okay.  And so you being here today, is today's case

23   related to the case in which you pled guilty?

24   A    No.

25   Q    Okay.  And is it fair to say that you are

1    cooperating, you agreed to cooperate pursuant to that

2    plea agreement in state court?

3    A    Yes.

4    Q    You agreed to cooperate with both state and federal

5    officials?

6    A    Yes.

7    Q    Okay.  And what's your understanding of what your

8    agreement was, what you were to provide?

9    A    The honest truth about anything I was being

10    involved in.

11    Q    Okay.  And in exchange for that --

12            THE COURT:  Mr. Nguyen, you want to move up

13    just a little bit so you speak right into the microphone

14    so the people can hear you.

15            THE WITNESS:  Yes.

16            MS. FULLER:  Okay.

17    BY MS. FULLER:

18    Q    So the honest truth about what you were involved

19    in, are you referring to the case in which you pled

20    guilty to?

21    A    Yes.

22    Q    Are you referring to anything else?

23    A    Yes.  Anything that I provided.

24    Q    Okay.

25    A    Yes.

1    Q    So I am just trying to make sure the jurors

2    understand what your understanding is.  So you agreed to

3    provide information in the case that you were involved

4    in that led to the aggravated assault conviction, right?

5    A    Yes.

6    Q    But you were also agreeing to provide information

7    in other cases?

8    A    Yes.

9    Q    Okay.  Is this one of these other cases?

10    A    Yes.

11    Q    Okay.  And in exchange for that, what's your

12    understanding of what the state and federal government

13    would do for you?

14    A    The aggravated assault charge instead of attempted

15    murder charge.

16    Q    Okay.  And how about according to the federal

17    government?  What was the federal government agreeing to

18    do for you?

19    A    Not charge me federally.

20    Q    Okay.  And just a little clarification:  When

21    you -- after the incident occurred that led to your

22    state conviction, did you stay in Vermont?

23    A    No.

24    Q    What did you do?

25    A    I fled down to Florida.

1    Q    Okay.  And when you fled down to Florida, was there

2    any evidence that you took with you?

3    A    Just my phone.

4    Q    All right.  And what happened to that phone?

5    A    I wiped it, but it's in your evidence.

6    Q    Okay.  So the evidence that was on your phone at

7    the time that you left Vermont for Florida no longer

8    exists?

9    A    Yes.

10   Q    Okay.  Now, I want to take you back to October

11   2019.  Did you know someone by the name of Octavious

12   Allen-Napier?

13   A    Yes.

14   Q    What did you know him as?

15   A    Boobie.

16   Q    Say that again?

17   A    Boobie.  That was his nickname.  Yeah.

18   Q    Okay.  And how long had you known him?

19   A    Since we were kids.

20   Q    Could you describe your relationship with him?

21   A    We were really good friends.

22   Q    Okay.  And did you also know around that time

23   somebody who you knew by the name of Unc?

24   A    Yes.

25   Q    And was there any relationship between Unc and

1    Boobie?

2    A    Yeah.  He was his uncle, I believe.

3    Q    Okay.  And do you see Unc in the courtroom today?

4    A    Yes.

5    Q    Could you identify where he is sitting?

6    A    Next to his lawyer in the red shirt.

7              MS. FULLER:  Okay.  Your Honor, could you let

8    the record show that he has identified the defendant,

9    Carl Martin?

10              THE COURT:  Yes.

11    BY MS. FULLER:

12    Q    Do you know him by any other name or is it just

13    Unc?

14    A    Unc.

15    Q    And have you ever -- back in 2000 -- October of

16    2019, had you ever exchanged any text messages with Unc?

17    A    Yes.

18    Q    Okay.

19              MS. FULLER:  Can we bring up what's been

20    marked and admitted as Exhibit -- Government's

21    Exhibit 122.  This is a text string that was found on

22    Carl Martin's phone.  It's already admitted into

23    evidence.

24         If you want to turn, you can see the screen that we

25    are all looking at.

1        If you could just highlight maybe the top two
2   boxes, please.
3   BY MS. FULLER:
4   Q    So anything you recognize there?
5   A    My number.
6   Q    All right.  And what's your phone number?
7   A    The (561) 306-6028.
8           MS. FULLER:  Okay.  Can you close that.
9   BY MS. FULLER:
10  Q    So if you can, before we talk about it, would you
11  just take a look at what's on the screen just to sort of
12  scroll through the messages yourself so that we can talk
13  about them in a minute.
14       Do those look familiar to you?
15  A    Yes.
16  Q    Okay.  And am I right that they start on October
17  10th, 2019?
18  A    Yes.
19  Q    Okay.  Can you tell us, what is going on in this
20  first page of messages between you and Carl Martin, or
21  who you know as Unc?
22  A    We're just exchanging, see where everybody is, and
23  ready to attempt a robbery.
24  Q    Okay.  So let's walk through them one by one.
25          MS. FULLER:  Message one and two, please.

1    Sorry.  I meant two and three.  All right.

2              LIZA LABOMBARD:  Hold on one second.

3    BY MS. FULLER:

4    Q    Okay.  So the first message is outgoing to you, and

5    it says, "WYA."  Is that where you at?

6    A    Yes.

7    Q    And then there's an incoming message to the phone

8    from your number.  What's DT?

9    A    Downtown.

10             MS. FULLER:  All right.  You can close that

11   out.

12        Can we highlight four through 10.

13   BY MS. FULLER:

14   Q    All right.  So I will read the outgoing messages;

15   if you want to read the incoming messages, please.

16        So Carl Martin says -- or Unc says, "Ready?"

17   A    It said, "Mr. Mike.  All right."

18   Q    "You close?"

19   A    "We haven't left yet.  We're waiting on Boobie."

20   Q    "Where is he?"

21   A    "He went on Williams Street and told us he'll meet

22   us at Mr. Mike."  Or "me Mike."

23   Q    Can you tell us what's going on in that message?

24   A    We're trying to meet up.

25   Q    Okay.  And what are you meeting up for?

```
1    A    To go back on Williams Street.

2    Q    Okay.  What is on Williams Street?

3    A    An apartment with somebody that has drugs and

4    money.

5    Q    Okay.  How did you first learn that this was

6    something that was being planned?

7    A    I think we were all sitting down talking about it.

8    Q    Okay.  Is there a specific word that was used for

9    it?

10   A    "Lick."

11   Q    Lick?

12   A    Lick.

13   Q    And what did you understand that to mean?

14   A    Robbery.

15   Q    And what was supposed to happen -- strike that.

16        You said that it was for drugs and money; is that

17   what you said?

18   A    Yes.

19   Q    Is there someone in particular that you heard that

20   from?

21   A    Yes.

22   Q    Tell me.

23   A    Unc.

24   Q    Okay.  And what did Unc say with regard to the

25   purpose of the robbery?
```

1    A    That we just going to go in there and grab it.

2    Q    Grab the drugs and the money?

3    A    Yes.

4    Q    Do you know what drugs there were?

5    A    Not really, but we assumed like cocaine.

6    Q    Okay.  And what was your interest in participating

7    in this?

8    A    The money.

9    Q    All right.  And what was Unc's interest in

10   participating in this?

11   A    The drugs.

12   Q    Did you know who the target of this particular

13   robbery was?

14   A    No.

15   Q    Did you get any description of where this person

16   worked?

17   A    Yes.  At one of the food stands downtown.

18   Q    All right.  And there was a reference to -- a

19   minute ago to Williams Street.  What reference -- what

20   relevance does that have to this incident?

21   A    It was the incident where it occurred at.

22   Q    All right.  Is it -- you mean somebody -- the

23   person -- the place where the target lived?

24   A    Yes.

25   Q    The victim of the robbery?

1    A    Yes.

2    Q    So it seems as though from the text messages that

3    Octavious Allen-Napier had gone up to Williams Street;

4    is that right?

5    A    Yes.

6    Q    I don't want to put words in your mouth.  Is that

7    what the text says?

8    A    Yes, that's what the text says.

9    Q    Okay.  Now, in this string of text messages, did

10   you meet up with Unc at some point?

11   A    Yeah, later.

12        MS. FULLER:  Okay.  If we could highlight

13   message 11 to message 16.

14   BY MS. FULLER:

15   Q    Okay.  And if we could do the same.  If you want to

16   read the incoming, and I will read the outgoing.

17   A    Yes.

18        "See if you can hit him up because it's not working

19   for me."

20   Q    What did you mean by that?

21   A    Because I was trying to call him.

22   Q    Boobie?

23   A    Yes.

24   Q    Okay.

25   A    That he wasn't answering.

1  Q    Okay.  And Unc says, "Dude not there.  He can't get

2  in.  You guys should come get me.  Then we go to

3  Mr. Mike's."

4  A    "Me and Slim already at Mr. Mike's.  We waiting on

5  Boobie.  He is not answering his phone."

6  Q    "You guys come get me.  Then we go back."

7  A    "Slim going to get you.  I'll wait here."

8  Q    Who is Slim?

9  A    Anthony Hyde.

10 Q    Okay.  And what was his involvement?

11 A    Just driving us around really.

12 Q    All right.  So what was the issue with meeting at

13 Mr. Mike's?

14 A    It was just a meetup spot.

15 Q    Okay.  Who was supposed to meet there?

16 A    Me, Unc, Boobie and Slim in a while.

17 Q    All right.  This reference to, right here, "Dude

18 not there.  He can't get in," what did you understand

19 that to mean?

20 A    It means the guy wasn't at home and he couldn't get

21 in.

22 Q    Boobie couldn't get in the house?

23 A    Yeah.

24 Q    At some point in this did you go back to Williams

25 Street to attempt to get in again?

1    A    Not until later that night.

2    Q    Okay.  But you did go back?

3    A    Yes.

4    Q    And was there any difficulty getting in to the

5    actual residence?

6    A    Yeah.  It's one of those key pad residence.

7    Q    Okay.  So tell us what you mean by that.

8    A    It's -- you got to -- it was either a lock or one

9    of those codes that you have to press to get in, and we

10    just waiting 'til somebody opened the door to walk in.

11    Q    Okay.  Did the robbery ever happen?

12    A    No.

13    Q    How come?

14    A    Too many people and we got scared.

15    Q    Okay.  Can you describe for us how each of you were

16    dressed and what you may have been carrying before going

17    to the robbery?

18    A    We were all dressed in black, and we had guns on

19    us.

20    Q    Okay.  Anything else other than the black clothing?

21    Any masks or anything?  Gloves?

22    A    Gloves, yes; no masks.

23    Q    Okay.  So you say "we all were," "we all had guns."

24    Is that what you just said?

25    A    Yes.

1    Q    I just want to be clear as to who the "we" is.

2    A    Me, Boobie and Unc.

3    Q    Did you see Unc with a gun?

4    A    Yes.

5         MS. FULLER:  Okay.  If we can pull up

6    Government's Exhibit 116 that's been previously admitted

7    as data received from Carl Martin's phone.

8         LIZA LABOMBARD:  116?

9         MS. FULLER:  116C.  Sorry.

10         LIZA LABOMBARD:  Oh.

11    BY MS. FULLER:

12    Q    Do you recognize that?

13    A    Yes.

14    Q    What is it?

15    A    It's a GSG 1911.

16    Q    Who does that belong to?

17    A    It belongs to me.

18         MS. FULLER:  116D.

19         THE COURT:  I didn't quite hear.  This was

20    your gun?

21         THE WITNESS:  Yes.

22         THE COURT:  Yes.

23         MS. FULLER:  116D, please.

24    BY MS. FULLER:

25    Q    Those are difficult to make out, but can you

1    recognize anything there?

2    A    Yeah.  That's still the GSG and the CZ.

3    Q    Who does the CZ belong to?

4    A    Me.

5    Q    And 116E.  Are those two firearms -- is that the

6    same ones you just identified --

7    A    Yes.

8    Q    -- as belonging to you?

9    A    Yes.

10    Q    And on this particular evening, do you know if

11    anyone who was in possession of the CS -- what did you

12    say?  CZ?

13    A    The GSG and the CZ.

14    Q    The CZ.  Who was in possession of the CZ on this

15    particular night?

16    A    Boobie.

17    Q    Boobie?

18    A    Yes.

19    Q    And is that this firearm right here?

20    A    Yes.

21    Q    All right.  Do you know or do you remember who was

22    in possession, if anyone, of the other firearm?

23    A    I don't recall.

24            MS. FULLER:  Your Honor, if I could just have

25    a moment?

```
 1                    THE COURT:  Yes.
 2                    (Brief pause.)
 3                    MS. FULLER:  I have no further questions.
 4                    THE COURT:  Okay.  Any cross examination?
 5                         CROSS EXAMINATION
 6    BY MR. MATSON:
 7    Q    Afternoon, Mr. Nguyen.
 8    A    Good afternoon.
 9    Q    I keep asking this because I feel like I get every
10    name wrong, but it's Mr. Nguyen?
11    A    You can say Nguyen.
12    Q    Nguyen?
13    A    Yes.
14    Q    Okay, thank you.
15         Mr. Nguyen, my name's Chandler Matson.  I represent
16    Carl Martin.
17         Mr. Nguyen, you grew up with Octavious Napier,
18    right?
19    A    Yes.
20    Q    Close friend?
21    A    Yes.
22    Q    Very close friend actually?
23    A    Yes.
24    Q    One of your best friends?
25    A    Yes.
```

1    Q    Did you testify or have you testified against
2    Mr. Napier?
3    A    Not yet.
4    Q    And tell me why.  Just have -- just a
5    straightforward question.  I want you tell me why you --
6    I'm going to back up and strike that question.
7         Mr. Nguyen, have you testified against Mr. Napier?
8    A    Not yet.
9    Q    Are you going to?
10   A    Yes.
11   Q    Mr. Nguyen, you have a cooperation agreement with
12   both the state and the federal government; that's right?
13   A    Yes.
14   Q    And that cooperation includes this expected
15   testimony against Mr. Napier?
16   A    Yes.
17   Q    All right.  Now, in your case, Mr. Nguyen, that
18   agreement, to your understanding, was to reduce
19   prospective charges from a murder down to a simple
20   assault; is that right?  I'm sorry.  An aggravated
21   assault, not simple.  Aggravated assault?
22   A    Yes.
23   Q    Okay.
24        THE COURT:  Well, he testified it was an
25   attempted murder charge; is that --

1          THE WITNESS:  Yes, attempted.

2          THE COURT:  Just to clarify, is it a murder

3     charge or is it an attempted murder charge?

4          THE WITNESS:  It was attempted.

5     BY MR. MATSON:

6     Q    Mr. Nguyen, let me talk about this incident, this

7     planned robbery.  Let me see if I can just get it to its

8     simple parts.

9          You went with Boobie, is what you call him?

10    A    Yes.

11    Q    And Mr. Hyde; is that right?

12    A    Yes.

13    Q    And you are saying Mr. Martin?

14    A    Yes.

15    Q    Now, Mr. Hyde, that's another one of yours friends,

16    right?

17    A    Yes.

18    Q    Close friend?

19    A    Yes.

20    Q    One of your best friends?

21    A    Yes.

22    Q    And Mr. Hyde drove you to an apartment building; is

23    that accurate?

24    A    Yes.

25    Q    And the group went and knocked on the door to the

1    apartment; is that right?  Someone from the group

2    knocked on the door to the apartment?

3    A    Yeah, but that was later on in the night.

4    Q    Okay.  So the first time is during the day.  Is

5    that when you don't get in at all?

6    A    Yes.

7    Q    Don't even get in?

8    A    Nobody's there.

9    Q    So you just drive around and go to an apartment

10   building and then leave?

11   A    Yeah.

12   Q    So the second time, that's when you knock; is that

13   right?

14   A    Yes.

15   Q    And then you leave?

16   A    Yes.

17   Q    All right.  And then this is never attempted or

18   nothing's done about this again, ever?

19   A    No, never.

20   Q    Mr. Nguyen, you had a recent meeting with the U.S.

21   Attorney's Office, right?

22   A    Yes.

23   Q    And they asked you if you had ever seen Carl Martin

24   dealing drugs, right?

25   A    Yes.

1    Q    And your answer was no.  Right?

2    A    Yes.

3    Q    Okay.

4              MR. MATSON:  Mr. Nguyen, thank you for your

5    time.  No more questions.

6              THE COURT:  Okay.  Any redirect?

7              MS. FULLER:  Yeah, just briefly.

8                        REDIRECT EXAMINATION

9    BY MS. FULLER:

10   Q    Mr. Nguyen, since Mr. Matson had asked you about a

11   conversation that you and I had, can you tell us a

12   little bit more about whether you had ever seen Mr.

13   Martin in possession of cocaine?

14   A    Yes.  He has been in possession of cocaine.  It was

15   more a party.

16   Q    Okay.  But he had in fact possessed it?

17   A    Yes.

18             MS. FULLER:  I have no further questions.

19             THE COURT:  Okay.  Anything further?

20             MR. MATSON:  No, Judge.  Thank you.

21             THE COURT:  All right.  Thank you, Mr. Nguyen.

22             (Witness excused.)

23             THE COURT:  The government want to call its

24   next witness?

25             MS. FULLER:  Yes, your Honor.  We would call

1    Sam Brown.

2                    SAMUEL BROWN,

3        being first duly sworn by the courtroom deputy,

4        was examined and testified as follows:

5            THE COURT:  Good afternoon, Agent Brown.

6            THE WITNESS:  Good afternoon.

7                    DIRECT EXAMINATION

8    BY MS. FULLER:

9    Q    Good afternoon.

10   A    Good afternoon.

11   Q    Can you tell us your name for the record, please.

12   A    Samuel Brown.

13   Q    How are you employed?

14   A    I am a special agent with the Bureau of Alcohol,

15   Tobacco, Firearms and Explosives.

16   Q    How long have you worked for them?

17   A    Almost eight years.

18   Q    Almost eight years?

19   A    Yes, ma'am.

20   Q    I thought I have known you longer.

21        What did you do before then?

22   A    I was a United States law enforcement park ranger.

23   Q    How long did you do that?

24   A    About seven years.

25   Q    Okay.  What is your role with regard to the

1    investigation into Mr. Martin?

2    A    I am the lead federal investigator in the case.

3    Q    All right.  Now, I want to take you back to 2018,

4    the Nectar's shooting that we have heard testimony

5    about.  Were you involved in that investigation?

6    A    I was.

7    Q    All right.  What was your role there?

8    A    Same.  I was the lead federal investigator for that

9    case as well.

10   Q    All right.  And did ATF -- while you were the lead

11   investigator into that case, can you tell us a little

12   bit more about who it was you were investigating, what

13   that investigation was?

14   A    Sure.

15        So primarily we ultimately investigated and

16   prosecuted Mr. Rashad Nashid, but from the beginning, I

17   was at the Burlington Police Department pretty early the

18   next morning after the shooting had taken place and

19   meeting with Detective Beliveau and the other

20   investigators and pretty quickly trying to figure out if

21   there was essentially a federal nexus or reason for

22   federal involvement in the case.

23        It seemed like, based on Mr. Nashid's criminal

24   history, there was a reason for us to be there, so the

25   ATF and the Burlington Police Department worked hand in

1    hand from that point forward.

2    Q    Okay.  So talk to us just a little bit about ATF's

3    interest in -- you have mentioned Mr. Nashid.  Was there

4    any interest in investigating Mr. Martin and, if so,

5    why?

6    A    There was.  As was seen on the video earlier, Mr.

7    Martin had a firearm and pointed it in a crowded street,

8    and so, you know, one of ATF's mission is public safety

9    in reference to violent crime.  I would say that was

10   violent crime at the time, and so it became part of the

11   investigation to determine if Mr. Martin was legally in

12   possession of a firearm at that time.

13   Q    And what was the result of that particular part of

14   the investigation into Mr. Martin at the time?

15   A    We determined that Mr. Martin was not a prohibited

16   person at the time.

17   Q    What does that mean?

18   A    He -- under federal law, he was legally allowed to

19   possess firearms.

20   Q    Okay.  And so in what you do for work, is it just

21   federal crimes or are you able to investigate other

22   crimes, or is it just the federal ones?

23   A    I just investigate federal crimes.

24   Q    So it sounds like you, ATF, determined that there

25   wasn't a federal -- there wasn't a federal crime here as

1    it relates to Mr. Martin?

2    A    That is true.

3    Q    At the time.

4    A    Correct.

5    Q    All right.  Now, were there any other incidents in

6    2018 which you became aware of that involved Mr. Martin

7    even loosely?

8    A    Yes.

9    Q    Tell us about that.

10   A    So in approximately May of 2018, we became aware of

11   a fight that occurred also in downtown Burlington

12   outside a parking lot near Church Street.  Investigation

13   revealed that there were two groups of people involved

14   in that fight.  One of the groups we discovered was Carl

15   Martin, Dennis Martin, Octavious Allen-Napier and two

16   other individuals.

17   Q    Okay.  Just to orient us here, could you remind us

18   what is Carl Martin's connection to Dennis Martin?

19   A    They're brothers.

20   Q    And Carl Martin's connection to Octavious

21   Allen-Napier?

22   A    I believe it's step-nephew.

23   Q    Okay.  And so just to be clear, was Mr. Martin

24   accused of doing any -- was there any wrongdoing on the

25   part of -- Mr. Martin's part in that May 2018 incident

1    in and around Church Street?

2    A    Besides possibly being involved in a physical

3    altercation, no.

4    Q    But describe for us a little bit more about why

5    that came to ATF's attention.

6    A    Well, it was shortly after the Nectar's shooting.

7    That investigation was still ongoing at the time.

8    Burlington Police Department and ATF both were aware of

9    Denis and Carl at that point.  So this came up -- when

10   this came up, there was also a firearm involved.  When

11   Burlington Police Department arrived to that scene, they

12   discovered a magazine and Dennis Martin's identification

13   at the scene of the crime.

14       Witnesses indicated that Dennis Martin had been

15   there --

16   Q    If you could just tell us what -- rather than tell

17   me what the witnesses indicated, if we could stick to --

18   you know, you just indicated there was a firearm with an

19   identification belonging to Dennis Martin.

20            THE COURT:  Okay.

21            MR. MATSON:  Objection.

22            THE COURT:  You are objecting on hearsay?

23            MR. MATSON:  Well, I am actually going to move

24   to strike the last question, not just on hearsay

25   grounds, but also I am failing to see where this is

1    going in terms of relevance.  Pretty far afield why we

2    are even talking about that Nectar's incident.

3              THE COURT:  Yeah.  Is there a particular nexus

4    to this particular -- this case that makes it relevant?

5              MS. FULLER:  Only because, from the

6    government's view of the opening, they have put -- the

7    defense has put ATF's motivation into Carl Martin

8    squarely at issue.  They say that he, you know, had

9    targeted him and pressured him, and what I am attempting

10   to elicit from Special Agent Brown is that there were

11   reasons why Mr. Martin kept coming up on their radar.

12             THE COURT:  Okay, would counsel approach.

13   Actually, I am going to excuse the jury at this point

14   because it's quarter of and just like to stay on the

15   bench and talk to the lawyers about this, and we will

16   see you just a little bit after three o'clock.

17   (The jury was excused after which the following was held

18   in open court at 2:44 p.m.)

19             THE COURT:  Okay.  So let me address that last

20   point that you were making.  I did not necessarily hear

21   that there was an intent or an allegation of an intent

22   on the part of ATF to focus in upon the defendant.  If

23   that, in fact, is the case, then that could very well

24   open up a whole Pandora's box here.

25             You know, I -- I indicated to both sides that I

1    felt that -- that the government could only argue that

2    the evidence of the Nectar's situation was relevant to

3    predisposition.  That was it.  And the defense wanted to

4    get into, well, this is not a state crime, and perhaps

5    they were going to call the prosecutor in the state

6    offense to say this was not a state crime.

7         I thought that was totally irrelevant because the

8    only relevance is predisposition.  The only relevance is

9    whether the defendant was in possession of a firearm.

10   If you are suggesting that there's some argument that

11   there's a motivation on the part of ATF argued by the

12   defendant, you know, do the parties have to address

13   that?  I didn't hear that, frankly.

14         MS. FULLER:  Your Honor, my notes could be

15   wrong, but I have, you know, quotes from Mr. Matson from

16   the opening in which he said they had a plan, they

17   pushed hard, they -- it was orchestrated events by law

18   enforcement.

19         He intends to call Trooper Prack, who did a short

20   investigation into Carl Martin in the fall of 2018.  I

21   could be putting my gloss on it, but I thought I

22   squarely heard that from the time of the Nectar's

23   shooting up until this investigation in 2019, that it

24   was, quote, an orchestrated event by law enforcement.

25   That's what he said.

1          And so I have been approaching this case as

2     though -- you know, eliciting testimony from ATF to sort

3     of legitimize the steps that they took.  I do believe

4     that's part of his -- he hasn't said the word

5     "entrapment," but I think that's part of his entrapment

6     argument because they pressured him because he was on

7     their radar since Nectar's.

8               THE COURT:  Okay.  Well, let me ask you:  What

9     are you in fact arguing?  Are you suggesting that ATF

10    concocted a plan to pressure the defendant based upon

11    his involvement in the Nectar's situation?

12               MR. MATSON:  Well, your Honor, one, I have

13    been overruled, but I am glad now we are having this

14    conversation because I would like to make the offer of

15    proof.

16          On August the 31st, a letter goes out from the

17    Chittenden County state's attorney saying, "We're not

18    prosecuting this."  Three weeks later a confidential

19    informant for the first time -- and I have requested all

20    police reports relating to the drug dealing of Mr.

21    Martin.  I have received nothing prior to that.  Three

22    weeks after that letter, a confidential informant is in

23    the Burlington Police Department saying, "Oh, by the

24    way, I buy drugs from Carl Martin."  And the timing of

25    that absolutely does raise an eyebrow, Judge.

1          THE COURT:  Okay.  So this is not ATF; this is

2    Burlington Police Department.

3          MR. MATSON:  At the Burlington Police

4    Department, that's when Mr. -- or Agent Brown meets with

5    Mr. Latimer.  That's when the ATF gets involved in Mr.

6    Latimer.

7          THE COURT:  Okay.

8          MR. MATSON:  So I can --

9          THE COURT:  All right.  So a confidential

10   informant comes in, says that he's engaged in drug

11   activity with your client.

12         MR. MATSON:  With no --

13         THE COURT:  What next?

14         MR. MATSON:  And then they do -- again, no

15   police reports implicating Mr. Martin because none have

16   been produced, and I have requested every single one,

17   right?  And that's when the two fake buys come in,

18   Judge.  And there is a -- an expla- -- why are we doing

19   this?  Right?  Why is this investigation happening with

20   Mr. Martin?

21       And yes, I do think that -- I would argue the

22   Nectar's investigation, right, led to that motivation --

23   just human beings and not alleging this is untoward, but

24   it -- oh, we did the Nectar's invention --

25   investigation, and it was not prosecuted.  And next

1    thing you know Mr. Martin is a hard target of a

2    year-and-a-half-long investigation with confidential

3    informants.  And, yes, that was a driving motivation

4    towards it.

5         Again, I have sort of backed away from that because

6    your Honor has told me that the lack of prosecution by

7    the Chittenden state's attorney is not coming into

8    evidence, so drop it, and I have.

9              THE COURT:  Yeah.  So what do you think the

10    consequence would be if we let the government get into

11    this following area of examination, that is, related to

12    the intention of ATF against the defendant?

13         I assume what you are arguing is that that would

14    open up the door to all kinds of evidence in regard to

15    charging decisions that are made by law enforcement.

16              MR. MATSON:  I mean, in a way, it legitimizes

17    your Honor's concerns, right?  Where does this end?  I

18    get that.  I understood your Honor was saying that.  And

19    I adjusted a bit accordingly.  And now I think we are

20    seeing why indeed we don't do that.  Right?  Because

21    where does it end?

22         So I was prepared to drop the issue of Sarah

23    George's letter on August 31st and just say that's where

24    it ends, right?  Nectar's come in for what Nectar's

25    comes in, there was an investigation, fine, and leave it

1   there.

2             THE COURT:  Okay?

3             MS. FULLER:  I'm happy to do that.  I am

4   just -- I am worried about summation so I am worried

5   about the argument -- you know, we heard the argument in

6   opening, which I realize people say things in opening

7   that sometimes never makes it to closing, but I am

8   worried about the argument at closing that sort of

9   mirrors the argument at opening, that there was

10  something untoward about what law enforcement was doing

11  in their investigation, which is why I had started to

12  elicit that from Sam Brown.  And I do think we are going

13  to hear more of this.

14      I mean, the intent is to call the task force

15  officer who conducted the controlled buys into Mr.

16  Martin in the fall.  I mean, the only reason they're

17  relevant is to sort of bolster this argument that law

18  enforcement was continuing to do something wrong by

19  investigating Mr. Martin.

20            MR. MATSON:  So, your Honor, just so we're

21  clear about what I was saying with the plan:  Here's the

22  plan.  Those are text messages from Prack to Latimer.  I

23  mean, the government has them.  The government's seen

24  them.  That's what I'm referring to.  Yes, there was a

25  plan.  This was the plan to target Carl Martin, right?

1           And again, since your Honor had overruled me on the

2    lack of prosecution from Chittenden County state's

3    attorney, at the time I did not agree with your Honor,

4    but I have reflected; I have seen the light.  It does

5    make sense.  Where does it end, right?  And I understand

6    that, because we get to issues that are far afield.

7           So I was referring to a plan.  I was.  It's

8    reflected in text messages.  And that plan involves

9    using Latimer to conduct controlled purchases over and

10   over and over again.  Right?  That is the plan.  I think

11   everyone knows that.

12           THE COURT:  You have got a factual situation

13   of no charges being brought against Mr. Martin as a

14   result of the Nectar's incident.  And then a short time

15   thereafter somebody comes into the Burlington police

16   station and indicates that they have been engaged in

17   drug activity with Mr. Martin, and so as a result, that

18   begins an investigation.  There's obviously nothing

19   improper about that.

20           MR. MATSON:  Right.  And, your Honor, again,

21   I'm taking your Honor's previous ruling as saying I'm

22   not bringing up August 31st.  I'm not using that.

23   That -- that's gone because that's not coming into

24   evidence.  Your Honor's told me it's not coming into

25   evidence --

```
1                THE COURT:  Right.
2                MR. MATSON:  -- so it's not.
3                THE COURT:  Well, right.
4                MR. MATSON:  Right.
5                THE COURT:  No, but of course the problem is
6     that if you start -- if the government starts
7     introducing evidence about the intent of ATF to respond
8     to your argument that they had a plan to go out and get
9     your client, then it seems to me that the door is open,
10    and I really think it is inappropriate.
11         I mean, I -- I did not hear a strenuous argument
12    that there is some conspiracy among law enforcement to
13    go out and get the defendant.  I heard that there was an
14    investigation as a result of someone coming in and
15    saying that they had been dealing with Mr. Martin in
16    cocaine trafficking.
17         And I just am really concerned about the government
18    opening up this door about going into the intent of the
19    law enforcement organization or organizations because I
20    think, you know, then you have to address, well, he was
21    never charged with these offenses, and then -- then -- I
22    just -- I don't know where it goes from there.  So --
23                MS. FULLER:  Your Honor, I'm happy to not go
24    down this road.  And I -- you know, with all due respect
25    to your Honor, I took verbatim notes.
```

1          I mean, Mr. Matson said over a year it took to show
2     Martin was a drug dealer.  I mean, he squarely put at
3     issue in the opening ATF's motivation for this.  I
4     mean -- and granted, I understand this was before
5     your Honor's ruling about Sarah George, so -- but he did
6     go down that road, and so I was -- you know, had been
7     planning for three days to sort of in a way to respond
8     to that.
9          But I am happy to not say anything further about
10    ATF's motivation or why they did what they did; just go
11    through the investigation into Mr. Martin.  I just want
12    some assurance, I guess, that, you know, in closing I am
13    not going to be, you know, blind-sided by this same
14    argument.
15                THE COURT:  Okay.
16                MR. MATSON:  Well, this is a tricky issue,
17    obviously, I mean, and I am working through it because I
18    don't want to be hamstrung in closing argument.  I am
19    going to take the evidence that's come in and I am going
20    to argue the inferences.  And again, I said it in
21    opening and I will say it at the closing:  It's not a
22    grand conspiracy but it started and it built and it
23    built and it built, right?  And ATF put a lot of
24    pressure into it and a lot of money into it.  I mean, I
25    think I am free to say all of those things without

1    opening the door up:  Well, yeah, we did it because he's

2    a really bad guy and he kept popping on our radar screen

3    and I heard this and I heard that.  That's the Pandora's

4    box.

5              THE COURT:  Right, but --

6              MR. MATSON:  It's hearsay --

7              THE COURT:  But of course that's the most

8    difficult --

9              MR. MATSON:  I know.

10             THE COURT:  -- problem because once you start

11   going down that road saying they have zeroed in on Mr.

12   Martin, they can respond by saying, first of all, they

13   didn't zero in on him for inappropriate reasons, but

14   second, that there is evidence of violence, and they're

15   really concerned about the evidence of violence.

16        And so then we -- we get into the Nectar's incident

17   being not just relevant for predisposition.  We get into

18   it for violence, and that's -- relates to the motivation

19   of the law enforcement organizations.

20        You know, they can come back and say this guy

21   showed that he was violent, and as a result, that's the

22   motivation, which of course would be appropriate if

23   that, in fact, was the motivation.  That's the risk, it

24   seems to me, that is presented by your approach.

25             MR. MATSON:  Understood, Judge.  You know,

1    obviously everything that I do or the government does

2    opens up certain doors of relevance.  But the volume of

3    confidential informant involvement, the volume of text

4    messages, coordinated effort, talks about plan and

5    here's how it's going to go and here's how we're going

6    to build it, that's fair argument to say that is the --

7              THE COURT:  In general --

8              MR. MATSON:  -- because that's what happened.

9              THE COURT:  In general, that's fair argument,

10   right?

11             MR. MATSON:  Yeah, that's what happened.  I

12   don't need to be hamstrung -- I can't give that argument

13   up because it would seem like -- it would be malpractice

14   if I gave that one up.  Without -- and I think every

15   defendant does that without opening up the door to,

16   Well, now we get to talk about, yeah, we -- you know,

17   sure --

18             THE COURT:  Sure.

19             MR. MATSON:  -- there was 25 there.

20             THE COURT:  And the reason was --

21             MR. MATSON:  There's 25 investigations before

22   that, too, so it's all relevant.

23             THE COURT:  Right, right.

24             MS. FULLER:  Your Honor, I don't have a

25   problem if -- you know, if Mr. Matson wants to admit --

1    I believe we are going to admit the confidential

2    informant's conversations with Jon Prack, and then we

3    have the confidential informant's conversations already

4    admitted between him and Brian Wood.  If he wants to

5    argue what those say, totally appropriate.  I mean, I

6    don't have any problem with that.

7        It's the larger grand conspiracy that he's

8    attributing to the government after this Nectar's

9    incident.  That is what I find concerning, so I don't

10   know if there's a middle ground for your Honor.  I

11   don't -- he obviously can argue both of those facts and

12   inferences within it.

13           THE COURT:  Well, I think there is a middle

14   ground.  I think the government -- or the defense should

15   be able to argue that there seemed to be an

16   investigation which really focused in upon the

17   defendant.  It became extended over a period of time.

18   It began with this interview of a person who was dealing

19   drugs, apparently, with the defendant, without opening

20   up the door to the government saying, We need to be able

21   to prove that law enforcement organizations had a good

22   motive, that is, because they thought that the defendant

23   was, in fact, violent.

24       So it seems to me that there should be a middle

25   ground, that the defense should be able to say, These

1    are all the things that you did, and it took over a

2    whole period of time, and you were really focused in

3    upon this defendant, without suggesting in some broad

4    way that this was improper in any kind of way, because

5    if it's improper, then you are going to the motivation

6    of law enforcement, and law enforcement should then be

7    able to say, Well, the reason we were doing this,

8    focusing in upon this person, is because of his risk to

9    the community.

10    So I don't think I am stopping the defense from

11    going through all of the stuff that law enforcement did

12    repeatedly, but I think that once you start suggesting

13    that law enforcement had this overarching, improper

14    motivation, that that opens up the door to the

15    government being able to come back and say what's the

16    motivation, and the motivation may very well have been

17    he's shown evidence of violence.

18    MR. MATSON:  Sure.  Right.

19    THE COURT:  So if you --

20    MR. MATSON:  And --

21    THE COURT:  -- go through all of the things

22    that the government did, in which the government has no

23    objection to that, I mean, I think that's totally

24    appropriate.  But if you start throwing around an

25    improper motivation, it seems to me the government

1    should be able to respond with something which opens up

2    a Pandora's box here, and I really don't think at this

3    late stage in the trial we should be going down new

4    avenues, new doors being opened.

5        So my question is, assuming that I permit the

6    defense to go through on cross examination these are all

7    the things that you did to focus in upon this defendant,

8    without making some grandiose argument that this was

9    discriminatory or this was improper in any particular

10    way, these are all the things they did to really focus

11    in upon the defendant, that's fine; but if you start to,

12    you know, throw around arguments that this is -- that

13    the motivation here is improper, I think they should be

14    able to respond with motivational testimony, i.e.,

15    their -- they have seen evidence of violence, and as a

16    result, that's why they're focused in upon him.

17        And once we get down through that, then of course

18    you will be able to call the state prosecutor and

19    everything would be opened up in regard to the incident

20    in Nectar's and everything would be opened up in regard

21    to all of these other issues of potential violence.  And

22    that's -- it's too far afield.

23        So I guess what I would like to do is suggest to

24    you that you have that right to cross examine going

25    through all of the things they did, and you can make a

1  big point of that, but if you start throwing around
2  motivational arguments, I think that's -- that opens up
3  a door that would be totally inappropriate.
4           MR. MATSON:  Agreed, Judge.  And I -- again, I
5  intimated something in the opening statement.  I think I
6  went out of my way to say it is not a grand conspiracy.
7  This isn't a dirty cop case.  I never said it was a
8  dirty cop case.
9           THE COURT:  Right.
10          MR. MATSON:  You did that --
11          THE COURT:  Right.
12          MR. MATSON:  -- again, you have opened the
13  door.
14          THE COURT:  Yeah, I didn't hear that.  I
15  didn't hear you attacking the motivation of ATF or
16  Burlington police or anything in regard to some
17  grandiose plan, but obviously the government did.
18          MS. FULLER:  That could be my prosecutorial
19  slant.
20          THE COURT:  Oh, really?  All right.
21          MS. FULLER: I didn't write down his words, but
22  I'm sure what I heard was pretty different than what
23  came out of --
24          THE COURT:  Okay.  So let's just leave it that
25  the defense is permitted to, you know, question about

1    all the things law enforcement did, focus in upon the

2    defendant.  You are not going to make an argument about

3    some grandiose motivation, because once you do, I bet

4    the agents would be right back on the stand saying, The

5    reason we were after him was because of our concern

6    about violence, and -- so we will exclude that, stop

7    that at this point, and just -- you're perfectly free to

8    do the cross examination you want to do.  Let's just

9    leave out the grandiose purpose.

10        All right?  Is that -- is that clear and

11   acceptable?

12            MR. MATSON:  It is, Judge.  You can bring that

13   jury right back in and let us walk out.

14            THE COURT:  No, I think I am going to take a

15   break.

16            MR. MATSON:  Thank you, your Honor.

17            THE COURT:  Okay.  Thank you.

18   (Court was in recess at 3:04 p.m.)

19   (The following was held in open court without the jury

20   present at 3:18 p.m.)

21            THE COURT:  Okay.  You wanted to meet with me

22   before?

23            MS. FULLER:  Yes, your Honor.  We are way

24   ahead.

25            THE COURT:  We're way ahead.

1          MS. FULLER:  We are way ahead.

2          THE COURT:  Good.

3          MS. FULLER:  And I think the government's plan

4     at this point, we will be calling our last -- our last

5     witness is on the stand now.  We will probably run a

6     little bit into tomorrow morning, but what I wanted to

7     talk to you about is, I know we ended at four.  There's

8     some pretty long stretch of text messages which makes

9     sense to sort of do all together, and I am wondering if

10    the Court would permit the government to get through,

11    you know, maybe 20 more minutes or half an hour and then

12    stop when we get to the text messages?

13         THE COURT:  That's fine.

14         MS. FULLER:  So it may be at quarter of four

15    or something.

16         THE COURT:  Yes, that's fine.

17         MS. FULLER:  All right, thank you.

18      So I think that means we -- I can't speak for the

19    defense, but it looks like we may be closing on Friday.

20         THE COURT:  Okay?  We'd be closing on Friday.

21    So you will be done.

22         MS. FULLER:  Tomorrow morning.

23         THE COURT:  Agent Brown will testify just a

24    little bit tomorrow morning and then that's it.

25         MS. FULLER:  Correct.

1           THE COURT:  Okay.  So it -- well, depending

2     upon what the defense does.  So we will be going on --

3           MR. MATSON:  We may be down to two witnesses,

4     Judge, so we could close evidence tomorrow.

5           THE COURT:  It could be that we close evidence

6     tomorrow?

7           MR. MATSON:  Yes.

8           THE COURT:  Okay.

9           MR. MATSON:  Funny how that happens on the

10    third day of trial.

11          THE COURT:  That's good.  Yeah, I just -- I

12    had been debating this whole issue, and --

13          MS. FULLER:  Do you want to reopen it?

14          THE COURT:  Pardon me?

15          MS. FULLER:  Do you want to reopen it?

16          THE COURT:  No, I don't think so.

17          MR. MATSON:  It's fascinating, Judge.

18          THE COURT:  No, I think this is -- I think

19    this is the answer.  I mean, I think the defense should

20    be able to say, you know, You did this and this and this

21    and this and this, you know, focus in upon the

22    defendant, without saying that there's some sort of

23    overall improper purpose.  But once you say overall

24    improper purpose, which I did not hear in the opening

25    statement, then the agents should be coming back and

1   say, Well, this is why we're doing it, you know.  And

2   that goes off into a completely other trial.

3       So this seems to be the perfect resolution.  I do

4   have to say that I think I got this one right.  Maybe --

5   maybe you don't agree, but that's it.

6       Okay.  So that's great.  So we will go for another

7   20 minutes.

8               MS. FULLER:  Yes.

9               THE COURT:  And then we will stop early.  And

10  I do have to -- I will say that I have to go over to

11  the -- Justice Dooley's hanging tomorrow, his portrait

12  hanging is at noon in the state court, and so -- and I

13  am giving a little presentation or talk.  So I will need

14  to leave at quarter of 12 tomorrow to get over there on

15  time.

16              MS. FULLER:  Okay.

17              THE COURT:  He and I teach a class at

18  Middlebury together, so we have become friends.  Anyway.

19  If that is relevant to the schedule as well.  But it

20  could be there might be a summation tomorrow afternoon.

21  Great.

22      Okay, so can we get the jury?  I will sit here.

23              MS. FULLER:  Thank you.

24  (The following was held in open court with the jury

25  present at 3:22 p.m.)

1              THE COURT:  Okay.  Thank you for your

2    patience.  We have had a number of conversations that

3    are now resolved and ready to go forward.

4              MS. FULLER:  Thank you, your Honor.

5    BY MS. FULLER:

6    Q    Agent Brown, there's been a lot of testimony about

7    the CI involved in this case.  Do you recall when you

8    first met with the CI?

9    A    Not -- not precisely, no.

10   Q    Okay.

11   A    Sometime after the Nectar's shooting.

12   Q    All right.  So was it in 2018 or 2019?

13   A    I think 2018.

14   Q    Okay.  And do you know -- do you have personal

15   knowledge of any assistance the CI gave to law

16   enforcement in 2018?

17   A    Yes.

18   Q    Okay.  And can you tell us what that is?

19   A    The CI was working for the Vermont State Police

20   Drug Task Force sometime in 2018, and the CI provided

21   information to the drug task force about Carl Martin and

22   narcotics distribution.

23   Q    Okay.  Are you aware of any controlled purchases or

24   attempted controlled purchases into Mr. Martin?

25   A    Yes, there were --

1    Q    Did you participate in any of those?

2    A    I was present for one of them in October of '18.

3    Q    Okay.  And were controlled substances purchased

4    from Mr. Martin during that time?

5    A    Suspected controlled substances, but they

6    ultimately tested negative for any controlled substance.

7    Q    And were you present for the second controlled

8    substance in the fall of 2018?

9    A    I was present for one of them.  I don't recall if

10   it was the first or the second.

11   Q    Okay.  So you were only present for one?

12   A    Correct.

13   Q    I want to fast-forward now to June of 2019.  Did

14   you become involved with the CI, John Latimer, at that

15   point?

16   A    Yes.

17   Q    And tell us how you became involved with that.

18   A    I had known or knew of the CI prior to that.  I was

19   aware that the October buys by the Vermont State Police

20   had come back as negative.  I don't remember the

21   specifics of how we came back to that confidential

22   informant or to call Martin at that time, but the best

23   of my recollection, it was something to the effect the

24   CI brought that back up to either myself or the Vermont

25   State Police and it filtered back to me, but it was

1    something to the effect of Carl Martin was selling

2    larger weights of drugs.

3    Q    Okay.  And so what effect did that have on ATF, you

4    and ATF?

5    A    Because we had already known Carl Martin from prior

6    investigation, we decided it was probably worth

7    continuing to look into that.

8    Q    Okay.  Is there anything else you -- or what did

9    you do next with regard to John Latimer, the CI?

10   A    We signed him up as an ATF confidential informant.

11   Q    All right.  Is there a protocol that ATF follows

12   when you sign someone up to be a confidential informant?

13   A    There is, yes.

14   Q    What is that protocol?

15   A    It would start with a conversation.  It would then

16   go --

17   Q    What do you mean by conversation?

18   A    Just talking to him about, you know, his interests,

19   his motivations, and the information that he would have

20   that would be salient to an ATF investigation.

21   Q    Okay.

22   A    We would then do a formal contract.  The agency has

23   I guess it's like a page and a half or two pages now --

24   it keeps getting longer -- of requirements per our

25   policy that the CI would be advised of.  He would need

1    to initial a lot of that and then sign it.  We explain

2    it to him more than just what's on the paper.  Things

3    like, you know, you don't represent yourself as law

4    enforcement.  We are not -- your work is not contingent

5    upon any kind of prosecution.  Agreements about

6    potential payment.  Things like no promises being made.

7    That sort of thing.

8    Q    Okay.  So when you -- when you go through that

9    document with him, what happens to the document after

10   that?

11   A    It goes up our chain of command.

12   Q    Okay.

13   A    That, along with some other paperwork, goes up the

14   chain of command and ultimately gets approved at a

15   division level.

16   Q    Okay.  So just to be sure -- just to be clear,

17   because there's two different -- it appears that Mr.

18   Latimer's involved in this case in two different ways,

19   the -- Mr. Latimer's work in the fall of 2018, did ATF

20   have any official involvement with him then --

21   A    No.

22   Q    -- as a CI?

23   A    He was not our CI.

24   Q    All right.  How does that work?  What do you mean

25   "he's not our CI"?  How does that work with law

1    enforcement agencies, your CI versus somebody else's CI?

2    A    It's mostly -- I mean, a lot of it has to do with

3    paper.  Probably some liability.  But for the most part,

4    like in a nutshell, I am not running the CI at that

5    point.  The CI is not reporting to me generally.  It's

6    possible the CI -- or a CI would have another law

7    enforcement officer's number just because that -- you

8    know, especially in Vermont, it's a small state, there's

9    a lot of overlap, but the long and the short of it is,

10   you know, at that time in October, the CI is reporting

11   to the Vermont State Police and his handler with the

12   Vermont State Police.

13   Q    Okay.  You said his handler.  So describe for us --

14   you mention a couple words there.  You said handler and

15   running the CI.  Tell us how a CI operates in terms of,

16   you know, where does the direction come from, what does

17   he -- how does he know what to do.

18   A    Well, by handler, I mean the agent who is

19   responsible for signing him up and would be responsible

20   for the primary communication with the CI.  How the CI

21   knows what to do would be through conversation and a

22   sense of where the investigation is going or what -- or

23   what the -- or what we believe the direction of the

24   investigation will be, you know.

25        I'm sorry.  If you can ask the question again.  I

1    think I lost my train of thought.

2    Q    Yes.  Does that come from the handler?

3    A    Generally, yes, or, you know, other agents working

4    with the handler as an office.

5    Q    Okay.  So a VSP CI, signed-up CI, takes direction

6    from that agency?

7    A    Yes.

8    Q    All right.  And an ATF CI takes direction from ATF?

9    A    Correct.

10    Q    All right.  Why was Mr. Latimer agreeing to work

11    with ATF?  What was he receiving in exchange?

12    A    Cash.

13    Q    Okay.  Is there a word you use to describe that

14    cash other than just cash?

15    A    Subsistence payments.

16    Q    All right.  What do you mean by that?

17    A    Well, we pay confidential informants for their

18    work, but importantly we don't pay them with any

19    specific purpose, which is to say their payment is not

20    contingent upon a certain outcome.  It's not contingent

21    upon the number of buys they do.  It's not contingent

22    upon successful prosecution.  It's simply paid by days

23    working.

24    Q    All right.  So can you give us a hypothetical to

25    sort of explain what you mean?

```
1    A    Sure.  So if on day X a CI provides us information
2    that someone is distributing firearms illegally, that
3    could result in a subsistence payment.  If on day Y,
4    which could be a week, a month, even a year later, that
5    CI provides us -- or, say, does a controlled phone call
6    with us present, that could be another instance where he
7    would receive a subsistence payment.  If the CI on day
8    Z, which again could be a day, a week, however long
9    later, helps us with a controlled purchase, that's
10   another day that they could be paid a subsistence
11   payment for.
12   Q    So what happens on those days, the X, Y and Z,
13   nothing comes of it, it doesn't bear any fruit and the
14   leads end up in a dead end?  What if nothing comes of
15   that?  Is there still payment?
16   A    Likely we would still pay them, yes.
17   Q    So this Mr. Latimer, did you know him by another
18   name?
19   A    Red.
20   Q    All right.  Now, was it only this case in which Red
21   was agreeing to work with ATF?
22   A    No.  He was working at least one other if not two
23   other cases on top of this.
24   Q    All right.  And was he being paid for those as
25   well?
```

1    A    He was.

2    Q    So can you tell us what the typical -- I mean,

3    understanding this is sort of just an average -- typical

4    payment to any CI in ATF would generally be for a day?

5    A    We can pay a confidential informant up to $200 a

6    day in subsistence payments.

7    Q    All right.  Is that -- trying to give the jurors an

8    idea of how -- how common that payment is for any CI,

9    not just Mr. Latimer.

10   A    I would say it depends on the agent.  And also the

11   informant.

12   Q    Okay.

13   A    I would say that I personally probably pay on the

14   higher end because I find that it -- that the

15   confidential informant is more likely to provide

16   information on a regular basis.

17   Q    Okay.  So we have heard a lot of testimony about

18   the controlled -- the controlled buys conducted into Mr.

19   Martin.  What was your role, just generally, and then

20   we'll get to a more granular level?

21   A    I was the case agent, so I would have been, I would

22   say, running the undercover as well as taking the larger

23   view of the investigation as a whole.

24   Q    Okay.  What do you mean running the undercover?

25   A    I would have been workinging with the undercover

1    before and after the undercover goes in to the deals.

2    The undercover agent and I would have extensive

3    conversations about where this was going and what we

4    thought it would look like.  And I would be the person

5    primarily in contact with the undercover during the

6    deals.

7    Q    How about as it relates -- sorry.

8         When you say undercover, you mean Special Agent

9    Wood?

10   A    Correct.

11   Q    How about as it relates to the CI?

12   A    The same thing.

13   Q    Okay.  So I want to talk to you about the buy on

14   August 26th, 2019.  Can you describe for us what your

15   role for that buy was.

16   A    I was the case agent, and I primarily -- once the

17   deal is going, I end up being surveillance for the most

18   part.

19   Q    Okay.  Did you have any involvement with the

20   substances that were purchased?

21   A    Yes.  I would have received them after Agent Wood

22   and I met up.

23   Q    Okay.  And what happens after you take possession

24   of a substance purchased during a controlled buy?

25   A    I would take them back to our office, and then they

1    would be weighed, packaged, and put in the vault.

2    Q    Okay.  And in this particular case, on August 26th,

3    2019, did you touch the substances in any way, you know,

4    inside the packaging?

5    A    No, not that I recall.

6    Q    How about the buy on September 5th?

7    A    Same answer.

8    Q    Okay.  So you received the substances, took them

9    back to the office, and didn't touch them inside the

10   packaging?

11   A    No.  I would have just packaged them back up and

12   packaged them into our sealed bags.

13   Q    Okay.  The heat sealing that you heard described

14   earlier?

15   A    Correct.

16   Q    Were you present for the controlled buy on

17   September 20th?

18   A    I was not.

19   Q    And how about the reverse on September 23rd?

20   A    I was.

21   Q    And so did you have contact with the controlled

22   substances in that case as well?

23   A    Not on that one, no.

24   Q    Okay.  So did you have any involvement with the

25   analysis of Carl Martin's cell phone, which is

1    Government's Exhibit 55?

2    A    Yes.

3    Q    And what was your involvement?

4    A    I have reviewed the data from the phone.

5    Q    Okay.  And when you review data from a phone, what

6    kind of things are you looking for?

7    A    Well, I work for the ATF, so primarily firearms and

8    violent crime.

9    Q    Okay.

10   A    But also, you know, in this case there would be

11   drug uses -- or drug possession, drug usage as well.

12   Q    Okay.  I am going to talk to you about one exhibit,

13   Exhibit 126.

14        Okay.  So this exhibit has previously been admitted

15   and was discussed by Agent Ekstrom as something that

16   came off from Carl Martin's phone.

17             MS. FULLER:  Could we scroll into the user

18   account at the bottom.

19   BY MS. FULLER:

20   Q    Have you seen this document before?

21   A    I have.

22   Q    Okay.  So I want to go through a couple of things

23   that we see here.  Under the first line where it says

24   TextMe, we have a username of Stephanie Bilodeau, and

25   then we have an e-mail of stephaniebilodeau1986.  Do you

1    know who Stephanie Bilodeau is?

2    A    It's my understanding she was Carl Martin's

3    girlfriend or wife at the time.

4    Q    Okay.  And down on the second line, we have a

5    TextNow account that says jamaicaman84.  Do you know

6    Carl Martin's -- where he was born?

7    A    Jamaica.

8    Q    And one question before that.  I should have asked

9    you this before we left Miss Bilodeau.  Do you know

10   where Miss Bilodeau was living?

11   A    Cottage Grove, South Burlington.

12   Q    All right.  Do you know whether that location has

13   any other -- came up in any other way in connection with

14   this case?

15   A    There was surveillance done, I believe -- at least

16   after buys if not before buys of Mirnes Julardziga and

17   Carl Martin at that address.

18   Q    Okay.  At the Cottage Grove address in South

19   Burlington?

20   A    Yes.

21   Q    What proximity does that address have to Price

22   Chopper in South Burlington on Williston Road?

23   A    Very close.  Within minutes.

24        MS. FULLER:  Your Honor, I think we might be

25   at that point.

1          THE COURT:  All right.  So we are coming to a

2    change in the focus of the testimony, so I think it's

3    probably appropriate that we stop a little early today.

4    You should know that we are actually above -- we are

5    ahead of schedule.  It's -- it may be that the case may

6    be resolved and to you tomorrow or Friday, but it could

7    be tomorrow.  So I would ask that tonight you try to

8    make some alternative plans for your personal

9    responsibilities just in case the case is submitted to

10   the jury.  And if it's submitted to the jury, of course

11   you take charge of the schedule, and you can go later,

12   assuming that everyone in the jury agrees to that.  So

13   you might want to try to have an alternative

14   arrangement.

15       I don't know whether it will be submitted to you

16   tomorrow or not, but just in case, it would be helpful

17   if you have some alternative arrangements.

18       So again, I just want to remind you not to learn

19   anything about this case, to talk with anyone about this

20   case, and we will see you tomorrow at nine o'clock.  I

21   am going to stay here and talk with the lawyers.  Okay.

22   (The jury was excused after which the following was held

23   in open court at 3:41 p.m.)

24          THE COURT:  All right.  Thank you, Agent

25   Brown.

1          THE WITNESS:  Yes, sir.

2          (Witness temporarily excused.)

3          THE COURT:  All right.  So we will begin again

4    at nine o'clock tomorrow.  Do you anticipate needing to

5    speak with me in advance?

6          MR. MATSON:  Well, your Honor, there is one

7    outstanding issue, and if it starts tomorrow morning,

8    the issue would be the treatment of Officer Prack --

9    Trooper Prack, pardon me, as --

10         Your Honor, if Trooper Prack was to start

11   testifying tomorrow morning, there is an outstanding

12   issue as to whether I can treat him as an adverse

13   witness.

14         THE COURT:  I am going to grant your request

15   to do that.

16         MR. MATSON:  Thank you.

17         THE COURT:  Yes.  So you can cross examine

18   him.

19         MR. MATSON:  Thank you, Judge.

20         THE COURT:  Yes.  All right.

21         Also, the jury charge has been drafted.  I have a

22   couple of questions of initial issues.

23         First, the defense had requested a missing

24   witness's instruction.  I don't think that's appropriate

25   anymore.  Is that correct?

1          MR. MATSON:  What happens to the missing

2    witness instruction when the defense lawyer finds them?

3          THE COURT:  Right.  You found them.

4          MR. MATSON:  That was -- yeah.

5          THE COURT:  Right.

6          MR. MATSON:  That was a novel question, but --

7          THE COURT:  Yeah, it's a -- it's a novel

8    question, but I don't think you get it.

9          MR. MATSON:  I mean, I think it's a fair

10   argument as to why the defense called and, you know,

11   depending on what his testimony is, but not --

12   definitely not worthy of instruction, Judge, so I will

13   withdraw it.

14         THE COURT:  Right.  Okay.  So I will strike

15   that.

16        Second, obviously the communications have been

17   between and among alleged co-conspirators, not

18   accomplices.  The question is whether a standard

19   accomplice instruction would be included.  I don't think

20   that's pled, but you might want to think about that.  I

21   don't think that would be worthy of a separate

22   instruction, but tell me if that's right.

23        So missing persons would be excluded.

24        Of course, I got an instruction here for defendant

25   not testifying.  Obviously we will see if the defendant

1    testifies or does not.  If the defendant does not

2    testify, then of course I turn to the defendant's

3    counsel and ask would you want the instruction or not.

4    Some people don't want it; some people do.  It's right

5    now in the purported instructions.

6        I am going to actually give you the instructions in

7    just a few minutes so you have them overnight.

8        There is an other crimes wrongs and acts of

9    defendant, but it's related, you know, to

10   predisposition, basically.  So it's modified to some

11   extent.  So it's related to predisposition.  You should

12   take a look at that.

13       The others are fairly standard instructions.  I

14   have an instruction at the end on entrapment defense.

15   We will address that tomorrow.  Okay?

16           MS. FULLER:  I suppose we will see it when we

17   get the papers, but I don't think we asked for an aiding

18   and abetting instruction.  I'm not sure if it's in

19   there, but the crime charged is -- that's one of the

20   allegations is aiding and abetting.

21           THE COURT:  Yeah.  And I don't think aiding

22   and abetting would be -- well, did you have section --

23   did you have a section two --

24           MS. FULLER:  Yes.

25           THE COURT:  -- instruction?

1          MS. FULLER:  Yes.

2          THE COURT:  So you did ask for an aiding and

3     abetting.

4          MS. FULLER:  I think we -- yeah, I think we

5     did.

6          LAW CLERK:  They did.

7          MS. FULLER:  Yes.

8          THE COURT:  Right.  Okay.

9          MS. FULLER:  I am just not sure -- I think it

10    seems to -- it seems pretty clear to me but there has

11    been an argument made that Mirnes did the hand-to-hand.

12    I don't want the jurors to be confused that merely --

13    you know, if Mirnes is doing the hand-to-hand but Carl

14    Martin arranges the deal, you know, that is an avenue to

15    get them to that charge.  I don't --

16         THE COURT:  So you are asking for that.

17         MS. FULLER:  Yes.

18         THE COURT:  All right.  So we will get copies

19    to you.  So we won't meet early in the morning, because

20    I don't know if it will go to the trial -- or go to the

21    jury or not, but you will have it overnight, and

22    obviously we will have a charge conference before final

23    summations.

24        Is there anything else we need to talk about at

25    this point?

1          MS. FULLER:  I don't think so, your Honor.

2          THE COURT:  Okay.  All right, thank you.  See

3    you tomorrow morning.

4              (Court was in recess at 3:46 p.m.)

5                      *** ** ***

6

7

8

9

10              C E R T I F I C A T I O N

11       I certify that the foregoing is a correct

12   transcript from the record of proceedings in the
     above-entitled matter.

13

14   July 8, 2023                    _____
     Date                            Anne Nichols Pierce

15

16

17

18

19

20

21

22

23

24

25