UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA       *
                               *
               V               *
                               *
CARL MARTIN                    * CRIMINAL FILE NO. 19-157




JURY TRIAL
Thursday, June 9, 2022
Burlington, Vermont




BEFORE:

     THE HONORABLE WILLIAM K. SESSIONS III
          Senior District Judge

APPEARANCES:

     WENDY L. FULLER, ESQ., and ANDREW C. GILMAN, ESQ.,
          Assistant United States Attorneys, Federal
          Building, Burlington, Vermont; Attorneys for the
          United States

     CHANDLER W. MATSON, ESQ., The Law Offices of
          Chandler W. Matson, 125 Mountain Road, Stowe,
          Vermont; Attorney for Defendant Carl Martin

ANNE NICHOLS PIERCE
United States District Court Reporter (ret'd.)
forttherecordinvermont@gmail.com

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **SAMUEL BROWN** | | |
| Direct by Ms. Fuller | 5 | 8 |
| Cross by Mr. Matson | 42 | 20 |
| Redirect by Ms. Fuller | 93 | 6 |
| Recross by Mr. Matson | 114 | 2 |
| **JON PRACK** | | |
| Cross by Mr. Matson | 119 | 8 |
| Recross by Ms. Fuller | 167 | 3 |
| Recross by Mr. Matson | 174 | 24 |
| Redirect by Ms. Fuller | 177 | 5 |

## E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| I | Payments to confidential informant | 91 |
| M | Photo of Carl Martin | 62 |
| T2 | Photos of interior of car/prop firearm | 49 |
| Y2 | Text messages between Brown and CI | 65 |
| A3 | Text message between Prack and CI | 121 |

# I N D E X

### M I S C E L L A N E O U S

|                     | PAGE |
| ------------------- | ---- |
| Government rests    | 115  |
| Defendant rests     | 178  |
| Charge conference   | 180  |

4

1     THURSDAY, JUNE 9, 2022
2     (The following was held in open court with the jury
3     present at 9:00 a.m.)
4               THE COURT:  Okay.  Good morning.
5               COURTROOM DEPUTY:  Your Honor, this is
6     criminal number 19-157, defendant number one, United
7     States of America versus Carl Martin.  The government is
8     present through Assistant United States Attorneys Wendy
9     Fuller and Andrew Gilman.  The defendant is present with
10    his attorney, Chandler Matson.
11        The matter before the Court is day four of jury
12    trial.
13              THE COURT:  All right.  Have any of you
14    learned anything about this case from outside of the
15    courtroom?  Have you read anything about this case?  Or
16    have you communicated among yourselves about the facts
17    of the case?
18              (The jury all indicate in the negative.)
19              THE COURT:  Okay.  Everyone has said no.
20        It's a little bit of a modification of schedule
21    today.  I have an event that I need to attend at noon at
22    the state court, state courthouse, so we will be taking
23    our break at about quarter of so that I can make it over
24    to this event at the state court.
25        Okay, so I think we are ready to proceed?

MS. FULLER:  We are, your Honor.  We call

Special Agent Samuel Brown.

SAMUEL BROWN,

being first duly sworn by the courtroom deputy,

was further examined and testified as follows:

THE COURT:  Good morning, Agent Brown.

THE WITNESS:  Good morning.

CONTINUED DIRECT EXAMINATION

BY MS. FULLER:

Q    Good morning.

A    Good morning.

Q    When we were here yesterday, Agent Brown, we were

starting to talk about your analysis of Carl Martin's

phone.

A    Yes.

Q    Can you just tell us what you -- kind of things you

look for when you look through a phone of a suspect.

A    Generally thing about firearms, illegal possession

of firearms, illegal trafficking in firearms, drugs, and

probably other violent crimes.

Q    And did you find any of those things on Mr.

Martin's cell phone?

A    Yes.

Q    Just back up a little bit.  Were you involved in

the arrest of Mr. Martin?

```
1    A    Yes.
2    Q    Okay.  And did you recover his cell phone?
3    A    Yes.
4    Q    From his --
5    A    It was recovered.
6    Q    From his person?
7    A    Yes.  I didn't personally, but yes.
8    Q    Okay.  So I want to show you a list of exhibits.  I
9    am just going to show -- they have all been marked and
10   admitted previously as exhibits that came from Mr.
11   Martin's cell phone, and I am going to show you
12   Government's Exhibits, just for the purposes of
13   the record, 110, 111, 112, 112A through B, 113, 114,
14   115, 120, 120A through H, and 130.  And Exhibit 116A,
15   116B, 116C, 116D, and 116E.
16            THE COURT:  Have those all been admitted into
17   evidence?
18            MS. FULLER:  They have been, your Honor.  Yes.
19       So, Agent, if we could start with Exhibit 110.
20       If you would bring that up.
21       Could you just take a look at that first.
22            THE WITNESS:  Yes.
23            MS. FULLER:  So if we can just make -- enlarge
24   that, please.
25            LIZA LABOMBARD:  The top part?
```

1          MS. FULLER:  Just the whole thing, so it's

2     clearer.

3     BY MS. FULLER:

4     Q    So what are we looking at here?

5     A    These are text messages from Carl Martin's phone to

6     phone number (802) 233-8025, and the contact in Carl

7     Martin's phone is listed as Ash.

8     Q    Okay.  So we will read through this series of

9     texts.  I will read the outgoing call.  If you read the

10    incoming call -- the outgoing call being Mr. Martin --

11    or being sent from his cell phone.

12    A    Okay.

13    Q    This is at October 14th, 2019.  And the message

14    says, "Still need that?"

15    A    "What do you mean?  You never hit me back so I just

16    left it alone.  I think he just got hard instead."

17    Q    "Oh."

18    A    "I'll ask him if he still wants one this morning.

19    He supposed to be stopping by in a few minutes, eat

20    breakfast."

21    Q    "Okay.

22         "Where is mines?"

23    A    "He don't use it so he probably needs."

24    Q    Okay.  Can we talk about a couple -- couple words

25    in there.  The word "I think he got hard instead," in

1    your training and experience in drug cases, can you tell
2    us what you understand that to refer to?
3    A    The crack cocaine.
4    Q    Okay.  And what words, in your training and
5    experience, are used to describe cocaine, crack cocaine?
6    A    Hard would be crack cocaine, and soft would
7    generally be like powdered cocaine.
8    Q    Okay.
9        All right.  Let's talk about another exhibit.
10   Exhibit 111.
11            MS. FULLER:  If we can highlight those,
12   please.
13   BY MS. FULLER:
14   Q    So if you could read this.  Just review it for a
15   minute.
16   A    Sure.  These are text messages from Carl Martin's
17   phone to phone number (802) 829-0768, and the contact in
18   the phone listed as Bevin.
19   Q    Okay.  We can --
20   A    And this person is looking for a refund.
21   Q    Looking for a refund of what?
22   A    Suspected to be a refund for drugs they purchased
23   or what they thought was drugs and maybe was not, or low
24   quality.
25   Q    Okay.  So if we can just read through this page.

```
 1    It's relatively short.  I will read the outgoing call
 2    and you can read the incoming.
 3    A    "How long till you're here?"
 4    Q    "10 minutes tops."
 5    A    "Okay.  I can't meet you closer than this place."
 6    Q    "My nephew coming.  Have interview.  He only know
 7    that spot."
 8         Oh.
 9         "Be there very soon."
10    A    "If I give it back, can I get my money back?"
11    Q    "How much you take out?"
12    A    "About a half or so."
13    Q    What do you understand that to be referring to?
14    A    Well, he wants his money back, and then he has
15    asked how much, like, did he use, and he is saying he
16    used about a half of whatever he got.
17    Q    So if we can skip down to message 14.
18         "Got you as soon as I'm done."
19    A    "Okay, buddy.  Thank you."
20    Q    "No problem."
21    A    "How much longer buddy?  I need my money back."
22    Q    "Waiting for my nephew.  Haven't seen him since."
23    A    "What do you need him for?  I can come to you."
24    Q    "He got that shit."
25    A    "I don't need that shit.  I need my money back
```

1  unless you got something good to replace it.  But come
2  on, buddy, this shouldn't take this long to give me my
3  money.  The shit is trash."
4  Q    "I got you."
5       And could you tell us, in the investigation, what
6  is going on in the investigation -- the ATF
7  investigation into Mr. Martin right around this time?
8            MR. MATSON:  Your Honor, I would object.  It
9  does seem like this would be based on just conversations
10 that he has had with other agents, and if it is going to
11 come in for that purpose, then I --
12           THE COURT:  Objection overruled.  He can
13 testify about what's happening in the investigation.
14           MR. MATSON:  Okay.  To the extent the hearsay
15 then comes in, your Honor, I just would want an
16 instruction that it shouldn't be --
17           THE COURT:  Well --
18           MR. MATSON:  -- considered for the truth --
19           THE COURT:  Well, it is his --
20           MR. MATSON:  -- of the matter asserted.
21           THE COURT:  Well, it is his understanding of
22 the status of the investigation.  I think that's
23 relevant, and objection overruled.  Go ahead.
24           THE WITNESS:  During this time we are doing
25 controlled purchases into Carl Martin and have or will

1    determine that some of them are real drugs and some of

2    them are not.

3            MS. FULLER:  Thank you.

4        If we can go to Government's Exhibit 112, please.

5            THE WITNESS:  This --

6            MS. FULLER:  Just the top, for -- line one

7    through -- sorry.  It's hard to see.  One through seven,

8    please.

9            THE WITNESS:  Sure.  Are you starting?

10           MS. FULLER:  Yes.

11   BY MS. FULLER:

12   Q    So, again, what is this?

13   A    So this is text messages phoned on Carl Martin's

14   phone to phone number (802) 461-9084 to a contact listed

15   as Byrd.

16   Q    Okay.  So the outgoing message says, "What's good?"

17   A    "Who's this?"

18   Q    "Dre."

19       And then there's an empty box here at the bottom,

20   line seven.  In your review of the phone, what occurs

21   in that -- at approximately October 5th, 2019, at that

22   particular time, 18:07?

23   A    There are two photos sent to this person Byrd.

24           MS. FULLER:  Okay.  Can we bring up

25   Government's Exhibit 112A.

BY MS. FULLER:

Q    Is that the first photo sent?

A    That's my recollection, yes.

Q    And who is that?

A    That's Carl Martin.

Q    And 112B?

A    That's also Carl Martin.

Q    Is that the other photograph that we see on that spreadsheet?

A    To my recollection, yes.

Q    Okay.  And if we can just go back to 112 again.

A    Sure.

Q    Just if we highlight line seven.

     What's happening with that particular message?

A    That is a message getting sent to Byrd that indicates that there's a photo attachment.

Q    All right.  So it's a message being sent out to Byrd --

A    Correct.

Q    -- with those two attachments?

A    Correct.

Q    Okay.  So if we can start with 112 -- or line 12 down to the bottom, please.

A    "NM homesick."

Q    "You should come see me one of these days."

```
1    A    "I would if I had a car.  I need a freaking water

2    pump for my car.  I don't have the money to get it."

3    Q    "I could make some if you know people who like that

4    girl."

5    A    "Are you talking about snow white or are you

6    talking about my friend Molly?"

7    Q    "Snow white."

8    A    "Already have snow white and the seven doors going

9    on right now."

10   Q    Can I stop you there.  What do you understand snow

11   white to refer to?

12   A    Powder cocaine.

13   Q    "Oh, nice.  What about your friend Molly?"

14   A    "No, Molly's not around.  I do have a friend that

15   has a friend named Molly.  My Molly is not here."

16   Q    "I have a fee few friends who's looking for her."

17   A    "Okay.  I may be able to help."

18   Q    "Yes.

19        "What's the number for her?"

20   A    Mmm, I'd have to find out from my people up."

21   Q    "Let me know."

22   A    "KK."

23   Q    So if we can go -- just -- we've heard this before

24   in the testimony in trial, but what does Molly refer to?

25   A    MDMA.
```

1    Q    Which is what?

2    A    Controlled substance.

3    Q    Can we go to Exhibit 113, and can you tell us what

4    this is, please?

5    A    These are text messages found on Carl Martin's

6    phone in which he is communicating with number

7    (802) 922-4068, and the contact is listed as Jake.

8    Q    Okay.  If we can just read through the two pages.

9    This is on September 4th, 2019?

10    A    Yes.

11    Q    Okay.

12         "I know you know people that like that white girl.

13         "Laugh out loud."

14    A    "Of you know this, huh."

15    Q    "I know."

16    A    "Why do you say that though."

17    Q    "I have."

18    A    "You know my people."

19    Q    "I got, you want?"

20    A    "What kinda ice cream you eating?"

21    Q    "I have soft ice cream right now."

22    A    "That's my favorite.  I spend too much on the other

23    kind.  I will tomorrow or Friday.  LOL."

24    Q    "Let me know what you looking for and I'll have it

25    ready."

```
1    A    "Only one or two scoops for me.  I'm dieting.

2    LOL."

3    Q    "LOL.  I got you.  I'll leave two scoops for you."

4    A    "Good looks, what you need."

5    Q    "Two.  LOL."

6    A    "Better leave one.  LOL."

7    Q    "160."

8    A    "That's better.

9         "Not my first creemee.  LOL."

10   Q    "LOL."

11        Next page.

12   A    I think it's still you.

13   Q    "I got you.

14        "Two separate creams or two in one?"

15   A    "I'm bringing bud for some of it.  LOL."

16   Q    "That's fine."

17   A    "Two separate.  Gotta keep the ice cream man

18   honest.  Haha."

19   Q    "LOL."

20   A    "The old one scoop vanilla scoop of arm and hammer.

21   LOL."

22   Q    So can we go back to the first page and talk

23   through some of the words we see there.

24        So at the top, line two, we see the word "white

25   girl."  What do you understand that to refer to?
```

1    A    Powder cocaine.

2    Q    And as we scroll down, we see on line 10 the

3    incoming call from Jake, or the text from Jake which

4    says, "What kind of ice cream you eating?"

5         And the text from Carl Martin's cell phone says, "I

6    have soft ice cream right now."

7         What do you understand that to refer to?

8    A    Cocaine.

9    Q    And as we scroll down a little further, line 14,

10   incoming text from Jake, "Only one or two scoops for me.

11   I'm dieting."

12        Line 15, "I got you.  I'll leave two scoops for

13   you."  That's from Carl Martin's phone.

14        What do you understand that to refer to?

15   A    Talking about quantities.

16   Q    And if we can go to the next page, please.  And on

17   line 24, we see a text message from Carl Martin's phone

18   to Jake that says, "Two separate creams or two in one."

19        You see this right here?

20   A    Yes.

21   Q    What do you understand that to refer to?

22   A    My understanding would be he is asking if he wants

23   it in one bag or two bags.

24   Q    Have you seen that anywhere else in connection with

25   this case?

1    A    When he is talking to the undercover before the

2    ultimate firearms reverse.

3    Q    Something similar was said to the undercover?

4    A    Ultimately, the undercover received two bags.

5    Q    Okay.  And the text here at the bottom, "The old

6    one scoop vanilla scoop of arm and hammer," do you

7    understand anything about what that means?

8    A    Arm and hammer is another code for powder cocaine,

9    and this scoop again would be the quantity.

10   Q    Thank you.

11        So if we can go to Government's Exhibit 115.

12   A    115 or 114?

13   Q    I'm sorry.  114.

14        And what is this, Agent Brown?

15   A    This is more text messages from Carl Martin's phone

16   to phone number (802) 999-3201.  The contact is listed

17   as Larry.

18   Q    Okay.  And what are these series of text messages

19   about?

20   A    Primarily, or at least in part, it talks about

21   Larry's asking Carl if Carl will front him or give him a

22   gram of drugs on consignment.

23   Q    If you can just read line seven for us.

24   A    Sure.

25        "I need a G till tomorrow if you trust me for a

1    night."

2    Q    And line eight?

3    A    "Yeah, I got you."

4    Q    So that was an incoming text from Larry asking for

5    a G?

6    A    Yes.

7    Q    And then there was an outgoing text from Carl

8    Martin's phone saying, "I got you"?

9    A    Yes.

10    Q    Can we look at 115, please.

11    A    These are also texts from Carl Martin's phone to

12    phone number (802) 355-5144, with a contact of Malik.

13    Q    Okay.  If we can start right at the top at line

14    two, the text on July 25th -- starting July 25th, 2019.

15    I'll read the outgoing if you want to read the ingoing.

16    A    Okay.

17    Q    "Yo bro.  You or trigger want to get rid of an

18    onion.  If so, how much?"

19    A    "Imma ask him."

20    Q    "Dude trying to get it like 10:30 soft girl."

21    A    "When do they want it?"

22    Q    "10:30, 11.

23         "How much?"

24    A    "I'm not sure.  I gotta ask him."

25    Q    "You busy right now?"

```
1    A    "I just woke up right now."
2    Q    "Oh.  Was trying to get home real quick."
3    A    "Trigger said he ain't got white girl."
4    Q    "Okay."
5         What do you understand that to refer to?
6    A    Carl is attempting to acquire an ounce of powdered
7    cocaine.
8    Q    And the word "onion" that we see at the top?
9    A    That would be an ounce.
10   Q    Okay.  And, again, I believe you already testified
11   to it, but the word "soft girl"?
12   A    Soft girl and white girl would both refer to
13   powdered cocaine.
14   Q    Thank you.
15        Now, if you can look at Government's Exhibit 120,
16   please.
17        Now, in connection with your investigation, did you
18   learn anything about the possible supplier for Mr.
19   Martin for the -- did you learn anything about who
20   possibly supplied Mr. Martin with the cocaine?
21   A    Yes.  Through the course of the investigation, we
22   learned that Bryan Correa Santiago was the supplier.
23             MR. MATSON:  I apologize, your Honor.  If
24   that's based on personal knowledge, fine; but if it's
25   hearsay, I move to strike.
```

1          THE COURT:  It's part of the investigation.

2    He can testify to that.  So objection overruled.

3    BY MS. FULLER:

4    Q    So could you review 120 and tell us what those are.

5    Exhibit 120.

6    A    These are text messages from Carl Martin's phone to

7    phone number (802) 391-6205 listed in the contacts as

8    Bryan Poker.

9    Q    Okay.  Have you reviewed all of those text

10   messages?

11   A    I have.

12   Q    And can you tell us generally what -- what are the

13   communications between Carl Martin's cell phone and this

14   person identified in these text messages as Bryan Poker?

15   A    They talk about Poker.  They also talk about

16   acquiring drugs.  They talk about the quality of drugs.

17   And they talk about attempting a robbery.

18   Q    Okay.

19          MS. FULLER:  So if I can go to line 434,

20   please?

21          LIZA LABOMBARD:  What's that line?

22          MS. FULLER:  434.  And just highlight from

23   434, just the line 434.

24   BY MS. FULLER:

25   Q    Could you read that message for us.

1   A    "RD.  I just hit up a couple people and let them

2   know.  I have the real -- I have that real deal

3   holyfield."

4   Q    And that's an outgoing text from Mr. Martin's cell

5   phone?

6   A    Correct.

7   Q    To Bryan Poker?

8   A    Yes.

9   Q    And have you heard the phrase "real deal holyfield"

10  in connection with this case before?

11  A    Yes.  Carl Martin sent that same phrase to the

12  undercover.

13           MS. FULLER:  Okay.  If we can go to line 550

14  through 561.

15  BY MS. FULLER:

16  Q    So more text messages from Carl Martin's phone; is

17  that correct?

18  A    Yes.

19  Q    Okay.  I will read the outgoing text messages to

20  Bryan Poker; if you could read the incoming.

21       "Boi said he will take one or two for now till he

22  gets good feedback from his people.  So make sure it's

23  fire so he come back."

24  A    "KK.  LMK."  Let me know when.

25  Q    "Working on it."

```
1    A    "K."

2    Q    "What's the word?  Boi waiting."

3    A    "I can't do nothing Kase blacky ain't here either.

4    I told you to let me know head of time.

5         "Probably like at 7:30 or tomorrow, bro."

6    Q    "He just hit me.

7         "So if you drop off tonight, I'll do it tomorrow."

8    A    "Yeah.

9         "Gotnu bro."

10   Q    So these text messages are on October 22nd, 2019.

11   Can you tell us what is going on in the investigation at

12   this particular point?

13   A    At this time the UC has been in conversation with

14   Carl Martin about another drug deal and I believe at

15   this point the firearm as well.

16   Q    Okay.  When was the firearm reverse in this case?

17   A    October 23rd, 2019.

18   Q    It was the day after this message?

19   A    Yes.

20              MS. FULLER:  If we can go to 645, please.

21   Line 645, Exhibit 120.  645 to 648, please.

22   BY MS. FULLER:

23   Q    If we can read those.

24   A    "You almost here?"

25   Q    "Beltline."
```

```
 1    A    "K."
 2    Q    "I'm outside."
 3         When is the date and time of these things, these
 4    texts we just read?
 5    A    This is October 23rd, 2019, at 11:50 a.m.
 6    Q    Okay.  And what is happening in the investigation
 7    right around this same exact time?
 8    A    The ATF undercover is getting ready to meet Carl
 9    Martin for --
10    Q    Do you know approximately when the ATF undercover
11    met with Carl Martin?  What time?
12    A    I don't recall.  Maybe around one o'clock, but I
13    would need to refresh my memory for a more exact time.
14    Q    Okay.  Agent Brown, I'm going to show you what's
15    been marked for identification as Government's
16    Exhibit 43.  If you could review that.  Let me know if
17    that refreshes your recollection.
18    A    Yes.
19    Q    And so, again, what is happening right around this
20    same time in your investigation around the same time as
21    these text messages we just heard?
22    A    The undercover is arranging with Carl Martin to
23    purchase more drugs and trade a firearm.
24    Q    Okay.  And from your review -- your refreshed
25    recollection of this report, can you tell us when the
```

1    reverse transaction occurred between Carl Martin and the

2    UC?

3    A    Approximately 12:56 p.m.

4    Q    All right.  So that's -- that section we just read

5    about Bryan Correa --

6              MS. FULLER:  Yes, if we can come up with --

7    A    It's about an hour before they meet.

8    BY MS. FULLER:

9    Q    These text messages are an hour before the reverse

10   happens?

11   A    Correct.

12   Q    Okay.  Thank you.

13        Now, we've heard testimony yesterday about an

14   incident that happened in and around October 10th into

15   the 11th, 2019, the attempted robbery.  Are you familiar

16   with that?

17   A    Yes.

18   Q    Okay.  Could you take a look at Exhibit 130.  We

19   can talk about some of the text messages found on Mr.

20   Martin's cell phone.

21        Okay.  If I could direct your attention to line 982

22   through 987.

23              LIZA LABOMBARD:  Do you have a document

24   number?

25              MS. FULLER:  Yes.  Sorry, Liza.  Document

1    number 2346.  At the bottom.

2    BY MS. FULLER:

3    Q    So if we could read through these text messages

4    again.  I'll read the outgoing; if you want to read the

5    incoming.

6         Outgoing message at -- on September 20th, 2019, to

7    Bryan Poker:  "Sup with that lick mang."

8         And then there's a phone call.  And then there's

9    another outgoing message.

10        "Any word on that?"

11   A    Bryan Poker responds:  "I told you I take you

12   fool."

13        And "IDC."

14   Q    "Not yet.  Be a minute."

15        Or, actually, that was an incoming -- that was

16   incoming message.

17        So what, in your training and experience, is

18   happening with the outgoing message on September 20th

19   with the words "sup with that lick mang"?

20   A    That is Carl Martin asking Bryan Poker about a

21   robbery target or victim.

22   Q    What do you understand the word "lick" to mean?

23   A    Robbery, or robbery target.

24             MS. FULLER:  Same exhibit.  If we can go to

25   document number 2357, line 1243 through 1251.

1    BY MS. FULLER:

2    Q    And, again, these are more text messages off of Mr.

3    Martin's cell phone?

4    A    Yes.

5    Q    September 30th, 2019, outgoing message to Bryan

6    Poker:  Lots of people -- "Lots people owe me and

7    hiding.

8        "I'm ready to go on a mission."

9    A    Bryan Poker responds with -- sometimes it's like

10    emojis or something like that, and then says, "I'm on

11    the same page."

12    Q    "Take me to it.  I'll take it for both of us."

13    A    "We can go tonight.  I can show you I told you.

14        "Or tomorrow.

15        "See, I know he collect on Tuesday."

16    Q    "I'm ready."

17        What does mission refer to?

18    A    It's my understanding that that also refers to

19    going like on a robbery, or robbing somebody.

20    Q    In connection with this investigation and your

21    review of the text messages on Mr. Martin's cell phone,

22    have you seen the word "mission" referred anywhere else?

23    A    I don't recall.

24        MS. FULLER:  Okay.  So same exhibit, 130.  If

25    we can go to document 23 -- 2362, line 1384 through

1    1392.

2    BY MS. FULLER:

3    Q    So, again, those previous messages that we just

4    read were on September 30th, 2019?

5    A    Yes.

6    Q    And these messages here, still on Mr. Martin's cell

7    phone, are from October 1st, 2019?

8    A    Yes.

9    Q    Okay.

10        Mr. Martin writes, "We ready mang?  Take us to the

11   spot."

12   A    Bryan says, "Yeah, tonight.  I don't got the car

13   till seven when my girl get home."

14   Q    "Okay.  I'll be off by then."

15   A    "KK."

16   Q    "How many people live in that apartment?"

17   A    "I guess two but I did see no body."

18             MS. FULLER:  Same exhibit.  If we could go to

19   document number 2370, line 1576 through 1579.

20   BY MS. FULLER:

21   Q    And this is a couple days later, on October 3rd,

22   2019.  There's an outgoing message to Bryan Poker in

23   which Carl Martin writes, "You still have those

24   hammers?"

25        And then there's another outgoing message on the

1    cell phone to Chango:  "I need to hold Lisa for the

2    night."

3    A    And then Chango writes back:  "No can't do, broski.

4    She MIA."

5    Q    "No problem."

6            MS. FULLER:  So if we can close that.

7        If we can go down to line 1586 and 1587.

8    BY MS. FULLER:

9    Q    It's an outgoing message on the same day from Carl

10   Martin's cell phone to Chango:  "I'm going on a mission

11   tonight."

12   A    Yes.

13           MS. FULLER:  Same exhibit, if we can go to

14   document number 2371, and that's 1594 through 1596.

15   It's the previous page.

16   BY MS. FULLER:

17   Q    Again, on October 3rd, 2019, outgoing message from

18   Mr. Martin's cell phone to Chango.  I'll read the

19   outgoing message.

20       "I need some money bad."

21   A    "Be careful, broski.  Yeah man."

22   Q    And there's a response:  "Just got BNB to find a

23   hammer."

24       And hammer, what does that refer to?

25   A    A gun.

1    Q    Now, do you know, Agent Brown, whether -- at the

2    time these references are being made to hammer, do you

3    know whether the UC had had a specific conversation with

4    Mr. Martin about a particular firearm?

5    A    No specific conversations.

6            MS. FULLER:  Same exhibit.  If we can please

7    go to 2373, line 1666 through 1677.  I'm sorry, 1677.

8    My apologies.

9            LIZA LABOMBARD:  What's that again?

10           MS. FULLER:  I'm sorry.  1666 through 1677.

11           LIZA LABOMBARD:  Okay, I'm going to do 1666

12   through 1672, and then we'll scroll down.

13   BY MS. FULLER:

14   Q    Okay.  So if we can read more messages on October

15   4th, 2019.

16           There's an outgoing text to Chango:  "Yesh broski.

17   It didn't happen last night."

18   A    "WTF really?"

19   Q    "Too much people was in the building."

20   A    "Wow.  That sucks, mang.  Had your peeps all the

21   way there.  Damn, I feel you."

22   Q    "Word.  Pork Chop didn't line it up right."

23   A    "I don't think it's gonna happen any different.

24   People always gonna be there.  I knew Chop gonna fuck it

25   up as usual."

```
1    Q    Who else --

2    A    "Who else but Chop."

3             MS. FULLER:  If we can continue on.

4             LIZA LABOMBARD:  I just scrolled down.

5             MS. FULLER:  Oh, okay.

6    BY MS. FULLER:

7    Q    Continuation of that outgoing text:

8         "Nah, it will.

9         "I'll follow him after the club one of these

10   nights."

11   A    "Yeah, I guess.

12        "Damn, we was ready to eat.  Now we still hungry.

13   Fuck.  It's okay.  Everything happens for a reason."

14   Q    "It will happen though, even if it's just me."

15   A    "Yeah, just be careful.  I don't trust Chop.  Gotta

16   cut him of that play."

17   Q    "Word."

18   A    "Yeah.  Trust no one, broski."

19   Q    So in your investigation, did you become aware who

20   was the potential victim of the attempted robbery?

21   A    Yes.  We learned that it was somebody who was

22   selling hamburgers or sliders on Church Street, like

23   South End Sliders.

24   Q    Okay.  And when it refers to -- when the text

25   message refers to, "I'll follow him after the club one
```

1    of these nights," what does that mean to you in

2    connection with the potential victim?

3    A    South End Sliders generally sells their burgers

4    outside of Nectar's, and so to me that text meant that

5    Carl Martin was going to follow the victim after he was

6    done selling burgers outside of Nectar's to then rob

7    him.

8    Q    So is this -- I think you labeled it earlier as a

9    food cart?

10   A    Yeah, a food cart.

11   Q    Is it open after the bars close --

12   A    Yes.

13   Q    -- for a period of time?

14   A    Yes.

15          MS. FULLER:  If we can look at document number

16   2386, Bates 2001, 2086.

17          LIZA LABOMBARD:  What was the document number?

18   2376?

19          MS. FULLER:  2386.

20          LIZA LABOMBARD:  And we need a line number.

21          MS. FULLER:  2001 to 2086.

22   BY MS. FULLER:

23   Q    So these series of texts that we are looking at,

24   who's involved in these particular text messages?

25   A    That is Carl Martin's phone texting with Bryan

1    Poker and phone number (561) 306-6028.

2    Q    Do you know who that phone number belongs to?

3    A    I recall that is Peter Nguyen's phone.

4    Q    And I think the jury has seen these before, but can

5    you just describe for us what is going on in that first

6    page?

7    A    Yes.

8        So Carl Martin and his associates are back at --

9    attempting to do this robbery again.  Carl is trying to

10   get Poker Bryan to set it up and coordinate it and give

11   him some more information, and then at the same time

12   also trying to coordinate with Nguyen and his associates

13   about meeting up and getting the job done.

14   Q    Okay.  There's reference here in an incoming

15   call -- or an incoming text from (561) 306-6028 to, "He

16   went to Williams Street and told us he'll meet us at me

17   Mike."

18       Who lives on Williams Street as it relates to these

19   messages?

20   A    That be the -- the victim, this slider salesman.

21           MS. FULLER:  If we can keep going, please.

22   BY MS. FULLER:

23   Q    So I'd like to focus on 236.  If you could start at

24   line 236, which is here.  It's an outgoing text message

25   to Bryan Poker.  I'll read that.

1    It says, "Where you at?"

2    And then there appears to be a phone call

3    between -- to Bryan Poker?

4    A    And then Bryan Poker --

5    Q    Bryan Poker -- and then there's another outgoing

6    text.

7    "Yo."

8    A    And then two question marks.

9    Q    What build -- "What building?"

10    A    And then, "IDK," I don't know; N-word.  "I should

11    you the door is the one right after the little walkway

12    to the back parking."

13    MS. FULLER:  Scroll down, please.

14    BY MS. FULLER:

15    Q    Then there's two outgoing calls and a text message

16    on October 11th, 2019, that reads, "I'm in.

17    "Can't get in the apartment."

18    A    "Yeah, is hard."

19    Q    "How many digits?"

20    A    "IDK," I don't know.

21    Q    "You never saw the code, fool?"

22    A    "Hell na.  He cover it."

23    Q    Is there any other information in this case which

24    helps you understand that series of communications?

25    A    My conversations with Peter Nguyen.

1    Q    Without telling us what your conversations were, is

2    there any other information -- do you know what those

3    series of text messages refer to?

4    A    He is trying to get into the building and cannot

5    because there's a key pad that's -- he can't defeat.

6         MS. FULLER:  So then I would like to focus on

7    line 257 through -- yeah, the rest of the page.  Okay.

8    BY MS. FULLER:

9    Q    There's an outgoing message from Carl Martin's

10   phone to, I believe you told us, Mr. Nguyen's phone, and

11   it says 192 Grey Birch Drive in Colchester?

12   A    Yes.

13   Q    Who lives at that address?

14   A    Carl Martin.

15   Q    And then an outgoing message in the early morning

16   hours of October 11th that says, "Up."

17        What is the -- the item that we see next to the

18   message that I just circled?

19   A    Be a photo he sent -- Carl Martin sent to Bryan

20   Poker.

21   Q    All right.  So you have reviewed the cell phone so

22   you know what those -- those attachments are?

23   A    Yes.

24        MS. FULLER:  Can we bring up Government's

25   Exhibit 120A.

1    BY MS. FULLER:

2    Q    What is that?

3    A    That is the attachment, the first attachment, to my

4    recollection, which is a photo of a gloved hand holding

5    a GSG pistol.

6    Q    So just to be clear, this is a photo that was sent

7    along with the text message to Bryan Poker?

8    A    Yes.

9    Q    So it's a photo sent from Carl Martin's phone to

10    Bryan Poker?

11    A    Yes.

12            MS. FULLER:  Okay.  Could we go back, please,

13    to 230 -- 2388.

14    BY MS. FULLER:

15    Q    Tell us what's happening in the next message down,

16    this 2060.

17    A    Another photo being sent from the phone to Bryan

18    Poker.

19            MS. FULLER:  All right.  If we could bring up

20    Exhibit 120B, please.

21    BY MS. FULLER:

22    Q    Is that the attachment that was sent to Bryan

23    Poker?

24    A    It's my recollection, yes.

25    Q    On October 11th at 1:12 a.m.?

```
1     A    I'd have to see the previous exhibit, but I believe
2     so.
3              MS. FULLER:  Sorry.  If we can go back.
4              THE WITNESS:  Yes.
5              MS. FULLER:  Okay.  And then there's another
6     outgoing message, same time.  It says, "Why you
7     playing?"  And then another outgoing message at the
8     exact same time right after that.
9          If we could bring up Government's Exhibit 120C.
10    BY MS. FULLER:
11    Q    What is that?
12    A    That's the attachment from that text message.
13    Q    So this picture was sent to Bryan Poker?
14    A    Yes.
15    Q    At the same time as these other photos?
16    A    Yes.
17    Q    Okay.  And let's see what Bryan Poker's response
18    is.
19              MS. FULLER:  2388, line 263.
20         So line 263, right after that last message.  If we
21    can pull up Government's Exhibit 120D.
22    BY MS. FULLER:
23    Q    What is that?
24    A    That is a hand-to-face emoji or head slap.
25    Q    Sent by Bryan Poker to Carl Martin's cell phone
```

```
1    after those three photos of guns?
2    A    Yes.
3              MS. FULLER:  If we can go back to 2388.  If
4    you can focus on 264 through 284.
5    BY MS. FULLER:
6    Q    And we can read those.
7    A    Bryan --
8    Q    So --
9    A    Yep.  Sorry.
10   Q    So the first message is approximately a minute
11   after he sent the palm-to-face message?
12   A    Yes.
13   Q    Bryan Poker I mean by "him."
14   A    Yes.
15   Q    Okay.  If you could read that.
16   A    "Imma a delete this."
17   Q    "LOL."
18   A    "LOL.
19        "They look nice."
20   Q    "Yeah.
21        "Super light."
22   A    "Damn.  I had one 40 but that shit was heavy."
23   Q    "It's a 40, bro."
24   A    "I know.  Look like the one I had.
25        "I show you the video when I come back.
```

1    "My was chrome though.  My shit was not light, I

2    wish.  LOL."

3    Q    "Oh.  You deleted those ugly."

4    A    "The hole MSG."  Message.

5    Q    You think I want that -- whoop.

6    A    I think that's me.

7         "You think I want that here.  LOL."

8              MS. FULLER:  If we can keep scrolling up.

9    Actually, if we can scroll back out.

10             LIZA LABOMBARD:  Zoom out or --

11             MS. FULLER:  Zoom out, please.

12   BY MS. FULLER:

13   Q    So after that message, "You think I want that

14   here," if we can focus on 285 to 286.  What are we

15   looking at there?

16   A    Those are texts sent from Bryan Poker to Carl

17   Martin with attachments.

18             MS. FULLER:  Okay.  Could we bring up

19   Government's Exhibit 120.  I'm sorry, 120E.

20   BY MS. FULLER:

21   Q    Is that the first emoji sent to Mr. Martin?

22   A    That's my recollection.

23             MS. FULLER:  And 120F.

24        I'd like to show you one final exhibit.

25        If you could bring up Government's Exhibit 116A.

1    BY MS. FULLER:

2    Q    What are we looking at here?

3    A    This is the -- an extraction report or piece of an

4    extraction report from Carl Martin's phone, and

5    specifically photos that were on the phone.

6    Q    So what is this -- what does this tell us, this

7    document?

8    A    That potentially the photos that Carl Martin sent

9    to Bryan Poker on October 11th were taken by his phone.

10   Q    Okay.  So your colleague testified earlier that

11   this is one of the documents he extracted, or this is

12   part of the information he extracted from the phone.  Is

13   that --

14   A    Yes.

15   Q    -- correct?

16   A    Yes.

17   Q    So you just said this extraction report is

18   information indicating that the photos were taken by the

19   phone?

20   A    That -- that's my understanding.

21   Q    Okay.  So let's walk through them.

22             MS. FULLER:  Can we -- well, let me just look

23   through the first page first.

24        If you could look through that first page; and,

25   Liza, if you could just focus on lines two, three and

1    four.

2    BY MS. FULLER:

3    Q    Can you tell from that information when the

4    pictures were taken by the phone?

5    A    The created date, which is like the second line

6    down in the middle box for each one.

7    Q    Okay.  So the first --

8    A    That's --

9    Q    -- picture of the guns was taken at --

10   A    End --

11            COURT REPORTER:  One at a time, please.

12   BY MS. FULLER:

13   Q    The first photo, or the line two, the photo, was

14   taken at October 11th, 2019, approximately 1:10 a.m.?

15   A    Yes, that or the capture time.  I'm sorry.  I'm not

16   as versed as Agent Ekstrom.  But --

17   Q    That's okay.

18   A    -- they're -- they're significantly similar.

19   Q    So the capture time of this second photo, line

20   three, was October 11th, 2019, 1:12 a.m.?

21   A    Yes.

22   Q    And the capture time of the one down below it,

23   October 11, 2019, 1:12 a.m.?

24   A    Yes.

25   Q    What is going on around the time that those photos

1    were captured by the phone?

2    A    He is sending them to Poker Bryan.

3    Q    One last photo I'd like to show you.

4            MS. FULLER:  If we can zoom out.  Can you

5    bring up Government's Exhibit 116B.

6    BY MS. FULLER:

7    Q    Who is that?

8    A    Carl Martin.

9    Q    And according to the prior photo -- the prior

10   exhibit, 116A, was that photo taken by the phone or

11   captured by the phone?

12   A    Yes.

13   Q    And around the same time that these other photos

14   were captured by the phone?

15   A    Yes.

16   Q    So two final questions, Agent Brown.  One, are you

17   aware of whether Mr. Martin at the time of his arrest

18   had any currency on his person?

19   A    I don't recall.  Just the money that the -- my

20   recollection is the money that the undercover had given

21   him.  I don't recall.

22   Q    So no other money other than the one -- the stuff

23   the undercover had given him?

24   A    Not that I recall.

25   Q    And are you familiar with the --

1          MS. FULLER:  Well, actually, your Honor, I

2    would like to -- this has been previously admitted into

3    evidence, but could I publish this to the jury?  It's

4    Government's Exhibit 117.

5          THE COURT:  Yes.

6          MS. FULLER:  I don't believe I published it

7    before.

8    BY MS. FULLER:

9    Q    Government's Exhibit 117, if you could just refresh

10    the jury's memory, is what?

11    A    That's the firearm that was traded to Carl Martin

12    for cocaine by the undercover.

13    Q    This is the prop gun that we were talking about

14    earlier with Agent Wood?

15    A    Correct.

16          MS. FULLER:  I have no further questions,

17    your Honor.

18          THE COURT:  Okay.  Cross examination?

19          MR. MATSON:  Thank you, Judge.

20                     CROSS EXAMINATION

21    BY MR. MATSON:

22    Q    Good morning, Agent Brown.  I'm Chandler Matson.  I

23    represent Carl Martin.

24    A    Good morning.

25    Q    Agent Brown, let's start with the phone.  You've

```
1    just been talking about a lot of text messages.  These
2    were recovered after a Cellebrite search of a phone; is
3    that right?
4    A    Correct.
5    Q    Okay.  So October 23rd, Carl Martin was arrested,
6    right?
7    A    Yes.
8    Q    Taken into custody?
9    A    Yes.
10   Q    And did he speak with you?
11   A    Afterwards, yes.
12   Q    Okay.  Back at the police station or --
13   A    Yes.
14   Q    All right.  Did he then voluntarily give you that
15   phone?
16   A    He did consent to a search of the phone, yes.
17   Q    Right.  So he not only gave you the phone but he
18   said, Go ahead and search it.  Right?
19   A    Correct.
20   Q    Needless to say, he didn't have to do that, right?
21   A    Correct.
22   Q    And carrying it out a little bit further, I mean,
23   safe to say he was cooperative, right?
24   A    He did speak to us, yes.
25   Q    Okay.  Agent Brown, I know you took the phone.  At
```

1    some point a Cellebrite extraction was done on that

2    phone, right?

3    A    Yes.

4    Q    And you took the phone -- Carl Martin gave it to

5    you, right?

6    A    The phone was taken from Carl Martin's person

7    during the arrest.

8    Q    Yes.

9    A    So law enforcement had the phone immediately

10    following the arrest, maintained custody of that.  When

11    we were speaking to Carl Martin, the phone came up again

12    and it was reintroduced.  We brought it back.  I believe

13    Agent Ekstrom had it at the time.

14    Q    I guess my question is, other than you taking that

15    phone from Carl Martin, you have no personal knowledge

16    that Mr. Martin was using that phone in the months prior

17    to him giving it to you?  Personal knowledge, Agent

18    Brown.

19    A    If you are asking me did I see him use the phone?

20    No, I did not actually see him use the phone.

21    Q    Right.  That's personal knowledge, right?  Seeing,

22    hearing, feeling.  Personal knowledge, right?

23        Agent Brown --

24    A    Yes, sir.

25    Q    -- I am asking what people told you.  I am not

1    asking to surmise.  You don't have personal knowledge
2    that he was using that phone, right?
3    A    Well, from reviewing the phone, he -- a person
4    introduces himself as Dre to another person on the
5    phone.
6    Q    No, I completely understand that.  That's your
7    interpretation of the phone, and I get it.  And you have
8    your interpretation.  Like the rest of us, we're
9    processing this world.
10        I am asking for your personal knowledge of him
11   using that phone.
12   A    Again, I never actually saw him use the phone.
13   Q    All right.  And it's possible that someone else
14   could have used that phone as well, right?
15   A    I guess anything's possible.
16   Q    Well, anything's possible, but some things are
17   probable.  I mean, you have reviewed texts with Mirnes,
18   right?
19   A    Yes.
20   Q    And Mirnes uses that term "broski" a lot, right?
21   A    Yes.
22   Q    As a matter of fact, that might even be a calling
23   card of Mirnes; would you agree with that?
24   A    That I couldn't say.
25   Q    Okay.  Also, that Cellebrite extraction; have you

1    reviewed the whole Cellebrite extraction?

2    A    I mean, I would say the vast majority of it.

3    Q    Okay.  The texts that have come into evidence and

4    that you reviewed, that's just a portion of the texts

5    that were on that phone, right?

6    A    Yes.  But I did review every text on the phone.

7    Q    I know you did, but what's been introduced into

8    evidence by the government is only a portion of those

9    texts, right?

10    A    Yes.

11    Q    Those are selected texts by the government, right?

12    A    Yes.

13    Q    Okay.  So there's a lot of other stuff on there,

14    right?

15    A    Yes.

16    Q    And you have heard the Cellebrite expert, I guess I

17    will call him -- I can't remember his name, but he

18    talked about an app that was on the phone.  Do you

19    remember that?

20    A    Yes.  Agent Ekstrom talked about TextNow.

21    Q    Agent Ekstrom.  Thank you.  And Agent Ekstrom said

22    there's an app on the phone that would enable that phone

23    to text using a number that wasn't actually associated

24    with that phone.

25    A    It's not associated to the phone by the phone

1    company, but associated to the phone through the message

2    app.

3    Q    So essentially it puts another phone number onto

4    that phone?

5    A    That's my understanding.

6    Q    Okay.  Agent Brown, I also want to ask you, October

7    23rd -- and you did draft a report about the October

8    23rd incident, right?

9    A    I did.

10   Q    And attached to that report were some photographs,

11   right?

12   A    I believe so.  That sounds right.

13   Q    All right.  So you are aware that some photographs

14   were taken of the inside of the car after the arrest?

15   A    Yes.

16   Q    Safe to say that the officers moved some things

17   around when they were taking those photos, right?

18            MS. FULLER:  Objection, your Honor.  He didn't

19   take the photos and wasn't in the car.

20            MR. MATSON:  Well --

21            MS. FULLER:  I don't know how he testifies to

22   that.

23            THE COURT:  Well, if he in fact knows, he can

24   respond to the question.  So it's -- at least in terms

25   of the status of the investigation, he can talk about

1    that.  If he in fact knows whether things were moved
2    around or not, you can respond to that.
3                THE WITNESS:  I don't know specifically.  I
4    was not in the car.
5    BY MR. MATSON:
6    Q    Okay.  Well, let's look at the photographs that
7    were attached to that police report.
8                MR. MATSON:  Your Honor, may I approach with
9    what's been premarked as Defendant's Exhibit T2?
10               THE COURT:  Yes.  Z2 has been -- is it Z2?
11               MR. MATSON:  No.
12               THE COURT:  Not Z2.
13               MR. MATSON:  T as in tiger.
14               THE COURT:  T2.
15               MR. MATSON:  All animals, Judge.
16               THE COURT:  It's not been admitted; is that --
17               MR. MATSON:  Not admitted.
18    BY MS. FULLER:
19    Q    Just a minute, Agent Brown, and flip through those
20    and tell me if those are the photographs that are
21    attached to your report?
22    A    Just a minute?
23    Q    What's that?
24    A    Only a minute?
25    Q    Just a minute.

```
 1    A    Yes, sir.
 2              (Brief pause.)
 3              MR. MATSON:  Your Honor, may I approach?
 4              THE COURT:  Yes.
 5    BY MR. MATSON:
 6    Q    Agent Brown, I will put these on the overhead so
 7    you can look at these at the same time.
 8         Agent Brown, are these the photographs that were
 9    attached to your police report?
10    A    I believe so.
11    Q    Are they all of them?
12    A    I believe so.
13              MR. MATSON:  Your Honor, I would move for
14    admission of Defendant's Exhibit T2.
15              THE COURT:  Any objection to T2?
16              MS. FULLER:  No objection.
17              THE COURT:  So admitted.
18              (Defendant's Exhibit T2 was received in
19    evidence.)
20    BY MR. MATSON:
21    Q    So, Agent Brown, looking specifically -- this would
22    be Bates number 272.
23         Agent Brown, do you see that photograph?
24    A    Yes, sir.
25    Q    What is that in the center console?
```

1    A     That's a prop firearm.

2    Q     What kind of a firearm is that?

3    A     Davis Industries .380 pistol.

4    Q     Now, Agent Brown, I want to show you Bates 274.

5    Agent Brown, what's not in that center console?

6    A     Firearm.

7    Q     Okay.

8    A     Usually we would secure that very quickly after

9    taking a photo.

10   Q     I appreciate the explanation, but you can see my

11   point, right?

12   A     Yes, sir.

13   Q     The officers moved items around.

14            MS. FULLER:  Objection, your Honor.  He has

15   already testified that he didn't take the photos and

16   wasn't searching the car.

17            THE COURT:  Objection sustained because that

18   was not a question; that was a statement.  So go ahead.

19   Why don't you continue on.

20   BY MR. MATSON:

21   Q     Correct?

22            THE COURT:  Correct?

23   Q     Officer Brown, correct?

24            THE COURT:  Oh, so --

25   Q     Officer Brown, that photo shows the firearm in the

1    center console and the next one shows it gone from the

2    center console, right?

3    A    We secured the firearm --

4    Q    Okay.

5    A    -- so that no one else would have access to it.

6    Q    And 276, that's not how the officers found all of

7    these ID cards in the automobile, right?

8    A    Correct.

9    Q    Right.  They took them out and they placed them

10    orderly, and then took photos of them, right?

11    A    Yes.

12    Q    Okay.

13          MR. MATSON:  Madam clerk, I will put these

14    into evidence, but I will make sure they are in the

15    right order.

16    BY MR. MATSON:

17    Q    Agent Brown, I know you just talked about

18    photographs of two firearms that were found on the phone

19    that was taken from Carl Martin on the day he was

20    arrested, two particular firearms, in relation to this

21    whole sliders incident.  Do you remember those two

22    pictures?

23    A    Yes.

24    Q    And you heard Mr. Nguyen's testimony yesterday.

25    Mr. Nguyen said, "Those are my firearms."  Did you hear

1    that?

2    A    Yes, sir.

3    Q    Okay.  Let's back up a little bit to an incident at

4    Nectar's, so we will back up a lot.

5    A    Okay.

6    Q    Agent Brown, I know there was a shooting in

7    February of 2018 in Nectar's.  You are aware of that

8    incident?

9    A    I am.

10   Q    Okay.  Were you an active investigator of that

11   incident afterwards?

12   A    Yes, sir.

13   Q    How many people investigated that incident?

14   A    I would say there were two primary investigators,

15   myself and Detective Beliveau, and then, you know, the

16   ATF Vermont field office and the Burlington Police

17   Department.

18   Q    Now, again -- and this is ground we covered.  Well,

19   let me ask this:  Agent Brown, I mean, you have been

20   here throughout the trial, right?

21   A    Yes.

22   Q    So you are familiar with the kinds of questions I

23   am going to ask, right?

24   A    I would think so.

25   Q    Carl Martin didn't shoot anyone at Nectar's, right?

1    A    That's correct.

2    Q    Carl Martin punched the shooter in the face, right?

3    A    Also correct.

4    Q    You were one of the lead investigators on that

5    Nectar's incident?

6    A    I was.

7    Q    That investigation didn't involve drug

8    distribution, did it?

9    A    It did.  There -- Rashad Nashid we believed was

10    also a drug dealer -- a dealer.

11    Q    But you didn't find any evidence in that

12    investigation that Carl Martin was a drug dealer, did

13    you?

14    A    That's correct.

15    Q    And you actually went to Carl Martin's house I

16    believe on March 2nd of 2018, right?

17    A    I was there at least once, that I can recall.

18    Q    At least once?

19    A    Yes.

20    Q    Possibly twice?

21    A    It's possible.

22    Q    Well, I believe you were there on March 2nd, 2018,

23    but if that sounds incorrect, you can let me know.

24    A    I would need my recollection refreshed to say for

25    sure.

1    I was there when -- if it helps, I was there when
2    the firearm -- I recall being there when the firearm was
3    seized that day.
4    Q    Well, that -- okay, great, because that's the day I
5    am talking about.
6    A    Okay.
7    Q    Who did you go there with?
8    A    The Burlington Police Department.
9    Q    Was Officer Beliveau there?
10    A    Yes.
11    Q    Any other officers?
12    A    Lieutenant Warren.
13    Q    So four police officers, and you went to Carl
14    Martin's house?
15    A    I know there were other Burlington officers.  I
16    don't remember how many besides Beliveau and Warren and
17    myself.
18    Q    Beliveau, Warren and you.  That's three.  Is that
19    right?
20    A    Right.
21    Q    And then there were more.  We just don't know.
22    A    I believe so.
23    Q    All right.  Was that an announced visit or was that
24    just showed up?
25    A    We showed up.

1    Q    Okay.  Carl Martin let you in?

2    A    That's my recollection, yes.

3    Q    No -- he didn't close the door on you and say, Let

4    me straighten up in here before you come in?

5    A    I don't recall that.

6    Q    All right.  When you went in, did you do any sort

7    of a search, make sure things were safe in there?

8    A    I don't think I initially went in.  I think -- I

9    recall standing outside and not going in until, I

10   believe, Mr. Martin took officers up to the firearm.

11   Q    Okay.  So Mr. Martin spoke with the officers to

12   begin with, and then took them and you to retrieve his

13   firearm?

14   A    That's my recollection, yes.

15   Q    Okay.  Where was that that he took you?

16   A    I believe it was upstairs in a bedroom, I recall.

17   Like a -- maybe like a bedside drawer.  That's the best

18   of my recollection.

19   Q    Was that his bedroom?

20   A    I believe so.

21   Q    Did you take possession of that firearm?

22   A    I did not, but the Burlington Police Department

23   did.

24   Q    Do you remember what kind of firearm it was?

25   A    A Ruger.

1    Q    A Ruger nine millimeter?

2    A    I do not recall the -- the caliber.

3            MS. FULLER:  Do you want the actual firearm?

4            MR. MATSON:  No, I just want the picture.

5        Lisa, the government's going to call up

6    Exhibit 116B for me.

7    BY MR. MATSON:

8    Q    What kind of a firearm is that, Agent Brown?

9    A    I believe that is the GSG.

10   Q    What is a GSG?

11   A    German sports gun.

12   Q    Okay.  You don't believe that is a Ruger nine

13   millimeter?

14   A    Based on the other photos that were taken that

15   night, no.

16   Q    Okay.  Based on that photograph, do you think

17   that's a Ruger nine millimeter?

18   A    Without the context of the other photos, I guess I

19   couldn't say.

20   Q    Okay.  So, again, I am just trying to say, in

21   isolation, you look at that, that could be a Ruger nine

22   millimeter, right?

23   A    I would need to see it next to a Ruger nine

24   millimeter to say for sure.  I know it's a pistol.

25   Q    To say for sure.  I understand to say for sure.

1    But you are an ATF -- Alcohol, Tobacco and Firearms
2    agent; that could be a Ruger nine millimeter?
3    A    I couldn't say that.  It's -- I can say it's a
4    full-sized pistol.
5    Q    And you couldn't say that that could be a nine
6    millimeter Ruger?  You couldn't say that?
7    A    No.
8    Q    Okay.  Fair enough.
9         So that Ruger nine millimeter that came from Carl
10   Martin's house that he gave you, and the Nectar's
11   incident, that was taken into police custody, right?
12   A    Correct.
13   Q    And it was never given back, right?
14   A    Correct.
15   Q    Was it tested?
16   A    I don't know.
17   Q    Okay.  So you didn't perform any testing on it?
18   A    I did not.
19   Q    You didn't look into it to see if it had been
20   stolen or used in any other incidences?
21   A    I don't recall.
22   Q    Do you recall if anybody else did or have you heard
23   that anyone else did?
24   A    It would be standard practice to check to make sure
25   it's not stolen, but I don't recall if I traced the

1    firearm or not.

2    Q    But you don't have any reason to believe that it

3    was used in any other incidences or --

4    A    That's correct.

5    Q    Now, in September of 2018, fast-forwarding a little

6    bit, did you become aware of a confidential informant

7    that was working with a Trooper Jon Prack?

8    A    Yes.

9    Q    Was that individual's name John Latimer?

10    A    Yes.

11    Q    Just going back to the Nectar's incident real

12    quick:  As a result of your investigation, you learned

13    that Rashid had eight prior felonies; is that correct?

14    A    That sounds right.  I don't recall right off the

15    top of my head, but that could be.

16    Q    But as to Carl, he was not prohibited --

17            MS. FULLER:  Objection, your Honor --

18    Q    -- from possessing a firearm?

19            MS. FULLER:  Objection.  I think we're

20    getting --

21            THE COURT:  That's asked and answered.  He

22    already has indicated in testimony that he had the -- he

23    has not testified, but there has been evidence to

24    suggest that he could possess a firearm, i.e., did not

25    have a felony.  So go ahead.

1          MR. MATSON:  Right.  And that was the only
2     question I had, Judge.
3          THE COURT:  Right.
4          MR. MATSON:  Okay.  I can ask it --
5          THE COURT:  That's already been --
6          MR. MATSON:  In evidence.
7          THE COURT:  In evidence.
8          MR. MATSON:  Okay.
9     BY MR. MATSON:
10    Q    At that time I don't believe that Mr. Latimer had
11    an agreement with ATF, right?
12    A    Correct.
13    Q    But he did have an agreement with Trooper Prack?
14    A    With the Vermont State Police, is my understanding,
15    yes.
16    Q    Okay.  And he was working with Trooper Prack in
17    order to work off some criminal charges, something like
18    that?
19    A    That is my understanding.
20    Q    Okay.  And did you write a report -- and I think
21    you said he was doing this in consideration of criminal
22    charges; does that sound right?
23    A    That does sound right.
24    Q    All right.  So essentially he is working as a
25    confidential informant because he is hoping for leniency

1    in his own criminal cases?

2    A    Yes.

3    Q    Okay.  Do you know if he was working for money

4    during that time?

5    A    I don't know.  Or I don't recall.

6    Q    Now, did you speak to Latimer about doing

7    specifically deals with Carl Martin?

8    A    I believe I did.

9    Q    And prior to this, did you -- were you aware of any

10   reports about Carl Martin and drug dealing and Carl

11   Martin being a drug dealer, any reports in your office?

12   A    No reports that I recall.

13   Q    Who else -- well, let me ask you this:  Was the

14   first time you met with Latimer in September of 2018?

15   A    I don't think I would have met with him before

16   that, so I would say yes.

17   Q    So at that first meeting, who else was present?

18   A    I believe Detective Beliveau and possibly Trooper

19   Prack.  I don't -- I don't recall off the top of my

20   head.  I know when I met, that Detective Beliveau was

21   with me.

22   Q    Agent Brown, at that first meeting, did you show a

23   picture to Latimer to identify Carl Martin?

24   A    I don't recall.

25   Q    Okay.  Did you author a report about the first

```
1     contact with the confidential informant?

2     A    I believe I did, yes.

3     Q    Would that help refresh your recollection?

4     A    It surely would.

5         MR. MATSON:  Wendy, I am approaching the

6     witness with Defendant's Exhibit K marked for

7     identification.

8         Your Honor, may I approach?

9         THE COURT:  Yes.

10    BY MR. MATSON:

11    Q    Agent Brown, I am just handing you what's been

12    premarked as Defendant's Exhibit K for identification.

13    A    Yes.  I did show him a photo, and it is not

14    attached there, but I did attach it, to the best of my

15    recollection.

16    Q    Okay.  Well, let me ask this.

17        MR. MATSON:  Your Honor, may I approach with

18    what's been marked as Defendant's Exhibit M?

19        THE COURT:  Yes.

20        MR. MATSON:  Thank you.  M.

21        THE WITNESS:  Yes, that's the -- my

22    recollection is that's the attachment to that report,

23    and the photo of Carl Martin.

24    BY MR. MATSON:

25    Q    And is that the photo that you showed to John
```

1    Latimer?

2    A    I believe so.

3            MR. MATSON:  Your Honor, I move for the

4    admission of Defendant's Exhibit M.

5            THE WITNESS:  It's --

6            THE COURT:  Any objection to M?

7            MS. FULLER:  No objection.

8            THE COURT:  So admitted.

9            (Defendant's Exhibit M was received in

10   evidence.)

11   BY MR. MATSON:

12   Q    So, Agent Brown --

13           MR. MATSON:  Lisa -- your Honor, can I publish

14   this to the jury?  I believe it's on their screen.

15           THE COURT:  You have published it.

16           MR. MATSON:  Well, sometimes those screens are

17   off, Judge.

18           THE COURT:  Right.

19           MR. MATSON:  As they should be, but not now.

20   BY MR. MATSON:

21   Q    Okay.  So, Agent Brown -- sorry -- just again, you

22   showed Latimer this picture and he said yes, that's Carl

23   Martin?

24   A    I -- and now I'm second-guessing myself, but, yes,

25   I think I also showed him a picture of Dennis Martin

1    too.

2    Q    Possibly.  So essentially, Mr. Latimer says, Oh,

3    yeah, I was dealing with Carl Martin back in 2017 --

4              MR. MATSON:  Your Honor, move for admission.

5    I will just set this back there.

6    BY MR. MATSON:

7    Q    That he had been dealing with Carl Martin back in

8    2017; is that a fair statement?

9    A    Yes.

10   Q    And then from there, safe to say that the plan was

11   to go ahead and try and do some deals with Carl Martin;

12   is that also a fair statement?

13   A    Yes.

14   Q    All right.  Did you direct Latimer to make contact

15   with Carl?

16   A    If I did, it was a -- like a joint decision between

17   myself and Trooper Prack.

18   Q    Okay.  Did you direct Latimer to try and set up a

19   drug deal with Carl Martin?

20   A    I would say the same answer.

21   Q    Okay.

22              MR. MATSON:  Your Honor, may I approach with

23   what's been premarked defense Exhibit Y2?

24              THE COURT:  It is 10:30.  This would be a good

25   time for a break, it seems to me.

```
1              MR. MATSON:  This would be a good time for a
2    break.
3              THE COURT:  So let's take our midmorning break
4    and be back at quarter of.
5    (Court was in recess at 10:31 a.m.)
6    (The following was held in open court with the jury
7    present at 10:49 a.m.)
8              THE COURT:  Okay?
9              MR. MATSON:  Your Honor, may I approach the
10   witness?
11             THE COURT:  Yes.
12   BY MR. MATSON:
13   Q    Agent Brown, I am showing you what's been premarked
14   as Defendant's Exhibit Y2.  Just take a minute.  Let me
15   know if you recognize those documents.  Just a minute.
16   A    I'm good.
17   Q    Thank you, Agent Brown.
18        Agent Brown, what are these?
19   A    They're text messages between myself and the
20   confidential informant.
21   Q    Okay.  And these are text messages that you turned
22   over to the government to be produced to me; is that
23   right?
24   A    Yes.
25   Q    Agent Brown, I am going to start -- it's actually
```

1    upside down.

2                THE COURT:  Are those admitted into evidence?

3                MR. MATSON:  I'm sorry, your Honor.  I'd move

4    to admit Defendant's Exhibit Y2.

5                THE COURT:  Okay?

6                MS. FULLER:  No objection.

7                THE COURT:  So admitted.

8                (Defendant's Exhibit Y2 was received in

9    evidence.)

10                MR. MATSON:  And it is going to be really

11    difficult to see this, but --

12                THE COURT:  I think that's upside down.

13                MR. MATSON:  It is upside down, but the

14    Bates -- the actual text is upside down, but the Bates

15    623 is down there, and that's what I am looking at --

16                THE COURT:  Oh.

17                MR. MATSON:  -- 623.  And now I will flip it

18    right side up.  I just wanted everyone to know what I am

19    talking about.

20                THE COURT:  Okay.

21    BY MR. MATSON:

22    Q    Agent Brown, is that you that said, "Just talked to

23    Prack.  Please begin to try to make contact with Dre.

24    Keep both Prack and I in the loop if you can"?

25    A    Yes.

1    Q    Okay.  So that's you directing Latimer to make

2    contact with Carl Martin, right?

3    A    Yes.

4    Q    All right.  And Latimer says, "Okay.  Will do"?

5    A    Yes.

6    Q    Do you see that?

7    A    Yes.

8    Q    All right.  So next, you say there where it starts,

9    "Isaac about to send me his info.  As soon as I get it,

10   I'll send it to you and also we can all figure out a

11   plan."

12        Do you see that?

13   A    Yes.

14   Q    Do you think it was a little odd that if Latimer

15   had been dealing with Carl Martin, he didn't even have

16   his info?

17   A    I don't know that he is talking about Carl Martin.

18   Q    Okay.  You don't know, but it's in the conversation

19   about Carl Martin, right?

20   A    Yes, but we may have then been talking about

21   another individual in an unrelated case.

22   Q    Anything's possible.  Thanks, Agent Brown.

23        So leading up -- well, thereafter -- let me not get

24   there yet.

25        I am going to show you now, at Bates 624,

1    fortuitously, Latimer says, "Dre just called me," right?

2    A    Yes.

3    Q    You weren't a party to that conversation.  You

4    didn't hear Latimer talk to Dre, did you?

5    A    I did not.

6    Q    Okay.  And you asked, "What'd he say?"

7    A    Yes.

8    Q    The response from Latimer, "He said I owe him money

9    and gotta pay him before he can do anything with me.  I

10   owe him 500."

11        Do you see that?

12   A    Yes.

13   Q    Your response, "Thought it was 400.  Anyway, tell

14   him you're working on getting that together and ask him

15   if he'd take anything besides cash.  But don't be

16   specific if you don't have to be."

17        Do you see that?

18   A    Yes.

19   Q    Now, isn't that you introducing the idea of

20   firearms?

21   A    Trading for any number of things.

22   Q    Sure.  You're Alcohol, Tobacco and Firearms, right?

23   A    Yes, but Carl Martin wouldn't know that.

24   Q    I understand that.  I'm asking if you're suggesting

25   in that text message, very fairly, if Latimer's talking

1    to you, wouldn't you think that he infers you're saying

2    firearms?

3    A    Yes.

4    Q    So at some point was there actually a controlled

5    purchase with Carl Martin?

6    A    In October.

7    Q    October 4th, to be specific?

8    A    I don't recall the exact date but that sounds

9    right.

10    Q    Were you present for that?

11    A    I was present for one of them.  I know there were

12    two.  I don't recall if I was present for that one or

13    the other one.

14    Q    Okay.  Well, just so we can be clear, is there a

15    police report -- sorry, I should say an ATF report that

16    you wrote in relationship to one of them?

17    A    I believe so, yes.

18    Q    And would that refresh your recollection?

19    A    Surely.

20    Q    Agent Brown, just give us a minute.  We're just

21    making sure you get the right report.

22    A    Yes, sir.

23             THE COURT:  Does the government have the

24    agent's police reports, ATF reports on the sales in

25    October of 2019?

1           MS. FULLER:  I don't believe we put those on

2     our exhibit list, your Honor.

3           MR. MATSON:   Looking at Defendant's Exhibit L.

4     BY MR. MATSON:

5     Q    Agent Brown, I am approaching with what's been

6     premarked as Defendant's Exhibit L, and I understand

7     that report wasn't authored by you but perhaps that

8     would refresh your recollection about who was involved.

9     A    Yes.

10    Q    Okay, thank you.

11         So was there a controlled purchase on October 4th?

12    A    Yes.

13    Q    Okay.  And were you involved in that at all?

14    A    I was present.

15    Q    Okay.  Were you doing surveillance?

16    A    Yes.

17    Q    All right.  And did you see Carl Martin approach

18    John Latimer at some point?

19    A    I would again need to review the report

20    specifically.

21    Q    Oh, you certainly can.

22    A    Thank you.

23         It looks like, no, I did not personally -- per the

24    report, I did not personally observe Carl Martin meet

25    with the CI.

1    Q    So you didn't see the actual transaction?

2    A    Not that I recall, and not that's in the report.

3    Q    But you were surveillance that day?

4    A    Yes.

5    Q    Okay.  So were you present then for an October 8th

6    controlled purchase?

7    A    I don't believe so.

8    Q    Okay.

9          MR. MATSON:  Your Honor, I am approaching with

10   defense Exhibit R.

11   BY MR. MATSON:

12   Q    Agent Brown, I hand you that and I would direct

13   your attention to the first page.  What was the date of

14   the incident and who was involved?  The officers

15   involved.

16   A    I stand corrected.  I apparently was there.

17   Q    Okay.  So you were doing surveillance on both

18   October 4th and October 8th, right?

19   A    Apparently.

20   Q    Okay.  And a controlled purchase was done with

21   Latimer on both days?

22   A    Yes.

23   Q    Okay.  And on both days, the substances delivered

24   to Latimer was fake, right?

25   A    We later found out, yes.

1    Q    Right.  It was tested?

2    A    It was tested at a lab, yes.

3    Q    And it came back no controlled substances

4    whatsoever, right?

5    A    That is my understanding.

6    Q    Now, safe to say that there's a pretty long period

7    of time then where Latimer has no real contact with Carl

8    Martin; is that right?

9    A    I don't -- I don't know.

10   Q    Well, do you remember saying something specifically

11   to Latimer like, Hey, we're not going to do this any

12   more.  We're not going to keep buying fake drugs?

13   A    That sounds like something I would have told him.

14   Q    Okay.  And the decision was made to stop using him

15   because you didn't want to buy any fake drugs --

16        The decision was made not to do any more controlled

17   buys at that time because you didn't want to buy any

18   more fake drugs, right?

19   A    Yes.

20   Q    Sometime in February of 2019, there -- Officer

21   Gonyaw testified about an incident where Mr. Martin was

22   interviewed.  It involved Dennis Martin.  Were you

23   involved in that investigation at all?

24   A    Not really at the time, but after the fact.

25   Q    Okay.  So I know some agents searched Carl Martin's

1    house, interviewed Carl Martin?

2    A    I was not involved in any of that.

3    Q    Okay.  Didn't search his house, nothing like that?

4    A    No.

5    Q    Okay.  Officer Brown, can I -- or Agent Brown, can

6    I approach and just grab those from you?  Thank you.

7         So Officer Brown, I am going to fast-forward quite

8    a bit because the next time it appears that there was

9    anything to do with Latimer and Mr. Martin was in June

10   of 2019; is that right?

11   A    Yes.

12   Q    All right.  In fact, Latimer reached out to you on

13   June 13th and claimed that Dre had reappeared; is that

14   about right?

15   A    I don't recall specifically, but that could be.

16   Q    Okay.  Well, let's look at -- turning back to Y2 --

17   and this would be Bates 634 -- Latimer says to you, "So

18   we can pretty much do Dre any time.  Just so you know, I

19   seen him today at the store 'n talked with him.  He say

20   he's good for whatever we might need."

21        Do you see that?

22   A    Yes.

23   Q    Your response is, "Okay.  Great work.  Still

24   waiting on paperwork.  Aiming for the end of the week of

25   the 24th."

1          Do you see that?

2     A    Yes.

3     Q    So safe to say at this point you had already made

4     arrangements to start using Latimer as your confidential

5     informant, right?

6     A    Yes.  That would have been on, I believe, June

7     11th, was when we conducted that paperwork.

8     Q    Okay.  So when you started the paperwork on June

9     11th, it's not finalized for a little bit thereafter?

10    A    It can take a while.

11    Q    It can take a while.  But you started on June 11th,

12    and on June 13th, two days later after you start, what

13    do you know, Latimer says, "Dre just called me."

14         Is that right?

15    A    Yes.

16    Q    Fortuitous.

17    A    I don't think so.

18    Q    Did you see the conversation between Latimer and

19    Dre that Latimer's referring to here?

20    A    No.

21    Q    Okay.  So you are taking Latimer at face value that

22    he just had this conversation with Dre, right?

23    A    Yes.

24    Q    Okay.  And, again, when is that agreement finalized

25    with Latimer?

1    A    I don't recall the exact date it's finalized, but

2    as the text message said, probably something right

3    around the 24th-ish.

4    Q    Okay.  So between June 11th and maybe sometime

5    around the 24th-ish, Latimer again also says that Dre's

6    doing big things.  Do you remember anything like  that?

7    A    Yes.

8    Q    Okay.  Well, let's look at 636.

9        There's a text there.  "I'm not sure but I'm sure

10   he's doing big things, because him and my cousin get

11   money, and my cousin told me that Dre's got fire

12   powder."

13       Do you see that?

14   A    Yes.

15   Q    And, again, this is eight short days after you

16   start talking about using him as a confidential

17   informant; you'd agree with that, right?

18   A    Yes.

19   Q    All right.  Oh, I'm sorry.  Let me go back.  I'm

20   not done with 636.

21       What do you know.  That same day, "Your paperwork

22   is approved.  Let's meet up on Friday afternoon."

23       Do you see that?

24   A    Yes.

25   Q    All right.  That means his confidential informant

1    agreement has now been finalized and is ready for

2    signature.

3    A    It's been signed.  He's now assigned a number.

4    Q    Up to that point, do you know if Latimer had been

5    receiving payments in his prior confidential informant

6    agreement?

7    A    I don't know.

8    Q    Okay.

9    A    Or I don't recall.  I believe I would have known.

10   Q    Okay.  But under this agreement that he is now

11   going to have with you, he is going to be being paid

12   directly, right?

13   A    Yes.

14   Q    All right.  And as you described, that's for

15   subsistence payments and it's -- I forget what the

16   amounts were.  Can you --

17   A    He can be paid up to $200 a day.

18   Q    Okay.  Does that come out of the ATF budget?

19   A    Yes.

20   Q    So is there a plan then to do a controlled purchase

21   on June 25th, 2019?

22   A    Yes.

23   Q    Not long after his paperwork is approved, right?

24   A    Yes.

25   Q    All right.  So I am going to show you 640.

1          "Weird question:  What's your shirt size for a

2     button-up?"

3          Do you see that?

4     A    Yes.

5     Q    That's a weird question.  Why are you asking that?

6     A    As I recall, we were getting a shirt that would fit

7     him so that we could put recording monitoring devices

8     into a shirt.

9     Q    Okay.  And is that in preparation for a June 24th

10    controlled buy?

11    A    Yes.

12    Q    And you specifically asked, "Any contact with Dre?"

13         You see that?

14    A    Yes.

15    Q    And he says, "Not yet."

16         You see that?

17    A    Yes.

18    Q    Now, at that controlled buy, how many people were

19    conducting surveillance?

20    A    I don't recall off the top of my head.  A number.

21    Q    Were you conducting surveillance?

22    A    Yes.

23    Q    Officer Brown, did you write a report in regard

24    to -- actually it's the June 25th controlled purchase?

25    A    Yes.

1   Q    So you were present.  Was Matthew Ekstrom present?

2   A    I would need to see my report to refresh my

3   recollection.

4            MR. MATSON:  Your Honor, could we turn the

5   jurors' monitors off.  I'm not going to put this into

6   evidence but I want him to --

7            THE COURT:  Okay.  You want to turn those off.

8   BY MR. MATSON:

9   Q    I am just looking at what'd been premarked as

10  defense Exhibit W, and let's just go along together,

11  Agent Brown.

12  A    Sure.

13  Q    Is this the report that you wrote in regard to the

14  June 25th?

15  A    Yes.

16  Q    Okay.  So I am looking at the second paragraph.  It

17  says, "Agent Brown and RAC Schmidt" -- I take it that's

18  another law enforcement officer?

19  A    That's my boss.  Yes.

20  Q    Okay.  And then going down, ATF Special Agent

21  Ekstrom is there, right?

22  A    Yes.

23  Q    Cohen is there, right?

24  A    Yes.

25  Q    Premo is there, right?

```
1    A    Yes.

2    Q    Davis is there, right?

3    A    Yes.

4    Q    Murray is there, right?

5         And it doesn't look like Detective Prack is there

6    until you get to paragraph three.  It looks like

7    Detective Prack is there as well, right?

8    A    After Murray in paragraph two, it says Prack and

9    Defiore.

10   Q    Okay.  I'm sorry.  So Prack is there as well as

11   Defiorie there too.

12   A    Yes.

13   Q    And you are all watching this controlled purchase,

14   right?

15   A    It's pretty standard to have that number.  We would

16   call -- a lot of those people would be designated as CI

17   rescue in case something went wrong and --

18   Q    Sure.

19   A    -- be our job to pull him out.

20   Q    I'm just saying there's a lot of agents there for

21   that controlled purchase, right?

22   A    I would say it's the normal number of agents.

23   Q    Yeah.  But you know who's not there is Carl Martin,

24   unfortunately.  Right?

25   A    He was not there.
```

1    Q    Another individual showed up and met with the

2    confidential informant; is that right?

3    A    His sister.

4                 MR. MATSON:  Okay.  I'm sorry.  Move to

5    strike.

6         What did you just say?

7         Sorry.  Wait.  Move to strike and say it again.

8         No, Agent Brown --

9         And, Judge, move to strike.

10                THE COURT:  Yeah.  Yeah, I will strike it.

11                MR. MATSON:  All right, thank you.

12                THE WITNESS:  Apologies.

13   BY MR. MATSON:

14   Q    Okay.  So moving along, how much money was involved

15   in that transaction, if you remember?  A few hundred

16   bucks?

17   A    Yeah, I think it was 300 --

18   Q    Okay.

19   A    -- my recollection.

20   Q    Now, do you try again to do a controlled purchase

21   from Carl Martin?

22   A    Yes.  On the 28th.

23   Q    All right.  June 28th.  And you were present for

24   that one as well?

25   A    Yes.

1    Q    All right.  So at this transaction, again, there's

2    some surveillance officers there.  There's a bunch of

3    other officers.  Pretty much the same crew as June 25th?

4    A    Similar but not matching.

5    Q    Okay.  Was there additional agents there as well?

6    A    I would -- I could not recall off the top of my

7    head.

8    Q    All right.  Well, do you recall if there was

9    helicopter surveillance during -- for this one?

10   A    I believe there was.

11   Q    Okay.  Do you know if that helicopter surveillance

12   took video of the area for the June 28th?

13   A    It probably did, yes.

14          MR. MATSON:  Your Honor, that aerial footage

15   has been marked Exhibit W and it's coming in by

16   stipulation.

17          THE COURT:  Okay.

18          MR. MATSON:  I'm not going to slow things down

19   by playing it now.

20          THE COURT:  All right.

21   BY MR. MATSON:

22   Q    Okay.  So now all the surveillance is there,

23   helicopter's flying around taking surveillance, video

24   footage and everything, and you are supposed to be doing

25   a drug deal with Carl Martin, right?

```
1    A    Yes.

2    Q    All right.  But again, Carl Martin doesn't show up.

3    Fair statement?

4    A    Yes.

5    Q    All right.  And also what Latimer got turned out to

6    be fake drugs on top of it, right?

7    A    That time, yes.

8    Q    Was $300 paid for that?

9    A    That sounds right.

10   Q    Okay.  It turned out to be aspirin?

11   A    Yes.

12   Q    Not super sophisticated, huh?

13   A    I suppose not.

14   Q    Super expensive aspirin?

15   A    It was.

16   Q    All right.  So -- try again.  July 23rd, a month

17   later, once again try and buy drugs from Carl Martin?

18   A    Yes.

19   Q    Now, what was your involvement in the July 23rd

20   transaction, whatever it was?

21   A    I would have been working with both the UC and the

22   CI as well as doing surveillance.

23   Q    Okay.  So the undercover is now involved, right?

24   A    Yes.

25   Q    So now the undercover, which was Agent Wood, is
```

1    working directly with Latimer together, right?

2    A    Yes.

3    Q    And Agent Wood is trying to create the appearance

4    that he is actually a drug dealer, right?

5    A    Involved in the drug trade, yes.

6    Q    Not a drug user, right?

7    A    I'm not sure it was determined at that time, but he

8    was buying quantity, yes.

9    Q    Okay.  And trying to create the appearance that he

10    was buying quantity that he would then go back out and

11    resell, right?

12    A    I don't -- I don't recall if that's how it was

13    advertised at that time, but I will say that I would

14    characterize that as true later.

15    Q    Okay.  Well, Agent Wood -- or Agent Brown, you

16    heard Agent Wood's testimony and he never said in that

17    testimony, right, "I pretended to be a drug user"?  He

18    didn't say that, right?

19    A    Yes.

20    Q    So on July 23rd, this happens inside a

21    McDonald's -- and I'm going to use it obliquely, but

22    whatever happened, happened inside a McDonald's, right?

23    A    Yes.

24    Q    You were not in the McDonald's, though, were you?

25    A    I was not.

1    Q    You were outside doing surveillance?

2    A    Yes.

3    Q    I understood that -- you know, Agent Wood testified

4    that Carl Martin was there, but did you also see that

5    Bryan Correa Santiago went to that McDonald's?

6    A    I know that he went, yes.

7    Q    And you know that he went inside the McDonald's?

8    A    Yes.

9    Q    Now, moving along to an August 9th, 2019,

10   controlled purchase.  Do you remember that?

11   A    Yes.

12   Q    Okay.  What were you doing in regard to that

13   incident?  What was your role that day?

14   A    I would've been working with the undercover as well

15   as surveillance.

16   Q    Okay.  So the undercover -- this is roughly two

17   weeks after the McDonald's thing?

18   A    Approximately, yes.

19   Q    Yeah.  A little more?

20   A    Yes.

21   Q    All right.  So now the undercover is still working

22   with Latimer and still trying to do controlled purchases

23   with Carl Martin, right?

24   A    Yes.

25   Q    Now, for that one, Carl Martin actually does hand

```
 1    something to the undercover; is that your understanding?
 2    A    Yes.
 3    Q    And for that, he is paid $3600.  Right?
 4    A    I believe so.
 5    Q    Okay.  But that substance turns out to be fake,
 6    right?
 7    A    I believe so.
 8    Q    No regulated substances.
 9    A    Yes.
10    Q    No cocaine.
11    A    Correct.
12    Q    For which he was paid $3600, right?
13    A    Yes.
14    Q    Was that frustrating?
15    A    When we found out, it was a little discouraging.
16    Q    Now, for that one, similar number of agents
17    present -- doing surveillance present and everything?
18    A    Likely, yes.
19    Q    So more than a dozen, sounded like?
20    A    I don't know, off the top of my head.
21    Q    Okay.  Don't make me go back and count, though.
22    A    Okay.
23    Q    It was a lot?
24    A    There was a number of agents.  We would normally
25    have a lot of agents, especially when undercover's in
```

1    play, in case something went wrong to rescue the agent.

2    Q    And of course the undercover's an agent as well?

3    A    Yes.

4    Q    Were you present then for an August 26th attempt at

5    a Rite Aid?

6    A    Yes.

7    Q    Were you doing surveillance?

8    A    Yes.

9    Q    All right.  And did you see Mirnes Julardziga, who

10   testified?  Did you see him at that?

11   A    I saw him at one of the deals.  I cannot remember

12   which deal, off the top of my head.

13   Q    Okay.  Well, let me ask this:  Do you remember what

14   happened on August 26th, or not at all?

15   A    Yes.

16   Q    Okay.  Did you ever see Carl Martin get out and

17   hand the undercover or anybody else anything?

18   A    I did not personally see that.

19   Q    That's right.  And I want to know what you saw

20   personally.  You did not see Carl Martin get out and

21   hand that undercover anything, right?

22   A    I did not.

23   Q    All right.  In any case, in October -- or August

24   26th, whatever was purchased turned out to be fake as

25   well, right?

1    A    I -- I think so.  I don't recall, off the top of my
2    head, the order of which was fake and which was real.
3    Q    Hard to keep track of, isn't it?
4    A    Yes, sir.
5    Q    All right.  We'll let the drug cert speak for
6    itself.
7         Do you remember though that $7500 in ATF funds were
8    used in that transaction?
9    A    That sounds right.
10    Q    That's a number that sticks out, right?
11    A    Yes.
12    Q    That would be a lot of money for fake drugs,
13    wouldn't you agree?
14    A    We would not intentionally buy fake drugs for that
15    much money.
16    Q    So, now moving on to the September 5th, 2019.  Do
17    you remember that purchase?
18    A    Yes.
19    Q    So on that date, were you doing surveillance?
20    A    Yes.
21    Q    All right.  And did you see Mirnes Julardziga
22    approach a vehicle in which the undercover was?
23    A    I believe it was that deal that I saw them drive in
24    to the parking area, like into the area.
25    Q    Okay.  Did you see the actual transaction between

1    whoever and the undercover?

2    A    I don't believe I actually saw the transaction.

3    Q    Okay.  We'll leave that for somebody else then.

4        After that September 5th incident -- well, let me

5    ask this first about September 5th.

6        Did you see Mirnes Julardziga there at the

7    September 5th transaction?

8    A    I believe so, yes.

9    Q    Okay.  After September 5th, however, was there a

10   plan to arrest Carl?

11   A    Yes.

12   Q    I mean, at this point, your theory, your viewpoint,

13   you have four buys that you attribute to Carl, right?

14   A    Yes.

15   Q    You have got the August 9th buy.  That's 56.4 grams

16   for 3600 bucks, right?

17   A    Yes.

18   Q    But you don't know it's fake at that point, do you?

19   A    Correct.

20   Q    All right.  And then you have got the August 16th

21   one, 153 grams for six grand.  Do you remember that?

22   A    Yes.

23   Q    Even though Mirnes handed the drugs to the

24   undercover, you attribute it to Carl Martin, right?

25   A    Yes.

1    Q    All right.  And let's see.  Adding things up here.
2         And you have got the September 5th, 2019, buy.
3    That's 142 grams for $7500, right?
4         And, again, even though Mirnes is the one who
5    handed those drugs to the undercover, you guys
6    attributed that to Carl Martin, right?
7    A    Yes.
8    Q    All right.  But something happened on September
9    16th, and it changed that plan, right?
10   A    Correct.
11   Q    Okay.  On September 16th, were you present when
12   someone ran a TruNarc over those alleged drugs?
13   A    I don't -- I would have to see a report.  I don't
14   think I was present.
15   Q    Okay.  Well, let's just ask it more simply then
16   without looking at a report.  Did you become aware that
17   there was a TruNarc done and it came back negative on
18   those substances?
19   A    Yes.
20   Q    And at that point the plan was cancel the arrest of
21   Carl Martin?
22   A    At that time, yes.
23   Q    Now, let me fast-forward.  At some point Latimer's
24   the one that says, "Hey, Carl reached out to me.  Carl
25   wants a firearm."  Right?

```
 1    A     Yes.
 2    Q     That's what Latimer tells you, right?
 3    A     Correct.
 4    Q     You're not present for that conversation, right?
 5    A     Correct.
 6    Q     You weren't present for any conversation or doing
 7    surveillance or aware of any conversations between Carl
 8    Martin telling Latimer, "I want to get a gun for you,"
 9    right?  "I want to get a gun from you."
10    A     Yes.
11    Q     Sorry.  I saw your confusion.
12          Were you aware that Latimer approached Octavious
13    Napier and asked him if he wanted a gun?
14    A     It's my understanding that Napier approached -- or
15    Napier or Carl had approached Latimer about a gun for
16    Napier.
17    Q     That's your understanding.  That comes from
18    Latimer, right?
19    A     Yes.
20    Q     All right.  So Latimer conveyed to you that
21    Octavious asked him for a weapon, right?
22    A     Yes.
23    Q     All right.  Latimer didn't tell you, "I asked
24    Octavious if he wanted a weapon."
25          He didn't say that, right?
```

```
 1    A    Right.
 2    Q    And safe to say you weren't present for that
 3    conversation?
 4    A    Correct.
 5    Q    So that's what Latimer told you?
 6    A    Yes.
 7    Q    In October -- well, scratch that.
 8         How much were you paying him and how regularly were
 9    you paying him?
10    A    My recollection is that for this case, we paid the
11    CI I think about $2700 for this particular case, and how
12    regularly, I -- I couldn't say.  We probably -- those --
13    maybe that came in like approximately four or five
14    payments, six payments.  I don't know, off the top of my
15    head.
16    Q    Would something refresh your recollection?
17    A    Yes.
18         MR. MATSON:  Your Honor, may I approach with
19    Defendant's --
20         THE COURT:  Yes.
21         MR. MATSON:  -- Exhibit I?
22         THE COURT:  Yes.
23         THE WITNESS:  So we paid him -- up until
24    August 6th, we paid him six times for a total of $2500.
25         MR. MATSON:  Okay.  Agent Brown --
```

1          Your Honor, can I approach again?

2          Could I have that back?

3               THE WITNESS:  Sure.

4    BY MR. MATSON:

5    Q    What I just handed you, defense Exhibit I, is

6    that -- and I can tell you this is how it was produced

7    to me, but I understand there's not -- it's actually

8    redacted so Latimer's name is not on this.  But is this

9    the payment history to John Latimer from the ATF?

10   A    Yes.

11              MR. MATSON:  Your Honor, I would move for

12   admission of Defendant's Exhibit I.

13              THE COURT:  Any objection to I?

14              MS. FULLER:  No objection.

15              THE COURT:  So admitted.

16              (Defendant's Exhibit I was received in

17   evidence.)

18              MR. MATSON:  And I will just put this on the

19   screen.  It's Defendant's Exhibit I.

20   BY MR. MATSON:

21   Q    It looks like payments started on June 5th; is that

22   right?

23   A    Payments started on --

24   Q    No.  Ended on June 5th?

25   A    -- June 21st.

```
1    Q    June 21st.  Now, that was the day the agreement was
2    finalized?
3    A    That was a few days after that.
4    Q    Okay.  And they ended on June 5th, 2020?
5    A    That is the last payment, yes.
6    Q    So Carl Martin was arrested on October 23rd, right?
7    A    Yes.
8    Q    But Latimer's participation continued?
9    A    In other cases.
10   Q    Yep.  Why was Latimer -- why did his involvement
11   discontinue?
12   A    I think for a number of reasons.  We no longer --
13   he was no longer providing case information that was
14   useful to us for any case, and we had started to hear
15   that he was maybe getting into things he should not get
16   into.
17   Q    Part of his agreement is that he would not engage
18   in any other illegality, right?
19   A    Correct.
20   Q    You had information that he was actually engaging
21   in other illegality while under this agreement; is that
22   right?
23   A    Yes.
24   Q    Specifically involving fraud?
25   A    Yes.
```

1    Q    Okay.  Thank you.

2              MR. MATSON:  If I could have a moment?

3         Thank you, Agent Brown.  I have no more questions.

4              THE COURT:  Okay.  Any redirect?

5              MS. FULLER:  Yes.  Thank you.

6                    REDIRECT EXAMINATION

7    BY MS. FULLER:

8    Q    So, Agent Brown, at the beginning of cross

9    examination, the defense asked you about your personal

10   knowledge of whether -- the personal knowledge of Mr.

11   Martin's use of the cell phone that you have in evidence

12   which ATF attributes to Mr. Martin.  Do you remember

13   that?

14   A    Yes.

15   Q    Okay.  And there was a series of questions about

16   the word "broski."  Do you remember that?

17   A    Yes.

18   Q    In fact, Mr. -- Mr. Matson indicated that it

19   appeared to be Mirnes Julardziga's calling card, right?

20   A    Yes.

21   Q    Okay.

22              MS. FULLER:  Could we bring up, please,

23   Government's Exhibit 130 and go to document number 2313,

24   line 371.

25              LIZA LABOMBARD:  371?

1          MS. FULLER:  371.

2    BY MS. FULLER:

3    Q    Could you read that for us.

4    A    Text message from Carl Martin's phone to

5    (802) 310-8276 with the contact name of Chango, and it

6    says, "Think you can drop me off at work, broski?"

7    Q    So this is a call from the phone to Chango?

8    A    Correct.

9    Q    Okay.

10         MS. FULLER:  Can we -- same exhibit.  Can we

11   look at document number 2343, line 911.

12   BY MS. FULLER:

13   Q    Could you read that?

14   A    This is a text message, also the same number,

15   listed as Chango.  It says, "Okay, broski.  Could you

16   pick me up from work after."

17   Q    So, again, an outgoing call from the phone to

18   Chango?

19   A    Yes.

20   Q    Same exhibit number, please, document 2351, line

21   1075.

22        Could you read that?

23   A    Yep.

24        Same outgoing, to Chango:  "Yeah, broski."

25   Q    Same exhibit, document 2354, line 1143.

```
 1            Could you read that?
 2       A    Yep.
 3            Also outgoing to Chango:  "Can you drop me off to
 4       work tomorrow, broski?"
 5       Q    Same exhibit, page 2356, line 1215.
 6            Can you read that?
 7       A    Also to Chango:  "You left yet, broski?"
 8       Q    Same exhibit, page 2356, line 1216.
 9       A    Also to Chango:  "You working tomorrow, broski?  If
10       not, can you drop me off at my kids like 11?"
11       Q    Same exhibit, document number 2358, line 1257.
12       A    Also to Chango:  "Broski, what's good?"
13       Q    Same exhibit number, document number 2359, line
14       1300.
15       A    Also to Chango:  "What time your mom getting there,
16       broski?  No money on card."
17       Q    Same exhibit, line 2359, line -- I'm sorry,
18       document 2359, line 1304.
19       A    Also outgoing to Chango:  "You know how to fill
20       this pen, broski?"
21       Q    Document 2384, same exhibit, line 1973.
22       A    Also outgoing to Chango:  "What's good, broski?"
23       Q    So, Agent Brown, it seems as though they both have
24       the same calling card; is that right?
25       A    It does seem that way.
```

1  Q    Now, Mr. Matson asked you about the interview at

2  Carl Martin's house after the Nectar's incident.  Do you

3  have that in mind?

4  A    Yes.

5  Q    And you testified that you didn't see any

6  controlled substances or drugs or packaging while at

7  that house; is that right?

8  A    Yes.

9  Q    Is there another location involved in this case

10 that Carl Martin was involved with?

11 A    12 Cottage Grove.

12 Q    12 Cottage Grove?

13 A    Yes.

14 Q    And what location is that?

15 A    That is the residence of his girlfriend, or wife,

16 Stephanie Bilodeau.

17 Q    Does that location also come up in any other way in

18 this case?

19 A    Yes.  The surveillance shows Carl Martin there

20 before and after deals.

21 Q    All right.  Did law enforcement ever have any

22 opportunity to search 12 Cottage Grove in South

23 Burlington?

24 A    Not to my recollection.

25 Q    So you were asked about a text message that you

1    sent to Red, the CI, on September 25th, 2018.  And I'll

2    just show it to you.  Document number 624.  This is

3    defense exhibit  -- it's defense Exhibit Y2.  I am going

4    forward to page 624.

5         MS. FULLER:  Could you turn on the ELMO.

6    BY MS. FULLER:

7    Q    So, Mr. Matson asked you about this message.  Do

8    you remember this?

9    A    Yes.

10   Q    So this is on -- this message, if we look back a

11   page, on -- this message was sent after September 25th,

12   2018; do you recall that?

13   A    Yes.

14   Q    Okay.  Do you remember if there's any information

15   in this case that law enforcement had about Mr. Martin's

16   involvement with firearms before you sent that text?

17   A    The Nectar's shooting.

18   Q    Anything else that you remember?

19   A    Sorry.  What was the date of the --

20   Q    Before September 25th, 2018.

21   A    Yes.  Also the incident in Colchester.

22   Q    No.  This is 2018.

23   A    Oh, my apologies.

24   Q    If you don't remember --

25   A    I guess I don't remember.

1    Q    I'm going to show you --

2              MS. FULLER:  Your Honor, we are looking for a

3    defense exhibit.

4              COURTROOM DEPUTY:  Is it an exhibit that has

5    already been admitted?

6              MS. FULLER:  No.  This is marked for

7    identification.

8              THE COURT:  Well, I guess my question is, do

9    you have much time on redirect?  We might take a break

10   at this point.

11             MS. FULLER:  I think that makes sense,

12   your Honor.  I do have a little bit more.

13             THE COURT:  Okay.  Let's take our recess at

14   this point.  I appreciate that you are going to have a

15   little bit more time in the city, but we will reconvene

16   again at one o'clock.

17   (Court was in recess at 11:39 a.m.)

18   (The following was held in chambers at 1:10 p.m.)

19             THE COURT:  Okay.  So when I got back, I got a

20   letter from a juror, and it reads as follows:

21             "Thursday, June 9 at about 11:40, when exiting the

22   building during lunch break, I, Scott Wieber, overheard

23   an individual in a blue shirt say to someone on the

24   phone, in quote, They're lying, trying to make me look

25   bad, close quote.  I did not make contact or speak to

1    this individual."

2         What is the defendant wearing?

3              MS. FULLER:  Blue shirt.

4              MR. MATSON:  If you refresh my recollection.

5              THE COURT:  Huh?

6              MR. MATSON:  If you refresh my recollection --

7    I don't -- I wouldn't be able to answer your question

8    until --

9              THE COURT:  He is wearing a blue shirt.

10             MR. MATSON:  He is wearing a blue shirt.

11             THE COURT:  There we have it.  "When exiting

12   the building during lunch break, an individual in a blue

13   shirt said to someone on the phone, 'They're lying,

14   trying to make me look bad,' end quote.  I did not make

15   contact or speak to this individual."

16        Obviously when he goes back into the courtroom,

17   he'll notice that the defendant is wearing a blue shirt.

18        Okay.  So what is your wish at this point?

19             MS. FULLER:  I mean, you know, we all don't

20   know yet whether Mr. Martin is going to testify.  If he

21   testifies, maybe this would be moot because he, in

22   theory, would say the same thing, but we don't know that

23   yet.

24        I would think at this point, if he is not going to

25   testify, I think Mr. Wieber should be excused.  We do

1    have two alternates.  That would be my inclination.

2              THE COURT:  So that's the government's

3    position.  Okay?

4              MR. MATSON:  I mean, there's two options,

5    right?  To ask him if it affected you, but you are never

6    going to get -- I agree.  He is obviously concerned

7    about it.  I think it was important enough to him to

8    bring it to your Honor's attention, and if that's the

9    case, that indicates --

10             THE COURT:  What I suggest, though, that he be

11   brought into here -- into the chambers, and we find out,

12   first of all, if this is the case, and then second,

13   whether he has told anyone else.  Right?

14             MR. MATSON:  Okay.

15             THE COURT:  Don't you think that would be --

16             MS. FULLER:  Yes, your Honor.

17             THE COURT:  -- questions you would want to

18   know the answers to?

19        Okay.  Can you bring Mr. Wieber back.

20             (Juror No. 9 is now present in chambers.)

21             THE COURT:  Hello.

22             JUROR NO. 9:  Hello.

23             THE COURT:  Mr. Wieber, please take a seat and

24   don't think this is an inquisition, but I just have a

25   couple of questions because you wrote a note.

1          JUROR NO. 9:  Absolutely.

2          THE COURT:  And the note says that as you were

3    walking out of the building, you heard somebody, who had

4    a blue shirt, on the phone saying, in quote, They're

5    lying, trying to make me look bad.  Right?

6          JUROR NO. 9:  Yes.

7          THE COURT:  Can you just tell me, in your own

8    words, what you heard?

9          JUROR NO. 9:  That's -- that's what I heard.

10   I never looked up.  I just kept walking across the

11   street and about my business.

12         THE COURT:  And you never saw who this person

13   was?

14         JUROR NO. 9:  Never made eye contact or

15   addressed this person at all.

16         THE COURT:  You just knew this person had a

17   blue shirt on?

18         JUROR NO. 9:  I did notice out of my periphery

19   they were wearing a blue shirt.

20         THE COURT:  Did you tell anyone else in the

21   jury pool that --

22         JUROR NO. 9:  I did not.

23         THE COURT:  I really appreciate you disclosing

24   this.  This is really important.  And I ask that you

25   just sit outside the room or stand outside the room just

1    for a second --

2                    JUROR NO. 9:  Okay.

3                    THE COURT:  -- while I talk with the lawyers,

4    and then we'll let you know what we need to do.

5                    JUROR NO. 9:  Okay.

6                    THE COURT:  Okay.  Thanks.

7                    JUROR NO. 9:  Thanks.

8                    (Juror No. 9 left chambers.)

9                    THE COURT:  Okay.  The concern about exposure

10   to the rest of the jury pool is -- is taken care of.  So

11   all we have is this particular witness [sic].  My

12   thought is that he should be excluded, but that's what

13   your position is?

14                   MS. FULLER:  Yes, your Honor, it is.

15                   THE COURT:  And you agree?

16                   MR. MATSON:  I do.

17                   THE COURT:  Okay.  So if we can have

18   Mr. Wieber come in.

19                   (Juror No. 9 is now present in chambers.)

20                   THE COURT:  Okay.  All right.  Again, thank

21   you very much for sharing that.  So we are actually

22   going to ask that you be excused because you have been

23   exposed to some statement that was made, and it could be

24   prejudicial to one side or the other.  So you are going

25   to be free to go now.  And I'd ask that you go back into

1    the room and not talk to the jurors about what happened

2    or -- but you can tell them you have been excused.

3              JUROR NO. 9:  Okay.

4              THE COURT:  And it's not -- it's not your

5    fault, clearly not your fault, but you shouldn't tell

6    them why --

7              JUROR NO. 9:  Correct.

8              THE COURT:  -- because that's really

9    important.  So, thank you very much.

10             JUROR NO. 9:  Thank you.

11             MS. FULLER:  Thank you.

12             MR. MATSON:  Thank you.

13             THE COURT:  You are able to get your stuff now

14   and the rest of the jury pool will be moved in.

15   (Chambers conference concluded at 2:19 p.m.)

16   (The following was held in open court with the jury

17   present at 1:22 p.m.)

18             THE COURT:  Okay.  Thank you for coming back.

19   Lovely day, isn't it?  Really.

20        So obviously we have had just a change of one

21   juror.  I won't get into why that happened, but there

22   was no fault on his part, so it's just an unfortunate

23   accident, and we'll just go forward with 13.

24        All right.  So, ready to go forward?

25             MS. FULLER:  Yes, your Honor.

1         CONTINUED REDIRECT EXAMINATION

2    BY MS. FULLER:

3    Q    So good afternoon, Agent Brown.

4    A    Hello.

5    Q    When we last left, I had asked you if you

6    remembered -- let me back up before that.

7         Just to refresh what I had asked you, Mr. Matson

8    had asked you about a communication you had with the CI

9    on September 25th, 2018, about introducing the concept

10   of a firearm to the CI.  Do you remember that line of

11   questioning?

12   A    Yes.

13   Q    All right.  And I had asked you if you remembered

14   right around that time whether there was any other

15   information from law enforcement or that had been

16   provided to law enforcement about Mr. Martin and guns,

17   and I believe you told me the answer was you didn't

18   remember.

19   A    I think I -- I need my recollection refreshed,

20   please.

21   Q    Okay.  I am going to shown you what's been marked

22   and not admitted as Defendant's Exhibit A3.

23             THE COURT:  And is this being offered to

24   refresh his recollection?

25             MS. FULLER:  Yes, it is.

1          THE COURT:  All right.  So it's not going to

2     be admitted.  You're just --

3          MS. FULLER:  Not through me, it is not,

4     your Honor.

5          THE COURT:  -- refreshing his recollection.

6          Pardon me?  Not through --

7          MS. FULLER:  It's not going to be admitted

8     through me.

9          THE COURT:  Yes.  All right.

10    BY MS. FULLER:

11    Q    If you could take a look at that and turn to page

12    1275.  Just to orient you, I believe it's at the top of

13    the page.

14    A    Okay.

15    Q    So does that refresh your recollection as to

16    whether --

17    A    Yes.

18    Q    -- there was information in the possession of law

19    enforcement with regard to Mr. Martin and firearms

20    before you had the first conversation with the CI about

21    Mr. Martin and firearms?

22    A    Yes.

23    Q    And what was that information?

24    A    Trooper Prack with the Vermont State Police had

25    been using the confidential informant as his

1    confidential informant, and the confidential informant

2    had informed Trooper Prack that Carl Martin was known to

3    carry a loaded firearm.

4    Q    Okay.  And just to be clear, this was before you

5    talked to the CI about Carl Martin and firearms?

6    A    Yes.

7    Q    So it was information that the CI had provided to

8    law enforcement?

9    A    Yes.

10   Q    Just moving a little forward to the June 25th and

11   the June 28th controlled buys, you were asked a series

12   of questions about how many people were there for the

13   controlled buys?

14   A    Yes.

15   Q    Can you just describe a little bit better about how

16   law enforcement conducts controlled buys in terms of how

17   many people you use and what some of the concerns are?

18   A    Sure.

19        We generally use many people.  There are even some

20   policies that would require certain numbers of agents,

21   not just law enforcement officers but ATF employees

22   under specific circumstances, usually revolving around

23   the use of a confidential informant for the confidential

24   informant's safety.  So we may have a number of agents

25   out there only -- I mean, they may be able to act as

1    surveillance, but their primary function is for what we
2    would call UC rescue or CI rescue.
3        Other law enforcement agents or other ATF agents
4    would then also be brought into play for their primary
5    function as surveillance.
6    Q    So you mentioned the word again, and I am going to
7    ask you what CI rescue is but may seem obvious, but
8    what --
9    A    If something goes wrong during the deal, the CI
10   becomes -- the confidential informant is our
11   responsibility, as we have signed him up, and it's a
12   controlled purchase, like -- yeah, he's our
13   responsibility, so if something goes wrong, whether it a
14   be robbery or -- I mean, mostly we are worried about
15   robberies or firearms being used against the CI, we'd be
16   required to go in and get the CI out of that situation.
17   Q    Do those kinds of things ever happen?
18   A    They do.
19   Q    Just a little bit more about the buy on June 25th
20   and June 28th.  Who arranged those buys with the
21   confidential informant?
22   A    Carl Martin.
23   Q    So there was some questioning about the payments
24   made to the CI.  Do you remember that?
25   A    Yes.

1          MS. FULLER:  Lisa, can you turn on the ELMO.

2     BY MS. FULLER:

3     Q    I just want to ask you -- or I am going to show you

4     what's been marked as Defendant's Exhibit I.

5          THE COURT:  I has been admitted; is that

6     right?

7          MS. FULLER:  Yes, it has, your Honor.

8          THE COURT:  Yes.  Okay, so you can broadcast

9     that.

10    BY MS. FULLER:

11    Q    Okay.  So if we come down to the bottom -- just a

12    little clarification:  I mean, this is case number, but

13    what do these numbers mean under case number?

14    A    Those are individual ATF case numbers for different

15    cases.

16    Q    So when someone's paid, you make sure you put it

17    under a certain case number?

18    A    Correct.

19    Q    And so was this CI providing more assistance to

20    law -- providing assistance to law enforcement or ATF in

21    cases in addition to Mr. Martin's?

22    A    Yes.

23    Q    Okay.  So is this Mr. Martin's -- the case number

24    for Mr. Martin's case, the one I am pointing to now at

25    the top?  The top line?

1      A    Yes, it is.

2      Q    So if we follow this down, these next five payments

3      are not related to the case that Mr. Martin's involved

4      with?

5      A    Correct.

6      Q    And the line here at the bottom, that is also not a

7      case that Mr. Martin is related to?

8      A    Correct.

9      Q    Can you tell us from this, what date was the CI

10     last paid?

11     A    June 5th, 2020.

12     Q    Okay.  And did the CI provide any information to

13     you, to ATF, about Mr. Martin and firearms after this

14     date?

15          No, I'm sorry.  Actually that question's wrong.

16          What date -- could you tell us on which date this

17     CI was last paid for his assistance in Mr. Martin's

18     case?

19     A    September 18th, 2019.

20     Q    All right.  Now, let me ask you the additional

21     question.  I'm sorry.

22          Did the CI provide assistance to ATF in terms of

23     providing information about Mr. Martin and guns after

24     September 18th, 2019?

25     A    There probably would have been some additional

1    conversation with him, yes, but nothing that he got paid

2    for.

3    Q    That was my question.  Did he get paid for any

4    additional work after September 18th, 2019?

5    A    No, not on this case.

6    Q    So there was also some questions posed to you about

7    Mr. Martin not being a prohibited person at the time he

8    possessed the firearm at Nectar's.  Do you remember

9    that?

10    A    Yes.

11    Q    And also not being a prohibited person at the time

12    he possessed the firearm in Colchester.  Do you remember

13    that?

14    A    Yes.

15    Q    Okay.  When you refer to prohibited persons, what

16    kinds of categories of people are you talking about?

17    A    There's a number of different activities, I guess

18    for lack of a better word, for a prohibited person.  So

19    just being a felon, being a drug user, being wanted,

20    being convicted of a domestic violence.

21    Q    Are there other crimes that would disallow a person

22    from possessing a firearm?

23    A    Yes.

24    Q    What are those?

25    A    I mean, the one that comes to the top of my mind

```
1    would be using a firearm while also conducting drug
2    trafficking.
3    Q    So is it a federal crime to possess a firearm while
4    you are conducting drug transactions?
5    A    Yes.
6              MR. MATSON:  Objection, your Honor.  We are
7    getting a little far afield in what's relevant in this
8    case.
9              THE COURT:  Objection overruled.  He is
10   responding to his earlier answer.
11   BY MS. FULLER:
12   Q    So the last question I have for you --
13             MS. FULLER:  Could we bring up Exhibit 101,
14   please.
15             LIZA LABOMBARD:  101?
16             MS. FULLER:  Yes.  Actually 116B.
17   BY MS. FULLER:
18   Q    So this has been admitted into evidence as
19   Government's 116B.  And do you remember Mr. Matson
20   talking to you about the firearm that is in that
21   picture?
22   A    Yes.
23   Q    And Mr. Martin -- Mr. Matson suggested to you that
24   that firearm was the firearm that was perhaps used in
25   the Nectar's shooting.
```

1    A    Yes.

2    Q    And that it was not a firearm that was newly

3    possessed around October 11th, the date of the robbery.

4    Do you remember that?

5    A    Yes.

6    Q    Okay.  So I am going to shown you what's been

7    marked as Government's Exhibit 101.  Can you just remind

8    us what this is?

9    A    That's the firearm that Carl Martin possessed at

10   the Nectar's shooting.

11   Q    Okay.  If I can hand this to you and have you look

12   at -- compare that to the picture that appears at

13   Government's Exhibit 101, and talk us through what you

14   see in the picture compared to Government's Exhibit 101.

15   A    Sure.  So I can -- so the top part of the firearm

16   is a slide.

17          MS. FULLER:  Your Honor, I wonder, would it be

18   possible for him to come up and have him show on the

19   ELMO?

20          THE COURT:  Yeah.  No, that would be fine,

21   actually.  And obviously being very careful not to point

22   the firearm in --

23          THE WITNESS:  Yes, sir.

24          THE COURT:  -- in any direction.

25   BY MS. FULLER:

1    Q    So, Agent, if you could walk us through -- this

2    is -- this is 116B that's up on the ELMO.  If you could

3    walk us through what you see in 116B compared to the

4    Government's Exhibit 101.

5    A    Sure.

6         So the top part of a firearm on a pistol is the

7    slide, bottom part would be the frame or the receiver.

8    I can see in this photo it appears that the slide has a

9    ridge that is protruding from like the frame of the

10   receiver, whereas this slide is more set back.

11        I can see that this firearm has a -- what might be

12   called like slide rails to fit like a light or some

13   other function, a piece onto the firearm, whereas the

14   one in the photo does not appear to have a slide.  It's

15   more of a rounded edge.

16        I can see that there is a logo on what would be the

17   right side of the firearm in the photo, whereas that

18   logo is not present on this firearm in my hands.

19        I think that's a pretty good summary.

20   Q    Okay.  So, Agent Brown, does Government's

21   Exhibit 101 appear to be the same firearm that's in

22   Government's Exhibit 116B?

23   A    No.

24             MS. FULLER:  No further questions, your Honor.

25             THE COURT:  Okay.  All right.  Recross?

1          MR. MATSON:  Briefly, your Honor.

2                    RECROSS EXAMINATION

3   BY MR. MATSON:

4   Q    Agent Brown, I believe you just testified that Mr.

5   Martin was the one who initiated these drug or

6   controlled buys or whatever they were with the

7   confidential informant Latimer?

8   A    Yes.

9   Q    Okay.  You are basing that on what Latimer tells

10  you, right?

11  A    Yes.

12  Q    Okay.  So what Latimer kicks up the chain is that

13  Carl's the one's who's doing this stuff, right?

14  A    Yes.

15  Q    And again, Latimer was terminated because he was

16  engaged in criminality involving fraud, right?

17  A    Check fraud.

18  Q    Check fraud.  Fraud.

19  A    Check.

20  Q    You can't say check fraud without fraud.

21  A    Yes, sir.

22  Q    Okay.  Safe to say that Latimer was at all times

23  working at the direction of either Prack, you, or

24  somebody else in law enforcement, right?

25  A    He was signed up by us as a confidential informant

1    and was, while working, working under our direction.

2    Q    Right.  So to be more specific, the contract says,

3    You will engage in these activities only at the

4    direction of law enforcement.  That's right, isn't it?

5    A    Yes.

6    Q    Okay.

7                 MR. MATSON:  Thank you.  No more questions,

8    Judge.

9                 THE COURT:  All right.  Thank you, Agent

10   Brown.

11                THE WITNESS:  Thank you.

12                (Witness excused.)

13                THE COURT:  All right.  Does the government

14   have any more witnesses?

15                MS. FULLER:  No, we don't, your Honor.  The

16   government rests.

17                THE COURT:  The government rests.  All right,

18   I am going to speak with the lawyers at this point for

19   just a few minutes, so I'd ask that you be excused to

20   the jury room.  You will be coming back relatively

21   quickly, so ask that you be excused.

22   (The jury was excused after which the following was held

23   in open court at 1:39 p.m.)

24                THE COURT:  Okay.  Are there any motions filed

25   by either side at the close of the evidence?

1          MR. MATSON:  Yes, your Honor.  I move for
2     judgment of acquittal.
3          THE COURT:  Okay.  That motion is denied.  I
4     think there's sufficient evidence to warrant the case to
5     be determined by the jury.
6        Okay.  Is there any other request at this point?
7          MR. MATSON:  No, your Honor.
8          THE COURT:  Okay.
9          MS. FULLER:  Not from the government,
10    your Honor.
11         THE COURT:  Okay.  I think we can bring the
12    jurors right back, and --
13         MR. MATSON:  And, your Honor, to begin, I am
14    just going to play that -- two days I struggled with a
15    recorded interview of Carl Martin.
16         THE COURT:  Okay.
17         MR. MATSON:  I am going to play less than half
18    of it.  It's 45 minutes long, but I got it down to 20
19    minutes.
20         THE COURT:  Okay.  All right.  And you have --
21    okay.
22         MR. MATSON:  And I should be able to do it
23    this time.  Practiced and everything.
24         THE COURT:  And you have two witnesses.
25         MR. MATSON:  I may only have one, Judge.

1        THE COURT:  Okay.  All right.  You fully

2   anticipate being done --

3        MR. MATSON:  Correct.

4        THE COURT:  -- soon?  Okay.

5   (The following was held in open court with the jury

6   present at 1:43 p.m.)

7        THE COURT:  All right.  The government has

8   rested, and now we turn to the defendant.

9      Do you wish to call any witnesses or present

10  evidence?

11       MR. MATSON:  I do.  Thank you, your Honor.

12     Your Honor and ladies and gentlemen of the jury, I

13  would like to begin by playing a recorded interview

14  between Officer Beliveau and Carl Martin recorded on

15  February 2nd of -- 22nd of 2018, premarked as

16  Defendant's Exhibit C and admitted in evidence two days

17  ago.

18     Ladies and gentlemen of the jury, this was the

19  interview that I alluded to when Officer Beliveau was on

20  the stand.  The interview conducted at Mr. --

21       THE COURT:  Okay.  I can't hear you when you

22  are speaking.

23       MR. MATSON:  Sorry, Judge.  I was orienting

24  the jury.

25       THE COURT:  All right.  So this is the

1    recorded interview on February 2nd from Sergeant
2    Beliveau of the defendant?
3              MR. MATSON:  Yes.
4              THE COURT:  That's what you are introducing?
5              MR. MATSON:  Correct.
6              THE COURT:  Okay.
7              MR. MATSON:  All right.
8              THE COURT:  And any objection to the --
9              MS. FULLER:  No, your Honor.
10             THE COURT:  All right.  Okay.
11             (A digital recording was played in open
12    court.)
13             MR. MATSON:  Can everyone hear okay?  I have
14    got it turned up here.
15             (A digital recording was further played in
16    open court.)
17             MR. MATSON:  Okay, Judge.  That's all.
18             THE COURT:  Are you done?
19             MR. MATSON:  I am done with that exhibit, yes.
20             THE COURT:  All right.  Any cross examination?
21    I don't think so.
22             MS. FULLER:  No, your Honor.
23             THE COURT:  Okay.  Do you want to call your
24    next witness?
25             MR. MATSON:  Your Honor, the defense would

1    call Trooper Jon Prack.

2                        JON PRACK,

3        being first duly sworn by the courtroom deputy,

4        was examined and testified as follows:

5            THE COURT:  Good afternoon.

6            THE WITNESS:  Good afternoon, your Honor.

7            THE COURT:  Trooper Prack.

8                    CROSS EXAMINATION

9    BY MR. MATSON:

10   Q    Trooper Prack, I am Chandler Matson.  I represent

11   Carl Martin.

12        We spoke briefly this morning, and, Trooper Prack,

13   I just want to get right to it.  I actually handed you

14   something.  It's now in my hands, and it's been marked

15   Defendant's Exhibit A3.

16            MR. MATSON:  Your Honor, may I approach?

17            THE COURT:  Yes.

18   BY MR. MATSON:

19   Q    Could you please go through every single text

20   message -- I'm just kidding, Trooper Prack.

21        Okay.  Trooper Prack, just briefly, can you

22   identify that that is, in fact, the text message record

23   between you and John Latimer?

24   A    Yes.  That's correct.

25   Q    Did you have a chance to review that this morning

```
1     just to reorient yourself?

2     A    Yes, I did.

3     Q    Agent Prack, needless to say, you and Mr. Latimer,

4     who was the confidential informant -- right?

5     A    Yes.

6     Q    Worked with you in 2018?

7     A    Correct.

8     Q    Actually started back in 2018, didn't he?

9     A    I don't recall the date but it sounds right.

10    Q    Well, you talked a lot by text?

11    A    Yes.

12    Q    Okay.  I'm not going to ask you about every single

13    one of those, trust me.

14         When do you think you started working with Mr.

15    Latimer?

16    A    I believe it was 2018 or -- I'm not sure the

17    correct date.

18    Q    Early 2018?

19    A    I think so.  I know there's some stuff in there

20    from July, but I'm not sure exactly when.

21    Q    So why did you start working with John Latimer?

22    A    So he was a target of mine as a -- for -- in drug

23    sales, and I did an investigation into him, and then I

24    signed him up as a confidential informant.

25    Q    Was he facing charges himself?
```

```
 1    A    He was.
 2    Q    Trooper Prack, looking --
 3              THE COURT:  So is that whole book admitted
 4    into evidence at this point?
 5              MR. MATSON:  I apologize, your Honor.  I would
 6    move to admit Defendant's A3.
 7              MS. FULLER:  No objection.
 8              THE COURT:  Okay.  So admitted.  All right.
 9              MR. MATSON:  Thank you, Judge.
10              (Defendant's Exhibit A3 was received in
11    evidence.)
12    BY MR. MATSON:
13    Q    Trooper Prack, I am now looking at Bates number
14    1092 out of that.  Can you see that on your screen,
15    Trooper Prack?
16    A    Yes, sir, I can.
17    Q    Does this conversation -- it looks like it's taking
18    place November 20th, 2017?
19    A    Okay.
20    Q    So does that refresh your recollection?  Were you
21    working with him during that time?
22    A    Yes, I think that's when we started.
23    Q    And that top text message there, looks like that's
24    John Latimer; would that be accurate?
25    A    Yes.  That's correct.
```

1    Q    And it says, "I -- I hope so, bro, because this can

2    benefit both of us, and I promise we can get slot off

3    the streets because I know a bunch of people."

4        You see that?

5    A    Yes.

6    Q    Did you take that to mean that he knew a bunch of

7    people involved in criminal behavior?

8    A    That's correct.

9    Q    Probably because Mr. Latimer was himself a

10   criminal; is that right?

11   A    He -- I'm not sure of his criminal record at the

12   time.

13   Q    But he had criminal charges?

14   A    He was facing a criminal charge, correct.

15   Q    And he apparently knew a bunch of criminals?

16   A    Correct.

17   Q    All right.  Was texting sort of the primary means

18   of communication that you and Mr. Latimer had?

19   A    Text and phone calls.

20   Q    Did you talk on the phone quite bit?

21   A    We did talk, yeah, from time to time.

22   Q    At some point does Latimer claim that Carl Martin

23   sold him drugs in 2017?

24   A    I'm not sure.  He named a bunch of people that he

25   could buy from, buy narcotics from, one of them being

1    Dre, and I think at the time I didn't know who Dre was
2    during that time frame.
3    Q    So when Latimer first told you about something with
4    Dre, you had no police reports or prior knowledge or
5    anything about Carl Martin dealing drugs, did you?
6    A    I did not.  He just named a bunch of targets that
7    he could purchase narcotics from, listed off, I think,
8    at the time.
9    Q    At some point did you direct Mr. Latimer to Agent
10    Brown?
11    A    I'm sorry?  Direct him --
12    Q    At some point -- sure -- did you make introduction
13    between Latimer and Brown?
14    A    Yes.
15    Q    Okay.  Let's look at 1337.  There we go.
16         And down at the bottom, is that you that says, "I'm
17    flip your number to a fed who wants to talk to you about
18    Dre Monday"?
19    A    Yes.  That's correct.
20    Q    September 24th, 2018, right?
21    A    Correct.
22    Q    Okay.  And you said, "Just wanted to give you a
23    heads-up."
24    A    Yes.
25    Q    So prior to that, fair to say, you had not talked

1    to Mr. Latimer about Agent Brown.  This was new news to

2    him?

3    A    That's correct.

4    Q    Next page, 1338, Latimer says, "Okay," and then he

5    asks, "What's the dude's name?"

6         You see that?

7    A    Yes.

8    Q    Okay.  And then you say, "Sam."

9         Right?

10   A    Correct.

11   Q    And then, "Okay.  Yo."

12        And then this text message here, is this Latimer

13   saying, "How is me meeting with Sam benefit me in any

14   way?  'Cuz there's no point in it if I don't."

15        Do you see that?

16   A    Yes.

17   Q    So Latimer's expressing to you he's not going to do

18   anything with Agent Brown unless there's something in it

19   for him.  I mean, that's the basic statement, right?

20   A    Yeah.  I think he wanted -- he was working off a

21   contract for his pending charges, and I think he wanted

22   to make sure that was towards his contract.

23   Q    It would benefit him?

24   A    Or monetary.

25   Q    Now, of course you, being the voice of reason, say,

1    "Because, bro, why wouldn't you?"

2    A    Right.

3    Q    "Why wouldn't you?"

4         There's a lot of text messages here.  I'm going to

5    take my time, okay?  But I am going to move as fast as I

6    can, I promise.

7         Now, not long after you introduced Latimer to Agent

8    Brown, suddenly Carl reaches out to Latimer; is that

9    right?

10   A    I don't recall how it went.

11   Q    So picking up with 1339.  And this looks like a

12   continuation where Latimer's saying, "I'm just like I'll

13   do it but I feel like there should be something in it

14   for both sides, feel me 'cuz at the end of the day

15   they're coming to me for help with him.  Know what I

16   mean."

17        You see that?

18   A    Yes.

19   Q    Right.  "They're coming to me for help with him."

20   Is "him" Carl Martin?

21   A    That being Dre, yes.

22   Q    Okay.  So at the time of the introduction, Carl

23   Martin's already been introduced as the subject of why

24   he would be talking to Agent Brown?

25   A    I'm sorry, can you repeat the question again?

1     Q     Sure.

2           This makes it sound like when you are making the

3     introduction to Agent Brown, Latimer's already been

4     informed that this is in regard to Carl Martin.

5     A     Yeah.  He had been a target that we initially

6     discussed in 2017 of somebody that he could purchase

7     narcotics from and off of a list of people he said.  So,

8     yeah, we had already targeted him for narcotics.

9     Q     Right.  And now Latimer's being employed for that

10    purpose, right?

11    A     That and other targets as well, yes.

12    Q     Sure.

13    A     That's correct.

14    Q     So what do you know?  The day after, September

15    25th, "Yo.  Dre just called me."

16          Do you see that?

17    A     Yes.

18    Q     Okay.  So Carl, again, just after you make the

19    introduction, apparently reaches out to Latimer.  That's

20    what you understand?

21    A     I think we had already, if I -- my recollection's

22    correct, we had already tried I think in the past to

23    contact Dre, if my memory serves me correct.  And it was

24    just something that we were going to try to target.  So

25    I don't know if that was out of the blue and I'd have to

1    go back through the text messages and see --

2    Q    Well, your response seems a little bit surprised.

3    You say, "For real?"

4    A    Yeah.

5    Q    Right?

6         Okay.  Also around this time, did you ask Latimer

7    to introduce the subject of guns with Dre?

8    A    I don't recall.  I think I asked him previously if

9    he was involved with firearms, and I did do some

10   background on him where I discovered that he was

11   involved with another incident that involved firearms,

12   is how I think I got to where I was.

13   Q    Well, apparently, at your direction, Latimer

14   reached out to Carl about drugs, and I say that because

15   at 1342 there's a text message from you that said, "So

16   he's a no on some guns."  Right?

17   A    Yeah, that's correct, but I'm not sure of the

18   context.

19   Q    Sure.  Well, "He's a no on some guns."  "He" would

20   be Carl Martin?

21   A    I would not -- I'm not sure because during this

22   time we were working two other cases with other people

23   that were involved with firearms and narcotics, so I'm

24   not sure if that's in the context of this discussion or

25   something else.

1    Q    Okay.  It is --

2    A    Sorry.

3    Q    That's fine.

4         It is just after the other September 26th text

5    message that "Dre told me when I got money, then he can

6    help me as long as I pay him off," right?

7    A    Correct.

8    Q    So it's in the context of Dre, but you just can't

9    be a hundred percent sure that you are talking about

10   Carl Martin?

11   A    Correct.

12            MR. MATSON:  All right.  Is that in focus for

13   everyone?

14   BY MR. MATSON:

15   Q    At some point is a controlled buy set up, supposed

16   to be with Latimer, and with Carl Martin?

17   A    Yes.

18   Q    All right.  Would that be on October 4th, 2018?

19   A    I believe so.

20   Q    Now, prior to that deal, did you give some

21   instruction to John Latimer?

22   A    How so?  I'm not sure.

23   Q    Well, did you tell him how to conduct himself?

24   A    During a buy or --

25   Q    Yeah.

```
1    A    I mean, how to do a buy?  We just give them certain
2    parameters of what things to do and not to do.  Getting
3    in vehicles or, you know, leaving -- going to a place we
4    can't see them, things of that nature.
5    Q    Um hum.  Well, looking at 1345, it starts at the
6    bottom.  That's you:  "You ready to do some work?"
7         That's to Latimer, right?
8    A    Correct.
9    Q    Okay.  1346:  "Yes, sir.  Are you ready?  LOL."
10   That's from Latimer, right?
11   A    Um hum.
12   Q    You say, "You know it."  Then you say, "So what's
13   good with Dre?"
14   A    Yes.
15   Q    Right?
16        And this is on October 4th.  I take it this is
17   before the controlled buy?
18   A    Yeah, I would say so.
19   Q    Okay.  And then, "Okay, we will -- we will see.
20   LOL."
21        And then you say, "I'm ready right now bro.  LOL."
22        That doesn't seem like the way you normally talk,
23   Trooper Prack.  Were you sort of adopting the vernacular
24   of Latimer?
25   A    Yeah.  I was just trying to be on, you know, a more
```

1    social level than, you know, being from a more
2    professional trooper standpoint for people can trust you
3    a little better.  Actor.
4    Q    Is this sort of just conversation in preparation
5    for the controlled buy?
6    A    I think we were -- I was just trying to get him to
7    do work to fulfill his contract.  And a lot of times
8    with multiple CIs, it takes a lot of motivation and
9    different tactics to get them to go to work for you.  So
10   it takes a lot of time to set things up and keep 'em
11   motivated to stay on task.
12   Q    Well, so that October 4th controlled purchase, did
13   you see it?
14   A    Yes.
15   Q    Okay.  And did you see Carl Martin approach John
16   Latimer?
17   A    I don't recall if I specifically saw it.  We had
18   other units on surveillance.  So I'm not -- I don't
19   recall.  I'd have to look at my report.
20   Q    Okay.  So there is something that would maybe
21   refresh your recollection?
22   A    Yes.
23            MR. MATSON:  Your Honor, may I approach?
24            THE COURT:  Yes.
25   BY MR. MATSON:

1    Q    Trooper Prack, I'm marking what's -- or I am

2    handing you what's been marked for identification as

3    Defense Exhibit L.

4    A    Okay.

5    Q    Why don't you take a look at that.  First of all,

6    do you recognize that document?

7    A    Yes.

8    Q    All right.  That's the report you were looking for?

9    A    Correct.

10   Q    All right.

11   A    Okay.

12   Q    You can hold onto it.

13   A    Okay.  Perfect.

14   Q    When I refresh recollection, it takes a long time.

15        Now, does that refresh your recollection, Trooper

16   Prack?

17   A    Yes.

18   Q    Okay.  So that's the October 4th controlled

19   purchase, and let me just summarize real quick:  Carl

20   Martin goes to John Latimer and there's an exchange; is

21   that fair to say?

22   A    Yes.

23   Q    And Latimer takes what's in a clear plastic baggie.

24   There's a substance in it.  How much is Latimer given

25   for that substance?

```
1    A    I'm sorry?  How much is Latimer given?

2    Q    Yeah.  Money.  How much money was exchanged?

3    A    I believe it was $800.

4    Q    Okay.  So $800.  And then $800 goes from you to

5    Latimer to Carl Martin, right?

6    A    Correct.

7    Q    And you bought aspirin?

8    A    I'm not sure what it tested for, but it was not --

9    Q    Not a controlled substance?

10   A    Correct.

11   Q    All right.  Call it that.

12        Okay, so October 4th comes and goes and doesn't

13   work.  But there's another one coming up.  Do you try

14   and do another controlled purchase on October 8?

15   A    I don't recall the date, but, yeah, we tried

16   another controlled purchase.

17   Q    Would something help refresh your recollection?

18   A    Yes, it would.

19        MR. MATSON:  Your Honor, may I approach with

20   Defendant's Exhibit R?

21        THE COURT:  Yes.

22        MR. MATSON:  Just marked for identification.

23   BY MR. MATSON:

24   Q    Trooper Prack, there's a final page missing.

25   A    Thank you.
```

```
1    Q    Just let me know when you are all set, Trooper
2    Prack.
3    A    Okay.
4         All set.
5    Q    Trooper Prack, that's an 8 -- October 8th
6    controlled purchase, right?
7    A    Correct.
8    Q    Okay.  Leading up to that, did you -- 1358 -- did
9    you direct that text message to Latimer:  "Okay.  So
10   let's try and get two balls"?
11   A    Yes, that's me.
12   Q    All right.  And is that in regard to that October
13   8th controlled purchase?
14   A    Correct.
15   Q    And once again, during that controlled purchase,
16   Latimer and Martin had an exchange, right?
17   A    During the transaction?
18   Q    Um hum.
19   A    Yes.
20   Q    Okay.  And it was directly Martin to Latimer?
21   A    Correct.
22   Q    Right?
23   A    Correct.
24   Q    Or Latimer to Martin?
25   A    Correct.
```

1    Q    And once again the substance turns out to be fake?

2    A    It did not test positive for cocaine.

3    Q    It was a clear plastic bag, right?

4    A    Correct.

5    Q    It wasn't in any other container, right?

6    A    No.

7    Q    All right.  And how much money was exchanged there?

8    A    $600.

9    Q    Okay.  So -- and that comes out of what?  Where --

10   what money source?  Task force funds?

11   A    Yeah.  Task force funds, correct.

12   Q    What is the task force, Trooper Prack?

13   A    It's investigators that are a conglomerate of local

14   and state police officers that do narcotics

15   investigations.

16   Q    Is it affiliated with the DEA at all?

17   A    No.

18   Q    Okay.  Now, needless to say, after that

19   transaction, you've now spent $1400 and all you got to

20   show for it is fake drugs.  You weren't happy, were you?

21   A    I mean, I wouldn't say I was upset.  Whenever you

22   buy fake substances and spend money, it's not what you

23   are looking for, but I wouldn't necessarily say I was

24   unhappy.

25   Q    Okay.  Well, let's look at 1360.  Right there in

1    the middle, is that you?

2    A    Yes.

3    Q    "Fuckin guy ripped us off."

4    A    Correct.

5    Q    I mean, you were upset?

6    A    No, I don't think I was upset.  I was trying to

7    force the -- not force but instruct the CI to show that

8    we needed to look mad, per se.  So I was trying to not

9    act or fake but -- yeah, act like I was upset so that

10   way he would also get some energy to -- because he

11   doesn't care.  He's -- he did his job and got paid,

12   so --

13   Q    So you are trying to motivate Latimer, right?

14   A    Yeah, because I think eventually we were going to

15   try and to come after -- like we do in the past,

16   we've -- I have bought, purchased fake narcotics

17   previous to this as well, so I just use a tack that if

18   it looks like I'm upset, then the CI who works for me

19   will hopefully use that to also --

20   Q    And that creates pressure on the situation, right?

21   Because you're upset?

22   A    No.  I am just trying to get him motivated to try

23   to make -- see if he would continue the investigation.

24   I don't want him to just be like okay, whatever, I'm

25   gonna move on.  So --

1    Q    Motivation and pressure seem pretty related to me,

2    Trooper Prack.  You are motivating him with pressure

3    pretending to be mad.

4    A    Umm --

5    Q    What about that don't you agree with, Trooper

6    Prack?

7    A    Yeah, I wouldn't say -- I don't necessarily

8    pressure anybody.  It's more of like a tack to motivate

9    to continue the investigation.  So I will use different

10   tacks where I will get on their level and try to be, you

11   know, level with them, and be on their level.  I am not

12   necessarily -- I mean, it doesn't affect me, so I don't

13   necessarily get mad about purchasing fake narcotics.

14   Q    Right.  You pretend to be mad.

15   A    Correct.

16   Q    I got it.  And actually, you kind of saw this --

17            THE COURT:  All right.  It is 2:30.

18            MR. MATSON:  Oh.

19            THE COURT:  This is our time for a break.

20   Let's take our break at this point and be back in 15

21   minutes.

22   (Court was in recess at 2:33 p.m.)

23   (The following was held in open court with the jury

24   present at 2:48 p.m.)

25            THE COURT:  Okay?

1    BY MR. MATSON:

2    Q    Judge -- Trooper Prack, I believe where we picked

3    up was the October 8th controlled purchase that involved

4    an unregulated substance, not drugs, for which John

5    Latimer paid 800 bucks.  Right?

6    A    I think it was 600.

7    Q    600 bucks.

8    A    Yep.  Correct.

9    Q    And we talked about sort of your reaction to that,

10   and we were talking about the pretending to be upset, I

11   suppose; is that right?

12   A    Yes.

13   Q    All right.  Well, continue:  Do you view this as

14   maybe an opportunity to start putting pressure onto Carl

15   to sell real drugs?

16   A    No.

17   Q    Okay.  So did you at least plan with Mr. Latimer in

18   how to address this with Carl?

19   A    Yes.

20   Q    Okay.  Look at 1361.  So that's you saying, "So let

21   him know you sold the first ball to some out-of-state

22   college kid," right?

23   A    Correct.

24   Q    All right.  That's a lie, but you want Carl to get

25   this message and believe the lie, right?

```
 1    A    Yeah.  It was a way to keep him out of being the
 2   police -- letting Carl know the police had purchased
 3   narcotics.
 4    Q    Of course.  I understand --
 5    A    You have to distance something --
 6    Q    I understand you have to lie.
 7         Okay.  Continuing, message by you:  "Call his ass
 8   and tell he needs to make this shit right."
 9         See that?
10    A    Yes.
11    Q    That's you?
12    A    Correct.
13    Q    Latimer:  "Word, bro."
14         And then Latimer says, "He's a bitch for that
15   serious."
16         And you say, "How do you think this is gonna go?
17   Think he will make this right?"
18         That's what you said?
19    A    Yes.
20    Q    Okay.  So you are just wondering with Latimer, Do
21   you think this is going to work?
22    A    Yeah.  I'm wondering if it's going to make him try
23   and make things right.  Correct.
24    Q    Yeah.  Which means sell real drugs.
25    A    Just sell us something that doesn't test negative,
```

1    yeah.  Correct.

2    Q    Real drugs, not fake drugs.

3    A    Correct.  Yeah.

4    Q    And there you are again, angry, Trooper Prack:  "He

5    fuckin better."

6         You see that?

7    A    I think that was -- that's not my number, I don't

8    think.

9    Q    Well, it says message by you.

10   A    Oh, yes.  I'm sorry.  I apologize.

11   Q    That's all right.

12   A    Yes.  Correct.

13   Q    Not that you're always you, but in this case you

14   are you.

15   A    Yep.  Sorry.  I was looking above it.

16   Q    Right.

17   A    I apologize.

18   Q    1362.  Continuing, you say, "For real though, what

19   do you think."  Right?

20   A    Correct.

21   Q    And that's just again you wondering like is this

22   going to work, and you are asking Latimer.

23   A    Correct.

24   Q    And then message by you:  "As long as we make it

25   right, we can keep going, but Imma be pissed if he

1    doesn't make it right."

2        You see that?

3    A    Yes.

4    Q    All right.  So you are going to be pissed if he

5    doesn't make it right, which means if he doesn't sell

6    real drugs, right?

7    A    Yeah.  I think it was more, um, upsetting that we

8    got sold fake drugs.

9    Q    Understand that would be.

10   A    We have nothing to show for the time that we had

11   spent.

12   Q    1363, continuing.  This is October 9th, and that's

13   you, asked, "Any word from Dre," right?

14   A    Correct.

15   Q    "He never called, I'm assuming," right?

16   A    Yes.

17   Q    And then Latimer says, "No, I just texted him

18   also."  See that?

19   A    Correct.

20   Q    And a few more lines down, Latimer asks, "There was

21   no coke in it at all," question mark?  You see that?

22   A    Yes.

23   Q    The message by you, "Nothing tested.  I did it a

24   couple times."  You see that?

25   A    Yes.

1    Q    All right.  That's referring to the substance on

2    October 8th?

3    A    Correct.

4    Q    1364, on October 9th, Latimer queries, "So he can't

5    get in trouble for selling fake drugs," right?

6    A    Correct.

7    Q    And you say, "Yeah, but it's not as good."

8    A    Correct.

9    Q    All right.  Then you say, "So blow him up and see

10    what's up."  You see that?

11    A    Yes.

12    Q    All right.  Latimer says, "I am now, he said he's

13    going to kill me, lots of laughs."  You see that?

14    A    Yes.

15    Q    All right.  Then he continues, "Yeah, he said that

16    he's not paying me and calling me a bitch and talking

17    shit, so I said, 'Man, why you talking like a bitch

18    these days?'"

19         You see that from Latimer?

20    A    Yes.

21    Q    1365, conversation continues.  You:  "Tell him he

22    doesn't need to pay you but that he needs to front you

23    legit powder."  You see that?

24    A    Yes.

25    Q    You are just directing Latimer to tell Carl that

1    Carl needs to give legit powder, right?

2    A    Yeah, to -- to make things correct.

3    Q    Yep.

4    A    Yes.

5    Q    And continuing, you say, "And don't fuck you over."

6    Right?

7    A    Yes.

8    Q    That's what you want Latimer to say to Carl?

9    A    Not in specifically those words, but yes.

10   Q    Doesn't sound like the way you talk normally,

11   Trooper Prack, but --

12        And then finally, 1365, you ask, "Dre's not gonna

13   make it good."  You see that?

14   A    Yes.

15   Q    All right.  Latimer responds, "Not at all.  He's a

16   stupid POS."  You see that?

17   A    Yes.

18   Q    And you ask, "So he said he's done with you?"

19   Right?

20   A    Correct.

21   Q    Question mark.

22        Now, fair to say he is not a stupid PO because

23   Latimer's calling him that because Carl won't sell him

24   real drugs; that's what that means, right?

25   A    Can I see that again?

1    Q    Sure.

2    A    I'm sorry.  I just want to --

3    Q    "Not at all.  He's a stupid POS."

4    A    Can I see the one before that?  I apologize.

5    Q    Sure.

6         "Dre's not gonna make it good."  That's you.

7    A    Correct.

8    Q    "No, not at all.  He's a stupid POS."

9    A    Correct.

10   Q    Right.  He's not going to sell real drugs to

11   Latimer.

12   A    I just -- I think it was more he's not going to

13   make things right for selling us fake drugs.

14   Q    Right, right.

15        Turning to 1369, I think you are dealing with

16   someone else.  Maybe this gentleman named Tim who's got

17   crack?  Is that familiar to you?

18   A    I don't recall.  It might have been.

19   Q    Okay.  Well, Latimer, also on October 12th, reports

20   that "Dre is being a piece of shit."  Do you see that?

21   A    Yes.

22   Q    And you ask, "Why?  What's he saying?"  Right?

23   A    Yes.

24   Q    Latimer responds, "That basically he's not going to

25   make it right and leave him alone."  Right?

1    A    Yes.

2    Q    And, again, making it right means supplying actual

3    drugs, not fake drugs, right?

4    A    Correct.  Just to try to recoup some of -- to have

5    evidence for what we purchased and not a fake substance.

6    Q    Now, after all that, you and Latimer didn't speak

7    of Carl Martin for a long time; is that accurate?

8    A    If I recall correctly, yeah.  It was a short while.

9    Q    I'm sorry?

10   A    Yeah, if I recall correctly.  I'd have to -- I'm

11   not sure the time frame.

12   Q    Well, in May of 2019, did you and Latimer start

13   discussing Carl again over text message?

14   A    I don't recall.

15   Q    Looking at 1537 -- oh, sorry.  I don't mean 1537.

16   I need 1538.

17        So on May 2nd, you asked, "What up?"

18        And Latimer says, "Dre changed his number."

19        You say, "Can you get it?"

20        Do you see that?

21   A    Yes.

22   Q    And then it says, "N, I don't know" -- or Latimer

23   says, "N, I don't know how to get it till I see him

24   around."

25        You see that one?

1    A    Yes.

2    Q    So, again, does that sort of refresh your

3    recollection that there's really nothing to do with Carl

4    Martin between October 8th and looks like May 2nd?

5    A    Through text message, correct.

6    Q    Was there some other communication report that

7    would --

8    A    I think -- you know, we still -- it was still in

9    the back burner of continuing on through like phone

10   calls possibly that might come up, but I don't recall

11   correctly like specifically when.

12   Q    Okay.

13   A    He was still a target of ours.  He just -- we were

14   obviously doing other things between now and then.

15   Q    Yeah.  You were asking Latimer to get his number?

16   A    Yeah.  He said he lost his number, so I asked him

17   if he could get it, find it again.

18   Q    Right.  Because looking at your text message,

19   "Because we're looking like a go for that."

20        You see that?

21   A    Yes.

22   Q    Referring to Carl Martin?

23   A    Correct.

24   Q    Looking at 1539, this is you?

25   A    Yes.

1    Q    A follow-up text.  "They're going to hammer his ass
2    too, lots of laugh."
3         You see that on May 2nd?
4    A    Yes.
5    Q    It does say LOL, but by LOL you mean lots of
6    laughs, right?
7    A    Correct.
8    Q    All right.  And Latimer responds, "The feds,"
9    thumbs-up.
10   A    Yes.
11   Q    And then you reply, thumbs-up, fist bump?
12   A    Correct.
13   Q    So there was apparently some sort of a plan to
14   hammer Carl Martin's ass?
15   A    No.  That's just slang we were using.
16   Q    Well, that's what you said?
17   A    Correct.
18   Q    There's a plan to hammer his ass, right?
19   A    That was just slang again for --
20   Q    I got it.  But they were your words; you would
21   agree with that?
22   A    Correct.
23   Q    All right.  And you'd agree you both gave the
24   thumbs-up, right?
25   A    Correct.

1    Q    And the fist bump.

2         And then just a few days later, as luck would have

3    it, Dre reaches out to Latimer; is that your

4    understanding?

5    A    I don't recall.  I'd have to see the text again.

6    Q    Okay.  I'm looking at 1541.  "Hey, Dre just hit my

7    line."

8    A    Correct.

9    Q    Fortuitous, don't you think?

10   A    I think I instructed him to try to find the phone

11   number through his cousin.

12   Q    You instructed Latimer to reach out and find Carl?

13   A    To get his number, yes.

14   Q    You still a little bit, maybe, though, trepidatious

15   of Carl?

16   A    I'm not sure.

17   Q    Like you don't want to get fake drugs again, right?

18   A    I'm sorry.  Me or him?

19   Q    You don't want to get fake drugs again.

20   A    I think that was a risk that we were willing to

21   take.  I mean, like I said from the beginning, it's

22   something that happens from time to time, but I don't

23   recall if -- if I had any concerns over it.

24   Q    Well, we have 1542.  On May 6th, you said to

25   Latimer, "How sure are you that he won't rip us off

```
1     again?"
2          So that expresses some level of concern, right?
3     A    Yes.
4     Q    Right.  And then I gotta say, Trooper Prack, in
5     going through the texts, I didn't see anything about
6     Carl Martin until May 23rd.  That seem right to you?
7     A    I don't recall.
8     Q    Well, let's go to May 23rd, because -- and
9     that's -- that first text chain I was just showing you
10    was May 6th --
11    A    Um hum.
12    Q    -- and then the 23rd is a little more than two
13    weeks after.
14         Looking at 1566, Latimer once again says, Should I
15    hit -- "Should I hit Dre up also?"  Right?
16    A    Yes.
17    Q    And you respond, "Nah."
18         You see that?
19    A    Yes.
20    Q    So do you have any reason to believe Latimer was
21    even actually talking to Carl Martin during this time?
22    A    Yeah, he had told me that he had reached out to
23    him, so --
24    Q    Right.  He told you.
25    A    Correct.
```

1    Q    Yeah.  And the reason I ask is slowly forthcoming.

2    At 1570, Latimer asks you for Dre's number.  Do you see

3    that?

4    A    Yes.

5    Q    On May 25th, 2019, Latimer says, "Hey, bro.  Send

6    me Dre's number."

7    A    Yeah, he had normally either -- that's his --

8    probably his fifth phone in the time being, and it was a

9    common occurrence for him to delete all his phone.

10   Q    Sure.  He doesn't have Dre's number.  That's all

11   that means, right?

12   A    Yeah, at that time.  Yeah.  Anymore.

13   Q    And you gave him Dre's number?

14   A    From the previous number that he had prior to that.

15   Q    At some point in May 2019, does Latimer express he

16   doesn't want to do this anymore?

17   A    If I recall correctly, he did text a message along

18   those lines.

19   Q    Okay.  That maybe he wanted to quit?

20   A    Yeah.  I don't recall completely, but I think there

21   was a text exchange.  Yeah.

22   Q    Well, 1571, is that Latimer saying, "I think I'm

23   all done working with you guys"?

24   A    Yes.

25   Q    "I wanna better my life instead of living the fake

1    life, man, and locking people up.  Yeah, I understand

2    it's never gonna stop.  Jon, I like you, man.  You're a

3    great dude, but I'm done with this stuff, man.  Just

4    wanna live my life, not worry about who says shout about

5    me.  Be able to have my life back.  Like IDK, tell on

6    people for 150 to 160 isn't worth it in the end of the

7    issue."

8        Do you see that?

9    A    Yes.

10   Q    And that's what Latimer said to you, right?

11   A    Yeah.  He was having an issue with another target

12   of ours that was making threats to his family.

13   Q    Sounds like he was having a tough time, right?

14   A    Yeah, at that time.  Correct.

15   Q    And it also sounds like he was being paid 150 to

16   160 dollars, right?

17   A    Yes, by us.  Correct.

18   Q    And he was paid that, to be precise, in order to be

19   a confidential informant, right?

20   A    That was the rate that we paid informants at the

21   time.

22   Q    So was the task force paying him to do this?

23   A    Correct.

24   Q    Safe to say, though, you talked him out of it?

25   A    I don't think I necessarily talked him out of it.

1    I just discussed what his concerns were and then tried
2    to assist with any issues he may be facing.
3        I think it was connected to another target that was
4    making threats to his family and causing him issues.
5    Q    Sure.  He doesn't say anything about that in that
6    text message, right?
7    A    Correct.
8    Q    He just says, I'm sick of doing this work because I
9    don't feel good about it?
10   A    I think he was concerned about, again, that target
11   that was causing problems for his family.  I think I
12   called him right after that --
13   Q    Sure.
14   A    -- to see what his issues were.
15   Q    Well, let's look at it again.
16       Okay.  He doesn't say anything about this target or
17   anything like that.  He says, "I wanna better my life
18   instead of living the fake life, man, and locking people
19   up."  That's what he says, right?
20   A    He does say that, correct.
21   Q    Okay.  And he keeps working with you after he sends
22   that text message?
23   A    Yes.
24   Q    Now, in June of 2019, does Latimer start working
25   with Special Agent Brown?

1    A    I don't recall the time frame.

2    Q    So I'm looking at 1612.  That's from Latimer,

3    right, at the top, where it said, "Yeah, Sam and I are

4    meeting tomorrow one-ish"?

5    A    Yes.

6    Q    Okay.  And do you understand that to mean Agent Sam

7    Brown?

8    A    Yes.

9    Q    ATF Agent Sam Brown?

10   A    Correct.

11   Q    Okay.  Is he still under -- bad question.  Strike

12   that.

13        At that point is John Latimer still under contract

14   with you as a confidential informant?

15   A    I don't recall.

16   Q    Okay.  At some point does he sign a contract with

17   ATF, to your knowledge?

18   A    I'm not sure.

19            MR. MATSON:  Your Honor, may I approach with

20   what's been marked for identification as defense

21   Exhibit H?

22            THE COURT:  Yes.

23   BY MR. MATSON:

24   Q    Trooper Prack, do you recognize that document?

25   A    I do.

 1    Q    Could you just take a look at it and just see if it

 2    refreshes your recollection into when you actually

 3    entered into an agreement with the confidential

 4    informant?

 5    A    So July of 2018.

 6    Q    Okay.  Thank you.

 7         So after, where the text messages started, you

 8    start text messaging with Latimer in November of 2017,

 9    right?

10    A    Correct.

11    Q    All right.  Eight months prior to the actual

12    agreement?

13    A    Correct.

14              MR. MATSON:  I will not be moving for

15    admission, Judge.

16    BY MR. MATSON:

17    Q    Look at 1620.  On June 25th, Latimer asks you, "You

18    with Sam yet or no?"

19         Do you see that?

20    A    Yes.

21    Q    So are you now working in conjunction with Agent

22    Brown?

23    A    So we were doing a joint investigation, and I

24    think in October of 2018, I think Special Agent Brown

25    was on some of their controlled purchases.

1    Q    Okay.  And, yeah, your response to, "Are you with

2    Sam yet or no" -- that's 1621 -- your response is,

3    "Yeah."

4         Right?

5    A    Yes.

6    Q    So you are meeting with Sam Brown that day?

7    A    I believe so.

8    Q    On that same day, looking at 1623, Latimer asks,

9    "Yeah.  Do you know what the next plan is?"

10        You see that?

11   A    Yes.

12   Q    And you say, "No.  I'll find out."

13        Find out from who?

14   A    I'm not sure in what's it's reference to.  It could

15   be from my supervisor or -- I don't know.  It could be a

16   multitude of things.  I'm not sure.

17   Q    Well, June 25th is the day that you were meeting

18   with Agent Brown, right?

19   A    Yes.

20   Q    So possibly that you might be finding out from

21   Agent Brown?

22   A    I'm not sure.  I don't know.  It could be our next

23   target or if my boss is going to continue on.  It could

24   have been anything.  I don't know what the -- what it's

25   in reference to.

```
1    Q    Right.  But it might be a fair inference to say
2    that since you were meeting with Agent Brown, that
3    that's who you would find out when --
4                 MS. FULLER:  Objection, your Honor.  He has
5    testified as to what he knows.
6                 THE COURT:  Objection sustained.  Go ahead.
7                 MR. MATSON:  Okay.
8    BY MR. MATSON:
9    Q    Well, continuing, on June 25th, you say, "Let's
10   start making moves on him if we can."
11        Latimer says, "I can try."
12        Latimer asks, "Guns or drugs."
13        Do you see that?
14   A    Yes.
15   Q    All right.  And lot of texts, Trooper Prack.  There
16   it is.  1624.
17        Looking at 1624, which is the next text, Latimer
18   asks, "Guns or drugs?"
19        You say, "Drugs to start."
20        Do you see that?
21   A    Yes.
22   Q    Was there a controlled purchase involving Latimer
23   in -- on June 25th?
24   A    I don't recall.
25   Q    Well, let's look at 1625.  On June 25th, Latimer
```

1    says, "Can't, bro.  I made plans with Sam but depends on

2    how fast we go."

3        Do you take that to mean that now Latimer is

4    working with Agent Brown?

5    A    I believe so.

6    Q    Right around that time was there a controlled

7    purchase that Latimer was supposed to buy drugs from

8    Carl Martin, but a woman showed up instead?

9    A    Yes.

10   Q    Okay.  Do you remember that?

11   A    I was there.

12   Q    You were present.  Now, what were you doing?

13   Surveillance?

14   A    Surveillance.

15   Q    Okay.  Did you see Carl Martin anywhere around that

16   transaction at all?

17   A    I did not.

18   Q    All right.  Did anyone see Carl Martin, to your

19   knowledge?

20   A    I'm not sure.  I don't know what everybody else

21   saw.

22   Q    Going back to sort of the plan, around this time

23   was there a plan to start involving an ATF undercover

24   with the confidential informant?

25   A    I do not -- I am not a hundred percent sure.  I

```
1   think Latimer is now signed up by ATF.  I'm not sure
2   what their plans are.  I don't recall.
3   Q    Okay.  Well, looking at 1626, June 25th, you say to
4   Latimer, "Plus we can start slowly working Brian into
5   the mix."
6        You see that?
7   A    Yes.
8   Q    That's referring to Brian Wood?
9   A    I believe so.
10  Q    All right.  And Brian Wood is an ATF agent?
11  A    Correct.
12  Q    Who is about to work in an undercover capacity; is
13  that right?
14  A    I'm not sure if this is in context to Carl Martin
15  or other cases we were working, but --
16  Q    Okay.
17  A    I'm not sure what the context is.  I think at the
18  time we had multiple cases at the same time.
19  Q    Was there another controlled purchase not long
20  after the June 25th controlled purchase?  One on June
21  28th?
22  A    I don't recall.
23  Q    Do you recall another transaction shortly after the
24  June 25th one where Latimer was again supposed to meet
25  with Carl and instead he met with a woman?
```

```
1    A    I don't recall.

2    Q    Okay.

3              MR. MATSON:  Your Honor, may I approach with

4    defense Exhibit C1?

5              THE COURT:  Yes.

6    BY MR. MATSON:

7    Q    Trooper Prack, I know you didn't author that report

8    but maybe that will help refresh your recollection.

9    A    Okay.

10   Q    Does that help?

11   A    Yes.

12   Q    All right.  You can keep it.

13        So was there an under -- well, scratch that.

14        Was there a controlled purchase after June 28th?

15   A    June 25th.

16   Q    Oh, that's the June 25th one?

17   A    Yes.

18   Q    Trooper Prack, I am so sorry.  And we are strapped

19   for time.  That is supposed to be June 28.

20        Now, Trooper Prack -- I'm sorry -- you have been

21   corrected.

22   A    I'm sorry.

23   Q    You want to take a look at that first paragraph

24   again?  They're confusing, aren't they?  Top of the

25   page.  June 28.
```

```
1    A    Oh, yes.  Sorry.  I apologize.  In the narrative.
2    Yeah.
3    Q    Trooper Prack, apologize to Tim.
4         Okay.  Trooper Prack, does that refresh your
5    recollection?
6    A    Just give me one second to read it.  Sorry.
7    Q    Sure.  Take your time.
8    A    Yes.  Sorry.
9    Q    All right.  So was there a controlled purchase
10   after June 28?
11   A    Yes.
12   Q    A familiar scene, Carl Martin does not show up for
13   that, right?
14   A    Correct.
15   Q    All right.  And getting to the end, did you at some
16   point find out that whatever Latimer got that day was
17   fake drugs anyway?
18   A    Correct.
19   Q    All right.  Turned out to be aspirin?
20   A    I'm not sure what it turned out to be.
21   Q    All right.  But not a controlled substance?
22   A    Correct.
23   Q    And for that, the government paid another $300,
24   right?
25   A    I believe that was the price, yes.
```

```
 1    Q    Now, here again, I gotta say, Trooper Prack, were
 2   you angry?
 3    A    No.
 4    Q    Frustrated?
 5    A    It wasn't my case, so I --
 6    Q    Not your case.
 7         I'm looking at 1629.  Do you see Latimer says, "I
 8   called him 22 times.  No answer."
 9         And you say, "Damn."
10         And then you say, "This mother effer."
11         Do you see that?
12    A    Yes.
13    Q    And you are referring to Carl Martin, right?
14    A    I believe so.
15    Q    All right.  Because, once again, fake drugs and
16   Carl wasn't even there, right?
17    A    Correct.
18    Q    Latimer says, "I know, bro."
19         And you say, "Give me a call when you can.  Gotta
20   come up with a game plan."
21         Do you see that?
22    A    Yes.
23    Q    Safe to say that that's gotta come up with a game
24   plan to get real drugs out of Carl Martin?
25    A    I'm not sure.  It could have been further plans to
```

1    other targets.

2    Q    Sure.  Sure looks like that, though, right?

3    A    I'm not -- I --

4    Q    That was a conversation about Carl Martin, right?

5    A    Yeah.  I mean, we talked multiple times about

6    different targets and different jobs, and it's kind of

7    hard to follow through text message.

8    Q    I'm going to back up a little bit just so we get a

9    clear idea for that conversation.

10        Prior to that text message, June 28th -- 1243 --

11   you say, "Yo, make sure to blow this guy up."

12        And then you say, "Make him know you are pissed."

13        Do you see that?

14   A    Yes.

15   Q    Safe to say that once again you want Carl to know

16   that Latimer's pissed because you're trying to put

17   pressure on Carl to do a real drug deal?

18   A    I'm just trying to get actual narcotics, is what

19   the plan is.

20   Q    Right.  From Carl Martin.

21   A    Correct.

22   Q    So there was another controlled purchase attempt on

23   July 23rd, 2019.  Were you present at that one?

24   A    I don't recall.

25   Q    Okay.  I'm not going to introduce another police

1    report but I would suggest to you it took place

2    allegedly at a McDonald's.  Does that help refresh your

3    recollection?

4    A    No.

5    Q    Okay.

6    A    Sorry.

7    Q    No more police reports.

8         So I'm going to move forward a little bit.  August

9    16th, 2019.  Did you become aware of an alleged purchase

10    from Carl Martin around that time?

11    A    I don't recall.

12    Q    All right.  1650.  Latimer excitedly says, "We got

13    five ounces off Dre today."

14         Do you see that?

15    A    Yes.

16    Q    August 16th, 2019.  Right?

17    A    Yes.

18    Q    And you reply, "Damn.  At the drive-in?"

19         And then you say, I heard."

20         You see that?

21    A    Yes.

22    Q    And Latimer says, "Yeah.  The drive-in."

23              MS. FULLER:  Your Honor, could we approach,

24    please?

25              THE COURT:  Yes.  Okay.

1    (The following was held at the bench.)

2            MS. FULLER:  Your Honor, I am concerned that

3    the next couple text messages talks about a potential

4    sentence for Mr. Martin for the drug crime, and I am

5    just concerned about the impact that's going to have on

6    the jury.

7            THE COURT:  Is that right?

8            MR. MATSON:  It is right.  I understand that

9    normally that would not be admissible, but I am talking

10   about a plan to build towards drugs.

11           MS. FULLER:  Then that doesn't have

12   anything --

13           MR. MATSON:  It becomes relevant for that.

14           MS. FULLER:  It doesn't have anything to do

15   then with the statement that "What do you think he's

16   going to get?  Five years at least."  I think that

17   should be excised from the -- not asking that the entire

18   conversation be excised.  It's just the reference to the

19   amount of time he is potentially looking at.

20           MR. MATSON:  It's kind of hard for me to pull

21   that out without -- I mean, I can take a look at it.  I

22   certainly didn't intend to go through the entire

23   communication, and not for an improper purpose, but to

24   show that the plan was to build this up to a gun, which

25   is serious.

1          MS. FULLER:  I believe the guns are separate.
2     So the one isolated conversation I am talking about --
3     and I believe it's Trooper Prack who says he may be
4     looking at five years at least.  I think you could take
5     that out and then have the conversations afterwards
6     about the gun.
7          THE COURT:  So the comment about the five
8     years is actually from Trooper Prack?
9          MS. FULLER:  Yes.
10         THE COURT:  Right?
11         MR. MATSON:  Um hum.
12         THE COURT:  Well, is there some particular
13    reason why you would want that in?  Can't imagine how
14    that would be helpful.
15         MR. MATSON:  I know why they would want it
16    out, right, because they don't want to give the
17    impression that, Oh, like this is really serious.  You
18    don't want to give the guy five years.  And I am not
19    making that argument.  It's just again trying to show
20    the buildup of the pressure, what they're trying to do
21    to eventually lead to this firearm which does involve
22    stiff sentences, five years, bigger charges.
23         THE COURT:  So is your -- is your position
24    that the statement he could be facing five years is
25    relevant to the issue of pressure on the defendant?

1              MR. MATSON:  Yes.  And the activities of

2    Latimer and Prack.

3              THE COURT:  Okay.  Well, I think he should be

4    able to ask that question.

5              MS. FULLER:  Okay.

6              THE COURT:  Okay.  So objection overruled.

7    BY MR. MATSON:

8    Q    Okay, so continuing:  "How much time you think he's

9    gonna get?"

10        You say, "At least five years, is my guess."

11        You see that?

12   A    Yes.

13   Q    1651.  Latimer says, "Hopefully LOL."

14             MR. MATSON:  And I will scrub that, Judge.  We

15   start to get into other things.

16             THE COURT:  Okay.

17   BY MR. MATSON:

18   Q    But continuing, on 1661, Latimer says, "And they

19   gonna get more probably.  Shit, he's just about hit."

20        And then he says, "N that's not including the shit

21   he ripped everyone off for."

22        Right?

23   A    Correct.

24   Q    Needless to say, Latimer's excited because the

25   plan's coming together, right?

1          MS. FULLER:  Objection, your Honor.  I don't

2    think he can testify to -- Trooper Prack can't testify

3    to what Latimer feels or doesn't feel.

4          THE COURT:  Objection sustained.  He can't

5    make a speculation as to whether he is excited or not.

6          MR. MATSON:  Okay.  Strike that.  And I'll

7    move on.

8          THE COURT:  You don't have to strike it.

9          MR. MATSON:  You're right, Judge.  I don't

10   have to strike it.

11         THE COURT:  It was struck.

12         MR. MATSON:  But I do have to move on.

13         THE COURT:  Right.  You do -- that's true.

14         MR. MATSON:  At least I got that part right.

15   BY MR. MATSON:

16   Q    At some point, though, do you learn that, in fact,

17   the last controlled purchase was also fake drugs?

18   A    I don't recall.

19         MR. MATSON:  Judge, if I could just have a

20   moment to look at my notes?

21         THE COURT:  Yes.

22         MR. MATSON:  Thank you.

23       Trooper Prack, I have no more questions.  Thank

24   you.

25         THE COURT:  Okay, any redirect?  Or, I'm

1    sorry, cross.

2                    MS. FULLER:  Yes, your Honor.  Thank you.

3                         RECROSS EXAMINATION

4    BY MS. FULLER:

5    Q    Good afternoon, Trooper Prack.

6    A    Good afternoon.

7    Q    So it's fair to say, isn't it, that you had no

8    involvement at all in the Nectar's investigation in

9    February 2018?

10   A    Correct.

11   Q    And at the first -- at the time that the CI,

12   Latimer, first referenced Carl Martin to you, you didn't

13   really know who he was?

14   A    Correct.

15   Q    In fact, it was sometime after that that you, in

16   fact, learned who he was?

17   A    Correct.

18   Q    Now, Mr. Matson asked you about there was a text

19   message between you and Latimer in which you, quote,

20   flipped Latimer's number to the ATF.

21            Do you remember that line of questioning?

22   A    Yes.

23   Q    And that text message was on September 24th of

24   2018?

25   A    I believe so.

1    Q    Okay.  But it's fair to say, isn't it, that the CI

2    had mentioned to you Dre on numerous occasions before

3    you ever contacted ATF about Dre.

4    A    Correct.

5    Q    Isn't that right?

6    A    Yes.

7    Q    In fact, the CI, in three separate conversations,

8    found at document 1125, 1134 and 1135, told you that Dre

9    was selling drugs; isn't that right?

10   A    Yes.  That's correct.

11   Q    And that is before the September 24th message in

12   which you said, "I'm going to provide ATF with this

13   information"?

14   A    Correct.

15   Q    So it was the CI coming to you with information?

16   A    Yes.

17   Q    And that's common, isn't it?

18   A    Correct, yeah.  A lot of times they'll come with --

19   Q    In fact, when you run a CI, isn't that the whole

20   point of having a CI, is that you're relying on the CI

21   to provide you with information?

22   A    Yes.

23   Q    You are paying them to do exactly that?

24   A    Yes.

25   Q    Isn't that right?

1     A    Correct.

2     Q    And, in fact, the task force builds whole cases

3     around confidential informants; isn't that correct?

4     A    Yes.

5     Q    And you rely on things like monitored controlled

6     buys under the supervision of law enforcement to conduct

7     those cases?

8     A    That's correct.

9     Q    And that's exactly what happened here, right?

10    A    Yes.

11    Q    And so regarding Dre's carrying -- or Mr. Martin's

12    carrying of a gun, Mr. Martin -- Mr. Matson asked you

13    about -- and I will show it to you -- Mr. Matson asked

14    you about a conversation you had with the CI about guns.

15    And your response -- this was defense Exhibit A3.  And

16    I'm showing you page 1342, down at the bottom, in which

17    you say, "So he's a no on guns."

18         Do you see that?

19    A    Yes.

20    Q    Your answer to Mr. Matson was you weren't sure if

21    that was related to Carl Martin, right?

22    A    Correct.

23    Q    And that conversation was on September 26th, 2018?

24    A    Yes.

25    Q    It's fair to say, isn't it, that right around that

1   time you were working with ATF on another gun case?

2   A    Yes.

3   Q    And that gun case was into somebody by the last

4   name of Brooks?

5   A    That's correct.

6   Q    And that ATF case, in fact, Brian Wood was

7   introduced as an undercover in that case?

8   A    That's correct.

9   Q    And that case led to the prosecution of someone

10  named Tam Mi?

11  A    Yes.

12  Q    So it's fair to say that this conversation could

13  very easily be related to the Tam Mi case?

14  A    Yes.  That's correct.

15  Q    Okay.  But it's also true, isn't it, that that

16  reference to guns and -- in fact, the reference to guns

17  and Dre was not something initiated by law enforcement,

18  was it?

19  A    No.

20  Q    And, in fact, the CI had told you previously, in a

21  text message, that Dre is, quote, Known to carry a

22  loaded handgun, just so you know.

23       Right?

24  A    Yes.

25  Q    Do you remember that conversation?

1     A     Yes.

2     Q     This is the same defense exhibit, document 1275, at

3     the top.

4     A     Correct.

5     Q     So this information about Dre having guns was not

6     something that law enforcement came up with?

7     A     No.

8     Q     It was provided to you by a CI?

9     A     Correct.

10    Q     Which is the whole point of having a CI?

11    A     Yes.

12    Q     So there's been a lot of talk about your comments

13    after the two controlled buys you did into Dre, whether

14    you were angry about not having real product, and you

15    provided consistent statements.  You weren't angry, but,

16    you know, that this is part of the controlled purchase

17    process.

18    A     Yes.

19    Q     Can you describe for the jury, when you are running

20    a CI and you learn that the drugs are fake, what happens

21    for a CI if the CI does not complain about the quality

22    of the product?

23    A     So there's a chance that the narcotics -- the

24    dealer or the target will know something is up.  If they

25    don't make a stink or they don't make a complaint,

1    they're going to say, Well, why did you just buy fake

2    stuff and not care?

3        So that's part of our tactic is to make it seem

4    that they're upset so that way they think that they're

5    not working for the police.

6    Q    So this is a way to preserve the integrity of the

7    investigation?

8    A    Yes.

9    Q    It's not about pressure?

10   A    No.

11   Q    Mr. Matson asked you about a text message that you

12   had exchanged with the CI in which the CI wasn't aware

13   of Mr. Martin's current cell phone.  You remember

14   that --

15   A    Yes.

16   Q    -- question?

17   A    I do.

18   Q    How long were you on the task force for?

19   A    I think just under three years.

20   Q    Okay.  And in your three years of experience on the

21   task force, how common was it for drug dealers to have

22   multiple cell phones?

23   A    Very common.

24   Q    So they have multiple numbers?

25   A    Yes.

1    Q    And how common is it for drug dealers to change

2    those phone numbers?

3    A    It's common.

4    Q    And do drug dealers often use different ways of

5    communicating with people?  For example, they

6    communicate with them not only over phone numbers, but

7    via texting apps?

8    A    Yes.

9    Q    Common?

10   A    Yes, very common.

11   Q    So it wouldn't be uncommon for a CI, even within

12   the same span of a couple months, to not know what

13   number his dealer is using?

14   A    Yeah, absolutely.

15   Q    So the last question I have for you:  Mr. Matson

16   had talked to you about the so-called pressure on Mr.

17   Martin to make it right.  You remember those series of

18   conversations?

19   A    I do.

20   Q    After the second unsuccessful controlled buy?

21   A    Yes.

22   Q    He talked to you a lot about the text messages that

23   you had exchanged with the CI and tried to get you to

24   admit that that was designed to pressure Mr. Martin into

25   doing something different.

1    A    Yes.

2    Q    Is that right?

3         And he gave you the date of between October 8th,

4    2019 -- or October 8th, 2018, and May 2nd, 2019.  Do you

5    remember that?

6    A    Yes.

7    Q    He said to you there was no contact between your CI

8    essentially and Mr. Martin between those two dates; is

9    that right?

10   A    Yes.

11   Q    So you'd agree with me that that claimed pressure

12   by law enforcement obviously had no impact on Mr.

13   Martin?

14   A    Correct.

15            MS. FULLER:  I have no further questions.

16            THE COURT:  All right.  Any redirect?

17            MR. MATSON:  Your Honor, could I just have two

18   minutes?

19            THE COURT:  Yes.

20            MR. MATSON:  Thank you.

21            (Brief pause.)

22            MR. MATSON:  Madam clerk, can we turn these

23   screens off for the jurors.

24                        RECROSS EXAMINATION

25   BY MR. MATSON:

1    Q    Trooper Prack, I am showing you again what's

2    Defendant's Exhibit L just marked for identification.

3    That's an investigative report authored by you, right?

4    A    Yes.

5    Q    All right.  And I'm going to turn to the second

6    page here, but before we do, this is October of 2018,

7    right?

8    A    Correct.

9    Q    Paragraph three, it looks like the CI told you that

10   he contacts Martin at (802) 559-1972.

11        Do you see that?

12   A    Yes.

13   Q    Does that sound right?

14   A    Yes.

15   Q    Okay.  And you just testified it's not uncommon for

16   drug dealers to change their numbers, right?

17   A    Yes.

18   Q    Then again on June 25th -- you remember that

19   controlled purchase we talked about?

20   A    The ATF?

21   Q    That's right.

22   A    Yes.

23   Q    You were there, right?

24   A    Correct.

25   Q    And I'm looking at Defendant's Exhibit W.  Again, I

1   understand you did not author this, but it refreshed

2   your recollection.

3        Do you see there in paragraph two that ends, "Prior

4   to moving to the new area, confidential informant called

5   Martin at (802) 559-1972"?

6   A    Yes.

7   Q    Do you see that?

8   A    Yes.

9   Q    That's the same exact number as you report in

10  October 2018?

11            THE COURT:  So he can't testify about what's

12  in the document.  Does that refresh his recollection in

13  regard to the number that was used?

14            MR. MATSON:  Understood, your Honor.  I'm

15  sorry.  I went too quickly.

16            THE COURT:  Yes.

17  BY MR. MATSON:

18  Q    Does that refresh your recollection about Carl

19  Martin's number in June of 2019?

20  A    Yes.

21  Q    Okay.  The same number that you reported in October

22  of 2018?

23  A    Yes.

24  Q    Eight months difference there, right?

25  A    Correct.

1    MR. MATSON:  Thank you.

2    THE COURT:  Okay.  Any further questions?

3    MS. FULLER:  I'm hesitant to beat a dead horse

4    here, your Honor.

5                    REDIRECT EXAMINATION

6    BY MS. FULLER:

7    Q    But are you aware that of Carl Martin's -- that

8    cell phone for Carl Martin was operative in the time

9    frame when the CI was claiming he couldn't get a hold of

10   him?

11   A    Yeah, I am not sure.

12   Q    Okay.  Are you also aware that Carl Martin,

13   throughout this investigation with ATF, had three other

14   phone numbers?

15   A    I am not aware of that.

16   Q    Are you aware that he had the phone number

17   (802) 335-2236?

18   A    I don't recall.

19   Q    And how about the number (628) 250-1735?

20   A    No.

21   Q    And how about the phone number (413) 273-6250?

22   A    No.

23   Q    Are you aware that he had any of those numbers?

24   A    I am not.

25                    THE COURT:  All right.  Thank you, Trooper.

1           THE WITNESS:  Thank you, sir.

2           (Witness excused.)

3           THE COURT:  All right.  The defense want to

4   call the next witness?

5           MR. MATSON:  Your Honor, the defense needs

6   consultation.

7           (Brief pause.)

8           MR. MATSON:  Your Honor, the defense rests.

9           THE COURT:  All right.  Does the government

10  have any additional witnesses in rebuttal?

11          MS. FULLER:  No, we don't, your Honor.

12          THE COURT:  All right.  That means the

13  evidence is now closed.  So we will send you home just a

14  little bit early today.  We are going to start again at

15  nine o'clock.  Of course, the next -- the next part of

16  the trial are summations by counsel and then the charge,

17  and by, I anticipate, late morning, you will have the

18  case for deliberations.

19      So I'd ask that you make some alternative

20  arrangements for your personal responsibilities for

21  Friday just in case the jury would want to deliberate

22  past the normal business hours.  If that's the case,

23  then I ask everyone to remain here, and so you take over

24  the schedule.  So if you can have alternative plans,

25  that would be really helpful.

1        All right.  I'm going to stay here on the bench to

2    talk with counsel, and we'll see you tomorrow.  Again, I

3    just want to remind you -- we are getting to the very

4    end -- it's so important not to talk to anyone about

5    this case or learn anything from outside of the

6    courtroom.  We will see you tomorrow morning.

7    (The jury was excused for the day after which the

8    following was held in open court at 3:47 p.m.)

9           THE COURT:  All right.  Now, the standard

10   practice is to, in cases -- in criminal cases in which

11   the defendant does not testify, I ask defense counsel

12   whether you've gone over the defendant's right to

13   testify with the defendant and has he made a decision to

14   waive his right to testify?

15           MR. MATSON:  Yes, he has, your Honor.

16           THE COURT:  Okay.  And Mr. Martin, is that

17   correct?

18           THE DEFENDANT:  Yes, Judge.

19           THE COURT:  Did your counsel explain to you

20   that you have the right to testify if you wished, but

21   that you could waive that right?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  And have you made a decision to

24   waive your right to testify?

25           THE DEFENDANT:  Yes, sir.

1           THE COURT:  Okay.  All right.  Thank you.

2       Okay.  So let's talk about the jury charge.  Have

3   both sides gone over the jury charge?

4           MR. MATSON:  Yes, your Honor.

5           MR. GILMAN:  Yes, your Honor.

6           THE COURT:  Okay.  And are there any

7   suggestions, in which case we can go over that in

8   chambers, or not?

9           MR. GILMAN:  The government has one suggestion

10  concerning the entrapment charge.  Could we review that?

11          THE COURT:  Okay.  So you have one question on

12  the entrapment charge?

13          MR. GILMAN:  We have some proposed language to

14  potentially add.

15          THE COURT:  So we can have a conference there.

16      Is there anything that the defense objects to?

17          MR. MATSON:  No, your Honor.

18          THE COURT:  Okay.  All right.  So let's -- we

19  will address that in chambers now, and then you'll be

20  free to leave and prepare your summations.  Okay.

21  (Court was in recess at 3:49 p.m.)

22  (The following was held in chambers at 3:52 p.m.)

23          THE COURT:  So this is the entrapment defense.

24          MR. GILMAN:  Yeah.  The government has no

25  objection to the other portion of the charge.  We think

1    it's appropriate and well crafted, and the government

2    also appreciates the balance the Court has struck in the

3    current draft of the entrapment instruction.

4         THE COURT:  But now you want to change it.

5         MR. GILMAN:  We have a suggestion which we

6    think would hopefully add some clarity.

7         THE COURT:  It's very well balanced.

8         MR. GILMAN:  I guess I would say I would be

9    happy with how it is, and I guess our -- you know, it's

10   a suggestion that we included in our proposed

11   instruction where we talk about predisposition more

12   specifically.  It's on page 17 of our proposed

13   instruction where we talk about three ways in which the

14   government can show predisposition.  And this is on page

15   17, sort of in the middle, and this is taken from a

16   recent unreported decision from the Second Circuit where

17   they affirmed an entrapment instruction by Judge

18   Sweet -- I stand corrected.  I correct myself.  It looks

19   like it was Judge Nathan, but I thought it was Judge

20   Sweet.

21        So it's a string -- on the header they say Judge

22   Nathan, but in the decision -- I believe the case was

23   before Judge Sweet, anyhow.

24        May I hand this case to your Honor?

25             THE COURT:  Sure.  But what are you -- where

1      is the language that you are suggesting that defines

2      predisposition?

3                  MR. GILMAN:  Predisposition on page 17 is

4      measured independently from the government's inducement,

5      and there are three different ways for the government to

6      establish predisposition.  First, the government may

7      show an existing course of criminal conduct similar to

8      the charged crime, for example, that Mr. Martin was

9      predisposed to commit the crime charged based on

10     criminal conduct he was engaged in at the time of or

11     prior to the government's involvement.

12          Second, the government may prove an already formed

13     design on the part of Mr. Martin to commit the crime for

14     which he is charged; for example, Mr. Martin made plans

15     to commit the crimes before the government's

16     involvement.

17          And third, the government may establish a

18     willingness to commit the crime charged as evidenced by

19     Mr. Martin's ready response to the government's

20     inducement.  For example, predisposition may be

21     established if the government proves Mr. Martin quickly

22     and enthusiastically responded to the government's

23     inducement.

24          And so that's -- tried to track this instruction

25     that was included in -- in this case.

1        They also -- in that case, they also added that --
2   the judge further instructed that predisposition is
3   measured independently from the government's inducement.
4            THE COURT:  Yeah, right.  Well, that's pretty
5   obvious.  The difficulty is when you start talking about
6   one, two and three, that is, how you prove a particular
7   legal question, people look at that and see no
8   difficulty, see this as a definitive test.  This is not
9   a definitive test.  Right?  These are only factors which
10  you may look at.
11           MR. GILMAN:  Yeah.
12           THE COURT:  But there are a whole myriad of
13  factors which suggest predisposition.
14           MR. GILMAN:  Yeah.
15           THE COURT:  And by -- by highlighting the
16  three, I tend to think that it misinterprets what
17  predisposition is, and I bet that Leonard Sand, who
18  didn't have those three positions, would agree with me.
19           MR. GILMAN:  It's a fair point, your Honor.
20  Perhaps --
21           THE COURT:  Who -- do you say here that there
22  are three different ways for the government to establish
23  predisposition?  So what you are suggesting is
24  that that -- you have to prove these things, one of
25  these three, for predisposition.  I don't think that's

1    right.  I think you -- you can consider a whole number

2    of different factors on predisposition.

3              MR. GILMAN:  Yeah.

4              THE COURT:  Don't you think?

5              MR. GILMAN:  No, I think that's right.  And

6    perhaps then there would only be like an illustrative

7    list, for example, instead of there are only three

8    different ways.

9              THE COURT:  Right.  And then there's a second

10   problem.  When you start mentioning Mr. Martin's

11   responses or -- then it looks like -- since I am reading

12   this to the jury, it looks like I'm making a factual

13   determination.  Right?  So when I say to the jury the

14   government may establish a willingness to commit the

15   crime charged as evidenced by Mr. Martin's ready

16   response to the government's inducement, oh, am I saying

17   that Mr. Martin made a ready response to the

18   government's inducement?  I don't think so.  I don't

19   think I should be doing that.  Right?

20             MR. GILMAN:  Yeah.  Okay.  In that event, to

21   go back to the proposed instruction --

22             THE COURT:  Okay.

23             MR. GILMAN:  So the instruction, there's a

24   sentence that reads at the start, Thus the defendant may

25   not be convicted of a crime if it was the government who

1      gave the defendant the idea to commit the crime, if it

2      was the government who also persuaded him to commit the

3      crime and he was not ready and willing to commit the

4      crime before the government officials or agents first

5      spoke with him.

6          And then, you know, that -- I have sort of

7      expressed some reservations of that language at the

8      earlier charge conference, and I think you adapted to

9      that by including this line that -- in the end of that

10     last paragraph on that page -- that's page 35 -- the

11     entrapment must be considered individually as to each

12     crime charged.

13         I just want to confirm that the government can

14     essentially -- the jury doesn't -- the jury might --

15     well, let's see.

16         I am trying to say the government has space to

17     argue the jury has to consider entrapment to each

18     response and not look at -- the government would be free

19     to argue that's a definition to each separate offense

20     and the jury doesn't have to look at the prior

21     government inducements.

22             THE COURT:  I thought there was language put

23     in here which suggested just that.

24         Okay.  The entrapment defense is applicable to each

25     of the separate charges and that it has to be assessed

1    for each charge.

2              MR. GILMAN:  Yes, you did.

3              THE COURT:  Are you checking --

4              LAW CLERK:  I added this language.

5              MR. GILMAN:  I just read it.  The entrapment

6    defense must be --

7              THE COURT:  Doesn't that confirm --

8              MR. GILMAN:  It gives us the flexibility in

9    our argument to address that.

10             MS. FULLER:  I see the language.  It says the

11   entrapment must be considered independently as to each

12   count charged.  I am wondering if -- if the Court would

13   consider adding an additional sentence that they have to

14   find, like this suggests, yes, consider it as to each

15   count charged, but they have to find entrapment as to

16   each.  So it's not just enough to say consider it

17   independently; you have to make an independent

18   determination for Count 1, entrapmentment; Count 2,

19   entrapment; Count 3 -- well, we found Count 1,

20   entrapment -- we have considered them all, therefore we

21   are sort of finding entrapment for all the counts.

22             THE COURT:  That's a good point.  Do you have

23   any objection to making sure that's clear?  So tell me

24   where exactly this.

25             MS. FULLER:  Bottom of that last full

```
1   paragraph.  If you can just add maybe a sentence after
2   the last full sentence.
3            THE COURT:  Must be considered independently
4   as to each count charged.  And what you are suggesting
5   is that you need to address the entrapment defense in
6   regard to each and every count of the indictment?
7            MS. FULLER:  Yes.
8            THE COURT:  Okay.  Could you add that?
9            LAW CLERK:  Yes.
10           MR. MATSON:  So -- sorry.  Go ahead.
11           LAW CLERK:  No, no.  Go ahead.
12           MR. MATSON:  I am looking at that -- now I am
13  looking at that paragraph again.  This is always what
14  happens.  The first sentence, On the other hand, if a
15  defendant was ready and willing to violate the law --
16  that's a bit misleading though.  It has to be to violate
17  the crimes charged.  You could be ready and willing to
18  violate the speed limit or fish and game violation.
19           THE COURT:  But isn't that in the context of
20  this instruction, by violate the law --
21           MR. MATSON:  No, I understand, but it makes it
22  sound like it's a character of general badness is
23  enough.
24           THE COURT:  So how would you suggest it
25  change?  If the defendant was ready and willing to
```

1    violate the laws charged in the indictment?

2              MR. MATSON:  Yes, that's how I would do it.

3              THE COURT:  The laws charged in the

4    indictment.

5              MS. FULLER:  That's fine.

6              THE COURT:  The offenses.

7              MR. GILMAN:  The offenses.  The offenses or

8    crimes charged.

9              MR. MATSON:  That's what happens when you look

10   at stuff.  Just kidding.

11             THE COURT:  Okay.  All right.

12             MR. GILMAN:  Nothing further from the

13   government on that.

14             THE COURT:  Is that right?

15             MR. GILMAN:  Yes.  Thank you, your Honor.

16             MS. FULLER:  I think we are fine.  I am

17   wondering, I am doing the closing and I just want to

18   make sure I understand the Court's ruling as to the

19   parameters of what I am -- about this whole Nectar's

20   thing.

21       We did hear part of Mr. Martin's statement about

22   his version of events.  I'm -- I don't want to overstep

23   what I am supposed to say about it.

24             THE COURT:  So my understanding of the

25   relevance of Nectar's is that it shows predisposition to

1    be in possession of a firearm.  It does not show that he

2    is of a particular violent nature.  I mean, that's what

3    I have concerns about.  So if you are taking a look at

4    Nectar's, what it shows is that he has got a firearm in

5    his car, he takes the firearm, he is willing to use the

6    firearm as reflected in that video.  So that's

7    predisposition, or that's relevant to predisposition to

8    have a firearm, but it's not relevant for any other

9    purpose like shows he is a violent guy.

10              MS. FULLER:  So I will absolutely cabin my

11    closing to that.

12              THE COURT:  Yes.

13              MS. FULLER:  I am hoping the defense argument

14    doesn't open another door.  That's my worry that, you

15    know, it harkens back to what he says in his post --

16    his -- the statement that, I didn't intend to do

17    anything.  I was protecting my brother.

18         You know, if we get into that, just -- problematic

19    for rebuttal.

20              THE COURT:  Yeah.  I'm not so sure that that's

21    problematic.  What's problematic is to say that the

22    government had a clear, improper design or purpose that

23    stemmed out of or linked to the incident.

24              MS. FULLER:  Okay.

25              THE COURT:  Right?  So -- and I think -- I

1    think that it became clear, and I think the defense used

2    it effectively, that is, the defense could go through

3    all of the contacts that the officers had, suggesting

4    that they were really focused in upon him; but to

5    actually say that the government had an improper or --

6    well, an improper purpose stemming out of -- I think

7    it's very prejudicial and I think that's excluded.

8        And the fact is that when one looks at exactly the

9    defense -- what Mr. Matson said in the opening

10   statement, he didn't say that the government had some

11   malevolent purpose.  He didn't say it was a conspiracy

12   to violate his constitutional rights.  In fact, he said

13   just the opposite.

14       So I think as long as the defense stays with they

15   just were, you know, constantly going at him, without

16   saying that this is a -- a malevolent purpose because

17   they were so upset about, you know, what happened at

18   Nectar's, that's fine.

19       So you can go through all of that.  You just can't

20   say that the government was out to violate his

21   constitutional rights because of Nectar's, and I don't

22   think that, you know, you can say that -- or that --

23   well, I just don't think that linking Nectar's to what's

24   a standard 404(b) argument would be appropriate.  This

25   is not a standard 404(b).  This is a predisposition,

```
1    right?
2              MS. FULLER:  Right.
3              THE COURT:  So therefore it should be limited
4    to it.
5              MS. FULLER:  Just so I understand.
6              THE COURT:  That's the fine line.
7              (Brief discussion off the record.)
8              MS. FULLER:  Thank you, your Honor.
9              MR. MATSON:  Thank you, your Honor.
10             MR. GILMAN:  Thank you, your Honor.
11          (Chambers conference concluded at 4:08 p.m.)
12                        *** ** ***
13
14
15               C E R T I F I C A T I O N
16       I certify that the foregoing is a correct
     transcript from the record of proceedings in the
17   above-entitled matter.
18
19   July 8, 2023              _____
     Date                          Anne Nichols Pierce
20
21
22
23
24
25
```