```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
             V               *
                             *
CARL MARTIN                  * CRIMINAL FILE NO. 19-157




                           JURY TRIAL
                      Friday, June 10, 2022
                       Burlington, Vermont




BEFORE:

      THE HONORABLE WILLIAM K. SESSIONS III
         Senior District Judge

APPEARANCES:

      WENDY L. FULLER, ESQ., and ANDREW C. GILMAN, ESQ.,
         Assistant United States Attorneys, Federal
         Building, Burlington, Vermont; Attorneys for the
         United States

      CHANDLER W. MATSON, ESQ., The Law Offices of
         Chandler W. Matson, 125 Mountain Road, Stowe,
         Vermont; Attorney for Defendant Carl Martin
```

```
                   ANNE NICHOLS PIERCE
      United States District Court Reporter (ret'd.)
             fortherecordinvermont@gmail.com
```

<u>**I N D E X**</u>

**M I S C E L L A N E O U S**

| CLOSING ARGUMENTS | PAGE |
|---|---|
| Ms. Fuller | 3 |
| | 44 |
| Mr. Matson | 28 |
| **Charge to jury** | 50 |
| **JURY NOTE** | |
| #1 | 103 |
| #2 | 105 |
| **Verdict** | 111 |
| **Jury polled** | 112 |

1    FRIDAY, JUNE 10, 2022

2    (The following was held in open court with the jury

3    present at 9:07 a.m.)

4              THE COURT:  Good morning.  Welcome back.

5              COURTROOM DEPUTY:  Your Honor, the matter

6    before the Court is criminal case number 19-CR-157,

7    defendant number one, United States of America versus

8    Carl Martin.  Present for the government are Assistant

9    United States Attorneys Wendy Fuller and Andrew Gilman.

10   Present with the defendant is Chandler Matson.

11        And we are here for the fifth day of a jury trial.

12             THE COURT:  All right, good morning and

13   welcome back.  Has anyone spoken to you about the case

14   or have you spoken among yourselves about the case or

15   have you learned anything about this case from outside

16   of the courtroom?

17             (The jury all indicate in the negative.)

18             THE COURT:  All right.  Thank you.  Everyone

19   is shaking their heads right and left.

20        And I think we're ready to proceed.  Government

21   ready to make its summation?

22             MS. FULLER:  Yes, I am, your Honor.  Or we

23   are.

24        Ready, willing, and able.  Those are three words I

25   hope you keep in mind throughout these closing

1    statements and in your deliberations.  Carl Martin, well

2    before he met ATF Agent Brian Wood, was ready, willing,

3    and able to sell cocaine and possess firearms.  No one

4    pressured Carl Martin to deal cocaine.  No one pressured

5    him to possess firearms.  He did that all on his own.

6    And for that, ladies and gentlemen, you should return a

7    verdict of guilty on all counts.

8        Now, I just want to talk to you briefly about the

9    charges.  You will hear the judge instruct you that

10   there's a six-count indictment.  The first count is a

11   conspiracy count.  The judge will tell you what a

12   conspiracy means.  But the simplest way to explain it is

13   it's simply an illegal agreement between two or more

14   people.  It's an illegal agreement, illegal agreement to

15   commit an unlawful act.  These parties need to come to a

16   mutual understanding of what that act is.

17       And in this case, Carl Martin, along with Mirnes,

18   Bryan Correa Santiago, conspired, they agreed, to

19   distribute cocaine between the fall of 2018 and October

20   23rd, 2019.

21       The second charge in this count is a possession of

22   a firearm in furtherance of a drug trafficking crime.

23   That charge relates to Mr. Martin's trade of cocaine

24   with the undercover agent for a firearm.  It's that

25   simple.

1            And then the remaining counts, Counts 3, 4, 5 and

2    6, all relate to Mr. Martin's distribution of cocaine on

3    each of the controlled transactions that you heard.

4            Just to be clear, Mr. Martin doesn't need to

5    actually physically hand the drugs in each of those

6    transactions to be guilty of that crime.  And the judge

7    will instruct you of that.  If Mr. Martin helps in that

8    distribution, if he helps bring about that distribution,

9    he is guilty of that crime.

10           I want to start with talking to you about what's

11   not disputed.

12                LIZA LABOMBARD:  Can you take that off for a

13   second?

14                COURTROOM DEPUTY:  Sure.

15                LIZA LABOMBARD:  Can you try it again?

16                COURTROOM DEPUTY:  Yes.

17                MS. FULLER:  We appear to be having a --

18                THE COURT:  Technological problem.

19                MS. FULLER:  -- technological problem.

20                COURTROOM DEPUTY:  I can --

21                LIZA LABOMBARD:  Yeah, the screens are a

22   little different.

23                MR. GILMAN:  There it is.

24                MS. FULLER:  Okay.  Don't go away.

25          All right.  Let's talk about what's not in dispute.

1    First, it is not disputed that on August 26th, September

2    5th, September 20th, and October 23rd, 2019, controlled

3    transactions occurred in which cocaine was distributed,

4    and in that last transaction, a firearm was traded for

5    cocaine.  That's not disputed.  It's not disputed that

6    those transactions occurred.

7         It's also not disputed that Mr. Martin was present

8    for each of the transactions on August 26th, September

9    5th, September 20th, and August 23rd.

10        It's further not disputed that there was cocaine in

11   the substances purchased on August 26th, September 5th,

12   September 20th, and October 23rd.

13        Now, it's been suggested to you that the cell phone

14   used in this case either didn't belong to Mr. Martin or

15   was being used by somebody else in addition to Mr.

16   Martin.  Did you see any evidence of that?  Aside from

17   the claim regarding the word "broski," did you see any

18   evidence of that?  There isn't any evidence that anybody

19   used his phone, and I don't think you want me to go back

20   over the text messages in which it indicates that Mr.

21   Martin also used the word "broski."  It's -- it's his

22   phone.

23        Brian Wood testified that when he would send Carl

24   Martin a message, Carl Martin would show up with

25   cocaine.  It's kind of like asking a family member to

1    get a gallon of milk at the store, and they come home

2    and they have that gallon of milk.  It's the same

3    concept.  It's not complicated.  It can't be seriously

4    disputed that this was Martin's cell phone.

5         And to the extent there's any lingering question

6    about whether this is Mr. Martin's cell phone, Mr.

7    Martin actually tells us it's his cell phone.

8    Government's Exhibit 112.  There's an outgoing message

9    to Byrd.  That's Mr. Martin talking to Byrd.  He says,

10   "What's good?"  She says, "Who's this?"  He say, "Dre."

11        And if that's not enough, then Mr. Martin sends a

12   photo of himself to Byrd.  Governments 112B.  It's Mr.

13   Martin's cell phone.  Can't be seriously disputed that

14   it's not.

15        And if it's not certainly disputed that it's Mr.

16   Martin's cell phone, those first three things still

17   apply, but the last also applies.  And that is that Mr.

18   Martin arranged each of the deals on August 26th,

19   September 5th, September 20th, and August -- October

20   23rd.  That put -- that puts Mr. Martin squarely

21   accountable for the cocaine that was distributed on each

22   of those days.

23        So just to review.  We'll walk through each of the

24   controlled buys and talk about some of the evidence that

25   is corroborating the fact that those buys occurred and

1    that Mr. Martin was involved in them.  First let's start

2    on the August 26th, 2019, controlled buy.

3         Do you remember by this time Mr. Martin had twice

4    sold fake drugs?  Not twice.  On multiple occasions had

5    sold fake drugs to law enforcement.  I will talk about

6    that in a bit, but I suggest to you that that's a side

7    show in this case.  Mr. Martin's a drug dealer.  People

8    sell fake drugs.  It's not a legitimate business.  He

9    doesn't care if he sells fake drugs, because what he

10   wants is money, and whether you sell fake product or

11   real product, you still get the money.

12        So before this deal on August 26th, he sold some

13   fake drugs.  Brian Wood was complaining about the

14   quality of the cocaine.  Remember that?  And in response

15   to entice Brian Wood to buy cocaine, Mr. Martin sends

16   him this, a video of cocaine.  "Look.  This is the

17   product I'm selling you.  It's good."  It's an

18   advertisement.  If there's any inducement in this text

19   message, it's Mr. Martin trying to induce Brian Wood to

20   keep buying his product.

21        Then there's text messages from Martin to -- to

22   Brian Wood arranging the deal.  Mirnes and Martin show

23   up in Mirnes's Chevy Equinox at the Price Chopper on

24   Williston Road.  Mirnes comes to the window.  You've

25   seen that video.  It's not Mirnes just telling you what

1    happened in the video.  You have seen it.  You've heard

2    it.  There's talk about taking a trip to Philly.  Folks,

3    there's only one person in this room, potentially

4    there's only one person sitting at the defense table who

5    is from Philly.  It's Carl Martin.  Mirnes isn't from

6    Philly.  He's from Bosnia.

7         So there's talk about taking a trip to Philly for

8    better product.  There's reference to Carl Martin.  And

9    Mirnes says, "Hey, I'm just a middleman."

10        Now, there was some suggestion to you that Mirnes's

11   testimony about just being the middleman was, you know,

12   Mirnes didn't want to get caught.  Well, think about

13   that for a second.  Mirnes has no idea that this is

14   being recorded by law enforcement.  He thinks Brian Wood

15   is an actual buyer of cocaine.  What motivation is

16   Mirnes going to have to claim he is a middleman when

17   he's not when nobody's looking?  That's the time that

18   Mirnes is going to tell the truth.

19        In that deal, Mirnes hands the cocaine to Brian,

20   Brian gives the money to Mirnes, Mirnes gets back in the

21   car with Martin, and they drive away.

22        Then we have the September 5th controlled buy.

23   Again, more text messages with Martin arranging the

24   deal.  And you could read all of them.  You will have

25   every single text message between Brian Wood and Mr.

1    Martin.  You can see exactly what was said.

2        But there's more because there's also text messages

3    between Mirnes and Martin about meeting the CI.  Martin

4    says to Chango -- who is Mirnes, remember -- "He's on

5    the way," referring to Brian Wood.  Mirnes writes back,

6    "So about 20 minutes until we there, I'm guessing?"

7    Martin says, "Probably."  And then Mirnes says, "On my

8    way to you."

9        Okay.  "On my way to you," because Mirnes is Mr.

10    Martin's chauffeur.  All of the drugs and all of the

11    deals in this case, Mr. Martin had Mirnes drive him.  If

12    Mirnes was really the supplier of these drugs, does it

13    make any sense to you that Mirnes would be driving

14    Martin, and Martin's just along for the ride?  Seems to

15    me it would be the other way around.

16        Now, I suggest to you that Mr. Martin was using

17    Mirnes for a ride, as a chauffeur, as a person to bring

18    him wherever he needed to go and to distribute his drugs

19    to whoever Martin was distributing to.

20        In that controlled buy, Mirnes and Martin arrive in

21    the Equinox again at the Price Chopper.  This is

22    surveiled by law enforcement.  Independent law

23    enforcement officers see this.  Mirnes comes to the UC's

24    window.  There's more talk about taking a trip, a trip

25    down to Philadelphia, to get more high-quality product.

1    Mirnes hands the cocaine to Brian Wood.  Brian Wood
2    gives the money to Mirnes in a coffee cup.  Mirnes gets
3    back in the car and drives away with Mr. Martin.

4         September 20th, 2019.  This is the third controlled
5    transaction.  Again, more texts between Martin and Brian
6    Wood.  You can read them.  They corroborate exactly what
7    happened here.  But by this time on September 20th, you
8    remember during the early part of September there was a
9    dispute over the quality of the cocaine.  There had been
10   a dispute over the quality of the cocaine almost this
11   entire time.  And the UC was complaining about the
12   quality because you learned that in this time frame, ATF
13   learned for the first time that some of the substances
14   that Mr. Martin had been selling wasn't real.

15        And so Mr. Martin was reacting to that, in
16   Exhibit 26, and he says, "I have some good news.  One of
17   my brothers on his way from Philly right now with some
18   raw fish that you can cook yourself if needed."  Only
19   thing is he wants one more.  Again, Mr. Martin
20   advertising the cocaine that he potentially has for
21   sale.  Why?  Because he is trying to entice Brian Wood
22   to buy more.

23        Again, Martin texts his chauffeur, Mirnes, for a
24   ride.  Government's Exhibit 97.  Martin says, "Yo,
25   thought you was taking me may."  Martin -- or Mirnes,

1    joking with Martin, says, "Who's this?"  But they

2    ultimately show up at the deal in Martin's Equinox.

3    This deal is at the McDonald's, a place where you had

4    seen other controlled purchases had happened.

5        This time the UC gets into the Equinox.  He gets

6    into the Equinox, and there is a hand-to-hand

7    transaction directly with Mr. Martin.

8        And in this case, you will remember, because of the

9    quality of the cocaine, because it was so bad, because

10   ATF was not going to buy anymore fake product from

11   Martin, Martin enticed the UC to buy -- to take a little

12   bit more cocaine on the front.

13       And you heard that word, about what fronting is.

14   Fronting is when it's essentially a consignment deal.

15   Martin is giving the UC cocaine so he can try it out, so

16   he can make sure it's good.  He doesn't need to pay for

17   it unless he is able to turn around and resell it.  It's

18   another aspect of this case which shows that it's Martin

19   attempting to get Brian Wood's business.  Certainly not

20   the other way around.

21       And we know this because in the video you heard

22   Martin tell the CI, quote, That's why I'm giving you

23   that, to gain trust back.

24       Now, the last transaction.  There's a series of

25   controlled buys before the October 23rd, 2019,

1    controlled transaction.  You'll remember there's an

2    ongoing dispute about quantity.  ATF and Brian Wood are

3    saying, "Hey, I want to sort of put the brakes on this."

4    They're trying to put some distance between them and Mr.

5    Martin.  But Mr. Martin doesn't give up.

6        Exhibit 34, on October 6th, he says, "Got the best

7    fish right now.  Just a little bit more."  Brian Wood

8    doesn't bite on that, so on October 16th, he writes

9    back, "What's the word?"  Brian Wood doesn't bite on

10   that.

11       So on October 17th, he says, "I have the real deal

12   holyfield."  We have heard that before, right?  That's

13   what he told Bryan Correa Santiago he was telling to all

14   of his people.  Another -- another example of Mr. Martin

15   trying to get business.  He is trying to drum it up.  "I

16   got the real stuff.  It's good.  You gotta get it."

17       October 21st, Brian Wood still not been interested,

18   and he says, "Just let me know the number of fish."

19       And then on -- later on October 23rd, Brian Wood

20   says to him, "Yo.  Red says you're looking for

21   something.  Let me know if I can help."  We know Red is

22   John Latimer, the CI in this case.

23       I want you to focus pretty closely on the words

24   that Brian Wood used.  I'm going to suggest to you that

25   there's a lot he didn't say right here, right?  He says,

1    "Yo, Red says you're looking for something.  Let me know

2    if I can help."  A person who is not criminally minded

3    might take that to mean or would likely take that to

4    mean, depending on where you are in your life, looking

5    for something.  Maybe you're looking for a couch.  Maybe

6    you're looking for a twin bed for your daughter.

7         If you are not criminally minded, this could mean

8    all sorts of things, right?  That door was left wide

9    open for Mr. Martin to interpret it any way he wanted

10   to.  It doesn't say, "Hey, I hear you're looking for a

11   firearm.  I have a firearm, specifically a .357, to give

12   to you."  It doesn't say that.  It specifically doesn't

13   say that.  So that there could be all sorts of space for

14   Mr. Martin to fill any way he decided to fill it.

15        And Mr. Martin decided to fill it by saying, "Yeah.

16   Like a .357.  Has to be clean."  You'll see in the

17   evidence in this case that is the first time a specific

18   firearm is referenced by anyone, and it's the defendant.

19        Following up on those texts, on the day of the

20   actual controlled transaction, there's texts between

21   Martin and Mirnes about the deal.  Exhibit 97.  And we

22   see exactly what is going to happen.

23        Martin writes to Chango, who is Mirnes:  "I'm

24   supposed to drop off two to the white boy."  We know

25   that's Brian Wood.  Later messages that morning in the

1    same general time frame, he says to Mirnes, "I can give

2    you something out of it."  Probably, because, again, Mr.

3    Mirnes is his chauffeur.  "Okay.  No problem, broski.

4    What time?"  And, "Where you at?"

5          Then Martin and Mirnes go to pick up the cocaine.

6    Exhibit 120.  And how do we know that?  Because we saw

7    the messages on Bryan Correa's text messages with Carl

8    Martin, Bryan Correa being the supplier of Mr. Martin.

9    And there's an incoming text message from Bryan Poker,

10   who we know is Bryan Correa Santiago, and it says, "You

11   almost here?"  Martin says, "Beltline,"  "K."  Martin

12   says, "I'm outside."

13         Now, you remember I asked the agent about the

14   timing of these messages right here?  That message was

15   sent at 11:50 a.m. on October 23rd, 2019.  You also

16   heard testimony that the deal with Brian Wood happened

17   less than an hour after this text message was sent.

18         Folks, these controlled transactions, the

19   government has proved them.  We have corroborated them.

20   You can see all the text messages.  You can see the

21   video.  You can see the information from Carl Martin's

22   phone.  There can't be a serious dispute that those --

23   that those transactions happened the way that the

24   government's evidence indicate that they happened.

25         There can't be a dispute that Mr. Martin traded

1    cocaine for this firearm, Government's Exhibit 117.  He
2    didn't pay for it.  The only thing he gave over for this
3    was cocaine.
4        So I want to talk to you a little bit about the
5    conspiracy indictment.  We -- I mentioned it earlier,
6    but it's worth noting again that this is just an illegal
7    agreement, and as you will see in the Court's jury
8    charge to you, it doesn't need to be a formal agreement.
9    These people didn't meet in a conference room somewhere
10   and write it down on a piece of paper and sign at the
11   bottom.  It doesn't have to be that formal.  What it is
12   is just a mutual understanding between people.
13       And in this case, Bryan Correa Santiago, Mr.
14   Martin, and Mr. Julardzija had a mutual understanding to
15   sell cocaine.  And they started in 2018, and it
16   continued until October 23rd, 2019.  How do we know
17   this?  Much of the same evidence I just described to you
18   is how we know:  Text messages.  Testimony of Agent
19   Wood.  Video.  The audio.  But we also have the
20   testimony of Mirnes and Daniel Lathrop.
21       And I want to talk to you a minute about them,
22   because their testimony supports what you saw in the
23   other evidence.  And I expect that you are going to
24   hear -- you already have heard in opening -- I believe
25   the quote was, "You will not hear from a witness in this

1    case that does not have a reason to be here, that does

2    not have a bias."

3         It is true that Mirnes Julardziga, Daniel Lathrop,

4    and Peter Nguyen have agreements with the government.

5    And as the Court will instruct you, that is absolutely

6    fair to consider.  It is part of your credibility

7    determination, because you get to determine whether

8    someone is credible or not.  It's part of determining

9    credibility.  So think about that.  Think about their

10   motivation for being here.

11        But there's other things that also go into

12   someone's credibility determination:  the way they

13   testify; how they answer questions; how they appear to

14   you, their body language; whether they're able to answer

15   questions or whether they're confused or can't remember.

16   Think about all those things.  All perfectly fair things

17   to consider when you're thinking about whether someone's

18   credible.

19        There's also another piece to credibility, though,

20   that I don't think you are going to hear from the

21   defense.  That piece to credibility is whether there's

22   other evidence supporting what they say, because you

23   don't just judge credibility in a vacuum.  It's not just

24   somebody's motivation for being here.  Somebody can have

25   a pretty significant motivation for being here, and I'm

1    sure that will be suggested to you.  But ask yourselves:

2    Did what they say match the evidence in this case?  Did

3    Mirnes's testimony match Brian Wood's?  Did Daniel

4    Lathrop's testimony match Mirnes's?  And did both of

5    their testimony match the physical evidence that we have

6    in the case?  Because if it does, that's a pretty strong

7    indication that these people walked in here and were not

8    influenced by whatever bias they had.

9        One of the things that was suggested to you in

10   opening pretty strongly is that law enforcement

11   pressured the defendant into this.  I think you heard

12   the words, "He's not a drug dealer.  He's not.  It was

13   the government's pressure that got him here."  Let's

14   look at some of that pressure.

15       Go to the next slide.

16       Government's Exhibit 118.  You know what this is?

17   This is the first ever text between Carl Martin and

18   Brian Wood.  First ever.  Wasn't Brian Wood to reach out

19   to Carl Martin.  It was Carl Martin reaching out to

20   Brian Wood.  "If you need something, let me know."  Is

21   that pressure?

22       How about the next one, Exhibit 129.  August 13th:

23   "When you wanna have lunch?  That way I have it prepared

24   for you."  No deal is set up at this time, folks.  No

25   deal.  But it's Mr. Martin wanting to get ahead of the

1    game.  Wanting to make sure he's there.  Is that

2    pressure?

3        August 15th:  "What time you thinking tomorrow?"

4    They hadn't yet set up a deal, but he's still wanting

5    him to set one up.  He wants lunch with him.

6        More texts, Exhibit 3.  August 20th, he is checking

7    in to see how everything was.  Brian Wood writes back,

8    "Going all right, man."

9        And then Carl Martin writes back, "That's good.

10   Let me know when you're trying to eat some lunch."

11   Again, no deal set up.  Pushing, want to make that next

12   sale, and it's not coming from Brian Wood.

13       August 21st:  "That fish came in."  Again, "Let me

14   know when you wanna have lunch."

15       August 22nd:  I'll give you a good deal.

16       Sunday:  "I have lunch prepared.  Let me know when

17   you're ready to eat."  Over and over and over again.

18       And it continues.  August 29th:  "How's everything

19   going?

20       "Good, my man."

21       "That's good."

22       "Yeah, man.  Good meal."

23       "Let me know when you wanna have lunch again."

24       "Yeah, bud.  Will do.  Thanks."

25       September 2nd:  No communication since the 29th,

1    and out of the blue Carl Martin writes to the UC and

2    says, "What's good, my boy?  When you wanna do lunch?"

3         September 3rd, later in the day:  "Just let me

4    know.  How many fish you looking for for lunch?"

5         That's not pressure from the government.

6         Martin was also pushing quantity in a way that

7    Brian Wood was not.  Exhibit 129, August 10th:  "6500

8    for five onion?"

9         And Brian Wood's response tells you everything you

10   need to know about government pressure or not:  "I like

11   that number, my man, but lemme know how fast that two

12   can go to see if I can get some bigger mouths to feed."

13        Up until this 6500, five-ounces text, they hadn't

14   come close to five ounces.  They were at two.  So the

15   person suggesting more quantities was Mr. Martin.

16        And then Exhibit 25, a couple days later:  "How

17   much you willing to take?  All seven?"  Seven?  They

18   were less than five.

19        And then the final text:  "You want all 10 or just

20   seven?"  They went from two ounces in a controlled buy

21   to five to seven to 10, all initiated by Mr. Martin.

22        Then we have the time period that we've already

23   talked about in which ATF had learned that some of the

24   substance they had purchased did not contain real

25   cocaine.  You remember that?  And there was a period of

1    time in which the UC wanted to sort of push back and

2    say, "No, we gotta slow this down.  Not going to buy

3    anymore substances from him until we can figure it out."

4         Exhibit 25.  This is right before they find out

5    that some of the substances are not real.  "Trying to

6    get some lunch this week."

7         September 13th:  "What's the word for the day?"

8         September 16th:  Now we're in the heat of it.

9    Brian Wood has not been in contact with Mr. Martin.

10   "Can you meet at Price Chopper next to McDonald's in

11   Colchester where we meet the first time?  My guy?  Let

12   me know so I can make a move.  Everything good??"

13        "Can you meet at Price Chopper next to McDonald's

14   in Colchester where we meet the first time?"  He's

15   panicked.

16        Later, "On my way to you."  Brian says, "I'll hit

17   you up later if the phones are working."

18        "Can I come to you?  Want me to come to you?"  Does

19   that look like pressure from Brian Wood?  It looks like

20   somebody who is panicked about the quality of their

21   product and they're nervous that they're going to lose a

22   customer.  That's what it looks like because that's what

23   it is.

24        Later on September 16th:  "Give me an address.

25   I'll come to you.  I'm trying to call you.  Or

1   McDonald's work for you?"

2          September 16th:  "What's the word?  What's good?"

3          And then on September 17th:  "If you want, I could

4   swing by -- I could swing by you after -- after I get

5   off work in an hour and bring you a basketball to try

6   out."  So now he's offering him more product on the

7   front.

8          Mr. Martin was ready, he was willing, he was able

9   to sell drugs.  He is not an unwary innocent.  He was

10  dealing drugs long before Brian Wood contacted him.  He

11  saw Brian Wood as a good customer.  He wanted to keep

12  him.  That's what all these text messages are about.

13         How else do we know that Carl Martin was dealing in

14  cocaine?

15         If you go back a couple slides, please.

16         These are text messages that Mr. Martin had with

17  other customers, because Mr. Martin's a drug dealer and

18  he deals drugs to people more than Brian Wood.  He deals

19  to Malik.  "You or trigger wanna get rid of an onion?

20  If so, how much?"

21         He deals to Larry.  "I need a G till tomorrow night

22  if you can trust me."

23         Carl's response, "Yeah, I got you."

24         He deals to Jake.  "I got.  You want?"

25         "What kinda ice cream you eating?" says Jake.

1    "I have soft ice cream right now."  Powder cocaine.

2    He deals to Byrd.  "I could make some if you know

3    people who like that girl."

4    Byrd writes, "Are you talking about snow white or

5    are you talking about my friend Molly?"

6    He says, "Snow white."

7    This is all indication that Carl Martin was

8    previously predisposed to sell cocaine.  He's not only

9    selling to the government; he's selling to other people.

10   Those texts, those people -- Mirnes, Lathrop, person

11   named Ashley Hojon (phonetic), Bevin, Byrd, Jake, Larry,

12   Malik, these are all customers of Carl Martin.

13   If the government pressured him into selling coke,

14   why is he selling to other people?  That's

15   predisposition, folks.  That's sale of drugs to other

16   people.  It's predisposition.  Mr. Martin was selling

17   cocaine long before Brian Wood entered the picture.

18   Go forward with the texts, please.

19   So the last area I want to cover is Mr. Martin and

20   guns.  Now, we know from the evidence that Mr. Martin

21   possessed a firearm in February of 2018 in connection

22   with the Nectar's shooting.  This is that firearm,

23   Government's Exhibit 101.  He admits he possessed it.

24   Law enforcement took it directly from him.  This is a

25   person who was interested in firearms at least as far

1   back as February 2018.

2        This is the firearm he possessed in Colchester, a

3   year later, in February 2019.  Mr. Martin has his first

4   firearm taken from him, so he needed another one, and

5   this is it.  This too ended up in the possession of law

6   enforcement.

7        Undeterred, Mr. Martin needed more firearms.

8   Remember those texts about him going on a mission?

9   Exhibit 120, he is writing to Brian:  "Lots of people

10  owe me."  You know what that's a reference to?  Cocaine.

11  It's a reference to his customers owing him money.  "I'm

12  ready to go on a mission."  You know what a mission is.

13  It's a robbery.

14       Next series of text messages, Exhibit 97, he is

15  writing to Chango:  "I need to hold Lisa for the night."

16  Lisa's a firearm.  He's on the hunt.  He's looking.

17       Mirnes writes back:  "No, I can't, broski.  She's

18  MIA," because Mirnes knows it's not a good idea to give

19  Carl Martin a firearm.

20       He writes to Chango:  "I'm going on a mission

21  tonight," same thing he just told Bryan Correa Santiago.

22  "What's up with the rifle?"

23       "So if I can't have Lisa, I can take the rifle.  I

24  need something for the mission."

25       More texts with Chango:  "Just got BNB to find a

1  hammer."  He's looking.

2       Mirnes says, "I got the air one, look real as

3  shit."

4       He's like, "At this point I'll take anything.

5       "Okay, I'll let you have that one."

6       More messages with Bryan Correa Santiago.  He's not

7  getting any hammers from Mirnes, so he asks Bryan Correa

8  Santiago for a hammer.

9       And all of these texts, folks, this is before

10  the .357 text.  This is before Brian Wood says to him,

11  "Hey, I hear you're looking for something."  Remember

12  that text where Brian left it wide open for Martin to

13  fill the space?  These texts are before that.  Mr.

14  Martin was predisposed to seek out a firearm and possess

15  it.  These texts prove it.

16       Then we get to the attempted robbery, which is only

17  to show his continued possession of firearms.  The first

18  text he exchanged with Bryan Poker:  "Can't get into the

19  apartment."

20       Bryan's like, "Yeah, it's hard."

21       He wants to know how many digits, remember, because

22  there's a key pad that you need to get into the

23  apartment.  "I don't know."

24       And he said, "You never saw the code, fool?"

25       He writes later to Bryan Correa Santiago, right

1    around the time that the robbery is happening, according

2    to Peter Nguyen.  They're going to the place on Williams

3    Street because the attempted victim in the robbery was

4    still working his food cart.

5        And what do we know happens next?  From Mr.

6    Martin's cell phone, he sends Bryan Correa Santiago this

7    series of pictures.  The first one.  The second one.

8    The third one.  That third one's all you need to know

9    about Mr. Martin and guns.

10       Bryan Correa Santiago's response to those messages:

11   This (indicating).

12       His next response:  "Hope it goes well."

13       His last response:  "Shhhhh.  Don't tell anybody."

14       I've said this repeatedly now, but by the time

15   Brian Wood and ATF became involved with Mr. Martin, he'd

16   long been selling drugs, poorly.  He is not a

17   sophisticated drug dealer.  He is not very good at it.

18   He waters down his product so it's not real.  But he's

19   still a drug dealer because he intersperses those drugs

20   with real drugs.  He is a poor drug dealer, not

21   effective, but he's a drug dealer, and he was a drug

22   dealer before law enforcement became involved with him.

23       He's also someone who regularly possessed firearms,

24   and he needed no suggestion from law enforcement to

25   continue to possess them.

```
1           Ladies and gentlemen, I thank you for your time.
2    Thank you for listening to me.  The government asks that
3    you please return a verdict of guilty on all counts.
4               THE COURT:  All right?  Defense want to make a
5    closing argument?
6               MR. MATSON:  I do.  Your Honor, may we
7    approach first?
8               THE COURT:  Yes.
9               MR. MATSON:  Thank you, your Honor.
10   (The following was held at the bench.)
11              MR. MATSON:  Judge, I didn't want to interrupt
12   Attorney Fuller's argument, but there was one -- Carl is
13   from Philly.  That was testimony that I objected to.  It
14   was allowed in to show the course of the government
15   investigation, not for the truth of the matter asserted.
16        I don't think there's any credible evidence that
17   Carl is from Philly.  That's a pretty important point in
18   this case, and I ask the jury to be instructed to
19   disregard it.
20              THE COURT:  Okay.  What's the evidence of him
21   being from Philly?
22              MS. FULLER:  The agents testified in their
23   investigation --
24              THE COURT:  Pardon me?
25              MS. FULLER:  In the course of the
```

1   investigation, they learned he was from Philly.  He was

2   originally from Jamaica; there was testimony about that.

3   I believe it was Agent Brown or -- I believe Agent Brown

4   testified in the course of his investigation he was --

5               THE COURT:  So is there testimony from one of

6   the agents in the record --

7               MS. FULLER:  Yes.

8               THE COURT:  -- that they said he was from

9   Philly?

10              MS. FULLER:  Yes.

11              MR. MATSON:  That's okay.  If that was the

12  evidence, I objected to it because I thought it was

13  hearsay.

14              THE COURT:  Okay.  There is evidence of it,

15  so -- on that point, so objection overruled.

16              MR. MATSON:  Thank you, Judge.

17  (The following was held in open court.)

18              MR. MATSON:  Ladies and gentlemen of the jury,

19  we have definitely learned the government's better with

20  technology.  That we know.

21      I appreciate everyone, your time, taking a week of

22  your lives to listen to a criminal case.  I know it is

23  incredibly inconvenient for you, and you have lives to

24  live.  I hope you know that everybody in this room

25  thinks that it's incredibly important.  It is a

1    cornerstone of our government.  Its citizens, not the
2    government, citizens decide criminal cases.
3         Enough about that, but I sincerely do want you to
4    know how much it is appreciated.
5         Ladies and gentlemen, this case, look at the
6    indictment.  This is a drug case, no matter what the
7    government tries to spin it into, no matter what the
8    government's evidence might otherwise suggest.  It is a
9    drug case.  Look at Count 1.  It's a drug conspiracy.
10   Count 2.  That firearm offense that they talk about, the
11   alleged transaction on October 23rd, that has its
12   underpinning in drug distribution.  They all are drug
13   distribution cases.
14        The problem, Carl Martin is not a drug dealer.
15   That's the problem with the government's case
16   fundamentally.  Drug dealers don't sell fake drugs.  The
17   direct evidence that you have in this case is that Carl
18   Martin absolutely on October 5th, 2018, delivered to
19   John Latimer fake drugs.  He did so again on October
20   8th, and then again in July of 2019.  Those are fake
21   drugs.
22        Drug dealers don't sell fake drugs because fake
23   drugs, probably not get you a repeat customer.  You sell
24   fake anything, you're going out of business.  Drug
25   dealers sell real drugs.  Fake drug dealers sell fake

1      drugs.  Carl Martin is not a drug dealer.

2          What do we know about Carl Martin?  And we heard

3      from Mirnes.  We heard from several other witnesses.

4      Carl Martin was a janitor.  Carl Martin's afraid.  A lot

5      of valid reasons.  He's, you know, afraid to drive.

6      It's true, he doesn't drive himself.  He relied on

7      others to get to work, transport him and his kids and

8      his family.  That's Carl Martin.

9          And we also learned that Carl Martin is open and

10     honest and really accessible during police interviews.

11     Because we heard, unrelated to these charges, that Carl

12     Martin in 2018 and 2019 was interviewed by law

13     enforcement three times, and he talked to them on three

14     occasions.  Told them, "I lawfully possessed firearms."

15     He said that.  "I've lawfully possessed firearms."  He

16     freely admitted it, and indeed he did lawfully possess

17     firearms, which begs the question why somebody could

18     lawfully possess a firearm would be dealing with

19     somebody like John Latimer for a firearm or Agent Wood

20     for a firearm.  Why not go to a gun store where there's

21     no risk, right?  Just doesn't make sense, the

22     government's case, if he can lawfully possess firearms.

23         If you are selling fake drugs, then why are you a

24     drug dealer who's illegally getting firearms?  Why would

25     you do any of those things?  Because Carl Martin's not a

1    drug dealer, and he could lawfully possess firearms.

2    That's the evidence in this case.  Direct evidence.

3        I would say the only thing that could be proven

4    beyond a reasonable doubt is that Carl Martin sold those

5    fake drugs.  That's true.

6        Where does the story really begin?  Does it start

7    with Nectar's?  Not really.  It starts with John Latimer

8    in October of 2018.  Actually, he first met with law

9    enforcement in September of 2018.  John Latimer was

10   working with Trooper Prack.  He was trying to engage in

11   otherwise illegal transactions in order to get himself

12   consideration to get out from underneath his own

13   criminal behavior.

14       It's dirty business, but it happens.  Confidential

15   informants are a necessary part of law enforcement.  I

16   concede that.  But that's John Latimer.

17       In September of 2018, John Latimer says, "I was

18   buying drugs from Carl Martin in 2017."  There's no

19   police reports to back that up.  There's no

20   corroboration for what John Latimer is saying there.  He

21   just says it.  And then they go test it.  How do they

22   test it?  They set up those two controlled purchases I

23   talked about before, the ones where Carl gives fake

24   drugs.

25       So when they test it, the theory fails.  Many, many

1    months later, the theory's tested again, July 2019.

2    They don't stop.  And, again, the theory fails because

3    Carl gives fake drugs, because Carl's not a drug dealer.

4         Something else happens too.  June 25th and June

5    28th of 2019, again, John Latimer's theory is being

6    tested, and he is going to set up two more drug deals

7    with Carl Martin.  Problem is, Carl Martin's not there.

8    Carl Martin's not even present.

9         He says, "I'm buying drugs from Carl Martin" in

10   June of 2019.  He goes and sets out to prove it.  Carl

11   Martin's not there.  And don't think they weren't

12   looking, because after those first two failed drug deals

13   in June of 2019, we now have lots more police doing

14   surveillance, looking to say, Where's Carl Martin?

15   Where's his involvement?

16        They don't find it, and they don't find him.  You

17   heard evidence, they had a helicopter in the sky June

18   28th doing aerial surveillance all around the

19   neighborhood looking for Carl Martin, and they didn't

20   find him.  You know why?  Because Carl Martin's not a

21   drug dealer.

22        Before I go further, I have to talk about this

23   notion of entrapment.  That's the legal definition of

24   it.  The judge instructs you on the law after we're all

25   done here, but entrapment is the idea that government

can't introduce a crime to an innocent person, get them
to commit that crime, and then charge them with it.
There's two elements -- there are two elements to it.

So if you find there's some credible evidence that
it was the government who was instigating these
crimes -- and I think that's not even close -- between
Latimer and Trooper Prack working with Latimer, and
Agent Brown working with Latimer, and the fake texts,
the ruse -- and it is an investigation based on lies
meant to trick, meant to, as much as they fought me on
it, apply pressure, pressure to get real drugs -- so I
think that first element is easy for you -- then you
have to move on to the next element of entrapment.

So if government instigates a crime, then what the
government has to prove beyond a reasonable doubt,
beyond a reasonable doubt, is that that person was
otherwise predisposed to commit those crimes.  Now,
let's look at what they offered you for predisposition.
And now maybe you understand Nectar's.

They offered you the Nectar's incident to say he is
predisposed for firearms.  He lawfully possessed the
firearm.  He is not on trial for lawfully possessing
firearms, by the way.  Predisposition evidence in this
case has to relate to the actual crimes for which he is
charged.

1          What happened at Nectar's?  You heard it.  Carl
2    spoke to the police.  The police showed up at his house.
3    He let them right in.  His kids were home.  Two police
4    officers came into his apartment, and what did they
5    find?  Someone who is willing to answer their questions,
6    someone who readily told them, "I lawfully possessed a
7    firearm that night.  Someone threatened to kill my
8    brother."  I think stopping there for just a second.
9          Who else is Carl Martin?  Look, Carl Martin's
10   dealing with some things and dealt with some things that
11   most of us probably can't understand, hopefully never
12   will.  He's just out at a bar with his brother.  Someone
13   approaches him and says, I'm going to kill your brother.
14   And they've got the weapon to prove it.  The bartenders
15   take the weapon from that guy, and then give it back.  I
16   think for any of us, that would be horrifying.
17         Carl waits outside.  When the bar empties, Carl
18   punches that guy in the face.  You might judge that;
19   it's fine.  Carl had a firearm, and he chose not to use
20   it.  He chose not to use a firearm.  He chose to do the
21   safe thing.  Again, guessing most people haven't been in
22   that circumstance.  Hopefully no one ever is.  But Carl
23   made the best choices he could and the safest choices he
24   could there.  And he tells all this to the police.
25         But why are we really talking about the Nectar's

1    thing anyway?  Because when the police were inside his

2    house, they found no evidence of drug dealing.  They

3    didn't give him warning and saying we're coming.  It was

4    an announced visit, and Carl says, "You can go up to the

5    closet in my bedroom and you can retrieve that firearm."

6    They didn't take the firearm.  Carl gave it to them.

7    Carl said test it.

8        They went into the closet with him.  They went

9    through his house.  You don't think the police know what

10   drug dealing looks like?  Scales, baggies, money,

11   cocaine, drugs.  They don't find it.  So their own

12   predisposition evidence tells you he's not predisposed

13   to be a drug dealer.

14       What else do they offer?  Look, I heard Mr. Nguyen,

15   and I honestly can't tell you that I understand what

16   that was even about.  They knocked on his door.  They

17   left.  And they never did anything more about it.  They

18   went to the apartment building, they didn't get in, and

19   no one does anything about it.  Okay, predisposed and

20   knocking on door and leaving, I don't know.

21       I asked Mr. Nguyen what actually happened, and he

22   told me.  I don't know where it fits into

23   predisposition, but I can tell you, again, that's the

24   only way you can consider it?  This is a drug offense,

25   and that had nothing to do with drug dealing.  It had

1  nothing to do with Carl Martin's predisposition to be a

2  drug dealer because he is not a drug dealer.

3       Finally, I want to talk about the February 2019

4  firearm that the police recovered.  It's one of these.

5  I don't want to touch it.

6       So February 2019, what does that tell us about

7  predisposition as well?  It tells us that once again

8  Carl Martin's predisposed in accommodating an interview,

9  because the police are -- something happened with Dennis

10  Martin again, Carl's brother.  The police get a search

11  warrant for Carl's house.  They show up.  They search

12  the house.  They put Carl in a car.  Carl talks to 'em.

13  He said, "Yeah, I lawfully possessed a firearm."  I

14  mean, he's scared.  Still scared.  That Nectar's

15  incident still scared him.  And he tells the police, "I

16  possessed a firearm."  He was allowed to.  He lawfully

17  possessed it.  He didn't hide the fact.  He didn't try

18  to keep them out of the house.  They went in the house.

19  They searched the house.  And you heard Officer Gonyaw

20  say they did not find any evidence of drug dealing or

21  drug distribution or scales, baggies, you name it.

22       Their predisposition evidence tells you Carl is not

23  a drug dealer.  They want to say there's no pressure in

24  this case, fine.  But that simply is not true.  I

25  confronted those witnesses about their text messages.

1    Why are you -- Trooper Pratt, Agent Brown, Why are you
2    pretending to be mad?  Because they're trying to push
3    real drugs.  Fake drugs doesn't do it, right?  That's
4    what we're on trial for.  They're trying to push it to
5    real drugs.  That predisposition evidence tells you --
6    again, look at it and consider it only for that
7    purpose -- it informs the opposite conclusion that Carl
8    Martin was not predisposed.
9         Let's return to the government's actual showing of
10   drug dealing.  Ladies and gentleman -- and I mean gentle
11   "man," because there's one of you.  That's why we say
12   "members of the jury."
13        Members of the jury, I can tell you that every
14   assumption the government and the government's witnesses
15   made has cut against Carl Martin even when everyone is
16   looking him right in the face saying, I'm the drug
17   dealer.
18        Mirnes went to the window of the undercover agent's
19   car and said, "We do this deal.  It's only going to work
20   if you give me the money and I go to Philly."  And
21   still, Agent Wood says, "Carl Martin gave me those
22   drugs.  Carl Martin wanted to go to Philly."
23        Every assumption they make goes against Carl
24   Martin.  But the opposite is true in this room.  The
25   presumption of innocence, which is the only fair way to

do this, goes to Carl Martin and every other person
that's accused of a federal indictment.  And it's only
overcome unless and until you find the government proves
its case beyond a reasonable doubt.  Every time you hear
an assumption out of the government's case or from their
evidence, their witnesses, get rid of it.  There are no
assumptions.  This is proof beyond a reasonable doubt.

And let's talk about that a little bit, because
when it suits their theory, they're fine with the
testimony.  When it doesn't, they just turns things on
its head.  Look at those text messages.  They say, Oh, I
know it was Carl Martin.  Agent Wood, I asked him
directly, "How do you know it was Carl Martin on the
other side of those text messages?"  Well, "Because I
texted them and Carl Martin would show up."  Not true.
Not true.

Mirnes showed up, so use the logic.  Agent Wood's
own logic.  I text someone, so and so shows up.  Fine.
Text someone, Mirnes shows up.  And, Mirnes delivered
the goods.  Those text messages are Mirnes.

As the government just said, it's Mirnes delivering
the milk, and that's how you know you reached a family
member to get you milk.  But they don't want to talk
about that.  It's never Mirnes.  It's always Carl
Martin, because this was an investigation of Carl Martin

1    and they always viewed it through that prism that it's

2    Carl Martin.

3        They testified that, well, drug dealers use a lot

4    of different phone numbers, a lot of different phones,

5    and they're always trying to obfuscate.  That's fine.  I

6    get that.  I believe it.  I believe a drug dealer would

7    not want to be caught.  So, if Carl Martin knows what's

8    on that phone, he knows all that stuff is on it, why

9    does he say, Here, take the phone and go ahead and

10   search it?

11       It's just not possible that someone else was using

12   that phone that was taken?  You heard that there are

13   apps that can just put a phone number onto a phone and

14   give it a phone number that's not associated with that

15   phone.  You have heard that drug dealers use different

16   phones and different numbers.  But it's just not

17   possible that somebody else was using that phone?

18       Why would Carl give it to 'em and say go ahead and

19   search it.  Same reason he said go ahead and search and

20   look up in the closet and get that firearm.  Carl didn't

21   think he was doing anything wrong, because Carl's not a

22   drug dealer.

23       Let's talk about Mirnes for a second because,

24   again, you can be sure that Mirnes was there, that

25   Mirnes did deliver drugs, and sometimes himself fake

1    drugs.  Carl and Mirnes are friends, and I -- I don't

2    doubt that Mirnes was going through a hard time.  I can

3    believe that.  But they were friends, and they trusted

4    each other, and not -- in a friendly way, right?  Mirnes

5    said, "Sometimes Carl was scared home alone and he would

6    borrow my gun" because he would be home alone and he had

7    his kids and he was scared, scared for his safety.

8         Again, there are clearly some things going on

9    around Carl, especially with his family.  Carl's a

10   scared guy.  That's fine.  But he trusted Mirnes and

11   Mirnes trusted Carl.

12        The fact is, in some of those texts I showed you,

13   in September of 2019, we know that Mirnes was having

14   money problems.  And we know that Mirnes was afraid of

15   being caught.  And when you have money problems, you're

16   not buying drugs.  You're selling them because you're

17   looking to solve the problem.  Maybe he does drugs too.

18   But buying drugs doesn't make money.  Selling drugs

19   makes money.

20        And when you think you're going to get caught, you

21   gotta push somebody out in front of the bus.  When

22   Mirnes says to that undercover, "The only way this works

23   is if you give me the money directly and I go to

24   Philly" -- that's what he says to the undercover; that

25   is a quote -- he catches himself, and instantly that's

1    when he says, "I'm just the middleman." It's his deal.

2         When I asked Mirnes, "What did you mean by 'the

3    only way this works is you give me the money,'" he

4    said -- Mirnes said, "Oh, by 'me,' I meant Carl." You

5    see what I mean? Like everything gets turned on its

6    head until it's Carl. But that doesn't cut it in here.

7    You can't just say things. You can't just assume

8    things. It is proof beyond a reasonable doubt.

9         The one thing I did believe Mirnes, in those text

10   messages, he said, "You never know when the devil will

11   come, Carl." Well, the devil comes when your back's

12   against the wall and you make the wrong decision to try

13   and save yourself.

14        That's the government's case. Those are the

15   government's witnesses. All their backs are against the

16   wall. Mirnes knows it. He knows that a drug dealer's

17   going to do worse at sentencing than a drug user. So

18   Mirnes constantly says, "I'm a drug user." His back's

19   against the wall and that's what he is going to say.

20        Daniel Lathrop wants to get his pilot license.

21   Daniel Lathrop says, "Mirnes is my drug dealer. Carl

22   was introduced as his buddy." Daniel Lathrop's back's

23   against the law.

24        Look, undercover work, confidential informants,

25   it's a tough business. I get that. I get that these

1    agents have to do something that's fairly unbelievable,
2    which is to convince people that Agent Wood is a drug
3    dealer.  You heard him talk.  He is polite.  He is
4    well-mannered, well-spoken.  Seemed like a genuine
5    person who really wants to do a good job.  And then you
6    see his texts.  You see how far he has to go to create
7    the appearance that he is dangerous, he is a drug
8    dealer.  And if you get him behind on his money, you're
9    in trouble, and you better make it right, and making it
10   right means real drugs, none of this fake stuff.

11       If Carl Martin's a drug dealer, why did it take all
12   that?  If he is predisposed to do things that they say
13   he is doing, why did they have to do all that?  Show me
14   the witness whose job it was not to investigate Carl
15   Martin but something else.  Show me the witness that
16   doesn't have drug charges themselves, isn't being paid
17   to investigate Carl Martin, isn't try to work off their
18   own criminal charges.  Show me the outside evidence from
19   just someone who is disinterested.

20       It shouldn't be that hard, if Carl Martin is
21   predisposed to committing this crime, to show me where
22   independently he was committing these crimes.  But when
23   they investigated him independently, i.e., things that
24   weren't related to this investigation -- the Nectar's,
25   the thing with Dennis Martin -- they found the opposite.

1    No evidence of drug dealing.  If Carl Martin's a drug

2    dealer, you have seen drug dealing in those other

3    instances.

4         The government says there's no government pressure

5    in this case.  I started out this case by saying this

6    case is about government pressure.  Judge for

7    yourselves.  Look at what we saw in this room:  the

8    binders, the paperwork, the digital evidence, the

9    massive agent involvement, the confidential informants,

10   the payments.

11        There is massive government pressure in this case,

12   and it took every single bit of it to make Carl look

13   like a drug dealer.  And if you find, again, that Carl

14   did anything wrong in this case -- and I don't know if

15   you can beyond a reasonable doubt, but if you find --

16   and I will respect your decision no matter what;

17   obviously we all will.  If you find he did anything

18   wrong, ask yourselves, Was he predisposed to do that?

19   Did he do any of that stuff before the government got

20   involved, before all that time in government pressure?

21   Because if you can't say yes, you have to acquit Mr.

22   Martin.

23        Predisposition has to be proved beyond a reasonable

24   doubt.  It took all that time and all that money and all

25   that pressure to make it look like Carl Martin was a

1    drug dealer.  I want you to look at the evidence

2    honestly, openly.  Use your common sense.  That's why we

3    have civilians look at criminal cases and make those

4    decisions, because common sense is your best tool in

5    sorting through this evidence.  And when you do that,

6    I'm going to ask you to return a verdict of not guilty

7    on behalf of Mr. Martin.

8         Thank you very much.

9            THE COURT:  All right.  The government offer

10   rebuttal?

11           MS. FULLER:  Yes, your Honor.

12        Mr. Matson has tried to describe to you or convince

13   you that Carl Martin's not a drug dealer.  And he spent

14   copious amounts of time talking about the two times that

15   law enforcement was inside Mr. Martin's house on Grey

16   Birch Drive.  There's a fundamental flaw in that, of

17   course, because Mr. Martin also stayed with his

18   girlfriend at 12 Cottage Grove.  We have surveillance

19   around that time.  He leaves deals from Cottage Grove,

20   sells to the undercover.  So there's a whole house out

21   there that law enforcement never went into.

22        There's another problem with the Nectar's search.

23   You heard testimony that when they searched the house,

24   it was days after the Nectar's incident.  And they

25   didn't search the house.  Mr. Martin directed them to a

1    closet where the firearm was.  They picked up the closet

2    and left.  They picked up the gun and left.

3         You heard Detective Beliveau say they didn't search

4    the house.  They went to a closet Mr. Martin told them

5    to go to.  Maybe the drugs were in the basement.  Maybe

6    they were in the attic.  Maybe they were under the

7    couch.  Maybe they were in the oven.  There could have

8    been plenty of places inside that house because that

9    house wasn't searched.

10        And the final point about that search of the house:

11   Mr. Martin, you heard his own words, say, "I was up all

12   night long after the shooting waiting for the police to

13   come."  Those are his words.  That's what he says in the

14   recording after Nectar's.  "I was up all night long

15   waiting for the police to come."

16        Well, if you are a drug dealer, and you know

17   they're coming to your house, what are you going to do?

18   You're going to spend hours sanitizing that house of

19   every bit of drug dealing there is.

20        The claim that Mr. Martin is not a drug dealer is a

21   fairy tale.  Tell that to Mirnes, who's using his

22   product, who told you he gets high off his product.

23   Tell that to Daniel Lathrop, who put his livelihood on

24   the line because of a product that Mr. Martin was

25   selling to him.  You think Daniel Lathrop would risk his

1    job as a pilot using Carl Martin's fake cocaine?  Does

2    that make any sense to you?

3        Tell that to Ashley Hojon.  Tell that to Bevin.

4    How about Byrd?  Jake?  Larry?  Malik?  They're all

5    buying Mr. Martin's stuff.  It's not good stuff.  But

6    it's just enough.  Fairy tale that he's not a drug

7    dealer.

8        It's also a fairy tale that there's pressure.  This

9    is defense Exhibit A3.  Remember this?  These are the

10    text messages, 600 pages of text messages, between John

11    Latimer and Jon Prack that continue for about two years.

12    Spend time with that.  Look through them.  Look through

13    the conversations between John Latimer and Jon Prack.

14        You know what you are not going to find in there?

15    I'll tell you.  And this is the secret to this case.

16    This is what the defense doesn't want you to know.

17    These are all the smoke screens that the defense has set

18    up around these text messages.  You will not find a

19    single message in this case, in this binder, or in any

20    other text messages in this case in which John Latimer

21    communicates directly with Carl Martin and pressures

22    him.  You won't read a single text message because that

23    doesn't exist.

24        Mr. Matson talked about assumptions.  "Don't make

25    assumptions in this room.  We can't make assumptions.

1    We're based on facts."  Absolutely 100 percent agree.

2    It is based on facts.  And the facts is -- the facts are

3    there is not one single text message from John Latimer

4    to Carl Martin in which Latimer pressures Martin.  Not

5    one.  Not one piece of paper in all of this paper.  Not

6    one text message.  So the assumption that the defense is

7    making is that Prack pressured Latimer such that Latimer

8    turned around and continued to pressure Mr. Martin.

9    That's a big jump.  Out of those 600 pages, not one

10    piece of paper to show you the pressure that Latimer put

11    on Mr. Martin.  Doesn't exist.  It's a fantasy.  It's a

12    fairy tale.

13        And the last fairy tale you need to know about,

14    Exhibit 116B.  Remember this line of questioning, the

15    defense line of questioning?  Tried to convince you that

16    this photo, the night of the robbery, that was on Mr.

17    Martin's phone -- it was created on the night of the

18    robbery on Mr. Martin's phone, the defense tried to

19    convince the agent that this was the Nectar's gun?  This

20    is an old photo.  This is from a year ago.  It's not

21    from the robbery.  It doesn't show Mr. Martin's new

22    possession of another -- yet another firearm.  It

23    doesn't corroborate that he possessed the firearm on

24    that day.

25        When you are in back in the jury room, take a look

1    at this.  Take a look at that picture.  It's not the

2    same gun.  It's not even close to the same gun.  It's a

3    fairy tale.  It's a fantasy.  He is trying to convince

4    you of things that are not in the record, that's not in

5    the evidence, that's not true to the facts of this case.

6         Don't be swayed by that.  Mr. Martin has long been

7    a drug dealer.  He's selling fake stuff.  You know why

8    he's selling fake stuff?  Because he makes money either

9    way.  Mr. Martin doesn't care whether he sells fake

10   drugs or real drugs, because he makes money either way.

11   That's what he is in this for.  That's what drug dealers

12   are in this for.

13        Now, if you are a better drug dealer, you put a

14   little bit more cocaine in there to make sure people get

15   high and they keep coming back.  He's just not a very

16   good businessman.  That's all this is.

17        The last thing I want to say is that it sounds to

18   me the defense in this case, it's kind of a it-wasn't-me

19   defense.  He accepts the government's evidence but he

20   says, "I was at every deal but I had nothing to do with

21   it.  It was all Mirnes," Mirnes who has pled guilty to

22   conspiracy, by the way.  "Mirnes picked me up for every

23   deal.  Chauffeured me around.  But it wasn't me."

24        And the capstone of that is that "somebody used my

25   cell phone" to communicate with all these other

1    customers, to communicate with Mirnes.  Mirnes was

2    communicating with Mirnes over -- Carl Martin's cell

3    phone?  That makes a lot of sense?  Don't be swayed by

4    that defense.  He wasn't pressured.  He was there

5    willingly at every deal.  He sold the coke.  Mirnes

6    helped him.  This is not a complicated case.  You don't

7    need to think too hard about what happened here.

8        You know, someone once said that usually the best

9    answer is the easiest one.  It's simple.  This case is

10   simple.  He's a drug dealer and had been for years.

11           THE COURT:  All right.  It's now 25 after.

12   Let's reconvene at quarter of, and it's for the charge,

13   and the case will be given to you later this morning.

14   (Court was in recess at 10:26 a.m.)

15   (The following was held in open court with the jury

16   present at 10:51 a.m.)

17           THE COURT:  All right.  I have passed out, I

18   believe, the charge to you.  I have a legal obligation

19   to actually read the charge, but I've found that it's

20   really helpful if the jurors have a written copy of the

21   charge to follow along as I -- as I read it.  And you

22   should know that the charge will be going into the jury

23   room with you.  You can bring in the charge that you

24   have been given to assist in your deliberations.  All

25   right.

JURY CHARGE

1

2          Members of the jury:

3          Now that you have heard the evidence and the

4     arguments, it is my duty to instruct you on the law.  It

5     is your duty to accept these instructions of law and

6     apply them to the facts as you determine them.

7          This case is a criminal prosecution brought by the

8     United States against the defendant, Carl Martin.  The

9     first superseding indictment charges Mr. Martin on six

10    counts.  You will receive a copy of the indictment to

11    take with you into the jury room.

12         Count 1 of the indictment alleges that Carl Martin

13    knowingly and willfully conspired together and with

14    others, known and unknown to the grand jury, to

15    distribute cocaine, a Schedule II controlled substance,

16    from in or about fall 2018 to on or about October 23rd,

17    2019.

18         Count 2 alleges that Carl Martin knowingly

19    possessed a firearm on October 23rd, 2013 *[sic]*, in

20    furtherance of a drug trafficking crime, the

21    distribution of cocaine as charged in Count 6.

22         Counts 3 through 6 allege that Carl Martin

23    knowingly and intentionally distributed cocaine, a

24    Schedule II controlled substance, on or about August

25    26th, 2019; on or about September 5, 2016 -- I'm sorry,

1    2019 -- Did I say 2016? -- 2019; on or about September
2    20, 2019, and on or about October 23, 2019.  You should
3    refer to your copy of the first superseding indictment
4    to read each charge and to identify the particular dates
5    on which each count was alleged to have occurred.

6                        ROLE OF INDICTMENT

7         At this time I would like to remind you of the
8    function of a grand jury indictment.  An indictment is
9    merely a formal way to accuse a defendant of a crime
10   preliminary to trial.  An indictment is not evidence.
11   An indictment does not create any presumption of guilt
12   or permit an inference of guilt.  It should not
13   influence your verdict in any way other than to inform
14   you of the nature of the charges against Mr. Martin.

15        Mr. Martin has pled not guilty to the six counts in
16   the first superseding indictment.  You have been chosen
17   and sworn as jurors in this case to determine the issues
18   of fact that have been raised by the allegations within
19   the indictment and the denial made by the not guilty
20   plea of Mr. Martin.  You are to perform this duty
21   without bias or prejudice against Mr. Martin or the
22   prosecution.

23           PRESUMPTION OF INNOCENCE, REASONABLE DOUBT
24                     AND BURDEN OF PROOF
25        The law presumes that the defendant is innocent of

the charges against him.  The presumption of innocence
lasts throughout the trial and during your
deliberations.  The presumption of innocence ends only
if you, the jury, find beyond a reasonable doubt that
the defendant is guilty.  Should the government fail to
prove the guilt of the defendant beyond a reasonable
doubt, you must find the defendant not guilty.

The question naturally is what is a reasonable
doubt?  The words almost define themselves.  It is a
doubt based upon reason and common sense.  It's a doubt
that a reasonable person has after carefully weighing
all of the evidence.  It is a doubt that would cause a
reasonable person to hesitate to act in a matter of
importance in his or her personal life.  Proof beyond a
reasonable doubt must, therefore, be proof of such a
convincing character that a reasonable person would not
hesitate to rely and act upon it in the most important
of his or her own affairs.  A reasonable doubt is not a
caprice or whim; it is not a speculation or suspicion.
It is not an excuse to avoid the performance of an
unpleasant duty.  And it is not sympathy.  Under your
oath as jurors, you are not to be swayed by sympathy;
you are to be guided solely by the evidence in this
case.  Reasonable doubt must [sic] arise from a lack of
evidence.

1          In a criminal case, the burden of proof is upon the

2     government to prove guilt beyond a reasonable doubt.

3     The law does not require that the government prove guilt

4     beyond all possible doubt; proof beyond a reasonable

5     doubt is sufficient to convict.  This burden never

6     shifts to the defendant, which means that it is always

7     the government's burden to prove each of the elements of

8     the crimes charged beyond a reasonable doubt.  The law

9     never imposes upon a defendant in a criminal case the

10    burden or duty of calling any witnesses or producing any

11    evidence.  A defendant is not even obligated to produce

12    any evidence by cross examining the witnesses for the

13    government.  For each offense charged in the indictment,

14    if after fair and impartial consideration of all the

15    evidence you have a reasonable doubt, you must find the

16    defendant not guilty of that offense.  If you view the

17    evidence in the case as reasonably permitting either of

18    two conclusions -- one of innocence, the other of

19    guilt -- you must find the defendant not guilty.  If,

20    however, after fair and impartial consideration of all

21    the evidence you are satisfied of the defendant's guilt

22    of that offense beyond a reasonable doubt, you should

23    vote to convict.

24                            EVIDENCE

25         You have seen and heard the evidence presented

during this trial, and it is the sole province of the

jury to determine the facts of this case.  The evidence

consists of the sworn testimony of the witnesses, any

exhibits admitted into evidence, and all the facts

admitted or stipulated.  I would now like to call your

attention to certain guidelines by which you are to

evaluate the evidence.

There are two types of evidence which you may

properly use in reaching your verdict.  One type of

evidence is direct evidence.  Direct evidence is when a

witness testifies about something she or he knows by

virtue of their own senses, something she or he has

seen, felt, touched or heard.  Direct evidence may also

be in the form of an exhibit with the fact to be proved

is the exhibit's existence or condition.

Circumstantial evidence is evidence which tends to

prove a disputed fact by proof of other facts.

Circumstantial evidence refers to inferring from one

established fact the existence or nonexistence of some

other fact on the basis of reason, experience, and

common sense.  Circumstantial evidence is of no less

value than direct evidence.  The law makes no

distinction between direct evidence and circumstantial

evidence but requires that your verdict be based on all

of the evidence presented.

1          You should weigh all the evidence in the case.

2     After weighing all the evidence, if you are not

3     convinced of the guilt of Carl Martin beyond a

4     reasonable doubt, you must find him not guilty.

5          The evidence that you will consider in reaching

6     your verdict consists, as I have said, only of the sworn

7     testimony of witnesses, the stipulations made by the

8     parties, and all the exhibits that have been received in

9     evidence.  Anything you have seen or heard outside the

10    courtroom is not evidence and must be not -- and must be

11    entirely disregarded.  You are to consider only the

12    evidence in this case.  But in your consideration of the

13    evidence, you do not leave behind your common sense and

14    life experiences.  In other words, you are not limited

15    solely to what you see and hear as the witnesses

16    testify.  You are permitted to draw, from facts which

17    you find have been proven, such reasonable inferences as

18    you feel are justified in light of your experiences.

19    However, if any juror has specialized knowledge,

20    expertise or information with regard to the facts or

21    circumstances of this case, he or she may not rely upon

22    it in deliberations or communicate it to other jurors.

23                        STIPULATION OF FACTS

24         When the attorneys on both sides stipulate or agree

25    as to the existence of a fact, you must accept the

1    stipulation as evidence and regard that fact as proven.

2                STRICKEN TESTIMONY AND ARGUMENTS EXCLUDED

3        I caution you that you should entirely disregard

4    any testimony that has been excluded or stricken from

5    the record.  Likewise, the arguments of the attorneys

6    and the questions asked by the attorneys are not

7    evidence in the case.  The evidence that you will

8    consider in reaching your verdict consists only of the

9    sworn testimony of witnesses, the stipulations made by

10   the parties, and all exhibits admitted into evidence.

11       Over the course of the trial I occasionally have

12   asked questions of a witness in order to bring out facts

13   not fully covered in his or her testimony.  Do not

14   assume that I hold any opinion on matters related to my

15   questions.

16                            OBJECTIONS

17       Over the course of the trial, I have ruled on

18   objections made by the attorneys.  These objections and

19   my subsequent rulings are legal issues for the Court to

20   decide and are not for your concern or consideration.

21   It is the duty and job of the attorneys to make

22   objections and you should not hold it against either

23   side.

24            ARGUMENTS AND STATEMENTS BY THE ATTORNEYS

25       The opening and closing arguments, questions and

1    other remarks made by attorneys during the trial are not

2    evidence.  You should consider witness testimony and the

3    exhibits in making your decisions about the facts in

4    this case.  Attorney statements and arguments reflect an

5    effort to organize and describe the evidence for you.

6    You should consider their arguments carefully.  In the

7    end, however, it is the evidence admitted at trial which

8    must govern your decision making.

9                    CREDIBILITY OF WITNESSES

10        You as the jurors are the sole judges of the

11   credibility of witnesses and the weight of their

12   testimony.  You do not have to accept all the evidence

13   presented in this case as true or accurate.  Instead, it

14   is your job to determine the credibility or

15   believability of each witness.  You do not have to give

16   the same weight to the testimony of each witness since

17   you may accept or reject the testimony of any witness in

18   whole or in part.  In weighing the testimony of the

19   witnesses you have heard, you should consider their

20   interest, if any, in the outcome of the case; their

21   manner of testifying; their candor; their bias, if any;

22   their resentment or anger toward the defendant, if any;

23   the extent to which other evidence in the case supports

24   or contradicts their testimony; and the reasonableness

25   of their testimony.  You may believe as much or as

1    little of the testimony of each witness as you think

2    proper.

3        The weight of the evidence is not determined by the

4    number of witnesses testifying.  You may find the

5    testimony of a small number of witnesses or a single

6    witness about a fact more credible than the different

7    testimony of a larger number of witnesses.  The fact

8    that one party called more witnesses and introduced more

9    evidence than the other does not mean that you should

10    necessarily find the facts in favor of the side offering

11    the most witnesses.  Inconsistencies or discrepancies in

12    the testimony of a witness, or between the testimony of

13    different witnesses, may or may not cause you to

14    discredit such testimony.  Two or more persons may hear

15    or see things differently or may have different points

16    of view regarding various occurrences.  It is for you to

17    weigh the effect of any discrepancies in testimony,

18    considering whether they pertain to important or

19    unimportant details, and whether a discrepancy results

20    from innocent error or intentional falsehood.  You

21    should attempt to resolve inconsistencies if you can,

22    but you also are free to believe or disbelieve any part

23    of the testimony of any witness as you see fit.

24        In this case you have heard testimony from a number

25    of witnesses.  I am now going to give you some

guidelines for your determinations regarding the

testimony of the various types of witnesses presented in

this case.

### INTEREST IN OUTCOME

As a general matter, in evaluating the credibility

of each witness, you should take into account any

evidence that the witness who testified may benefit in

some ways -- in some way from the outcome of this case.

Such an interest in the outcome creates a motive to

testify falsely and may sway the witness to testify in a

way that advances his or her own interests.  Therefore,

if you feel that any witness whose testimony you are

considering may have an interest in the outcome of this

trial, then you should bear that factor in mind when

evaluating the credibility of his or her testimony and

accept it with great care.

This is not to suggest that every witness who has

an interest in the outcome of a case will testify

falsely.  It is for you to decide to what extent, if at

all, the witness's interest has affected or colored his

or her testimony.

### EXPERT WITNESSES

You have heard the testimony of expert witnesses in

this case.  An expert witness is permitted to express

his or her opinion on those matters about which he or

she has special knowledge, skill, experience, or
training.  Such testimony is presented to you on the
theory that someone who is experienced and knowledgeable
in a field can assist you in understanding the evidence
or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider
his or her qualifications, opinions, and reasons for
testifying, as well as all the other considerations that
apply when assessing a witness's credibility.  You may
give the expert's testimony whatever weight, if any, you
find it deserves in light of the evidence in the case.
You should not, however, accept the expert's testimony
merely because he or she is an expert.  Nor should you
substitute it for your own reason, judgment, and common
sense.  The determination of the facts in this case, as
I have said, rests solely with you.

<u>LAW ENFORCEMENT WITNESSES</u>

You have heard the testimony of law enforcement
officials in this case.  The fact that a witness may
be employed by a federal, state or local government as a
law enforcement official, does not mean that his or her
testimony is necessarily deserving of more or less
consideration or greater or lesser weight than that of
an ordinary witness.

At the same time, it is quite legitimate for

1    defense counsel to try to attack the credibility of a

2    law enforcement witness on the grounds that his or her

3    testimony may be colored by a personal or professional

4    interest in the outcome of the case.  It is your

5    decision, after reviewing all the evidence, whether to

6    accept the testimony of law enforcement officials, and

7    to give to that testimony whatever weight, if any, you

8    find it deserves.

9                 ACCOMPLICES CALLED BY THE GOVERNMENT

10        You have heard witnesses who testified that they

11    were actually involved in planning and carrying out the

12    crime charged in the indictment.  There has been a great

13    deal said about these so-called accomplice witnesses and

14    whether or not you should believe them.

15        The government argues, as it is permitted to do,

16    that it must take the witnesses as it finds them.  It

17    argues that only people who themselves take part in

18    criminal activity have the knowledge required to show

19    criminal behavior by others.  For those very reasons,

20    the law allows the use of accomplice testimony.  Indeed,

21    it is the law in federal courts that the testimony of

22    accomplices may be enough in itself for conviction, if

23    the jury finds that the testimony establishes guilt

24    beyond a reasonable doubt.

25        However, it is also the case that accomplice

testimony is of such nature that it must be scrutinized
with great care and viewed with particular caution when
you decide how much of that testimony to believe.

GOVERNMENT INFORMERS

There has been evidence introduced at trial that
the government used an informer in this case.  I
instruct you that there is nothing improper in the
government's use of informers and, indeed, certain
criminal conduct would never be detected without the use
of informers.  You, therefore, should not concern
yourselves with how you personally feel about the use of
informers.  Your concern is to decide whether the
government has proved the guilt of the defendant beyond
a reasonable doubt, regardless of whether evidence was
obtained by the use of an informer.

On the other hand, where an informer testifies, as
occurred here, his or her testimony must be examined
with great scrutiny -- with greater scrutiny than the
testimony of an ordinary witness.  You should consider
whether he or she received any benefits or promises from
the government which would motivate the informer to
testify falsely against the defendant.  For example, the
informer may believe that he or she will only continue
to receive these benefits if he or she produces evidence
of criminal conduct.

1          If you decide to accept an informer's testimony,

2     after considering it in light of all the evidence in

3     this case, then you may give it whatever weight, if any,

4     you think it deserves, but you should consider the

5     testimony of the informer with more caution than the

6     testimony of other witnesses.

7                    USE OF DRUGS BY CERTAIN WITNESSES

8          There has been evidence introduced at the trial

9     that the government called as witnesses persons who were

10    using or addicted to drugs when the events they observed

11    took place.  I instruct you that there is nothing

12    improper about calling such witnesses to testify about

13    events within their personal knowledge.

14         However, testimony from such witnesses may be

15    examined with greater scrutiny than the testimony of

16    other witnesses.  The testimony of a witness who was

17    using drugs at the time of the events he or she is

18    testifying about may be less believable because of the

19    effect of the drugs -- the drugs may have on the

20    witness's ability to perceive or relate to the events in

21    question.

22         If you decide to accept the testimony of such

23    witnesses, after considering it in the light of all the

24    evidence in this case, then you may give it whatever

25    weight, if any, you find it deserves.

1    <u>GOVERNMENT WITNESS - NOT PROPER TO CONSIDER GUILT</u>

2         You have heard testimony from government witnesses

3    who pled guilty to charges arising out of the same facts

4    as this case.  You are not to draw any conclusions or

5    inferences of any kind about the guilt of the defendant

6    on trial from the fact that a prosecution witness pled

7    guilty to similar charges.  That witness's decision to

8    plead guilty was a personal decision about his own

9    guilt.  It may not be used by you in any way as evidence

10   against the defendant on trial here.

11   <u>COOPERATING WITNESS PLEA AGREEMENT</u>

12        In this case, there has been testimony from

13   government witnesses who pled guilty after entering into

14   agreements with the government to testify.  There is

15   evidence that the government has promised to bring the

16   witnesses' cooperation to the attention of the

17   sentencing court.

18        The government is permitted to enter into this kind

19   of plea agreement.  You, in turn, may accept the

20   testimony of such a witness and convict the defendant on

21   the basis of this testimony alone, if it convinces you

22   of the defendant's guilt beyond a reasonable doubt.

23        However, you should bear in mind that a witness who

24   has entered into such an agreement has an interest in

25   this case different than an ordinary witness.  A witness

1    who realizes that he or she may be able to obtain his or

2    her own freedom or receive a shorter sentence by giving

3    testimony favorable to the government, has a motive to

4    testify falsely.  Conversely, a witness who realizes

5    that he or she may benefit by providing truthful

6    testimony has a motive to be honest.  Therefore, you

7    must examine his or her testimony with caution and weigh

8    it with great care.  If, after scrutinizing his or her

9    testimony, you decide to accept it, you may give it

10   whatever weight, if any, you find it deserves.

11                IMPEACHMENT OF A WITNESS

12       A witness may be discredited or impeached by

13   contradictory evidence, by a showing that the witness

14   testified falsely concerning a matter, or by evidence

15   that at some other time the witness said or did

16   something inconsistent with the witness's present

17   testimony.  It is your job to give the testimony of each

18   witness the credibility or weight that you think it

19   deserves.

20          RACE, RELIGION, NATIONAL ORIGIN, SEX, OR AGE

21       You may not consider any personal feelings you may

22   have about the race, religion, national origin, sex, or

23   age of Mr. Martin or any of the witnesses in your

24   deliberations over the verdict or in the weight given to

25   any evidence.

1                    GOVERNMENT AS A PARTY

2          You are to perform the duty of finding the facts

3     without bias or prejudice toward any party.  You are to

4     perform this duty in an attitude of complete fairness

5     and impartiality.

6          This case is important to the government, for the

7     enforcement of criminal laws is a matter of prime

8     concern to the community.  Equally, this case is

9     important to Mr. Martin, who is charged with a serious

10    crime.

11         The fact that the prosecution is brought in the

12    name of the United States of America entitles the

13    government to no greater consideration than that

14    accorded to any other party to a case.  By the same

15    token, it is entitled to no less consideration.  All

16    parties, whether government or individuals, stand as

17    equals before the court.

18                   DEFENDANT NOT TESTIFYING

19         You may have observed that Mr. Martin did not

20    testify in this case.  Mr. Martin has a constitutional

21    right not to do so.  He does not have to testify, and

22    the government may not call him as a witness.  Mr.

23    Martin's decision not to testify raises no presumption

24    of guilt and does not permit you to draw any unfavorable

25    inference.  Therefore, in determining whether or not the

government has proved Mr. Martin's guilt beyond a
reasonable doubt, you are not to consider in any manner
the fact that he did not testify.  Do not even discuss
it in your deliberations.

ADMISSIONS BY A DEFENDANT

There has been evidence Mr. Martin made certain
statements in which the government claims he admitted
certain facts.

In deciding what weight to give Mr. Martin's
statements, you should first examine with great care
whether each statement was made and whether, in fact, it
was voluntarily and understandingly made.  I instruct
you that you are to give the statements such weight as
you feel they deserve in light of all the evidence.

OTHER CRIMES, WRONGS, OR ACTS OF DEFENDANT

As part of the government's case, you heard
testimony and have seen evidence that Mr. Martin engaged
in other acts that are otherwise unrelated to the
charges in the indictment.  This evidence of these other
acts was admitted only for a limited purpose.  You are
to consider this evidence only for the purposes -- for
the purpose of deciding whether Mr. Martin was
predisposed to committing the substantive charges for
which he is on trial.  Do not consider this evidence for
any other purpose.

1           Of course it is for you to determine whether you

2    believe this evidence and, if you do believe it, whether

3    you accept it for the purpose offered.  You may give it

4    such weight as you feel it deserves, but only for the

5    limited purpose that I described to you.

6           Mr. Martin is not on trial for committing these

7    other acts.  You may not consider the evidence of these

8    other acts as a substitute for proof that he committed

9    the crimes charged.  If you find that the government has

10   failed to prove the primary charges beyond a reasonable

11   doubt, do not consider these other acts in any other

12   way.

13                         PUNISHMENT

14         The punishment provided by law for the offenses

15   charged in the first superseding indictment is a matter

16   exclusively within the province of the Court, and should

17   never be considered by the jury, in any way, in arriving

18   at an impartial verdict as to the guilt or innocence of

19   Mr. Martin.

20              USE OF RECORDINGS AND TRANSCRIPTS

21         The government has offered evidence in the form of

22   recordings.  This information may have been gathered

23   without the knowledge of the participants.  The use of

24   these procedures to gather evidence is perfectly lawful,

25   and the government is entitled to use the evidence in

this case.  You should not consider the method of

gathering this evidence in your deliberations.

Along with these recordings, the parties were

permitted to display a transcript containing the

parties' interpretation of what can be heard on the

recordings.  The transcripts were provided as an aid or

guide to assist you, the jury, in listening to the

recordings; however, the transcripts themselves are not

evidence.  The recordings are evidence, and, as such,

you must rely on your own interpretation of what you

heard on the recordings.  If you think you heard

something different than what was represented on the

transcript, then what you heard on the recording must

control.

INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

Having explained the general guidelines by which

you will evaluate the evidence, I will now instruct you

with regard to the law that is applicable to your

determinations in this case.  It is your duty as jurors

to follow the law as stated to you in these instructions

and to apply the rules of law to the facts that you find

from the evidence.  You will not be faithful to your

oath as jurors if you find a verdict that is contrary to

the law that I give to you.

However, it is the sole province of the jury to

1    determine the facts in this case.  I do not, by any

2    instructions given to you, intend to persuade you in any

3    way as to any questions of fact.

4        The parties in this case have a right to expect

5    that you will carefully and impartially consider all the

6    evidence in the case, that you will follow the law as I

7    state it to you, and that you will reach a just verdict.

8                    MULTIPLE COUNTS

9        The indictment charges Carl Martin in six counts.

10   You must consider each count and any evidence pertaining

11   to it separately and return a separate verdict of guilty

12   or not guilty for each.

13                "ON OR ABOUT" EXPLAINED

14       The indictment in this case charges that offenses

15   were committed "in or about" or "on or about" certain

16   dates.  Although it is necessary for the government to

17   prove beyond a reasonable doubt that the offenses were

18   committed on dates reasonably near the dates alleged in

19   the indictment, it is not necessary for the government

20   to prove that the offenses were committed precisely on

21   the dates charged.

22        COUNT 1:  CONSPIRACY TO DISTRIBUTE COCAINE

23       Count 1 of the first superseding indictment charges

24   that Carl Martin engaged in a conspiracy with others to

25   distribute cocaine, a Schedule II controlled substance,

1    in violation of 21 USC, sections 846, 841(a)(1) and

2    841(b)(1)(C).  Title 21, United States Code, section

3    846, as charged in Count 1, makes it a separate federal

4    crime or offense for anyone to conspire or agree with

5    someone else to do something which, if actually carried

6    out, would be a violation of section 841(a)(1).  Section

7    841(a)(1) makes it a crime for anyone to knowingly or

8    intentionally distribute a controlled substance.  I

9    instruct you that cocaine is a controlled substance.

10         Under the law, a conspiracy is an agreement or a

11    kind of partnership in criminal purposes in which each

12    member becomes the agent or partner of the other

13    members.

14         In order to establish the conspiracy offense in

15    charged in Count 1, it is sufficient to show that the

16    conspirators tacitly came to a mutual understanding to

17    accomplish an unlawful act by means of a joint plan or

18    common design.  The indictment alleges the objective of

19    the conspiracy was to distribute cocaine.  If you find

20    beyond a reasonable doubt that the objective of the

21    conspiracy was to distribute this drug, then you may

22    find that the joint plan or common design is proven.

23    Also, because the essence of a conspiracy is the making

24    of the scheme itself, it is not necessary for the

25    government to prove that the conspirators actually

1    succeeded in accomplishing their unlawful plan.

2         In order to find Mr. Martin guilty of Count 1, you

3    must find that the government has proven beyond a

4    reasonable doubt the following essential elements of the

5    charge.  That at the time and places alleged in the

6    indictment:

7         (1) two or more persons in some way or manner, came

8    to a mutual understanding to try to accomplish the

9    common and unlawful plan that is charged in the first

10   superseding indictment;

11        (2) that Mr. Martin knowingly and willfully became

12   a member of such conspiracy.

13              ELEMENT ONE:  EXISTENCE OF AGREEMENT

14        The first element which the government must prove

15   beyond a reasonable doubt to establish the offense of

16   conspiracy is that two or more persons entered the

17   unlawful agreement charged in the indictment.

18        In order for the government to satisfy this

19   element, you need not find that the alleged members of

20   the conspiracy met together and entered into an

21   express -- to any express or formal agreement.

22   Similarly, you need not find that the alleged

23   conspirators stated, in words or writing, that the

24   scheme -- what the scheme was, its object or purpose, or

25   every precise detail of the scheme or the means by which

2:19-cr-00157-wks    Document 174    Filed 07/13/23    Page 73 of 115

73

1    its object or purpose was to be accomplished.

2         What the government must prove is that there was a

3    mutual understanding, either spoken or unspoken, between

4    two or more people, to cooperate with each other to

5    accomplish an unlawful act.  You may, of course, find

6    that the existence of an agreement to disobey or

7    disregard the law has been established by direct proof.

8    However, such -- since conspiracy is, by its very

9    nature, characterized by secrecy, you may also infer its

10   existence from the circumstances of this case and the

11   conduct of the parties involved.

12        In a very real sense, then, it is -- then, in the

13   context of conspiracy cases, actions often speak louder

14   than words.  In this regard, you may, in determining

15   whether an agreement existed here, consider the actions

16   and statements of all of those you find to be

17   participants as proof that a common design existed on

18   the part of the persons charged to act together to

19   accomplish an unlawful purpose.

20            ELEMENT 2:  MEMBERSHIP IN A CONSPIRACY

21        The second element which the government must prove

22   beyond a reasonable doubt to establish the offense of

23   conspiracy is that Carl Martin knowingly became a member

24   of the conspiracy.

25        If you are satisfied that the conspiracy charged in

1    the indictment existed, you must next ask yourselves who

2    the members of that conspiracy were.  In deciding

3    whether Mr. Martin was, in fact, a member of the

4    conspiracy, you should consider whether he knowingly

5    joined the conspiracy.  Did he participate in it with

6    the knowledge of its unlawful purpose and with the

7    specific intention of furthering its business or

8    objective as an associate or worker?

9        In that regard, it has been said that in order for

10    a defendant to be deemed a participant in a conspiracy,

11    he must have had a stake in the venture or its outcome.

12    You are instructed that, while proof of a financial or

13    other interest in the outcome of a scheme is not

14    essential, if you find that Mr. Martin had such an

15    interest, that is a factor which you may properly

16    consider in determining whether or not the defendant was

17    a member of the conspiracy charged in the indictment.

18        As I mentioned, before Mr. Martin can be found to

19    have been a conspirator, you must find -- you must first

20    find that he knowingly joined in the unlawful agreement

21    or plan.  The key question, therefore, is whether he

22    joined the conspiracy with an awareness of at least some

23    of the basic aims and purposes of the unlawful

24    agreement.

25        Mr. Martin's knowledge is a matter of inference

from the facts proved.  In that connection, I instruct

you that to become a member of the conspiracy, Mr.

Martin need not have known the identities of each and

every other member, nor need he have been aware of all

of their activities.  Moreover, Mr. Martin need not have

been fully informed as to all of the details or scope of

the conspiracy in order to justify an inference of

knowledge or  -- on his part.  Furthermore, Mr. Martin

need not have joined in all of the conspiracy's unlawful

acts or objectives or participated in it for the full

time period alleged in the indictment.

The extent of a defendant's participation has no

bearing on the issue of his guilt.  A conspirator's

liability is not measured by the extent or duration of

his participation.  Indeed, each member may perform

separate and distinct acts and may perform them at

different times.  Some conspirators play major roles,

while others play minor parts in the scheme.  An equal

role is not what the law requires.  In fact, even a

single act may be sufficient to draw a defendant within

the ambit of the conspiracy.

A conspiracy may continue for a long period of time

and may include the performance of many transactions.

It is not necessary that all members of the conspiracy

join it at the same time, and one may become a member of

1    a conspiracy without full knowledge of all the details

2    of the unlawful scheme or the names, identities, or

3    locations of all of the other members.

4         So if a defendant has an understanding of the

5    unlawful nature of a plan and knowingly joins in that

6    plan on one occasion, that is sufficient to convict him

7    for conspiracy even though he had not participated

8    before and even though he played a minor part.

9         I want to caution you, however, that a defendant's

10   mere presence at the scene of the alleged crime does not

11   by itself make him a member of the conspiracy.

12   Similarly, mere association with one or more members of

13   the conspiracy does not automatically make the defendant

14   a member.  A person may know, or be friendly with, a

15   criminal, without being a criminal himself.  Mere

16   similarity of conduct or the fact that they may have

17   assembled together and discussed common aims and

18   interests does not necessarily establish proof of the

19   existence of a conspiracy.

20        I also want to caution you that mere knowledge or

21   acquiescence, without participation, in the unlawful

22   plan is not sufficient.  Moreover, the fact that the

23   acts of a defendant, without knowledge, merely happen to

24   further the purpose or objectives of the conspiracy,

25   does not make a defendant a member.  More is required

under the law.  What is necessary is that the defendant
must have participated with knowledge of at least some
of the purposes or objectives of the conspiracy and with
the intent of aiding in the accomplishment of those
unlawful ends.

In sum, Mr. Martin, with an understanding of the
unlawful character of the conspiracy, must have
intentionally engaged, advised and [sic] assisted in it
for the purpose of furthering the illegal undertaking.
He thereby becomes a knowing and willing participant in
the unlawful agreement, that is to say, a conspirator.

<u>"KNOWINGLY" AND "WILLFULLY" DEFINED</u>

You have been instructed that to sustain its burden
of proof on Count 1, the government must prove that Mr.
Martin act knowingly and willfully.  A person acts
knowingly if he acts intentionally and voluntarily, and
not because of ignorance, mistake, accident or
carelessness.  You may consider evidence of Mr. Martin's
words, acts or omissions, along with all other evidence,
in deciding whether he acted knowingly.

Willfully means to act with knowledge that one's
conduct is unlawful and with the intent to do something
that the law forbids, that is to say with bad purpose to
disobey or to disregard the law.  Mr. Martin's conduct
was not willful if it was due to negligence,

1    inadvertence, or mistake.

2         Now before we go on to Count 2, let's just take a

3    one-minute stretch break and invite you to stand and

4    stretch, and I'm going to have some water.

5         (Brief pause.)

6              THE COURT:  All right.  Let's return to the

7    charge.

8              COUNT 2:  KNOWING POSSESSION OF A FIREARM IN

9                   FURTHERANCE OF A DRUG TRAFFICKING CRIME

10        You will recall that in Count 2 of the indictment,

11   Carl Martin is charged with knowingly possessing a

12   firearm in furtherance of a drug trafficking crime for

13   which he may be prosecuted in a court of the United

14   States.  The underlying drug trafficking crime is the

15   distribution of cocaine, the offense charged in Count 6.

16        The relevant statute on this subject is Title 18

17   United States Code, section 924(c).  If upon

18   consideration of all of the evidence you find that the

19   government has failed to prove Count 6 beyond a

20   reasonable doubt, then you will proceed no further.

21   Count 2 is to be considered only if you first find Mr.

22   Martin guilty under Count 6 as charged.

23        In reaching your verdict on Count 2, you may

24   consider the evidence of Count 6 only for the purpose of

25   determining whether the elements of Count 6 have been

1    satisfied.

2         The government must prove each of the following

3    elements beyond a reasonable doubt to sustain its burden

4    of proving Mr. Martin guilty:

5         First, that Mr. Martin committed a drug trafficking

6    crime for which he might be prosecuted in a court of the

7    United States; second, that Mr. Martin knowingly

8    possessed a firearm in furtherance of the crime charged

9    in Count 1.

10        ELEMENT 1:  COMMISSION OF THE PREDICATE CRIME

11        The first element the government must prove beyond

12   a reasonable doubt is that Mr. Martin committed a drug

13   trafficking crime for which he might be prosecuted in a

14   court of the United States.

15        Mr. Martin is charged in Count 6 of the indictment

16   with committing the crime of distribution of cocaine.  I

17   instruct you that the crime of distributing cocaine is a

18   drug trafficking crime.  However, it is for you to

19   determine whether the government has proven beyond a

20   reasonable doubt that Mr. Martin committed the crime of

21   knowingly and intentionally distributing cocaine as

22   charged.

23        ELEMENT 2:  KNOWING POSSESSION OF A FIREARM IN

24   FURTHERANCE OF THE COMMITMENT OF THE PREDICATE CRIME

25        That should be "commission" of the predicate crime.

The second element that the government must prove beyond a reasonable doubt is that Mr. Martin knowingly possessed a firearm in furtherance of the commission of the crime charged in Count 6.  A firearm is any weapon which will or is designed to or may be readily converted to expel a projectile by the action of an explosive. The term also includes the frame or receiver of any such weapon.

To prove that Carl Martin possessed the firearm in furtherance of the crime, the government must prove that he had possession of the firearm and that such possession was in furtherance of that crime.  Possession means that a defendant either had physical possession of the firearm on his person or that he constructively possessed the firearm, meaning that he had dominion and control over the place where the firearm was located and had the power and intention to exercise control over the firearm.

To possess a firearm in furtherance of the crime means that the firearm helped forward, advance, or promote the commission of the crime.  The mere possession of the firearm at the scene of the crime is not sufficient under this definition.  The firearm must have played some part in furthering the crime in order for this element to be satisfied.

1    To satisfy this element, you must also find that

2    Mr. Martin possessed the firearm knowingly.  This means

3    than he possessed the firearm purposely and voluntarily,

4    and not by accident or mistake.  It also means that he

5    knew that the weapon was a firearm, as we commonly use

6    the word.  However, the government is not required to

7    prove that Mr. Martin knew than he was breaking the law.

8              COUNTS 3, 4, 5, AND 6:  DISTRIBUTION OF

9                      CONTROLLED SUBSTANCE

10    As you will recall in Counts 3, 4, 5, and 6 of the

11    indictment, Carl Martin is charged with knowingly and

12    intentionally distributing a controlled substance.

13    Title 21 USC, section 841 makes it a federal crime for

14    any person to knowingly or intentionally distribute

15    controlled substances.

16    To sustain its burden of proof for the crime of

17    distribution of controlled substance, the government

18    must prove the following two elements beyond a

19    reasonable doubt:

20    First, that Mr. Martin knowingly and intentionally

21    distributed a controlled substance, as charged in the

22    indictment, and

23    Second, that at the time of the distribution, Mr.

24    Martin knew that the substance distributed was a

25    controlled substance.  I instruct you again that

1  cocaine, as charged in the indictment, is a Schedule II
2  controlled substance.

3  ### DEFINITION OF "DISTRIBUTION"

4  The word "distribution" means to deliver a
5  controlled substance. Deliver is defined as the actual,
6  constructive, or attempted transfer of a controlled
7  substance. Simply stated, the words "distribute" and
8  "deliver" mean to pass on, or to hand over to another,
9  or to cause to be passed on or handed over to another,
10 or to try to pass on or hand over to another, controlled
11 substances.

12 Distribution does not require sale. Activities in
13 furtherance of the ultimate sale, such as vouching for
14 the quality of the drugs, negotiating for or receiving
15 the price, and supplying and delivering the drugs may
16 constitute distribution.

17 In short, distribution requires a concrete
18 involvement in the transfer of drugs.

19 ### "KNOWINGLY" AND "INTENTIONALLY" DEFINED

20 With respect to Counts 3, 4, 5, and 6 of the
21 indictment, you have been instructed that in order to
22 sustain its burden of proof, the government must prove
23 that Mr. Martin acted knowingly and intentionally. A
24 person acts knowingly if he acts intentionally and
25 voluntarily and not because of ignorance, mistake,

1    accident, or carelessness.  You may consider evidence of

2    Mr. Martin's words, acts, or omissions, along with all

3    other evidence, in deciding whether he acted knowingly.

4    A person acts intentionally if he acts deliberately and

5    purposefully and not because of mistakes or accident.

6                KNOWLEDGE OF THE CONTROLLED SUBSTANCE

7         Although the government must prove that Mr. Martin

8    knew that he possessed a controlled substance, the

9    government does not have to prove that he knew the exact

10   nature of the substance he possessed.  It is enough that

11   the government proves that Mr. Martin knew that he

12   possessed some kind of controlled substance.  Your

13   decision about whether Mr. Martin knew the materials he

14   distributed were a controlled substance involves a

15   decision about his state of mind.  It is obviously

16   impossible to prove directly the operation of Mr.

17   Martin's mind.  But a consideration of all the facts and

18   circumstances shown by the evidence and the exhibits in

19   this case may enable you to infer that Mr. Martin's

20   state of mind -- what Mr. Martin's state of mind was.

21   You may rely on circumstantial evidence in determining

22   his state of mind.

23                    AIDING AND ABETTING

24        Alternatively, the indictment charges Carl Martin

25   in Counts 3, 4, 5, and 6 with violating Section 2 of

1    Title 18 of the United States Code, which makes it a

2    crime to aid or abet the commission of an offense

3    against the United States.  Specifically, Carl Martin is

4    charged with aiding and abetting the distribution of

5    cocaine as charged in these counts.

6        The aiding and abetting statute, Section 2(a) of

7    Title 18 of the United States Code, provides that:  in

8    quote, Whoever commits an offense against the United

9    States or aids or abets or counsels, commands, or

10   induces, or procures its commission, is punishable as a

11   principal, close quote.

12       Under the aiding and abetting statute, it is not

13   necessary for the government to show that a defendant

14   himself physically committed the crimes with which he is

15   charged in order for the government to sustain its

16   burden of proof.  A person who aids or abets another to

17   commit an offense is just as guilty of that offense as

18   if he committed it himself.

19       Accordingly, you may find Mr. Martin guilty of the

20   offense charged if you find beyond a reasonable doubt

21   that another person actually committed the offense with

22   which Mr. Martin is charged, and that Mr. Martin aided

23   or abetted that person in the commission of the offense.

24       As you can see, the first requirement is that you

25   find that another person has committed the crime

1    charged.  Obviously, no one can be convicted of aiding

2    or abetting the criminal acts of another if no crime was

3    committed by the other person in the first place.  But

4    if you do find that a crime was committed, then you must

5    consider whether Mr. Martin aided or abetted the

6    commission of that crime.

7        In order to aid or abet another to commit a crime,

8    it is necessary that a defendant knowingly associate

9    himself in some way with the crime, and that he

10    participate in the crime by doing some act to help make

11    the crime succeed.

12        To establish that Mr. Martin knowingly associated

13    himself with the crime, the government must establish

14    that he knew that another person knowingly and

15    intentionally distributed cocaine.

16        To establish that Mr. Martin participated in the

17    commission of the crime, the government must prove that

18    he engaged in some affirmative conduct or overt act for

19    the specific purpose of bringing about that crime.

20        The mere presence of a defendant where a crime is

21    being committed, even coupled with knowledge by the

22    defendant that a crime is being committed, or merely

23    associating with others who are committing a crime, is

24    not sufficient to establish aiding and abetting.  One

25    who has no knowledge that a crime is being committed or

1    is about to be committed but inadvertently does
2    something that aids in the commission of that crime is
3    not an aider and abettor.  An aider and abettor must
4    know that the crime is being committed and act in a way
5    which is intended to bring about the success of the
6    criminal venture.
7        To determine whether Mr. Martin aided or abetted
8    the commission of the crime with which he is charged,
9    ask yourself these questions:
10       Did he participate in the crime charged as
11   something he wished to bring about?
12       Did he knowingly associate himself with the
13   criminal venture?
14       Did he seek by his actions to make the criminal
15   venture succeed?
16       If he did, then Mr. Martin is an aider and abettor,
17   and therefore guilty of the offense.  If, on the other
18   hand, your answer to any of these questions is no, then
19   Mr. Martin is not an aider and abettor, and you must
20   find him not guilty.
21                      ENTRAPMENT DEFENSE
22       Defendant Carl Martin asserts as a defense that he
23   was the victim of entrapment by an agent of the
24   government.  While the law permits government agents to
25   trap an unwary criminally minded person, the law does

1    not permit government agents to entrap an unwary
2    innocent.  Thus, a defendant may not be convicted of a
3    crime if it was the government who gave the defendant
4    the idea to commit the crime, if it was the government
5    who also persuaded him to commit the crime, and if he
6    was not ready and willing to commit the crime before the
7    government officials or agents first spoke with him.

8        On the other hand, if a defendant was ready and
9    willing to commit the offenses charged against him in
10   the indictment, and the government merely presented him
11   with an opportunity to do so, that would not constitute
12   entrapment.  The entrapment defense must be considered
13   independently as to each count charged, and the jury
14   must render a verdict regarding entrapment for each and
15   every count charged.

16       Your inquiry on this issue should first be to
17   determine if Mr. Martin was induced by the government
18   agent to commit the offense in question, and
19   specifically if there is some credible evidence that the
20   government agent took the first step that led to a
21   criminal act.  Inducement is defined as soliciting,
22   proposing, initiating, broaching or suggesting that Mr.
23   Martin commit each of the crimes charged.  If you find
24   there was no such evidence, there can be no entrapment,
25   and your inquiry on this defense should end there.

1        If, on the other hand, you find some credible
2    evidence that the government agent initiated the
3    criminal acts charged in the indictment, the burden then
4    moves to the government to prove beyond a reasonable
5    doubt that Mr. Martin was not entrapped.  Specifically,
6    you must decide if the government has satisfied its
7    burden to prove beyond a reasonable doubt that prior to
8    first being approached by the government agents, Mr.
9    Martin was ready and willing to commit the crime.  If
10    you find beyond a reasonable doubt that Mr. Martin was
11    predisposed, that he was ready and willing to commit the
12    offense charged, and merely was awaiting a favorable
13    opportunity to commit them, then you should find Mr.
14    Martin was not the victim of entrapment.  On the other
15    hand, if you have a reasonable doubt that Mr. Martin
16    would have committed the offenses charged without the
17    government's inducements, you must acquit Mr. Martin.
18        In determining this question of predisposition or
19    willingness, you may consider evidence of the prior
20    conduct of Mr. Martin including his criminal record, if
21    any.  You may consider such evidence, however, solely in
22    connection with your determination of his predisposition
23    or readiness to commit the offense with which he is
24    charged.
25        You may not consider this evidence as proof that he

1    actually committed the offense with which he is charged,
2    and you are free to find that he was not predisposed to
3    commit the crime even if he had previously committed
4    similar offenses.
5        The question of predisposition is an issue of fact
6    for you to determine based on all of the evidence.
7                            CONCLUSION
8        I caution you, members of the jury, that you are
9    here to determine whether the government has proven Mr.
10   Martin's guilt beyond a reasonable doubt.  I remind you
11   that the mere fact that Mr. Martin has been indicted is
12   not evidence against him.  Also, Mr. Martin is not on
13   trial for any act or conduct or offense alleged [sic] in
14   the indictment.  Nor are you called upon to return a
15   verdict as to the guilt or innocence of any other person
16   or persons not on trial as defendant in this case.
17       You should know that the punishment provided by law
18   for the offenses charged in the indictment is a matter
19   exclusively within the province of the judge and should
20   never be considered by the jury in any way in striving
21   at an impartial verdict as to the guilt or innocence of
22   the accused.
23       It is your duty as jurors to consult with one
24   another and to deliberate.  Each of you must decide the
25   case for yourself, but only after an impartial

1    consideration of the evidence in the case with your

2    other jurors.  Do not hesitate to reexamine your own

3    views and change your opinion if you think that you were

4    wrong.  Do not, however, surrender your honest

5    convictions about the case solely because of the opinion

6    of your other jurors or for the mere purpose of

7    returning a verdict.

8        To return a verdict, it is necessary that every

9    juror agree to the verdict.  In other words, your

10    verdict must be unanimous.  The government has alleged

11    that Mr. Martin engaged in a conspiracy to distribute

12    cocaine, that he knowingly possessed a firearm in

13    furtherance of a drug trafficking crime, and that he

14    distributed a controlled substance on four occasions.

15    In order to find Mr. Martin guilty of any of these

16    charged offenses, you must find that the government has

17    proven every element of the offense beyond a reasonable

18    doubt and that the conclusion must be unanimous.  You

19    must do this for each count charged.

20        All right.  At this time I'd like to offer my

21    thanks to the alternate, Miss -- it's Miss Miller; is

22    that right?

23                MR. GILMAN:  Your Honor?

24                THE COURT:  Yes.

25                MR. GILMAN:  One tiny item with the

1    instructions.  We just noted on page 28 there's just a
2    tiny typo.  It's correct elsewhere, but just in the
3    middle paragraph, there's one sentence, and it says
4    Count 1, but that should read Count 6 as it does
5    elsewhere in the instruction.
6                THE COURT:  I was going to have you come up --
7                MR. GILMAN:  Ah.
8                THE COURT:  -- forward in a second --
9                MR. GILMAN:  I apologize.
10               THE COURT:  -- and we would address any
11   mistakes that were in it.  So if you could hold on just
12   a second.
13               MR. GILMAN:  Thank you, your Honor.
14               THE COURT:  All right, Ms. Miller, I really
15   appreciate your service.  Obviously the -- the person
16   who's the alternate oftentimes has the worst of all jobs
17   as jurors, that is, you get to listen to the evidence,
18   you get to make an assessment of the evidence, but then
19   you don't get to deliberate.  So I appreciate your
20   service, just in case you were needed.
21        At the close of the hearing, you can go back into
22   the jury room.  I'd ask that you not speak with the
23   other jurors about the case at all, and you can get your
24   things, and you will be excused.
25        All right.  So, now, I am also going to assign

1    juror Julie Best to be the foreperson of the jury.

2         Upon retiring to the jury room, your foreperson

3    will preside over your deliberations and will be your

4    spokesperson here in court.  A verdict form has been

5    prepared for your convenience.  If you are able to reach

6    an agreement as to the counts contained in the

7    indictment, you will have your foreperson record a

8    verdict of guilty or not guilty.  Your foreperson will

9    then sign and date the verdict form, and you will

10   return -- then return to the courtroom.

11        If, during your deliberations, you should desire to

12   communicate with the Court, please put your message or

13   question in writing signed by the foreperson and pass

14   the note to the marshal who will bring it to my

15   attention.  I will then respond as promptly as possible

16   either in writing or by having you returned to the

17   courtroom so that I can speak with you.

18        I caution you, however, with regard to any message

19   or question you might send, that you never -- that you

20   should never state or specify your numerical division at

21   the time.

22        You have been permitted to take notes during the

23   trial for use in your deliberations.  You may take those

24   notes with you when you retire to deliberate.  They may

25   be used to assist your recollection of the evidence, but

1    your memory, as jurors, controls.  Your notes are not

2    evidence and should not take precedence over your

3    independent recollections of the evidence.  The notes

4    that you took are strictly confidential.  Do not

5    disclose the notes to any other -- to anyone other than

6    other jurors.  Your notes should remain in the jury room

7    and will be collected at the end of the case.

8         A copy of this charge will go with you into the

9    jury room for your use.

10         Again, I appointed Juror Best to be foreperson.

11         All right.  I am going to turn the husher on.  You

12   are free to stand and stretch here.  I'd ask the lawyers

13   to come up.

14   (The following was held at the bench.)

15             MR. GILMAN:  Sorry about that, your Honor.  I

16   apologize.

17         Page 28.

18             LAW CLERK:  Right there.

19             MR. GILMAN:  Yes, just that one spot.

20             LAW CLERK:  It should say Count 6.

21             THE COURT:  Oh.

22             MR. GILMAN:  We missed that.  We apologize,

23   your Honor.

24             THE COURT:  All right.  Now, are there any

25   other mistakes that I made?  Usually I read something

```
1    wrong.  Sometimes I have not.  Anyway.
2                 MR. GILMAN:  No.
3                 MR. MATSON:  I'm sorry.  I will wait my turn.
4                 THE COURT:  Yes?
5                 MR. MATSON:  Yes.  And unfortunately it was
6    during the presumption of innocence, reasonable doubt
7    and burden of proof.  You read the sentence, "Reasonable
8    doubt 'must' arise from a lack of evidence" instead of
9    "may" arise.
10                THE COURT:  Oh, all right.  So what page is
11   that on?
12                MR. MATSON:  That's page three.  It says
13   "may."
14                THE COURT:  Okay.
15                MR. MATSON:  But that's one any lawyer will
16   jump on.
17                THE COURT:  Okay.  I am going to straighten
18   that out.  So where -- where is that?
19                MR. MATSON:  Bottom of page three, your Honor,
20   second-to-last line.  It says "may" arise, and you said
21   "must."
22                LAW CLERK:  You said "must."
23                THE COURT:  Okay.  I am going to straighten
24   that out.  Okay?  Is there anything else?
25                MR. GILMAN:  You already noted the page 29
```

1    should read "commission" as opposed to "commitment."

2    You already did that.

3              THE COURT:  I did do that.

4              MR. GILMAN:  Thank you, your Honor.

5    (The following was held in open court.)

6              THE COURT:  All right.  Two mistakes that I

7    made.  The first is on page three, the second line from

8    the bottom, the charge is correct.  Reasonable doubt may

9    arise from lack of evidence.  For some reason I said

10   "must," and that's not correct.  So reasonable doubt may

11   arise from a lack of evidence.

12        Then on page 28 --

13             JUROR NO. 5:  Our version is not correct?

14             THE COURT:  Oh, no.  Your version is correct.

15   I read it wrong.

16             JUROR NO. 5:  Oh, you read it wrong.

17             THE COURT:  Right?  And so I am correcting the

18   record that I read it wrong.

19             JUROR NO. 5:  Got it.

20             THE COURT:  I read it wrong.

21        And then on page 28, at the end of the second full

22   paragraph, just before Element 1, Commission of the

23   Predicate, it reads Count 1.  You see that?  It's

24   actually Count 6.  Right?  That's -- it should have been

25   6.  All right.

1          All right.  Now, you are going to have the jury

2     charge with you.  There's one other thing that I just

3     want to add.  There may be times when one juror may want

4     to leave the room to go to the bathroom or do something

5     else.  All deliberations should stop.  So you should

6     only deliberate when you are in the presence of everyone

7     so that everyone knows what you are saying during the

8     course of the deliberations.

9          All right.  Are the marshals here to -- for the

10     giving of the oath?  Would the court security officer

11     approach?

12          All right, the court security officers have been

13     sworn, so --

14               (The Court and deputy clerk speak off the

15     record.)

16               THE COURT:  All right.  United States versus

17     Carl Martin is now given to you.  The first thing that

18     you might want to resolve is what would you like for

19     lunch, so lunch will be brought in for you, and I think

20     menus will be brought to you, and you can decide what

21     you'd like to have for lunch.

22          So I am going to stay here on the bench and speak

23     with the lawyers.  So the case is now in your hands.

24     (The jury was excused after which the follow was held in

25     open court at 12:13 p.m.)

1           THE COURT:  All right.  So I have a couple of

2    questions.  The first is the jury verdict form.  We have

3    drafted a verdict form which is essentially just a

4    guilty or not guilty in regard to each of the six

5    counts.  I didn't ask for more precise answers to

6    questions like inducement or predisposition, but it's

7    made clear in the charge.  It seemed to me that the most

8    simple thing would be guilty or not guilty in regard to

9    all counts.

10        Tell me if there's a request on anyone's part to

11   have a more detailed verdict form?

12           MS. FULLER:  It's fine from the government,

13   your Honor, the way you intend to draft it.

14           THE COURT:  Okay.

15           MR. MATSON:  Yes.  That's appropriate, your

16   Honor.

17           THE COURT:  Okay.  All right.  The second

18   thing is that -- interesting with the use of so many

19   electronic pieces of evidence, text messages, in

20   particular.  My view is that even though the text

21   messages are introduced into evidence, those messages

22   don't go to the jury unless they request them, you know.

23   And I was thinking -- as the government indicated, Take

24   a look at this whole book of text messages, 600 pages.

25   You won't see anything in here which in any way relates

1    to threats or whatever.

2        I just always thought that the introduction of text

3    messages, as you go through those text messages, is

4    similar to testimony.  In other words, you don't

5    highlight the text messages by giving them to the jury

6    unless they are asking for what are the text messages,

7    i.e., what was the testimony in regard to what happened.

8    But I think it's a fuzzy area in the law, frankly.  It's

9    not -- it's not a piece of evidence which is, you know,

10    a constructive piece of evidence.  It's like testimony.

11    And so like testimony, you don't actually introduce

12    those messages.  But if they seek out those messages,

13    then you bring them back and it's read like testimony.

14        So -- but I acknowledge that this is sort of a

15    fuzzy area.  I did actually think about, when I tried

16    cases, there were no such thing as text messages, and

17    this is just a totally different era.  I mean, just

18    totally different.  And, quite frankly, a better one

19    than what we did.  But --

20        So tell me about whether we send in volumes of text

21    messages or if they ask for them, then they will be

22    brought back and we will read them as if it was

23    testimony.

24        What's -- what is your wish at this point?

25            MS. FULLER:  I'm not sure how the second

1    alternative would work simply because -- I don't know if

2    they would -- you know, out of 600 pages of text

3    messages, if they'd be able to come back in and say,

4    Could we, you know, read document 1237 through 1240.  Do

5    you see what I am saying?

6              THE COURT:  Right.  Yeah, they would --

7              MS. FULLER:  I'm not sure how to read that

8    back.

9              THE COURT:  -- come back and say, Well, you

10   know, I'm -- we're considering, you know, let's say, the

11   October 23rd.  You know, what were the text messages?

12   Can we have a reading of the text messages which

13   preceded the October 23rd sale?  And then you'd read

14   them as if that was the testimony of a witness.  I mean,

15   if it's a testimony of a witness, that doesn't go into

16   the jury room.  They have to ask for it.

17             MS. FULLER:  But these are exhibits.  I mean,

18   I think it's --

19             THE COURT:  Well, they're -- but -- they're

20   exhibits, but they're exhibits in the sense of

21   testimony, in the replacement of testimony.  Right?  I

22   think it's a -- I haven't dealt with this and so tell

23   me.  I mean, I have no -- certainly I have no objection

24   to, you know, submitting all of these text messages as

25   exhibits.  It's just a massive amount of paperwork,

1    and --

2            MS. FULLER:  My fear is, is that a rereading

3    back of the text messages, let's say for the controlled

4    buys, doesn't accurately capture what is in them.  I

5    think you need to, you know, to -- part of the

6    government's argument, you heard it, was that Mr.

7    Martin, you know, had -- over a period of time had kept

8    asking Mr. Wood.  You'd have to read back before the

9    text messages right before October 23rd in order to

10   understand that, you know.

11       And also my point about the 600 text messages, what

12   is not in there.  It doesn't exist in those 600 text

13   messages, communications with Mr. Martin.

14       So just talking to Mr. Gilman, he indicated that in

15   a trial before Judge Reiss, a recent trial before Judge

16   Reiss, some text messages did go back --

17       Is that correct?

18            MR. GILMAN:  That's correct.

19            MS. FULLER:  -- to the jury room.  I think

20   it's an exhibit.  I think the government's perspective

21   is it's an exhibit.  We -- they are entitled to see

22   those exhibits.

23            THE COURT:  Well, it technically has been

24   introduced into evidence as an exhibit, and so

25   ordinarily all exhibits go back to the jury, but it is

1    in the form of testimony.  I mean, you are basically

2    using that exhibit to track exactly what happened in

3    place of oral testimony.  And that's why it's confusing

4    to me.

5        I am certainly willing to submit those because I

6    think they are exhibits, and right now the rule is that

7    all exhibits are introduced into evidence and delivered

8    to the jury in the jury room.  It would make it

9    obviously quite simple for them to actually refer to

10   those exhibits in discussing what happened in regard to

11   each of the counts.  I just think it's -- I think it's a

12   fuzzy area, and I raise it.  Okay?

13           MR. MATSON:  Thank you, Judge.

14       My feeling on the subject would be it should either

15   all go back or it should all sit out here and wait for a

16   question.  It is a new age, a digital age, with lots of

17   things coming in, and it comes in not just as an exhibit

18   but as testimony, evidence of a -- could be a common

19   plan or state of mind or whatever, and it comes in, as

20   the government did and I did, by bringing those certain

21   texts --

22           THE COURT:  Well, so what --

23           MR. MATSON:  Sure.

24           THE COURT:  -- your concern is that there

25   would be some come in and some not come in.

1    MR. MATSON:  Right.

2    THE COURT:  So these would be all of the --

3    all of them would go in.

4    MR. MATSON:  They would either all go back to

5    them or it should await for --

6    THE COURT:  Okay.

7    MR. MATSON:  -- them to ask a question.

8    THE COURT:  All right.  So let's send all of

9    them back.  I mean, they are exhibits.  They have been

10    accepted into evidence.  The standard rule is they go

11    back to the jury room.  It's just -- it's -- the nature

12    of those exhibits is a little different because it

13    really is relied upon to prove the case, and so that

14    those exhibits really take on a pretty significant role

15    in the jury deliberations.  But they have been accepted

16    into evidence.  They should be sent back.  Okay.

17    MS. FULLER:  Obviously, I think it's probably

18    unsaid, but this doesn't go for the drugs or the guns.

19    They are available down in my office --

20    THE COURT:  Right.

21    MS. FULLER:  -- should they want to see them

22    at any time, but --

23    THE COURT:  They're not -- right.

24    MR. MATSON:  Then they will have more

25    questions because they will --

1                    THE COURT:  Pardon me?

2                    MR. MATSON:  No.

3                    THE COURT:  I -- yeah, the guns and the

4      drugs --

5                    MS. FULLER:  Right.

6                    THE COURT:  -- don't go back.

7         All right.  Is there anything else we need to talk

8      about at this point?

9                    MS. FULLER:  No, thank you, your Honor.

10                   THE COURT:  Okay.

11                   MR. MATSON:  No, thank you, your Honor.

12                   THE COURT:  It was a great job, and I really

13     enjoyed the trial.  Very good job.  Okay.

14                   MR. MATSON:  Thanks.

15                   MS. FULLER:  Thank you.

16     (Court was in recess at 12:23 p.m.)

17     (The following was held in chambers at 5:35 p.m.)

18                   THE COURT:  All right.  We have a note from

19     the jury.  It reads:

20         "Indictment.  Typo on Count 2?  Reference to Count

21     8?  Should this be Count 6?

22         "Thank you.  Julie."

23         And we looked at the indictment that was submitted

24     to them and it, in fact, had not been changed from 8 to

25     6.  So the simple answer to this question is, Yes, it

1    should be referring to Count 6.  Right?

2                    MS. FULLER:  That's correct.

3                    MR. GILMAN:  Yes.

4                    THE COURT:  Okay.  Then -- so I will write

5    that out.  And then I will write it right now so you can

6    see it.

7                    MR. GILMAN:  Excuse me.  I didn't hear it.

8                    MR. MATSON:  In terms of Count 6?

9                    MR. GILMAN:  Yes.  Sorry.

10                   MR. MATSON:  Yes.  Count 6.

11                   THE COURT:  Okay.  So the next question is

12   dinner.  So we can have Lisa take this into the jury and

13   ask them if they want dinner.  It may be they are just

14   waiting for this answer, because obviously there is no

15   Count 8.  Or they may want dinner.

16        So do you have any objection of me suggesting that

17   we ask them do they want dinner?

18                   MS. FULLER:  No objection.

19                   MR. MATSON:  No.

20                   THE COURT:  Okay.  So I will say:  "Yes.

21   Count 2 should refer to Count 6, not Count 8."

22        Okay?  Okay.  "Yes, Count 2 should refer to Count

23   6, not Count 8."  Okay.

24                   MR. GILMAN:  Thank you, your Honor.

25                   MS. FULLER:  Thank you.

1          (Brief pause.)

2          THE COURT:  So I have just been notified that

3    one book of exhibits -- that's of messages, text

4    messages -- was not submitted to the jury.  I had

5    thought that it had not been offered into evidence, but,

6    in fact, had been offered into evidence, and it has not

7    been submitted to the jury.  So we are going to submit

8    it at this point.  This is --

9          COURTROOM DEPUTY:  A3.

10         THE COURT:  A3, which consists of

11   approximately 600 pages of text messages.  Okay?  Is

12   that acceptable to everyone?

13         MS. FULLER:  It is.

14         MR. MATSON:  Yes.  Thank you, Judge.

15         THE COURT:  Okay.

16   (Chambers conference concluded at 5:43 p.m.)

17   (The following was held in chambers at 6:30 p.m.)

18         THE COURT:  "We have questions of the law.  If

19   the gun is part of the currency of an illegal drug

20   transaction, does that satisfy, in quote, possession of

21   a firearm in furtherance of a crime?  Based on the law,

22   does the gun traded for drugs advance the commission of

23   the illegal drug crime?  Do you have advice?  Opinion?

24         "Thank you.  The foreperson."

25         I think it is very problematic for me to give them

1    legal advice in the middle of jury deliberations.  So

2    tell me what the government's position is and what the

3    defendant's position is.

4                MS. FULLER:  I'm --

5                THE COURT:  Let's face it:  If I was to say --

6    if I was to answer their question, If the gun is part of

7    the currency of an illegal drug transaction, does that

8    satisfy possession of a firearm in furtherance of a

9    crime? they're asking for my legal opinion.  They're

10   asking me to decide this case.  Right?

11               MR. MATSON:  Yeah.

12               THE COURT:  Not a good thing.  Not a good

13   thing, but --

14               MS. FULLER:  Yeah.  No.  I hear you,

15   your Honor.  I think everybody in this room knows the

16   answer, the legal answer to that is yes.  So I'm not --

17   I have never been in the situation you have.  So I'm not

18   sure.  Maybe we refer them back to, you know, part of

19   the instruction that's relevant.

20               THE COURT:  That's what I would say is that I

21   can't give legal advice to the jury, that I have written

22   a charge.  You need to refer to the charge and make your

23   own assessment based on that.

24      I think that's the only thing that --

25               MR. MATSON:  I don't think I have anything to

1    add.  I mean, that's the point of the jury instructions,

2    right?  And if -- obviously you know what defense

3    thinks, but I'd also say if we made a record that we

4    answer that question, this trial is under attack, no

5    question.

6                THE COURT:  Oh, yeah.

7                MS. FULLER:  So the one thing I am wondering

8    if the Court would consider -- I know these are the

9    Court's jury instructions.  I am wondering if what's

10   hanging them up is the first sentence:  To possess a

11   firearm in furtherance of the crime means that the

12   firearm helped forward, advance, or promote the

13   commission of the crime.  I am wondering if they are

14   hung up on what the crime is.

15               THE COURT:  No, I think they know what the

16   crime is because they highlighted the fact that it was

17   Count 8 as opposed to Count 6.

18               MS. FULLER:  But did they say Count 8?

19               THE COURT:  "If the gun is part of the

20   currency of an illegal drug transaction, does that

21   satisfy possession?"

22               MR. GILMAN:  Yeah, I think it's a good

23   instruction that the Court gave.  Is it too much to have

24   the Court refer them to the specific part of the

25   instruction?

1    THE COURT:  I just want to have them go back

2    to the instruction.

3    MR. GILMAN:  Okay.

4    THE COURT:  I just think it would be

5    extraordinarily problematic for me -- I mean, actually,

6    I would turn to the both of you, and we could write

7    another instruction, but that would be crazy at this

8    point, together with the fact that probably they have

9    resolved all of the other issues here, so -- I would

10    think.  Although maybe not.  I don't know.

11    So I would suggest that we call them back in, and I

12    will tell them that it's -- you know, this is the

13    instruction, I can't give them legal advice, and they

14    have to use the instruction.  And just leave it at that.

15    Is that acceptable to the defense?

16    MR. MATSON:  Yes.  That would be the

17    suggestion of the defense.

18    THE COURT:  And acceptable to the government?

19    MS. FULLER:  Yes, your Honor.

20    THE COURT:  Okay.

21    (Chambers conference concluded at 6:34 p.m.)

22    (The following was held in open court with the jury

23    present at 6:39 p.m.)

24    THE COURT:  Okay.  I've -- the jury is in, and

25    I have received a note from the jury, and I will read

1    the note.

2         "We have questions of the law.  If the gun is part

3    of the currency of an illegal drug transaction, does

4    that satisfy, in quote, possession of a firearm in

5    furtherance of a crime, close quote?  Based on the law,

6    does a gun traded for drugs advance the commission of an

7    illegal drug crime?  Do you have advice?  Opinion?"

8         The difficulty is that I have given you the law in

9    the charge, and that's what the law is to be applied in

10   the case, and for me to give you any further legal

11   advice, seems to me, would be inappropriate.

12        You have to say what is the charge and use that as

13   the frame of reference, and I can't give you legal

14   advice at this particular point.

15        So I'm just going to put it back on your plate.

16   You need to take a look at the charge, follow the

17   charge, apply the charge, and I can't give you any other

18   legal advice at this point.

19        Okay, is that acceptable to both sides?

20             MS. FULLER:  Yes, your Honor.

21             MR. MATSON:  Yes, your Honor.

22             THE COURT:  All right.  I'm going to sit here

23   just for a second, talk with counsel, and you -- has the

24   food arrived yet?

25             JUROR NO. 3:  No.  Soon.

1           THE COURT:  Has it arrived?

2           JUROR NO. 3:  No.  We have ordered it, but --

3      we didn't order enough for everybody.

4           THE COURT:  Okay.

5      (The jury was excused to further deliberate upon their

6      verdict after which the following was held in open court

7      at 6:41 p.m.)

8           THE COURT:  Okay.  All right.  So is there

9      anything else that we need to address at this point?

10          MS. FULLER:  I don't think so, your Honor.  Do

11     you have a timing of how long you will let them

12     deliberate?  As long as they want or --

13          THE COURT:  10 -- 10 o'clock, nine o'clock,

14     something like that.

15          MS. FULLER:  Okay.

16          MR. MATSON:  It's not like Happy Days, Judge?

17     10 o'clock, 11 o'clock, around the clock.

18          THE COURT:  Yes.  So they'll have dinner and

19     then we'll see if they resolve it.  If not, you know, we

20     will be talking about that later.  I am going off and

21     getting something to eat, so you are certainly free to

22     leave for a little while as long as we know exactly

23     where you're going so we can notify you if they come

24     back.

25          MS. FULLER:  Okay.  Thank you.

```
 1              MR. MATSON:  Thank you.
 2              THE COURT:  Thank you.
 3     (Court was in recess at 6:42 p.m.)
 4     (The following was held in open court with the jury
 5     present at 9:02 p.m.)
 6              THE COURT:  Okay.  Has the jury reached a
 7     verdict?
 8              JURY FOREPERSON:  Yes, your Honor.
 9              THE COURT:  Okay.  Would you submit the form.
10              (Brief pause.)
11              COURTROOM DEPUTY:  "In United States of
12     America versus Carl Martin, taking into account the
13     facts of this case and the specific legal instructions
14     given for each count, indicate whether you find Carl
15     Martin guilty or not guilty.
16         "Count 1:  Guilty.
17         "Count 2:  Not guilty.
18         "Count 3:  Guilty.
19         "Count 4:  Guilty.
20         "Count 5:  Guilty."
21         And "Count 6:  Guilty."
22         Signature of the foreperson dated today.
23         Foreperson Best, is that the verdict as read --
24     sorry.  Excuse me.
25         Madam foreperson, is that the verdict of the jury?
```

1              JURY FOREPERSON:  That is.

2              THE COURT:  So say you all, ladies and

3      gentlemen?

4              (The jury all indicate agreement with the

5      verdict as read.)

6              THE COURT:  Does either side wish the jury

7      polled?

8              MR. MATSON:  Yes, your Honor.

9              THE COURT:  Okay.  All right.

10             (The jury, upon each member being asked by the

11     courtroom deputy, "Is that your verdict as read?"

12     answered in the affirmative.)

13             THE COURT:  I want to thank you for your

14     service.  This was a pretty long trial and a very

15     intense trial, and I just noticed that you were just --

16     you seemed to be absorbed in it, and you were very

17     dedicated in fulfilling your responsibilities, and I

18     really appreciate the service that you have provided.

19         Ordinarily I meet with the jurors, but in light of

20     the late hour, I won't meet with you today.  I just want

21     to express the appreciation of all of us in the criminal

22     justice system for your dedicated service, and at this

23     point, we'll excuse you.  Thank you very much.

24     (The jury was dismissed after which the following was

25     held in open court at 9:06 p.m.)

1          THE COURT:  All right.  Does the defense want

2     some time to file post-trial motions?

3          MR. MATSON:  Yes, your Honor.

4          THE COURT:  Do you need 30 days?

5          MR. MATSON:  Yes, your Honor.

6          THE COURT:  So we'll order that post-trial

7     motions be filed in 30 days.

8        Now, the presumption of detention applies.  What's

9     the government's position as to detention or release?

10          MS. FULLER:  We move for detention of the

11     defendant.

12          THE COURT:  Okay.  And what's your response?

13          MR. MATSON:  Your Honor, I understand it is

14     now extraordinary to delay detention.  However, Mr.

15     Martin has been released for two years.  Your Honor gave

16     him an opportunity two years ago with the caveat, "Don't

17     disappoint me," and Mr. Martin's not.  He has not ever

18     given a dirty urine.  He has worked.  He has supported

19     his family.  He has done everything this Court has asked

20     him for two straight years.

21        He does not have a minimum mandatory.  He was found

22     not guilty of Count 2.  The sentencing will be

23     forthcoming, obviously.  But I would ask that he not be

24     held, your Honor, in light of his rather exceptional and

25     extraordinary performance on pretrial release.

1           THE COURT:  All right.  I appreciate the fact

2    that he has done well under supervision.  There's no

3    question that that will be very relevant at the time of

4    sentencing.  I took a look at 18 USC, section 3143,

5    which is, of course, the statute in regard to detention

6    or release pending sentence.

7           Essentially there is a change in the presumption.

8    The defendant is to be detained unless, number one, the

9    judicial officer finds a substantial likelihood that a

10   motion for acquittal or new trial be granted, and I

11   can't find that.  And second, an attorney for the

12   government has recommended that no sentence of

13   imprisonment be imposed on the person, and obviously the

14   government has not requested that.

15          That's the first factor, and -- the first factor

16   needs to be met; and then the second factor needs to be

17   met as well:  the judicial officer finds by clear and

18   convincing evidence that the person is not likely to

19   flee or pose a danger to any other person or the

20   community.

21          The Court can't address that because the statute

22   clearly says that -- that a judicial officer finds there

23   is substantial likelihood that a motion for acquittal or

24   new trial be granted, and I can't find that.

25          And I also -- also, the government has not

1    recommended a sentence of an alternative to

2    imprisonment.  So as a result, the presumption applies,

3    and as a result, the Court will order that the defendant

4    be detained at this point.

5         Okay.  Thank you.

6                   (Conconcluded at 9:09 p.m.)

7                        *** ** ***

8

9

10              C E R T I F I C A T I O N

11        I certify that the foregoing is a correct
     transcript from the record of proceedings in the
12    above-entitled matter.

13

14   July 9, 2023         _____
     Date                      Anne Nichols Pierce
15

16

17

18

19

20

21

22

23

24

25